**NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA**

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

<table>
<tr><td>

**ALI MOKARAM (individually and**
**derivatively on behalf of Texas REIT, LLC)**

   *Claimant,*

vs.

**DALIO HOLDINGS I, LLC,**
**DALIO HOLDINGS II, LLC, and**
**ALI CHOUHDRI**

   *Respondents,*

vs.

**TEXAS REIT, LLC**
*Nominal Party*

</td><td>

§
§
§
§
§
§
§
§
§
§
§
§
§

</td><td>

**Case No. 01-19-0002-7577**

</td></tr>
</table>

2/15/2022 1:49:14 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 61757410
By: HODGINS, KEELEY M
Filed: 2/15/2022 1:49:14 PM

### FINAL ARBITRATION AWARD

WE, THE UNDERSIGNED ARBITRATORS in this matter, having submitted their respective oath to the American Arbitration Association and having been duly designated in accordance with the arbitration agreements referred to in paragraph 12 *infra* and pursuant to the **Order On Motion To Compel Arbitration And To Stay Proceedings** from the 333rd District Court of Harris County (the "Court") dated December 3, 2018 ( the verbatim recital of such order is contained in paragraph 11 *infra*), compelling arbitration, and having heard the proofs, testimony, and allegations of the parties, and after due consideration and deliberation of all the credible evidence, extensive briefing and argument of counsel, issue this Final Arbitration Award.

The Final Hearing on this matter began on October 3, 2020 and continued on October 5, 2020, and was recessed for the Panel to address various motions and legal issues that were the subject of the Panel's Procedural Order #22 re: Respondents' Motion to Terminate Arbitration and Claimant's Motion for Fees and Costs issued on November 6, 2020 (the "Termination Order").

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 1 of 42

The Final Hearing was reconvened on February 8, 2021, to receive evidence and arguments from the parties each day that week, and was concluded on February 12, 2021. In the course of that hearing, Claimant presented and the Panel accepted into evidence 145 exhibits and Respondents presented and the Panel accepted 109 exhibits (many of which were overlapping). The Panel gave such appropriate weight and consideration to the exhibits with due regard to objections raised as to certain exhibits, but all were admitted. Leading up to the hearing the Panel considered many matters, including Respondents' motions to continue the proceeding on more than one occasion, permitting one or more of the Respondents attorneys to withdraw and new counsel to be substituted. The Panel issued 27 Procedural Orders in this arbitration.

The Panel then requested post-hearing briefs to summarize the evidence and to make legal arguments. The Panel then heard oral "closing" arguments on May 5, 2021. As of this date, not additional evidence was presented. The Final Hearing was closed July 9, 2021. The Panel issues this Reasoned Final Award, which contains mixed findings of fact and conclusions of law:

## I.
## Findings of Fact

To the extent any of the following conclusion of law are findings of fact, they should be considered findings of fact. To the extent that any of the proposed conclusions contain mixed findings of fact and conclusions of law, they should be considered as mixed findings and conclusions. The arbitration proceedings were transcribed by a court reporter. Any reference in this Final Award to an exhibit will be Claimant's Exhibit ("C-Ex".) and Respondent's Exhibit ("R-Ex.").

1.    Ali Mokaram is the Claimant ("Mokaram"). Mokaram appeared at the Final Hearing personally and by and through counsel being Scott Funk and Preston Kamin, Houston, Texas of the Gray Reed law firm.

**EXHIBIT AA-9**    Certified Document Number: 100393676 - Page 2 of 42

2.      Osama Abdullatif ("Latif") is an assignee of 50% of Mokaram's 30% interest in Texas REIT, LLC ("TXR"). He is not a party to this arbitration but was a witness.

3.      The Respondents are Ali Choudhri ("Choudhri"), Dalio Holdings I, LLC ("Dalio I"), and Dalio Holdings II, LLC ("Dalio II"). (Dalio I and Dalio II are jointly referred to herein as "Dalio") Respondents appeared at the final hearing personally and by and through counsel: Choudhri was represented by Lloyd Kelly and Michele Fraga of the Lloyd Kelly Law Firm; Dalio was represented by Marty Hill of the Pagel, Davis & Hilland, P.C.

4.      Nominal third-party is Texas REIT, LLC ("TXR") was represented by James Pierce, Attorney at Law. TXR is the entity in which Mokaram and Choudhri have been in contest over the ownership of their respective interests and Latif's interest therein. TXR filed a counter-claim and answer in this arbitration.

5.      On September 23, 2020, Erika Nemeti, Executrix of the Estate of Ede I. Nemeti, Deceased ("Nemeti") intervened as a Claimant through a Plea in Intervention filed in this matter. Nemeti's attorney, David Thornton of the Thornton Law Firm represented and stipulated to the Panel that Nemeti would agree to and be bound by the same award and/or findings that apply to Mokaram in this case, but Nemeti did not participate in the final hearing. Accordingly, any reference to Nemeti in this Award is always in and to her representative capacity as Executrix of the Estate of Ede I. Nemeti, Deceased.

6.      Respondents have resisted this arbitration and Interim Orders of the Panel, even after agreeing to arbitration in open court (see paragraph 12 *infra*). In an effort to curtail Respondents' resistance to, and interference with the due order of proceedings of the arbitration, Mokaram sought and the Court granted a follow-up order herein recited:

**EXHIBIT AA-9**

CAUSE NO. 2012-27197A

| | | | |
|---|---|---|---|
| MOKARAM, ALI, | § | | IN THE DISTRICT COURT OF |
| *Plaintiff(s)* | § | | |
| | § | | |
| vs. | § | | HARRIS COUNTY, TEXAS |
| | § | | |
| CHOUDHRI, ALI ET AL., | § | | 333rd JUDICIAL DISTRICT |
| *Defendant(s)* | § | | |

## ORDER

The Court has considered Mokaram's Emergency Motion for Approval on Arbitration Panel Orders, Choudhri's Response, Mokaram's Reply, their attachments, and the Court's file. After considering them, pursuant to Tex.Civ.Prac. & Rem. Code 171.086, the Court GRANTS the motion.the orders are directed, to comply fully with the arbitration panel's orders already issued, as well as all future orders.

(2) The Court will consider any motion filed pursuant to Chapter 171 of the Civil Practice and Remedies Code after the panel has rendered its award.

Signed September 17, 2020

Daryl Moore

Hon. DARYL L. MOORE
Judge, 333rd District Court

7.    Thereafter, and prior to the commencement of the Final Hearing, Respondents' tried to delay the start of the arbitration hearing by presenting their motion to delay the arbitration to Judge Brittanye Morris, the newly elected Judge of the 333rd District Court , who replaced Judge Moore in January, 2021. Mokaram requested that Judge Morris recuse herself due to a conflict of interest because prior to being sworn in, Mokaram alleged that she had in fact provided to Choudhri legal services regarding related matters to this controversy and also she was a tenant in the same building that he had an interest in and his company, Jetall Companies, was also a tenant. Although Choudhri knew this conflict of interest existed, he nevertheless contested Mokaram's request for Judge Brittanye Morris to recuse herself. However, she denied Mokaram's motion for recusal and granted the stay of the arbitration as Respondents had

AAA No. 01-19-00027-7577                    Final Award                    Page 4 of 42

**EXHIBIT AA-9** Certified Document Number: 100393676 - Page 4 of 42

requested. As a result, Mokarm sought emergency relief to lift the stay from the Administrative Judge of the Civil District Courts of Harris County, Texas. The Administrative Judge appointed former District Judge Randy Wilson as a Special Judge to hear the recusal. On February 5, 2021 Judge Wilson lifted the stay in the following order:

## ORDER LIFTING STAY

On February 4, 2021, the court conducted an oral hearing on Ali Mokaram's Emergency Motion to Lift Stay. After considering the motion, the multiple supplements, responses and replies the motion, as well as any evidence and arguments of counsel, it is hereby

ORDERED that the Emergency Motion to Lift Stay is GRANTED, the Order Finding Good Cause and Granting Emergency Motion to Stay Arbitration on January 11, 2021, is vacated and set aside in its entirety, and the stay of the arbitration that is the subject of the Motion is lifted effective immediately.

Signed Feb. 5, 2021.

JUDGE PRESIDING

8. Although Choudhri continues to disavow Mokaram's membership status in TXR, from denying the membership altogether, to referring to his ownership in the September 1, 2020 TXR of Resolution of the Members of TXR as a putative member, the Panel finds that the preponderance of evidence favors that Mokaram owns a 30% membership interest in TXR and is a member of TXR. Nemeti owns a 5% membership interest in TXR and is a member of TXR. (C-Ex. 3C). Mokaram assigned 50% of his interest to Latif which assignment does not affect Mokaram's standing or ownership interest for purposes of this arbitration, (C-Ex. 3B). This interest was acquired in a 2008 transaction (described in this paragraph below) in which

AAA No. 01-19-00027-7577                    Final Award                    Page 5 of 42

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 5 of 42

Mokaram failed in his effort to set aside that transaction alleging Choudhri had committed fraud. Choudhri filed an affidavit in which he claimed the 30% interest was transferred to Mokaram and the transaction should not be rescinded. The Panel construes these events that Choudhri admitted to the ownership and claimed the 2008 transaction could not be unwound. This was one of many inconsistent positions Choudhri has taken in this matter. The Court of Appeals issued its decision March 30, 2018 holding the assignment was void. After that opinion, Choudhri then started taking the position the entire 2008 transaction was void and he denied Mokaram's ownership interest in TXR. However, the Panel notes that in June, 2008, Mokaram sold and assigned to Choudhri the 15% interest in the WL Partnership, a 12.5% interest in 2606 Fannin, L.L.C. ("2600 Fannin"), agreed to pay Choudhri $400,000 cash, and gave Choudhri a 50% interest in a Lamborghini Murcielago. In the same transaction, Choudhri assigned to Mokaram 30% interest in TXR, a limited liability company which owned a retail strip center and a contiguous Walgreen's at 8050-8098 Westheimer (between Hillcroft and Fondren) in Houston, Harris County, Texas (the "Property") and as more specifically described in the IBC Deed of Trust (C-Ex 2. The 30% interest was transferred via two different written agreements, each of which assigned a 15% interest in TXR to Mokaram, and each of which had separate consideration. C-Ex. 152 (Affidavit of Choudhri with four purchase agreements for the 2008 transaction attached). Around the same time, WCW Houston Properties, LLC ("WCW") acquired the Architectural Services, Inc. ("ASI ") second lien on the property that is the subject of this controversy and WCW sought to foreclose on the property. Choudhri then undertook a plan to deprive Mokaram of his membership interest in TXR and to deprive WCW of its second lien. Evidence was presented by Mokaram that Choudhri retained all of the consideration Mokaram paid for his 30% interest in TXR and returned none of it. The Panel understands that litigation still continues between Choudhri and Mokaram *inter alia,* over the above referenced

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 6 of 42

Court of Appeals 2014 decision. Choudhri purposefully orchestrated a plan to wrongfully deprive Claimants' of their lawful ownership interest in TXR.

9. Choudhri owns a 65% membership interest in TXR, and Choudhri was the sole manager of TXR at all relevant times. Through his ownership and management of TXR, Choudhri effectively controlled TXR at all relevant times.

10. In June, 2008, TXR executed a promissory note in favor of IBC in the amount of $8,640,000.00 (the "IBC Note") for the purpose of acquiring the Property and as more specifically described in the IBC Deed of Trust, Claimant's Exhibit 2 (the "Property").

11. The IBC Note was secured by the Property pursuant to a deed of trust executed by TXR (the "IBC DOT"). Choudhri personally guaranteed the IBC Note (the "Guaranty"). The IBC Note, the IBC DOT and the Guaranty were all executed as part of one loan transaction for TXR to acquire the Property (the "Loan Documents"). There were three IBC documents arising out of the IBC transaction which provided for arbitration: a promissory note, deed of trust and security agreement. The arbitration clauses in all three of the documents are basically the same. The arbitration clause has a provision in it that permits the arbitrators to award attorney's fees and costs/expenses of the arbitration to the prevailing party and the Panel finds that Choudhri signed the guaranty and is subject to this arbitration by virtue of that IBC agreement as is TXR. Furthermore, Dalio and Choudhri filed a Motion to Compel Arbitration on November 8, 2018 requesting Judge Moore of the 333rd District Court of Harris County, Texas to refer this controversy to arbitration and Choudhri's attorney, being one of several attorneys who appeared before Judge Moore, participated in the actual wording of this Court's order dated December 3, 2018 at a bench hearing and his actions constituted agreement with Judge Moore's Order. When asked by the Judge for consent of all of the lawyers, Choudhri's attorney did not voice disagreement.

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 7 of 42

12.     A party who voluntarily initiates arbitration proceedings waives any objections to the arbitrator's authority and courts applying the Federal Arbitration Act ('FAA") have recognized that "agreeing to an arbitration demand may constitute an independent agreement to arbitrate. *See, e.g., OJSC Ukrnafta v. Capatsky Petro. Corp.,* 957 F.3d 487, 499 (5th Cir. 2020). To be enforceable under the FAA, the agreement need only be in writing and comply with applicable state law, which is a Rule 11 in this case. "An agreed order that complies with Tex. R. Civ. P. 11 ("Rule 11") requirements is enforceable as a Rule 11 agreement." *Kerulis v. Granberry Lake Props, Inc.,* No. 02-05-00247-CV, 2006 WL 1791617, at *3 (Tex. App.—Ft. Worth June 29, 2006, no,. pet.). Here, the order granting Dalio's motion to compel arbitration satisfies Rule 11, in that it is in writing, and all the parties consented to tis terms in court and on the record. The FAA expressly provides that parties may agree to submit an existing controversy to arbitration, regardless of whether they had a previous contract to do so. *See* 9 U.S.C. §2; *Gen. Motors Corp. v. Pamela Equities Corp.,* 146 F.3d 242, 246 (5th Cir. 1998).

**13.**     At that hearing referenced in paragraph 9 above, Judge Moore compelled to arbitration eight claims. **His Order verbatim is quoted below:**

**"On this day, the Court considered Defendants Dalio Holdings I, LLC ("Dalio I') and Dalio Holdings II, LLC's ("Dalio II") (collectively, the "Dalio Entities ") Motion to Compel Arbitration and to Stay Proceedings ("Motion"). The Court, having considered the Motion and all other material matters, including any responses, replies, and arguments from counsel, determines that the Motion has merit and should be granted.**

**It is, therefore, ORDERED that the Motion is GRANTED.**

**It is further ORDERED that the following claims asserted in this case are hereby compelled to arbitration pursuant to the arbitration agreements in the Real Estate Lien Note ("Note") and Deed of Trust, Assignment of rents, Security Agreement and Financing Statement ("Deed of Trust") executed between Texas REIT, LLC ("Texas REIT") and International Bank of Commerce ("IBC"):**
**(1)     Plaintiff in-Intervention Ali Mokaram's ("Mokaram") wrongful foreclosure claim against Dalio I;**
**(2)     Mokaram's conspiracy claim against the Dalio Entities and Defendant and CrossPlaintiff Ali Choudhri ("Choudhri");**

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 8 of 42

(3)     Mokaram's claim of knowing participation in a breach of fiduciary duty against the Dalio Entities;

(4)     Mokaram' s breach of fiduciary duties claims against Choudhri relating to or arising out of any of the Arbitrable Claims (as defined in this Order);

(5)     Mokaram's breach of the Texas REIT limited liability company agreement against Choudhri relating to or arising out of any of the Arbitrable Claims;

(6)     Intervenor Erika Nemeti's ("Nemeti") breach of fiduciary duties claims against Choudhri relating to or arising out of any of the Arbitrable Claims;

(7)     Nemeti's breach of the Texas REIT limited liability company agreement against Choudhri relating to or arising out of any of the Arbitrable Claims;

(8)     Nemeti's application for receivership.

For purposes of this Order, "Arbitrable Claims" shall mean any claims relating to or arising out of: (i) Dalio I's acquisition of the Note, Deed of Trust, and related loan documents from IBC ("Loan Documents"), (ii)Dalio I's foreclosure 8098 Westheimer Road, Houston, Texas 77063 (the "Property"); (iii) Texas REIT's loss of the Property as a result of the foreclosure; (iv)Texas REIT's defaults under the Loan Documents resulting in the foreclosure sale by Dalio I, (v) he Property after Dalio I's foreclosure on the  Property; and (vi) the relationship between Choudhri and/or Texas REIT, on the one hand and Dalio I and Dalio II, on the other hand. "Arbitrable claims" does not mean any claims brought against Choudhri that are unrelated to or do not arise out of: the Dalio Entities; the foreclosure of the Property; or the Loan Documents.

It is further ORDERED that the above-listed claims be dismissed in favor of arbitration."

The Judges stamped signature and date (12/3/2018) then appear.

These claims arose out of arbitration agreements in the Real Estate Lien Note ('Note") and Deed of Trust. At this hearing attorneys for Dalio I and II, Ali Choudhri, Ali Mokaram and Latif West Loop, LTD appeared and all agreed to the wording of Judge Moore's Order and compelling to arbitration and staying the court proceeding on these matters. This Panel previously issued a Procedural Order confirming the Panel's jurisdiction, determination of the arbitrability of these matters and that these parties including Ali Choudhri through his attorney agreed to Judge Moore's Order. It is noted that as to the latter issue, in the Procedural Order the Panel specifically addressed Choudhri's attorney asserting that Choudhri did not agree to Judge Moore's Order and the Panel reviewing the transcript of that hearing overruled that objection and found that Choudhri's attorney's responses to the Judge's inquiry constituted consent to the arbitration.

**EXHIBIT AA-9** Certified Document Number: 100393676 - Page 9 of 42

14.     Judge Moore in his Order of December, 3, 2018, quoted above, presented a series of

questions for the arbitrators to determine. As will be further addressed in this Final Award, the

Panel finds in favor of Claimant for the first seven issues and the eighth issue requested for a

receiver was not granted. The Panel recognizes that the trial court has compelled to arbitration

Nemiti's application for receivership. However, the Panel does not believe it has the power under

the AAA Rules, the FAA or any of the arbitration agreements to appoint a receiver in this

arbitration. However, in the event it is determined that the Panel does have such power the Panel

denies Nemiti's application for receivership because no evidence or argument was presented to

the Panel by Nemiti at the final hearing regarding the appointment of a receiver. As to issues (6)

and (7), Nemeti as the Executor of her father's estate, is awarded damages as described below for

the reasons set forth below on those causes of action to which her position is related to

Mokaram's positions. The Note and Deed of Trust contain similar mandatory arbitration

provisions encompassing Mokaram's and Nemeti's derivative claims on behalf of TXR.

Specifically, the Note provides:

> ANY AND ALL CONTROVERSIES BETWEEN THE PARTIES, EXCEPT SUCH
> CLAIMS AND CONTROVERSI.ES WHICH ARE CONSUMER RELATED AND
> INVOLVE AN AGGREGATE AMOUNT IN CONTROVERSY OF LESS THAN TEN
> THOUSAND DOLLARS ($10,000.00), SHALL BE RESOLVED BY ARBITRATION
> IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE
> AMERJCAN ARBITRATION ASSOCIATION IN EFFECT AT THE TIME OF
> FILING, UNLESS THE COMMERCIAL ARBITRATION RUL.ES CONFLICT WITH
> THIS PROVISION, AND IN SUCH EVENT THE TERMS OF THIS PROVISION
> SHALL CONTROL TO THE EXTENT OF THE CONFLICT.

(C-Ex. 1, Note at 3, §I (a).)

The Note also specifies the disputes covered by the arbitration provision:

> ARBITRABLE DISPUTES INCLUDE ANY AND ALL CONTROVERSIES OR
> CLAIMS BETWEEN THE PARTIES OF WHATEVER TYPE OR MANNER,
> INCLUDING WITHOUT LIMITATION, ANY CLAIM ARISING OUT OF OR
> RELATING TO THIS NOTE. ALL PAST, PRESENT AND/OR FUTURE CREDIT
> FACILITIES AND/OR AGREEMENTS INVOLVJNG THE PARTIES, ANY
> TRANSACTIONS BETWEEN OR INVOLVING THE PARTIES, AND/OR ANY

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 10 of 42

ASPECT OF ANY PAST OR PRESENT RELATIONSHIP OF TIIE PARTIES,
WHETIIER BANKING OR OTHERWISE, SPECIFICALLY INCLUDJNG ANY
ALLEGED TORT COMMITTED BY ANY PARTY.

(*Id.* at 4, §(c).)

Similarly, the arbitration provision in the Deed of Trust provides:

ANY AND ALL COMMERCIAL CONTROVERSIES BETWEEN THE PARTIES,
SHALL BE RESOLVED BY ARBITRATION IN ACCORDANCE WITH THE
COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION
ASSOCIATION IN EFFECT AT THE TIME OF FILING, UNLESS THE
COMMERCIAL ARBITRATION RULES CONFLICT WITH THIS PROVISION, AND
IN SUCH EVENT THE TERMS OF THIS PROVISION SHALL CONTROL, TO THE
EXTENT OF THE CONFLICT.

(C-Ex. 2, Deed of Trust at 9, §III (a).)

The Deed of Trust likewise specifies the disputes covered by the arbitration provision:

ARBITRABLE DISPUTES INCLUDE ANY AND ALL CONTROVERSIES OR
CLAIMS BETWEEN THE PARTIES OF WHATEVER TYPE OR MANNER,
INCLUDING WITHOUT LIMITATION, ANY CLAIM ARISING OUT OF OR
RELATING TO THIS DEED OF TRUST, ALI, PAST, PRESENT AND/OR F1JTURE
CREDIT FACILITIES AND/OR AGREEMENTS INVOLVING THE PARTIES, ANY
TRANSACTIONS BETWEEN OR INVOLVING THE PARTIES, AND/OR ANY
ASPECT OF ANY PAST OR PRESENT RELATIONSHIP OF THE PARTIES,
WHETHER BANK.ING OR OTHERWISE, SPECIFICALLY INCLUDING ANY
ALLEGED TORT COMMITTED DY ANY PARTY.

(Id. at 10, §III(c).)

Both the Note and Deed of Trust define "THE PARTIES" for purposes of the arbitration

provisions expansively as TXR, IBC, and the following additional parties:

FOR PURPOSES OF THIS PROVISION, "THE PARTIES" MEANS BORROWER
AND LENDER, AND EACH A.ND ALL PERSONS AND ENTITIES SIGNING THIS
AGREEMENT OR ANY OTHER AGREEMENTS BETWEEN OR AMONG ANY OF
THE PARTIES AS PART OF THIS TRANSACTION. "THE PARTIES" SHALL ALSO
INCLUDE INDIVIDUAL PARTNERS, AFFILIATES, OFFICERS, DIRECORS,
EMPLOYEES, AGENTS ANO/OR REPRRESENTATIVES OF ANY PARTY TO
SUCH DOCUMENTS, AND SHALL INCLUDE ANY OTHER OWNER AND
HOLDER OF THIS AGREEMENT.

(C-Ex. 1, Note at 4, §(f); C-Ex. 2, Deed of Trust at 10, §III (f).)

**EXHIBIT AA-9**

Mokaram's and Nemeti's derivative claims (on behalf of TXR) relate to or arise out of Dalio I's foreclosure of the Property and, thus, fall within the scope of the arbitration provisions in the Note and Deed of Trust.

15.     On April 11, 2018, IBC and TXR executed a forbearance agreement related to the IBC Note (the "Forbearance Agreement") that required TXR to pay IBC $80,000 and $642,154.07 (the "Forbearance Payment") and that provided a period of forbearance from foreclosure and reinstatement of the IBC Note. Choudhri paid these amounts and signed the Forbearance Agreement.

16.     In 2008, TXR also executed a promissory note in favor of. ASI in the amount of $1,500,000 that was secured by a second lien on the Property (the "ASI Note"). In 2018, ASI sold and assigned the ASI Note to WCW.

17.     On May 25, 2018, Dalio I acquired the IBC Note and the IBC DOT from IBC for $6,334,189.88, the full amount due and owing under the IBC Note at the time, including accrued interest. Under the Forbearance Agreement, the IBC Note was reinstated in good standing. TXR made the Forbearance Payment on the same day, and IBC refunded the amount of $642,154.07 to Dalio I to reduce the net balance owed by TXR on the IBC Note to Dalio I to $5,692,035.93, as of May 25, 2018. Within 39 days, on July 3, 2018, Dalio I foreclosed on the Property.

18.     Dalio I and Dalio II were purportedly set up and owned by Azeemeh Zaheer ("Zaheer"), a resident of London, England. Under oath, Choudhri denied having ownership or involvement with Dalio I when it purchased the IBC Note and when it foreclosed on the Property. Mokaram incurred fees and expenses to obtain documents from third parties which Respondents should have produced, but did not produce, including documents showing Choudhri was actually the beneficial and *de facto* owner of Dalio before it purchased the IBC Note.

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 12 of 42

19.     Later, third parties produced documents revealing that Choudhri was the true owner of Dalio and he had installed Zaheer, his alleged girlfriend, as the "front" to hide his ownership and involvement in Dalio I conducting the foreclosure and taking the Property away from TXR.

20.     Choudhri ultimately had to admit he was the true beneficial owner of Dalio through an Agency Agreement with Zaheer dated May 2018, under which Choudhri, as principal, owned Dalio and the IBC Note, and Zaheer, as agent, only held them in name for Choudhri. At all relevant times, Choudhri had beneficial ownership and control of Dalio.

21.     It became clear that Choudhri planned and orchestrated a plan to cause Dalio I to purchase the IBC Note and DOT from IBC, to put TXR into a non-monetary default when it was not really in default, to falsely inflate the amount of the IBC Note, and to conduct a wrongful foreclosure of the Property using credit bids for funds that were not even owed by TXR to Dalio I with the purpose and intent for Choudhri to deprive TXR of the Property, to deprive WCW of the Property and any lien on the Property, and to and for the sole benefit of Choudhri.

22.     Another entity that Choudhri owned and controlled, 2401 FV, LLC ("2401"), provided Dalio I with the funds that were used to purchase the IBC Note. Choudhri initially made misrepresentations about his ownership, involvement and control of 2401 until once again, documents produced by third parties proved Choudhri was knowingly untruthful.

23.     Choudhri caused Dalio I and TXR to enter into a Loan Modification Agreement ("LMA") to the IBC Note after the foreclosure in an attempt to justify the false inflation of the IBC Note by Dalio I. There were actually multiple signed and materially different versions of the LMA with no explanation from Choudhri as how or why it kept changing. Each LMA was an interested and self-interested and self-dealing transaction, as Choudhri owned and controlled both entities to the agreements.

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 13 of 42

24.     The Panel does not find it credible that IBC sold the note for its full value, including all past due interest, and that the amount due under the IBC Note could properly and lawfully increase almost three-fold in 39 days after the IBC Note was reinstated. Respondents did not provide evidence to substantiate their position that the amount of the IBC Note increased from $5,692,035.93, as of May 25, 2018, to more than $14.5 million just 39 days later on July 3, 2018.

25.     The true balance due and owing on the IBC Note as of July 3, 2018, was $5,727,474.22, at the most, which includes default interest for 39 days that was not even owed. As such, Dalio I was not lawfully able to bid more than this amount at a foreclosure sale by using credit (a "credit bid"). By law, a lender can only credit bid up to the amount owed on a note, and if it wants to bid more than the amount owed on the note, any additional bids would have to be with cash or cash equivalents.

26.     The fair market value of the Property as of July 3, 2018, was $14 million.  Choudhri's testimony and position that the Property was "under water" and only had a value of $7.5 million is not credible.  The equity of the Property (the value less the IBC Note debt against the Property) was $8,272,525.78 as of July 3, 2018.

27.     The WCW second lien debt was in litigation and in dispute with WCW suing TXR and Dalio I.  In that litigation, Respondents contend no amount is owed by TXR to WCW, and Choudhri has refused to authorize TXR to make any payments.  $3.5 million was owed as of July The Panel was presented and admitted RX-65 which stated that as of May 30, 2018, the amount owed was $3,650,990.05.

28.     Choudhri's fiduciary duty included the duty to minimize the debts of TXR and to settle and compromise claims by creditors if it was in the best interests of TXR to do so. If the WCW debt was valid, or arguably valid, Choudhri should have taken steps to compromise and pay the

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 14 of 42

debt. The evidence showed WCW was willing to settle and compromise the WCW note claim for $1.5 million as of July 3, 2018.

29.    In the alternative, the equity of the Property as of July 3, 2018, should at most be reduced by the amount that WCW could have been paid to settle, or to $6,772,525.78. Instead of taking steps in the best interest of TXR, Choudhri instead planned and orchestrated his fraudulent foreclosure scam to deprive TXR and its members and creditors of the Property and its equity.

30.    Choudhri went to great lengths to prevent arms-length lenders (WCW and IBC) from foreclosing and taking the significant equity in the Property that he denies even existed. However, he did nothing to prevent Dalio I from foreclosing because of his conflict of interest and his ownership of Dalio I, and because it was his intent to take the Property away from TXR, its members, and WCW for his own self-benefit.

31.    Choudhri secretly orchestrated the foreclosure sale.    Choudhri intentionally hid his involvement in Dalio and the foreclosure process, and the Panel finds that his conduct was wrongful and improper. Choudhri tried to cover up his wrongful conduct after the fact, including by intentionally withholding and secreting evidence that he was ordered to produce by the Panel.

32.    On June 10, 2018, Dalio I issued a notice of foreclosure for the Property and filed it with the Harris County Clerk (the "Second Notice") that identified four potential trustees who might conduct the sale.

33.    On July 3, 2018, Wade Williams, serving as trustee for Dalio I under the IBC DOT, auctioned the Property for sale (the "Foreclosure"). Williams was hired through Choudhri's attorney, Jeff Joyce.    Several attorneys for Dalio I also represented Choudhri individually, creating additional potential conflicts of interest.

34.    At the time of the Foreclosure, multiple persons attended the auction and were ready, willing, and able to bid on and purchase the Property. Despite the presence of these bidders, who

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 15 of 42

could offer immediate cash or the equivalent, Dalio I took steps to ensure that it would take title to the Property without paying for it by making credit bids for amounts that were not owed to Dalio I, and that would prevent the other bidders from purchasing the Property.

35.     In advance of the sale, Dalio I instructed Williams and Kevin Pennell, an attorney for Dalio and Choudhri who helped Dalio I foreclose on the Property, to withhold relevant information regarding the foreclosure process that was requested by potential bidders. The attorney for WCW contacted Williams and Pennell to inquire about the auction process (when/where/protocol), to ask whether Dalio I intended to make credit bids, and if so, how much the total amount due under the IBC Note was available to credit bid. Among other things, WCW asked who it should make payment to at the auction (which of the four trustees) and asked to coordinate the timing and logistics given the amount at stake.

36.     Dalio I later used this scheme as an excuse to chill bidding, and by refusing to accept valid bids if cashier's checks were not made payable to Williams. Williams refused to allow cashier's checks to be endorsed to Dalio I as is customary in Harris County, thus preventing some bidders from bidding. Dalio I improperly withheld information about the time and place of the Foreclosure prior to the sale. Even though it was the trustee's duty to maximize the amount of the sale price, Choudhri instructed Dalio I to conduct the Foreclosure in a manner designed to suppress bids so Choudhri could acquire the Property by credit bids from Dalio I.

37.     Latif also reached out to Williams through his assistant via emails and calls to obtain any special instructions prior to the foreclosure, including the physical location of the trustees and to whom checks should be made payable to. Even though Williams warned Choudhri it would be deemed chilling the bidding if he did not respond, Dalio I (Choudhri and Zaheer) did not allow Williams to respond. Instead of providing information to maximize the sales price, Dalio I made

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 16 of 42

it difficult for any prospective buyer to bid and purchase the Property other than for and in behalf of Choudhri.

38.     For every cash bid made at the Foreclosure, Dalio I made a higher credit bid. All bids made by Dalio I during the Foreclosure were credit bids. Prior to the Foreclosure, Dalio I authorized Williams to credit bid as much as $13 million to buy the Property even though just over $5.7 million was owed to Dalio I, and even though Choudhri claimed the Property was only worth $7.5 million. Dalio I kept making credit bids until all cash bidders were driven out, leaving Dalio I as the "successful" bidder at $10.1 million. Dalio I could have sold the Property for a $10 million cash bid but refused, even though Choudhri claims the Property was only worth $7.5 million.

39.     Dalio I transferred the IBC Note and DOT (lien) to Dalio II (also owned and controlled by Choudhri) for no consideration as part of the scheme to take the Property away from TXR, its members and WCW. On July 3, 2018, the same day that Dalio I foreclosed and received the trustee's deed for the Property, Dalio I granted and conveyed a Deed of Trust to Dalio II to give it a "first lien" on the Property to secure a non-existent $10,000,000.00 obligation (the "Dalio II DOT").

40.     On September 3, 2019, Dalio II foreclosed on its bogus lien on the Property and the Dalio II Trustee conveyed the Property, as Trustee, to Dalio II by a Trustee's Deed dated September 3, 2019. Choudhri orchestrated this foreclosure as well.

41.     Choudhri claims he did not intend to damage TXR, Mokaram, or Latif, but that he was trying to protect the Property (and Mokaram's interest in TXR) by saving the Property from WCW, who was also trying to foreclose. Respondents' attorneys spent considerable time trying to paint the picture that Mokaram and Latif had been at "war" with Choudhri for almost 10 years, and that they were mortal enemies. It is not credible that Choudhri was conducting a fraudulent

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 17 of 42

foreclosure in secret to help what he claims are his enemies. And it is not credible that Choudhri did so to protect a property that he claimed was under water with no equity. Finally, it is not credible that Choudhri would foreclose and take the Property from TXR and its members to "protect" them.

42.    In addition, Choudhri tried to orchestrate essentially the same secret fraudulent foreclosure scheme to take the Beal Bank building property (the "Beal Bank") away from its owner, the Mokaram Latif West Loop Limited Partnership (the "Partnership"), which is owned by Latif. However, there was no second lien holder for the Beal Bank, and no need to "save" the property to protect the Partnership. Yet Choudhri essentially did the same thing there. Whether or not this establishes a pattern and practice by Choudhri are past and such similar events that they cannot be disregarded by the Panel.

43.    Choudhri used his company, 2500 WL, Inc. ("2500 WL"), which was alleged to be a sham front company, to purchase the first lien note owed from Capital One Bank that was secured by Beal Bank for approximately $4.2 million on July 6, 2018, just one month after Choudhri caused Dalio I to buy the IBC Note and start foreclosure proceedings. Choudhri hid his true ownership of 2500 WL with another Agency Agreement with his CFO, Brad Parker, as the front man this time.

44.    Choudhri immediately claimed the Capital One note had been in default since 2008, when Capital One had never taken that position and had renewed and extended the note multiple times. Choudhri falsely inflated the note to more than $14.5 million, claiming this amount must be paid by the Partnership or 2500 WL would foreclose on the Beal Bank. And then Choudhri instituted foreclosure proceedings, only to be stopped by an injunction issued by a district court. There was no purpose for Choudhri to do this except to intentionally damage the Partnership, Mokaram and/or Latif.

EXHIBIT AA-9

Certified Document Number: 100393676 - Page 18 of 42

45.     Choudhri was the true owner and manager of Dalio, and he had full control of Dalio from at least May 2018. As such he was also an agent and representative of Dalio and all of Choudhri's conduct is imputed to Dalio. Dalio is also responsible for the acts of Zaheer and Williams, who acted as their agents and representatives as well.

## II.
## Conclusions of Law

        To the extent any of the following conclusions of law are findings of fact, they should be considered findings of fact. To the extent that any of the proposed conclusions contain mixed findings of fact and conclusions of law, they should be considered as mixed findings and conclusions.

### A.     Jurisdiction

46.     The Termination Order referenced *supra* at 1 is incorporated herein by reference, The Panel finds it has jurisdiction over the claims of Mokaram set forth in his Amended Complaint filed on or about October 4, 2020, and that all such claims are arbitrable.

47.     Mokaram has standing to assert derivative claims on behalf of TXR, because the Panel finds he is a member of TXR. As explained in one of the earlier Procedural Orders of this Panel, it was found, over the objection of Respondents, that Claimants did file their claims for arbitration timely with the American Arbitration Association ("AAA"), even though the AAA actually received the payment after September 1, 2019. Claimant's original filing and efforts to pay and ability to pay were made prior to September 1, 2019, the Panel concluded the arbitration claim was deemed filed prior to September 1, 2019 and therefore such claims also are grounded in the Texas Business Organizations Act ("TBOC") and the Derivative Claims provisions therein in existence prior to the effective date of the amendment (being September 1, 2019). As such Respondents' claim that Claimants under the amended act (specifically TBOC Section 101.453) were required to provide 91 days' advance notice before bringing a derivative action which

**EXHIBIT AA-9**

Claimants did not do. As the Panel concluded in a prior Procedural Order, the amendment did not apply and therefore since the 91 days' notice provision was not in the antecedent law, there was no duty upon Claimants to provide such notice.

**B.    Wrongful Foreclosure**

48.    The Foreclosure of the Property orchestrated and conducted by Respondents was wrongful and unlawful, therefore constitutes a wrongful foreclosure.   There were multiple defects in the Foreclosure before and during the process.   Respondents compromised the fundamental integrity of the Foreclosure by their conduct to cause a lower selling price.  Because Respondents "deliberately chilled" the bidding process for potential buyers at the foreclosure through their conduct, Mokaram need not prove that the defects caused a grossly inadequate selling price. *See Charter Nat'l Bank–Houston v. Stevens*, 781 S.W.2d 368, 371 (Tex. App.— Houston [14th Dist.] 1989, writ denied).

49.    While a wrongful foreclosure claim typically requires evidence of a "grossly inadequate selling price" this element is eliminated where, as here, the defect involves a deliberate chilling of the bid process. *Villarreal v. Wells Fargo Bank, N.A.,* 814 F.3d 763, 768 (5th Circ. 2016).

50.    Alternatively, the $10.1 million selling price was grossly inadequate in relation to the $14 million value of the Property. As a result of the wrongful foreclosure, TXR and its members were damaged.  TXR is entitled to recover actual damages from Respondents in the amount of $8,272,525.78, the difference between the value of the Property ($14 million) and the indebtedness ($5,727,474.22). *See Houle v. Cassillas*, 594 S.W.3d 524, 540 (Tex. App.—El Paso 2019, no pet.). One would not set aside a foreclosure sale if only a minor or technical deficiency grossly affected the sales price. Here the mortgagee chills the bid process, the mortgagee has compromised the fundamental integrity of the sale. Choudhri's conduct created an improper and

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 20 of 42

wrongful chilling effect on the bidding which caused "a lower selling price of any measure of magnitude, grossly inadequate or otherwise." *Stevens*, 781 S.W.2d at 372.

## C.  Breach of Contract

51.     Choudhri breached Article 3.3 of the Company Agreement of TXR, which required Choudhri as the Manager to (a) manage and control the company and its business and affairs in accordance with the standards of the industry, (b) use reasonable, good faith efforts to carry out the business and affairs of the company in a manner he reasonably believes to be in the best interest of the company, and (c) to perform duties with ordinary prudence and in a manner reasonable under the circumstances. Each side provided cases and arguments regarding whether or not one can breach the Company Agreement, to wit, whether or not it is a contract. After reviewing the authorities and arguments provided by counsel for each party, the Panel has determined that the Company Agreement is a valid contract; it was breached by Choudhri, and as a result of his breaches, TXR and its members were damaged. Respondents, in support of its position on this point cited *In re Denman,* 513 B.R. 720, 722 (Bankr. W.D. Tenn. 2014) in which the Tennessee bankruptcy court merely evaluated whether an LLC operating agreement was an executory contract under Bankruptcy Code provisions. *Id.* at 722-23. It does not appear that this case stands for the proposition that an agreement is not an agreement as Respondents argue. Claimant has cited the Panel to several authorities that Respondents attempted to distinguish in their closing argument. however, although these cases may be factually distinguished from our case at hand, the principles that Claimant cites its cases for lend greater credence and support to Claimants argument that the Company Agreement is a contract that has been breached by Choudhri. *See, Soaring Wind Energy, L.L.C. v Catic USA Inc.*, 946 F.3d 742 (5th Cir. 2020) (affirming arbitration award of damages for breach of an LLC agreement); *Millennium Ice, Inc. v CryoUSA, LLC* No. 05-18-00440-CV, 2018 WL 3688424, at *2 (Tex. App.—Dallas Aug. 3,

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 21 of 42

2018, no pet.); *Chan II Pak v. Ad Villaral, LLC*, No. 05-14-01312-CV, 2018 WL 2077602, at *2 (Tex. App. –Dallas may 4, 2018, pet. Denied) (affirming judgment that majority member and co-manager of two LLCs ", materially breached" the LLC agreements); *Love v Harrison*, No. 14-16-00632-CVF, 2017 WL 3567868, at *1 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, no pet.) (Discussing trial court's grant of TRO based on breach of LLC agreement); *Med. Gardens, LLC v. Wikle*, No. 07-12-00111-CV, 2013 WL 2390103, at *4 (Tex. App.—Amarillo May 29, 2013, no pet.) (Upholding award of attorney's fees for breach of LLC agreement).

52.     Choudhri's breaches of the Management Agreement included his failure to manage and control TXR and its business and affairs in accordance with the standards of the industry, his failure to use reasonable, good faith efforts to carry out the business and affairs of TXR in a manner reasonably believed to be in the best interest of the company, and his failure to perform his duties as a manager with ordinary prudence and in a manner reasonable under the circumstances.  TXR is entitled to recover economic damages in the amount of $8,272,525.78 from Choudhri.

**D.     Breach of Fiduciary Duty**

53.     As a result of the relationships and Choudhri's ownership, position and control of TXR, Choudhri owed fiduciary duties to TXR and its members at all relevant times, including the duty of loyalty and the duty of care.  *Pinnacle Data Services, Inc. v. Gillen*, 104 S.W.3d 188 (Tex. App.—Texarkana 2003, no pet.), *disapproved of on other grounds by Richie v. Rupe*, 443 S.W.3d 856 (Tex. 2014); *Cardwell v. Gurley*, No. 05-09-01068-CV, 2018 WL 3454800, at *8 (Tex. App.—Dallas July 18, 2018, pet. denied). Choudhri breached each of these duties, and his breaches resulted in injury or damages to TRX and its members.

54.     Choudhri did not act in good faith, and he allowed his personal interests to prevail over the interests of TXR.  Choudhri did not act with an intent to confer a benefit to TXR, but rather,

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 22 of 42

Choudhri acted to benefit his own self-interests to the exclusion of TXR, and its members. Choudhri acted with the fraudulent intent to deprive TXR of the Property and its equity, and to damage Mokaram in the process. Choudhri's actions were actions taken with the actual intent to cause injury to TXR and its members, and without just cause or excuse that proximately caused injury to TXR and its members.

55.     Choudhri engaged in self-dealing, as he acted to derive a personal profit or advantage (taking for his own benefit the Property and its equity) at the expense of TXR. In doing so, Choudhri did not act solely with an eye to the best interest of TXR, unhampered by any pecuniary interest of his own. When acting as an agent of the LLC, a manager/managing member owes a duty pursuant to basic agency principles. *See Hardee,* 2013 WL 1084494, at \*9 (Bankr. E.D. Tex. Mar. 14, 2013 (citing *McAfee, Inc. v. Agilysis, Inc.,* 316 S.W.3d 820, 829 (Tex. App.—Dallas 2010, no pet.); *see also Allen v. Devon Energy Holdings, L.L.C.,* 367 S.W. 3d 355, 392 (Tex. App.—Houston [1st Dist.] 2012.

56.     Respondents assert they do not owe Claimants a fiduciary duty and the law does not provide that a manager in a LLC owes a fiduciary duty to its members. The facts in this case do not support their argument and it is expressly overruled. Fiduciary duties include the duty of fair and honest dealing, and the duty of full disclosure. Respondents failed in this duty. *See KCM Fin. LLC v. Bradshaw,* 457 S.W. 3d 70, 80 (Tex. 2015). The duty of full disclosure requires disclosure of material facts relating to the company's business, as well as the dedication of uncorrupted business judgment for the sole benefit of the company. *See Accent Energy Corp. v. Gillman,* 824 S.W.2d 274, 278 (Tex. App. –Amarillo 1992, writ denied). Choudhri made no such disclosures of his wrongful dealings as described in this Final Award and therefore breached his fiduciary duties to Claimants and did not act in good faith to them, rather acted for his own personal interests which constituted a breach of his fiduciary duties to Claimants. *See General*

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 23 of 42

*Dynamics v Torres,* 915 S.W.2d 45, 49 (Tex. App.—El Paso, writ denied); *Gerhart Industries, Inc. v. Smith Intern. Inc.,* 741 F.2d 707, 719 (5th Cir. 1984). A manager or officer is "interested" in a transaction if he: (i) makes a personal profit from a transaction by dealing with the corporation (LLC) or usurps a corporate opportunity; (ii) buys or sells the assets of the corporation (LLC); or (iii) transacts business in his capacity with a second entity of which he is also significantly financially associated. *Gearhart Indus. Inc.,* 741 F.2d at 719-20. "Transactions involving an interested [manager] are subject to strict judicial scrutiny." *Id.* at 720. This Panel has strictly scrutinized the conduct of Choudhri and has concluded he meets the legal and factual standards for violating his fiduciary duty to Claimants. The TBOC (Section 101.255(b)) does provide a mechanism to avoid a manager's conflicts, i.e., to engage the approval of disinterested members (or affected members) which Choudhri did not do and could not do. *Gearhart Indus. Inc.* 741 F.2d at 719-720.

57. Because Choudhri is a managerial official of and has a financial interest in Dalio, the purchase of the IBC Note, the Foreclosure, the LMA's, and the purported rescission transaction and settlement agreement were all "interested" transactions. *See* Tex. Bus. Orgs. Code Ann. § 101.255(a)(2). Choudhri engaged in these transactions to make a personal profit, and he transacted with TXR as the owner and principal of Dalio I, an entity he owned and in which he had a significant financial interest. Choudhri had a conflict of interest when acting on behalf of both Dalio and TXR.

58. Choudhri breached his duty of full disclosure of material facts relating to TXR's business, and he failed to provide his uncorrupted business judgment for the sole benefit of TXR. Choudhri knowingly, fraudulently and intentionally hid his ownership of Dalio and the self-dealing and self-interested transactions relating to the IBC Note, the Foreclosure and the other transactions between TXR and Dalio. Choudhri then covered up his wrongful conduct by failing

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 24 of 42

and refusing to follow the discovery rules and the orders of the Panel to provide documents and other discovery that existed, and by even refusing to participate in this arbitration after causing Dalio to move to compel this arbitration.

59.     Choudhri engaged in numerous tactics designed to improperly delay and obstruct this arbitration, and to prevent Mokaram from getting to the final hearing. This included Choudhri's self-serving and purported rescission that was not even implemented.

60.     Because the purchase of the IBC Note, the Foreclosure, the LMA's, and the purported rescission transaction and settlement agreement were all "interested" transactions, they constituted breaches of the duty of loyalty by Choudhri unless those transactions were either approved by the disinterested managers or members of TXR or fundamentally fair to TXR. Tex. Bus. Orgs. Code Ann. § 101.255(b); *Gearhart Indus., Inc.* 741 F.2d at719.Choudhri bears the burden of proving that those transactions were fair to the corporation. *Gearhart Indus.*, 741 F.2d at 720. There are no disinterested managers, and the disinterested members (Mokaram and Nemeti) did not approve any transaction between TXR and Dalio. Moreover, Choudhri has failed to meet his burden to show that the transactions are fundamentally fair to TXR. As a result, Choudhri has breached his duty of loyalty (and thus fiduciary duty) to TXR, which caused injury to TXR. TXR is entitled to recover economic damages in the amount of \$8,272,525.78 from Choudhri for this breach of fiduciary duty.

## D.     Knowing Participation in a Breach of Fiduciary Duty

61.     "It is settled as the law of this State that where a third party knowingly participates in the breach of fiduciary duty, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d 509, 519 (1942). It is well established law that the injured party (Claimants) may recover from Choudhri all economic damages associated with the breach, as well as exemplary damages. *See*

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 25 of 42

*W. Reserve Life Assur. Co. of Ohio v .Graben, 233* S.W.2d 360, 377 (Tex. App.—Fort Worth 2007, no pet.); *McCullough v. Scarbrough Medlin & Associates, Inc.* 434 S.W.3d 871m 911 (Tex. App.—Dallas 2014, pet. Denied).

62.     A fiduciary relationship existed between TXR and Choudhri.

63.     Dalio was aware that Choudhri owed fiduciary duties to TXR.

64.     Dalio knowingly participated in Choudhri's breaches of his fiduciary duties to TXR by engaging in transactions in which Choudhri was personally interested, falsely declaring TXR's default on the IBC Note, inflating TXR's debt on the IBC Note, taking steps to chill bidding at the Foreclosure, and making credit bids in excess of TXR's debt at the Foreclosure.

65.     Dalio is jointly and severally liable for Choudhri's breaches of his fiduciary duties. TXR is entitled to recover economic damages from Choudhri in the amount of \$8,272,525.78.

## E.     Constructive Fraud

66.     Choudhri's conduct constitutes constructive fraud.     Choudhri breached his legal and/or equitable duty to TXR and its members, and his conduct was fraudulent because of its tendency to deceive others, to violate confidence, and/or to injure public interests.     Choudhri also committed constructive fraud because of his breaches of fiduciary duty. Choudhri's fraud was proved by clear and convincing evidence, and that evidence showed Choudhri acted intentionally, knowingly and with malice toward TXR, its members, and its creditors. Choudhri's actions were taken with the actual intent to cause injury to TXR and its members, and without just cause or excuse that proximately caused injury to TXR and its members. Respondents assert that Claimants did not include as a separate cause of action constructive fraud, although Claimants did sue for fraud. Constructive fraud is a specie of fraud and that is deemed by the Arbitrators as sufficient pleading. Certainly Respondents could have filed special exceptions requiring a more specific pleading, however, from the beginning it was apparent that

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 26 of 42

Claimants' claim founded in fraud was in fact constructive fraud. There was no surprise to anyone. Constructive fraud is the "breach of some legal or equitable duty which irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. *Archer v. Griffith,* 390 SW.2d 713, 740 (Tex. 1964). When a party violates a breach of fiduciary duty, this action gives rise to a cause of action for constructive fraud. *Strobach v. WesTex Cmty. Credit Union,* 2019 WL 38123366 at *14 (Tex. App.—El Paso Aug. 14, 2019, no pet.). In an action for constructive fraud, the plaintiff may recover all economic damages proximately resulting from the fraud, as well as exemplary damages if the constructive fraud resulted from malice. *See Vickery v. Vickery,* 1997 WL 751995, at *36 (Tex. App.—Houston [1st Dist.] Dec. 4, 1997, pet. denied); Tex. Civ. Prac. & Rem. Code Ann. § 41.003.

67.     TXR is entitled to recover economic damages proximately caused by such actions from Choudhri in the amount of $8,272,525.78.

**F.    Conspiracy**

68.     Choudhri, Dalio I, and Dalio II were members of a combination, the object of which was to transfer the Property, which was wholly owned by TXR, to another entity under Choudhri's control and then conceal Choudhri's involvement in those transfers. Those objects were unlawful, as they constituted wrongful foreclosure, constructive fraud, and breaches of Choudhri's fiduciary duties to TXR.

69.     Choudhri, Dalio I, and Dalio II had a meeting of the minds on the object of their combination.

70.     Multiple overt, unlawful acts that furthered the conspiracy occurred. At Choudhri's direction, Dalio I falsely declared TXR in default on the IBC Note, inflated TXR's debt on the

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 27 of 42

IBC Note, entered in the LMA's, took steps to chill bidding at the Foreclosure, and made credit bids in excess of TXR's debt at the Foreclosure.

71.     TXR incurred damages as a proximate result of the conspiracy. Choudhri, Dalio I, and Dalio II are jointly and severally liable to TXR in the amount of \$8,272,525.78.

**G.      Respondents' Defenses**

72.     Choudhri did not meet his burden of proof on any of his affirmative defenses. Choudhri did not meet his burden to show any of the interested transactions were fair to TXR, or that there was any value whatsoever returned to TXR when the rescission deeds were filed for the first time on February 12, 2021.

73.     Choudhri was not credible as a witness. Choudhri repeatedly lied under oath and changed his positions and testimony as necessary to suit his personal needs and without regard to the truth. Choudhri caused multiple documents to be fabricated after the fact, and Choudhri unlawfully withheld evidence to protect himself and to hide his wrongful conduct. He was found by the Panel to have failed and refused to participate as ordered in necessary discovery and through his attorney, even stated that he would not attend and participate in the arbitration, arguing that he did not agree to arbitrate when his attorney was before Judge Moore when that Judge by agreement of the parties (attorneys of the parties) agreed to arbitrate. The Panel also found that Mokaram was entitled to sanctions against Choudhri due to Choudhri's failure to properly and timely participate in discovery. Zaheer who testified through deposition as the representative of Dalio was circuitous in her answers and the Panel found much of her testimony incredulous, further leading the Panel to conclude material disputed fact issues in favor of Mokaram.

74.     Based upon Choudhri's extensive misconduct, the Panel does not believe that Choudhri would act in good faith and in the best interests of TXR in the future, and it is apparent Choudhri

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 28 of 42

will continue to do what he can to deprive TXR and its members of the value, if any, of the Property and their investments. C- Ex. 145 is a copy of a temporary restraining order issued by Judge Moore in another case involving the Beal Bank Building and some related parties to the instant case, in which Choudhri created another sham company, 2500 West Loop, Inc. ("2500 WL") to purchase the approximate $4.211 million note and first lien owned by Capital One Bank on or about July 6, 2018 (one month after Choudhri acquired the IBC note in the instant case). Once again, Choudhri tried to hide his true ownership and involvement, falsely inflated the debt by claiming WL Partnership was in default since 2008 making the debt more than $14 million and tried foreclosing on Beal Bank. It is noted that other alleged wrongs by the same actor may not usually be relevant, this one involves the same parties at the same time, using the same attempted foreclosure scheme with the same fraudulent inflation of the first lien note. This similar fact pattern has been considered by the Panel in determining the relief awarded Claimants.

## H.   Damages

75.    As a result of Respondents' fraud and breach of fiduciary duty, TXR and its members incurred damages, including the lost equity of the Property in the amount of $8,727,474.22, as more fully discussed below. Mokaram offered expert testimony and appraisals of the fair market value of the Property. (C-Exs. 130 and 12). Mokaram introduced TXR's to sell the Property for approximately $15million, along with numerous market offers to purchase portions or all of the Property for approximately for $13.8 million. C-Exs. 13-14, 15-16, 24-25, 27, 28B, 20, 20B, 34, 63, 153. Mokaram offered admissions from Respondents via their internal emails that the value of the Property was in excess of $12 million, that there was a "veritable amount of equity," that Dalio would bid at least $13 million to buy the Property at a fire sale, and that Zaheer wanted $15 million pre-foreclosure. C- Exs. 67-70, 72, 75, 76, 81, and 89. Mokaram offered his expert,

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 29 of 42

John Camp's uncontested expert testimony on the amount of the first lien debt calculated to the penny. C- Ex 129. Mokaram offered admissions by Respondents that the amount of the second lien debt was $0 (Choudhri's position against WCW) because of limitations. R-Ex.77. Respondents offered evidence the second lien debt was $3.65 million (WCW's position). R- Ex. 39. Mokaram offered evidence the disputed debt could have been compromised for $1.5million. C-Exs. 115, 174 at 26-28. Dalio admitted the $3.65 million WCW debt was "inflated" and "excessive by at least $2.1 million". Dalio Brief at 6-7. This matches exactly with Mokaram's evidence the debt could have been settled for $1.5 million. The issue of whether Choudhri is owed money by TXR is irrelevant and not arbitral. The measure of damages (the value less the debt) does not include resolution of whether Choudhri owes money to TXR, or is owed money by TXR. The only claims pending in the 333rd on this issue are Mokaram's derivative claims against Choudhri for engaging in the self-dealing diversion of funds to himself, his companies and others that were not owed. Choudhri has never sued TXR for amounts allegedly owed.

76.     As a result of Respondents' breach of contract, knowing participation in breach of fiduciary duty and conspiracy, TXR and its members incurred damages, including the lost equity of the Property in the amount of $8,727,474.22, as more fully discussed below.

77.     Morkaram's damages are measured at the time of the foreclosure. Choudhri failed in his defense of mitigation of damages by his after the fact attempted rescission and return of equity into the property by conveyance deed into TXR on February 21, 2021, being the last day of the arbitration hearing. It was his burden to show the amount of any equity returned (value of the Property on that date, less the amount of the debt on that date) and he failed to prove either. Experts on property value, Mr. Schultz, for Mokaram, testified he did not have an opinion and Mr. LaGrasta, for Choudhri, did not offer an opinion of value on that date either.

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 30 of 42

78.     The equity in the Property is the fair market value of the Property ($14 million), less the amount of the IBC Note, ($5,727,474.22), or $8,272,525.78. Although Claimants' have argued that given Respondents' claim there is nothing owed on the WCW debt and Choudhri's refusal to pay WCW a penny, and given Respondents' unlawful and fraudulent conduct, it would not be equitable to allow Respondents to ask and receive a credit against the equity for the WCW debt. To this point the Panel does not agree.

79.     Evidence was presented that a credit for the WCW lien and federal lawsuit should be afforded Respondent consisting of two different amounts: $1.5 million and also pursuant to RX-65 the amount of credit was $3,650,990.05 were shown to be an equity of the Property which is the amount the disputed claim could have been settled for, if not for Choudhri's decision to orchestrate the wrongful foreclosure instead of acting in the best interests of TXR (which obviously includes acting in accordance with the law). The Panel finds that $3,650,990.05 is the more credible credit to be given and so adopts this amount.

80.     The Panel may grant any remedy or relief that is just and equitable and within the scope of the agreement of the parties, and the Panel has broad discretion in fashioning an appropriate remedy, including equitable remedies. The Panel believes that "justice requires" that Mokaram's claims in part are direct, and the derivative claims he asserted should be treated as direct claims, and finds that Mokaram may individually recover on all claims including the derivative claims. *See* Tex. Bus. Orgs. Code Ann. § 101.463(c).

81.     The parties have been litigating for a long time, and unfortunately there appears to be no end in sight.  Choudhri will likely continue his attempts to litigate against Mokaram and to deprive TXR of the Property again if given the opportunity.  The evidence showed Choudhri will just seek to foreclose again on the Property, at an amount inflated by improper default interest created by Choudhri for his own self-interest.

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 31 of 42

82.     If the Property and/or damages are returned to TXR with no direct award to Mokaram, Choudhri is likely to take whatever steps he can, lawful or not, to deprive Mokaram of the benefits of his ownership interest in TXR, which means causing damage and harm to TXR.

83.     If the Panel were to award damages to TXR, the funds would be placed in the hands of Choudhri, the proverbial fox guarding the hen house. Mokaram and the other member of TXR have never been paid one penny for their ownership in TXR since 2008. And Choudhri claims he is owed millions by TXR. It is likely Choudhri will continue to oppress and defraud TXR and its members, and it is likely he would use the funds returned to TXR to just pay himself with no benefit actually going to TXR or its members.

84.     The same reasons would apply and be true with respect to Nemeti and her claims as it relates to allowing her to recover directly.

85.     Respondents have also asserted that Mokaram did nothing to protect the property or mitigate damages. That is not true. Mokaram sought a receiver which was denied after the Court considered Choudhri's asserted strenuous opposition and assurances that the property was safe. C-Ex.20 [Respondent's Response to Application to Appoint Receiver], C-Ex.21 [transcript of Hearing of April 12, 2019]. Mokaram's attorney suggested the Property be sold with the proceeds placed in the registry so any disputes could be litigated with funds on hand. C- Ex.21 and 26. Mokaram's attorney inquired multiple times about what, if anything, Choudhri was doing about the foreclosure. C- Ex 59 and 86. Choudhri hid the ball and instructed the trustees not to respond to reasonable and necessary inquiries about terms dealing with the foreclosure sale which went unanswered and Choudhri refused to respond or ask for a capital call which would have avoided the scheme he undertook. The Panel therefore, finds that Mokaram, in dealing with Choudhri who proved to be self-dealing and unscrupulous in his business dealings with Mokaram, was thwarted by Choudhri from doing any more than Mokaram did.

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 32 of 42

## I.    Attorney's Fees

86.    Mokaram is entitled to recover his reasonable, customary and necessary attorneys' fees to prosecute the claims in this case, and that such fees were incurred as required by law by Mokaram even though Latif advanced such fees.  Mokaram has an obligation to reimburse or repay the fees advanced.  This derivative proceeding has resulted in a substantial benefit to TXR. Mokaram is entitled to recover attorneys' fees pursuant to Tex. Bus. Orgs. Code Ann. § 101.461, and as a prevailing party under the arbitration agreements in the Loan Documents.  This includes, but is not limited to, Mokaram prevailing on his claims for constructive fraud/fraud, and/or breach of fiduciary duty and/or breach of contract. The Panel considered testimony by Scott Funk, attorney for the Claimants including C-Ex. 134,156 and 157 as to the reasonableness and necessity of his attorney's fees and expenses. The Panel finds that the fees and expenses awarded were all inextricably intertwined within the causes of action to which the law allows the recovery of attorney's fees. The Panel finds that the fees requested are reasonable and necessary within Harris County, Texas. The Panel also finds that the arbitration clause in the three documents referred to above (the IBC Note, DOT and Choudhri's Personal Guaranty contained in C- Exs.1-3) provide that the party prevailing shall be entitled to reasonable attorney's fees and the Panel so finds that Claimants have prevailed on their causes of action which entitle them to attorney's fees including under the derivative action of TBOC (Section 101.461).

87.    The Panel notes that an attorney for Choudhri before he withdrew on the eve of arbitration, appeared at the Final Hearing of the arbitration and proffered a rebuttal but did not offer a counter opinion; rather, he argued positions and legal reasons why fees should not be recoverable after the purported rescission of the transaction of September 1, 2020. In this regard the Panel notes that the rescission deed proffered at the arbitration hearing was created to purportedly effectuate the rescission, was not recorded until the last day of the merits hearing in

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 33 of 42

this arbitration. Given the prior misconduct of Choudhri referred to in this Final Award, Mokaram's arguments about Choudhri's misconduct, presented further concerns and evidence that Choudhri denying even in the Final Hearing of the arbitration that Morkaram and Nemeti were not members of TXR justified Mokaram's continued prosecution of the arbitration after the September 1, 2020 purported TXR members' meeting and actions taken by Choudhri at said meeting including his attempt to rescind the foreclosure and terminate the arbitration..

88.     Mokaram voiced concern, with good reason, that Choudhri could continue claiming that Mokaram and Nemeti were non-members of TXR and, as the sole member, rescind the filing of such deed. If WCW seeks to foreclose, whether or not successful, a mere attempt could allow Choudhri to foreclose again. As long a Choudhri would have within his power to foreclose and deprive Claimants' of their interest in the property as he has previously tried to do, the Panel will not permit this possibility.

89.     The Panel also overrules Respondents' argument that because Latif advanced the fees and expenses for the benefit of Mokaram (including the fees charged by AAA) and Mokaram did not pay these fees, Mokaram should not be able to recover them. Mokaram did testify that while Latif advanced payment of the fees, their agreement required Mokaram to repay those advances from any recovery "off the top". Mokaram transcript 376:8-25; 377 1-8. The Panel finds that Mokaram's testimony on this point was credible. The Panel also overrules Respondents' argument that the 2012 Sales Agreement between Mokaram and Latif did not govern those advances, as that agreement dealt with prior claims and on its face, does not cover new claims that accrued for the first time six years later. See C- Ex 3B. In *Culken Center Bank & Trust v. Wonder,* 874 S.W.2d 757, 759 (Tex. App.—Houston [1st Dist.] 1994, no writ) the court held: "As a general rule, the successful party to a lawsuit is entitled to recover all costs from his adversary."); s*ee also, In re Estate of Johnson,* 340 S.W.3d 769m 786 (Tex. App.—San Antonio

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 34 of 42

2011, pet. filed) (holding that plaintiff was not precluded form recovering attorney's fees that were paid on its behalf; *In re Ellison Grandchildren Trust*, 262 S.W.3d 111, 127 (Tex. App.— San Antonio 2008, pet. denied) ("the Trustees have cited no authority for the proposition that it is unequitable and unjust to award attorney's fees to parties who have had their fees paid up front by another party, subject to reimbursement"). In this arbitration and with the interest of justice and equity in mind, the Panel finds merit in Claimant's request for attorney's fees and costs and expenses even though they were advanced by Latif.

90.     The Panel also notes that Respondents argued that Mokaram should not have pursued his claims after receiving notice from TXR that in September, 2020, that Choudhri stated that he had rescinded the foreclosure and returned the Property to TXR. As previously pointed out there was no evidence in the deed records that in fact a deed was executed and recorded. Although Respondents do point out that the recording of a deed that has been duly executed is not a requirement to effectuate the transaction, under the circumstances in this case, Mokaram was justified in continuing the arbitration especially in light of the fact that Choudhri testified in his deposition in December, 2020 that the rescission was in limbo, that it was not effectuated because Mokaram did not agree to it, and that is why the deed was not filed. Choudhri TT 787:22-789-18, R-Ex 172, at 27:19-28:12 (Choudhri Depo).

91.     It is noted that Mokaram filed several motions for sanctions as a result of Choudhri's failure and refusal to comply with the certain of the Panel's Procedural Orders and discovery requests of Mokaram including production of documents and timely deposition appearance scheduling.

## J.     Exemplary Damages

92.     Incorporating all of the foregoing findings of fact and conclusions of law, Mokaram is entitled to recover exemplary damages against Respondents, jointly and severally, on his claims

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 35 of 42

for claims for breach of fiduciary duty and fraud, as there is clear and convincing evidence that Respondents' conduct was knowing, intentional and malicious, that they acted with malice and intent to defraud, and that Respondents had a specific intent to cause substantial harm or injury to TXR, its members and creditors.

93. The Panel notes that there is conflicting authority under Texas law as to whether exemplary damages can be recover for constructive fraud. On the other hand, AAA Rule 47 affords the Panel the right to award any remedy or relief it deems just and equitable which could include exemplary damages. Similarly, exemplary damages can be awarded for a breach of fiduciary duty, an intentional tort, if the Panel finds clear and convincing evidence of fraud or malice. *See also, James j. Flanagan Shipping corp. v Del Monte Fresh Produce N.A. Inc.,* 403 S.W.2d 360, 368 (Tex. App. –Houston [1st Dist.] 2013, no pet.); *McCullough v Scarbrough, Medlin & Associates, Inc.,* 435 S.W. 3d 871, 911 (Tex. App.—Dallas 2014, pet. denied) and Tex, Civ. Prac. & Rem. Code Ann. §41.003 (citing numerous cases that permitted exemplary damages for breach of fiduciary duty). The Panel weighing the facts and law in this case, has concluded favorably for Claimants on this point.

94. Mokaram is entitled to recover exemplary damages against Respondents, jointly and severally, on his claims for claims for wrongful foreclosure, as there is clear and convincing evidence that Respondents' conduct was knowing, intentional and malicious, that they acted with malice and intent to defraud, and that Respondents had a specific intent to cause substantial harm or injury to TXR, its members and creditors.

## K. INTEREST

95. Mokaram has asserted that he is entitled to recover pre-judgment interest on all damages awarded, including attorneys' fees, accruing on December 11, 2018, until the day before the final judgment is entered. *See Johnson & Higgins of Texas, Inc. v Kenneco energy, Inc.* 962 s.w.2d

**EXHIBIT AA-9**
Certified Document Number: 100393676 - Page 36 of 42

507, 528 (Tex. 199); *Derrick Res., Inc. v. Wilstein,* 471 S.w.3d 468, 487 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Although the Panel agrees that pre-judgment interest shall be awarded for actual damages, it denies the request for pre-judgment interest for attorneys' fees. The pre-judgment interest rate is the same as the post-judgment interest rate. If the agreement does not provide a rate of interest, which it does not, then the pre-judgment interest rate and post-judgment interest rate is calculated based on the statutory rate provided in the Texas Finance Code. Meriden *Hotels, Inc. v. LHO fin. P'Ship I, LP*, 255 S.W.3d 807, 823 (Tex. App.—Dallas 2008, no pet.). Pursuant to Chapter 304 of the Tex. Fin. C, prejudgment interest starts to accrue on the earlier of: ((1) 180 days after the defendant receives written notice of the plaintiff's claim, or (2) the day suit is filed. Here, Choudhri received written notice of Mokaram's claims on July 11, 2018, when Mokaram filed his 8th Amended Petition and asserted claims against Choudhri for wrongful foreclosure, breach of fiduciary duty, breach of contract and fraud. Thus, pre-judgment interest should run at the latest from December 11, 2018 through the day before the judgment is signed. *Id.*

94.     Under Section 304.003 of the Tex. Fin. C, the interest rate in this context is the rate determined by the Consumer Credit Commission, based upon the Federal Reserve rate. The current rate is 5% as of the date of the Award (see https://occc.texas.gov/gov/publicatios/interest-rates). The prejudgment rate is the rate in effect when the Panel signs the award. *Tennessee Gas Pipeline Co. v. Technip USA,* 2008 WL 387141m at *25 (Tex. App.—Houston [1st] Aug. 21, 2008, pet. denied).

## L.  Defenses and Arguments of Respondents

96.     The foregoing Finding of Fact and Conclusions of law have dealt with the several defenses and arguments that Respondents have asserted and it is believed that the preceding ninety paragraphs have denied them. Nevertheless, the Panel additionally will address several of

**EXHIBIT AA-9** Certified Document Number: 100393676 - Page 37 of 42

their arguments they have made. The Panel denies the argument that an award in favor of Mokaram would be an "impermissible buyout". As stated above the remedy to which Mokaram and Nemetti are entitled to is not based upon a forced buyout *per se* of minority stakeholder that merely asserts that a majority has oppressed them. No, here there has been determined misdeeds by Choudhri dealing with a most valuable asset of the entity in a manner that the award of damages to Mokaram and Nemetti is justified as fully explained above.

97.    Respondents ask the question that if Mokaram and Nemetti are indeed members in TXR, then as majority owners they could have had a meeting of members and controlled the situation. One would agree except in this situation not only did Choudhri litigate resisting Mokaram's ownership, but Choudhri's handling of this situation would be a fruitless gesture. The law does not require a needless act in this type of situation.

98.    As referenced above, the Panel, in light of the testimony provided by Latif and Mokaram, we do not find that their arrangement for the advancement of attorneys' fees and expenses and cost associated with this arbitration violates ethical rules or the Texas Code of Professional Responsibility and therefore Latiff funding 100% of the attorneys' fees and expenses of Mokaram and paying directly to Funk for his legal services and paying the AAA fees coupled with the obligation of Mokaram to repay Latiff,, as Mokaram testified, is a lending arrangement, which does not deprive Mokaram of his right to recover the attorneys'' fees, costs and expenses of this arbitration.

99.    Choudhri has asserted that he has no agreement to arbitrate with Mokaram. The Panel has addressed this issue above regarding the reference to Judge Moore's Order regarding this arbitration in which all the attorneys for the TXR, Mokaram and Choudhri were present and agreed to arbitrate the matters dealt with in this Award. As noted in one of this Panel's Procedural Orders, this matter was previously addressed denying Respondent's argument again

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 38 of 42

raised at the Final Hearing of this arbitration. The conduct and appearances of the Respondents before Judge Moore certainly constitutes an estopple to deny the agreement to arbitrate, and Respondents' agreement at that hearing is also deemed to be a ratification of the agreement to arbitrate and a waiver to now assert there was no agreement between Choudhri and Mokaram to arbitrate. Similarly, the same applies for Dalio and TXR.

100. Respondents have asserted that because Mokaram requested rescission as one of other remedies including damages, and that Choudhri contended he rescinded the foreclosure as announced in an August, 2020 meeting of LLC, then Claimants got the relief they sued for. Choudhri is wrong about this too. As stated above the Panel has misgivings about the efficacy of that transaction for many reasons including that not until the last day of the arbitration, did Respondents record the deed rescinding the foreclosure and allegedly restoring the Property to TXR. Because Choudhri has at times and continues to deny Claimants membership in TXR, this action, even if taken as valid action, does not deprive Claimants of their right to elect the remedy they pleaded and for and now elect damages.

101. Respondents assert that the "most fatal flaw in Mokaram's claim is that he failed to actually tender the full amount of the debt owed, which Mokaram admits is no less than $6 million". This argument has been overruled and discussed under the Wrongful Foreclosure (Section II. B.) above.

102. The Panel did not believe that Choudhri or Azeemh Zaheer ("Zaheer") were credible and forth coming in many aspects of their testimony which was material to the findings of fact in this case. On the other hand, Mokaram and Latif seemed more credible in their testimony as to material disputed facts.

## III.

## AWARD

Certified Document Number: 100393676 - Page 39 of 42

As such, it is hereby

ORDERED that Mokaram shall have and recover money damages against Respondents, jointly and severally, in the amount of 30% of ($8,272,525.78 less $3,650,990.05), or $1,386,460.71, as a result of Respondent's wrongful conduct, including but not limited to, Respondents' constructive fraud and breach of fiduciary duty. It is further

ORDERED that Nemeti shall have and recover money damages against Respondents, jointly and severally, in the amount of 5% of ($8,272,525.78 less $3,650,990.05), or $231,076.78, as a result of Respondent's wrongful conduct, including but not limited to, Respondents' constructive fraud and breach of fiduciary duty. It is further

ORDERED that Mokaram shall also have and recover against Respondents, jointly and severally, $603,000.00 as attorneys' fees through final hearing, $15,000.00 for post-trial briefing and through the final award, $60,000.00 if any Respondent files a motion to vacate this award or otherwise challenges its validity in any manner, $125,000.00 for an appeal in the event a notice of appeal is filed, and $100,000.00 for an appeal to the Texas Supreme Court in the event a petition for review is filed. It is further

ORDERED that the administrative fees and expenses of the American Arbitration Association totaling $17,802.50 shall be borne $17,802.50 by Respondents and the compensation and expenses of the Panel totaling $387,659.40 shall be borne $387,659.40 by Respondents. Therefore, Respondents shall pay Mokaram an amount of $405,461.90. It is further

ORDERED that Mokaram shall have and recover against Respondents, jointly and severally, the amount of $250,000.00 as exemplary damages resulting from Respondents constructive fraud and breach of fiduciary duties.

- It is further ORDERED that Mokaram shall also have and recover against Respondents, jointly and severally, $172.028.59 pre-award interest on actual

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 40 of 42

damages of $1,386,460.70 at the rate of 5% compounded annually from December 11, 2018, until May 5, 2021, and the amount of $213.49 per diem until the date of entry of this award. It is further

ORDERED that Nemeti shall also have and recover against Respondents, jointly and severally, $28,671.34 as pre-award interest on the actual damages of $231,076.38 at the rate of 5% compounded annually from December 11, 2018, until May 5, 2021, and the amount of $44.15 per diem until the date of entry of this award. It is further

ORDERED that Mokaram shall have and recover against Respondents, jointly and severally, post-award interest on all damages awarded herein at the rate of 5% compounded annually, including on actual damages, attorneys' fees, costs, expenses and exemplary damages, from the date this award is entered until the date all amounts owed hereunder are paid in full. It is further

ORDERED that Nemeti shall also have and recover against Respondents, jointly and severally, post-award interest on all damages awarded herein at the rate of 5% compounded annually, from the date this award is entered until the date all amounts owed hereunder are paid in full. It is further

ORDERED that upon the written request of Choudhri sent within 60 days of the entry of this award, Mokaram and Nemeti shall each assign all of their respective right, title and interest in TXR to Choudhri or his designee, but only after Respondents have paid all amounts owed under this award in full, including pre- and post-award interest (Mokaram and Nemeti shall be entitled to keep their ownership if this award is not paid in full). It is further

ORDERED that all other relief requested by any party and not granted herein is DENIED, and that this award is a FINAL AWARD that disposes of all claims and counterclaims

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 41 of 42

and defenses asserted by all parties in this Arbitration.

SIGNED this **27** day of _____ July _____, 2021.


_____
Honorable Alvin Zimmerman, Chair


_____
Trey Bergman


_____
W. Jerry Hoover

**EXHIBIT AA-9**

Certified Document Number: 100393676 - Page 42 of 42



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   March 11, 2022

Certified Document Number:          100393676 Total Pages:  42

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

**EXHIBIT AA-9**