# EXHIBIT 3

```
1                      UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION

3    In re                      )  CASE NO: 23-34815 (JPN)
                                )
4    GALLERIA 2425 Owner, LLC,   )  Houston, Texas
                                )
5             Debtor.           )  Monday, June 17, 2024
                                )
6                                )  9:00 a.m. to 7:35 p.m.
     -----------------------------)

7

8                                TRIAL

9            BEFORE THE HONORABLE JEFFREY P. NORMAN
                  UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Debtor:              REESE W. BAKER, ESQ.
                              Baker & Associates
13                            950 Echo Lane, Suite 300
                              Houston, TX 77024
14
     For 2425 WL, LLC:        H. GRAY BURKS, IV, ESQ.
15                            BurksBaker, PLLC
                              950 Echo Lane, Suite 300
16                            Houston, TX 77024

17                            STEPHEN SATHER, ESQ.
                              MARK E. SMITH, ESQ.
18                            Barron & Newburger, P.C.
                              7320 North Mopac Expressway
19                            Suite 400
                              Austin, TX 78731
20
     For Ali Choudhri,        ALI CHOUDHRI
21   pro se:                  2425 West Loop South, 11th Floor
                              Houston, TX 77027
22
     For the Trustee:         R.J. SHANNON, ESQ.
23                            Shannon & Lee LLP
                              2100 Travis Street, Suite 1525
24                            Houston, TX 77002

25
```

EXHIBIT
3

```
 1   For National Bank of       ANDREW M. TROOP, ESQ.
     Kuwait, S.A.K.P., New      PATRICK E. FITZMAURICE, ESQ.
 2   York Branch:               Pillsbury Winthrop Shaw Pittman
                                31 West 52nd Street
 3                              New York, NY 10019-6131
                                CHARLES C. CONRAD, ESQ.
 4                              Pillsbury Winthrop Shaw Pittman
                                Two Houston Center
 5                              909 Fannin, Suite 2000
                                Houston, TX 77010-1028
 6
     Court Reporter:            TRACEY CONRAD
 7
     Transcribed by:            Veritext Legal Solutions
 8                              330 Old Country Road, Suite 300
                                Mineola, NY 11501
 9                              Tel: 800-727-6396

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

```
 1                              INDEX

 2    TRIAL WITNESSES        DIRECT   CROSS   REDIRECT   RECROSS

 3    MICHAEL CARTER         50

 4                           62

 5    RUSSELL INGRUM         84

 6    JERRY ALEXANDER        100      110     117

 7                                            124

 8    JEFF STEIDLEY          136

 9                           139

10    JIM WETWISKA           151      184     198        222

11                           166              206

12                                            224

13    CHRISTOPHER MURRAY     229      278     280        295

14                           242              285

15                                            296

16                                            298

17    CHARLES CONRAD         306

18    THOMAS PHILLIPS        341

19    R.J. SHANNON           348      373     375

20    RUSSELL INGRUM         387

21

22    TRIAL EXHIBITS                                     RECEIVED

23    Exhibit 90-3                                       207

24    Exhibit 90-8                                       211

25    Exhibit 463-2                                      367
```

| | | |
|---|---|---|
| 1 | Exhibits 467-15 – 467-17 | 9 |
| 2 | Exhibit 498-01 | 222 |
| 3 | Exhibit 499-36 | 170 |
| 4 | Exhibit 499-41 | 194 |
| 5 | Exhibit 499-44 | 380 |
| 6 | Exhibit 499-83.1-6 | 109 |
| 7 | Exhibits 505-1 – 505-16 | 7 |
| 8 | Exhibit 508-7 | 127 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1              HOUSTON, TEXAS; MONDAY, JUNE 17, 2024; 9:00 a.m.

 2                          (Call to Order)

 3              THE COURT:  Good morning.  We're on the record for

 4    June 17, 2024.  The first matter set is the motion of the

 5    trustee for a protective order, Number 467.

 6              Mr. Shannon, I'm assuming you're going to be

 7    speaking for the trustee.

 8              MR. SHANNON:  Yes, Your Honor.  R.J. Shannon, on

 9    behalf of the trustee.

10              THE COURT:  All right, and Mr. Sather, are you

11    going to be speaking for 2425 WL?

12              MR. SATHER:  Mr. Burks will be taking the lead for

13    our side.

14              THE COURT:  Okay.  Thank you.

15              MR. SATHER:  However, Mr. Smith will be appearing

16    on the motion for protective order.

17              MR. BURKS:  You've called a motion for protective

18    order and, Mr. Sather, I didn't understand.  That's the only

19    thing you're asking --

20              THE COURT:  That's the only thing I'm asking

21    about.

22              MR. SATHER:  Oh, I'm sorry.

23              THE COURT:  So Mr. Burks is going to speak on that

24    particular motion, because it's the only thing I'm calling

25    right now.
```

1          MR. SATHER:  Oh, no.  Actually, Mark Smith will

2     speak on that.

3          MR. SMITH:  I'll be speaking, Your Honor.  Mark

4     Smith.

5          THE COURT:  Okay.  Thank you.

6          All right.  Mr. Shannon, what's the status?

7          MR. BURKS:  Thank you, Your Honor.

8          MR. SHANNON:  Thank you, Your Honor.  Again, R.J.

9     Shannon, on behalf of the trustee.  Yes, this motion is, I

10    guess, going forward.  The motion was filed at Docket 467.

11    The court entered an order granting it in part at 468, and

12    the trustee filed a witness and exhibit list at Docket 505

13    just with respect to this particular motion.

14          Your Honor, to expedite things, we filed a

15    declaration for me about this, and that's at Docket 505-1.

16    I believe perhaps the easiest way to do that would be to

17    address that first, have that admitted or not admitted along

18    with the rest of the exhibits, and then do argument.

19          THE COURT:  Okay.  That's fine.  So at this point

20    in time, do you want to offer 505-1 through 15?  Is that

21    what you're asking?

22          MR. SHANNON:  Yes, Your Honor.

23          THE COURT:  All right.  So let me go to Mr. Smith.

24    Do you have any objection to 505-1 through 15, or excuse me,

25    through 16?

1          MR. SMITH:  No objection, Your Honor.

2          THE COURT:  Okay.  They're admitted.

3          (Trial Exhibits 505-1 - 505-16 entered into

4     evidence)

5          MR. SHANNON:  Thank you, Your Honor.  And with

6     that, that's all the evidence we have, and we'd move to

7     argument unless they have evidence.

8          THE COURT:  All right.  Mr. Smith?

9          MR. SMITH:  Your Honor, if we're just talking

10    about his 505, we have no objection.  You know, all I would

11    say is with regard to the necessity, I believe it's, what,

12    ten hours on this motion.  Just to give you a little of the

13    background, there was an email sent --

14         THE COURT:  No one can see you unless

15    (indiscernible) appearing online.

16         MR. SMITH:  Sorry about that, Your Honor.  There

17    was an email sent to Mr. Shannon on the 10th asking for

18    dates for the deposition.  He responded basically that there

19    was no time available during that week.  After conferring

20    with our client, we set a deposition for what appeared to be

21    the least conflicting date of the dates he -- there was some

22    conflict with all of them.  We picked the one that appeared

23    to have the least conflict, sent the notice of deposition

24    with the intent of then having Mr. Shannon to respond and

25    being able to work out hopefully someday.

1          He did respond on the 11th.  I believe he sent the

2     email around 9:50 a.m.  I did not receive that email or did

3     not see that email until about 1:24.  I know that because I

4     forwarded it at that time.  And he offered a one- to two-

5     hour window on that Sunday for a remote deposition.  I was

6     unavailable on that Sunday.  I began trying to find someone

7     to either cover that time or to reschedule on our behalf.  I

8     did not get a chance to get back to him.  At 3:43, I

9     believe, he filed a motion which was then granted.

10          So there was no -- he mentioned a motion for

11     protection in his email, but with no deadline, did not say

12     when he would be filing or deadline for response.  So we

13     don't feel that the fees are appropriate in this situation.

14     We did not -- we did not disagree with withdrawing that

15     original.  We were trying to get the Sunday deposition time

16     covered or decide whether we even wanted to take a

17     deposition one to two hours remotely on a Sunday.  So we

18     just don't feel that the fees are appropriate in this case.

19     This was just a matter of he sent the email, we were working

20     on responding to that email and he filed a motion for

21     protection within just a few hours.

22          THE COURT:  All right.  So do you want to present

23     any evidence at this point in time other than argument?

24          MR. SMITH:  The evidence are in the record, Your

25     Honor.  If you look, I believe it's the email string are

1    467-16 and 467-17 are those emails that I referenced, and

2    then the 467-15 would be the schedule, the original email he

3    sent regarding the schedule for that week.

4            THE COURT:  All right.  So do you have any

5    objection, Mr. Shannon, to me admitting those into the

6    record, 467-16, 17 and 15?

7            MR. SHANNON:  No, Your Honor.

8            THE COURT:  All right.  Then I'll admit those as

9    well.

10           (Trial Exhibits 467-15 - 467-17 entered into

11   evidence)

12           THE COURT:  Mr. Smith, anything else?

13           MR. SMITH:  No sir, other than just looking at the

14   timing, as you will see from those emails, we clearly

15   believe that ten hours is excessive for the motion that was

16   filed.  Obviously that's what he's represented.  We feel

17   like ten hours -- I believe there's 15 hours from the time

18   we sent this in total time from the time this began until

19   the time the motion was filed.  And the claim is that there

20   were ten of those 15 hours spent drafting this motion, if

21   you look at 467 itself.  This is not a very detailed or

22   complicated motion.  We just feel that the ten hours is

23   excessive, Your Honor, and I believe that'd be all.

24           THE COURT:  All right.  Thank you.

25           Mr. Shannon, I'll let you close.

1        MR. SHANNON:  Thank you, Your Honor.  I suppose it

2    seems like the objection is to the reasonableness of the

3    fees.  That's what I hear.  As detailed in the declaration,

4    it wasn't -- it was actually 8.1 hours spent from the motion

5    and it was not all spent drafting the motion.  Of course, we

6    had to -- as detailed in the declaration, I had to

7    communicate with the trustee, ask if there was an

8    alternative time.  And also, I'll just point out in this

9    case, normally I do not think this amount of time would have

10   been reasonable.  I think you have to consider this

11   particular case and there have been appeals that, at least

12   from the trustee's perspective, are not well-grounded.  And

13   we wanted to establish a definitive record of what happened

14   so that if there is any kind of appeal based on the

15   inability to take the trustee's deposition, that it is clear

16   what happened.

17        I'll point out also, Your Honor, again that the

18   trustee had made himself available.  He made himself

19   available to me on June 6th when the deposition was

20   originally scheduled.  The trustee did not agree to

21   reschedule it.  It was unilaterally canceled by 2425 WL.

22   And I think all of that was important information for the

23   court to have and to be in the record.  And that was the

24   reason for the amount of time.  Again, it was 8.1 hours

25   between communicating with the trustee, communicating with

1    counsel for 2425 WL, and then 2.5 hours preparing the

2    declaration and the exhibits that are now admitted into the

3    record.

4              Again, just under the circumstances of this

5    particular case and the importance of actually obtaining the

6    protective order, that was all necessary and reasonable,

7    Judge.  Again, the trustee, we had essentially two days to

8    obtain the protective order.  I think if there was more

9    time, it might have made sense to file a very brief motion

10   with just pointing out the obvious, that the trustee said he

11   was unavailable and the deposition was noticed in two days.

12   And that might have been enough, but it might have also

13   required a hearing.

14             So under those circumstances, Judge, we submit

15   that those fees are reasonable and should be awarded, and

16   that's essentially our argument, Judge.

17             THE COURT:  All right.  Thank you.  So I'll take

18   the motion of the trustee for protective order, Number 467,

19   based on the evidence, under advisement, and we'll move on

20   to the next matter, which is probably more pressing.

21             All right.  Let's call now the motion to permit

22   credit bidding filed by 2425 WL, LLC.  Who's going to speak

23   on behalf of 2425 WL?

24             MR. BURKS:  My name is Gray Burks, G-R-A-Y, B-U-R-

25   K-S, Your Honor.

1              THE COURT:  Thank you, Mr. Burks.  Who's going to

2    speak for NBK?

3              MR. TROOP:  Your Honor, Andrew Troop.  I'm told I

4    don't speak loud enough.  Let me try again.  Your Honor, Mr.

5    Troop, from -- Andrew Troop (indiscernible) from Pillsbury

6    Winthrop Shaw Pittman, on behalf of National Bank of Kuwait.

7    Your Honor, if you take openings or closings, I'll be doing

8    that.  Witnesses, Mr. Fitzmaurice will take.

9              THE COURT:  All right.  Thank you.

10             All right.  Mr. Burks, opening statement.  Go

11   ahead.

12             MR. BURKS:  Yes, Your Honor.  Before Mr. Troop and

13   I start speaking on opening statements, Your Honor, there is

14   a very pressing matter that I personally have great concern

15   over.  I'm asking Mr. Baker to put up on the record the

16   medical records of medical doctor statements regarding Mr.

17   Ali Choudhri, who is a necessary party and an individual.  I

18   have read the motion for continuance.  I've written the

19   order denying that motion for continuance.  I've also spoken

20   with Mr. Choudhri on Thursday, Friday, Saturday and Sunday,

21   personally on Thursday and Friday; that is, in person.  I

22   spoke to Mr. Shannon and told him that I was extremely

23   concerned about the physical condition of Mr. Choudhri.  I

24   don't know if it got worse after June 4th or 5th or 6th or

25   after the motion was filed or not.  The man's left side of

1   his body, his face is completely paralyzed.   The right side

2   of his face is puffed up because the left side has dropped.

3   He has a weeping eye.   His gait is changed.   He has doctor's

4   letters, which I'm asking Mr. Baker to put up, stating that

5   he should be stress-free for four weeks.   I don't want to be

6   the person responsible for another stroke or a heart attack.

7           I discussed with Mr. R.J. Shannon that whatever

8   the pressing matters of the motion, obviously the motion for

9   to preclude credit bidding is tied in with confirmation.

10  It's almost impossible to separate the plan out from that

11  motion.   However, two weeks -- I mean, I'll be available on

12  any of those dates.   Two weeks is up in -- well, the four

13  weeks is up in two weeks.   I do not understand, and I

14  personally don't -- I'm not going to abandon my client at

15  this hearing.   But I personally do not want to be part of a

16  hearing where we are violating doctor's orders and putting

17  this man under extreme stress, Your Honor.   And I understand

18  the motion.   I understand why you denied it.   But as we

19  stand here today --

20          THE COURT:  Mr. Burks, I've already ruled on the

21  motion for continuance.   If you're making another oral

22  motion, okay --

23          MR. BURKS:  I am.

24          THE COURT:  All right.   Then I'll let everyone

25  respond to that.   You've made it.   I think you've made your

1    argument.

2              Let me now go to Mr. Troop or Mr. Fitzmaurice, and

3    you can respond to that.

4              Mr. Burks, I will tell you, part of the reason

5    that I basically denied the motion was because I had a

6    discussion with Judge Isgur about what happened at the

7    hearing after the motion was filed.

8              MR. BURKS:  Yes.

9              THE COURT:  So I didn't do it callously.  I

10   basically talked to him.  He said that he was there, that he

11   participated, that he appeared able to participate and he

12   didn't participate -- didn't at that point in time appear to

13   have any sort of problems at all.  Okay.  So that's the

14   reason for the motion being denied.  If the order isn't

15   clear in that regard, it is.

16             MR. BURKS:  It is.

17             THE COURT:  All right.  So that's where we are

18   currently.  I take your oral motion.  I'll let Mr. Troop or

19   Mr. Fitzmaurice respond to it.  All right.  Thank you.

20             MR. BURKS:  Thank you, Judge.  And I am talking

21   about where we are now, not where we were.

22             THE COURT:  I understand.  I understand.  But I

23   mean, here's also the problem.  Okay.

24             MR. BURKS:  Yes.

25             THE COURT:  You're doing this at 9:15 for a

1    hearing that was set at 9:00.  Is there some reason you

2    couldn't have put everyone else on notice that you were

3    going to ask for continuance today, and did you give anyone

4    else notice?

5          MR. BURKS:  On Friday afternoon at approximately

6    2:00 I had a conversation with Mr. R.J. Shannon.  He told me

7    he --

8          THE COURT:  I don't think the party to this motion

9    is R.J. Shannon.  I think it's the National Bank of Kuwait.

10   Did you have any discussions with them?

11         MR. BURKS:  No, Your Honor.  I did not.

12         THE COURT:  All right.  All right.  Then I'll ask

13   Mr. Troop or Mr. Fitzmaurice to respond to that.

14         MR. TROOP:  Your Honor, Andrew Troop, again for

15   National Bank of Kuwait.  We, of course, like the court, do

16   not intend to be callous in our response.  I am, however,

17   surprised that the first we're hearing this and these new

18   circumstances are today, as you said, at 9:15.

19         The need to move this case forward has been well

20   known for a long time.  There is an auction schedule for

21   tomorrow.  There are five, four attorneys from Pillsbury

22   here.  Three of us traveled, two of us on Saturday, to be

23   here prepared for today's hearing.  The representative of

24   the bank also traveled yesterday to be here for today's

25   hearing.

1          And the challenge here, Your Honor, is that, as we

2     laid out in our papers, is not that Mr. Choudhri is reported

3     to be unable to participate.  The challenge here is that if

4     the auction and the confirmation hearing on NBK's plan is

5     tied to Mr. Choudhri's health, then there's no telling how

6     many times at the last minute this issue will rise and have

7     to be addressed by us, meaning you and me, in an awkward and

8     uncomfortable circumstance.

9          The alternatives to proceeding are not good for

10    the estate.  The estate, Your Honor, you'll hear in

11    testimony today, so I'll just proffer it now, and please

12    accept it as true.  You will hear that the building is in

13    bad shape.  It is requiring significant maintenance and

14    expense.  And the party expending those funds is NBK.  And

15    getting the property out of the hands of the estate and

16    proceeding with what is a fair plan, Your Honor, NBK's plan,

17    is in the best interest of the estate, which I think, under

18    the circumstances, needs to take precedence, though I say

19    that with a heavy heart because my -- I'm always sympathetic

20    to anyone's individual plights.

21          But this is a corporate debtor and this is a

22    corporate objector and this is -- Mr. Choudhri's health and

23    his challenges, at least since June 2nd, have also been

24    related to them.  And so, Your Honor, I would ask humbly,

25    because I don't know how else to say it, that the request

1    for a continuance be denied.  Thank you.

2              THE COURT:  Thank you.

3              Mr. Burks, you can come to the podium.

4              MR. BURKS:  May I ask Mr. Choudhri to come step

5    forward, Your Honor?

6              THE COURT:  No.

7              MR. BURKS:  All right.

8              THE COURT:  No.  I mean, and here's the problem,

9    Mr. Burks.  You don't come to a hearing at 9:15 that's set

10   at 9:00 and surprise parties who have traveled and done

11   whatever they need to do to get here to be ready to

12   prosecute or defend your motion at the last minute and ask

13   me to continue the case.  I'm going to deny your motion.

14   All right.

15             MR. BURKS:  Yes, Your Honor.

16             THE COURT:  Thank you.  So you may go ahead and

17   make your opening statement.

18             MR. BURKS:  Yes, Your Honor.  One moment.

19             THE COURT:  Thank you.

20             MR. BURKS:  We start with the concept that credit

21   bidding is a familiar tool used in Chapter 11 bankruptcy.

22   We also start with -- we also continue with the concept that

23   it is not an absolute that the court has discretion on the

24   equities and on the case to -- a case-by-case basis to

25   preclude the use of the credit bid.

```
 1           Let's look at what the court has said all along in
 2   various procedural orders.  The most important thing that we
 3   have to do with this auction in this case is to market test
 4   the value of this property by an auction to maximize the
 5   return for all creditors and possibly to the debtor.
 6           There are circumstances where a credit bid simply
 7   does not promote maximizing or testing the auction -- the
 8   value of the property, but actually retards it.  And that is
 9   the case here for at least three separate reasons, Your
10   Honor.
11           The first one is the proof of claim filed at
12   Document Number 14 for $67,157,000 by NBK, plus the proof of
13   claim filed at Docket Number 13 for tax liens in the amount
14   of $3,864,455 by NBK totals over $71 million, Judge.  Nobody
15   thinks that the cash value at the auction is $71 million or
16   close to it.  In other words, the cash bids that are subject
17   to the auction are moot to the extent NBK chooses to simply
18   credit bid over any cash bid.  There won't be any cash out
19   of pocket.
20           The second problem here, this is not what I would
21   call a pure credit bid, Judge.  So a pure credit bid is a
22   bid where they are bidding in against their proof of claim.
23   That's not what the plan provides and that's not what's
24   happening here.  This one has conditions, it has feelers, it
25   has strings.  The credit bid is together with -- it's
```

1    packaged with NBK doing two other things, paying cash, and

2    I'm using a number that may be wrong.  It's, for example,

3    about $275,000 into the estate and promising to cover

4    administrative expenses.  Now if they can't credit bid, that

5    money is not required to be paid.  In other words, they're

6    saying we want to tie in the credit bid with a release of

7    all claims against NBK.  So they're credit bidding against

8    their proof of claim to buy out claims.  I don't know if

9    that's a credit bid.  It's almost a Rule 90.  It's almost a

10   combination credit bid with motion to settle and compromise.

11        The third problem here, and not the most pressing

12   of all problems, the third problem is that there are

13   objections to the allowable amount of this claim unresolved.

14   We don't know what this claim is for two reasons.  One, the

15   pure objection, and two, three lawsuits that are pending

16   against NBK which need to be resolved in order to know, for

17   purpose of this motion, not what their allowable claim is,

18   but what is the ceiling on the credit bid, and it might be

19   zero.

20        There's an equitable subjugation action.  There's

21   a claim that you'll be hearing about in the confirmation

22   process regarding whether or not NBK is subject to

23   liability.  And there's a serious claim that you'll be

24   hearing from both sides on a settlement agreement and on a

25   subsequent offer, an intender of cash to buy out NBK's note.

1    There's a serious argument the NBK is not the party entitled

2    to exercise any rights on the note, let alone to credit bid.

3            So the case law that Mr. Sather has filed in his

4    brief tells you what should be happening here.  It says that

5    in circumstances like this, and, Judge, those cases in which

6    they held that the credit bid should be denied and held that

7    the bank can simply make a cash bid, and then if it wins its

8    claim actions or disputes, get that cash back, well, those

9    cases address problems far more simpler than here.

10           We have three major problems that call into doubt

11   whether or not this creditor is even entitled to credit bid

12   at all.  And so if it was a pure credit bid, that would be

13   one thing.  If there was a claim where we knew what the

14   amount of the claim was, that would be one thing.  If there

15   was a situation where the only proponent of the plan, the

16   proponent of the plan was the only accepting class and no

17   one else accepted this plan, that would be another thing.

18   But literally you have an opponent of a plan saying, Judge,

19   innocuously, let me credit bid and resolve all the disputes

20   against me, settle all the claims, basically selling all the

21   claims for zero, and let me bid zero cash and have the

22   opportunity up to $71 million to trump anyone who bids cash.

23   Thank you, Your Honor.

24           THE COURT:  Thank you.

25           Mr. Troop?

```
 1          MR. TROOP:  Thank you, Your Honor.  Andrew Troop,
 2    again, from Pillsbury Winthrop Shaw Pittman, on behalf of
 3    the National Bank of Kuwait.  Let me take the easy one
 4    first.  The credit bid (indiscernible) it's not the
 5    (indiscernible) is not tax hunting.
 6          Secondly, Your Honor, let me take this in the
 7    reverse order (indiscernible) issues are argued.  The first,
 8    Your Honor, is that there are objections or challenges to
 9    NBK's claims.  Those objections are for the reasons that we
10    identified (indiscernible) conduct before August of 2022 has
11    been released.  Conduct since August of '22 has been
12    investigated by the trustee.  Under the final cash
13    collateral order, the trustee was to bring claims against
14    (indiscernible) validity, priority or security by the end of
15    the challenge period.  That period has ended.  No challenges
16    were brought.  When that happened, under the final cash
17    collateral order, everyone was bound by the stipulations in
18    the final cash collateral order.
19          But, Your Honor, you will hear, if there's
20    testimony there, (indiscernible) testimony today in
21    connection with the credit bid and the confirmation hearing
22    that that investigation that was described took place.  And
23    in fact, the resolution, there were no claims asserted
24    because the trustee concluded they were (indiscernible).
25    And, Your Honor, because I can't help myself, on the offer
```

1    question, look very quickly at this timeline.  There was a

2    foreclosure sale schedule for July 5, 2023.

3            At the end of June of 2023, the debtors' lawyers

4    at Akin Gump emailed and said, could we have documents to

5    close in accordance with the settlement agreement, which the

6    state court had effectively elongated until for 210 days,

7    and -- or let's say even to July 3rd, for the sake of

8    argument, so we can have them and we could close.  And we

9    said, okay, here's the -- here are the documents.  Here's

10   the number.  And July 3rd came and went and nobody

11   performed.  The debtor didn't perform.  How, how, how can a

12   letter which says, here's what you need for the closing on

13   July 3rd be an offer which is purportedly accepted in April

14   2024 through a letter that says we'll perform in accordance

15   with that prior settlement agreement and we tender payment.

16           Your Honor, I think everyone will stipulate that

17   payment was never made.  Even if a tender could solve the

18   problem, there's been no tender.  A tender is when you walk

19   up and say, here's my money.  And there was no money, right?

20           What was the second one?  Your Honor, I'll go on

21   generally to the concept of credit bidding here.  The case

22   law is clear that people, even when there are challenges to

23   claims, credit bidding is still allowed.  There's no dispute

24   that the money was loaned.  There's no dispute it wasn't

25   paid back.  And there's no dispute that the security

1    interest, the deed of trust, was properly perfected.  No one

2    sought to avoid that.  No one sought to avoid that.  And

3    they can't, Your Honor.  They can't.  Even without the final

4    cash collateral order, they can't.  That's a resolved issue

5    here.

6         So the question then becomes whether this alleged

7    -- I guess I'll describe it as an intercreditor dispute over

8    who owns the loan (indiscernible) remember the reasons I

9    said I think it's there's no there there -- should stand in

10   the way of credit bidding, where I note the estate's

11   representative is not objecting to credit bidding.  And it

12   seems to me that what they're saying is, well, don't credit

13   bid because make them pay cash, and then they can get it

14   back.  But National Kuwait -- National Bank of Kuwait is

15   good for a money judgment.  If they've got independent, non-

16   derivative claims that they can state that would survive a

17   motion to dismiss, summary judgment or a trial, there's a

18   defendant who can pay (indiscernible).

19        So the question is whether the auction should be

20   put -- thrown into chaos, effectively, which goes back,

21   unfortunately, to the arguments we had just before, which

22   is, what is the benefit of delay or (indiscernible)  delay

23   on this estate, and there is none.

24        Finally, Your Honor, the issue with regard to the

25   plan and the sale being connected, everyone knows that.

1   There's another issue with deception, lack of clarity, lack

2   of disclosure.  The trustee set a (indiscernible) auction

3   price, calculating what the benefit, how the cash bid would

4   provide the same benefit to the estate as a credit bid, and

5   the price for NBK stepping out, like it is often for a

6   stalking horse bidder, is a release.  It's a release from

7   the estate.  It's embedded into the plan.  The plan does not

8   release anything but estate claims, and for the reasons

9   already stated, pursuant to the final cash collateral order,

10  everyone's already bound effectively by the results of that

11  release, except people who have independent, non-derivative

12  claims.

13          With regard to the chilling nature of the auction,

14  Your Honor, I can't think of a case where credit bidding has

15  been disallowed, where the conduct that gave rise to the

16  disallowance of credit bidding did not involve some kind of

17  inappropriate, improper interference with the bid and

18  auction process.  That's the primary issue that

19  (indiscernible) looking at in these questions.  And, Your

20  Honor, we have done -- we did what a -- we're not a

21  fiduciary (indiscernible) right?  But we put a sort of a

22  fiduciary hat on and said, how do you get this accomplished

23  in a way that gives the court and creditors confidence that

24  the process is a fair one.  And that was to -- while they're

25  connected, it was to separate the responsibility and

1    decision-making with regard to the auction process and the

2    auction itself from NBK.  NBK acted as the bidder, stalking

3    horse bidder.  Did it make demands or conditions?  Of

4    course.  You'll hear that they were pushed back on by the

5    trust bidding.  You can look and, if we need to, Your Honor,

6    we'll give you the draft bidding procedures that we

7    presented at the trustee, and we'll give you the redline to

8    show what came back as a result of the trustee doing his

9    job.

10           When you put all of this together, Your Honor,

11   there is no basis to disallow credit bidding.  The claims

12   are -- the claims that are asserted are implausible.  They

13   are independent of the estate.  In fact, Your Honor, before

14   I forget, remember two weeks ago, I think it was, we took a

15   case out of state court and brought it here, and Mr.

16   Choudhri filed an emergency motion to remand.  And what was

17   his argument?  His argument was that the dispute over who

18   owns the tax lien and who owns the loan is not a core

19   proceeding.  It's related to jurisdiction at best.  And the

20   court should let the state court decide that issue.

21           Now for a variety of reasons, we may disagree with

22   that.  But they're estopped from arguing differently.

23   They're estopped from arguing differently.  That means that

24   this dispute, the whole basis for their claims, they say, is

25   a dispute you shouldn't resolve.  If you shouldn't resolve

1   it, how can it be the basis to stop credit bidding in a

2   matter before you?  How can it not be that they acknowledge

3   that the remedy, if they have one, is damages?  How could it

4   not be that the process that was undertaken by the trustee,

5   which garnered lots of interest, we don't know what the

6   results are.  Maybe not lots of bids, who knows?  But lots

7   of interest to create a market isn't the one to go forward,

8   particularly where the credit bidding is clearly known to

9   everybody (indiscernible).

10          So Your Honor, I ask that you deny the motion and

11  that the auction go forward with (indiscernible) credit

12  bidding.

13          THE COURT:  All right.  Mr. Burks, you can call

14  your witness.

15          MR. SHANNON:  Your Honor, may I address the court

16  real quickly?  Your Honor?

17          THE COURT:  Bear with me.  Okay.  I have a motion.

18  I have a response.  I have a response deadline that passed

19  and no one else filed any sort of responses.  I only intend

20  to hear the people who actually filed a response.

21          MR. SHANNON:  Yes, Your Honor.  It has to do with

22  one of the exhibits that was inadvertently provided in

23  discovery that's attorney-client privileged.  We can address

24  it if it comes up.

25          THE COURT:  We'll address it if and when it comes

1    up.

2              MR. SHANNON:  All right.

3              THE COURT:  Thank you.

4              All right.  Mr. Burks, you may call your witness.

5              MR. BURKS:  Yes, Your Honor.  At this point, Your

6    Honor --

7              THE COURT:  Please sit down, sir.

8              MR. CHOUDHURI:  I want to make a record, Your

9    Honor.

10             THE COURT:  No.  I would like you to sit down,

11   please.  Thank you.

12             MR. CHOUDHURI:  Because --

13             THE COURT:  I would like you to sit down, please.

14   Thank you.

15             Go ahead Mr. Burks.  You may call your witness.

16             If you're called as a witness by somebody, Mr.

17   Choudhri, you may speak at that point in time.  I don't have

18   any problem with that.  But --

19             MR. CHOUDHRI:  I'm a movant on this motion, Your

20   Honor.  That's why --

21             THE COURT:  You're not.  You didn't file a

22   response.  There's no response in opposition.  You didn't

23   file anything.

24             MR. SATHER:  He was at co-movement, Your Honor.

25             MR. CHOUDHURI:  Yes, Your Honor.

1          MR. TROOP:  Your Honor, he was a co-movant.

2          THE COURT:  He was a co-movant?  Okay.  Come

3     forward.

4          MR. CHOUDHRI:  Thank you, Your Honor.  First of

5     all, Your Honor, I'm sorry I was a little late.  I just

6     wanted to clarify just one thing for a minute, Your Honor.

7     So on June the 2nd, I had a stroke on Sunday and I didn't

8     think it was.

9          THE COURT:  Mr. Choudhri, I've already heard the

10    motion for continuance.  If you want to make an opening

11    statement on the motion, I'm happy to hear it.

12         MR. CHOUDHURI:  Yes, Your Honor.

13         THE COURT:  But this is not let's throw it to the

14    court and see what sticks.  If you want to make an opening

15    statement on the motion to prohibit credit bidding, please

16    do.

17         MR. CHOUDHRI:  Yes, Your Honor.  I just wanted to

18    mention one thing about that, something that you had

19    mentioned earlier.  When I went to the doctor on June the

20    7th, I did call into a hearing --

21         THE COURT:  Again, I don't want to hear anything

22    relative to the motion to continue.  If you want to talk

23    about the motion to prohibit credit bidding, which was

24    filed, I'm happy to hear it.

25         MR. CHOUDHRI:  Yes, Your Honor.  Okay.  Thank you.

1   First of all, Your Honor, I wanted to just mention the key

2   here is transparency and how and why we're here and how we

3   got here.

4          The acts of NBK have been consistent where leasing

5   efforts have been awarded.  There's been offers to sell the

6   property and NBK is not.  In fact, Your Honor, the question

7   is -- so NBK takes a position that the settlement agreement

8   has not been rescinded.  We have taken the position that --

9   let me back up a little bit.  Sorry.

10          NBK is the reason the debtor is in bankruptcy.  In

11   2020, the building by NBK was appraised for over $100

12   million, and the largest tenant went bankrupt, Stage Stores.

13   And when Stage Stores went bankrupt, there was another

14   tenant that had signed a lease for three floors, Saunders.

15   And they didn't move in, mainly, I believe, due to COVID.

16   But had they been in before COVID, the requirements in the

17   loan documents by the Bank of Kuwait required them on

18   5.27(c) that they shall provide SNDAs.

19          Your Honor, I went back.  I'm a little slow, and I

20   apologize, so bear with me.  But I went back and I read the

21   January 31 transcript when you asked me, where are they

22   required to do SNDAs?  Show me.  And I said, the settlement

23   agreement.  And at that time, the settlement agreement was,

24   I believe, confidential.  And it's been filed, I believe, by

25   the trustee and the bank.  So I don't believe it's

 1    confidential anymore.  The settlement agreement supplanted
 2    the loan agreement.  The settlement agreement also compelled
 3    them to provide SNDAs and allow the debtor to lease up the
 4    building.  The settlement agreement was entered on August
 5    2022, a week before the key people in Kuwait were compelled
 6    to testify.  And Mona Dajani, the general counsel, because
 7    what the Bank of Kuwait did in July of 2022 is they filed a
 8    false SAR before they made the loan.  They structured the
 9    loan where it was a sale.
10          This goes back to what also happened, what is
11    happening with me across the board, Your Honor.  There's a
12    gentleman named Osama Abdullatif.  He has filed lis pendens
13    on 90 of my properties.  First, what he did is he recruited
14    my ex-wife in 2015, even though I was divorced in 2012 and
15    had her file lis pendens, and all of these entities were
16    defendants, including the creditor here.  2425 WL was a
17    defendant, and this property had a lis pendens on it.  And
18    that case ended in 2019.  The court found that I was
19    divorced, or the court had no jurisdiction because the court
20    earlier found I was divorced in 2012.  So this was
21    asymmetric warfare and barratry, sponsored litigation by
22    Osama Abdullatif.
23          So in 2018, when the loan was made by the Bank of
24    Kuwait, they wanted the property to be transferred from 2425
25    WL to a new created entity, Galleria.  All the funds from

1    the buyer -- there's no funds that came from the buyer on

2    the closing statement that Mona Dajani, representing the

3    Bank of Kuwait, approved, the closing statement.  The deal

4    was structured the way it was.  There's evidence of that.

5    That's what our case -- they structured the deal the way

6    they did.

7           The loan documents provided that the bank shall

8    approve leases, but not unreasonably withhold approval.

9    Fast-forward, Sonder shows up.  Sonder wants to sign a

10   lease.  Now in 2019, the court, the family court in Harris

11   County found that I was divorced as of 2012, and the court

12   had no jurisdiction.  So all of the lis pendens that were

13   filed by Osama through the sponsored litigation were void

14   and dissolved.  And that was one of the concerns that Bank

15   of Kuwait had and Mona Dajani had, that she could -- the ex

16   could file more lis pendens, and that's why they structured

17   the deal.

18          And at that point, we moved forward.  In 2020 --

19   in 2019, Sonder came to me through the City of Houston, the

20   mayor's office.  They were looking at expanding their short-

21   term rental.  They go and -- they're like Airbnb, but

22   they're standardized.  It's as if you go to a Marriott

23   versus like an Airbnb is a one-off independent.  You get

24   independent reviews.  And Sonder, one of their seed

25   investors is Bezos Expeditions.  So it was a startup, and

1    they came to me and I met with them.  They met with a lot of

2    developers in town.  They ended up signing five leases with

3    varying companies, Your Honor.  And once they did that, we

4    informed the Bank of Kuwait, Mr. Carter, Michael Carter.

5            And one thing I want to mention, Your Honor,

6    there's an internal loan memo that was drafted and submitted

7    by the Bank of Kuwait in March of 2018 when they laid out

8    this whole thing about my ownership, Jetall being successful

9    in leasing the building, myself owning it and continuing to

10   own it after the loan closed.  And after Stage filed

11   bankruptcy, I attempted to acquire Stage when it was in

12   Judge Jones' court.  I was not successful.  But the company

13   failed, 13,000 people lost their jobs.  They were our

14   largest tenant.  And there's an email with Michael Carter

15   where he emails other people at the Bank of Kuwait.  Again,

16   all decisions were made in Kuwait and it says our effective

17   equity counter, Ali Choudhri is trying to buy Stage Stores.

18   If they do, they'll be successful in saving the tenant.

19   This is in 2020.

20           Fast-forward with Sonder not moving in.  Some of

21   the factors of Sonder not moving in, there were delays.

22   Obviously, Sonder had their own excuses, and I believe it's

23   mainly COVID.  The Bank of Kuwait's position has been all

24   leases have to be approved in writing and cannot be

25   unreasonably withheld.  They asked the (indiscernible) to

1    sign those leases for the three floors for 15 years.  And

2    what that does, Your Honor, it was forethinking.  It would

3    convert three floors of the building to apartment hotel.

4    It's truly live, work and play, mixed use.  And in Feb.

5    2020, permits were approved by the City of Houston.

6          But in January 2019, when the leases were

7    submitted to Mr. Carter, he and Mr. Marwan and the people

8    that I spoke to in Kuwait were anxious for us to sign those

9    leases.  We did not get those approvals in writing.  They

10   asked us to get them signed.  Those leases were signed.

11   Subsequently, a few months later, when the TIs, the tenant

12   improvements and leasing commissions were sought, Bank of

13   Kuwait took a position that those leases are null and void

14   because you never got them in writing.  They sent initial

15   default letters.  That's what the default started.  Mr.

16   Carter, in his deposition, could confirm that and testify to

17   that.  So the bank says leases approved.  Then they say, you

18   didn't get it right.  It's not approved.  It's null and

19   void.  And then they're emailing the appraiser, asking him

20   to include the leases in their report.

21          Fast-forward, COVID.  So Feb. 2020, the permits

22   get approved.  March 2020, COVID happens.  May 2020, Stage

23   Stores files bankruptcy.  The building is bleeding.  It's

24   losing money.  Lots of things are going on at that time.

25   It's very difficult.  And the bank -- at that point, we

1    tried our best to lease up the building, and we got some

2    leases.  We got a tour with Microsoft.  We had an interest

3    with Bechtel.  We had lots of interest and proposals, actual

4    proposals.  And this is a pattern that's been repeating

5    itself.  We got the proposals.  We presented them to the

6    bank.  They wouldn't approve them.

7            Finally, we threw up our hands and said, we're

8    going to sell the building.  We got an offer.  We got a

9    couple of offers.  Holland & Knight sent the offer to the

10   Bank of Kuwait, to Mona Dajani at Pillsbury.  The offers,

11   there's an offer there for $85 million.  There's an offer

12   there.  And these are typical offers that require typical

13   due diligence so you're not depressing or suppressing the

14   market.  It's not a value destroying auction or process

15   where somebody has three weeks of marketing and has to pay

16   10 percent nonrefundable and close immediately.  You're

17   going to take 80 percent of the buyer pool away.

18           Subsequent to that, Your Honor, offers were made

19   to the Bank of Kuwait.  Mr. Carter in his deposition on June

20   the 5th testified that they received no offers.  They didn't

21   receive the $85 million offer, when it was in fact received.

22   In fact, it was also that Holland & Knight letter and the

23   control and the documents were also sent to R.J. Shannon in

24   2021.  Subsequent to that -- when he was with the firm

25   Parkins Lee & Rubio, which was Kyung Lee, R.J. Shannon and

1    Lenny Parkins.

2           Subsequent to that, Your Honor, the bank decided

3    instead of responding to the offer and the leases, to help

4    the borrower pay the bank off, it would be a good thing.

5    The loan documents also state in the loan documents that the

6    borrower has to get approval of the bank before it can enter

7    into a sales contract.  Obviously we were very hesitant to

8    do that without getting approval because of the Sonder

9    default that they claimed after they approved the lease of

10   Sonder, then they claimed it was not approved.

11          Interestingly, after Sonder didn't move in and in

12   the state court litigation, in their Interrogatory Number 6,

13   they state we approved Sonder.  Well, in the deposition they

14   approved, they state they didn't approve them.  Well, it's

15   very convenient.  They approve them or they don't.  They've

16   also stated they've never approved a single lease, except

17   one lease which is Sonder.  And I can guarantee, Your Honor,

18   there have been many, many leases submitted.

19          Mr. Carter also testifies that he doesn't know

20   Vaxanix.  If you remember, there was a gentleman from

21   Vaxanix, which is the Dole Food Company, who wanted to sign

22   the lease for 13,000 square feet and take up to two floors,

23   but start with 13,000 feet.  NBK says they didn't receive

24   that lease either.  That lease was submitted to the trustee.

25   It was submitted to the court.  The witness was submitted to

1    the court.  I correct myself.  The lease was submitted to

2    the trustee in Feb., in March.  Mr. Carter testified that he

3    didn't receive that lease either, that he hasn't received

4    any leases.

5          In September of 2021, in August of 2020 -- I'm

6    sorry.  August of 2021, Holland & Knight, our counsel, my

7    counsel, the debtor's counsel, my counsel sends a contract

8    to the Bank of Kuwait to approve to sell the building for

9    $85 million that would clear their debt.  Instead of

10   responding to it, they posted the property for foreclosure

11   before accelerating the loan.  The debtor goes to court,

12   gets a TRO.  Mediation is compelled.  They don't come to

13   mediation.  The TI goes forward.  Judge Weems grants the TI.

14   Nobody from Kuwait shows up.  Judge Weems grants the TI in

15   March of 2022 and trial is set for September 2022.

16         In June of 2022, the bank amends their complaint,

17   adds fraud claims.  When you're -- it seems like a pattern.

18   When you question or someone retaliates back.

19         MR. TROOP:  That's the removed adversary that's

20   (indiscernible) state court.

21         MR. CHOUDHRI:  In June of 2022, the Bank of Kuwait

22   amends their complaint, counterclaims and says that the

23   debtor committed fraud.  We asked for discovery.  They non-

24   suit.  Their amended complaint said that discovery is not

25   necessary.  We go forward to trial.  Depos are compelled

1    Mona Dajani because claims they made were not truthful.

2    Representations they made, even on an SAR, were false.  And

3    in fact, they asked Judge Weems to terminate their

4    testimony, which would be an obstruction of justice.  And

5    Judge Weems denied doing that.

6         Judge Weems compelled the depositions of the key

7    people at the Bank of Kuwait.  The Bank of Kuwait entered

8    into a settlement agreement.  I don't believe they entered

9    into that settlement agreement in good faith, Your Honor,

10   and I don't believe they're here in good faith today.  The

11   settlement agreement got entered.  Tax liens for several

12   million dollars were assigned over to them.  And there's no

13   provision in that settlement agreement that says they get to

14   keep them.  They have to give them back.

15        The settlement agreement also says the venue, the

16   reason it was filed in the 129th, that case, Your Honor, it

17   says, by agreement, the venue is Harris County district

18   court.  We'd be happy to come to Your Honor, but that's what

19   we followed, and that's what the settlement says, which

20   they've now filed.  And so when the settlement agreement was

21   done, Your Honor, in August 2022, at this point, the

22   building is suffering.  It has no occupancy.  I've been

23   funding this, bringing funds, as you can understand.  You

24   have a 300,000 square foot building.  It's hundreds of

25   thousands of dollars every month just to keep things going

1    while they're tying our hands and precluding us from leasing

2    out.  The reason Judge Weems entered that TI, because if

3    some testimony and evidence came out, Your Honor, where

4    their plan was to remove me, the equity owner, and bring in

5    their other people in New York that they had.

6          NBK is acting like banks in the '80s where laws

7    were created and they want to hide discovery.  They'll do

8    whatever to hide and run from the discovery.  And everything

9    should be transparent, should be open, and it's transparent,

10   and it hasn't been, Your Honor.  I can vouch for that.  When

11   the Stage bankruptcy happened, Your Honor, at Document 70,

12   Page 8 and 9, furniture, FF&E, Stage spent $14 million on

13   furniture for 200,000 square feet.

14         The background of the building, Your Honor, I

15   bought the building in 2012 when Blue Cross was moving out.

16   And I gutted it, renovated it, fixed it up, got it leased

17   up, brought Stage in.  In fact, their loan memo brags how

18   great I did and all the assets they looked at and how

19   successful I was.  I've had my own challenges with this guy

20   Osama, who's been attacking me on every front.

21         But when I got the building leased up, I got Bank

22   of America to finance it.  And then I was approached by NBK

23   to refinance it with them, and that's the structure they

24   set.  We followed their structure.  Their loan agreement

25   says they cannot unreasonably withhold approval.  They have

1  to act in good faith.  And the provision is New York law

2  where it's good faith in dealing.  And they haven't done

3  that.

4        They're going to do everything they can.  They've

5  given the trustee -- they've told the trustee, because I

6  asked the trustee, what are the admins so we can come up

7  with a proposal that's better.  It's irrelevant because --

8  in writing, Mr. Shannon says it's irrelevant because NBK is

9  going to pay whatever it is, whatever it is, so they can

10  create liquidating trust and keep attacking, and so they

11  have an open check by the Bank of Kuwait.  Instead of

12  holding them accountable, hold everybody accountable, open

13  the door for transparency, have a discovery master,

14  whatever, because there's things that are being hidden, Your

15  Honor.

16        Mr. Reese filed a deposition which earlier on they

17  said, well, you were dilator in discovery.  He filed a

18  deposition, and it was quashed.  Then they bullied him and

19  said, hey, you can't do it, you're not the debtor.  And that

20  wasn't accurate.  And so when you see the email, Your Honor,

21  it will be astonishing.  The evidence is overwhelming.  The

22  bad faith by the bank is overwhelming and it is -- and the

23  reason Jerry Alexander, who's here in the courtroom, he

24  handled the Bailey Tool case.  And there's other large law

25  firms that have agreed to take this case on against the Bank

1    of Kuwait on a full contingency for no cost.

2         Forget the litigation.  We said, hey, we'll pay to

3    buy those claims.  All we want to do is settle.  All we want

4    to do is for them to honor what they said they were going to

5    do.  If they want to say the settlement isn't rescinded,

6    well then their amount is not more than $26 million.  They

7    can't have it both ways.  We have QB -- and I'm all over the

8    place and I'm sorry, Your Honor.  Thanks for bearing with

9    me.

10        It's just there's a malignment of reputation.

11   There's a malignment of a narrative.  There's always two

12   sides to it.  And my dad taught me -- pe passed away in 2012

13   and I learned from him going to the RTC in the early '90s

14   and I've been in and around real estate.  I started young.

15   But he taught me, if somebody says the dog ran away with

16   your ear, don't run after the dog.  Check your ear first.

17        And the thing that I've been saying

18   (indiscernible) reading everything, Your Honor, and what Mr.

19   Troop has stated on the record in different transcripts, and

20   I have them all and I have what you, Your Honor, has said.

21   And you read everything.  You're very smart.  The things

22   that I've seen, Your Honor, there's so much

23   misrepresentation to Your Honor.  There has been fraud on

24   this court and I'm not saying that lightly, Your Honor.  And

25   I will prove it.  And if I have to bring a 60(b) motion, I

1   will, because I want -- I want the facts to come out, what's

2   happening.

3           I want to go back to Stage.  Stage filed

4   bankruptcy.  Non-debtor entity acquired the FF&E from

5   bankruptcy court.  There's 200,000 square feet of furniture

6   in that building, Your Honor.  And so the reason I thought

7   it was a good idea to stage the space so when somebody walks

8   in, they want to lease it.  It's easier.  But they've been

9   handicapping me from leasing it.  I have acquired several

10  dozens of buildings successfully.

11          When they say money judgment -- by the way, Your

12  Honor, I want to mention something.  This is an I.M. Pei

13  building.  I.M. Pei is deceased.  He's the architect that

14  designed the pyramid in the Louvre.  He's only done two

15  buildings in Houston, the JPMorgan Tower and this building.

16  This real estate is very, very unique.  And what they want

17  to do is suppress and depress the value and have a value

18  damaging model.

19          Hilco -- let me go back to the FF&E.  Hilco is

20  representing to third parties and the public that the

21  furniture is included in the sale.  That's what they're

22  representing.  So these buyers that are out there are under

23  the impression that all the furniture that's in the building

24  that's not owned by the debtor is included in the sale.  So

25  trampling rights, left and right.  Entities have rights,

1    people have rights and they can't just ignore those rights.

2    And that is going on here.

3            We have the evidence.  I have the evidence where

4    they are marketing.  And I've asked for the marketing

5    material so I could look at what the marketing materials and

6    it's been said, no, wait until the sale motion in July.

7    Well, that's been too late.  There's false advertising going

8    on, number one.  Number two, the phone number on the

9    building goes to a 99 cent real estate Hilco dedicated

10   hotline for 99 cent store bankruptcy for the real estate.

11   And I brought that to the attention.  And I have a recording

12   of that phone call that shows what number you call, the

13   number that's on the building.

14           I want to just go back for a second, Your Honor,

15   and mention a few things.  Once the settlement agreement got

16   signed, the building was virtually empty.  But the

17   settlement agreement supplanted the loan agreement,

18   supplanted their rights.  And the settlement agreement

19   allowed me or my designee to acquire the note for $26

20   million, meaning I could bring another lender, I could bring

21   in another bank to take them out.  That was the deal.

22           So once I did that, I rolled up my sleeves.  I

23   started going to work every day trying to lease up the

24   building in a challenging market.  And I brought in DC

25   Partners.  They took an entire floor.  They're the group

1   that developed the Allen and the Thompson hotel on Allen

2   Parkway, brought them in, and they've taken a whole floor.

3   I brought in other tenants.  I brought in Regus interested

4   in moving in, but they won't approve Regus.  Regus is IWG.

5   They've taken over a lot of the WeWork spaces.  They're

6   publicly traded.  I've brought in lots of tenants that want

7   to move into the building.  It's a beautiful building.  It

8   deserves -- it's like shutting a chemical plan and saying,

9   let's sell it while it's shut, then letting it run for a

10  couple months and then selling it based on revenue, which is

11  what our plan was.

12          It's very easy to say, you know -- but going back,

13  at the end of 2022, I meet with a gentleman named Paul

14  Caldwell, who represents a hedge fund.  And his investor is

15  a billionaire in Hong Kong who's interested in redeveloping

16  the garage and making it automated.  And he meets with me,

17  firs, is interested in taking space in the building.  Then

18  he becomes interested in buying the building.  He had signed

19  an LOI on Post Oak at the (indiscernible) building, but he

20  loved the building that he came over.

21          Same thing with DC Partners (indiscernible) came

22  over to meet me.  He had signed an LOI.  Phoenix Tower, I

23  convinced him the building was so great, and it has

24  furniture.  So he signed a lease here.  So I was doing the

25  best to lease up the building.  And it's been negative for

1   sure, but it'll be positive with tenants.

2           I got Paul Caldwell to come in.  He liked the

3   building.  He makes an offer to buy the building for $136

4   million.  He puts it in writing.  It's signed.  There's a

5   recording of a meeting that R.J. Shannon had with Paul

6   Caldwell that's supposedly privileged, we can't get, which

7   we'd like to get.  But Paul Caldwell, in that memo that Mr.

8   Shannon provides, he says he didn't sign any agreement with

9   the debtor.  There was no agreement.  He has his story.

10          Well, here's what really happened.  At the end of

11  September, he wants to buy the building.  I start leasing up

12  the building.  He sees there's activity.  He wants to take

13  two floors and buy the entire building.  The offer he makes

14  is $75 million for 55 percent.  The debtor retains 45

15  percent.  He puts down $35 million.  The debtor gets a first

16  lien, a carried interest of $40 million at 7 percent at 20-

17  year am.  So the debtor retains 45 percent passively, and

18  the building is sold or the asset is sold to Caldwell's

19  group.

20          Publicly, the debt on the property is $60, $70

21  million.  If you look it up, that's what it is.  The

22  confidential agreement is confidential.  It says the debt's

23  26, I can buy for $26 million.  But no one knows that.  So

24  if you're buying a property from someone and their debt is

25  publicly $8 million, you're buying it for ten and then you

1    find out it's one, it's going to change your heart on what

2    you want to do.

3           Mr. Caldwell signs an NDA.  Mr. Caldwell then

4    informed me that Pillsbury represents him in New York and

5    they asked him to call the Houston office.  Then we find out

6    he's attempting to buy the debt.  He later tells me that

7    he's now uncovered -- he tells me this, Your Honor, that the

8    bank has agreed to cut the debt in half.  I didn't tell him

9    that.  So he has information the bank's taking less than

10   what the public information is because of the confidential

11   nature of our settlement.

12          At that point, Your Honor, the deal falls apart.

13   I tried to bring another lender in, Security State Bank, and

14   they're a witness as well.  They went to committee.  They

15   approved the note on note because commercial lending is

16   hard, CRV concentration.  But lenders can make loan on loans

17   because it doesn't fall under that C&I bucket.

18          The Bank of Kuwait files a receivership.  The

19   lender tells them that they're trying to get this deal

20   closed.  It's been frustrating efforts after and after and

21   after.  We ask for SNDAs, they won't provide them.  We have

22   tenants that want to move in.  We ended up in the

23   bankruptcy, Your Honor --

24          THE COURT:  Mr. Choudhri --

25          MR. CHOUDHURI:  The 26th --

```
1              THE COURT:  Mr. Choudhri, anything you're telling
2    me isn't evidence.  It's argument.  And you've been going on
3    now for basically 35 minutes.  I'm going to ask you to
4    basically wrap up in the next five minutes.
5              MR. CHOUDHURI:  Yes, Your Honor.
6              THE COURT:  We have actual evidence to hear.
7              MR. CHOUDHURI:  Yes, Your Honor.
8              THE COURT:  Go ahead.
9              MR. CHOUDHURI:  So Your Honor, what I wanted to
10   mention is when you -- I've seen the redlines, and the
11   redlines include the tax lien as a credit bid.  There's that
12   in there.  And it was redlined, it was collapsed, it was
13   truncated.  But there's a tax lien component and there's a
14   credit bid.  So when Mr. Troop tells you that that credit
15   bid is not the tax lien, well, that's not what the initial
16   redline showed.  What they did is they combined them.  But
17   when you look at the earlier draft, it's bifurcated.  So you
18   can see that is what it is.
19             The note and lien was sold.  The thing that has to
20   be done, Your Honor -- and I'm here and I can represent to
21   Your Honor that we can solve this.  We have a friendly
22   lender.  QB Loop Property has provided the wherewithal and
23   the proof of funds and the liquidity to Mr. Troop and the
24   trustee.  And they're prepared to move forward and execute
25   on the loan sale.  And they'll come in and they'll step in
```

1    the shoes of the bank and they're prepared to pay the $26

2    million.  So we've attempted to do that.  There's been an

3    offer, there's been an acceptance.

4         As far as the credit bid, when you introduce a

5    credit bid, I can tell you from experience, Your Honor,

6    people are not going to come, number one.  When you have a

7    process where Hilco markets the property three weeks and

8    requires 10 percent nonrefundable just to be able to bid,

9    that's 80 percent.  Number two, all parties here, even in

10   deposition, will agree if the building is more leased up,

11   it's more valuable.  Well, guess who's blocked the leases

12   since the trustee has been appointed.  The Bank of Kuwait,

13   and we have evidence of that.  They said they've got no

14   leases.  We've provided all these leases and they said

15   they've got no leases.  So they've artificially depressed

16   the value so they can come in and get an advantage to credit

17   bid.

18        A true market test -- and by the way, everything

19   should be market tested.  I agree with the market test.

20   What is the largest asset, in my opinion, of this estate?

21   It's the claim against the Bank of Kuwait.  That needs to be

22   market tested.  It hasn't been.  We've made offers and

23   tendered offers for a million, $700,000, half a million.  No

24   counters.  No, we can't do it.  We can't do it.  We've asked

25   the Bank of Kuwait, what consideration are they providing

```
1    for this release?  $200,000, $300,000 is what they say.  And
2    Your Honor heard earlier that the consideration is they get
3    to credit bid.  That's the consideration.  That doesn't make
4    any logical sense.
5         And I can tell, Your Honor, I've been in real
6    estate.  I started real estate in '92 with my dad when I was
7    12.  I bought my first property in '95.  I bought a lot of
8    CMBS loans in 2008, '09, '10, '11.  I've never -- in my
9    opinion, if there's a true property sale, it should be a
10   market, open market.  People bid on it, whatever the market
11   is.  And if the Bank of Kuwait wants to bid on it, then they
12   can do a round credit.  They have the wherewithal.
13        But to say that, before we even get there, they
14   have to have standing.  It's my belief, Your Honor, that
15   they don't have standing, they don't own the note and we're
16   prepared to step in.  And if Your Honor would like to enter
17   an order ordering a sale of the note, or if they're willing
18   to sell the note and honor the agreement at $26 million,
19   which was the deal, then we have a friendly lender that will
20   step in, Your Honor.  That's all I wanted to say.
21        And the other thing, Your Honor, I just wanted to
22   say that the evidence will show that all of these actions
23   were directed by the bank, 100 percent of these actions,
24   hiring Hilco, hiring all of these people were directed.  And
25   the plan from day one was to auction the property and deal
```

1    with the claims later.  We never had a chance.  That's what

2    I went back and I'll show Your Honor more times as well.

3    Thank you, Your Honor.

4              THE COURT:  All right.

5              MR. CHOUDHURI:  Thanks for your time.

6              THE COURT:  Thank you.

7              Mr. Troop, since we kind of went out of order,

8    I'll let you respond to anything that Mr. Choudhri just said

9    to the extent that you want to or need to.

10             MR. TROOP:  Can I just have one minute, Your

11   Honor?

12             THE COURT:  Sure.

13             MR. TROOP:  Cover up that mic in the middle.

14             THE COURT:  Go ahead.

15             MR. TROOP:  Thank you, Your Honor.  Andrew Troop,

16   again, from Pillsbury, for NBK.  Your Honor, suffice it for

17   now to say that there is very little that Mr. Choudhri

18   espoused over the last 40 minutes with which the bank agrees

19   or that is true.  And if, as we go through today's hearing,

20   what he said is in fact deemed by the court to be relevant,

21   we reserve all of our objection in that regard.  We will

22   answer them as necessary.  But again, Your Honor, this case

23   needs to go forward.  The credit bidding motion needs to be

24   decided today.  Confirmation should be decided today.  And

25   this case should be headed towards its end, not towards its

1    middle and additional expense and additional delay.  Thank

2    you.

3              THE COURT:  Thank you.

4              Mr. Burks, you may call your first witness.

5              MR. BURKS:  Your Honor, on behalf of 2425 WL, at

6    this time we call our first witness as -- one moment, Judge

7    -- where's my pen --  Mr. Michael Carter, Your Honor.

8              THE COURT:  Mr. Carter, if you'll come forward,

9    wherever you are.  Mr. Carter, if you'll come to the podium

10   first, I'll swear you in.  Once I've sworn you in, you can

11   be seated.  Please raise your right hand to be sworn, sir.

12             MR. CARTER:  Yes.

13             THE COURT:  Do you swear or affirm to tell the

14   truth, the whole truth and nothing but the truth, so help

15   you God?

16             MR. CARTER:  I do.

17             THE COURT:  All right.  Mr. Carter, you may be

18   seated there.  Please make sure you speak into the

19   microphone.

20             Mr. Burks, as soon as he's seated, you may

21   proceed.

22             MR. BURKS:  Thank you, Judge.

23                  DIRECT EXAMINATION OF MICHAEL CARTER

24   BY MR. BURKS:

25   Q    Mr. Carter, you've already stated your name for the

1   record, I believe.  Will you please tell the court what your

2   current occupation is?

3   A    I'm a relationship manager at the bank of the -- at the

4   Bank of Kuwait.

5   Q    Is it the Bank of Kuwait or the National Bank of

6   Kuwait?

7   A    The National Bank of Kuwait.

8   Q    And where -- out of where do you office, sir?

9   A    299 Park Avenue.

10  Q    In New York City?

11  A    Yes.

12  Q    And in your position as relations manager, what do you

13  generally do?

14  A    I seek out new business.  I do the credit applications

15  for that.  I close the loans and I manage them.

16  Q    All right.  Have you ever testified in bankruptcy court

17  before?

18  A    You mean outside of this one?

19  Q    Yes, sir.

20  A    No.

21  Q    And do you have -- what is your area of expertise?  I

22  understand what you do for the bank, and I appreciate that.

23  What is your area of expertise in terms of valuation of

24  properties?  Do you have any expertise in that area?

25  A    I have an appraisal certificate that I got when I was

1    at -- first started in banking at the Bank of New York.

2    Q    Good, and how long ago was that?

3    A    That was 1989.

4    Q    Have you taken an appraisal or done an appraisal of the

5    building at issue here in this case?

6    A    Say that again.  You asked me if I had done an

7    appraisal?

8    Q    Yes, sir.  Have you done an appraisal?

9    A    No.

10   Q    Have you seen an appraisal?

11   A    Yes.

12   Q    Has the bank taken an appraisal or ordered an

13   appraisal?

14   A    Yes, several of them.

15   Q    And have you looked at those?

16   A    Yes.

17   Q    Based on those appraisals, what do you believe is the

18   value of the building at auction?

19           MR. FITZMAURICE:  Objection, Your Honor.

20           THE COURT:  Stand up, and what's the objection?

21           MR. FITZMAURICE:  Your Honor, calls for

22   speculation.  The purpose of the auction is itself to set

23   the value.  The witness' opinion, as to -- the witness'

24   opinion today as to what's going to happen tomorrow at the

25   auction is not relevant to any issue in this -- in

1    connection with this proceeding.

2           THE COURT:  I'll overrule the objection.  Go

3    ahead.

4    BY MR. BURKS:

5    Q    Do you have an opinion as to the value of the building

6    at issue in this case, sir?

7    A    Our last appraisal said it was worth $18.6 million and

8    $20 million as raw land.

9    Q    All right, and that's your opinion of the value based

10   on that appraisal, sir?

11   A    I believe that's a reasonable number.

12   Q    All right.  Now have you reviewed this account, this

13   loan account involving this case and involving this

14   property?

15   A    Yes.

16   Q    And what is the amount that is due, in your opinion,

17   based on National Bank of Kuwait's records currently?

18   Currently, what is the amount due?

19   A    The total amount due is approximately $70 million.

20   Q    All right, and you're not trying to round it up or give

21   the exact number, but it's in the neighborhood of $70

22   million?

23   A    Yes.

24   Q    All right, sir.  And are you aware of the Chapter 11

25   plan that the National Bank of Kuwait has filed in this

1    case?

2    A    Yes.

3    Q    Have you reviewed bankruptcy claims outside of this

4    case before?

5    A    No.

6    Q    Do you have general understandings of what the plan

7    filed in this case has?  And I'm asking you a general

8    understanding within your own definition of whatever that

9    means.

10            MR. FITZMAURICE:  Objection, Your Honor,

11    relevance.  This is -- we're here on the motion to prohibit

12    as to credit bidding.

13            THE COURT:  I'll sustain the objection.

14    BY MR. BURKS:

15    Q    Do you think that the National Bank of Kuwait's

16    provision for credit bidding at this auction is a provision

17    that's been propounded in good faith?

18            MR. FITZMAURICE:  Objection, Your Honor, vague as

19    to provision and also that whether -- that's a question that

20    goes to confirmation of the plan, not to the credit bidding

21    issue, which is what we're here on now.

22            THE COURT:  I'll sustain the objection.  Thank

23    you.

24    BY MR. BURKS:

25    Q    Is it your understanding that on the auction

1   proceeding, National Bank of Kuwait has a right to credit

2   bid?

3   A     Yes.

4   Q     And what does a credit bid mean to you?

5   A     That means that we bid our mortgage claim.

6   Q     And when you credit bid, how much cash out of pocket

7   will the bank pay?

8   A     Typically there are fees involved in a credit bid.

9   Q     Are there fees involved in this case?

10   A     Yes.

11   Q     And how much will the National Bank of Kuwait pay out

12   of pocket?

13   A     There are administrative fees as well as other payments

14   we've agreed to make for some of the other creditors.

15   Q     As part of the agreement to credit bid, are you saying

16   that you've agreed to make payments to the Chapter 13 -- the

17   Chapter 11 liquidating trustee?

18         MR. FITZMAURICE:  Objection, Your Honor.  Again,

19   that's confirmation of the plan.  That's not the motion to

20   credit bid at the auction tomorrow.

21         MR. BURKS:  Response?

22         THE COURT:  Go ahead.  Respond.

23         MR. BURKS:  There is no way to separate out case

24   law.  If there are any ties to the conditions of credit,

25   then there is no way to separate that out, Judge.

```
 1              THE COURT:  I think there is.  So I'll sustain the
 2    objection.  Thank you.
 3              MR. BURKS:  All right.
 4    BY MR. BURKS:
 5    Q    Looking at your declaration that was filed at Docket
 6    Number 514, sir --
 7              MR. FITZMAURICE:  Your Honor, same objection.  The
 8    declaration was filed in support of confirmation of the
 9    plan.
10              THE COURT:  I'll sustain the objection.  I've read
11    specifically the motion at 353.  It's got to be part of that
12    motion.  I'm going to sustain the objection.  Go ahead.
13    BY MR. BURKS:
14    Q    Does National Bank of Kuwait have cash sufficient to
15    pay a $71 million cash offer at auction?  If you're not a
16    credit bid, does National Bank of Kuwait have cash
17    sufficient to pay $71 million at auction?
18              MR. FITZMAURICE:  Objection, Your Honor.  I guess
19    assumes facts not at evidence, that the motion is to credit
20    bid and whether or not we should be allowed to credit bid,
21    not whether the bank has sufficient resources to pay cash.
22    We're focused on whether or not there is going to be a
23    credit bid at the auction tomorrow.
24              THE COURT:  I'll sustain the objection.
25    BY MR. BURKS:
```

1    Q    Are you aware that your attorney in opening argument

2    argued that the cash collateral final order has released all

3    claims against National Bank of Kuwait?

4              MR. FITZMAURICE:  Objection, relevance of the

5    witness' knowledge of a legal argument that counsel made in

6    the hearing.

7              THE COURT:  I'll sustain the objection.  I'm not

8    sure what relevance that has, Mr. Burks.

9              MR. BURKS:  The relevance is that under the case

10   law, our argument is that this isn't a -- this is not a pure

11   credit bid.  This is a release.  This is a credit bid plus

12   cash in turn for a release of all cash causes of action, and

13   you can argue that that is a confirmation issue.  But --

14             THE COURT:  I've already ruled on the objection.

15   I'm not going to change my ruling based on what you just

16   said.  You can ask your next question, please.

17             MR. BURKS:  Yes, Your Honor.

18   BY MR. BURKS:

19   Q    In your experience as the banker for NBK, have you ever

20   dealt with any other credit bids?  Have you ever been in a

21   situation where there's been credit bidding by NBK on any

22   other properties?

23             MR. FITZMAURICE:  Objection, relevance, Your

24   Honor.

25             THE COURT:  Mr. Burks, let me kind of -- and I'm

1    going to sustain the objection.  But let's -- I reviewed the

2    motion at 353 and I'm familiar with 363 and credit bidding.

3    Okay.  Basically there are several claims made in the

4    motion.  Okay.  The first is that NBK has no interest in the

5    property.  Okay.  Second, that there's been a breach of

6    contract.  Three, that there are claim objections pending.

7    Okay.  And fourth, that there's a sufficient dispute between

8    the parties that I shouldn't allow credit bidding.  That's

9    really what I'm interested in hearing, okay, because that's

10   what the motion says.  All right.  So if you want to move

11   forward on those bases, which is what's pled, that's what

12   I'd like to hear.

13        MR. BURKS:  Yes, Your Honor.

14        THE COURT:  Okay.  Thank you.

15   BY MR. BURKS:

16   Q    Mr. Carter, are you aware that the debtor -- are you

17   aware that there's been litigation filed against National

18   Bank of Kuwait in connection with this property in this

19   case?

20   A    Yes.

21   Q    Has any of that mitigation been resolved, adjudicated?

22        MR. FITZMAURICE:  Objection, Your Honor.  Does

23   counsel mean other than through the settlement agreement and

24   the claims that were withdrawn with prejudice under the

25   settlement agreement?

1            MR. BURKS:  Response?

2            THE COURT:  Go ahead, Mr. Burks.

3            MR. BURKS:  The effect of that settlement

4     agreement, the status of that settlement agreement is

5     actually (indiscernible) litigation.

6            THE COURT:  And I'm sure that's going to be part

7     of the evidence.  But I think to ask -- have him answer that

8     question is probably unfair because he probably doesn't know

9     what the legal effect of the settlement agreement is.  But

10    I'm going to hear it at some point in time, I'm assuming,

11    from some witness.

12           MR. BURKS:  But the question is, is he aware that

13    there's -- that that agreement's in dispute --

14           THE COURT:  Well, whether he's aware of it or not,

15    it doesn't really make any difference to me, I mean, because

16    you're going to raise the issue that somehow they breached

17    it.  What he thinks, I really don't care.  It's what I

18    think.  Okay.  So go ahead, ask the next question.

19           MR. BURKS:  Yes, Your Honor.

20           THE COURT:  Go ahead.

21    BY MR. BURKS:

22    Q    What is your understanding of the effect of the credit

23    bid if you're successful pursuant to a plan to credit bid in

24    this property?  What do you believe the effect of that will

25    be on National Bank of Kuwait?

1    A    We would get possession of the property.

2    Q    Would you get anything else?

3    A    I believe there's some cash held by the trustee from

4    the building.

5    Q    And you'd get that cash?

6    A    We'd get that cash.

7    Q    Would you get releases?

8    A    We'd get releases from the (indiscernible) --

9         MR. FITZMAURICE:  Objection, Your Honor.  As a

10   result of the credit bid or as a result of the confirmation

11   of the plan?  We're here on the credit bidding motion.  The

12   plan is a different topic.

13        THE COURT:  Let's go ahead and make your question

14   a little more clear because I think the credit bidding isn't

15   going to affect any releases as best I know.  Go ahead, ask

16   your question.

17   BY MR. BURKS:

18   Q    Are you aware of what the marketing was prior to in

19   this bidding process?

20   A    What the marketing was?

21   Q    Yeah, the marketing of the property leading up to the

22   auction, et cetera.

23   A    Hilco was hired by the trustee to market the property.

24   Q    And how long do they market it for?

25   A    I believe it was about 45 days.

1    Q    Forty-five days.  In your opinion, is 45 days enough

2    time to maximize auctions, auction bids, cash bids as

3    against a credit bid?

4         MR. FITZMAURICE:  Objection, Your Honor, to the

5    question for calling for opinion evidence, calls for

6    speculation as Mr. Carter is not here as an expert to offer

7    opinion evidence.

8         THE COURT:  I'll let you respond to that, Mr.

9    Burks.

10        MR. BURKS:  So the question is whether or not

11   there's cause to prohibit a credit bid in this case.  I

12   think, frankly, based on the opening arguments, there is.

13   That said, this is the man who's been presented by NBK as

14   having knowledge of this case.  I want to know -- I'm going

15   -- my next question will be what they intend to do with the

16   property.

17        THE COURT:  I'll sustain his objection.  You can

18   ask your next question.  Thank you.

19   BY MR. BURKS:

20   Q    If the Bank of Kuwait is successful in its credit bid,

21   do you intend to sell it for the amount of the credit bid or

22   a higher amount?

23        MR. FITZMAURICE:  Objection, Your Honor, relevance

24   to whether or not -- whatever the bank is going to do after

25   it acquires the property, if it does, is not relevant to

```
1   whether or not it's entitled --

2            THE COURT:  I'll sustain the objection.

3   BY MR. BURKS:

4   Q    Why do a credit bid instead of a cash bid, sir?

5            MR. FITZMAURICE:  Objection, relevance, Your

6   Honor.

7            THE COURT:  I'll sustain the objection.

8            MR. BURKS:  I pass the witness, Your Honor.

9            THE COURT:  Thank you.

10           Mr. Fitzmaurice?

11           MR. FITZMAURICE:  No questions for the witness,

12  Your Honor.

13           THE COURT:  Thank you, sir.  You may step down.

14           Next witness, Mr. Burks?  Oh, excuse me.  I

15  apologize.

16           Sit back down, sir.  I'm going to let Mr.

17  Choudhuri ask any questions he may have.

18                DIRECT EXAMINATION OF MICHAEL CARTER

19  BY MR. CHOUDHURI:

20  Q    Hello, Mr. Carter.  How are you?

21  A    Good.

22  Q    Mr. Carter, do you remember -- do you recall giving

23  your deposition.

24           MR. FITZMAURICE:  Objection, relevance, Your

25  Honor.
```

```
 1                  THE COURT:  It's preliminary.  I'll allow it.

 2                  MR. CHOUDHURI:  Thank you.

 3                  THE COURT:  Go ahead.

 4                  MR. CHOUDHURI:  Thank you.

 5                  THE WITNESS:  Yes.

 6   BY MR. CHOUDHURI:

 7   Q     And everything in your deposition was truthful?

 8   A     Yes.

 9   Q     And you still stand by all the statements, all the

10   answers in your deposition were truthful and under oath as

11   if you were sitting here?

12   A     Yes.

13   Q     And you've given your deposition how many times in this

14   matter?

15                  MR. FITZMAURICE:  Objection, relevance, Your

16   Honor.

17                  THE COURT:  Again, I don't know where he's going.

18   But I'm going to give him a little bit of leeway.  If

19   eventually he's going to ask a question about a deposition,

20   you can raise your objection.

21                  Go ahead.  Do you want to project, Mr. Choudhri?

22                  MR. CHOUDHURI:  Yeah.

23                  THE COURT:  Okay.  Then you can connect.  Do you

24   see a mic cord right in front of you --

25                  MR. CHOUDHURI:  So the left?
```

```
 1              THE COURT:  You can just put it up there.

 2              MR. CHOUDHURI:  While he's doing that, I'll start.

 3    BY MR. CHOUDHURI:

 4    Q    Mr. Carter, do you recall testifying that you have not

 5    received any leases or proposals to lease up the building

 6    from trustee Chris Murray?

 7    A    Correct.

 8    Q    So since Judge Norman has appointed the Chapter 11

 9    trustee, you have not received any leases from the Chapter

10    11, correct?

11    A    Correct.

12    Q    Has the Chapter 11 trustee asked you about SNDAs?

13              MR. FITZMAURICE:  Objection, vague as to time.

14    BY MR. CHOUDHURI:

15    Q    Since he was appointed -- well, let me back up.  The

16    Chapter 11 trustee was appointed by the Honorable Judge

17    Norman on February 9, 2024, correct?

18    A    I don't remember the specific date.

19    Q    I can represent to you that on February 9th, on Friday,

20    the Chapter 11 trustee was appointed by Judge Norman.  And

21    since that's happened, you have not received any leases for

22    the property at 2425, correct?

23    A    Correct.

24    Q    And has the Chapter 11 trustee asked you for any SNDAs?

25    A    No.
```

1    Q    And the Bank of Kuwait, you mentioned in your

2    deposition, is willing to, wants to do SNDAs, correct?

3              MR. FITZMAURICE:  Objection, Your Honor, assumes

4    facts not in evidence.

5              THE COURT:  I'll sustain the objection.

6    BY MR. CHOUDHURI:

7    Q    Didn't you in your deposition testify that the Bank of

8    Kuwait wants SNDAs and welcomes them, something to that

9    effect?  I can get your deposition and show you.  But do you

10   recall that answer and question line?

11             MR. FITZMAURICE:  Objection, Your Honor, relevance

12   and also the witness is here.  He can ask a question as

13   opposed to saying is it true about something you testified

14   at some point.

15             THE COURT:  You can't impeach him.  So ask the

16   question.

17   BY MR. CHOUDHURI:

18   Q    Does the Bank of Kuwait provide SNDAs when its

19   borrowers request SNDAs?

20             MR. FITZMAURICE:  Objection, Your Honor, to the

21   extent we are talking about a borrower other than the one at

22   issue here.

23             THE COURT:  Be more specific, Mr. Choudhri.

24   BY MR. CHOUDHURI:

25   Q    The borrower -- we can agree, Mr. Carter, the borrower

1    is Galleria 2425 Owner, LLC, correct?  The debtor and the

2    borrower is the same?

3    A    Yes.

4    Q    So going back to my last question --

5              MR. CHOUDHURI:  For the gentleman, I don't know if

6    you can read it -- can it be read (indiscernible) --

7              THE COURT:  Yeah.  It doesn't work that way here.

8    Everything we're saying is being electronically recorded,

9    but there's no way to read back anything on the record.

10   BY MR. CHOUDHURI:

11   Q    Does the National Bank of Kuwait provide SNDAs?

12             THE COURT:  To whom?  When?  Be more specific.

13   BY MR. CHOUDHURI:

14   Q    If the trustee -- if the Chapter 11 trustee asked you

15   to provide an SNDA, would that be a hurdle for the Bank of

16   Kuwait to provide an SNDA?

17             MR. FITZMAURICE:  So objection, Your Honor, calls

18   for speculation, assumes facts not in evidence.  It assumes

19   that there actually -- there has been a request.  What would

20   the bank do in this hypothetical situation?

21             THE COURT:  I'll sustain the objection.  I think

22   the testimony at this point was if the trustee hasn't

23   presented any.  So there's no support for your question.

24   Ask another question, please.

25   BY MR. CHOUDHURI:

1   Q    So we're clear, you haven't received any SNDAs since

2   the appointment of the trustee in this case?

3   A    Correct.

4   Q    And what about before the appointment of the trustee?

5   Have you received any SNDAs from the borrower/the debtor?

6            MR. FITZMAURICE:  Objection, relevance to the

7   bank's credit bidding at the auction tomorrow.

8            THE COURT:  What's the relevance, Mr. Choudhri?

9            MR. CHOUDHURI:  It goes back to motivation, Your

10  Honors.  Their motivation has been to frustrate, thwart

11  efforts so they could depress the value and be the

12  beneficiary at the auction.

13           THE COURT:  I'll sustain the objection.  And

14  again, I'll tell you what I told Mr. Burks.  I've read your

15  motion.  All right.  And your motion has specific

16  allegations in it.  As far as testimony, I'm more than happy

17  to hear any testimony you have regarding what you've pled.

18  So just limit it to that.  Thank you.

19  BY MR. CHOUDHURI:

20  Q    The Bank of Kuwait has not received any offers to buy

21  the note, correct?

22           MR. FITZMAURICE:  Objection, Your Honor, relevance

23  to credit bidding.

24           THE COURT:  I'll sustain the objection.

25  BY MR. CHOUDHURI:

1    Q    Mr. Carter, is it true that the Bank of Kuwait -- Mr.

2    Carter, on the credit bid, is the Bank of Kuwait aware that

3    the trustee wanted to limit the credit bid in any way, shape

4    or form?

5    A    I don't know.

6    Q    Who would know?

7    A    I assume the trustee.

8    Q    Mr. Carter, you're aware that you were provided a

9    deposition notice of, I think, a 30(b)(6) with eight topics.

10   Do you recall that?

11             MR. FITZMAURICE:  Objection, Your Honor, relevance

12   to the credit bidding motion and the witness' testimony here

13   today.

14             THE COURT:  Well, I know, Mr. Choudhri, you have

15   an argument relative to plan confirmation.  This is not plan

16   confirmation.  And I've said as much, that you can raise

17   those issues in plan confirmation.  Now is not the time.

18             MR. CHOUDHURI:  Your Honor, in that deposition

19   notice, one of the topics that was -- all the topics were

20   not objected to.  One of the topics was credit bidding.  So

21   we could ask about (indiscernible) --

22             THE COURT:  But again, you filed a motion that

23   specifically says you object to credit bidding based on

24   these grounds.  And those are the -- that's what I want to

25   hear evidence about.  Okay.  So please limit it to what

1  you've pled.  I mean, you have a pleading in front of me and

2  it specifically talks about NBK doesn't have an interest in

3  the property.  All right, that basically there's been a

4  breach of contract, that there are claim objections pending.

5  There's sufficient dispute between the parties that I

6  shouldn't allow credit bidding.  That's what I want to hear.

7  Okay.  So please focus on those issues because that's how

8  I'm going to make a decision on credit bidding.  All right.

9  Go ahead.

10  BY MR. CHOUDHURI:

11  Q    So who would decide the credit bid, Mr. Carter, at the

12  National Bank of Kuwait?  Who would decide how much to

13  credit bid?

14          MR. FITZMAURICE:  Same objection, Your Honor, as

15  to relevance.

16          THE COURT:  I'll sustain the objection as not

17  relevant to what I want to hear, Mr. Choudhri.

18  BY MR. CHOUDHURI:

19  Q    What is the amount under the settlement agreement or

20  any subsequent agreement that the Bank of Kuwait agree to be

21  paid either in assignment of its (indiscernible) or full

22  satisfaction of its debt?

23          MR. FITZMAURICE:  So Your Honor, objection as to

24  relevance in the credit bid.  It assumes facts not in

25  evidence.  It's a compound question.

```
 1                    THE COURT:  And the document speaks for itself.

 2                    MR. TROOP:  And the -- thank you.

 3                    THE COURT:  I'll sustain the objection.

 4       BY MR. CHOUDHURI:

 5       Q    Are you aware of an amount of $26,038,000?  Let me

 6       withdraw that.  The outcome of any litigation has not been

 7       determined yet as in the dispute between myself and the Bank

 8       of Kuwait, correct?

 9                    MR. FITZMAURICE:  Objection, Your Honor, vague as

10       to time, given the provisions of the settlement agreement

11       which reflect a waiver of claims and stipulations of

12       dismissal with prejudice of pending lawsuits.

13                    THE COURT:  Mr. Choudhri, whatever happened in the

14       underlying litigation or didn't happen in the underlying

15       litigation, there are probably, I'm assuming, documents that

16       evidence what happened or didn't happen, and I'm happy to

17       hear them and see them in evidence.  This may or may not be

18       the witness to do that through.  Okay.  But again, what he

19       thinks relative to what the documents say doesn't mean a

20       whole lot of difference to me because it's what I think, and

21       so I really need to see them and then you can ask questions

22       about them.  Okay, and you may have -- you may have

23       legitimate, valid disputes.  I'm not sure this is the

24       witness that's going to get you where you want to go.  Okay.

25       Go ahead.
```

1    BY MR. CHOUDHURI:

2    Q    Does the Bank of Kuwait intend to have a United States

3    headquarters in this building?

4            MR. FITZMAURICE:  Objection, Your Honor,

5    relevance.

6            THE COURT:  Mr. Choudhri, again, and I hate to go

7    back, I'm worried about what's in your motion.  I don't know

8    how that has any relevance to anything you've pled.  I'll

9    sustain the objection and ask you to move on and concentrate

10   on what's in the motion.

11   BY MR. CHOUDHURI:

12   Q    Mr. Carter, you testified in the deposition the plan is

13   -- the plan and the sale motion are part and parcel.  Do you

14   recall that?

15           MR. FITZMAURICE:  Objection, Your Honor.  He's

16   using the transcript, I guess, to try to impeach him about

17   something he hasn't testified to and also relevance.

18           THE COURT:  So you can ask him questions, sir.

19   You can't impeach him until he's basically said something.

20   Okay.  Go ahead.

21   BY MR. CHOUDHURI:

22   Q    Bank of Kuwait's plan is tied to the sale motion,

23   correct?

24           MR. FITZMAURICE:  Objection, Your Honor.  That's

25   confirmation -- I think a confirmation issue, not whether

1    the bank can credit bid.

2            THE COURT:  It is, and I'll sustain the objection.

3    Again, we're here just on credit bidding.  We're going to

4    get to plan confirmation, but we've got to get through this

5    credit bid motion today.  We may be here until 2:00 in the

6    morning.  You're not making things any easier.  I'm going to

7    warn you one more time.  You need to stick to issues that

8    are relevant.  If you continue to ask questions that are

9    nonrelevant, I'm just going to tell you to sit down.  Okay?

10   So, fair warning.  Go ahead.

11   BY MR. CHOUDHURI:

12   Q    Who owns the note of lien as we sit here today?  What

13   party?

14   A    NBK.

15   Q    And is that a disputed -- is that a disputed fact?  Is

16   that under dispute, the ownership of the note?

17   A    That's a fact.

18   Q    Is it under a -- is there a pending dispute as to who

19   owns the note of lien today?

20   A    I understand there's some filing about it.

21   Q    So is there a challenge?  Is it on dispute?

22   A    What I'm saying is there's a filing about it.

23   Q    So as we sit here today, the minimum bid, or there's a

24   stalking horse bid, which has a credit bid component in it,

25   right?

1    A    Yes.

2    Q    And can you explain how that works, please, so I

3    understand, we understand?  What are the bid increments from

4    the stalking horse agreement on the sale motion that was

5    entered?

6              MR. FITZMAURICE:  So objection, Your Honor,

7    relevance as to whether or not the bank is -- whatever the

8    overbid is, it is not relevant to whether the bank is

9    entitled.

10             THE COURT:  I agree.  I'll sustain the objection.

11   Again, Mr. Choudhri, another warning.  You need to ask

12   questions that are relevant to the issue of whether there

13   should actually be credit bidding or not.  That's what I'm

14   interested in hearing.  All right.  Go ahead.

15   BY MR. CHOUDHURI:

16   Q    Is the bank willing to refrain from credit bidding to

17   allow an open market so where buyers can make offers and not

18   be handicapped by an imputed credit bid?

19             MR. FITZMAURICE:  So objection, Your Honor,

20   assumes facts that are not in evidence.  It calls for

21   speculation.  It's also not relevant to whether or not the

22   bank should be entitled to credit bid in the first place.

23             THE COURT:  I'll sustain the objection.

24   BY MR. CHOUDHURI:

25   Q    Mr. Carter, do you know anything about the FF&E in the

1    building?

2              MR. FITZMAURICE:  Same objection, Your Honor.

3              THE COURT:  I'll sustain the objection.  This is

4    your last warning, Mr. Choudhri.  I need questions that are

5    relevant to the motion.  All right.  Credit bid motion.  If

6    you have a dispute as to ownership of the personal property

7    in the building, that has nothing to do with credit bidding.

8    BY MR. CHOUDHURI:

9    Q    If the bank credit bids, does that include -- does the

10   bank's credit bid include furniture in the building?

11             MR. FITZMAURICE:  So, same objection, as to

12   relevance.

13             THE COURT:  Sustain the objection.  And I'm going

14   to give you one final warning, Mr. Choudhuri, and I'm happy

15   to print the motion that I've read, that I'm looking at for

16   you to look at if you want to take a short break and read

17   it.

18             MR. CHOUDHURI:  Thank you.  Yeah.

19             THE COURT:  Okay.  So that you ask relevant

20   questions.

21             MR. CHOUDHURI:  I appreciate it.

22             THE COURT:  You're one more question from me

23   cutting you off.

24             MR. CHOUDHURI:  I appreciate it.

25             THE COURT:  So bear with me for one second.  All

1    right.  So the record's clear, I'm printing ECF 353.  I'm

2    going to hand it to Mr. Choudhri.  We're going to take a 10-

3    minute break and we'll come back and Mr. Choudhri can

4    continue his examination.  You may take a minute

5    (indiscernible) --

6              MR. BURKS:  Thank you, Your Honor.  May I approach

7    Mr. Choudhuri?

8              THE COURT:  You may.

9              MR. TROOP:  No, that's the one that I filed.  The

10   one that is removed is --

11             THE COURT:  All right.  Mr. Burks, you need to be

12   aware that those mics are picking up everything you say.

13   Everything you've been talking about is all over the record.

14             MR. BURKS:  I'm sorry.  Thank you, Judge.

15             THE COURT:  So if you have discussions, you either

16   want to mute your mics or you want to take it outside.

17             MR. BURKS:  How do I mute my mic, Your Honor?  I

18   can't -- thank you, Judge.  I saw a mute button on the

19   screen and foolishly I touchscreen it, Judge.  I apologize.

20   Thank you, though.

21             CLERK:  All rise.

22        (Recess)

23             CLERK:  All rise.

24             THE COURT:  Please be seated.

25             Mr. Carter, I'll remind you that you're still

1    under oath.  Please be seated, sir.

2              All right.  Mr. Choudhri, next question, please.

3    BY MR. CHOUDHURI:

4    Q    Mr. Carter, you're most familiar with the claims

5    against NBK by the debtor, correct?

6              MR. FITZMAURICE:  Same relevance objection, Your

7    Honor, Mr. Carter's familiarity with claims by NBK against

8    the debtor.

9              THE COURT:  I agree.  It's not relevant.

10   BY MR. CHOUDHURI:

11   Q    Was one of the topics in the 30(b)(6) claims against

12   the bank in credit bidding?

13             MR. FITZMAURICE:  Same objection as to relevance,

14   Your Honor.

15             THE COURT:  I'm not sure I understand the

16   question.  Go ahead.  Rephrase the question.

17             MR. CHOUDHURI:  Sorry, Your Honor.  So --

18             THE COURT:  And Mr. Choudhri, I'm confused.

19   You're talking about the bank's claims against the debtor or

20   the debtor's claims against the bank?

21             MR. CHOUDHURI:  The debtor's claims against the

22   bank.

23             THE COURT:  Because the first question you asked

24   was did the bank have any claims against the debtor, which

25   is the reason I overruled it on relevance.

1             MR. CHOUDHURI:  Sorry.

2             THE COURT:  So just make sure that you understand

3    what you're asking.  Go ahead.

4    BY MR. CHOUDHURI:

5    Q    Mr. Carter, you sat for a 30(b)(6) deposition with

6    eight topics, and one of those topics was credit bid and

7    claims against the bank by the debtor.  Do you recall that?

8             MR. FITZMAURICE:  Objection, Your Honor,

9    relevance.  But also if there is --

10            THE COURT:  Compound question.  Just one question

11   at a time, Mr. Choudhri.  You can't ask multiple questions

12   in the question.

13   BY MR. CHOUDHURI:

14   Q    You were the designated representative with the most

15   knowledge for 30(b)(6) deposition, correct?

16            MR. FITZMAURICE:  Objection, Your Honor, misstates

17   the -- it calls for a legal conclusion that misstates the

18   applicable rule.  It's also not relevant to the issue of

19   whether the bank should be allowed to credit bid tomorrow.

20            THE COURT:  I'll sustain the objection.  Again,

21   Mr. Choudhuri, let's focus on the motion which I gave you a

22   copy of.  You have it in your hand.  Ask your questions.

23   BY MR. CHOUDHURI:

24   Q    Who would have the most knowledge --

25            THE COURT:  Finish your question.

1   BY MR. CHOUDHURI:

2   Q    Has the court found what the claim is, what the amount

3   of claim is, Mr. Carter?  Has there been a finding of what

4   the amount of the claim is as we sit here today?

5           MR. FITZMAURICE:  Objection, Your Honor,

6   relevance.  I don't think the court needs to determine the

7   exact amount of the claim in order for the bank to be able

8   to credit bid.

9           THE COURT:  I'll allow the question.  I think it

10  dances around the issue, but I'm not sure what he -- again,

11  Mr. Choudhri, what he thinks relative to what I've done, I

12  know what I've done.  Okay.  I know what I'm going to do

13  hopefully after I hear all the evidence.  What he thinks

14  really doesn't make any difference to me.  I mean, I know

15  that I haven't ruled on any of the claim objections.  You

16  don't need evidence as to that.  I'm aware of that.  Okay.

17  BY MR. CHOUDHURI:

18  Q    If the bank is successful as a credit bidder, and it's

19  found that the bank doesn't have a claim, how does the bank

20  intend to deal with that?

21          MR. FITZMAURICE:  So objection as to relevance.

22  What might happen after the auction is not relevant to

23  whether or not the bank can credit bid at the auction.

24          THE COURT:  I agree.  I'll sustain the objection

25  based on relevance.

1   BY MR. CHOUDHURI:

2   Q    Are you aware what the impact of credit bidding does?

3             MR. FITZMAURICE:  Objection, vague, and also --

4             THE COURT:  And I'll sustain the objection.  It's

5   vague and I'm not sure.  Again, Mr. Choudhri, so maybe it

6   will help you if I give you my viewpoints on this to move

7   this along.  Okay.  You're going to have to show cause for

8   their not -- for credit bidding not to be allowed.  Okay.

9   This witness probably can't prove up your case.  Okay.

10  You're going to have to basically give me some sort of

11  evidence that I agree with you that you've got cause that

12  there shouldn't be credit bidding.  I don't think this

13  witness is going to get you to where you want to go.  Okay.

14  You may have witnesses which will get you where you want to

15  go.  But he's not that person.  I promise.  Okay.

16            MR. CHOUDHURI:  Okay.

17            THE COURT:  All right.  Ask your next question.

18  BY MR. CHOUDHURI:

19  Q    Mr. Carter, are you aware that the bank received an

20  offer contract from Holland & Knight for $85 million?

21            MR. FITZMAURICE:  I wanted to make sure the

22  question was done before.  But objection as to relevance,

23  assumes facts that are not in evidence.  If there is such an

24  offer, the best evidence rule suggests that we should look

25  at the document itself.

 1            THE COURT:  I'll sustain the objection.

 2   BY MR. CHOUDHURI:

 3   Q    Mona Dajani represents the Bank of Kuwait, correct?

 4            MR. FITZMAURICE:  Objection, Your Honor, relevance

 5   as to whether or not the bank can credit bid tomorrow.

 6            THE COURT:  I'll sustain the objection.  Mr.

 7   Choudhri, we're back to where we were before, which is --

 8            MR. CHOUDHURI:  Sure.

 9            THE COURT:  -- I've given you the motion.  I've

10   given you lots of leeway.  You're a question away from being

11   cut off.  Okay.

12            MR. CHOUDHURI:  Your Honor, I appreciate it.  What

13   I'm trying to get in and establish is that there's been

14   offers that the Bank of Kuwait says they haven't received.

15   Yet they received them.  The Bank of Kuwait has received

16   them.  And they've not approved them or responded --

17            THE COURT:  If there is an offer and it's been

18   made, then the offer is the best evidence, not his testimony

19   as to what he knows.  Okay.

20            MR. CHOUDHRI:  Okay.  I'm almost done.

21            THE COURT:  You will be done soon.  So ask your

22   next question.  Thank you.

23   BY MR. CHOUDHURI:

24   Q    Mr. Carter, are you aware of -- so the bank has no

25   limit on their credit bid?  As we sit here today, the bank

1    can credit bid up to what amount?

2    A    We can credit bid up to the full amount we're due.

3    Q    Which is roughly how much?

4    A    Again, roughly $70 million.

5    Q    $70 million.  So despite anybody coming to the auction,

6    the bank can credit bid up to $70 million?  They have a

7    right to do so?

8    A    Yes.

9    Q    And you don't believe that will affect the buyer pool

10   or the marketing of the property in any way?

11            MR. FITZMAURICE:  Objection, Your Honor,

12   relevance.  Mr. Carter's view as to that is not relevant to

13   whether the bank --

14            THE COURT:  I sustain the objection.  Again, one

15   more time --

16            MR. CHOUDHURI:  Okay.

17            THE COURT:  -- one last question.  If I get a

18   relevance objection and I sustain it, you're done.

19   BY MR. CHOUDHURI:

20   Q    What does the bank intend to credit bid?

21            MR. FITZMAURICE:  Objection, Your Honor.

22            THE COURT:  It's not relevant, Mr. Choudhri.  The

23   issue is whether they get to credit bid, not how much that

24   bid would be.  You're done.  Sit down.  Thank you.

25            MR. CHOUDHURI:  Thank you.

1                    THE COURT:  Thank you.

2                    Mr. Fitzmaurice, did you have any questions based

3        on his direct examination?

4                    MR. FITZMAURICE:  We do not, Your Honor.  To the

5        extent that we put on a case on this motion, we reserve the

6        right to call Mr. Carter in that case.  But we have no

7        questions now.

8                    THE COURT:  All right.  You may step down, and I

9        apologize, but you're going to have to wait in court.

10                   Mr. Burks, next witness.

11                   MR. BURKS:  Your Honor, at this time, WL -- Your

12       Honor, may I please be excused for about ten seconds?

13                   THE COURT:  Sure.

14                   MR. BURKS:  May I be excused, please?

15                   THE COURT:  That's fine.

16                   MR. BURKS:  Whoever provided that water, I thank

17       you.

18                   Your Honor, at this time, I call to -- on behalf

19       of 2425 WL, I call via Zoom --

20                   MR. SATHER:  Russell Ingrum.

21                   MR. BURKS:  Is he on the Zoom?

22                   MR. SATHER:  Yes.

23                   MR. BURKS:  -- via Zoom, Mr. Russell Ingrum, Your

24       Honor.

25                   THE COURT:  All right.  Mr. Ingrum needs to show

1   up.

2           MR. BURKS:  Well, that's what I was just trying to

3   find out, where he is.

4           MR. INGRUM:  (indiscernible) I am (indiscernible)

5   --

6           THE COURT:  Hold on one second.  Mute everyone

7   right now.  Just mute everyone.

8           AUTOMATED VOICE:  Conference muted.

9           THE COURT:  There were connection instructions for

10  him to follow.

11          MR. FITZMAURICE:  So Your Honor, we would object

12  and we'd ask for a proffer as to the substance of Mr.

13  Ingrum's testimony.  To be candid, we have no idea who he

14  is.

15          THE COURT:  Then I'd like to hear it from him

16  first.  So let's -- I'll rule on your objection.  Is that

17  Mr. Ingrum there?  Yes?

18          MR. BURKS:  Do we have audio for Mr. Ingrum?

19          THE COURT:  We don't because we don't know what

20  number he's calling in on because he didn't say his name.

21          CLERK:  I'm looking.

22          THE COURT:  Can you find him?

23          CLERK:  I'm looking.  Gary --

24          THE COURT:  Let's unmute everyone and see if we

25  can get him to --

1               AUTOMATED VOICE:  Conference unmuted.

2               MR. INGRUM:  All right.  How about now?

3               THE COURT:  Where is he?

4               CLERK:  He's the very last one.

5               THE COURT:  Okay.  Add his name, and mute everyone

6     else.

7               CLERK:  I did.

8               THE COURT:  All right.  Mr. Ingrum, will you

9     please raise your right hand to be sworn?

10              MR. INGRUM:  Yes, sir.

11              THE COURT:  Do you swear or affirm to tell the

12    truth, the whole truth of nothing but the truth, so help you

13    God?

14              MR. INGRUM:  Yes, sir.

15              THE COURT:  All right.  Go ahead.

16              MR. BURKS:  Thank you, Your Honor.

17                   DIRECT EXAMINATION OF RUSSELL INGRUM

18    BY MR. BURKS:

19    Q    Mr. Ingrum, I'm going to talk a little slower than I

20    normally do because I don't know if there's a time lapse.

21    If you do not understand the question, please state that you

22    didn't hear it or don't understand it.  All right, sir?

23    A    Yes, sir.

24    Q    Please state your name for the record.

25    A    Russell Ingrum.

```
 1   Q    And how are you employed?

 2   A    I'm employed by CBRE, A commercial real estate company.

 3   Q    And what is CBRE?

 4   A    CBRE is the world's largest commercial real estate

 5   services company.  They do everything in the real estate

 6   business all over the world.

 7   Q    All right.  Do you have any knowledge -- and how long

 8   have you been working there, sir?

 9   A    I've been there 27 years.

10   Q    And what do you do for CBRE, sir?

11   A    My job is to sell office buildings.  That's all I do.

12   Q    And do you sell it in what context?  In what manner do

13   you sell office buildings, sir?

14   A    I'm not sure I follow the question.  Like the best

15   example is like somebody -- like a realtor sells a house,

16   you get hired by the owner of the house, you market the

17   house and then you find buyers and you run the process.

18   Q    All right.  So you sold --

19   A    Same process (indiscernible) --

20   Q    Are these residential homes or are these commercial

21   properties?

22   A    Forgive me.  I just do office.  I was trying to give an

23   analogy that may be easier to understand.  I just sell

24   office buildings.  That's all I do.

25   Q    All right, and do you sell them only on the open
```

1   market, that is, with realtors trying to find buyers?  In

2   what manner do you sell office buildings?

3   A    I sell office buildings on a "market".  There are

4   thousands of buyers across the United States and across the

5   world.  Our job is to understand who they are and reach out

6   to them when we have an office building that we are

7   attempting to sell.

8   Q    All right.  Have you been involved in any sales of

9   office buildings that involve bankruptcy auctions?

10              MR. FITZMAURICE:  So Your Honor, I'm going to

11   object again to the witness' testimony.  It appears designed

12   to potentially offer evidence that might conceivably support

13   some objection by the Choudhri parties to confirmation.  But

14   the issue on this motion is whether or not the bank can

15   credit bid.  And what does this witness have to say about

16   the claims that are between the parties which support the

17   objection that they filed?

18              THE COURT:  I'll overrule the objection.  You may

19   proceed.  Go ahead.

20              MR. BURKS:  So Mr. --

21              THE WITNESS:  I've done one sale out of bankruptcy

22   court.

23   BY MR. BURKS:

24   Q    And in that sale, have you -- were you ever involved --

25   in that sale, was there a credit bid involved?

1    A    There was not a credit bin.

2    Q    What do you know about credit bid, sir, experience-

3    wise?

4              MR. FITZMAURICE:  Objection, relevance, Your

5    Honor, to whether or not --

6              THE COURT:  I'll sustain the objection.  It's not

7    relevant.

8    BY MR. BURKS:

9    Q    In your opinion, if there is a non-cash credit bid

10   involved in the sales process, does that have an effect on

11   the ultimate sales price on the open market?

12             MR. FITZMAURICE:  Objection, Your Honor, to the

13   extent that he's being offered as an expert to give opinion

14   evidence.

15             MR. BURKS:  No.  I'm not offering him as an

16   expert, Judge.

17             MR. FITZMAURICE:  You --

18             MR. BURKS:  I'm offering his opinion based on 27

19   years of selling office buildings.

20             MR. FITZMAURICE:  That's an expert opinion, Your

21   Honor.

22             THE COURT:  I'll sustain the objection.

23             MR. BURKS:  Is your ruling that I cannot ask this

24   witness what the effect of a credit bid is on the sales of

25   business --

1          THE COURT:  That's my ruling.

2          MR. BURKS:  Buildings?

3          THE COURT:  I just ruled.  Thank you.

4          MR. BURKS:  Nothing further.

5          THE COURT:  All right.  Thank you, sir.  Thank you

6    for appearing.

7          Oh, I apologize.  Mr. Choudhri, do you have

8    questions of this witness?

9          MR. CHOUDHRI:  I'm going to short-circuit this.

10   I'm not allowed to ask questions about his opinions at all?

11         THE COURT:  No.  You can't ask those questions.

12         MR. CHOUDHURI:  Okay.

13         THE COURT:  Do you have any other questions you

14   want to ask him?

15         MR. CHOUDHRI:  No.  About the building?

16         THE COURT:  I'm not sure questions about the

17   building have any relevance to credit bidding.

18         MR. CHOUDHURI:  The court's (indiscernible) credit

19   bidding.

20         MR. BURKS:  Who do you want now?

21         THE COURT:  That's not relevant.

22         MR. CHOUDHURI:  Okay.

23         THE COURT:  Thank you.

24         Mr. Fitzmaurice?

25         MR. FITZMAURICE:  No questions for the witness,

1    Your Honor.

2              THE COURT:  All right.  Thank you.

3              Next witness, Mr. Burks.

4              MR. BURKS:  Your Honor --

5              THE COURT:  Thank you, Mr. Ingrum.

6              MR. BURKS:  Your Honor, at this time I want to try

7    -- I don't know if I'll be successful, Judge.  I want to try

8    and --

9              THE COURT:  I just want you to call a witness, Mr.

10   Burks.

11             MR. BURKS:  Well, I may be able to short-circuit

12   two of my witnesses if I'm allowed to ask the court to take

13   judicial notice of the existence, not the truth or veracity,

14   but the existence of certain pleadings regarding the

15   disputes involved because it's got to be part of the record

16   here and I'd rather just have the parties --

17             THE COURT:  I'd be happy to take judicial notice

18   that there are pleadings on file that basically are

19   disputes.  I'm happy to do that, Mr. Burks.

20             MR. BURKS:  All right.  May I offer them, Judge?

21             THE COURT:  You may.

22             MR. BURKS:  Your Honor --

23             THE COURT:  Do you have an ECF number or are you

24   going to -- I'm assuming they're on the docket so I can see

25   them.

1              MR. BURKS:  They're on the docket, but they're

2       also on the exhibit numbers.  Do you want to go -- do you

3       want to take them off the docket, or would you like to take

4       them exhibit by exhibit?

5              THE COURT:  I just would like the record to know

6       which exhibits I should be looking at by ECF number.

7              MR. BURKS:  What are the ECF numbers?

8              THE COURT:  And I know that there -- I know that

9       there is one attached to the motion itself at ECF 353.  It's

10      an attachment to the motion.

11             MR. BURKS:  But that's not all these.

12             THE COURT:  So I certainly can take judicial

13      notice of the claim objections.  I can also take judicial

14      notice of the adversary proceedings.

15             MR. BURKS:  Your Honor, I -- yes, Your Honor.  So

16      I'm offering you -- I'm requesting that you take judicial

17      notice of Proof of Claim Number 13, which is 499-2, Proof of

18      Claim Number 14, which is --

19             THE COURT:  Whoa, whoa, whoa, whoa.  We've got to

20      just slow down because I'm going to write it down.  So,

21      proof of claim what?

22             MR. BURKS:  Proof of Claim Number 13.

23             THE COURT:  Thirteen.

24             MR. BURKS:  And Proof of Claim Number 14, which is

25      499.

1          THE COURT:  Well, if they're proof of claim -- if

2     they're on the claims docket as 13 and 14, that's fine.  I

3     can take judicial notice on that, if they've been filed and

4     they're pending.

5          MR. BURKS:  Yes.  Your Honor, Amended Objection to

6     Proof of Claims 13 and 14.

7          THE COURT:  At?

8          MR. BURKS:  I believe it's 499-4.  Is it, Reese?

9          MR. BAKER:  Where's the (indiscernible) where I

10    was writing down some of these ECF numbers?  This is a

11    little embarrassing.  I need the ECF numbers.

12         MR. BURKS:  499-4.  I was intending to present

13    them on the screen as we rolled through it.

14         THE COURT:  Fine.  You can do it if you want to.

15    I'm more than happy to let them connect and project them if

16    you want to.

17         MR. BURKS:  That would be easier.

18         THE COURT:  All right.  So bear with me one

19    second.  Where do you want to connect from?

20         MR. BURKS:  Mr. Baker, where would you like to

21    connect from?  Despite my fumbling and my apologies to

22    counsel and my slight embarrassment, Judge, this will be

23    faster than the two witnesses --

24         THE COURT:  That's fine.  Go ahead.

25         MR. BURKS:  Yeah.  But that doesn't tell me what

 1   ECF number it is.

 2               THE COURT:  (indiscernible) you're not going to be

 3   tell what it is.

 4               MR. BAKER:  That's 499-2.

 5               MR. BURKS:  Proof of Claim Number 13, which is

 6   499-2, Your Honor.  Next --

 7               THE COURT:  If it's on the claims register, why

 8   don't we just do it by the claims register?  Claim 13.

 9               MR. BURKS:  All right, Your Honor.

10               THE COURT:  Okay.  Thank you.

11               MR. BURKS:  Claim 14 on the claim register.

12               THE COURT:  All right.  I'll take that one, too.

13   Thank you.

14               MR. BURKS:  Amended Objection to Claims 13 and 14

15   on the claim register.

16               MR. FITZMAURICE:  I think that'd be on the docket.

17               MR. BURKS:  Reese?  I can't tell if they're on the

18   docket or not.

19               THE COURT:  Let's look --

20               MR. FITZMAURICE:  Your Honor, I think the amended

21   objection --

22               THE COURT:  Bear with me for one second.

23               MR. FITZMAURICE:  -- is ECF 284.

24               THE COURT:  Bear with me for one second.

25               MR. BURKS:  I need ECF numbers for Numbers 1

1    through 11.

2             MR. BAKER:  Yeah, 500 -- Your Honor, this amended

3    objection --

4             THE COURT:  Bear with me, Mr. Baker.

5             MR. BAKER:  I'm sorry.  I'm sorry.

6             THE COURT:  There's the claim register.  I think

7    that's what you want.

8             MR. BURKS:  It is, Judge.  Success.  Can I start

9    over with --

10            THE COURT:  Go ahead.  Go ahead.

11            MR. BURKS:  You know, I'd ask this court to take

12   judicial notice of the contents, but not the truth or

13   veracity of the following documents: Proof of Claim 13-1,

14   Objection to claim number 13 and 14, at 270, Objection to

15   claim 13 and 14, at 284, Proof of Claim 14-1.  I also want

16   to ask the court to take judicial notice of the second

17   amended original petition in Adversary Case Number 2024-

18   2716.  This is our Exhibit Number 6, which would be at --

19            MR. BAKER:  499-6 on the docket.

20            MR. BURKS:  499-6 on the docket, Your Honor.  I'd

21   ask the court to take judicial notice of the amended -- the

22   amended complaint for equitable subordination and damages

23   filed by 2425 WL.  It's our Exhibit Number 7.  And it's at

24   Docket Number 499-7.  I'd ask the court to take judicial

25   notice of the amended petition in Adversary 2023-2274 which

 1    is at ECF Docket Number 499- --

 2              MR. BAKER:  Eight.

 3              MR. BURKS:  -- 8.  I'd ask the court to take

 4    judicial notice of the motion for entry in order authorizing

 5    creditor to pursue estate claims, specifically a lender

 6    liability claim, which is at our Exhibit Number 9, ECF

 7    499 --

 8              MR. BAKER:  It should be nine.

 9              MR. BURKS:  Is it nine?

10              MR. BAKER:  Let me check.  It is.

11              MR. BURKS:  499-9, correct, Mr. Baker?

12              I'd ask the court to take judicial notice of the

13    petition in Adversary Number 23-60036.  That's at ECF number

14    our Exhibit 10.  499-10.  That leaves me only two more

15    exhibits that I want to try and get in, Your Honor, and I

16    appreciate -- with humility and a bit of embarrassment, I

17    appreciate your patience in offering these for you to take

18    judicial notice.  So taken or not, Your Honor?

19    (indiscernible).  I'm actually waiting on you, Your Honor.

20    Have you taken judicial notice of these?

21              THE COURT:  Oh, I thought you had more, that you

22    had more to go?

23              MR. BURKS:  I have two more to go, but I don't

24    think counsel's going to want me to offer them.  Actually,

25    why don't we give it a whirl.

```
1              THE COURT:  Let's just do this.  I'm going to take

2     judicial notice of the pleadings that are on file, but not

3     the facts that are in them.  Proof of Claims 13-1 and 14-1

4     and all objections thereto that are reflected on the claims

5     register as well as ECF 499-6, 499-7, 499-8, 499-9 and 499-

6     10.  All right.  Those I've taken judicial notice of, and

7     you can move to your next two that you think are going to be

8     disputed.

9              MR. BURKS:  The next two are June 11 -- the

10    Exhibits 11 and 20 -- or 10 and 11 -- 11.  Exhibit 11.

11             Mr. Baker, will you put that up for the

12    (indiscernible) on the screen.

13             THE COURT:  So are you asking me to take judicial

14    notice of 499-11?

15             MR. BURKS:  Well, I'd like to offer it for limited

16    purposes and see if it draws an objection.  If it doesn't

17    draw an objection, I won't need -- I may not need an entire

18    witness, Your Honor.  If it draws an objection, I'll need

19    the witness.

20             THE COURT:  Okay.  Go ahead.

21             MR. BURKS:  I offer into evidence Exhibit Number

22    11.

23             Mr. Baker, will you put that on the screen,

24    please.

25             Your Honor, what I'm intending to do, if I can
```

1    find it, if I can find it, what I intend to do is offer into

2    evidence a letter, which, not for the purpose of whether or

3    not there's an offer --

4              THE COURT:  I need to see it.

5              MR. BURKS:  Yeah, you do.  May I have a four-

6    minute recess, Judge?

7              THE COURT:  I'll just sit here.  Let's just do

8    this quickly.

9              MR. BURKS:  Yes, Your Honor.

10              THE COURT:  Thank you.

11              MR. FITZMAURICE:  Your Honor, while they're doing

12    that, and we don't object to the request for judicial notice

13    of those exhibits, not for their contents, not for the

14    truth.

15              THE COURT:  They're just --

16              MR. FITZMAURICE:  As a matter of sort of fairness

17    and completeness, can we similarly ask you to take judicial

18    notice of the document at exhibit -- sorry, at ECF Number

19    430, which is the bank's response to the amended claim

20    objection.

21              THE COURT:  Let's just do this.  For completeness

22    purposes as well as fairness, any sort of response to any of

23    the pleadings that I just took judicial notice of, I also

24    will take judicial notice of.

25              MR. FITZMAURICE:  For purposes of the -- I

1  apologize, Your Honor, for pushing my luck here.  But for

2  purposes of the record, that would also include the bank's

3  motion to dismiss the amended complaint for (indiscernible)

4  subordination filed by 2425 WL.

5        THE COURT:  Any sort of response will be

6  (indiscernible) --

7        MR. FITZMAURICE:  Thank you very much, Your Honor.

8        MR. BURKS:  Nobody asked me.  They didn't have to,

9  but I had no objection to that.

10        THE COURT:  Doesn't make any difference.  You

11  could have objected all you wanted.  I'd have overruled you.

12  Go ahead.

13        MR. BURKS:  I thought you might.  Judge, we filed

14  a supplemental exhibit list at 95 with three documents.

15  Will somebody please put it up on the screen.

16        MR. SATHER:  517-3.

17        MR. BURKS:  517-3.  While I'm waiting for that, I

18  confess that I've never seen this fancy seal on the screen,

19  Judge.

20        THE COURT:  Apparently you're not connected or you

21  would be showing up because you're -- the right cable is

22  connected to the screen.  Whoever thinks they're connected,

23  they're not.  That's the reason you're seeing the seal.

24        MR. BURKS:  That's what I was thinking.  Yeah.

25  (indiscernible) so it's Exhibits 93, 94, 95.  Your Honor,

1    this is Exhibit 93.  I offer not for --

2              THE COURT:  Again, not by exhibit number, by ECF

3    number, because everything's electronic.  What ECF number is

4    it?  I can see it, but you need to put it on the record.

5    It's right in front of you, Mr. Burks.

6              MR. BURKS:  Your Honor, at this time I offer into

7    evidence Document Number 517-3 for the sole purpose of

8    whether the debtor or any related entity, or Mr. Choudhri or

9    any related enemy has tendered $700,000 to the trustee for

10   the purpose of buying the NBK note.  I am not offering it to

11   argue that they have the right to do so or that they don't

12   have the right to do so, or that the trustee had a duty or

13   did not have a duty to accept it.  I'm not offering it in

14   any way to say that that prejudices any rights of NBK.  I am

15   offering it to establish the scope of the dispute.  And then

16   in regards to the dispute, A, these documents were submitted

17   to the Chapter 11 trustee.

18             THE COURT:  So let me just cut to the chase.  You

19   want to have me admit it for the limited purpose of the

20   funds were tendered?

21             MR. BURKS:  The emails with the copy of that check

22   were submitted.  Yes.

23             THE COURT:  All right.  So let me hear if there

24   are any objections.

25             MR. FITZMAURICE:  There are, Your Honor.

```
 1              THE COURT:  That's fine.  Then we need a witness.
 2   I mean, I can't do it by stipulation.  Call your next
 3   witness.
 4              MR. BURKS:  I tried.  At this point -- at this
 5   point, Judge, I call -- I'm mindful of your previous rulings
 6   on objections regarding relevancy.  May I have 60 seconds?
 7   That's all I --
 8              THE COURT:  Sure.
 9              MR. BURKS:  Your Honor, at this time, I call Mr.
10   Jerry Alexander.
11              THE COURT:  Mr. Alexander, you want to come
12   forward, please?
13              MR. ALEXANDER:  Yes, sir.
14              THE COURT:  If you'll step to the microphone.
15              Mr. Burks, if you'll step aside so I can swear him
16   in.  Then you can step back.  Thank you.
17              Mr. Alexander, please raise your right hand to be
18   sworn.  Do you swear or affirm to tell the truth, the whole
19   truth and nothing but the truth, so help you God?
20              MR. ALEXANDER:  I do.
21              THE COURT:  All right.  Please be seated, sir.
22              MR. FITZMAURICE:  Your Honor, we object to the
23   calling of the witness.  We don't think he has any relevant
24   testimony to offer.  Our best guess is he's going to be --
25   he's testifying about his view as to the merits of certain
```

1   claims.  That's not relevant to whether or not the bank

2   should be allowed to credit bid tomorrow.

3             THE COURT:  All right.  Thank you.

4             I'll let you begin your testimony, and then if he

5   wants to make an objection, go ahead.

6             MR. BURKS:  Thank you, Your Honor.

7             DIRECT EXAMINATION OF JERRY ALEXANDER

8   BY MR. BURKS:

9   Q    Sir, will you please state your name for the record?

10  A    My name is Jerry Alexander.

11  Q    And what do you do for a living?

12  A    I'm an attorney.

13  Q    What kind of law do you practice?

14  A    I practice business litigation.

15  Q    What type of business litigation?  All types or --

16  A    All types.  For the last 10 or 15 years, I've had a lot

17  of cases where I represented trustees in bankruptcy.

18  Q    All right.  Mr. Alexander, have you ever looked at or

19  examined a lender liability cause of action?

20  A    Yes.

21  Q    In this particular case, are you aware of any dispute

22  or alleged lender liability cause of action?

23  A    Yes.

24             MR. FITZMAURICE:  Objection, relevance, Your

25  Honor.

```
 1              THE COURT:  I'll overrule the objection.

 2   BY MR. BURKS:

 3   Q    And in this case, have you examined facts or evidence

 4   or allegations on any party for a lender liability cause of

 5   action against NBK?

 6              MR. FITZMAURICE:  Objection, Your Honor.

 7              THE WITNESS:  Yes.

 8              THE COURT:  Okay.  Hold on.

 9              THE WITNESS:  Excuse me.

10              THE COURT:  You're a lawyer.  You know when he

11   objects, you need to stop.

12              Go ahead.

13              MR. FITZMAURICE:  Objection on relevance grounds.

14   Also on compound grounds.  And also I think that the debtor

15   is going to need to explain what facts it is that he

16   supposedly reviewed to form -- again, there's a generic

17   objection to this entire (indiscernible) --

18              THE COURT:  Mr. Burks, lay a better predicate.

19              MR. BURKS:  I'm going slowly, and --

20              THE COURT:  Okay.  Then go slower.  Thank you.

21              MR. BURKS:  Yes, Your Honor.

22   BY MR. BURKS:

23   Q    In this case, have you looked at facts regarding

24   allegations of (indiscernible)?

25   A    Yes.
```

1    Q    What facts have you looked at?

2    A    I reviewed emails.  I reviewed documents.  I spoke to

3    people, and I reviewed the lawsuit that led to the

4    settlement agreement.  I reviewed the settlement agreement

5    and I reviewed email traffic and I talked to Mr. Choudhri,

6    of course, and I talked to Mr. Wetwiska and I talked to

7    other people that worked with Mr. Choudhri at various

8    periods of time.

9    Q    And when you say you looked at the settlement

10   agreement, are you referring to the settlement agreement

11   that was mentioned by counsel for NBK in his opening

12   statement?

13   A    Yes, sir.

14   Q    What settlement agreement was that?

15   A    The settlement agreement, there was a lawsuit filed by

16   Mr. Wetwiska, and they settled that lawsuit.  And the way

17   they settled that lawsuit was they said that they could buy

18   the note or the property for a certain amount of money.

19   Q    And did it also provide for any releases or any

20   consideration towards NBK?  I mean, let's be fair.  If

21   you're going to describe part of it --

22   A    I'm sorry?  What --

23   Q    What else did the settlement agreement have in it?

24   A    The usual settlement agreement things.  There are

25   releases and things like that.

1    Q    Okay, and in your review of the settlement agreement,

2    in your conversations, who else did you talk to other than

3    Mr. Choudhri?

4    A    I talked to Mr. Wetwiska.  I talked to people that

5    worked for Mr. Choudhri.  I talked to Azeemeh Zaheer.  I

6    talked to people that worked for Mr. Choudhri during the --

7    during the time that no longer worked for him.  And a couple

8    of those I talked to under oath in a lawsuit, in a

9    proceeding.

10   Q    And did you determine that, at least from Mr. Choudhri

11   or Mr. Choudhri's entities' perspective, that there was a

12   lender liability dispute?  I'm not asking you to comment on

13   it, good or bad, but is there a dispute?

14   A    Yes, sir.

15   Q    Did you talk to anyone else about your opinions on the

16   dispute?

17   A    Yes sir.

18   Q    Who?

19   A    I talked to lawyers in my law firm about whether or not

20   they thought it was a good case.  I talked to other lawyers

21   that are bankruptcy lawyers about whether or not they

22   thought it would be a good case, those kinds of people.

23   Q    And in fact how much time have you spent evaluating, to

24   your satisfaction or in your opinion, this case?  How long

25   have you spent evaluating?

1    A     There was -- I was representing -- I was representing

2    Mr. Choudhri and some of his entities --

3    Q     I'm going to re-ask the question.

4    A     Okay.

5    Q     How long have you spent evaluating it, sir?

6    A     Evaluating this case specifically, over 100 hours.

7    Q     So I'm going to ask it again because I'm not being

8    clear, and I apologize.  How much time have you spent

9    examining the lender liability dispute that we've

10   identified, at least Mr. Choudhri or his companies

11   (indiscernible) --

12          MR. FITZMAURICE:  Objection, Your Honor.  What's

13   the relevance to how much time Mr. Alexander has spent?

14          THE COURT:  I'll overrule the objection.

15          Go ahead, Mr. Burks.

16          THE WITNESS:  I would have spent over 100 hours

17   doing that.

18   BY MR. BURKS:

19   Q     All right.  Did you talk to the Chapter 7 trustee about

20   it?  Excuse me.  I'll retract and ask again.

21          Did you form an opinion as to the validity of the

22   dispute?

23   A     Yes.

24   Q     All right.  Have you offered to anybody to represent

25   plaintiffs in this dispute against NBK?

1   A   I offered --

2   Q   Yes or no, sir.

3   A   Yes.  I'm confused by the word plaintiff's counsel.  I

4   don't --

5   Q   Well, any plaintiffs in the lawsuit are whoever they

6   are.

7   A   Yes, I have.

8   Q   And did you state whether you would -- the terms on

9   which you would handle the action?

10  A   Yes.

11          MR. FITZMAURICE:  Objection, Your Honor.

12          MR. BURKS:  I'll --

13          MR. FITZMAURICE:  If there's a document that

14  establishes all of this, that would be helpful for us to

15  look at.  And again, I'm struggling with the relevance of

16  Mr. Alexander's views as to -- as counsel for the debtor,

17  who he's acknowledged he represents Mr. Choudhuri, what his

18  views of the dispute between the parties -- what relevance

19  that has as to whether or not the bank should be allowed to

20  credit bid.

21          THE COURT:  I'll overrule the objection except as

22  to the document.

23          Mr. Burks, if there is a document that evidences

24  that he mentioned, then I'd like to see that.  Go ahead.

25  BY MR. BURKS:

1   Q    Is there a document in writing which you made anybody

2   an offer to represent any plaintiff in a lender liability

3   complaint versus National Bank of Kuwait?

4   A    I believe I wrote a letter to the counsel for the

5   trustee that said I would take it on a contingent fee basis.

6   But I don't think I talked about percents or anything else.

7   I decided I would be willing to do it on a contingent fee

8   basis at no cost to the estate.

9        MR. BURKS:  All right (indiscernible) find that

10  document.

11       MR. BAKER:  It should be 499-83.

12       MR. BURKS:  Your Honor, we're about to put up on

13  the screen Docket Number 499 -- what?

14       MR. BAKER:  Eighty-three.

15       MR. BURKS:  Dash 83, and I'm looking at that

16  shield again.  Still looking at the shield.  Can we go to

17  the bottom of it, please, so we can -- just slowly scroll so

18  we can identify what this is.  Scroll down so we can see who

19  signed it, please, and then I want to go back up to the top,

20  Mr. Baker.

21       MR. BAKER:  Go up to the top?

22       MR. BURKS:  Well yeah (indiscernible) sending the

23  letter.

24  BY MR. BURKS:

25  Q    Mr. Alexander, are you looking at this document?

1   A    Excuse me?

2   Q    Are you looking at this document?

3   A    Yes.  It's a letter dated April 3, 2024 from me to R.J.

4   Shannon, Esquire and Kyung S. Lee, Esquire.

5   Q    A moment ago, we went to the last page where there was

6   a signature.  Did you see that?

7   A    Briefly.

8   Q    Is that your signature?

9   A    I'm sure it is.

10  Q    Is this your letter?

11  A    Yes.

12  Q    All right.  Are these the conditions and the

13  opinions -- I'll start again.

14       Are these the opinions -- do these reflect the opinions

15  you have regarding this lawsuit or this cause of action?

16  A    Some of them.  It has -- it says herein (indiscernible)

17  pertinent facts and references to exhibits.  There are --

18  there are others I keep.  I keep finding things out or

19  hearing things.

20       MR. FITZMAURICE:  Objection, Your Honor, lacks

21  foundation as to things he keeps finding out and hearing.

22       THE COURT:  I'll sustain the objection.  Thank

23  you.

24  BY MR. BURKS:

25  Q    Is this the letter you sent to the Chapter 11 trustee?

1  A    Yes.

2          MR. BURKS:  All right.  Your Honor, I offer it

3  into evidence, not for the veracity of the cause of action,

4  but for the fact that Mr. Alexander has the opinion set

5  forth in this letter regarding the dispute.

6          MR. FITZMAURICE:  Your Honor, we'd object to the

7  admission even for that limited purpose.  Mr. Alexander's

8  opinions as to the dispute are not relevant to whether or

9  not there is in fact a bona fide dispute between the parties

10 as identified in the motion --

11         THE COURT:  Bear with me.  I'm more worried about

12 the fact that it shows there's 175 pages to that exhibit at

13 the top of the ECF.

14         MR. FITZMAURICE:  And we've looked at two of them.

15         MR. BURKS:  I'm just offering Pages 2, 3 and 4.

16 Just the letter itself, Your Honor.  I'm not worried about

17 the exhibit.  I'm trying to establish the scope of the

18 dispute.

19         THE COURT:  Well, bear with me one second.  Two

20 through six is what you are offering?

21         MR. BURKS:  Yes, Judge.

22         THE COURT:  Okay.  So let me hear objections to

23 Pages 2 through 6, if you have any, Mr. Fitzmaurice.

24         MR. FITZMAURICE:  Your Honor, I just want to

25 briefly look to make sure I understand what those pages are

1    really quickly.  So it's the -- it's the same objections,

2    Your Honor.  Mr. Alexander's view as to the merits of any

3    dispute between the parties.

4            THE COURT:  I agree as to the merits.  I don't

5    think his opinion as to merits makes any difference to me.

6            MR. FITZMAURICE:  And the -- and the --

7            THE COURT:  But as far as the fact that he sent

8    the letter, I'll admit 499-83, only Pages 2 through 6 for

9    that limited purpose.

10           (Trial Exhibit 499-83.1-6 entered into evidence)

11           THE COURT:  Mr. Burks, you may call your next

12   witness.

13           MR. BURKS:  Actually, at this point, I pass the

14   witness.

15           THE COURT:  All right.  Thank you.

16           MR. BURKS:  I'm not going to try -- I'm not going

17   to try the lawsuit today.

18           THE COURT:  Mr. Choudhri, do you have any

19   questions of this witness?  No?  Is that a no?

20           MR. CHOUDHRI:  No, Your Honor.

21           THE COURT:  Thank you.

22           Mr. Fitzmaurice?

23           MR. FITZMAURICE:  Briefly, Your Honor.

24           THE COURT:  Go ahead.  Do you want to project?

25           MR. FITZMAURICE:  Oh, I'm sorry, Your Honor.  Yes.

```
 1              THE COURT:  I have to switch every time we move.
 2              CROSS-EXAMINATION OF JERRY ALEXANDER
 3    BY MR. FITZMAURICE:
 4    Q    So Mr. Alexander, good afternoon, or good morning,
 5    rather.  I'm showing you what -- the letter that you were
 6    just looking at here.
 7    A    Yes, sir.
 8    Q    Do you recognize that?
 9    A    Good morning to you.  Thank you.
10    Q    And I'm going to scroll down your bullet point list of
11    items.  I can go as fast or as slow as you want, but I'm
12    going to scroll through them, and then I'm going to ask you
13    a question.  I'll tell you now what that question is going
14    to be so you have it in your mind when you look.  And it is,
15    is it that all of these events occurred prior to August of
16    2022.  So the first bullet, that references events that
17    occurred in January 2021; is that correct?
18    A    That's correct.  That would be before August 2022.
19    Q    And then there's something at the end of that bullet
20    point of July 29, 2021?
21    A    That would be before August 2022.
22    Q    And then the second bullet, August of 2021?
23    A    Yes, sir.
24    Q    And then this bullet here that's at the bottom of the
25    page, it references an email that was sent in August of
```

1    2021.  Do you see that?

2    A    Yes, sir.

3    Q    Do you see in this bullet here, there's a reference to

4    events that occurred in September of 2019?

5    A    Yes, sir.

6    Q    In this bullet here, September of 2021.  Do you see

7    that?

8    A    Yes.

9    Q    And then July 2nd of 2022?

10   A    July 2nd of 2022 is before August.

11   Q    Okay, and then there's reference in this next bullet

12   about August 22, 2022?

13   A    Yes.

14   Q    Do you see that?

15   A    Yes.

16   Q    Do you know if that's the date that the parties entered

17   into the settlement agreement?

18   A    That's the settlement agreement date.  Yes, sir.

19   Q    Okay, and was the settlement agreement one of the

20   documents that you reviewed?

21   A    I believe it was.

22   Q    I have too many PDFs open (indiscernible) --

23   A    It's fine.

24   Q    So I'm referring to a document that's been filed at ECF

25   Number 508-7.  I'll scroll through it.  I'll scroll through

1    it, Mr. Alexander.  But my question is, do you recognize

2    this to be the settlement agreement that you reviewed?

3    A    I believe it could be that, yes.

4    Q    Okay, and looking here at the first paragraph, the

5    parties to the settlement agreement are the National Bank of

6    Kuwait, New York Branch.  Do you see that?

7    A    Yes.

8    Q    And debtor, Galleria Owner?

9    A    Yes.

10   Q    Do you know who Naissance Galleria is?

11   A    Yes.

12   Q    Who's that?

13   A    Naissance Galleria is a company that was a mezzanine

14   lender to Galleria 2425 Owner, LLC.

15   Q    Well, they were the mezzanine lender to the debtor's

16   owner, correct?

17   A    Yes.  Yes.

18   Q    And then the last party to the settlement agreement is

19   Mr. Choudhri, individually?

20   A    Yes, sir.

21   Q    When you reviewed the settlement agreement, did you

22   agree -- sorry.  Did you review the terms of the agreement

23   between the parties?

24   A    Yes, I found it very interesting.

25   Q    And as part of your review, did you review Section

1    3.1(a), where the debtor and  Mr. Choudhri acknowledged the

2    indebtedness that they owed to the bank?

3    A    I did see that.

4    Q    Okay, and did you see that they acknowledged that that

5    debt was owed without defense, setoff, claim, counterclaim

6    or deduction of any nature whatsoever, all of which were

7    expressly waived?

8    A    Yes, sir.  That's fairly typical language.

9    Q    Okay.  But you acknowledge that that's what, in fact,

10   the debtor and Mr. Choudhri did in this agreement?

11   A    I agree that that's what the words in the agreement

12   say.

13   Q    And in Section 3.1(b), the debtor and Mr. Choudhri

14   acknowledged that there were existing defaults under the

15   loan agreement?

16   A    That's what the agreement says.

17   Q    Right, and that there were no defenses, setoffs,

18   counterclaims, et cetera to those defaults?

19   A    The agreement also says that.

20   Q    And the agreement also says that if -- that the bank

21   had the right to foreclose?

22   A    It says that in (c).  Yes.

23   Q    Yes.  Thank you.  Now, the settlement agreement allows

24   the bank -- I'm sorry, allows Mr. Choudhri to make a payment

25   to the bank of $27 million; is that right?

1    A    It does.

2    Q    Okay, and that payment was never made, was it?

3    A    I don't think it was, no.

4    Q    Okay, and in Section (g), the settlement agreement

5    calls for any active litigation to be -- against the bank to

6    be dismissed with prejudice; is that right?

7    A    Yes.

8    Q    Section 4.1 of the settlement agreement contains

9    releases of the bank --

10   A    Yes, sir.

11   Q    -- by Mr. Choudhri and the debtor and the mezzanine

12   lender; is that right?

13   A    Yes.  Again, but I expected that language to be in the

14   agreement.

15   Q    And in fact it is there?

16   A    It is there.

17   Q    Okay.  In Section 5.3, the debtor and Mr. Choudhri

18   agreed that if they didn't pay the amounts that were due

19   under the settlement agreement, that the bank had the right

20   to foreclose.  Isn't that right?

21   A    Well, 5.3 says a lot of things.  Whatever it says,

22   that's what's in the agreement.

23   Q    Was this part of your review that -- was it part of

24   your review that the debtor agreed that if they didn't pay

25   the amounts that were owed, the bank would foreclose?

1    A    Yes sir, it was part of my review --

2    Q    And did they --

3    A    -- (indiscernible) expected release language, all the

4    other things to be in (indiscernible) --

5    Q    And it was also part of your review that the debtor and

6    Mr. Choudhri covenanted that they will not interfere with

7    the bank's ability to foreclose following a default under

8    the settlement agreement, right?

9    A    I don't see that.

10   Q    Let me see if I can help you.  Section 5.3.

11   A    I see that.

12   Q    The first sentence following the bold text, following

13   any settlement default, each of  Galleria, Choudhri and

14   Naissance covenant and agree that they shall not seek to

15   restrain or otherwise hinder, delay, frustrate or impair

16   NBK's efforts to (i) foreclose.  The text continues.  But

17   you can read that.

18   A    It says that.

19   Q    Okay, and that was all part of the review that you

20   undertook?

21   A    It absolutely was.

22   Q    Okay.

23   A    And like I said, I expected terms like that to be in

24   this agreement.

25   Q    All right, and you've previously represented Mr.

1    Choudhri in litigation against the bank, right?

2    A    Either him or one of his entities.  I'm not sure.  But,

3    yes.  Yes, I have.  Or maybe I haven't.  I don't

4    (indiscernible) --

5    Q    So I'm going to direct your attention, Mr. Alexander,

6    back to the letter.

7    A    Yes, sir.

8    Q    At 499-83.

9    A    Yes.

10   Q    Your second paragraph, I have previously represented

11   Mr. Choudhri in dispute with the bank.

12   A    Yes.

13   Q    Okay.

14   A    I think -- I think that's right.  I was confused if it

15   was him or one of his entities.

16   Q    Thank you, Mr. Alexander.  I apparently have one more

17   question.

18            THE COURT:  That's fine.

19            THE WITNESS:  You can ask it.

20   BY MR. FITZMAURICE:

21   Q    Mr. Alexander, I'm referring back to -- I'm referring

22   back to the confidential settlement agreement which is at

23   ECF 508-7, in particular directing your attention to Section

24   9.8 of that agreement.

25   A    Yes, sir.

```
 1    Q    Is this part of the review that you undertook?

 2    A    It is.  But I was not the --

 3    Q    You were not the counsel who was involved?

 4    A    I was not.

 5    Q    But in fact, the debtor and Mr. Choudhri and the

 6    mezzanine lender, they all had counsel?  They all

 7    acknowledged here that they had counsel?

 8    A    Yes, and I've spoken with them.

 9    Q    And that was Mr. Wetwiska from Akin Gump?  That was --

10    A    Mr. Wetwiska.  Yes.

11         MR. FITZMAURICE:  Nothing further, Judge.  Thank

12    you.

13         THE COURT:  All right.  I believe --

14         MR. BURKS:  Judge --

15         THE COURT:  Yeah.

16             REDIRECT EXAMINATION OF JERRY ALEXANDER

17    BY MR. BURKS:

18    Q    Mr. Alexander, while the door just got opened kind of

19    wide.  But I will not ask you to try this case today sitting

20    on the stand.  But I do have a few questions, sir.  All

21    right.

22    A    Yes, sir.

23    Q    So all the points that counsel just asked you, you

24    considered them before issuing your letter which has been

25    admitted into evidence on limited purposes, correct?
```

1    A    Oh, absolutely.  Absolutely.  All of them.  Every

2    lender -- every lender has documents that say things like

3    those.

4    Q    Have you brought lender liability actions before?

5    A    Yes.

6            MR. FITZMAURICE:  Objection, relevance, Your

7    Honor.

8            THE COURT:  Go ahead.  What's your response to

9    that?

10           MR. BURKS:  The relevance is that by reading -- by

11   asking this witness at least 14 specific questions regarding

12   this settlement agreement, I have now -- should have leeway

13   to explain why he still thinks there's a cause of action.

14           THE COURT:  I'll overrule the objection.  Go

15   ahead.

16   BY MR. BURKS:

17   Q    Mr. Alexander, you've read these points.  You've

18   considered these points that were asked of you, correct?

19   A    Yes.

20   Q    So have you tried lender liability actions before?

21   A    Yes, sir.

22   Q    Have you succeeded?

23           MR. FITZMAURICE:  Objective, relevance.

24           THE COURT:  I'll overrule the objection.

25   BY MR. BURKS:

1    Q    Have you succeeded?

2    A    Yes, sir.

3    Q    In those actions that you succeeded in, were there

4    these types of releases and settlement agreements involved?

5    A    There were agreements that were more onerous than this

6    when it came to that.

7    Q    All right, and you set forth in your letter your

8    opinion as to why there is a good lender liability action

9    against the National Bank of Kuwait, correct?

10   A    Part of my -- part of my opinion.

11   Q    All right.

12   A    Part of it.

13   Q    And some of the actions occurred after the settlement

14   agreement, correct?

15            MR. FITZMAURICE:  Objection.

16            THE WITNESS:  Most of them.  Most of them.

17            THE COURT:  Hold on.  There's been an objection.

18   What's the objection?

19            MR. FITZMAURICE:  There's nothing in the letter

20   about anything that happened --

21            THE COURT:  I'll sustain the objection.

22   BY MR. BURKS:

23   Q    Based on --

24            THE WITNESS:  I'm not sure that that's correct.

25   But --

```
 1          MR. BURKS:  He's -- the judge has sustained the

 2    objection, sir.  We're both attorneys.

 3          THE COURT:  If you want to look at the letter

 4    again.  I just sustained the objection as to the form of the

 5    question.  I didn't see anything.  If you want to bring the

 6    letter back up, feel free.

 7          MR. BURKS:  I didn't understand the scope of your

 8    ruling.  I apologize, Judge, for putting words in your

 9    mouth.  I apologize.

10          THE COURT:  I apologize.

11          MR. BURKS:  The witness cannot control the scroll,

12    can he, Your Honor?

13          THE COURT:  Can the witness scroll it down?

14          MR. BURKS:  If you will state what you need to do

15    to review, what pages, just tell us where you need to go.

16    BY MR. BURKS:

17    Q    And the question is, in your letter, are there any

18    allegations or acts which occurred after the date of the

19    settlement agreement.

20    A    There -- let me see.  Hold it right here.  Yes.  If you

21    look at the -- there's a --

22    Q    The answer is yes, and what are those, sir?  Please

23    identify them, in your letter though.

24    A    Well, the first -- the second bullet point on the page

25    that I'm looking at, and I don't know what page it is
```

1    because I didn't see the top of it.  Page 4, the second

2    bullet point starts in with all of those events happened

3    after August 22, 2022.  Excuse me, third bullet point.  NBK

4    has prevented debtor's successful performance under any and

5    all agreements it has with NBK, including the confidential

6    settlement agreement.

7    Q    What else?

8    A    Confidential settlement agreement permitted a timeframe

9    which the debtor could sell the 2425 building and debtor was

10   successful in receiving a hard letter of intent dated

11   January 17, 2023 to purchase the building from Caldwell

12   Soames.  A true and correct copy of that letter of intent is

13   attached hereto as Exhibit 2.

14   Q    What else after the settlement agreement?

15   A    Again, these negotiations were ongoing.  NBK took

16   actions.  They've interfered with the continuation and the

17   closing of that transaction, including issuing a notice of

18   foreclosure on March 29, 2023, in breach of the confidential

19   settlement agreement, which debtor believes was done

20   intentionally to prevent the sale.

21   Q    Anything else?

22   A    The sale would have cleared the Bank of Kuwait debt as

23   it stood and at the time and left great value to the other

24   plaintiffs.  The debtor believes the Bank of Kuwait

25   recognized that greater value and wanted to take it for

1    itself by foreclosure in a loan-to-own gambit.

2    Additionally, NBK posted for foreclosure in 2023 early and

3    against the extended grace period that the state court had

4    given to debtor, which chilled the bidding process and the

5    interest in the 2425 building completely.  Debtor believes

6    that NBK knew this would prevent the sale and did it on

7    purpose to prevent the debtor from successfully selling the

8    property and paying off the loan so NBK could foreclose and

9    become the owner of the building.  The debtor also made the

10    following substantial payments the NBK's consideration to

11    allow it a fair opportunity to sell the building.

12    $801,509.42, August 27, 2022; $80,000 paid by the debtor to

13    NBK on April 18, 2023; $80,000 paid by the debtor to NBK on

14    May 10, 2023.

15    Q    Sir, let me interrupt you.  Based on these things that

16    you believe, in your opinion, occurred after the settlement

17    agreement was executed, you then list various causes of

18    action that you believe exist; is that correct?

19    A    Yes, sir.

20         MR. FITZMAURICE:  So Your Honor, object to this

21    testimony, at least in part, on hearsay grounds.  The claim

22    is that the bank somehow interfered with an agreement that

23    the debtor had with Paul Caldwell and Caldwell Soames.  He's

24    on their list.  They could call him and talk to him about

25    whether or not any of that is true.  But instead they're

```
 1    offering this hearsay testimony from a witness who has no
 2    actual firsthand knowledge of any of those facts to try to
 3    prove, despite the fact of what they've said earlier about
 4    the limited purpose for which this is offered, they're
 5    actually trying -- offering this testimony and this evidence
 6    to try to establish to Your Honor that all of these things
 7    are in fact true.
 8              MR. BURKS:  Response?
 9              THE COURT:  Here's my ruling.  Okay.  It was
10    admitted for a limited purpose.  His knowledge or lack of
11    knowledge or what he specified to you goes to weight.  I've
12    heard it.  Whether it's true or not is a totally different
13    issue.  So --
14              MR. BURKS:  We're not trying the case today.
15              THE COURT:  So go ahead.  I'll overrule that
16    objection.
17    BY MR. BURKS:
18    Q    So why would you take a case like this,
19    (indiscernible), why would you take this on a contingency
20    basis?
21    A    Because I can win it.  And it's not a complex case.
22    You want to see a complex case?  Look at the Bailey Tool
23    case.
24    Q    For what case?
25    A    The Bailey Tool case.  Bailey Tool v. RBC.
```

1    Q    I'm going to cut you off on that because I don't know

2    why that's relevant.  But I understand you're saying for you

3    it's not complex.

4    A    It's not.  It's not complex and these documents are not

5    difficult.

6    Q    You have a damage model for this?

7    A    Yes.

8    Q    What is it?

9    A    Well --

10        MR. FITZMAURICE:  Objection, Your Honor.  Do we

11   have -- can we look at the damage model?

12        THE COURT:  I sustain the objection.

13   BY MR. BURKS:

14   Q    Do you have a damage model in this letter?

15   A    I don't know.  I don't think so.

16        MR. BURKS:  All right.  Nothing further, Judge.

17        THE COURT:  Thank you.

18        Mr. Choudhri?

19        REDIRECT EXAMINATION OF JERRY ALEXANDER

20   BY MR. CHOUDHURI:

21   Q    Mr. Alexander, you agreed to take this case on a

22   contingency where it would cost the estate no money,

23   correct?

24        MR. FITZMAURICE:  Objection, asked and answered.

25        THE COURT:  I'll sustain the objection.

```
 1              You can't be repetitive, Mr. Choudhri.  Ask

 2    something that hasn't been asked already.

 3    BY MR. CHOUDHURI:

 4    Q    I just want to make sure I understand.  You did speak

 5    to the Chapter 11 trustee or their counsel?

 6              MR. FITZMAURICE:  Objection, Your Honor, asked and

 7    answered.

 8              THE COURT:  I'll sustain the objection.

 9              Don't be repetitive, Mr. Choudhri.  If it's

10    already been asked and answered, I've already heard it.  You

11    don't need to go over it again.

12    BY MR. CHOUDHURI:

13    Q    In the settlement agreement, Mr. Alexander, there's

14    mutual promises that go both ways, right?

15    A    Yes, sir.

16    Q    So do you have an understanding, as a follow-up to Mr.

17    Fitzmaurice's questions, of how the settlement agreement

18    came to be?

19              MR. FITZMAURICE:  Objection, Your Honor,

20    relevance.

21              THE COURT:  I'll sustain the objection.

22    BY MR. CHOUDHURI:

23    Q    Are you aware in the settlement agreement that the bank

24    had an obligation to provide a loan sale agreement?

25              MR. FITZMAURICE:  Objection, Your Honor.  The
```

1    agreement speaks for itself.  We can look at it.

2            THE COURT:  I'll sustain the objection.

3    BY MR. CHOUDHURI:

4    Q    What was your experience in the Bailey Tool case, Mr.

5    Alexander?

6            MR. FITZMAURICE:  Objection, Your Honor,

7    relevance.

8            THE COURT:  I'll sustain the objection.  Thank

9    you.

10   BY MR. CHOUDHURI:

11   Q    Did the bank frustrate performance by the debtor and/or

12   me individually?

13           MR. FITZMAURICE:  So objection, Your Honor, calls

14   for speculation and calls for a legal conclusion and assumes

15   facts not in evidence.

16           THE COURT:  I'll sustain the objection.  Thank

17   you.

18   BY MR. CHOUDHURI:

19   Q    Mr. Fitzmaurice read some provisions of the settlement

20   agreement.  There are other provisions of obligations by the

21   bank as well in that same settlement agreement, correct?

22           MR. FITZMAURICE:  Objection, Your Honor.  We

23   can -- best evidence.  We can look at the agreement to see

24   what its terms are.

25           THE COURT:  The exhibit speaks for itself.

```
 1                    MR. CHOUDHURI:  And that's in, Your Honor?

 2                    THE COURT:  I don't think anyone has actually

 3     offered it as of yet, but I'm happy to admit it if the

 4     parties will agree to it.

 5                    MR. FITZMAURICE:  We agree.

 6                    THE COURT:  All right.  Then 508-7, the settlement

 7     agreement, is admitted.

 8                    (Trial Exhibit 508-7 entered into evidence)

 9                    THE COURT:  Thank you.

10     BY MR. CHOUDHURI:

11     Q    Do you believe that the National Bank of Kuwait has

12     committed a tort?

13                    MR. FITZMAURICE:  Objection, Your Honor.

14                    THE COURT:  Basis of the objection?

15                    MR. FITZMAURICE:  Mr. Alexander's expert opinion

16     about whether or not the bank has committed a tort is not

17     relevant.  It calls for a legal conclusion, and those are

18     for Your Honor.

19                    THE COURT:  I'll sustain the objection.

20     BY MR. CHOUDHURI:

21     Q    You've reviewed the documents in the case, correct?

22     A    Yes, sir.

23     Q    In the documents you reviewed in the case, have you

24     seen offers and leases and correspondence that was submitted

25     to the National Bank of Kuwait?
```

```
 1              MR. FITZMAURICE:  So objection, Your Honor, vague
 2    as to the case, which case we're talking about, but also
 3    that the documents would be the best evidence of --
 4              THE COURT:  I'll sustain the objection.
 5              You want to project, Mr. Choudhri?
 6              MR. CHOUDHURI:  Yes.  Can I put up the letter?
 7              THE COURT:  I just need to know where you're going
 8    to connect from and I'll put it up.  Where do you want it,
 9    where do you want to project from and who's going to
10    project?
11              Mr. Choudhri, you can connect right there and do
12    it yourself if you'd like.  Mr. Choudhri, he can stand there
13    and assist you.  That's fine, too.
14              MR. CHOUDHURI:  Thank you.
15              MR. FITZMAURICE:  Your Honor, just for purposes of
16    the record, can we just have a representation as to who that
17    is?
18              THE COURT:  Sure.  What's your name, sir?
19              MR. PALAVAN:  Shea Palavan.
20              THE COURT:  One more time?
21              MR. PALAVAN:  Shea Palavan.
22              THE COURT:  Shea Palavan?  Is that correct?  Did I
23    say that correctly?
24              MR. PALAVAN:  Yes, Your Honor.
25              MR. FITZMAURICE:  And in what capacity is Mr.
```

1    Palavan?

2              MR. CHOUDHURI:  He's assisting me.

3              MR. FITZMAURICE:  Is he a lawyer or a business

4    person or something else?

5              MR. CHOUDHURI:  Well, he is a lawyer.  But he's

6    assisting me --

7              MR. FITZMAURICE:  Well, If Mr. Choudhri is

8    represented by counsel --

9              THE COURT:  All he's doing is helping project

10   because of his difficulties with the stroke.  I don't have

11   any problem with that.  That's fine.  Go ahead.

12             MR. FITZMAURICE:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14             MR. CHOUDHURI:  I just want to clarify, Your

15   Honor.  I'm able to have an assistant to help me?

16             THE COURT:  I said he's more than happy to --

17             MR. CHOUDHURI:  Okay.  Okay.  Thank you, Your

18   Honor.  I just wanted to know if I understood.

19             THE COURT:  Yeah.

20   BY MR. CHOUDHURI:

21   Q    Mr. Alexander, you've been to the building, 2425?

22   A    Yes, sir.

23   Q    Can you describe the building?

24             MR. FITZMAURICE:  Objection, relevance, Your

25   Honor.

```
 1            THE COURT:  It's not relevant, Mr. Choudhri.
 2   BY MR. CHOUDHURI:
 3   Q    All right.  You've reviewed the contract that Mr.
 4   Caldwell and the debtor signed?
 5            MR. FITZMAURICE:  Objection, Your Honor.
 6            THE COURT:  Best evidence, if you have a contract,
 7   we need to look at the contract.  He can't testify what's in
 8   it.
 9   BY MR. CHOUDHURI:
10   Q    I'd point you to the document on your screen, Mr.
11   Caldwell --
12            MR. FITZMAURICE:  Your Honor, we object to the use
13   of the exhibit.  The purpose is to say that this is an
14   agreement by Mr. Caldwell.  It's not a letter from him.
15   There is no signature.  There is no DocuSign.  There's a
16   computer-generated name in script.  There's no way for
17   anyone to know whether he in fact put that on there.  So the
18   document is not authenticated, and it lacks foundation.
19            THE COURT:  I'll sustain the objection on lack of
20   authentication.
21   BY MR. CHOUDHURI:
22   Q    Did you receive this letter?
23            THE COURT:  You can't ask questions about it.  I
24   sustained the objection based on lack of authentication.
25   BY MR. CHOUDHURI:
```

1   Q    Have you seen the contract for $85 million that was

2   attached to your letter?

3        MR. FITZMAURICE:  Your Honor, I would just object

4   to the use of the word contract.

5        THE COURT:  I'll sustain the objection as to the

6   form of the question.  Ask another question.

7   BY MR. CHOUDHURI:

8   Q    Do you see what's on your screen, Mr. Alexander?

9   A    Yes.

10  Q    What does the heading say?

11       MR. FITZMAURICE:  Objection, Your Honor, the

12  document speaks for itself.

13       THE COURT:  It's not in evidence, but I'll sustain

14  the objection.

15  BY MR. CHOUDHURI:

16  Q    Mr. Alexander, this is a letter.  Is this an email that

17  you authored to R.J. Shannon and Kyung Lee on April the 3rd?

18  A    Yes, sir.

19  Q    And does this have an attachment?  Is this the complete

20  email and attachment that goes with it?

21  A    I think so.

22       MR. CHOUDHURI:  I'd like to move to make this

23  document, 499-83, Your Honor.

24       THE COURT:  Objections?

25       MR. FITZMAURICE:  Yes, Your Honor.  Mr. Choudhri,

```
 1   separate and apart from his counsel, or the counsel for one
 2   of his entities, is offering it for the proof, the truth of
 3   all of the matters asserted.  Your Honor already admitted
 4   the letter for a limited purpose, and this is now an attempt
 5   to introduce all of it for its truth and we would object to
 6   that.
 7             THE COURT:  I'll sustain the objection.
 8   BY MR. CHOUDHURI:
 9   Q    Mr. Alexander, do you believe that the Bank of Kuwait
10   properly posted for foreclosure of the property?
11             MR. FITZMAURICE:  Objection, Your Honor,
12   relevance.  It lacks foundation.  It assumes facts not in
13   evidence.
14             THE COURT:  I'll sustain the objection.
15   BY MR. CHOUDHURI:
16   Q    Do you have an opinion of what the value of this case
17   is worth?
18             MR. FITZMAURICE:  Objection, vague as to this
19   case.
20             THE COURT:  I'll sustain the objection.  Rephrase
21   the question.
22   BY MR. CHOUDHURI:
23   Q    Do you have an opinion on what the value of the claims
24   against the national bank are?
25             MR. FITZMAURICE:  Your Honor, it's offering --
```

1    seeking to have Mr. Alexander offer an opinion as to the

2    ultimate issue.  And again, those are for Your Honor to

3    decide or for another court to decide and not for Mr.

4    Alexander.

5         THE COURT:  I'll sustain the objection.

6    BY MR. CHOUDHURI:

7    Q    In your investigation, did you come to learn that there

8    was an offer to buy 2425 (indiscernible) 55 percent of it,

9    for $75 million?

10        MR. FITZMAURICE:  So objection, Your Honor, both

11   to the use of the term investigation.  That assumes facts

12   that are not of evidence.  And Mr. Choudri is just trying

13   to end run Your Honor's previous ruling about the

14   admissibility of the factual contents of the letter and its

15   exhibits.

16        THE COURT:  I'll sustain the objection.  Thank

17   you.

18   BY MR. CHOUDHURI:

19   Q    If you were to take this case on, on a contingency,

20   would it cost the estate any money?

21        MR. FITZMAURICE:  Objection, asked and answered.

22        THE COURT:  I'll sustain the objection.

23   BY MR. CHOUDHURI:

24   Q    Mr. Alexander, do you believe the debtor -- the NBK has

25   interfered with the debtor's efforts to pay NBK off --

1           MR. FITZMAURICE:  Same objection --

2   BY MR. CHOUDHURI:

3   Q    -- and perform under the settlement agreement?

4           THE COURT:  I'll sustain the objection.

5           MR. FITZMAURICE:  Your Honor, also --

6           THE COURT:  This witness doesn't have any personal

7   knowledge of any of these facts, Mr. Choudhri.  Okay.  He's

8   evaluated them.  I'm aware of that.  Okay.  But he doesn't

9   have personal knowledge.  He can't tell me that any of these

10  things actually occurred.  Okay.  So move along.  Again, I'm

11  going to give you a couple more questions and then I'm going

12  to cut you off.

13          MR. CHOUDHURI:  I'm almost done, Your Honor.

14  Thank you.

15  BY MR. CHOUDHURI:

16  Q    Mr. Alexander, do you believe there's any questions I

17  haven't asked you that --

18          THE COURT:  He can't give a narrative, Mr.

19  Choudhri.  That's not the way it works.

20          MR. CHOUDHURI:  Okay.  All right.  No more

21  questions then.  Thank you.

22          THE COURT:  Thank you.  All right.  I'll go back

23  to Mr. Fitzmaurice.

24          MR. FITZMAURICE:  Nothing further, Your Honor.

25          THE COURT:  Thank you.

1           Mr. Burks?

2           MR. BURKS:  How long has it been since you've had

3     to tell somebody to ask questions and not to give a

4     narrative?

5           THE COURT:  Go ahead, please ask your questions.

6           MR. BURKS:  At this point, Your Honor, on behalf

7     of 2425 WL, we call --

8           THE COURT:  Are you -- do you pass on this

9     witness?  I asked you if you had any questions for this

10    witness.

11          MR. BURKS:  None.

12          THE COURT:  Okay.  So you are excused, sir.  Thank

13    you for coming.

14          MR. ALEXANDER:  Thank you, Your Honor.

15          THE COURT:  All right.  You're going to call who,

16    Mr. Burks?

17          MR. BURKS:  Now my turn to call another witness?

18          THE COURT:  Yes.

19          MR. BURKS:  Your Honor, Mr. Jeff Alexander is

20    being called now on behalf of 2425 (indiscernible) --

21          THE COURT:  Mr. Alexander, will you come forward,

22    wherever you are?

23          MR. SATHER:  Steidley.

24          MR. BAKER:  Steidley.

25          MR. STEIDLEY:  I think he means Jeff Steidley,

1   Judge.

2            THE COURT:  Okay.

3            MR. BURKS:  Let me try again.  On behalf of 2425

4   WL, we call Mr. Jeff Steidley.

5            THE COURT:  All right, sir, will you please state

6   your name for the record.

7            MR. STEIDLEY:  Jeff Steidley, Judge.

8            THE COURT:  All right.  Please raise your right

9   hand to be sworn.  Do you swear or affirm to tell the truth,

10  the whole truth and nothing but the truth, so help you God?

11           MR. STEIDLEY:  I do.

12           THE COURT:  All right.  Please be seated.  Thank

13  you.

14           MR. FITZMAURICE:  Your Honor, again, just for the

15  record, we object to Mr. Steidley being called.  He's

16  counsel for 2425 WL.  It's not clear what possible relevant

17  evidence he could have to whether or not the bank's entitled

18  to credit bid tomorrow.

19           THE COURT:  Please object to anything that he's

20  asked and I'll rule on the record.  Thank you.

21           Mr. Burks, go ahead.

22                DIRECT EXAMINATION OF JEFF STEIDLEY

23  BY MR. BURKS:

24  Q    Can you please state your name for the record, sir?

25  A    My name is Jeff Steidley.

1    Q    And what do you do for a living?

2    A    I am an attorney.

3    Q    And in connection with this bankruptcy case, have you

4    filed any pleadings?

5    A    I filed a motion to remand on a case that I filed in

6    state court.

7    Q    So is your answer that you filed a state court

8    petition?

9    A    I filed a state court --

10           MR. FITZMAURICE:  Objection, Your Honor, leading.

11           THE COURT:  It's preliminary.  I'll allow it.  Go

12   ahead.

13           THE WITNESS:  I filed state court petition.  It

14   was removed.  I filed a motion to remand in Judge Norman's

15   court.

16   BY MR. BURKS:

17   Q    In Document Number 6, ECF Number --

18           MR. BURKS:  Can we please put it on the screen.

19           MR. BAKER:  499-6.

20           MR. BURKS:  What is it?

21           MR. BAKER:  499-6.  The court has taken judicial

22   notice of this document.

23   BY MR. BURKS:

24   Q    Is this the document you filed that you were referring

25   to?

1    A    Yes, sir.

2    Q    Without stating facts, describe what this lawsuit is in

3    terms of the allegations that are in it because I want to

4    understand the scope of the dispute and how it affects a

5    credit bid, sir.

6          MR. FITZMAURICE:  I'll object Your Honor.  Your

7    Honor's already taken judicial notice of the contents of

8    this pleading for the fact that they were made.  Your Honor

9    already has that information available.  It's not --

10         THE COURT:  I think the document speaks for

11   itself, Mr. Burks.

12   BY MR. BURKS:

13   Q    Why would this document be relevant to a credit bid,

14   sir?

15         MR. FITZMAURICE:  Objection, Your Honor.

16         THE COURT:  Go ahead.

17         MR. FITZMAURICE:  The question is calls for a

18   legal conclusion about -- he's asking the witness to offer

19   an opinion as to why this pleading is relevant.

20         THE COURT:  I'll sustain the objection.

21   BY MR. BURKS:

22   Q    Did you file this action on a contingency fee or an

23   hourly fee basis?

24   A    Contingency.

25   Q    Why?

```
 1   A    The case has a lot of value and I'd get a percentage of

 2   that value.  That's a good deal for me.

 3            MR. BURKS:  Nothing further, Judge.

 4            THE COURT:  All right.  Thank you.

 5            Mr. Choudhri?

 6            MR. CHOUDHURI:  (indiscernible)

 7            THE COURT:  Excuse me, sir.  I can't hear you.

 8                DIRECT EXAMINATION OF JEFF STEIDLEY

 9   BY MR. CHOUDHURI:

10   Q    What's your name, sir?

11   A    Jeff Steidley.

12   Q    And your occupation?

13   A    Attorney.

14   Q    And where did you graduate?

15   A    Vanderbilt Law School, 1980.

16   Q    The year I was born.  And your experience, your

17   background, which law firm did you start off at?

18            MR. FITZMAURICE:  Objection, relevance, Your

19   Honor.

20            THE COURT:  What's the relevance, Mr. Choudhri?

21            MR. CHOUDHURI:  Just laying a little background,

22   Your Honor.

23            THE COURT:  I don't need it.  Thank you.

24   BY MR. CHOUDHURI:

25   Q    What is the venue provision in the confidential
```

1    settlement agreement that has been entered in this case?

2                MR. FITZMAURICE:  Objection, Your Honor.  The

3    agreement speaks for itself.

4                THE COURT:  That document speaks for itself, Mr.

5    Choudhri.  I'll sustain the objection.

6    BY MR. CHOUDHURI:

7    Q    Are you intending on filing the summary judgment in

8    short order?

9                MR. FITZMAURICE:  Objection, Your Honor.

10               THE COURT:  Basis of the objection?

11               MR. FITZMAURICE:  Is relevance.  What counsel

12   intends to do.  I mean this is a very strange situation

13   where the client is questioning the lawyer on the stand, one

14   of many very strange issues in this case.  It's not relevant

15   to the issue of whether or not the bank is entitled to

16   credit bid at the auction tomorrow.

17               THE COURT:  I'll sustain the objection based on

18   relevance.  I don't think it's what he's going to do in the

19   case is relevant to the issue that I have to decide which is

20   currently whether the bank gets to credit bid or not.

21   BY MR. CHOUDHURI:

22   Q    In your belief, who owns the note as we sit here today?

23               MR. FITZMAURICE:  Objection, Your Honor.  Mr.

24   Steidley's belief on that issue is not relevant to

25   whether --

```
 1          THE COURT:  I'll sustain the objection.

 2  BY MR. CHOUDHURI:

 3  Q    How fast can this matter be decided, the case that

 4  you've brought?

 5          MR. FITZMAURICE:  Same objection, Your Honor.

 6          THE COURT:  I'll sustain the objection.

 7  BY MR. CHOUDHURI:

 8  Q    If NBK wins a credit bid and it's found that NBK didn't

 9  own the note and lien in the venue under the confidential

10  settlement agreement has stated, then what would be the

11  outcome of who owns the property?

12          MR. FITZMAURICE:  So objection, Your Honor, calls

13  for a legal conclusion.  And in fact, it calls for the

14  lawyer to reveal his attorney work product and attorney-

15  client communications.  So those have all now been waived

16  and we ask for an immediate production of all of those

17  materials.  He's asking him for his -- for his legal work

18  product and the analysis of --

19          THE COURT:  So at this point in time, he hasn't

20  answered the question.  If he were to answer, I think he'd

21  waive privilege.  He can claim it if he wants to.  He's the

22  person.

23          MR. FITZMAURICE:  But Your Honor, it's a client.

24          THE COURT:  I understand.  I understand.

25          MR. FITZMAURICE:  The client controls the
```

1    privilege, and he's --

2              THE COURT:  I understand.  But this is not a

3    discovery matter.  It's a matter for cash collateral, so --

4    I mean, for credit bidding.  So I'll sustain the objection

5    at this point in time.

6              I'd ask you to ask another question, and just be

7    aware that you may be waiving privilege.

8              MR. BURKS:  Objection.  2425 WL, I'm their counsel,

9    does not waive the privilege.

10             THE COURT:  Okay.  Go ahead.

11             MR. FITZMAURICE:  Excuse me.  The petition is by

12   Mr. Choudhri --

13             THE COURT:  Choudhri, personally.  I understand.

14             MR. FITZMAURICE:  -- and Mr. Steidley is --

15             THE COURT:  Go ahead, sir.  Ask your next

16   question.

17   BY MR. CHOUDHURI:

18   Q    I don't believe my question is without you revealing

19   any privilege.  My question is if the bank is a successful

20   credit bid winner at an auction, which presumes it's buying

21   it free and clear of all liens, and it's later found out

22   through your case, a court, that they didn't hold the note

23   and lien, what comes of who owns the property, Mr. Steidley,

24   if you know?

25             MR. FITZMAURICE:  So all the same --

```
 1              MR. BURKS:  Objection, irrelevant.

 2              THE COURT:  I'll sustain the objection, Mr. Burks'

 3    objection.

 4    BY MR. CHOUDHURI:

 5    Q    Do the claims against NBK have value?

 6              MR. FITZMAURICE:  Objection, Your Honor.

 7              THE COURT:  Sorry.  Bear with me.  The objection

 8    is based on what?

 9              MR. FITZMAURICE:  He is asking the lawyer to offer

10    an opinion as to the claim, the merit of the claims, which

11    is for Your Honor to decide.

12              THE COURT:  I'll sustain the objection.

13              MR. FITZMAURICE:  Also, Your Honor, again, I would

14    argue that the questions as to the merit of the claims is a

15    question that's designed to reveal the contents of attorney-

16    client communications or the lawyer's own work product.

17              THE COURT:  If there's an adversary proceeding,

18    then we can deal with that in the adversary proceeding or

19    the remand, as the case may be.

20              Go ahead, Mr. Choudhri.

21    BY MR. CHOUDHURI:

22    Q    Are you aware of a contingent expense lender willing to

23    put up $2 million to support the litigation against NBK?

24              MR. FITZMAURICE:  Objection, lacks foundation,

25    assumes facts not in evidence.
```

```
1              THE COURT:  I'll sustain it.  It's speculation.
2    It'll sustain the objection.
3    BY MR. CHOUDHURI:
4    Q    Do the claims against NBK have value?
5              MR. FITZMAURICE:  Same objection.
6              THE COURT:  I'll sustain the objection.  Thank
7    you.
8    BY MR. CHOUDHURI:
9    Q    Were you in the room when Mr. Troop made his opening
10   statements?
11   A    I was.
12   Q    You recall Mr. Troop making a statement, I'm sure it's
13   on the record, that NBK gets a release along with a credit
14   bid?
15             MR. FITZMAURICE:  Objection, Your Honor.  A
16   release is a plan confirmation issue.  It's not about credit
17   bid.
18             THE COURT:  I'll sustain the objection.  It's plan
19   confirmation, Mr. Choudhri.
20             MR. CHOUDHURI:  I was just referring to his
21   opening, Your Honor.
22             THE COURT:  It's still plan confirmation, and I'm
23   here on credit bidding.
24   BY MR. CHOUDHURI:
25   Q    Are you aware the state court issued -- the state court
```

1   had a several day injunction hearing and issued a TI in

2   favor of the debtor against NBK?

3           MR. FITZMAURICE:  Objection, Your Honor.  If there

4   is such a ruling, then we could see that.  We could see the

5   exhibit and they could look at it.

6           THE COURT:  I'll sustain the objection.  If you'd

7   like to present it, feel free.

8           MR. CHOUDHURI:  Where is it?  March 2022?  I think

9   it's an exhibit, Your Honor.

10  BY MR. CHOUDHURI:

11  Q    While he's doing that, do you have any knowledge as it

12  relates to how the tax liens are treated in the settlement

13  agreement and the proof of claim as it relates to the credit

14  bid for the Bank of Kuwait?

15          MR. FITZMAURICE:  Objection, Your Honor.  Those

16  documents speak for themselves and it mischaracterizes the

17  evidence (indiscernible) --

18          THE COURT:  I'll sustain the objection.  Those

19  documents speak for themselves and they're already in

20  evidence.

21  BY MR. CHOUDHURI:

22  Q    What would happen to the tax liens once NBK accepted

23  the tender of $26 million?

24          MR. FITZMAURICE:  So objection, Your Honor -- Your

25  Honor, excuse me.  Assumes facts not in evidence.  It's also

 1   not relevant to credit bidding.  It's asking about an

 2   unrelated issue.

 3            THE COURT:  And there's no foundation.

 4            MR. FITZMAURICE:  And there's no foundation.

 5            THE COURT:  I'll sustain the objection.

 6   BY MR. CHOUDHURI:

 7   Q    Do you believe the bank fraudulently induced me and the

 8   debtor from entering into the confidential settlement

 9   agreement?

10            MR. FITZMAURICE:  So objection, Your Honor.

11            THE COURT:  I don't even know how he can answer

12   that question.  I'll sustain the objection.

13   BY MR. CHOUDHURI:

14   Q    Mr. Steidley, have you seen this document?

15   A    I have.

16            MR. CHOUDHURI:  Can you scroll it up?  Scroll it

17   up.

18   BY MR. CHOUDHURI:

19   Q    If you can just take a second and read this document,

20   Mr. Steidley.  What has it stated?

21            MR. FITZMAURICE:  Your Honor, the document speaks

22   for itself.

23            THE COURT:  It does speak for itself.

24            Do you want to admit it into evidence, Mr.

25   Choudhri?

1              MR. CHOUDHURI:  Yes, Your Honor.

2              THE COURT:  What ECF number is it?  Let me ask you

3     this question.  Is this the lawsuit that led to the

4     settlement agreement?

5              MR. CHOUDHURI:  Yes, Your Honor.

6              THE COURT:  Okay.  Thank you.

7              MR. FITZMAURICE:  Your Honor, on that basis, we

8     would object on relevance grounds.

9              THE COURT:  I'll sustain the objection as to

10    relevance.

11             Mr. Choudhri, I think that the settlement

12    agreement is very, very germane to what we're discussing.

13    What happened leading up to that settlement agreement is not

14    relevant at all.  All right.

15    BY MR. CHOUDHURI:

16    Q   Mr. Steidley, are you -- have you read any

17    correspondence or are you aware that, as we sit here today,

18    if the settlement agreement has been rescinded or if it was

19    -- or if it was entered in being rescinded.

20             MR. FITZMAURICE:  So objection, Your Honor,

21    hearsay, assumes facts that are not in evidence.

22             THE COURT:  And there's no foundation.

23             MR. FITZMAURICE:  And there's no foundation.

24             THE COURT:  I'll stay the objection.  There's so

25    many reasons to object to that question.

1          MR. FITZMAURICE:  And Your Honor, I'm sorry for

2     making this objection, but the time is what it is.  We have

3     the things on our schedule for today and for tomorrow.

4     There's a clear pattern of what's happening in this case, of

5     an attempt to run out the clock so that we can't get to --

6          THE COURT:  Well, the clock's not going to run

7     out.  We'll go until we resolve this matter.  We may not get

8     to plan confirmation today, but we're going to resolve this

9     matter today, as I entered in the order.  And if we're here

10    until 2:00 in the morning, we'll be here until 2:00 in the

11    morning.

12          All right.  But again, Mr. Choudhri, I'm going to

13    warn you that your ability to simply go on and ask questions

14    that I'm going to overrule over and over and over again,

15    it's going to be very, very limited.  So I'm going to ask

16    you to ask a question that relates to the pleading that you

17    filed.  I'm happy to hear it.  I'm giving you an awful lot

18    of leeway, but I'm about to cut you off.  Okay.

19          MR. CHOUDHURI:  Okay.

20    BY MR. CHOUDHURI:

21    Q    What are the reasons that NBK should not be permitted

22    to credit bid, Mr. Steidley?

23          MR. FITZMAURICE:  Objection.

24          THE COURT:  He can't answer that question.

25          Mr. Choudhri, you're done.  Thank you.  Sit down.

1            Mr. Fitzmaurice, do you have any questions for

2    this witness?

3            MR. FITZMAURICE:  I do not, Your Honor.

4            THE COURT:  All right.  Thank you.

5            You may be excused.

6            Mr. Burks, next witness?

7            MR. BURKS:  2425 WL, we rest on the evidence.

8            THE COURT:  Thank you.  All right.

9            MR. WETWISKA:  Hold on.  Can I -- can I be -- I've

10   been subpoenaed here.  Can I be excused, Your Honor?

11           THE COURT:  I don't know what you've been

12   subpoenaed on, sir.  So you --

13           MR. WETWISKA:  For this hearing.  I received a

14   subpoena Friday night.

15           THE COURT:  Bear with me for one second.  I don't

16   know who you are.  Come to the podium, sir.

17           MR. WETWISKA:  My name is --

18           THE COURT:  Come to the podium, sir.  I need -- I

19   need to be on the record.

20           MR. WETWISKA:  Thank you.  I do too.  So Your

21   Honor --

22           THE COURT:  Bear with me.  What's your name?

23           MR. WETWISKA:  Your Honor, my name is Jim

24   Wetwiska.  I'm a lawyer here in town.  I was subpoenaed

25   Friday afternoon.  I'm supposed to be in a focus group this

1   morning.  I set everything aside to appear to accommodate

2   this court.  If I'm going to be called, I want to be called

3   and I want to be released.

4           THE COURT:  So bear with me one second, Mr.

5   Wetwiska.

6           So does anybody intend to call him as a witness at

7   any point in time today?

8           MR. BURKS:  I've been told that I spoke in error,

9   and I'm a representative of my client, and I have to retract

10  my statement that I rest (indiscernible).  I have two more

11  witnesses to call, Judge.

12          THE COURT:  Okay.  Then I'm sorry, sir, I can't

13  excuse you until we're done.

14          Okay.  So who's your next witness, Mr. Burks?

15          MR. BURKS:  Jim Wetwiska.

16          THE COURT:  All right.  Come on up.  Come forward.

17          MR. WETWISKA:  Can I just get my phone so I

18  (indiscernible) --

19          THE COURT:  Sure.  Feel free.

20          MR. WETWISKA:  Thank you.

21          THE COURT:  Sir, if you'll step to the podium,

22  I'll swear you in.  Do you swear or affirm to tell the

23  truth, the whole truth and nothing but the truth, so help

24  you God?

25          MR. WETWISKA:  I do, Your Honor.

```
 1                THE COURT:  All right.  Please be seated, sir.
 2                MR. WETWISKA:  Thank you.
 3                THE COURT:  Go ahead, Mr. Burks.
 4                   DIRECT EXAMINATION OF JIM WETWISKA
 5     BY MR. BURKS:
 6     Q     Sir, will you state your name for the record?
 7     A     Sure.  Jim Wetwiska.
 8     Q     And how do you pronounce -- spell your last name, sir?
 9     A     W-E-T-W-I-S-K-A.
10     Q     And what is your profession?
11     A     I'm a lawyer.
12     Q     And what do you do?
13     A     Trial lawyer.
14     Q     And do you have any knowledge of any legal matter in
15     this case?
16                MR. FITZMAURICE:  Objection, Your Honor.
17                THE COURT:  That's such an open-ended question.
18     Rephrase it, Mr. Burks.
19                THE WITNESS:  (indiscernible) without being
20     objected, so --
21                THE COURT:  No, I sustained the objection.  So ask
22     another question, Mr. Burks.
23                THE WITNESS:  Yes, I do have --
24                THE COURT:  No.  I sustained the objection.  He
25     needs to ask another question.
```

 1          Go ahead.

 2    BY MR. BURKS:

 3    Q    Sir, do you have any knowledge of litigation with

 4    respect to against NBK?

 5          MR. FITZMAURICE:  Objection, Your Honor, vague,

 6    lacks foundation.  What litigation?

 7          THE COURT:  Let's be more specific, Mr. Burks.

 8          MR. BURKS:  Well, let me get there, please, and

 9    I'll -- I apologize.

10    BY MR. BURKS:

11    Q    Sir, have you filed a lawsuit against NBK on behalf of

12    any entity of which Mr. Choudhri is the representative?

13    A    I (indiscernible) --

14          MR. FITZMAURICE:  Objection, vague as to time.

15          MR. BURKS:  Ever.  Has he ever filed --

16          THE COURT:  I'll overrule the objection.  It's

17    preliminary.  Go ahead.

18          THE WITNESS:  I did not file a lawsuit.  I came in

19    as additional counsel in a matter in the summer of 2022 for

20    Galleria 2425 Owner.

21    BY MR. BURKS:

22    Q    And what lawsuit was that, sir?  What was the subject

23    matter of that lawsuit, that specific lawsuit?

24    A    The subject of the lawsuit was the 2425 Galleria

25    building and the subject dealing with the note between the

1  National Bank of Kuwait and 2425 Galleria Owner.

2  Q    And what were the causes of action alleged in that

3  action?

4            MR. FITZMAURICE:  Objection, Your Honor,

5  relevance.

6            MR. BURKS:  Response?

7            THE COURT:  Go ahead.

8            MR. BURKS:  Everyone's been talking about

9  settlement agreement that came from this lawsuit, the scope

10  of the litigation, disputes that are relevant here to credit

11  bidding.  This is what it's about.  This is what --

12            THE COURT:  I'm going to sustain the objection,

13  Mr. Burks, and I'm going to give you my reason why.  That

14  litigation was taken and formalized into a settlement

15  agreement.

16            MR. BURKS:  All right.

17            THE COURT:  It's the settlement agreement that's

18  really relevant, if anything is relevant.

19            MR. BURKS:  Sure.

20            THE COURT:  So what happened in the litigation I

21  don't really care about.

22            MR. TROOP:  All right.

23            THE COURT:  Okay.  Go ahead.

24  BY MR. BURKS:

25  Q    There was a settlement agreement that came from the

1    litigation that we're not going to discuss, correct?

2    A    Correct.

3    Q    All right, and in that settlement agreement, did the

4    plaintiff have an opportunity or was there a basis for the

5    provision for making a settlement payment amount to buy the

6    note or the buy of the property?

7          MR. FITZMAURICE:  Objection, Your Honor, vague, as

8    to plaintiff, compound and the settlement agreement is in

9    evidence.  He can refer to its terms.

10          THE COURT:  It's in evidence.  It speaks for

11   itself.  If you want to ask him specific questions, then you

12   can project and ask them.  But the settlement agreement

13   speaks for itself, Mr. Burks.

14   BY MR. BURKS:

15   Q    Who was the plaintiff who had the ability or provision

16   to pay money to NBK to buy the note and/or the property?

17          MR. FITZMAURICE:  Objection, Your Honor,

18   mischaracterizes the terms of the settlement agreement which

19   are in evidence and can be reviewed.

20          THE COURT:  I'll sustain the objection.

21          MR. BURKS:  One moment, Your Honor.

22          THE COURT:  You want to project him somewhere?

23          MR. BURKS:  Mr. Baker is putting the settlement

24   agreement up, Judge.  Let's go down to Page 34.

25   BY MR. BURKS:

1   Q    Have you seen this document before, sir?

2   A    Yes, sir.

3        MR. BURKS:  And let the record reflect that the

4   settlement agreement previously admitted into evidence is on

5   the screen, Judge.

6   BY MR. BURKS:

7   Q    So the settlement agreement, which we all see, and

8   Subparagraph D on Page 4, do you have any information or

9   knowledge as to whether or not that settlement payment was

10  ever tendered?

11       MR. FITZMAURICE:  Objection, Your Honor, calls for

12  a legal conclusion as to the word tendered.  Also vague as

13  tender.  It's a legal concept.

14       THE COURT:  I'll overrule the objection.

15       THE WITNESS:  (indiscernible) I understand that

16  there were numerous times when one of the parties in this

17  settlement agreement were attempting to tender the -- it's

18  not actually $27 million when you take out the credits, but

19  when they attempted to tender approximately $26 million.

20  BY MR. BURKS:

21  Q    Do you have knowledge as to -- yes or no question.  Do

22  you have personal knowledge as to why the tender was not

23  completed?

24       MR. FITZMAURICE:  Objection, Your Honor, personal

25  knowledge as to why?  Either it was or it wasn't.

1                    THE COURT:  I'll overrule the objection.

2                    Do you know, sir?

3                    THE WITNESS:  I do know.

4    BY MR. BURKS:

5    Q    Why was it -- why were -- the tenders that you just

6    testified that were made, why were they not accepted?

7                    MR. FITZMAURICE:  So objection, Your Honor, again

8    to the word tenders.  And the question is designed to get

9    the witness to testify as to why the bank or some

10   representative of the bank did something.  He doesn't have

11   personal knowledge of that.

12                    MR. BURKS:  I don't --

13                    THE COURT:  Okay.  I'll let him testify now and

14   I'll basically determine -- I think it goes to weight.  I

15   don't think he can tell me what the bank did or didn't do,

16   but you can tell me what the other side did.

17                    Go ahead, answer the question.

18   BY MR. BURKS:

19   Q    What did your client do?

20   A    Well, let's be specific about who the parties are and

21   what they voted to do, okay?

22   Q    All right.

23   A    Is that fair, Mr. Burks?

24   Q    That is fair, sir.  That is very fair.  Who attempted

25   to make a payment?

```
 1   A     The --
 2              MR. FITZMAURICE:  Objection, leading and calls --
 3   assumes facts not in evidence about attempting to make a
 4   payment.
 5              THE COURT:  I'm going to overrule the objection.
 6              Go ahead.
 7              THE WITNESS:  There are a number of them.  And
 8   maybe if I can just start in order?
 9              MR. BURKS:  Please, sir.
10              THE WITNESS:  The first is, I understand, and what
11   I observed was in the spring, approximately February and
12   March of 2022, that there was some type of arrangement where
13   Mr. Choudhri was going to make a payment to purchase the
14   promissory note.  And that payment was being made based upon
15   an arrangement that Mr. Choudhri had reached with Mr.
16   Caldwell initially.
17              MR. FITZMAURICE:  So objection, Your Honor.  If
18   there's an arrangement, if there's a document, let's look at
19   it.
20              THE COURT:  I'm going to overrule the objection
21   and let him go ahead and testify.
22              Go ahead.
23              MR. BURKS:  All right, Your Honor.
24   BY MR. BURKS:
25   Q     Anything else?  What happened to this agreement that
```

1    you were the attorney for?

2    A    Well, those are two different questions.

3            THE COURT:  Mr. Wetwiska, I want to make sure that

4    you're testifying as to personal knowledge and not

5    speculating at any point in time.  So be very careful of

6    what you tell me.  Okay?  If you have personal knowledge,

7    fine.  If you don't know, that's fine.  So I just want to

8    know what you know.  Okay.

9            THE WITNESS:  Well, that's what I'm trying to do,

10   Your Honor.

11           THE COURT:  I appreciate that.

12           THE WITNESS:  Let's be on the same page.  It is a

13   little difficult because I was the lawyer and I have

14   personal knowledge.

15           THE COURT:  Who did you represent?

16           THE WITNESS:  I represented -- originally I

17   represented Galleria 2425 Owner.

18           THE COURT:  Okay.

19           THE WITNESS:  Then, as after the settlement

20   agreement was signed, going forward, I represented Galleria

21   2425 Owner and Mr. Choudhri.

22           THE COURT:  Okay.

23           THE WITNESS:  And so I have -- I have knowledge

24   regarding things that took place --

25           THE COURT:  For your client?

 1           THE WITNESS:  -- after this settlement.  Yes.  For

 2    my client.

 3           THE COURT:  Okay.  All right.

 4           THE WITNESS:  So that's part of the issue here is

 5    I also have to be careful not to disclose attorney-client

 6    information.  So I'm trying to do the best I can with all

 7    those.

 8           THE COURT:  Okay.  Thank you.

 9           MR. BURKS:  And I'm trying to be careful with my

10    questions, Judge, because I don't know what this witness is

11    about to testify to, and that's just a fact.

12    BY MR. BURKS:

13    Q    So sir, you answered that you acknowledged that a

14    payment was -- whether you wanted to use submitted,

15    tendered, made, but that it wasn't accepted.  What happened?

16    Just tell us what happened.

17           MR. FITZMAURICE:  Objection.  Objection, Your

18    Honor.

19           THE COURT:  I don't think he can tell me whether

20    it's accepted or not.  You can say one side of the story.

21    But --

22           THE WITNESS:  Let me -- maybe if I can address it

23    this way.  First, Mr. Caldwell, with respect to that issue,

24    there was a set of circumstances that took place where, as I

25    understand it, and as was communicated to me at the time,

 1    and this is not a privileged communication that's being

 2    disclosed, which is that Mr. Caldwell --

 3            MR. FITZMAURICE:  Your Honor, then objection.  All

 4    of this is hearsay testimony that's designed to get into

 5    evidence what Your Honor excluded when we had Mr. Alexander

 6    on the stand on the same issue.

 7            THE COURT:  I'm going to overrule the objection.

 8    I'm going to let him testify.

 9            Go ahead, sir.

10            THE WITNESS:  Is that Mr. Caldwell contacted Mr.

11    Choudhri and Mr. Choudhri's employee, Kelly Williams, and

12    informed them that he had found out that the note that Mr.

13    Choudhri was paying off was $26 or $27 million,

14    substantially below the amount that the note was for.  And

15    as a result of that, he was not going to move forward with

16    Mr. Choudhri.

17            MR. FITZMAURICE:  Objection, Your Honor.  The

18    source of that information was Mr. Choudhri?

19            THE COURT:  I don't know.

20            MR. FITZMAURICE:  It's hearsay and --

21            THE COURT:  It's hearsay, and it goes to weight.

22    I take your objection.

23            Go ahead.

24            THE WITNESS:  I mean, this --

25            MR. FITZMAURICE:  Your Honor, there's no question

1    pending.

2              THE WITNESS:  Right.

3              THE COURT:  Okay.  Go ahead.

4    BY MR. BURKS:

5    Q    Do you have conversations with Mr. Caldwell?

6    A    Mr. Caldwell would not return my call.

7    Q    Hm?  Did you --

8    A    So the answer is no.  The answer is no.  Yeah.

9    Q    Did you have conversations with the prospective

10   financier or buyer after the settlement agreement was

11   entered into?

12             MR. FITZMAURICE:  Objection, Your Honor, vague.

13   We're talking about, I think, different points in time, and

14   we need to identify who these parties are.

15             THE COURT:  Yeah.  Be more specific, Mr. Burks.

16   BY MR. BURKS:

17   Q    Subsequent to the settlement agreement, do you have

18   personal knowledge as to why (indiscernible) a payment was

19   made?

20   A    Why what?  I didn't hear you, sir.  Why what?

21   Q    Do you have personal knowledge as to whether a payment

22   was made for $26 million that you testified to earlier?

23   A    So the first instance that I was aware of where a

24   tender was attempted to be made was with Mr. Caldwell.  The

25   second instance has to do with Security State Bank, or I

1    can't remember the name of the bank, but it was a bank that

2    Mr. Choudhri was dealing with to arrange financing to close

3    on in order to pay the $26 million, approximately $26

4    million.

5    Q    Did you personally (indiscernible) --

6         MR. FITZMAURICE:  Objection.  Objection, Your

7    Honor.  The question was, was a payment made?  The answer

8    was an entirely different topic.  And with respect to

9    tender, there would be evidence of --

10        THE COURT:  I'll sustain your objection.

11        Go ahead and ask another question.

12   BY MR. BURKS:

13   Q    Is there -- are you aware -- is there -- who drafted

14   that settlement agreement?

15   A    I can tell you that Mr. Conrad drafted portions of it,

16   that my office drafted portions of it.  There were numerous

17   lawyers involved.  Mr. Choudhri had other lawyers, and

18   Galleria 2425 had other lawyers representing them at the

19   time.  Allen Zwernemann was involved in drafting it.  Seth

20   Nichamoff was involved in drafting it.  Mr. Conrad had an

21   associate, which I can't remember his name, was involved in

22   drafting it.  And there were lots of conversations.  In

23   fact, the mediator, I think, was Mickey Mills.  Mickey Mills

24   was involved in drafting that settlement agreement, and it

25   was iterative.  Is that the right word?

1          MR. TROOP:  Yes.

2          THE WITNESS:  And we started -- we started at a

3     mediation.  And over the course of a number of days

4     following that mediation, there were drafts sent back and

5     forth.  And then finally the document was signed whatever

6     the date is on the document.

7     BY MR. BURKS:

8     Q    And so without your giving any specifics as to your

9     opinion on the weight of any disputes, is it fair to say, in

10    your opinion, that there is now a dispute subsequent to

11    enactment -- subsequent to execution of settlement

12    agreement, as to whether or not Mr. Ali Choudhri or any of

13    his entities performed on the $27 or $26 million payment?

14          MR. FITZMAURICE:  Objection, Your Honor, lacks

15    foundation.  The question also said, I don't want you to

16    give an opinion, but then said, what's your opinion?

17          THE COURT:  I'll sustain the objection.

18          THE WITNESS:  Yes.

19          THE COURT:  I sustained the objection, sir.

20    Strike that answer from the record.

21          THE WITNESS:  I can't -- the problem, I can't hear

22    with this (indiscernible) --

23          THE COURT:  I apologize, but if we shut that, then

24    the whole computer blows up (indiscernible) --

25          THE WITNESS:  You're talking that way and it's

1   hard to hear with this (indiscernible) --

2          THE COURT:  Is that better?  Earlier it seemed too

3   loud.  Okay.

4          MR. BURKS:  Your Honor, my final set of two

5   questions will be to put a lawsuit up.  Is this it?  This is

6   one of the lawsuits that the court has taken judicial notice

7   of, and I'd like to see if I can get this question.

8   BY MR. BURKS:

9   Q    Have you seen this document before, sir?

10          MR. FITZMAURICE:  Objection, relevance.  The point

11   here is to get Mr. Wetwiska's opinion as to the merits of

12   this case and whether it represents a bona fide dispute.

13          THE COURT:  What's the relevance, Mr. Burks?

14          MR. BURKS:  The relevance is to identify whether

15   this document, whether this lawsuit, it arises from a

16   dispute on who breached or whether anyone breached the terms

17   of the settlement agreement that counsel has been talking

18   about more than I have.

19          MR. FITZMAURICE:  Well, then lacks foundation.  We

20   don't know whether Mr. Wetwiska has any knowledge about what

21   this lawsuit is about, what its facts are, any of the

22   underlying circumstances.

23          MR. BURKS:  (indiscernible) my first question.

24          MR. FITZMAURICE:  And in any event, Your Honor has

25   already determined to take judicial notice of the --

```
 1              THE COURT:  I'm going to overrule the objection

 2    and let you ask the question that you asked, whether he has

 3    any knowledge of this litigation.

 4              Go ahead, Mr. Burks.  You can ask the question one

 5    more time.

 6    BY MR. BURKS:

 7    Q    Do you have any knowledge of this litigation, sir?

 8    A    Can you go to the last page so I can see who signed it?

 9    Q    Yes, sir.

10    A    I do have knowledge.

11    Q    Without stating whether you believe this lawsuit has

12    merits, has damages, is good or bad, does this lawsuit arise

13    out of a dispute as to whether or not the $27 million was

14    tendered?

15              MR. FITZMAURICE:  Objection, Your Honor.  The

16    pleading speaks for itself.  This is --

17              THE COURT:  I'll sustain the objection.  I think

18    the settlement agreement and the pleadings speak for

19    themselves, Mr. Burks.

20              MR. BURKS:  Yes, Your Honor (indiscernible).  I

21    agree.  I've read the prayer.  It does speak for itself.

22    Nothing further, Your Honor.

23              THE COURT:  Happy to see that you agree with me,

24    Mr. Burks, for once.

25              MR. BURKS:  I hope we're right.
```

1          THE COURT:  Mr. Choudhri?  Mr. Choudhri, I'll warn

2    you, you're on a very, very short leash.  Okay.

3               DIRECT EXAMINATION OF JIM WETWISKA

4    BY MR. CHOUDHURI:

5    Q    Mr. Wetwiska, I just want to clarify.  You testified

6    March 2022, I think.  Did you mean March 2022 or did you

7    mean March 2023?

8          MR. FITZMAURICE:  Objection, leading.

9          THE COURT:  I sustained the objection.

10          MR. CHOUDHURI:  Well --

11          THE COURT:  You can't suggest an answer to your

12    question, Mr. Choudhri.  I know you're not a lawyer, but ask

13    the question that's open-ended.

14    BY MR. CHOUDHURI:

15    Q    Mr. Wetwiska, earlier you testified that a timeframe,

16    and I think you said March.  Did you -- I'm trying my best

17    not to -- because I heard 2022.  I just want to clarify, did

18    you mean 2022 or 2023?

19    A    The timeframe that I was referring to would have been

20    in the spring of 2023.  The settlement agreement was signed

21    in the fall of 2022.

22    Q    Correct (indiscernible) so that was correct.  And Mr.

23    Wetwiska, you're aware of the settlement agreement

24    (indiscernible) 1.6, Mr. Wetwiska?

25    A    Yes, sir.

1    Q    And it says Galleria, released parties means Galleria

2    and all of its present or past present successor, including

3    the (indiscernible) loan agreement.  Do you see that?

4    A    I do.

5    Q    So when this agreement was signed, the Bank of Kuwait

6    was releasing Galleria and all of its managers, members,

7    including (indiscernible).

8              MR. FITZMAURICE:  Objection, Your Honor.  The

9    document speaks for itself.

10             THE COURT:  I'll sustain the objection.

11   BY MR. CHOUDHURI:

12   Q    Are you aware that -- so did you ask National Bank of

13   Kuwait for the loan sale agreement in the timeframe of Feb.

14   to March 2023?

15             MR. FITZMAURICE:  Objection, Your Honor, best

16   evidence rule.

17             THE COURT:  I'll sustain the objection.

18   BY MR. CHOUDHURI:

19   Q    Did you have conversations with Mr. Conrad around

20   spring of 2023?

21             MR. FITZMAURICE:  Objection, Your Honor, hearsay,

22   and also --

23             THE COURT:  I'll sustain the objection.

24   BY MR. CHOUDHURI:

25   Q    Was it not a requirement by the bank to provide a loan

1    sale agreement?

2            MR. FITZMAURICE:  Objection, Your Honor, leading.

3            THE COURT:  I'll overrule the objection.  You can

4    answer that question.

5            THE WITNESS:  That was my understanding, yes.

6    BY MR. CHOUDHURI:

7    Q    And did you ask them for a loan sale agreement?

8            MR. FITZMAURICE:  Objection, Your Honor, best

9    evidence rule.

10           THE COURT:  I'll sustain the objection.

11           MR. SATHER:  499-44.

12           MR. CHOUDHURI:  So 499?

13           MR. SATHER:  41.

14           MR. BAKER:  499-41.

15   BY MR. CHOUDHURI:

16   Q    Are you aware that there was an offer made

17   (indiscernible) in the end of June 2023 to purchase a note?

18           MR. FITZMAURICE:  Objection, Your Honor, best

19   evidence rule, also calls for a legal conclusion as to

20   whether an offer specifically was made.

21           THE COURT:  I'll sustain the objection.

22           MR. CHOUDHURI:  Let me put up the document.

23           THE COURT:  Please.

24           MR. BAKER:  499, what?  499-41?

25           THE COURT:  The problem is -- we're off the

1    record.

2         (Recess)

3    BY MR. CHOUDHURI:

4    Q    Mr. Wetwiska, do you know who Sonder is?

5              MR. FITZMAURICE:  Objection, relevance, Your

6    Honor.

7              THE COURT:  What's the relevance?

8              MR. CHOUDHURI:  Just the acts of the bank, Your

9    Honor, (indiscernible) of performance.

10             THE COURT:  I'll sustain the objection.

11   BY MR. CHOUDHURI:

12   Q    Mr. Wetwiska, is this -- Mr. Wetwiska, did you receive

13   this letter, dated June 28, 2023, from the Pillsbury law

14   firm?  Does this look familiar?

15   A    Can you scroll down so I can read it?  Can you go to

16   the signature?  I did receive it, yes.

17   Q    And at the time you received this, you were

18   representing me, correct?

19   A    Correct, Mr. Choudhri.

20   Q    And have you went back and checked your records since

21   the receipt of this letter, if there was ever a subsequent

22   letter that withdrew this letter?

23   A    There was no withdrawal of this letter by anyone.

24             MR. CHOUDHURI:  I'd like to submit this letter to

25   the record, Your Honor.

 1           THE COURT:  ECF number?

 2           MR. FITZMAURICE:  Your Honor, it's 499.36.

 3    There's no objection.

 4           THE COURT:  All right.  499-36 is admitted.

 5           (Trial Exhibit 499-36 entered into evidence)

 6           THE COURT:  Mr. Choudhri, next question.  It was

 7    actually 36.

 8    BY MR. CHOUDHURI:

 9    Q    Mr. Wetwiska, on the confidential settlement agreement,

10    did your firm draft the confidentiality provisions?

11           MR. FITZMAURICE:  Objection, Your Honor,

12    relevance.  And I think the witness already testified.

13           THE COURT:  Asked and answered.  I'll sustain the

14    objection.  Thank you.

15    BY MR. CHOUDHURI:

16    Q    Was there a confidentiality provision?

17           MR. FITZMAURICE:  Objection, Your Honor, best

18    evidence.

19           THE COURT:  I'll sustain the objection.

20           MR. CHOUDHURI:  I'll pull up the document.

21           THE COURT:  Well, the document also speaks for

22    itself, Mr. Choudhri.  I can read it.  Thank you.  And I

23    really am trying to get your ex- lawyer or former lawyer out

24    of here as quickly as possible.

25    BY MR. CHOUDHURI:

1  Q    Mr. Wetwiska, are you aware that that offer was

2  accepted that was made at the end of June by me?

3            MR. FITZMAURICE:  Objection, Your Honor, best

4  evidence again.

5            THE COURT:  I'll sustain the objection.

6  BY MR. CHOUDHURI:

7  Q    Do you have any knowledge of -- do you have knowledge

8  of multiple attempts to pay the bank being made?

9            THE COURT:  Objection, Your Honor.

10           THE WITNESS:  Yes.

11           THE COURT:  What's the objection, please?

12           MR. FITZMAURICE:  If there -- if there are

13  attempts to pay the bank, then there will be a document that

14  shows that.

15           THE COURT:  Yeah.  I'll sustain the objection.

16  BY MR. CHOUDHURI:

17  Q    Mr. Wetwiska, as we're sitting here today, you're still

18  representing me in other matters?

19  A    I am representing you in a different matter.  Yes.

20  Q    Yes.  So we still retain an attorney-client privilege.

21           MR. FITZMAURICE:  Objection, relevance, Your

22  Honor.

23           THE WITNESS:  I think we --

24           THE COURT:  I'll sustain the objection --

25           THE WITNESS:  -- we have it no matter what.

1              MR. CHOUDHURI:  Thank you.

2    BY MR. CHOUDHURI:

3    Q    Mr. Wetwiska, I just want to make sure we have this.

4    You've seen a letter from Pillsbury at ECF 251-11?

5              MR. FITZMAURICE:  Your Honor --

6              THE COURT:  Best evidence?

7              MR. FITZMAURICE:  Yeah, asked and answered.  This

8    exhibits is in evidence.

9    BY MR. CHOUDHURI:

10   Q    Have you seen this letter before, Mr. Wetwiska, that

11   was forwarded to you?

12             MR. FITZMAURICE:  Objection, Your Honor, leading,

13   as to it was forwarded to you, but also relevance as to

14   whether or not Mr. --

15             THE COURT:  I'll sustain the objection.  Thank

16   you.

17   BY MR. CHOUDHURI:

18   Q    Mr. Wetwiska, are you familiar with a letter dated

19   April 28th that was --

20             THE COURT:  I've already sustained the objection.

21   If you want to get it in, you've got to do it some other

22   way.  But I've sustained the objection.  I'm not going to

23   admit that based on his testimony.

24   BY MR. CHOUDHURI:

25   Q    Can you describe the occurrences of the interference by

1    the Bank of Kuwait from the debtor or me performing to pay

2    the $26 million?

3            MR. FITZMAURICE:  So objection, leading, as to

4    interferences, lacks foundation, assumes facts not in

5    evidence.  It also, I think, asks Mr. Wetwiska to reveal his

6    own work product as to his legal conclusions as to whether

7    or not those tests have been satisfied.

8            THE COURT:  I'll sustain the objection based on

9    lack of foundation.

10   BY MR. CHOUDHURI:

11   Q    Mr. Wetwiska, you've had conversations and

12   communications with Mr. Conrad, that Mr. Conrad represents

13   the Bank of Kuwait, correct?

14           MR. FITZMAURICE:  Sorry.  Objection, compound.

15   Which is the question?

16           THE COURT:  Ask the question one at a time, Mr.

17   Choudhri.

18   BY MR. CHOUDHURI:

19   Q    Does Mr. Conrad represent the Bank of Kuwait -- the

20   National Bank of Kuwait?

21   A    That's my understanding, yes.

22   Q    And most of the communications dealing with this

23   transaction have been with you and Mr. Conrad?

24           MR. FITZMAURICE:  Objection, Your Honor --

25           THE WITNESS:  I think that's --

1           MR. FITZMAURICE:  Objection, Your Honor, vague as

2     to this transaction and also relevance to whether or not the

3     bank's entitled to credit bid at the auction tomorrow.

4           THE COURT:  I'll allow the answer to that question

5     and then you can urge your objection.  I want to know where

6     Mr. Choudhri is going.  You can answer that question.

7           THE WITNESS:  I think it's accurate to state that

8     the conversations were mainly between me and Mr. Conrad.

9     BY MR. CHOUDHURI:

10    Q    So to complete a transaction or consummate a

11    transaction, whether it's the actual deal documents that on

12    a closing that get done, that would be communications, phone

13    conversations or communications you had with Mr. Conrad,

14    correct?

15    A    In the beginning, they were by phone.  As things became

16    contentious over the summer of 2023, I think that Mr. Conrad

17    and I started putting more things in writing.  But prior to

18    that, there was more of a dialogue between the two of us,

19    and there was obviously a dispute that arose in the summer

20    of 2023 with respect to the settlement agreement and those

21    things.  We ended up trying to document as much as possible,

22    was my view.

23    Q    And so, following up on that question, one of the

24    material elements of completing the loan sale acquisition

25    would be a loan sale agreement, correct?

```
 1              MR. CHOUDHURI:  Objection, leading.

 2              THE COURT:  I'll sustain the objection.

 3    BY MR. CHOUDHURI:

 4    Q    What material document would be needed to consummate a

 5    loan sale?

 6              MR. FITZMAURICE:  Objection, as to material.

 7              THE COURT:  I'll overrule the objection.

 8              THE WITNESS:  Well, we needed a loan sale

 9    agreement.  We needed what is called, I think, an allonge is

10    the right word.  There was one other document, and in order

11    to consummate it, those documents had to be approved and

12    satisfactory to the National Bank of Kuwait.

13    BY MR. CHOUDHURI:

14    Q    And did you ask Mr. Conrad for those documents around

15    the Feb./March 2023 timeframe?

16              MR. FITZMAURICE:  Objection, Your Honor, best

17    evidence.

18              THE COURT:  I'll sustain the objection.

19    BY MR. CHOUDHURI:

20    Q    So your conversations, I think you said, were mainly

21    verbal, and then later, when things got contentious, they

22    were in writing.

23    A    Right --

24              MR. FITZMAURICE:  Objection, Your Honor, leading.

25              THE COURT:  I'll sustain the objection.
```

1    BY MR. CHOUDHURI:

2    Q    What would be necessary -- I just asked this and so I

3    won't ask it again.  Sorry.  Are you aware of Security State

4    Bank of Texas, who that is?

5    A    Yes.

6    Q    Do you recall having some conversations with Security

7    State Bank of Texas?

8    A    Numerous conversations, yes.

9    Q    And what is the first thing they needed to move forward

10   to fund the loan takeout?

11        MR. FITZMAURICE:  Objection, Your Honor, lacks

12   foundation is to fund the loan takeout.  Also hearsay as to

13   any communications with the bank.

14        THE COURT:  I'll sustain the objection as to

15   hearsay.

16   BY MR. CHOUDHURI:

17   Q    Did the settlement agreement have further assurances

18   provisioned where things that need to get done to consummate

19   a transaction, parties have to act in good faith to do so?

20        MR. FITZMAURICE:  Objection, Your Honor, best

21   evidence.

22        THE COURT:  Again, the document speaks for itself.

23   BY MR. CHOUDHURI:

24   Q    Are you aware of Security State Bank being ready,

25   willing and able to finance the loan sale from the National

1  Bank of Kuwait?

2          MR. FITZMAURICE:  Objection, Your Honor, lacks

3  foundation, also hearsay as to the conduct of the bank.

4          THE COURT:  I'll sustain the objection.

5  BY MR. CHOUDHURI:

6  Q    About how many times did you ask for a loan sale

7  agreement?

8          MR. FITZMAURICE:  Objection, Your Honor, hearsay

9  offered for the truth, to prove the truth of the matter.

10  Also, if there were requests, we should be able to look at

11  the emails or other correspondence related to that.

12          THE COURT:  I'll allow you to answer the question

13  as to did you make any email requests?

14          THE WITNESS:  I did, yes.

15          THE COURT:  How many times?

16          THE WITNESS:  It would have been somewhere during

17  the time of February or March of 2023 and then in connection

18  with the security or -- can you restate the --

19          MR. CHOUDHURI:  Security State Bank.

20          THE WITNESS:  Security State bank during the

21  conversations with Mr. Conrad on a security statement.  So

22  those would have been the two oral, the only two times that

23  I remember orally.  As I said, in the summer, Mr. Conrad was

24  interested in talking to us really.  Things got heated at

25  the courthouse.

Page 178

```
1              MR. FITZMAURICE:  Your Honor, I think we've gone

2     far afield from what the question was.

3              THE WITNESS:  And so we --

4              THE COURT:  Yeah.  I asked the question.  So I'll

5     cut you off.

6              THE WITNESS:  Okay.

7              THE COURT:  Thank you.  Go ahead and ask the next

8     question.

9     BY MR. CHOUDHURI:

10    Q    Do you know any reason why the Bank of Kuwait would not

11    provide a loan sale agreement, which is a transactional

12    document to consummate the deal?

13             MR. FITZMAURICE:  Objection, Your Honor.  The

14    witness has -- calls for speculation.  The witness has no

15    way to know.

16             THE COURT:  There's no foundation.

17             MR. FITZMAURICE:  Yeah.

18             THE COURT:  I'll sustain the objection.

19    BY MR. CHOUDHURI:

20    Q    The settlement agreement -- so let me back up.  Your

21    request for the loan sale agreement from Charles Conrad was

22    within the period allotted to pay the bank the $26 million?

23    A    Yes.

24    Q    So that period had not expired, the settlement payment

25    date had not come and gone at that point, correct?
```

1    A    Correct.

2    Q    And then you asked him for the loan sale agreement in

3    writing possibly later.  I think maybe around June.  Is that

4    --

5              MR. FITZMAURICE:  Objection, Your Honor, leading.

6              THE COURT:  I'll sustain the objection.  You can't

7    suggest the answer to your question, Mr. Choudhri.

8    BY MR. CHOUDHURI:

9    Q    Are you aware that -- did you -- are you aware that

10   when the district court stopped -- let me back up.  Did the

11   Bank of Kuwait move to appoint a receiver in the spring of

12   2023?

13   A    They moved to appoint either receiver or

14   conservatorship or one of those two things during the time

15   period that we were discussing with Security State Bank

16   providing the funding, yes.

17   Q    And were you on conversations with Security State Bank

18   when they said to move forward they needed a loan sale

19   agreement?

20   A    Yes.

21   Q    So that was a requirement by Security State Bank is we

22   need a loan sale agreement before we can proceed.

23   A    Correct.

24              MR. FITZMAURICE:  Objection, hearsay.

25              THE COURT:  It's hearsay, and I'll sustain the

1    objection.  Sorry.

2    A    Which one's Chris?

3    BY MR. CHOUDHURI:

4    Q    Do you recall who the receivership -- was it

5    (indiscernible) --

6              MR. FITZMAURICE:  Objection, relevance.

7              THE COURT:  I'll sustain the objection as to

8    relevance.

9    BY MR. CHOUDHURI:

10    Q    Are you aware that there is a pending lawsuit for the

11    breach of contract of the settlement agreement?

12              MR. FITZMAURICE:  Objection, Your Honor, lacks

13    foundation.

14              THE COURT:  I'll sustain the objection.

15    BY MR. CHOUDHURI:

16    Q    Was the payment, the down payment made in the

17    settlement agreement?

18    A    Yes.

19    Q    So the payment outstanding is the $26,038,000?

20              MR. FITZMAURICE:  Objection, lacks foundation.

21              THE COURT:  I'll overrule the objection.

22    BY MR. CHOUDHURI:

23    Q    Do you have any belief or do you have any knowledge or

24    understanding of why the bank refused to accept the $26

25    million?

1              MR. FITZMAURICE:  Objection, Your Honor, calls for

2    speculation and assumes facts not in evidence.

3              THE COURT:  I'll sustain the objection.  Thank

4    you.

5    BY MR. CHOUDHURI:

6    Q    Mr. Wetwiska, do you have kind of a background of what

7    my challenges have been?

8              MR. FITZMAURICE:  Objection, relevance, Your

9    Honor.

10             THE COURT:  I'll sustain the objection.

11   BY MR. CHOUDHURI:

12   Q    Do you have any knowledge of the structure of the loan

13   designed by the bank?

14             MR. FITZMAURICE:  Same objection, Your Honor.  It

15   also assumes facts not in evidence.

16             THE COURT:  I'll sustain the objection.

17   BY MR. CHOUDHURI:

18   Q    Were you successful in getting depositions compelled in

19   the state court case?

20   A    Yes.

21             MR. FITZMAURICE:  Objection, Your Honor,

22   relevance.

23             THE COURT:  It's not relevant.  I'll sustain the

24   objection.  Again, you're reading on thin ground, Mr.

25   Choudhri.  I'm giving you a lot of leeway.  Ask questions

1   that are relevant to what we want to hear or I'm going to

2   cut you off.

3   BY MR. CHOUDHURI:

4   Q    Did you have conversations with the trustee in this

5   case regarding the issues with the National Bank of Kuwait?

6   A    The Chapter 7 trustee, 11 trustee?

7   Q    Chapter 11 trustee, Chris Murray.

8   A    Chris Murray.  I did, yes, and his counsel.

9   Q    And do you remember who all was on this call?

10        MR. FITZMAURICE:  Objection, Your Honor, relevance

11   to whether the bank can credit bid tomorrow.

12        THE COURT:  Yeah.  I'll sustain the objection.

13   It's not relevant.

14   BY MR. CHOUDHURI:

15   Q    When the bank -- if at any time they did provide a loan

16   sale, do you have any knowledge of the bank's interference

17   with lease up of the building --

18        MR. FITZMAURICE:  Objection, Your Honor.

19   BY MR. CHOUDHURI:

20   Q    -- after the settlement was entered?

21        MR. FITZMAURICE:  Objection, Your Honor, as to

22   leading, as to interference.

23        THE COURT:  Say that again.  I didn't hear you.

24        MR. FITZMAURICE:  Leading us to the use of the

25   term interference.  Also assumes facts that are not in

1   evidence and lacks foundation.

2            THE COURT:  I'll sustain the objection.

3            You get one more question, Mr. Choudhri, before I

4   cut you off.  Make it a good one.

5   BY MR. CHOUDHURI:

6   Q    Were there proposals, lease proposals that you were

7   involved in where the bank was being asked to approve and

8   they were not cooperative?

9            MR. FITZMAURICE:  Objection, vague as to time.  If

10  any proposals, would be in writing and we could look at that

11  as best evidence, also lacks foundation.

12           THE COURT:  I'll sustain the objection, Mr.

13  Choudhri.

14           MR. CHOUDHURI:  No more questions.

15           THE COURT:  Thank you.

16           MR. CHOUDHURI:  Pass the witness.

17           THE COURT:  All right.  Thank you.

18           Mr. Fitzmaurice?

19           MR. FITZMAURICE:  With the court's permission,

20  I'll have my partner, Mr. Conrad, cross-examine the witness.

21           THE COURT:  Sure.  That's fine.  I just want to

22  get Mr. Wetwiska out of here.  So if we can finish with him,

23  I'd appreciate it.

24           MR. CARTER:  And I'll do it very quickly, Your

25  Honor.

```
1                THE COURT:  That's fine.  Come on over.

2                MR. CONRAD:  So 499-41.

3                MR. FITZMAURICE:  And Your Honor, I think I'll be

4      projecting from over here.

5                THE COURT:  That's fine.  Thank you.

6                CROSS-EXAMINATION OF JIM WETWISKA

7      BY MR. CONRAD:

8      Q    Good afternoon, Mr. Wetwiska.

9      A    Good afternoon.

10     Q    I understand you need to get out of here pretty

11     quickly, so I'm going to try to make this quick.

12     A    Take your time.

13     Q    All right.  Well, it's good to see you again.

14     A    I'm happy to help the court out.

15     Q    All right.  Well, I just wanted to start by getting

16     some like dates right, as much as we can.  So you understand

17     that the settlement agreement was August of 2022, correct?

18     A    Yes.

19     Q    All right, and I understand the document, but you

20     understand that there was a period of time for performance

21     by Choudhri Galleria 2425 or some other buyer.  What was

22     that date or what was that timeframe?

23     A    I believe it was March 20, 2023.  But you can look at

24     the document.

25     Q    Right.  I mean, the document says that there was 210
```

1    days for performance.

2    A    Yeah, I'd defer to the document, but it was -- we

3    negotiated hard on that provision.

4    Q    Right.  Seven months, right?

5    A    I think -- I think there about.  Yes, sir, Mr. Conrad.

6    Q    All right.  Did Choudhri or any of the Choudhri

7    entities, the debtor, Galleria 2425 Owner, LLC, ever tender

8    full payment during that 210 days?

9    A    They never presented a check during that time period.

10   Q    Did they ever present anything saying that we will pay

11   you the $26 million and change, which is the difference

12   after the credits, within that 210 days?

13   A    I don't remember one way or the other.

14   Q    Okay.  So after March 20, 2023, there was a notice of

15   default letter issued by the bank to the debtor.  Do you

16   remember that?

17   A    Yes.

18   Q    Okay.  Do you remember -- let me go back and ask you

19   some questions about Mr. Paul Caldwell.  Have you ever

20   spoken to Mr. Paul Caldwell?

21   A    Never.

22   Q    Okay.  Do you know who he is?

23   A    I know generally who he is.  I know he was -- he's an

24   investor.  But I've never spoken to him.  I've tried to

25   reach out to him.  He did not return my calls.

1    Q    Do you recall in the January, February, early March

2    2023 timeframe that I reached out to you and stated that Mr.

3    Paul Caldwell had contacted?

4    A    I don't remember if you reached out to me or if I asked

5    you if he had.  I don't remember how that happened.  It was

6    one way or the other.  But I do remember there was a

7    conversation by us about Mr. Caldwell, and you forwarded

8    something to me.  I do remember that.

9    Q    Do you recall that, going back to April of 2023, you

10   were asked questions about the appointment or the motion to

11   appoint a receiver?  Do you recall when that hearing day was

12   scheduled being around April 12, 2023?

13   A    I don't remember.  I mean, if you have the date, I

14   don't remember the date.

15   Q    Sure, we can pull it up, but it's not material.  So the

16   point is that you recall that there was a new lawsuit filed

17   against the bank immediately before the hearing on the

18   motion to appoint receiver and that there was a request for

19   temporary restraining order filed by Galleria 2425 Owner,

20   LLC.  Do you recall that?

21   A    Mr. Conrad, I don't remember the date.  I do remember,

22   at some point, I think Mr. Harrison filed that lawsuit; is

23   that correct?

24   Q    Do you remember appearing in that case?  I didn't --

25   let me strike that.  Do you remember a lawsuit being filed

1    by Galleria 2425 seeking a temporary restraining order

2    against the bank?

3    A    If you can show it to me, that'd be helpful.

4    Q    Okay.  But you don't recall any discussions between you

5    or anybody on behalf of the bank between the January,

6    February, early March timeframe ever raising any concern

7    about this alleged issue involving Paul Caldwell and the

8    bank --

9              MR. BURKS:  Objection.

10   BY MR. CONRAD:

11   Q    -- prior to that lawsuit being filed?

12             MR. BURKS:  Objection, Your Honor.  So at this

13   point, I think we've established that there's a dispute

14   between the parties for the same reasons that I don't intend

15   to try the suit today.  And it sounds like we're beginning

16   to try it.  The other side dutifully objected.  I've

17   listened as long as I need to, to understand that there's a

18   dispute between the parties.  A substantial one.

19             THE COURT:  I'll overrule the objection.  Go

20   ahead.

21             MR. CONRAD:  Okay.

22             THE COURT:  You can re-ask the question.

23             MR. CONRAD:  Sure.  I'll move on.

24   BY MR. CONRAD:

25   A    So, in June of 2023, you were asked -- you were shown a

1    letter to you regarding documents being sent to you, or

2    would be prepared to you, to your client, regarding the

3    actual closing of July 3, 2023.  Do you remember that

4    document?

5    A    I do.

6    Q    Okay.  The July 3, 2023 date is the date the state

7    court gave the parties, your team, Choudhri, Galleria 2425

8    or some other purchaser to actually close on that property

9    by that date; is that true?

10   A    It's around that time period.  I don't remember the

11   exact date.  It was before the 4th of July.

12   Q    Do you recall any evidence whatsoever of any entity,

13   either Galleria 2425, or any other entity related to

14   Choudhri or somebody on his behalf, tendering any type of

15   payment whatsoever prior to July 3, 2023?

16   A    Between June 28th and July 3.

17   Q    Or any time before that, between April of 2023 through

18   July 3, 2023?

19   A    I mean, I certainly remember State Security Bank and

20   trying to tender the information and the conversations we

21   had with the bank and conversations about whether or not the

22   Bank of Kuwait was going to extend the March 20th deadline

23   to even accept any additional money from any of the

24   signatories to the settlement agreement past March 20th,

25   yes.

1   Q    I want to show you what we're included on our exhibit

2   list.  I'm going to bring up 498-01.  This is a transcript,

3   but the hearing that we were talking about earlier, which

4   involved the appointment of the receiver originally.

5   A    Okay.

6   Q    But prior to that, or just prior to that, the day

7   before, there was a request for a temporary restraining

8   order on a new lawsuit that was filed by the debtor here

9   against the Bank of Kuwait.  And specifically, I want you to

10  go to the page where there was a representation made by you,

11  Mr. Wetwiska, on behalf of the debtor, Galleria 2425, that

12  stated that all you needed, or all your client needed, was

13  extra time in order to consummate a deal of the settlement

14  agreement.  Do you recall making that statement?

15  A    Can you -- I'm not sure.  You asked me if the

16  transcript --

17  Q    I'm just asking if you recall making that

18  representation to the court.

19  A    Well, I remember telling the court that in order for

20  there to be any ability for the transaction to be

21  consummated, that additional time would be required.  Right.

22  Q    And this is after the 210 days under the settlement

23  agreement had already expired on March 20th, correct?

24  A    Correct.

25  Q    And so between the time of March 20th and July -- I'm

1    sorry, April 12th, that's when the court granted your

2    request to give additional time to the debtor to close and

3    consummate the settlement agreement on or before July 3rd.

4    Do you recall that?

5    A    So can you show me the exact ruling by the court?  Is

6    it in the transcript?

7    Q    Sure.  You don't recall it from memory?

8    A    No.  I'm trying to remember exactly what the court's

9    ruling was.  In fairness, I got this subpoena on Friday.  I

10   did not go back and review all the records.  No one

11   forwarded me the pleadings.

12   Q    Give me a second.

13   A    Sure.

14        MR. CONRAD:  Your Honor, may I step away for just

15   a second?

16        THE COURT:  Sure.  Feel free.

17        MR. CHOUDHURI:  How do I object?  Do I come up

18   here?

19        THE COURT:  If you want to object, you can object

20   at any point in time, Mr. Choudhri.  Just come forward and

21   object.

22        MR. CHOUDHURI:  Okay.  Thank you

23   (indiscernible) --

24        THE COURT:  As long as you're by a microphone.  In

25   other words, anything that you say is being electronically

1    recorded.  If you're not by a microphone, we can't hear you.

2    So just basically stand up and object.

3            MR. CHOUDHURI:  Okay.

4            THE COURT:  Okay.

5            MR. CHOUDHURI:  Thank you.

6            THE COURT:  All right.

7            MR. BURKS:  Give him a mic.  Right here, Ali.

8            MR. CONRAD:  So if you'll scroll up, just for

9    purposes of the record, this is again ECF 498-01.  This is

10   Page 72 of the hearing, and specifically it says here, the

11   highlighted portion, beginning on Line 10:

12           "The Court:  My inclination is to give you 60

13   days, required payments of 80,"

14           THE WITNESS:  Right.

15           MR. CONRAD:  "And then with a foreclosure the

16   first Tuesday of July, so that there's some money going to

17   them.  And it's a lot compared to what you owe.  And if you

18   don't get it done, well, then if you don't get it done, they

19   foreclose, they're done.  I don't see you again.  You don't

20   see each other again because you've said on the record as an

21   officer of the court, that given more time, that if they

22   can't get it done, then they can foreclose.  I'm taking you

23   at your word, Mr. Wetwiska."

24           Do you see that?

25           THE WITNESS:  I do.  I think what I'm telling the

1    court is we have a duty to mitigate under the law, as you're

2    aware.  And what we were trying to do is do everything

3    possible to mitigate the damages that have been caused.  And

4    so part of that mitigation was trying to get additional time

5    to pay the note.  Of course, the Bank of Kuwait's position

6    was, is that the note and agreement was no longer in effect.

7    And that was the dispute during the spring and summer of

8    2023.  And that was the problem.  It was trying to mitigate.

9    And then we later went to mediation in July, I think, as

10   part of that process also.  I'm sorry.  We went --

11           MR. CONRAD:   (Indiscernible)

12           THE WITNESS:   We went to mediation in June.  I

13   think we went to mediation like the second week of June,

14   maybe.

15   BY MR. CONRAD:

16   Q    Again, let me go back to my question.

17   A    Sure.

18   Q    The point is that the debtor here, nobody on behalf of

19   the debtor ever tendered a full performance or offer by the

20   July 3, 2023 deadline that's set by the court, true?

21   A    I think it's true that after -- well, wait?  I don't

22   know.  I don't remember the time of Security State Bank and

23   those conversations.  I don't remember if that was before or

24   after April 12th.  I don't know the answer to that.  I mean,

25   if you have a document, I'm happy to look at it.  It was --

Page 193

```
 1   I suspect it was after April 12th, because the closing -- I
 2   mean, the first date was March 20th.  I know the Security
 3   State Bank conversations were in April.  I know you and I
 4   had conversations about whether or not the bank would even
 5   accept the payment.  We had a number of calls.  You and I
 6   had a lot of calls over a long time period.  We got to know
 7   each other well.  But we had a number of calls about that.
 8   And at some point, I think that I had asked you to just go
 9   to the bank to figure out if they were willing to give
10   additional time or not.  And I don't remember if the answer
11   was before or after this hearing, but I think after the
12   12th, there were additional conversations about Security
13   State Bank and the bank providing financing.  That's my
14   recollection.
15   Q    Are you speculating about that?  Because you said you
16   didn't remember.
17   A    No, I'm telling you I'm not speculating.  I wouldn't
18   call it speculation.  What I'm trying to do is that's the
19   best of my recollection as to the time period.
20   Q    Okay.  You don't recall any of those conversations
21   happening before April 12, 2023?
22   A    I definitely think some of them happened before, for
23   sure.
24   Q    All right.  Well, let's move on to let me show you
25   what's been marked this Exhibit 499-41 on our exhibit list.
```

1    A    All right.

2    Q    Do you recognize this document or the title of the

3    letterhead?

4    A    Can you show me the document?  Let me see who signed

5    it.  Okay.  I am familiar with it, yes.

6            MR. CONRAD:  Okay.  We'd move to admit this

7    document into evidence, Your Honor.  This is ECF --

8            THE COURT:  499-41?

9            MR. CONRAD:  Yes, Your Honor.

10           THE COURT:  Any objection to 499-41, from any

11   party?

12           MR. BURKS:  None.

13           THE COURT:  Mr. Choudhri?

14           MR. CHOUDHURI:  No.

15           THE COURT:  All right.  Then it's admitted.  Thank

16   you.

17           (Trial Exhibit 499-41 entered into evidence)

18           MR. CONRAD:  Thank you, Your Honor.

19   BY MR. CONRAD:

20   Q    This is a letter, we'll scroll up real quick, dated

21   June 28, 2023, correct?

22   A    Correct.

23   Q    This is a letter from you to me requesting information

24   about agreements or draft agreements, also confirming the

25   actual number.  As far as what the payoff of the settlement

1    agreement is, true?

2    A    True.

3    Q    Were those documents provided to you?

4    A    There was a -- they were provided to me in a fashion

5    that said, in a form agreement that said, subject to further

6    review or some type of further confirmation or approval by

7    the bank.  Like they were not in any type of final form, and

8    they were subject to further approval.

9    Q    But this document --

10    A    I thought was very strange.

11    Q    But this document contemplates that, again, it's making

12    a confirmation of the settlement of payment agreement amount

13    as extended by the state court judge on or before July 3,

14    2023; is that correct?

15    A    Well --

16    Q    It says it in number one there.

17    A    What I will say is this letter followed the mediation

18    that we had on about June the 12th.  And there were numerous

19    offers made during the mediation.  And at the mediation, the

20    position was by the bank that payment could be made by July

21    3, 2023.  And so when you say extended by the court, my

22    understanding was in sending this is that this was the offer

23    that was made through the mediation process and that's why

24    this was sent.

25    Q    Where does it say that?

1   A     Where does it say what?

2   Q     What you just said.  Where does this document in any

3   place whatsoever say what you just said?

4   A     What It says, July 3, 2024 --

5              MR. CHOUDHURI:  Objection.

6   BY MR. CONRAD:

7   Q     And that's the date that the court said -- we just

8   looked at the transcript.

9              THE COURT:  Hold on one second.  Mr. Choudhri

10   wants to object.

11              What do you want to object to, Mr. Choudhri?

12              MR. CHOUDHURI:  Objection.  It's optional

13   completeness.  There's a whole series of communications and

14   attachments.  He's just trying (indiscernible) to take it

15   out, including the whole record that I'm looking at, Your

16   Honor.

17              THE COURT:  I'm going to overrule that objection.

18   Go ahead.

19              MR. CONRAD:  Sure.

20   BY MR. CONRAD:

21   Q     I think again, where does it say anything about

22   mediation offer extended?  You know, we looked at the court

23   transcript and set the date.  They're extending the time for

24   performance over NBK's objection to July 3, 2023.  You know

25   that, true?

1          MR. BURKS:  Objection, argumentative.

2          THE COURT:  I'll overrule that objection.  I want

3     an answer to the question.  Thank you.

4          THE WITNESS:  Absolutely.  There's no question

5     whatsoever with that the court gave us -- the court said you

6     have until July 3rd to make the payment.  The critical date

7     was the -- when the sale would be, right?  So the sale was

8     going to be July 5th; is that right?  Whatever the Tuesday

9     was, it was going to be.  Maybe the 4th of July was on a

10    Tuesday, Your Honor.  So the sale is always the first

11    Tuesday of the month.  So I think it got pushed back to the

12    second Tuesday.  There were issues.  The issue with July 3rd

13    was we were worried about bank holiday and trying to get the

14    money in by July 3rd.  What the mediation did is that the

15    bank confirmed that they were willing to do this agreement.

16    Because the whole point of (indiscernible) --

17         MR. CONRAD:  Objection.  Your Honor, I'm going to

18    object as to nonresponsive to everything after he said yes

19    to my question.

20         THE COURT:  I'll sustain the objection.  You're

21    going to go back around, unfortunately.  So you're going to

22    be here for a while.  Go ahead.  Go ahead.

23         MR. CONRAD:  I don't think I have any further

24    questions, Your Honor.

25         THE COURT:  Okay, then I'll go to Mr. Burks.

 1          MR. BURKS:  Your Honor, will you take judicial

 2    notice that July 4, 2023 was a Tuesday, the first Tuesday of

 3    the month of July?

 4          THE COURT:  I think I can take judicial notice of

 5    the calendar.  Sure.

 6               REDIRECT EXAMINATION OF JIM WETWISKA

 7    BY MR. BURKS:

 8    Q    So this door is wide open.  What happened?

 9          MR. FITZMAURICE:  Objection, Your Honor.

10          THE COURT:  That asks for narrative.  Be specific,

11    Mr. Burks.

12    BY MR. BURKS:

13    Q    What happened in the time period of July 2, 3, 4, 5

14    regarding the payments that you were trying to talk about

15    and the counsel was asking about?

16    A    I'm trying to answer this, Your Honor, that doesn't

17    disclose attorney-client communication, which is involved

18    here.  Is there -- can you --

19    Q    Sir --

20    A    In your question, I get it, can you try to do it in a

21    way which maybe it doesn't require me to disclose attorney-

22    client communications?

23    Q    Sure.  There was the letter.

24    A    The June 28th letter.

25    Q    The June 28th letter.

1    A    Correct.

2    Q    There was a mediation, correct?

3    A    There was a mediation on or about June 12th.  Yes, it

4    was a Zoom with Diana Marshall.

5    Q    Pursuant to a letter, pursuant to the mediation, what

6    did you try and get done as far as the payments?

7    A    There were numerous conversations.  As I understood it,

8    the clients were in the process of discussing with numerous

9    individuals.

10   Q    Which clients?

11        MR. FITZMAURICE:  Objection, hearsay as to those

12   conversations, Your Honor.

13        THE COURT:  I'll sustain the objection.

14   BY MR. BURKS:

15   Q    You mentioned the bank, the name of the bank and the

16   name of a finance unit.  What was the name you mentioned?

17   A    Security State Bank.

18   Q    Did you speak with Security State Bank?

19   A    Oh, yes.

20   Q    All right, and so what was Security State -- what were

21   you and Security State Bank trying to get done as far as

22   making a payment?

23        MR. FITZMAURICE:  Objection, Your Honor, this has

24   all been asked and answered, but also hearsay as to comments

25   by Security State Bank.

1          THE COURT:  I'll overrule the objection.  You can

2    answer the question.

3          THE WITNESS:  Trying to get financing put in place

4    in order to make the $26 million and change payment.

5    BY MR. BURKS:

6    Q    And were you successful?

7    A    No.

8    Q    Why not?

9    A    There were numerous reasons.  The filing of the

10   conservatorship/receivership was probably the biggest issue,

11   in my view.

12   Q    Who filed it?

13   A    The Bank of Kuwait.  So once that was filed, it

14   essentially, from what I could tell, chilled the entire

15   process.

16   Q    Any other things that precluded the (indiscernible)

17   with the bank?

18   A    I can tell you what I observed.

19   Q    Please, and only what you observed.

20   A    Only what I observed.  The other things that I observed

21   were the article in the -- the May 2023 article in the

22   DealBook about the foreclosure.  I think that there was a

23   foreclosure filed by the bank for June.  I think after in

24   May --I think sometime in May, they (indiscernible) --

25          MR. FITZMAURICE:  So Your Honor, objection as to

1   filings that may or may not have happened.  Again,

2   there's -- if there are filings, there are records of those

3   that the court should consider.  Otherwise --

4        THE COURT:  I'll sustain the objection as to

5   anything that basically got filed that I haven't seen.

6        Go ahead, Mr. Burks.

7   BY MR. BURKS:

8   Q    What else happened, in your opinion, to stop the deal

9   for financing that you were working on in June, July 2023?

10        MR. FITZMAURICE:  Objection, Your Honor, calls for

11   speculation.

12        THE COURT:  I'll sustain the objection.

13   BY MR. BURKS:

14   Q    Do you have knowledge as to what happened?  Were you

15   involved in it?

16        MR. FITZMAURICE:  Objection, vague as to what

17   happened.

18        THE COURT:  Be more specific, Mr. Burks.

19   BY MR. BURKS:

20   Q    Were you working on getting financing approved and paid

21   to National Bank of Kuwait in that time period between, say,

22   July 1 through July 5 or 6, 2023.

23   A    Mr. Burks?

24   Q    Yes.

25   A    I was trying to assist these clients during June, May,

1    April, March all the way up to the 1st of July, yes.

2    Q    Okay.  Were you successful?

3    A    No.

4    Q    Why not?

5         MR. FITZMAURICE:  Objection, Your Honor, what

6    happened --

7         MR. BURKS:  It goes to weight.

8         THE COURT:  Well, there's been an objection.  But

9    I don't know what he's objecting against.  What's your

10   objection based on?

11        MR. FITZMAURICE:  The question is what happened,

12   which calls for a narrative response by the witness as to

13   events that we -- that we don't know whether he has any --

14   he has personal knowledge of.

15        THE COURT:  Yeah.  I don't want to give a

16   narrative.  If you've got a specific question, Mr. Burks,

17   ask that.  I understand we're treading lightly.  But you

18   can't just ask him to give a narrative.

19   BY MR. BURKS:

20   Q    Why were you not successful in March through July in

21   getting the financing approved and paid to NBK?

22        MR. FITZMAURICE:  Objection, Your Honor, calls for

23   speculation, also mischaracterizes the evidence, lacks

24   foundation that there was in fact the financing, that there

25   was any effort to make a payment to the bank.  None of that

1    is in evidence.

2            THE COURT:  I'll sustain the objection.

3    BY MR. BURKS:

4    Q    What was the name of the bank that you mentioned a

5    moment ago?

6    A    Security State Bank.  That was one of a number of

7    people that we had talked to.

8    Q    All right.  Whatever happened, because I may never get

9    it in, whatever happened between March through July, do you

10   believe, in your opinion as a lawyer working the case, that

11   that is what has resulted in the dispute that is now before

12   us in the adversary proceeding regarding the breach or non-

13   breach of the settlement agreement?

14           MR. FITZMAURICE:  So objection, Your Honor.  Mr.

15   Wetwiska's opinion on this matter is not relevant.  It's

16   Your Honor's determination.  Also, the question specifically

17   calls for the lawyer to testify about his legal work

18   product, his legal analysis and attorney-client

19   communications.

20           THE COURT:  I'll sustain the objection.

21           MR. BURKS:  Reese?  Reese?  Pull the complaint up,

22   please.

23           MR. BAKER:  The complaint?

24           MR. BURKS:  The adversary complaint regarding

25   (indiscernible).

1        May I have a moment, Your Honor, while it's

2   getting pulled?

3        THE COURT:  Sure.

4   BY MR. BURKS:

5   Q    All right.  Did you see the first page of the complaint

6   on the screen, sir?

7   A    I do, yes.

8   Q    And is this the same complaint you said that you had

9   personal knowledge of?

10       MR. FITZMAURICE:  Objection, Your Honor.  This is

11   a complaint filed in November of 2023.

12       THE WITNESS:  This isn't what I was shown earlier.

13       MR. BURKS:  Is that a different one

14   (indiscernible).  Just a moment to confirm.

15       THE WITNESS:  Can you just go to the signature

16   page?

17       THE COURT:  It's the wrong complaint.  It's not

18   the one they want to ask you about.  It's the one that got

19   removed to my court.

20       MR. BURKS:  Okay.  What number is this, Steve?

21       MR. SATHER:  Is it Exhibit 62 or docket?  I don't

22   think it's Exhibit 62.

23       MR. BAKER:  All right.  What do you see after

24   that?  You want (indiscernible) Number 10?

25       MR. BURKS:  I want the one based on the breach

1   (indiscernible) --

2            THE COURT:  I think this is what you're looking

3   for.  Bear with me one second while I drag it over to where

4   it needs to go.  I think that's what you're making reference

5   to.

6            MR. BURKS:  Thank you, Judge.

7            THE COURT:  Just tell me where you want to go.

8            MR. BURKS:  I want to see these signature page for

9   the witness to see.

10           THE COURT:  We have the prayer.  Where do you want

11  to go?

12           MR. BURKS:  I see the prayer.

13           THE COURT:  It starts there and then it goes to

14  (indiscernible).

15  BY MR. BURKS:

16  Q    Sir, are you familiar with this lawsuit?

17  A    I've seen it today, yes.

18           MR. BURKS:  Despite my best efforts, I'm not going

19  to be able to try this lawsuit today, Judge, nor do I have

20  to, to support my motion.  I have no further questions.

21           THE COURT:  All right.  Thank you.  Then I'll go

22  to Mr. Choudhri.

23           MR. TROOP:  Your Honor, can I be excused for just

24  a moment?

25           THE COURT:  Sure.  As soon as we're done with this

1   witness, we're going to take a break.  I'm just trying to

2   get him of here.

3           MR. TROOP:  I just (indiscernible) --

4           THE COURT:  That's fine.  Go ahead.  Feel free.

5           MR. CHOUDHURI:  Thank you.

6               REDIRECT EXAMINATION OF JIM WETWISKA

7   BY MR. CHOUDHURI:

8   Q    Mr. Wetwiska, Mr. Conrad put up some transcripts from a

9   hearing from April 2023, right?

10  A    Correct.

11  Q    Do you remember there was also a hearing on June the

12  12, 2023?

13          MR. CHOUDHURI:  I can pull up the transcript if

14  the court will permit me, Your Honor.

15          THE WITNESS:  So there were a number of hearings

16  we had and then maybe even a status conference.  We did have

17  some in June.  I thought it was June the 5th

18  (indiscernible).

19          MR. FITZMAURICE:  Your Honor, for the record, what

20  is the -- what exhibit is this in reference to?

21          THE COURT:  I'm not sure what the exhibit.  He

22  hasn't told me.  What's the ECF filing number?  90-3?

23          MR. CHOUDHURI:  Yes, Your Honor.

24          THE COURT:  I think that's either -- that is --

25  yeah, 90-3 is the ECF number.

1          MR. CHOUDHURI:  I'd like to enter this transcript

2     from the state court, Your Honor.  I move to admit this.

3          THE COURT:  90-3.  Does anybody have any

4     objections to the entry of 90-3?

5          Mr. Burks?

6          MR. BURKS:  No objection, Your Honor.

7          THE COURT:  Mr. Fitzmaurice, do you have time to

8     look at it?

9          MR. FITZMAURICE:  No.  Thank you, Your Honor.  No,

10    no objection.

11         THE COURT:  All right.  Then it's admitted.

12         (Trial Exhibit 90-3 entered into evidence)

13    BY MR. CHOUDHURI:

14    Q    What is the date of this hearing, Mr. Wetwiska?

15    A    June 12th.

16    Q    And this is after the transcript that I think Mr.

17    Conrad had put up earlier, correct?  That was from April.

18    A    Almost two months later.

19    Q    Mr. Conrad took a position and represented to the court

20    that the settlement agreement does not exist.  Do you recall

21    that?

22         MR. FITZMAURICE:  Objection, Your Honor, lacks

23    foundation.

24         THE COURT:  I'll sustain the objection.

25    BY MR. CHOUDHURI:

1  Q    Did the court foreclose the bank's breach of the

2  settlement agreement at that hearing?

3  A    No.

4          MR. FITZMAURICE:  Objection, Your Honor, vague as

5  to foreclose the bank's --

6          THE COURT:  I need to know what you mean by that.

7  You need to be more specific.

8          MR. CHOUDHURI:  Yes, Your Honor.

9  BY MR. CHOUDHURI:

10  Q    So let me back up.  We had a settlement agreement,

11  which is the settlement we're talking about in this case,

12  August 2022.

13  A    Correct.

14  Q    And a payment date that was spelled out of the

15  settlement agreement to being about 270 day, correct?

16  A    March.  It was March 2023.

17  Q    Correct, and the issues that the debtor parties went to

18  court for were the interferences or challenges of getting

19  the bank paid.

20          MR. FITZMAURICE:  Objection, Your Honor, leading

21  as to interferences, challenges, getting the bank paid.

22          THE COURT:  I'll sustain the objection.  Thank

23  you.

24          THE WITNESS:  Can you show me 59 of this exhibit,

25  just the bottom of it?  Can you go to the next page?  Okay.

1    BY MR. CHOUDHURI:

2    Q    Do you recall Mr. Conrad representing to the court

3    numerous times at this hearing that the settlement agreement

4    did not exist?

5            MR. FITZMAURICE:  Objection, Your Honor.

6            THE WITNESS:  Yes.  Sorry.

7            THE COURT:  Go ahead, make your objection.

8            MR. CHOUDHURI:  What's the objection?

9            MR. FITZMAURICE:  The document speaks for itself.

10   Also mischaracterizes the nature of the document, the legal

11   argument that was made at a hearing in open court.

12           THE COURT:  I'll sustain the objection.  Thank

13   you.

14   BY MR. CHOUDHURI:

15   Q    I'd like to show you a document, Mr. Wetwiska.  So just

16   to get the timeline right, at this hearing that you were

17   president on June the 12th, Mr. Conrad takes the position

18   that the settlement agreement doesn't -- or maybe we could

19   go to the transcript, or the transcript is submitted in the

20   record.  But the dispute was, did the settlement agreement

21   exist or not?  Your position to the court was it did.  Mr.

22   Conrad's position was it denied.  Do you recall that?

23           MR. FITZMAURICE:  Objection, Your Honor, lacks

24   foundation.

25           THE COURT:  I'll sustain the objection.  And I'm

1    happy to read the transcript.  And we'll read it, Mr.

2    Choudhri.

3              MR. CHOUDHURI:  Thank you.

4              THE COURT:  Thank you.

5    BY MR. CHOUDHURI:

6    Q    Do you recall that Mr. Russell Ingrum from CBRE came to

7    the hearing?

8              MR. FITZMAURICE:  Objection, Your Honor,

9    relevance.

10             THE COURT:  I'll sustain the objection.  I don't

11   understand what the relevance is.

12             MR. CHOUDHURI:  There was a buyer with a contract,

13   irrevocable contract, that was wanting to close as long as

14   the bank would honor the agreement.

15             THE COURT:  If there is, I'm happy to hear that

16   testimony and see that document.  Okay.  Thank you.

17             MR. CHOUDHURI:  Should I pull up that contract?

18             THE COURT:  I don't know if you get it in through

19   this witness, unfortunately.  But you can do whatever you

20   want to, Mr. Choudhri.  You represent yourself.

21   BY MR. CHOUDHURI:

22   Q    Okay.  Mr. Wetwiska, is this an email you received from

23   Mr. Conrad on June 29 at 5:42 p.m.?

24   A    It is, sir.  Yes.

25   Q    And earlier we had talked about there was a lot of oral

1    communications, verbal communications.  But then you wanted

2    to start putting things in writing.  Do you recall that?

3    A    I think Mr. Conrad wanted things in writing.  And I

4    think I wanted things in writing.  It had become contentious

5    over the -- between May and the end of June.

6    Q    And in this email here, this was the first time ever

7    that you received a draft set of loan sale documents with an

8    assignment of the tax liens and a purchase sale agreement

9    and with a caveat that these are not final.  These are not

10   the final documents.

11          MR. FITZMAURICE:  So Your Honor, objection as

12   leading and lacks foundation.  We will stipulate to the

13   admissibility of the email, if that's where Mr. Choudhri is

14   trying to do.  But I think he's --

15          THE COURT:  Okay.  I'll take the stipulation.

16   I'll admit Exhibit 90-8.  I'll sustain the objection

17   otherwise.

18          (Trial Exhibit 90-8 entered into evidence)

19   BY MR. CHOUDHURI:

20   Q    So Mr. Wetwiska, the first time the bank ever provided

21   anything close -- let me back up.

22          MR. CHOUDHURI:  Let me move around that question

23   and ask it a better way, Your Honor.

24   BY MR. CHOUDHURI:

25   Q    I think we've established that you asked for a loan

1   sale agreement from Mr. Conrad around March, before the

2   expiration of the payment date, correct?

3          MR. FITZMAURICE:  Objection, Your Honor, assumes

4   facts not in evidence.

5          THE COURT:  I'll sustain the objection.  That's

6   not my recollection of the testimony.

7   BY MR. CHOUDHURI:

8   Q    Did you ask for the loan sale agreement before the

9   expiration of the payment date in the settlement agreement?

10  A    Before March 20, yes.

11  Q    You did, right?

12  A    Yes.

13  Q    And how did you ask?

14  A    I asked Mr. Conrad.  I told him we're getting close to

15  March 20.  There was this issue with Mr. Caldwell.  We're

16  getting down to the wire.  I need to see the documents and

17  we're trying to see if we can get something done by the

18  20th.

19         MR. FITZMAURICE:  So just, Your Honor, objection

20  as to hearsay with respect to Mr. Caldwell, but --

21         THE COURT:  I'll sustain the objection as to

22  hearsay as to that part of the answer.

23  BY MR. CHOUDHURI:

24  Q    I just want the record to be clear.  So the request for

25  loan sale agreement was made before the expiration that was

1    stated in the settlement agreement, correct?

2    A    Before March 20, yes.

3    Q    Okay, and so the first time that you ever got a loan

4    sale agreement was this email we're looking at today that's

5    been stipulated, which is document 90-8, right?

6    A    I don't remember seeing them before this date.

7    Q    This is basically one business day before the

8    foreclosure, the scheduled foreclosure sale, correct?

9              MR. FITZMAURICE:  Objection, Your Honor.

10             THE WITNESS:  Actually two.

11             MR. FITZMAURICE:  Your Honor can take judicial

12   notice of the calendar, but we've got a Friday and a Monday

13   and the foreclosure is on a Wednesday.

14             THE COURT:  Yeah.  I'll sustain the objection

15   (indiscernible) --

16   BY MR. CHOUDHURI:

17   Q    Was Monday, July the 3rd, a holiday?

18             THE COURT:  I think we answered that before, Mr.

19   Choudhri.  Yes.

20   BY MR. CHOUDHURI:

21   Q    So this is an email that you received at 5:42 p.m.

22             MR. TROOP:  Objection.

23             MR. FITZMAURICE:  Objection.  I mean, Your Honor,

24   again, Your Honor can take judicial notice that Monday, July

25   3rd is not a holiday.

```
 1                    THE COURT:  Yes.  That's not a holiday.
 2    BY MR. CHOUDHURI:
 3    Q    Are you aware if the banks were closed on July the 3rd?
 4                    MR. FITZMAURICE:  Objection, Your Honor.
 5                    THE COURT:  I don't have personal knowledge of
 6    that.  I'll sustain the objection.
 7                    THE WITNESS:  I don't know.
 8    BY MR. CHOUDHURI:
 9    Q    And when you received this email, this was not the
10    final approved loan sale agreement by the Bank of Kuwait,
11    true or false?
12                    MR. FITZMAURICE:  Objection.  Objection, Your
13    Honor, leading.
14                    THE COURT:  I'll sustain the objection.
15    BY MR. CHOUDHURI:
16    Q    Could you read me the last sentence on the email?
17    A    These drafts remain subject to NBK's review and
18    comment.
19    Q    Do you know who Romston is?
20    A    (indiscernible) yeah, I do.
21    Q    Is this another lender that was willing to do the loan
22    to fund the loan purchase?
23                    MR. FITZMAURICE:  Objection, Your Honor, leading
24    as to another, also relevance.  There's no evidence, and
25    lacks foundation.  The issue is whether, again, the bank
```

1    should be allowed to credit bid tomorrow.  There's no

2    evidence that National Bank of Kuwait had any awareness,

3    knowledge of who these folks are, or that there was any

4    communication with the bank so that it would actually be

5    relevant to the bank's conduct necessary for the credit

6    bidding motion.

7              THE COURT:  I'll sustain the objection.  Go ahead,

8    sir.

9              MR. CHOUDHURI:  Your Honor, what I'm trying to

10   establish is --

11             THE COURT:  I've ruled on the objection.  You may

12   ask another question.  Please go ahead.

13   BY MR. CHOUDHURI:

14   Q    Mr. Wetwiska, how is it possible or commercially

15   feasible for a transaction to take place without the

16   operative document --

17             MR. FITZMAURICE:  Objection, Your Honor.

18             MR. CHOUDHURI:  Let me back up.  That's a bad

19   question.

20   BY MR. CHOUDHURI:

21   Q    Mr. Wetwiska, you've been involved in a lot of

22   closings, right?

23   A    I guess.

24             MR. FITZMAURICE:  Objection, Your Honor -- well,

25   go ahead.  I'm sorry.  I'll withdraw.

```
 1                THE COURT:  Go ahead.  Go ahead.  Ask the next
 2    question.
 3    BY MR. CHOUDHURI:
 4    Q    You're a senior partner at Akin Gump, correct?  You've
 5    been at Akin Gump how long?
 6    A    Twenty years.
 7    Q    And you've been involved in a lot of transactions?
 8    A    Both as a lawyer, as an individual, as an investor,
 9    yes.
10    Q    In fact, you personally have your personal investments
11    and lots of transactions like (indiscernible) --
12                MR. FITZMAURICE:  Objection, Your Honor,
13    relevance.
14                THE COURT:  I'll sustain the objection as to
15    relevance.
16    BY MR. CHOUDHURI:
17    Q    You have personal experience in business, in investing
18    and transacting?
19                MR. FITZMAURICE:  Objection, Your Honor,
20    relevance.  Mr. Wetwiska is not here as an expert on real
21    estate closing.
22                THE COURT:  I'll sustain the objection as to
23    relevance.  And again, Mr. Choudhri, I'm going to warn you.
24    You need to ask questions that the witness can actually
25    answer.
```

1    BY MR. CHOUDHURI:

2    Q    Mr. Wetwiska, is this an email that you received?

3              MR. FITZMAURICE:  So objection, Your Honor, lacks

4    foundation.  Mr. Wetwiska isn't anywhere on this email.

5              MR. CHOUDHURI:  Yes, he is.

6              THE COURT:  I see the top line.  Go ahead.

7              MR. FITZMAURICE:  I thought he meant this one down

8    here..

9              THE WITNESS:  I received it a couple of times.

10             THE COURT:  You weren't a party to the original

11   email?  It was simply forwarded to you?

12             THE WITNESS:  The original email was either

13   forwarded to me or shown to me.

14             THE COURT:  Okay.  That's fine.

15             THE WITNESS:  And then for some reason, and I

16   don't know why, this looks like it was sent to me in April

17   of this year, but I don't know why he would have sent it to

18   me.

19             THE COURT:  Okay.  Go ahead.

20   BY MR. CHOUDHURI:

21   Q    Mr. Wetwiska, would you just read into the record what

22   the email from Mr. (indiscernible) at Romston states?  Or

23   would you read in the record what is on the subject of the

24   email?

25   A    The subject?

1    Q    Yes, sir.

2    A    Re Galleria 2425 v. National Bank of Kuwait

3    (indiscernible).

4    Q    And what does the email say, starting from how.

5    A    How do they expect you to close on July 3 if they

6    haven't produced a sale agreement?  We'll look out for the

7    documentation.  Do you want me to continue?

8            MR. FITZMAURICE:  Your Honor, I don't -- so

9    objection, Your Honor.  The email, the underlying email, not

10   the forwarded to Mr. Wetwiska --

11           THE COURT:  It's not in evidence.

12           MR. FITZMAURICE:  It's not in evidence.

13           THE COURT:  I'll sustain the objection.

14           MR. CHOUDHURI:  I'd like to move this email, Your

15   Honor.

16           THE COURT:  It's not admissible through this

17   witness.

18   BY MR. CHOUDHURI:

19   Q    Is there any possibility of buying the loan under the

20   confidential settlement without a loan sale agreement, Mr.

21   Wetwiska, if you know?

22           MR. FITZMAURICE:  Objection, Your Honor.  That

23   agreement speaks for itself and also calls for speculation.

24           THE COURT:  Calls for a legal conclusion.  I'll

25   sustain the objection.

1   BY MR. FITZMAURICE:

2   Q    So Mr. Wetwiska, you're aware that at least two lending

3   institutions that require a loan sale agreement before they

4   move forward to fund the transaction, correct?

5              MR. FITZMAURICE:  Objection, Your Honor, lacks

6   foundation and also relevance to the issue of whether or not

7   the bank can credit bid tomorrow.

8              THE COURT:  I'll sustain the objection as to lack

9   of foundation.  Go ahead, ask the next question.

10   BY MR. CHOUDHURI:

11   Q    If the bank is acting in bad faith and preventing

12   performance, do you believe they should be able to credit

13   bid?

14              MR. FITZMAURICE:  So objection, Your Honor,

15   relevance, calls for a legal conclusion.

16              THE COURT:  I'll sustain it on both of those

17   grounds.  Thank you.

18   BY MR. CHOUDHURI:

19   Q    Mr. Wetwiska, are you aware of the bank telling the

20   buyers that were calling the trustee that there will be a

21   foreclosure in the future and Judge Weems admonished them

22   for doing so?  Do you recall it?  That's a bad question.

23   I'm sorry.  Do you recall going to a hearing in front of

24   Judge Weems where Judge Weems admonished NBK for after they

25   passed the sale, for telling the people calling the bank

 1    why?

 2              MR. FITZMAURICE:  Your Honor, lacks foundation.

 3    If there is such a hearing, then there will be a transcript

 4    and we can look at that.

 5              THE COURT:  I'll sustain the objection.

 6              Mr. Choudhri, you basically have gotten to the

 7    point where you're really trying my patience.  You have two

 8    more questions.  And if they're both overruled on

 9    objections, you're done.

10    BY MR. CHOUDHRI:

11    Q    Did you come to find out that Paul Caldwell was in

12    communication with Pillsbury?

13              MR. FITZMAURICE:  Objection, Your Honor, hearsay

14    as to Mr. Caldwell.

15              THE COURT:  I'll sustain the objection as to

16    hearsay.

17              Mr. Choudhri, you on your last question.

18    BY MR. CHOUDHRI:

19    Q    Was there an email forwarded to you?  I believe it's

20    one of the exhibits, if we can pull it up.  Can you tell us

21    the situation or the circumstance in your conversation with

22    Mr. Conrad relating to Paul Caldwell?

23              MR. FITZMAURICE:  Your Honor, I don't --

24              THE COURT:  I don't understand the question

25    either.

1           MR. FITZMAURICE:  Yeah.

2           THE COURT:  Rephrase it, please.

3     BY MR. CHOUDHURI:

4     Q    Did Mr. Conrad contact you and said he has received a

5     request for a payoff from Paul Caldwell?

6           MR. FITZMAURICE:  Objection, Your Honor, again,

7     best evidence rule.  If there is correspondence related to

8     this, it would be in an email.

9           THE COURT:  I'll sustain the objection.

10          One more question, Mr. Choudhri.

11          MR. CHOUDHURI:  I'm done, Your Honor.  I do not

12    have any (indiscernible) --

13          THE COURT:  Okay.  Thank you.  All right.

14          Let's go to Mr. Fitzmaurice.  Do you have

15    questions for this witness?

16          MR. FITZMAURICE:  I think Mr. Conrad does, Your

17    Honor.

18          MR. CONRAD:  Just real quick cleanup on two

19    issues.

20          THE COURT:  Sure.  Go ahead.

21          MR. FITZMAURICE:  And again, Your Honor, I'll

22    present from here.

23          THE COURT:  That's fine.

24          MR. FITZMAURICE:  Thank you.

25          MR. CONRAD:  Just quickly, there was an exhibit

1   that we had listed on our exhibit list that I forgot to be

2   admitted into the record.  This is ECF 498-01.  This is the

3   transcript from the April 12, 2023 hearing that we looked at

4   earlier.  I'd move to admit it.

5           THE COURT:  Are there any objections to ECF 498-01

6   being admitted?

7           MR. BURKS:  No, Your Honor.

8           THE COURT:  Mr. Choudhri?

9           MR. CHOUDHURI:  Which is the exhibit on this?

10  Which one?  This one?

11          THE COURT:  April 12th hearing date transcript.

12          MR. CHOUDHURI:  No.  No.

13          THE COURT:  It's admitted.  Thank you.

14          (Trial Exhibit 498-01 entered into evidence)

15          MR. CONRAD:  Thank you, Your Honor.  I'm going to

16  turn to the settlement quickly, and this is ECF 508-7.  And

17  looking specifically, if you'll zoom out a little bit just

18  to get an idea what page this is.  This is Page 5 of the

19  settlement agreement.  Scroll up if you will.  And this is

20  subsection settlement payment.

21              RECROSS-EXAMINATION OF JIM WETWISKA

22  BY MR. CONRAD:

23  Q    Do you see there D?

24  A    Yes.

25  Q    I think some of your testimony earlier today, Mr.

1    Wetwiska, was is the bank had an obligation to produce or

2    provide closing documents associated with the purchase or

3    sale.  Do you recall that testimony that you gave earlier

4    or, correct me if that's wrong or not.

5    A    I think what I was saying is that you had to have

6    documents, those documents to consummate it and the bank

7    somewhere in here I thought had agreed to work with and

8    provide information that's required to do that.

9    A    So I want -- but you don't recall off the top of your

10   head, do you?

11   A    I did not review this before today.

12   Q    Fair enough.  And so looking at here, this is under --

13   I'm sorry.  I said D.  I meant H.  This is under the

14   purchase option section.  If you look at the last sentence

15   of that paragraph of that section where it says, upon

16   written request of a purchase option party, do you see that?

17   A    Yes.

18   Q    It says, NBK shall provide such purchase option party

19   with a payoff statement for the satisfaction or purchase of

20   its loan and loan documents.  Do you see that?

21   A    Right.

22   Q    We've looked at your exhibit, your letter from June

23   28th where you're requesting that the bank provide

24   documents.  Do you remember looking at that letter that you

25   sent?

1    A    Right.

2    Q    We looked at an email correspondence where those

3    documents were sent to you --

4    A    Correct.

5    Q    -- within 24 hours of your letter, if you look at the

6    emails.

7    A    Right.

8            MR. CONRAD:  Nothing further, Your Honor.

9            THE COURT:  Thank you.

10           Mr. Burks?

11           MR. BURKS:  Two questions.

12               REDIRECT EXAMINATION OF JIM WETWISKA

13   BY MR. BURKS:

14   Q    Let's just continue on the question about the --

15   A    You guys should have called me first.

16   Q    The document -- so my question is, but the documents

17   stated that the loan documents provided were subject to

18   approval, were not in the final form, correct?

19   A    I don't -- it speaks -- it says what it says.  I think

20   they reserved the right to further review and consent, or

21   something along those lines.

22   Q    When did you receive an email, mail or otherwise of

23   final loan closing documents?  Did you ever?

24   A    No.

25           MR. BURKS:  Nothing further.

```
 1                   THE COURT:  Thank you.

 2                   Mr. Choudhri, do you have any questions to this

 3      witness, Mr. Choudhri?  You're limited to redirect what's

 4      just been asked in the two previous parties.

 5                   MR. CHOUDHURI:  No, Your Honor.

 6                   THE COURT:  All right.  Mr. Conrad?

 7                   MR. CONRAD:  Nothing further Your Honor.

 8                   THE COURT:  I'm going to let you go, sir.  Thank

 9      you for coming.

10                   MR. WETWISKA:  Your Honor, nice to meet you.

11                   THE COURT:  Nice to meet you, sir.

12                   MR. WETWISKA:  Thank you.

13                   THE COURT:  Good luck to you.

14                   MR. WETWISKA:  Thank you.

15                   THE COURT:  All right.  It's time now to take a

16      break.  It's overdue.  How long do the parties want to break

17      for?  You haven't eaten anything.  You haven't had a drink.

18      What do you want to do?  We're going to stay here until we

19      get finished with this motion.  So how long?  It's just your

20      time.  So you can decide what you want to do.

21                   Mr. Burks, how long do you want?

22                   MR. BURKS:  I want to get a Starbucks iced tea and

23      a sandwich.  If that takes about an hour and a quarter,

24      that's how much time I'd like.  I don't know where Starbucks

25      is.  Is it in the tunnel?
```

 1            THE COURT:  There is one directly across the

 2    street.  It should take you about 45 minutes to do both

 3    those things.  Okay.  You okay with a 45-minute break?

 4            MR. FITZMAURICE:  Your Honor, we'd like it to be

 5    less.  As much as we love the court's company, we'd rather

 6    not be here until 2:00 a.m. if we don't have to be.

 7            THE COURT:  That's my preference as well.  But I

 8    need to be in a position to give you a written ruling on

 9    this motion, and so I can tell you what's going to happen.

10    You guys are going to finish and then I'm going to send you

11    home because I need to now read everything you've put into

12    evidence and give you a written ruling before 1:00 p.m.

13    tomorrow.  And you're going to be back here on the 3rd.

14    Okay?

15            So how long do you want, Mr. Burks?

16            MR. BURKS:  Forty-five minutes.  I'll test -- I'll

17    test (indiscernible) --

18            THE COURT:  Okay.  I'll give you a few minutes.

19    I'm going to speed things along.  It is 2:20 according to my

20    Apple watch, which always has the right time.  We will

21    resume at 3:00 p.m.  Thank you.

22            MR. FITZMAURICE:  Thank you, Your Honor.

23            CLERK:  All rise.

24      (Recess)

25            CLERK:  All rise.

Page 227

```
1              THE COURT:  Please be seated.

2              Mr. Murray, did you have something to say?

3              MR. MURRAY:  Yeah, a short housekeeping matter.  I

4    didn't want to interrupt the evidence.  You had mentioned --

5    I don't know if I could start now or --

6              THE COURT:  Go ahead.

7              MR. MURRAY:  The court talked about scheduling

8    when you might issue an order in advance of 1:00 tomorrow so

9    that that would not delay the auction.  It's still my

10   intention to have an auction at 1:00.  I might however delay

11   it, the reason for that being we got a conforming bid where

12   the escrow money wasn't provided, but they said it was going

13   to be.  I wanted to wait a little bit of time to see if it

14   comes in today and, if it does, they'd have more bidders at

15   the auction.  And I think I have discretion under the rules

16   to extend the auction.  But I didn't want --

17             THE COURT:  I just want to rule on the credit bid

18   motion before 1:00 p.m. tomorrow so you know what's going on

19   there.

20             MR. MURRAY:  Okay, I appreciate it.  I just wanted

21   the court to know that.

22             THE COURT:  And when everyone gets here, I will

23   tell you that on the 3rd, basically the courthouse will be

24   closed.  You will have to enter through the entrance is to

25   the far left where the call box is.  They know you're
```

1    coming.  You'll have to hit the button.  Call, they'll let

2    you in to come up.  Okay.

3              MR. MURRAY:  Thank you.

4              MR. BURKS:  Thank you, Your Honor.

5              MR. FITZMAURICE:  On the 19th.

6              MR. TROOP:  Judge, you said the 3rd.  Did you mean

7    the 19th?

8              THE COURT:  The 19th.  I'm sorry.  yeah.  I

9    apologize.  I don't know why I'm saying the 3rd.  I think

10   it's because we filed on July 3rd (indiscernible) --

11             MR. FITZMAURICE:  We filed it as of July 3rd this

12   morning.  Yeah.

13             THE COURT:  Yeah.

14             Mr. Burks, do you have your next witness?

15             MR. BURKS:  He's not in the courtroom.  I'll call

16   him.

17             THE COURT:  You can call Mr. Murray.

18             MR. BURKS:  Mr. who?  Mr. Murray.  Yes.

19             THE COURT:  Okay.

20             MR. BURKS:  I thought he was there.

21             THE COURT:  You were looking at him.  I was

22   assuming that's who you were going to call.

23             Mr. Murray, come up and I'll swear you in.  Please

24   raise your right hand.  Do you swear or affirm to tell the

25   truth, the whole truth and nothing but the truth, so help

1    you God?

2              MR. MURRAY:  I do.

3              THE COURT:  All right.  Please be seated.

4              MR. MURRAY:  May I take a water with me?

5              THE COURT:  You may.

6              DIRECT EXAMINATION OF CHRISTOPHER MURRAY

7    BY MR. BURKS:

8    Q    Please state your name for the record.

9    A    Christopher Murray.

10   Q    And in connection with this case, do you serve in any

11   capacity?

12   A    I'm the Chapter 11 trustee.

13   Q    Are you also an attorney?

14   A    Yes.

15   Q    Boom.  When did you assume the position of Chapter 11

16   trustee in this case?

17   A    Early February.

18   Q    Of 2024?

19   A    Yes.

20   Q    All right, and have you seen the motion for sale and

21   have you seen the plan?  I'll do them one at a time.  Who

22   filed the motion which resulted in (indiscernible) auction

23   (indiscernible)?

24   A    I believe I filed a motion to authorize bidding

25   procedures and that's what was approved.

1    Q    All right, and in the bidding procedures, was there

2    provision for credit bidding by National Bank of Kuwait?

3    A    Yes.

4    Q    And may I refer to National Bank of Kuwait as NBK or

5    National Bank of Kuwait?

6    A    That's fine with me.

7    Q    Thank you, and was that something that you originally

8    drafted or was that something that NBK asked you to put in

9    later?

10    A    It said we drafted it together.  I think the first

11    draft came from that.

12    Q    So the first draft of the bidding procedures came from

13    the bank's attorney?

14    A    I believe that's right, yes.

15    Q    All right, and when you saw the credit bid provision,

16    did you have any comments on it?

17    A    Nothing specific comes to mind.

18    Q    All right.  On the bidding procedures, did you -- were

19    you able to quickly accept those procedures, or did you have

20    a draft of your own (indiscernible) your attorneys?

21    A    I believe we provided rounds of comments, but starting

22    with NBK's draft.  I don't think we had our own draft.

23    Q    Okay, and starting with NBK's draft, there wasn't a

24    prior draft before theirs, was there?

25    A    Not that I recall.

1    Q    Okay, and who signed off on the bidding procedure?  Did

2    you sign off on it?

3    A    I did, yes.  Well, ultimately, Judge Norman signed off

4    on it, but --

5    Q    Sure.  But what was proposed to the court, you signed

6    off on it?

7    A    Yes.

8    Q    And at what time of the case was this?  Was this -- in

9    what period were you drafting this motion?  January,

10   February, March?

11   A    Well, I was appointed in February.  It wasn't

12   immediately.  So it would have been March or April.

13   Q    Okay.

14   A    And the document itself has a timestamp.

15   Q    Sure.  Sure.  Well, I'm actually going into your

16   thought processes as to what's happening here.  Did you ever

17   question why the bank wanted to credit bid?

18   A    No.

19   Q    Did you ever analyze or ask the bank if there was any

20   procedure they'd agreed to other than credit bid?

21   A    Yes.

22   Q    And what did you ask them?

23   A    I asked them if they would be willing to put a cap on

24   the amount of their credit bid.

25   Q    And what cap did you ask them?

 1   A     I asked them conceptually, and they said no, there

 2   wasn't a number.

 3   Q     Okay.  Now, this was done before all the litigation

 4   that is now on file was on file; is that correct?

 5   A     I don't know what you're referring to.

 6   Q     Fair enough.  Was there a time where Ali Choudhri or

 7   anybody else post-bankruptcy brought you leases, potential

 8   leases for the building?

 9   A     There were documents presented to me that were called

10   leases.

11   Q     Okay, and what did you do with those?

12   A     I reviewed them with my counsel.

13   Q     All right.  Did you bring those to the bank?

14   A     I don't know if -- I don't know if lawyers shared those

15   leases.  I did not ask the bank to approve any of them.

16   Q     Did you ask the bank's lawyers to review them?

17   A     Personally?  I don't recall.  I don't know if I did

18   that.

19   Q     Do you know if your lawyers spoke to the bank's

20   lawyers?

21   A     I know they spoke to them all the time.  I don't know

22   if they presented leases.

23   Q     All right, and so you made a decision not to present

24   these documents that you said represented leases; is that

25   correct?

1    A    Yes.

2    Q    On the leases, are you aware whether or not a tenant

3    requires anything from the National Bank of Kuwait in order

4    execute a lease?

5    A    Just leases generally, or are you referring to one in

6    particular?

7    Q    Leases generally.  Do they need --

8    A    I don't know.

9    Q    -- do they need anything from the lender in order to

10   sign a business lease in a corporate (indiscernible) --

11   A    Yeah, lots of things.

12   Q    Yeah.  They need it from the lender, don't they?

13   A    Yeah.

14   Q    Okay.  So why did you not present any of these leases

15   to the lender's attorneys or to the lender?

16   A    Well, before I get the bank to sign off on the lease, I

17   have to think it's in the estate's best interest, and none

18   of them were.

19   Q    All right, and generally -- we'll go specifically or

20   someone else will.  Generally, why did you determine that

21   executing those leases was not an the bank's best -- excuse

22   me, the estate's best interest, or let me rephrase the

23   question.  Why did you determine that it wasn't even in the

24   estate's best interest to forward these documents, whatever

25   they are, to Bank of Kuwait?

1    A    I don't think I made that determination.  But what you

2    asked -- I want to answer your question.  What are you

3    asking, sir?

4    Q    Sure.  You reviewed documents that you say purported to

5    be leases, correct?

6    A    Yes.

7    Q    You stated you did not forward them to the National

8    Bank of Kuwait, either to the bank or to their attorneys.

9    A    I said I do not remember personally sending it to the

10   bank.  I know my attorneys were talking to the bank's

11   attorneys all the time.  Lots of documents were exchanged.

12   I don't know if they were exchanged in the process.

13   Q    Did you ask your attorneys to send these leases ahead

14   to the bank's attorneys?

15   A    No, I don't remember doing that.

16   Q    All right.  So why did you not ask your attorneys to

17   forward the leases ahead to the bank's attorneys or to the

18   bank?

19   A    I wasn't -- I had not determined that they were worth

20   the estate pursuing.  So why would I waste time asking the

21   bank's consent to do something I didn't want to do?

22   Q    And in deciding not to do that, how did you determine

23   that?  Did you speak to any of the potential tenants or just

24   to Mr. Choudhri?

25   A    I spoke to one of the potential tenants.

1    Q    Oh, good.  And who did you speak with -- excuse me.

2    I'll state it again.  Good.  With whom did you speak?

3    A    I spoke to Faisal Shah.

4    Q    Faisal Shah.  And that was for a potential lease of

5    what?

6    A    I think the company was called Vaxanix.  He said that

7    he represented that company in some capacity and we spoke

8    briefly about a potential proposal of a lease.  But I never

9    heard from him again on that.

10   Q    All right.  Do you recall any of the others?  I think

11   there were -- I'm not going to put words in your mouth.  Do

12   you recall any of the others that were presented to you by

13   Ali or someone on behalf of Ali with post-petition leases?

14   A    I think Ali presented one other potential lease from a

15   shipping company.  But I never heard from that company or

16   any of its representatives.

17   Q    Did you contact them?

18   A    No.

19   Q    Okay.  So were there any other lease or lease options

20   or occupancy documents that Ali or someone on behalf of Ali

21   sent to you?

22   A    Not that I recall.  I mean, the ones I'm talking about

23   are two documents that said lease on the top and looked kind

24   of like leases.  At various times, Ali would say and propose

25   different things about -- I'm sorry, I mean, Mr. Choudhri,

1    I'm not trying to be disrespectful -- that I do not think

2    rise to the level of a lease, but maybe indicated someone

3    might be interested in leasing space.

4    Q    In addition to those two?

5    A    Yeah.  I can't think of anyone in particular.

6    Q    All right.  But he never gave you -- did he ever give

7    you names or contacts?

8    A    I think at different times he gave some names, yes.

9    Q    All right, and did you contact those people?

10   A    No.

11   Q    What approach did you take from the time you took on

12   the Chapter 11 trusteeship, what efforts did you take to

13   market leases on this property?

14   A    I interviewed two different real estate companies with

15   experience in that field to explore the possibility of

16   marketing the building.

17   Q    All right, and what was the result of that?  Did you

18   say you had one conversation with each realtor or --

19   A    It was multiple conversations.  I didn't keep track of

20   the number with which ones.

21   Q    And what came of those conversations in general?

22   A    I decided which one to propose to hire to sell the

23   building.

24   Q    In the interim, did you -- of selling the building, did

25   you discuss with any realtors actively pursuing leases on

1   the building?

2   A    Yes.

3   Q    And with whom did you contact?

4   A    The two were Hilco, who I ultimately hired, and JLL,

5   which the bank had originally proposed as the broker.

6   Q    Did you get any of the leases post-petition into the

7   building?

8   A    No.

9   Q    Why not?

10  A    I didn't seek any new ones.

11  Q    Oh?  Why not?

12  A    Well, since you asked, both of the realtors I spoke to

13  said it would be nonsensical to try to sign up new leases

14  for several reasons, the first of which was the building had

15  a reputation, is the term they used.  They said no serious

16  creditworthy tenant would sign a significant lease with the

17  building knowing who its management was.  That was one

18  thing.

19  Q    All right.

20  A    The second thing was they didn't like a particular

21  tenant in the building, that being the Jetall companies.

22  That company also had a reputation.  And nobody would lease

23  space in a building where they were a tenant.  That's what

24  two different companies told me.

25  Q    All right.

1    A    They also said it was known that the company's owner

2    was in bankruptcy and that no serious tenant would ever

3    propose a meaningful, economically valuable long-term lease

4    with a company whose owner might change at any moment.  They

5    would want to know who the buyer is.  They would want to

6    know the result of the bankruptcy before signing a lease.

7    Their advice to me was that it was not realistic that a

8    serious person would propose a lease, and I shouldn't waste

9    my time looking at proposed leases like that.  More reasons,

10   since you asked.

11   Q    Sure.  I did.

12   A    It was explained to me that any time you sign a long-

13   term commercial lease, there is a broker payment that is due

14   to whoever brought the lease to you.  It was explained to me

15   by those two companies that you have to pay.  The landlord

16   has to pay cash to the broker at the beginning of the lease.

17   I don't have any cash.  I have very limited cash in this

18   estate, so I'm not in a position to do that.  I asked for

19   information on those leases as to who the broker was and

20   what they would get paid.  Never got an answer.  But I do

21   know that there were other leases that the debtor had, or

22   which Jetall companies and other related entities are still

23   asserting that they're due payment on a broker fee.  So I

24   was concerned that there might be an additional claim

25   against the estate if I were to sign a new lease that Mr.

1   Choudhri had presented to me.  Also, the leases call for

2   certain expenses to be advanced by the landlords --

3   Q    Correct.

4   A    -- and those include use of time by security staff,

5   after hours use of the elevators and HVAC for move in and

6   (indiscernible), all the kind of things that happen when the

7   tenant moves in.  I didn't want to incur those costs on such

8   speculative proposed leases.  And oh, almost all -- at least

9   one of the leases that I remember, the other one probably

10   had it and the brokers told me that any lease in today's

11   market would have it, a certain period of rent abatement

12   where there would be no cash paid.  One of my them I think

13   was at least a year.  I'm told is multiple years in long-

14   term leases in the current market.  I was not interested in

15   bringing in a tenant into this estate that is cash poor, in

16   bankruptcy, with no prospect of revenue coming in for that

17   period of time.  So those are what come to mind right now as

18   the reasons why I did not pursue new leases.

19   Q    So with all that in mind, why wouldn't you have jumped

20   through hoops to do everything possible to figure out

21   whether or not these two leases that Ali brought you were

22   real tenants and what the circumstances of their income and

23   terms were?

24   A    The source of the leases.

25   Q    So the fact that Ali brought them to you, you judged

1   meant that they wouldn't be profitable or beneficial to the

2   estate?

3   A    Well, no, it's all the factors I just mentioned.  But

4   you said why I didn't jump through hoops to contact who

5   proposed them, that's why.

6   Q    So what were the terms of those leases?

7   A    I don't remember them as I sit here today.  I mean, I

8   remember some.

9   Q    Did you read them?

10   A    Yes.

11   Q    And how many were there?

12   A    There were two that I recall reading.

13   Q    All right, and were there any others where Ali said,

14   this is somebody, despite the fact of what you were told by

15   Hilco or somebody else, these are people who want to rent

16   the space (indiscernible).  Didn't he call you with several

17   names?

18   A    He might have.  I don't remember reaching out to anyone

19   asking if they wanted to lease space, though.

20   Q    And you didn't reach out to these people because why?

21   A    I did not think it would be productive.

22   Q    But you didn't reach out to them?

23   A    Yeah, you've asked me that four times.  I haven't.

24   Q    So we'll never know if it would have been productive or

25   not?

1    A     No, I think we do know.  I think when someone's

2    motivated and wants to do a deal, they reach out to me.

3    That happens in almost all of my cases.  People say, hey,

4    you've got something I want to buy.  They call me.  It's not

5    somebody trying to delay the process who presents an offer

6    on their behalf.

7    Q     And that's what you thought Ali was doing?

8    A     That was the conclusion I reached throughout this case,

9    yes.

10   Q     Okay.  From your perception of Ali, or from your

11   perception of the potential tenant?

12   A     My perception of the tactics being employed by Mr.

13   Choudhri and his related entities in the case.

14   Q     Okay.  Fair enough.

15         MR. BURKS:  One moment, Your Honor.  I may be done

16   with this witness.

17   BY MR. BURKS:

18   Q     Do you have an opinion as to whether or not the winning

19   cash auction price is affected by a credit bid?

20   A     Yes.

21   Q     And what is your opinion based on?

22   A     Assumptions about human nature and what I would do if I

23   wanted to bid on an asset.

24         MR. BURKS:  No further questions, Judge.

25         THE COURT:  All right.  Mr. Choudhri, do you have

1    any questions for this witness?

2              MR. CHOUDHURI:  Yes, Your Honor.

3              THE COURT:  Come on up.

4              DIRECT EXAMINATION OF CHRISTOPHER MURRAY

5    BY MR. CHOUDHURI:

6    Q    Good afternoon, Mr. Murray.

7    A    Good afternoon.

8    Q    Mr. Murray, do you recall the first time we met?

9    A    Yes.

10   Q    And where was that?

11   A    That was at 2425 West Loop South.

12   Q    Was that on a Sunday?

13   A    I think so, yeah.

14   Q    Mr. Murray, would you represent that you've been

15   truthful and honest to me in this process?

16   A    Yes.

17   Q    When did you make the decision to not pursue any claims

18   against the Bank of Kuwait?

19   A    I'm not sure I have made that decision.  I think I am

20   pursuing them.

21   Q    You are pursuing claims against the Bank of Kuwait?

22   A    Yeah.  Those are live claims.  They have value to me.

23   They've not been released.

24   Q    So the estate still has claims against the Bank of

25   Kuwait as we sit here today?

1   A     As we sit here today, yes.  Yes, it does.

2   Q     So when Mr. Troop stated that there was a stipulation

3   in the final cash collateral that any claims that could have

4   been brought had to be brought and can't be brought anymore

5   --

6   A     I don't think that's what he said.  And that's not what

7   I understood.

8   Q     What did you understand?

9   A     I understood that it was specific claims about the

10  amount of the debt and the validity of the lien that

11  objections to that challenge period came and went.

12  Q     So what is the amount of the debt that you contend is

13  owed to NBK?

14  A     I don't contend anything about the amount of debt owed

15  to NBK.

16  Q     At your very first meeting with NBK, they told you that

17  they wanted to auction the property immediately, right?

18  A     I don't know if they said it that clearly.  My

19  impression from the first meeting was that, yes, they wanted

20  to foreclose essentially and have an auction.

21  Q     And can you explain why they didn't cooperate with the

22  cash collateral for six weeks after you got appointed?

23          MR. FITZMAURICE:  Objection, Your Honor.  Sorry.

24  Apologies.  Objection, Your Honor, lacks foundation, assumes

25  facts not in evidence.

```
 1              THE COURT:  All right.  I'll sustain the objection

 2    just to foundation.

 3    BY MR. CHOUDHURI:

 4    Q    Mr. Murray, do you recall having a meeting with me on

 5    March 13, 2024?

 6    A    I don't know the specific date.  We met a few times at

 7    least.

 8    Q    So is there a reason that you did not want to pursue

 9    the lease with Vaxanix?

10    A    Yes.

11    Q    What is that reason?

12    A    Do I need to say them again?  Again, several reasons.

13    Q    Was a specific question about Vaxanix asked earlier?

14    A    He asked about leases generally.  I answered generally.

15    But those reasons all apply in Vaxanix's case.

16    Q    So I just want to make sure my question is clear.

17    There is -- what is the reason you decided not to pursue the

18    lease with Vaxanix?

19    A    I wasn't sure if it was real.  I had been advised that

20    a serious tenant who was creditworthy and sophisticated

21    would never present such a lease.  There was not immediate

22    payment of cash into that lease.  You didn't tell me whether

23    you were going to get a fee for presenting the lease to me,

24    and I asked you as broker.  So I was concerned that there

25    would be a claim by you against the estate if I took the
```

1    lease.  I was also concerned that, failing that, there would

2    be another broker with their hand out for a fee.  I thought

3    it might be disruptive to a sale process to sign up a new

4    lessee.  Oh, that's one I forgot to mention before.  Let's

5    see.  Cash out of pocket costs, disruption of the process,

6    tenant probably not real.  Oh, and that party never reached

7    out to me directly.  I only ever heard of them through you

8    and then Faisal, who I spoke with about it.  But you made

9    that introduction that day.

10   Q    Did he ask you for an SNDA?

11   A    He did, yeah.  I think he mentioned that the tenant

12   would need an SNDA.  That's my recollection.

13   Q    And do you recall what you said?

14   A    I think I said the bank would never give him one.

15   Q    You said the bank would never give him one?

16   A    I'm pretty sure it was my -- yeah, I think it was my

17   understanding at the time that the bank was not going to

18   subordinate to a new lessee when they wanted to auction and

19   foreclose on the building.

20   Q    Now you were not at the deposition of Michael Carter --

21   A    No.

22   Q    -- on June the 5th, right?

23   A    No.

24        MR. CHOUDHURI:  Your Honor, may I move to admit

25   the deposition of Michael Carter?  Is there any objection to

1    that?

2              MR. TROOP:  What's the ECF number?

3              MR. CHOUDHURI:  It's attached as an exhibit.  It's

4    attached to the motion to compel, and it's an exhibit.  It

5    is a rough draft, Your Honor, but we did just today receive

6    a final copy.

7              THE COURT:  It's still going to have an ECF

8    number, even it's got to be exhibit.  So I just need to know

9    what the ECF number is.

10             MR. CHOUDHURI:  Yes, sir.

11             MR. SATHER:  499-22.

12             MR. CHOUDHURI:  Thank you.

13             THE COURT:  Again, Mr. Sather?  What?

14             MR. SATHER:  499-22.

15             THE COURT:  Any objection to 499-22?

16             MR. FITZMAURICE:  There is, Your Honor.

17             THE COURT:  Go ahead, ask -- go ahead.

18             MR. FITZMAURICE:  Mr. Carter is here.  Mr.

19    Choudhri -- he already testified today.  Mr. Choudhri could

20    have asked him then any questions that he wanted to ask.

21             THE COURT:  I'll sustain the objection of NBK to

22    the admission of the deposition.  Thank you.

23             MR. CHOUDHURI:  So Your Honor, may I then recall

24    Mr. Carter after I'm done because of the --

25             THE COURT:  You're going to have a chance to

1     present your evidence.  But let's ask questions of this

2     witness, please.  Thank you.

3            MR. CHOUDHURI:  Yes, Your Honor.

4     BY MR. CHOUDHURI:

5     Q    So Mr. Murray, did you have conversations --

6     A    When?

7     Q    Did you or your counsel have conversations with Baker

8     Botts, Tom Phillips, Justice Tom Phillips?

9            MR. FITZMAURICE:  Objection, relevance.

10           THE COURT:  What's the relevance?

11           MR. CHOUDHURI:  Your Honor, It goes to the fact

12    that there are assets of the estate and monies being offered

13    to either prosecute those claims or sell those claims that

14    can be used to stabilize the asset of the building so the

15    building can then be sold for a lot more money than a fire

16    sale and a value destroying sale.

17           MR. FITZMAURICE:  That sounds at best like a

18    confirmation issue, Judge, as opposed to whether or not the

19    bank can credit bid.

20           THE COURT:  I agree.  I mean it's an objection to

21    confirmation.  It's not credit bidding.

22    BY MR. CHOUDHURI:

23    Q    Do you recall having a conversation with me, Melissa

24    Hayward, Jim Wetwiska, Jerry Alexander, R.J. Shannon and

25    Kyung Lee on February 20th?

1    A    Oh, your memory of that's better than mine.  I think

2    that was a Zoom meeting.

3    Q    Right.  Do you recall that?

4    A    Yeah.

5    Q    And do you recall at that meeting an assurance was made

6    by you and Mr. Lee that we will not do a sale if there is no

7    limit to a credit bid?

8    A    I don't remember saying that.

9    Q    Do you remember having any conversations with the Bank

10   of Kuwait saying that if we don't limit the credit bid, it

11   would affect the marketing and the sale of the building?

12   A    I did -- I do remember those discussions, yes.

13   Q    And what is the reason that the trustee decided to move

14   forward with an option without a limit to the credit bid?

15   A    Because while a cap on the credit bid, I think, would

16   encourage more bidding, I don't think a lack of a cap on the

17   credit bid is fatal to bidding and I think an auction is

18   still in the estate's best interest, especially given that

19   there's no other alternative that was viable then or now.

20   Q    So earlier you just testified that NBK would not do an

21   SNDA, right?

22        MR. FITZMAURICE:  Objection, misstates the

23   witness' testimony.

24        THE COURT:  I'll sustain the objection.

25   BY MR. CHOUDHURI:

1    Q    Did you present any leases to NBK since your

2    appointment?

3    A    Me, personally?  No.

4    Q    You or your representative?

5    A    Yeah.  My attorneys had copies of the leases.  I know

6    they talked to the bank's lawyers.  I don't know if they

7    shared or showed those leases to them.  The bank's probably

8    seen them in discovery since then.  But I did not personally

9    present a lease to the bank for their approval.

10   Q    Do you think you needed the bank's approval?

11   A    Yes.

12   Q    But you chose not to present them any leases?

13   A    Yep.

14   Q    Can you explain why?

15   A    Mr. Choudhri, again?

16   Q    I just want to know, please.  If you could just explain

17   why you did present any leases to the bank for approval.

18   A    I did not believe it was in the estate's best interest

19   to enter into those leases.  So there was no need to ask the

20   bank's approval.

21   Q    And everything you're testifying today is truthful here

22   under oath, correct?

23   A    Yes.

24   Q    Do you remember having a conversation where I was --

25   let me back up.  Did you look into who Vaxanix is?

1    A    No.

2    Q    So you didn't look into who Vaxanix is at all?

3    A    No.  You told me a lot of things about them and the

4    Dole family backing them and things like that.  But no, I

5    did not research who they were.

6    Q    So did you receive terms with specific terms, amount

7    per foot, how many years for the Vaxanix lease?

8    A    You forwarded me an email with I think those terms and

9    only those terms.  And I said, that's not enough to go on,

10   get me a lease.  And it was sometime later you gave me a

11   lease.

12   Q    And so what did you do about the lease when you got the

13   lease?

14   A    By then I was pretty sure it was not a real offer.

15   Q    But you gave the representative of Vaxanix your phone

16   number, right?  He asked for your phone number at the

17   meeting on February 24th.

18   A    He did.

19   Q    And you gave him your phone number?

20   A    I did.

21   Q    And can you explain why you decided not to follow up

22   with him and pursue to see if this lease was real or not,

23   that's backed by the company that's owned by the Dole

24   family?

25   A    Well, this might be something where my recollection is

1    a little stronger than yours.  We had that meeting very

2    early on in the process.  It was more than a month later

3    that I got the email with the terms.  And it was some time

4    after that that you gave me the lease with all the terms in

5    it and my thinking about whether something presented by you

6    as an offer with respect to the building, my faith in that

7    declined substantially during that time period to where by

8    the time I got the lease from you, I was pretty sure it

9    wasn't worth reading.

10   Q    Why such hostility, Mr. Murray, towards me?

11          MR. FITZMAURICE:  Objection.  Objection, Your

12   Honor, argumentative.

13          THE COURT:  I'll sustain the objection.  You can't

14   argue with the witness.

15   BY MR. CHOUDHURI:

16   Q    Mr. Murray, did you read the June 31st transcript?

17   January 31 transcript, which was the motion to convert this

18   case when the Chapter 11 trustee was appointed.

19   A    Did I read the transcript?  No, I listened to the

20   audio, I think.  Yeah.  I did review that hearing, if that's

21   your question.

22   Q    Did you get any data from me or did you do any

23   investigation on who Vaxanix is whatsoever?

24          MR. FITZMAURICE:  Objection, Your Honor, asked and

25   answered.

```
 1              THE COURT:  I'll sustain the objection.  Don't be
 2   repetitive, Mr. Choudhri.
 3   BY MR. CHOUDHURI:
 4   Q    Do you know who IWG is?
 5   A    No.
 6   Q    International Workgroup, also a subsidiary
 7   (indiscernible) Regus.
 8              MR. FITZMAURICE:  So objection, Your Honor, lacks
 9   foundation.
10              THE COURT:  I'll sustain the objection.
11   BY MR. CHOUDHURI:
12   Q    Did you receive offers to sell the claim against the
13   Bank of Kuwait?
14   A    Yes.
15   Q    How many?
16   A    Two or three or four.  A few.
17   Q    And what did you do with them?
18              MR. FITZMAURICE:  So objection, Your Honor.  These
19   again sound like confirmation issues, not whether the bank
20   should be allowed to credit bid.
21              THE COURT:  What's the relevance to credit
22   bidding?
23              MR. CHOUDHURI:  Your Honor (indiscernible) that
24   the position of to not pursue or sell the claim, not pursue
25   or sell them the biggest asset of the estate, which is a
```

1   claim against the Bank of Kuwait because there's an

2   agreement to pay unlimited admin expenses and there's an

3   agreement where the trustee gets a significant commission on

4   a sale versus reorganizing the asset and the emails as I --

5            THE COURT:  That all sounds like plan confirmation

6   to me.  It doesn't sound anything at all like credit

7   bidding.  I'll sustain the objection.  Thank you.

8   BY MR. CHOUDHURI:

9   Q    Mr. Murray, did you tell Hilco not to communicate with

10  me?

11  A    No.

12  Q    So if there's emails to that effect, you would dispute

13  that?

14           MR. FITZMAURICE:  Objection, Your Honor, lacks

15  foundation.  If there are emails, let's look at them.

16           THE COURT:  I'll sustain the objection.  Thank

17  you.

18  BY MR. CHOUDHURI:

19  Q    Mr. Murray, did NBK delay providing you support or

20  approval or information you needed to get a cash collateral

21  order approved in this case?

22  A    Could you rephrase it?  I'm not sure what you're

23  asking.

24  Q    Did NBK drag their feet in getting you approval or

25  cooperation to come to court and get a cash collateral order

1    in this case?

2    A    I don't know if they dragged their feet.  I wanted it

3    faster.  It didn't happen faster, but it did happen.

4    Q    Did you tell me that you wanted to abandon the

5    building?

6    A    I think in our discussions I said that was a

7    possibility, that if the bank were not going to let me use

8    cash collateral, that's what I would have to do.

9    Q    And Mr. Murray, you recall that -- hang on.  So Mr.

10   Murray, the first time we met was on a Sunday, right?

11   A    I think so.

12   Q    And I texted you that I'm available for you 24/7?

13   A    Yes, several times.  Yeah.

14   Q    And on Monday, you had a meeting with our accountants,

15   Bob Norris.  Do you recall that?

16   A    I --

17            MR. FITZMAURICE:  So again, Your Honor, objection

18   to the bank's ability to credit bid at the auction tomorrow.

19            THE COURT:  What's the relevance?

20            MR. CHOUDHURI:  Your Honor, I'm getting there.

21            THE COURT:  Well, I know you want to get there,

22   but my question to you is, what is the relevance?  Because

23   if you can't explain it to me, then I'm going to cut you

24   off.  Okay.  What's the relevance to credit bidding, which

25   is what we're here for right now?

1          MR. CHOUDHURI:  Your Honor, the relevance is that

2     the bank has basically enlisted in allowing the trustee to

3     only help them versus all the creditors and other creditors.

4          THE COURT:  That'd be great if you pled that in

5     your pleading, but you never said anything along those

6     lines.  And you don't get to come in here and do trial by

7     ambush and just raise issues that weren't pled.  So move on.

8     Thank you.

9     BY MR. CHOUDHURI:

10    Q    Mr. Murray, when was a decision made to hire JLL?

11    A    I don't remember when.

12    Q    When was the decision made to sell the building and not

13    lease it up?

14    A    As soon as it was clear NBK was going to commit to use

15    cash collateral and pursue fund an auction process, that's

16    when I decided to -- that was the most likely outcome.

17    Q    Did you receive an offer from QB Loop Property?

18    A    Yes.

19    Q    Did you have a Zoom call with Mr. Anwar Qadeer?

20    A    I don't remember if it was Zoom.  I know I was on the

21    phone with him at one point.

22    Q    And there was an offer made to buy the claims.

23         MR. FITZMAURICE:  Your Honor, Mr. Murray doesn't

24    need my help, but the same objection with respect to the

25    relevance to credit bidding.

1          THE COURT:  Again, what does this have to do with

2    credit bidding?  And I understand these are all potentially

3    valid issues you might raise at plan confirmation, but as

4    far as credit bidding, I don't see the relevance.

5          MR. CHOUDHURI:  (indiscernible)

6          THE COURT:  Mr. Choudhri, okay, so again, we're

7    back to where we were before.  Okay.  I'm not going to let

8    you ask repeated questions where you get overruled on

9    objections, okay, or where I sustain objections based on

10   questions that don't have any relevance to do with credit

11   bidding.  So move along.  I'll give you a little bit more

12   leeway, but then I'm going to ask you to sit back down

13   again.  Okay.

14   BY MR. CHOUDHURI:

15   Q    Would you agree with me if the building was more leased

16   up, it would be more valuable?

17   A    No.

18   Q    The building would not be more valuable if it was

19   leased up?

20   A    My only choices are yes and no.  No, I don't know that

21   that's necessarily the case.

22   Q    Have you hired an appraiser?

23   A    No.

24   Q    Did you represent to me in Feb. and the lawyers for the

25   debtor 2425 that you were going to hire an appraiser?

1   A     I don't even remember if we discussed that.

2   Q     And R.J. Shannon and Kyung Lee are your lawyers,

3   correct?

4   A     Yes.

5   Q     And they represent you and what they say and they speak

6   on your behalf, when they speak on behalf of the trustee,

7   correct?

8   A     I would hope so, yes.

9   Q     And you endorse what they do and what they say in

10   representing you, correct?

11          MR. FITZMAURICE:  Your Honor, again, relevance to

12   the bank's credit bidding tomorrow at the auction.

13          THE COURT:  Again, what is the relevance, Mr.

14   Choudhri?

15          MR. CHOUDHURI:  The relevance, Your Honor, is I

16   have testimony from Mr. Carter and now testimony from Mr.

17   Murray that is completely inconsistent with the

18   communications with the bank and R.J. Shannon and Kyung Lee

19   on their motivations of really what they want to do, and --

20          THE COURT:  But what does it have to do with

21   credit bidding?

22          MR. CHOUDHURI:  Well, because they talk about

23   credit bidding in those communications.

24          THE COURT:  Okay.  I'm going to sustain the

25   objection and give you a little more leeway.  Ask your next

1    question.  Thank you.

2    BY MR. CHOUDHURI:

3    Q    Mr. Murray, is there a reason that you would not

4    support the bank accepting the $26 million that's spelled

5    out in the settlement agreement?

6              MR. FITZMAURICE:  Objection, Your Honor, lacks

7    foundation.

8              THE COURT:  I'll sustain the objection.  Thank

9    you.

10   BY MR. CHOUDHURI:

11   Q    Are you aware that your attorneys, you or your

12   attorneys had a conversation with Jim Wetwiska and Jerry

13   Alexander relating to the lender liability claims in this

14   case?

15             MR. FITZMAURICE:  Objection, Your Honor, hearsay.

16   But also, what is the relevance to the credit bidding by the

17   bank tomorrow.

18             THE COURT:  I'll sustain the objection as to

19   hearsay, even though I do think it's relevance.  Go ahead.

20   BY MR. CHOUDHURI:

21   Q    Mr. Murray, you filed a report to court about the

22   status of the auction.  Do you recall that?

23   A    Yes.

24   Q    And what is the current status as we sit here today?

25   A    The current status is that I have received one

1    conforming bid.  No, two conforming bids, one of which has

2    funded escrow.

3    Q    And that one is QB Loop Property?

4    A    Yes.

5    Q    Which is the same offer that you received through me

6    back in April?

7    A    Yeah, I think you sent me an offer from them.

8    Q    March or April.  And so, as we sit here today, on June

9    the 17th, at 3:42 p.m., you have received one conforming

10   offer, correct?

11   A    Two conforming bids, one that funded.

12   Q    And the funding deadline was 5:00 p.m.?

13   A    Right.  So yeah, one conforming --

14   Q    So just so we're all clear, so on June the 14th,

15   there's a bid deadline of 5:00 p.m.

16   A    Yes.

17   Q    And by 5:00 p.m., pursuant to your sale procedure

18   motion that the Honorable Judge Norman has signed, the

19   deadline to make a multimillion dollar deposit was 5:00

20   p.m., Friday, June the 14th, correct?

21   A    Yes.

22   Q    And that has only been done by one bidder.

23   A    Still yes.

24   Q    And that is QB Loop Property, the general partner being

25   Anwar Qadeer.

1              MR. FITZMAURICE:  So Your Honor, lacks foundation

2     as to the general partner portion of that.  The rest has

3     been asked and answered three times.

4              THE COURT:  I'll sustain the objection as to the

5     general partner position.

6     BY MR. CHOUDHURI:

7     Q     The representative is Anwar Qadeer.

8     A     I spoke with him.  The representative now is –– they

9     have a lawyer that counsels them.

10    Q     Simon Mayer.

11    A     Yes.

12    Q     Right.  With Locke Lord, correct?

13    A     Mm-hmm.

14    Q     And you're aware that the offer acceptance –– Hilco

15    told you –– tell me if this is true or false.  Did you

16    represent to me that Hilco said they needed at least four

17    months to market this building?

18    A     No.

19    Q     So you never said Hilco thinks it's going to be four

20    months at least to market this building?  Something like

21    that never was made ––

22    A     I don't understand the question.

23             MR. FITZMAURICE:  Objection, Your Hono, asked

24    answer.

25             THE WITNESS:  Oh, I'm sorry.

1          THE COURT:  I'm sorry.  I missed it.  You said it

2     so quickly, I didn't catch it.

3          MR. FITZMAURICE:  I apologize, Your Honor.  The

4     objection is asked and answered.

5          THE COURT:  I'll sustain the objection.  Thank

6     you.

7     BY MR. CHOUDHURI:

8     Q    Have you gotten a feasibility study on the building?

9     A    I don't know what that means.

10    Q    So what experience do you, Chris Murray, have in

11    running and stabilizing or selling office buildings?

12         MR. FITZMAURICE:  So objection, Your Honor, again,

13    relevance to the bank's --

14         THE COURT:  Yeah.  What's the relevance to credit

15    bidding?

16         MR. CHOUDHURI:  Your Honor, as I go through the

17    evidence I'm about to get through, it's going to show that

18    the bank is basically -- the trustee is supporting only one

19    creditor versus all the other creditors because they have

20    unlimited admin expense that the bank has agreed to pay.

21    And so the bank has designed this so that the sale is really

22    a legitimization of them winning the bid and credit bidding.

23    There's all kinds of bad faith that have taken place that

24    have been completely ignored and not pursued.

25         THE COURT:  I'll let you respond to that.

1          MR. FITZMAURICE:  Sure.  So there's no truth to

2    any of that.  There's no actual evidence anywhere of -- I

3    think the claim is that the bank has agreed to pay an

4    unlimited amount of administrative expenses.  I don't want

5    to tell Mr. Choudhri how to do the job he's trying to do.

6    That's maybe a question that could be asked, but the rest of

7    this is not.  Again, at best would be confirmation.  It's

8    not related to the --

9          THE COURT:  I'll sustain the objection.

10         Go ahead, Mr. Choudhri.

11   BY MR. CHOUDHURI:

12   Q    Mr. Murray, I asked you earlier if you knew who IWG was

13   and your answer is you don't know or you know or --

14   A    I don't know.  The name rings a bell, but I don't know.

15   Q    Have you heard of the company called Regus?

16   A    The office space, the temporary rentals?  Yeah.

17   Q    And so Regus is a publicly traded company.  You're

18   aware of that?

19   A    Yes.

20   Q    Have you investigated the creditworthiness of IWG,

21   which is the parent company of Regus?

22         MR. FITZMAURICE:  Objection, Your Honor, lacks

23   foundation to the corporate relationship.

24         THE COURT:  I'll sustain the objection.

25         THE WITNESS:  No, I haven't.

1   BY MR. CHOUDHURI:

2   Q    Are you aware of a full floor lease on the second floor

3   with a company called Hunan, HST, I think?

4   A    No.

5   Q    How many of these leases that you were provided have

6   you reviewed, Mr. Murray?

7   A    There were probably a dozen or more documents that said

8   lease on them that I reviewed at one time or another.

9   Q    But you didn't bother to pursue them because it came

10   from me; is that fair?

11        MR. FITZMAURICE:  Objection, Your Honor, asked and

12   answered.

13        THE COURT:  I'll sustain the objection.  Thank

14   you.

15   BY MR. CHOUDHURI:

16   Q    And you chose not to pursue these leases?  I think

17   you've answered that earlier, but I just want to make sure

18   the record is clear.  You chose not to pursue these leases?

19        MR. FITZMAURICE:  Your Honor, the record is clear.

20   The question has been asked and answered.

21        THE COURT:  I'll sustain the objection.  Thank

22   you.

23   BY MR. CHOUDHURI:

24   Q    Mr. Murray, is there a reason that you stopped

25   responding to my emails?

1   A    Yes.

2   Q    And what was that?

3   A    I didn't think I could trust things you were telling

4   me.  I said you could communicate with me as long as you

5   copied your own counsel and my counsel.  And you did that

6   for a time and then you stopped.

7   Q    Were you upset that I cross-examined you at the final

8   cash collateral -- or the cash collateral hearing?

9   A    No.

10       MR. FITZMAURICE:  Your Honor -- well, never mind.

11   I'll withdraw.

12       THE COURT:  Okay.

13   BY MR. CHOUDHURI:

14   Q    Do you know who Edna Castillo is?

15   A    No.

16   Q    Are you aware that Hilco is marketing the building with

17   the furniture?

18       MR. FITZMAURICE:  Objection, Your Honor, lacks

19   foundation.  Also relevance to the bank's credit bid

20   tomorrow.

21       THE COURT:  I'll sustain the objection.  Thank

22   you.

23   BY MR. CHOUDHURI:

24   Q    Does any bid, including a credit bid, include the

25   furniture that's in the building?

1          MR. FITZMAURICE:  Objection, Your Honor.  I think

2     the issue for today is the bank's entitlement to credit bid

3     at all, not what assets --

4          THE COURT:  I'll sustain the objection.  Again,

5     Mr. Choudhri, you're again back on very, very thin ground.

6     I'm interested in the issues that relate to credit bidding,

7     and that's the only thing I'm really interested in now.  And

8     you have this pattern of asking questions that basically

9     have no rational basis to the motion that's before the

10    court.  And again, I'm going to give you a little bit of

11    leeway, but I'm going to cut you off.

12         MR. SATHER:  Your Honor, we lost the --

13         THE COURT:  Because you didn't ask to project and

14    I took it down because it was just sitting on the screen.

15    So if you want to project something, I'm happy to give you

16    the control back again.

17         MR. CHOUDHURI:  Your Honor, may I project, please?

18    BY MR. CHOUDHURI:

19    Q    Mr. Murray, is this your email --

20         MR. FITZMAURICE:  Your Honor --

21    BY MR. CHOUDHURI:

22    Q    Is this your email address?

23         MR. FITZMAURICE:  Your Honor, objection.  Without

24    knowing if this is an exhibit that's on the list, if it's

25    been filed, it has ECF reference or has otherwise been

1    provided before --

2           THE COURT:  Do you we where it is on the record?

3    BY MR. CHOUDHURI:

4    Q    Mr. Murray, who -- you were appointed on February the

5    9th, correct?  This year?

6    A    That sounds right.

7    Q    And which third parties did you engage in this

8    transaction?

9           MR. FITZMAURICE:  Objection, Your Honor, relevance

10   to the bank's credit bid tomorrow at the auction.

11          THE COURT:  Again, Mr. Choudhri, what's the

12   relevance to credit bidding?

13          MR. CHOUDHURI:  Your Honor, it goes to when he

14   testifies earlier that he needs the bank's approval to do

15   leases and there's no -- and then the bank testifies that

16   they've received no leases, and he's saying he needs the

17   bank's approval to do leases and the value --

18          THE COURT:  That has absolutely nothing with

19   credit bidding.  Absolutely nothing.  All right.  So again,

20   I'm going to sustain their objection and give you just a

21   little bit more leeway before you hang yourself and I tell

22   you to sit back down.

23          MR. CHOUDHURI:  I'm trying to connect --

24          THE COURT:  I turned you off because you're not

25   projecting anything that's admissible.  I'll turn you back

```
 1   on, but if you want to put something in evidence, you're
 2   free to do so, but I'm just not going to let you project
 3   forever.
 4   BY MR. CHOUDHURI:
 5   Q    Are you supportive of the bank's credit bid?
 6             MR. FITZMAURICE:  So -- well, withdrawn.
 7             THE WITNESS:  Yes.
 8             THE COURT:  Then I ask the question, then why is
 9   that?
10             THE WITNESS:  Well, I'm supportive of any bid in
11   an auction.  I would love to sell the building.
12             THE COURT:  All right.  Thank you.
13             Go ahead.
14   BY MR. CHOUDHURI:
15   Q    Can you explain to me, so there's a sale motion and
16   there's a bid procedure.  And the bid procedure says the
17   minimum credit bid is $18,600,000, correct?
18   A    That's -- no, no.  I don't think any of that's right.
19   Q    I'm sorry.  Stalking horse.
20   A    Still no.  There's bidding procedures.  There's a
21   stalking horse bid and that included a credit bid.
22   Q    Stalking horse bid is $18,600,000, correct?
23   A    Yes.  I think that's right.
24   Q    And then it says, any additional bids above that are
25   $250,000 increments?
```

1    A    The bid increment is $250,000, yes, if I recall.

2    Q    So $18,600,000 will be the first bid.  And under that

3    process, there is no fee or commission to the trustee,

4    correct?

5    A    No, that's incorrect.

6    Q    There is a commission to the trustee on a credit bid?

7    A    Well, your question's not as simple as that.  There

8    would be a commission on disbursements in the case.  I don't

9    believe that a credit bid is a constructive disbursement

10   under the case law, but that doesn't mean that there

11   wouldn't be other monies flowing in connection with the sale

12   of the stalking horse price that would result in a

13   commission.

14   Q    So as I understand it as we sit here today, the minimum

15   credit -- the minimum bid right now on the stalking horse is

16   $18,600,000 and the next bid is $18,850,000 which would be

17   $250,000 more, which is what Judge Norman approved.

18   A    No.  The way you're describing it is unclear and I'm

19   not sure it's accurate.  Could you maybe ask again?

20   Q    So when I reviewed the civil motion, the civil -- the

21   bid procedures, which incorporates, which has an element of

22   credit bid embedded in it, it states that the minimum

23   stalking horse bid is $18,600,000 and the next bid is

24   $250,000.  There's a definition called minimum overbid.  So

25   the next bid up is $250,000 above $18.6.

1   Q    There's a minimum incremental overbid of $250,000 in

2   the bid procedures.  Yes, that's right.

3   Q    So the next bid would be $18,850,000.

4   A    Yes, I suppose.  18.6 plus 250, that math is correct.

5   Q    So can you explain to me --

6        MR. CHOUDHURI:  There's an exhibit, Mr. Sather, if

7   you could pull up the Hilco.  It's in -- I believe it's in

8   one of the exhibits, and I could pull it up.

9   BY MR. CHOUDHURI:

10  Q    Can you explain to me why -- now, you've hired Hilco,

11  correct?

12  A    Yes.

13  Q    And Hilco is marketing the building at your instruction

14  and direction?

15  A    Yes.

16  Q    And so the information they're giving to the market

17  based on credit bids, based on what somebody's buying, that

18  information is -- you're the source of that information?

19  A    Yeah.  I don't hear everything they say to everybody,

20  but yes, I'm the source of the information and the marketing

21  of the building and (indiscernible) --

22  Q    And can you explain to me why the minimum bid that's

23  being marketed to the public is $19,750,000?

24  A    Yes.

25  Q    Please explain.

Page 270

1    A    The minimum bid -- the minimum cash bid above the

2    stalking horse credit bid for it to still be as worthwhile

3    to the unsecured creditors is higher than just the 250

4    increment.  And it's higher because, in a cash bid scenario,

5    multiple things change.  One of them is that Hilco's

6    commission goes up and that will require more cash.  That's

7    cash that would otherwise have flowed to creditors.  There

8    might also be incremental admins which the bank would cover,

9    but that would come out of cash of the credit bid in that

10   situation.  Also, in a cash bid scenario, I believe that

11   money would be part of the trustee's commission and that

12   would increase the administrative expense there.  So the

13   difference between the minimum overbid and the stalking

14   horse bid accounts for that incremental admin expense that

15   happens when I take cash instead of a credit bid.  And that

16   has to be higher, because if it weren't, creditors would be

17   worse off on the cash bid as opposed to the nominal amount

18   of the credit bid.

19   Q    So as we sit here today, the credit bid is 18.6 by the

20   Bank of Kuwait.

21   A    Yes.

22   Q    Other than the QB Loop Property making a bid?

23        MR. FITZMAURICE:  I think objection, vague as

24   to --

25        THE COURT:  Be more specific in your question, Mr.

1    Choudhri.

2          MR. CHOUDHURI:  Yes, sir.

3    BY MR. CHOUDHURI:

4    Q    So as we sit here today, the bid by the National Bank

5    of Kuwait is $18,600,000.  And the next bid that's there is

6    by QB Loop Property.

7    A    There is also a bid by QB Loop Property.

8    Q    And that's the only qualified bid that is conforming.

9          MR. FITZMAURICE:  So objection, Your Honor.  I

10   think it mischaracterizes the record.  I would suggest the

11   bank's bid is a qualified bid that's conforming under the

12   court's order.

13         MR. CHOUDHURI:  You're right.  He's right.

14         THE COURT:  Okay.

15   BY MR. CHOUDHURI:

16   Q    So outside the bank's bid, that's the only qualified

17   conforming bid is the bid from QB Loop Property.

18   A    Right.  The only bid that funded.  And yeah, the bank

19   is by definition a qualified bid.  So yeah, I guess there's

20   two.

21         MR. CHOUDHURI:  Your Honor, may I -- I want to

22   show an exhibit to the court.

23   BY MR. CHOUDHURI:

24   Q    Does this look familiar to you, Mr. Murray?

25   A    Yes.

1    Q    And so we're talking about this here.  The minimum

2    overbid $19,750,000.  But that's not -- nobody's offered

3    $19,750,000 or anything above 18.6.  Let me back up.  That's

4    a bad question.  So the stalking horse bid is $18,600,000.

5    And this is the brochure that Hilco is presenting to the

6    public, correct?

7    A    Yes.

8    Q    It says the minimum overbid before anybody else's bid

9    is $19,750,000.

10   A    Yes.

11   Q    Does that conform with Judge Norman's sale motion order

12   in the bankruptcy --

13   A    Yes.

14   Q    It does?

15   A    Yes.

16   Q    So that $250,000 from 18.6 to $19.750, there's no other

17   bidders that have made those bids?

18   A    No.  Both things can be true.  The minimum increment

19   can be 250 and the minimum cash overbid that, in my

20   judgment, would be enough to provide the same benefit to

21   creditors as the bank's nominal credit bid, those can be

22   different numbers, and they are.

23   Q    I'm just confused.  So who's bid $19.750?

24   A    No one has.

25   Q    So why is the minimum overbid $19.750 when the sale

1    motion says 18.6 and 250 incremental bids above it?

2    A    I can try to explain it again.

3    Q    Because I don't understand it.  I'm sorry.  I've tried

4    to understand it.  I'm not understanding it.  So if you can

5    explain it.

6          THE COURT:  One more time, and then I'll cut him

7    off.  Go ahead.  Tell him again.  I understand why it is,

8    but go ahead.

9          THE WITNESS:  Okay.  A cash bid creates additional

10   admin expenses for the estate that a credit bid does not.

11   That is money that would otherwise go to unsecured

12   creditors.  So in order for unsecured creditors to do as

13   well as they would under the nominal credit bid, the cash

14   bid has to be substantially higher.  I made an attempt to

15   estimate how much higher.  That's what I came up with.

16   BY MR. CHOUDHURI:

17   Q    Mr. Murray, you and I have texted, correct?

18   A    Yeah.

19   Q    Do you recall telling me that you believe what the bank

20   wanted to do was have a value destroying auction?  Did you

21   ever use the word value destroying auction?

22   A    I don't know.  I don't know.  I don't know the context

23   of what you're talking about.

24   Q    When we had a discussion about leasing up the building,

25   you represented to me that the bank does not want a lease of

1   the building because it'll give you an opportunity to add

2   more value.

3   A    I recall talking with you about what I assumed the bank

4   might want or not want.  But I don't speak for the bank.

5   Q    Right.  So the last appraisal on the property that

6   you've seen or the bank has completed, as far as your

7   knowledge, is June 2023.

8   A    I really don't remember the dates of the appraisals.

9   Q    But you've never gotten an appraisal?

10  A    Right.  I have not.

11  Q    Is there any reason why you decided not to get an

12  appraisal?

13  A    They cost money.  I didn't want to spend it.  And if

14  we're having an auction, that's better than an appraisal in

15  terms of finding out money that I can get for an asset.

16  Q    So have you reviewed the appraisal, the (indiscernible)

17  appraisal that the bank has?

18         MR. FITZMAURICE:  Objection, Your Honor, lacks

19  foundation.  But also relevance to the credit bid.

20         THE COURT:  I'll sustain the objection as to

21  relevance.

22  BY MR. CHOUDHURI:

23  Q    Mr. Murray, was there any reason that you decided not

24  to reorganize the debtor?

25  A    In a sense, I am.  I don't know what you mean.  You

1  mean to continue operating -- well, I'll let you ask the

2  question.

3  Q    Has the bank agreed to give you -- to put no limit on

4  the admin expenses in this case?

5  A    Yes.  Yes.

6  Q    So there's no limit?  Open checkbook?

7  A    There might be some structural limits in the way the

8  plan is made, but my understanding is they're going to cover

9  with additional cash if necessary, all approved admins under

10 the plan.

11 Q    So when I ask what are the admin expenses so I can

12 maybe make a better deal, a better offer to help and if the

13 answer is it's not relevant, we're not going to tell you

14 because it's unlimited, do you think that's reasonable and

15 that's sound judgment, to not allow others to have an

16 opportunity?

17      MR. FITZMAURICE:  So objection, Your Honor,

18 assumes facts not in evidence.  I think it mischaracterizes

19 the witness' testimony.  It's also not relevant to the

20 credit bidding in question.

21      THE COURT:  I'll sustain the objection.

22 BY MR. CHOUDHURI:

23 Q    Mr. Murray, are you aware that I had a conversation

24 with R.J. Shannon on May 24th regarding takeout financing

25 and having the trustee facilitate and help with takeout

1    financing and exit financing?

2    A    Yeah.  He told me you had a call.

3    Q    And your desire is to not entertain any takeout

4    financing where the bank is taken out and a new lender is

5    put in?

6    A    I would love that.

7    Q    You would love that?

8    A    Absolutely.

9    Q    So if a new lender comes in and takes out the Bank of

10   Kuwait, you would be in support of that?

11   A    There's a lot --

12         MR. FITZMAURICE:  So Your Honor, again, relevance

13   to whether the bank can credit bid at the auction.

14         THE COURT:  What is the relevance to credit

15   bidding, Mr. Choudhri?  I mean, you're arguing about a plan,

16   but we're not there yet.  We're not going to get there

17   today.  So I need to know where you're going because I have

18   almost reached the point of my limit where I'm just going to

19   simply say no more.  All right.  If you have an issue as to

20   credit bidding with Mr. Murray -- and I'm not sure what Mr.

21   Murray does has anything to do with credit bidding at all,

22   because your complaints really aren't against him.  They're

23   against the bank -- then ask now or forever hold your peace.

24   Okay.

25   BY MR. CHOUDHURI:

1    Q    The sale motion was drafted by the Bank of Kuwait,

2    correct?

3              MR. FITZMAURICE:  Objection, Your Honor, asked and

4    answered.

5              THE COURT:  I'll sustain the objection.  One more

6    question.

7              MR. CHOUDHURI:  I don't recall asking that

8    question.

9              THE COURT:  I do, and that's all that makes the

10   difference.

11             MR. CHOUDHURI:  Okay.

12             THE COURT:  Thank you.

13   BY MR. CHOUDHURI:

14   Q    So as we sit here, since you've been hired, there's

15   nobody engaged, no professional engaged to lease the

16   building, correct?

17             MR. FITZMAURICE:  Objection, Your Honor, asked and

18   answered.

19             THE COURT:  I'll sustain the objection.  You're

20   done, Mr. Choudhri.  Thanks.  Thank you.  Sit down.

21             All right.  Mr. Fitzmaurice, do you have questions

22   of this witness?

23             MR. FITZMAURICE:  Just a couple, Your Honor.

24             THE COURT:  Yeah.  Go ahead.

25                CROSS-EXAMINATION OF CHRISTOPHER MURRAY

1    BY MR. FITZMAURICE:

2    Q    Mr. Murray, are you familiar with the final cash

3    collateral order that was entered in this case?

4    A    Yes.

5    Q    And the final cash collateral order contains

6    stipulations between the estate on the one hand and the bank

7    on the other; is that right?

8    A    Yes.

9    Q    And the final cash collateral order provides that if

10   you as trustee don't bring a challenge to the validity and

11   amount of the bank's lien by a date that is ten days before

12   for the confirmation hearing, then those stipulations binds

13   the estate and all parties in interest; is that right?

14   A    That's my recollection.

15   Q    Okay, and did you bring a challenge during the

16   challenge period?

17   A    No, I did not.

18   Q    Do you recall that Mr. Choudhri asked you questions

19   about Vaxanix?

20   A    Yes.

21   Q    There was a representative or a lawyer, I think, from

22   Vaxanix named Faisal Shah?

23   A    Yes.

24   Q    Is he a tenant in the building?

25   A    Yes.

1    Q    At 2425 West Loop South?

2    A    Yes.

3    Q    Okay.  Have you ever spoken to someone who actually

4    works for Vaxanix?

5    A    No, other than Mr. Shah, who said he represented them.

6    Q    Yes.

7    A    But no, no one --

8    Q    Mr. Choudhri said that Mr. Shah represented them?

9    A    Mr. Shah said that --

10   Q    Okay.

11   A    -- at a meeting where Mr. Choudhri introduced us.

12   Q    Got it.  During the course of the case, have you had

13   occasion to ask the bank to approve the use of cash

14   collateral?

15   A    Yes.

16   Q    Has the bank ever said no?

17   A    No.  Well, we asked for some things in the initial

18   budget that you did not agree to.  There have been

19   subsequent requests and I don't think you've denied any of

20   those.

21   Q    Thank you.  Thank you very much, Mr. Murray?

22            THE COURT:  Mr. Burks?

23            MR. BURKS:  Yes, Your Honor.  Thank you.  Your

24   Honor, I'm addressing one area.  There was reference to the

25   final order authorizing the trustee to use collateral, cash

1   collateral.  It's Document Number 187.  Question was asked

2   with language different than what's in the order and it was

3   answered inappropriately.  So I would like to put on the

4   screen Document Number 187 so that we can see --

5           THE COURT:  Where are you going to project from?

6   Over there, right?

7           MR. BURKS:  Yes.

8           THE COURT:  Go ahead.

9           MR. BURKS:  Document Number 187, final order

10  authorizing the trustee to use cash collateral.

11          REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

12  BY MR. BURKS:

13  Q    All right.  Sir, do you see it on the screen?

14  A    I do.

15  Q    Let's turn to Page 4, Paragraph 3.

16          MR. BURKS:  Up a little more.  Up a little more,

17  please.  Well, just (indiscernible) --

18          MR. SATHER:  3(a)?

19          MR. BURKS:  3(a) would be the top line and then

20  (indiscernible) all right.  Right there.  Good.

21  BY MR. BURKS:

22  Q    So you were asked a question about that a moment ago.

23  When you answered the question of the affirmative, did you

24  understand the question that was being asked to be not only

25  what your duties were by a certain date, as far as objecting

1    to the NBK note or any defenses to it?

2    A    I'm sorry?

3    Q    Read that -- read that.  I'm going to ask you two

4    questions.  Read that -- read that paragraph yourself,

5    please.  I'm reading it, too.  When you're finished reading,

6    let me know, sir.

7    A    Okay.

8    Q    Did you file any complaint or any pleading challenging

9    the amount of allowance of the NBK claim?

10   A    No.

11   Q    Did you file any complaint or any other pleading

12   seeking to equitably subordinate that claim?

13   A    No.

14   Q    And certainly, would you agree that especially if we

15   have a hearing on June 18th, which the judge has said we

16   are, that the time -- the time, it's more than ten days

17   before a hearing, correct?

18   A    Yes.

19   Q    So you're not bringing any claim?

20   A    I have not brought a claim by the deadline, no.

21   Q    All right.  Now, does it say anywhere in this paragraph

22   that no other party can bring a claim?

23   A    It says what it says.

24   Q    Does it say anywhere in this paragraph that no other

25   party can bring a claim?

1   A    No, I don't see that.

2   Q    Does it say that it concerns just --

3           MR. BURKS:  So Your Honor, at this time I wish the

4   court to take judicial notice of document number -- final

5   order authorizing the trustee, Document Number 187.

6           THE COURT:  I'll take judicial notice of that

7   order.  I signed it.  Thank you.

8           MR. BURKS:  Docket Number 321, order on motion to

9   strike.  Can we have that on the screen, please?

10  BY MR. BURKS:

11  Q    Mr. Murray, I'll give you a chance to read that.  Now

12  this is National Bank of -- an order, National Bank of

13  Kuwait's motion to strike the objection and claim of

14  National Bank of Kuwait.  You didn't file that objection to

15  claim, did you?

16  A    No.

17  Q    Somebody else filed it?

18  A    Yes.

19  Q    And National Bank of Kuwait said, oh, let's move to

20  strike it.

21  A    It looks like they filed a motion to strike.  Yes.

22  Q    Did the say court say that the court disagrees with the

23  argument of NBK that the final cash collateral order gives

24  the exclusive right to object to the claims to the Chapter

25  11 trustee.  Do you see that?

1   A     Yes, sir.  You read that correctly.

2   Q     So is it your position that if somebody else had a

3   problem with the National Bank of Kuwait, you didn't have

4   the duty to step in and make those objections?

5               MR. FITZMAURICE:  Objection, Your Honor.  It

6   mischaracterizes the order, the witness' testimony.  There

7   is no -- there is no argument that Mr. Murray had a duty to

8   do anything.  The question is, what does the cash collateral

9   order provide and what is its impact on creditors based on

10  his decision to act or not act.

11              THE COURT:  I'll let you respond, Mr. Burks.

12              MR. BURKS:  I'm not asking -- I'm not presuming

13  anything.  I'm asking him does he think that he had a duty

14  to object to claims if he disagreed with them or if he could

15  have let somebody else do it.  That's all I'm asking.

16              MR. FITZMAURICE:  Your Honor, it also then calls

17  for a legal conclusion about whether Mr. Murray had a duty

18  to act in a particular circumstance.

19              MR. BURKS:  This is --

20              THE COURT:  I'm going to overrule the objection

21  and let him answer the question.

22              Mr. Burks, go ahead.

23              MR. BURKS:  I don't know -- I don't know if you've

24  tracked the question to begin with, and I sure don't know if

25  you've tracked --

1              THE WITNESS:  I might have lost part of it.

2              MR. BURKS:  Yeah.

3              THE WITNESS:  If you could begin.

4    BY MR. BURKS:

5    Q    Given the plain language of the final cash collateral

6    order, given the judge's order of May 13th, do you view that

7    if you disagree with the claim of National Bank of Kuwait,

8    do you view that you had a duty to object to it?

9    A    I think you're talking about two things.  I'm going to

10   try to answer them both.

11   Q    Thanks.

12   A    I think the cash collateral order said that if I want

13   to bring certain claims or objections, I had a deadline to

14   do it.  I think I had the duty to evaluate whether bringing

15   objections or claims was in the best interest of the estate.

16   I made that determination.  It was no, I didn't file those.

17   I don't know what the order on the motion to strike has to

18   do with that, or how to answer the second part of your

19   question.

20   Q    All right.  Do you think that your failure to bring --

21   your decision not to bring any action against National Bank

22   of Kuwait or within the scope of the cash collateral order,

23   do you think that somehow precludes any other party from

24   being such a claim?

25              MR. FITZMAURICE:  Your Honor, calls for a legal

1    conclusion.

2            THE COURT:  The orders speak for themselves

3    (indiscernible) Mr. Burks, what he thinks really doesn't

4    make any difference.  Thank you.

5            MR. BURKS:  Thank you, Your Honor.  I have no

6    further questions, Judge.

7            THE COURT:  All right.  Mr. Choudhri?  Mr.

8    Choudhri, I warn you that the scope of your examination is

9    limited to Mr. Fitzmaurice's questions and Mr. Burks'

10   questions.

11           MR. CHOUDHURI:  Thank you.

12           THE COURT:  Thank you.

13           REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

14   BY MR. CHOUDHURI:

15   Q    Mr. Murray, I think I understood you to testify earlier

16   that you are pursuing claims against the Bank of Kuwait; is

17   that accurate?

18           MR. FITZMAURICE:  Your Honor, I think that's

19   beyond the scope.

20           THE COURT:  It's outside the scope.

21   BY MR. CHOUDHURI:

22   Q    Were there graphs and documents that you received from

23   the Bank of Kuwait that I asked you for that included credit

24   bid comments that you said you could not provide and you'd

25   have to ask Kyung Lee to provide?  Do you recall that

1    conversation?

2           MR. FITZMAURICE:  So same objection, Your Honor.

3           THE COURT:  Again, Mr. Choudhri, that's totally

4    outside the scope of the two prior examining attorneys.

5    You're limited only to questions or issues that they raised.

6    You don't get another chance at the witness.

7    BY MR. CHOUDHURI:

8    Q    So Mr. Murray, do you believe that you can still bring

9    claims?  Let me back up.  Have you valued the claims against

10   the Bank of Kuwait?

11   A    Yes.

12   Q    And what have you valued them at?

13   A    There's not really a specific number.  I have a sense

14   of a range of value.

15   Q    And what is that range?

16   A    It's below what unsecured creditors are getting under

17   the plan.

18   Q    And what are the unsecured creditors getting under the

19   plan?

20   A    Trade gets 70 percent.  Everybody gets a share in the

21   liquidating trust, which is prefunded with 150 and then

22   whatever the claims fall out to be.  They haven't gone

23   through that process yet.

24   Q    So that's -- so approximately under $400,000.

25   A    The minimum.  Yeah, 388, I think.

1   Q    So $388,000.

2   A    Yeah.

3   Q    And are you aware of an offer that was made for

4   $700,000 cash for claims that the estate owns and holds?

5   Did you receive an offer for $700,000 cash with a cashier's

6   check payable to Chris Murray, trustee and, on the memo,

7   purchase of NBK claims, cashier's check in the amount of

8   $700,000?  Did you receive a copy of the cashier's checking

9   with the offer?

10  A    Was this the one from like a day or so ago?

11  Q    On June the 13th?

12  A    Oh, okay.  Yes.

13  Q    And you rejected that?

14  A    Yes.

15  Q    And what's the reason of rejecting that?

16  A    It's not an apples to apples comparison with the amount

17  of cash the unsecured creditors get.  Also, I'm not sure

18  it's a valid offer.  Also, the last time an entity of yours

19  wanted to buy claims, I said that the proof of funds needed

20  to be the money in the bank in attorney's IOLTA account.

21  That happened, and I sold those claims.  That did not happen

22  this time.

23  Q    Did you receive a copy of the cashier's check?

24  A    I saw an image of what looked like a cashier's check.

25  Q    So if you receive a cashier's check for $700,000 for

1    claims against the Bank of Kuwait or if it was wired into

2    the account versus a cashier's check if the cashier's check

3    isn't good enough, then --

4    A    The money is just one problem.

5    Q    What's the other problem?

6    A    The other problem is, under the bank's plan, unsecured

7    creditors get the cash that I mentioned.  If you buy those

8    claims, I lose the plan and you've withdrawn the only

9    alternative plan.  So I either abandon the asset and we

10   convert and then I take the 700 and I throw it against admin

11   claims which already exceed that amount.  So then there will

12   be nothing for the unsecured creditors.  But are you asking

13   that question as Ali Choudhri personally or as the entity

14   represented by counsel who made the purported offer?

15   Because maybe they're not the same.

16   Q    Right.  I'm asking you if you received an offer to sell

17   the claims which demonstrate there's some value.  These

18   claims have value.  Let me back up.  Did the Bank of Kuwait

19   give you an investigation fund that limited your

20   investigation to only two weeks?

21        MR. FITZMAURICE:  Objection, Your Honor, relevance

22   to the bank's credit bid tomorrow.  We've gone on this path

23   and an adjacent one for a while, but I don't know what the

24   connection is to the --

25        THE COURT:  I'm not sure I see the relevance.

1          Mr. Choudhri, I'll let you argue relevance.

2    BY MR. CHOUDHURI:

3    Q    Is it your understanding that the plan --

4          THE COURT:  Then I'll sustain the objection.

5    Thank you.

6          MR. FITZMAURICE:  Thank you, Your Honor.

7          MR. CHOUDHURI:  Sorry?

8          THE COURT:  Go ahead.

9    BY MR. CHOUDHURI:

10   Q    The plan and the sale of the property is part and

11   parcel -- NBK's plan and the sale of the property is part

12   and parcel.

13         MR. FITZMAURICE:  So objection, Your Honor, I

14   think we dealt with this issue earlier and Your Honor --

15         THE COURT:  I'll sustain the objection.  Thank

16   you.

17   BY MR. CHOUDHURI:

18   Q    So when you say you're pursuing the claims against the

19   bank, are you pursuing the claims against the bank or are

20   you not pursuing the claims as we sit here today?

21         MR. FITZMAURICE:  So Your Honor, objection,

22   compound, but also relevance to the credit bidding.

23         THE COURT:  Again, Mr. Choudhri, where are we

24   headed as it relates to the issue that we're here right now

25   trying to try?  I want to give you every opportunity before

1   I cut you off again for I think what is probably the fifth

2   time for you to make a rational argument as to why I should

3   allow this testimony on a motion to prohibit credit bidding.

4   And I understand you have legitimate concerns about plan

5   confirmation.  We're not at plan confirmation.

6   BY MR. CHOUDHURI:

7   Q     Did you have conversations with Hilco --

8             THE COURT:  No, no.  I need you to respond to me.

9             MR. CHOUDHURI:  Sure.

10            THE COURT:  Because you haven't responded.  You

11   just simply are being silent.  Is there some basis, some

12   rational basis for this to have any relevance to the issue

13   that I'm about to decide?

14            MR. CHOUDHURI:  Your Honor, I believe it goes to

15   motivation --

16            THE COURT:  Motivation for what?

17            MR. CHOUDHURI:  Personal interest of the trustee

18   (indiscernible) --

19            THE COURT:  Which has absolutely -- again has

20   absolutely nothing to do with credit bidding.  Okay, and I

21   don't have to explain that to you.  But it doesn't.  Okay.

22   So move on.  I'll give you a little bit of leeway, but if

23   you go down this road, you're going to be sitting down in

24   like two seconds.

25   BY MR. CHOUDHURI:

1    Q    Did you have discussions with Hilco about credit

2    bidding?

3    A    Yes.

4    Q    Did you have email communications with Hilco about

5    credit bidding?

6    A    I don't remember how we communicated.  It was usually

7    by phone, but I've talked to them about credit bidding.

8    Q    And what was Hilco's perspective about credit bidding?

9    A    In what sense?

10   Q    Would credit bidding deter buyers, motivate buyers or

11   deter buyers?

12   A    I honestly don't remember what they said about it.  My

13   impression from all of that was that the existence of a

14   credit bid might limit sort of the number of people who

15   would also participate.

16   Q    So credit bid basically chills bidders, chills the

17   buyer pool of people who potentially did.

18        MR. FITZMAURICE:  Objection, Your Honor, to the

19   use of the term chilling.  It mischaracterizes the witness'

20   testimony.

21        THE COURT:  I'll overrule the objection.  Go

22   ahead.

23        THE WITNESS:  Yeah.  I mean, all things being

24   equal, it's not as good as not credit bidding.  The same

25   effect happens when somebody with extremely deep pockets

1    shows up at the auction.  You have the risk of being outbid,

2    and then some people might not participate in an auction

3    that they might lose.  So, yeah.

4    BY MR. CHOUDHURI:

5    Q    DO you have a range or assessment of what the property

6    is worth?

7    A    Not really.  I mean, only a very wide range.

8    Q    And what would that wide range be?

9    A    Well, there's a credit bid stalking horse minus other

10   things that have to get paid and that sort of value the

11   building to the estate.  And on the other end, there's

12   whatever I can get at auction.  I don't know what that's

13   going to be.

14   Q    But as we sit here today, there's only one bidder, non-

15   stalking horse bidder at this auction, correct?

16   A    Yes.

17   Q    So would it be fair -- I think you've already answered

18   this.  I think I'm almost done -- that when the public knows

19   there's credit bidding by a bank that has no limitations on

20   that credit bid that -- let me back up.  Do you believe

21   that's a true market test when there's a credit bid that's

22   unlimited?

23            MR. FITZMAURICE:  So --

24            THE WITNESS:  The credit bid's not unlimited.  But

25   yes, I do think it's a fair market test.  I think it's what

1    happens in almost every single bankruptcy case where there's

2    a secured lender willing to participate in a process like

3    this.  It happens all the time.  It's also almost

4    definitionally what a foreclosure is.

5    BY MR. CHOUDHURI:

6    Q    So this auction, is this a foreclosure or is this an

7    auction to determine the market test of the property?

8    A    This is an auction for the property by me.

9    Q    Not a foreclosure?

10   A    That's a state law term.  I was using a colloquial to

11   refer to when a secured lender bids against a property and

12   it's forced to sell.

13   Q    And so is there a possibility, in your opinion, if it's

14   found that the Bank of Kuwait is nonexistent, doesn't have a

15   claim?

16        MR. FITZMAURICE:  So I'm not sure there's a

17   question, Your Honor.  But I feel like it calls for

18   speculation, if there is one.

19        THE COURT:  I think so too, and I'll sustain the

20   objection.

21   BY MR. CHOUDHURI:

22   Q    Mr. Murray, if there was more time to market and sell

23   this property, and if there was someone like CBRE or

24   Transwestern to lease the property, or analyze the leases

25   that you have, if they're valid or good or not, and spend

1   about 60 to 90 days, in your opinion, would that add more

2   value and bring more buyers?

3          MR. FITZMAURICE:  Objection, Your Honor, calls for

4   speculation.  It's also not relevant.

5          THE COURT:  I'll sustain -- I'll sustain the

6   objection as to it's speculation.  Thank you.

7   BY MR. CHOUDHURI:

8   Q   Mr. Murray, if more time is spent marketing the

9   property, would that potentially result in a higher price

10  with more buyers?

11         MR. FITZMAURICE:  Objection, Your Honor, calls for

12  speculation.  Also not relevant to whether or not the bank

13  is entitled to credit bid.

14         THE COURT:  I'll sustain the objection as to

15  relevance.  Again, and if you want to make that argument

16  tomorrow at plan confirmation -- excuse me, on Wednesday at

17  plan confirmation, feel free to.  But it has nothing to do

18  with credit bidding..

19  BY MR. CHOUDHURI:

20  Q   Is there any element of credit bidding in the plan, Mr.

21  Murray?

22         MR. FITZMAURICE:  Objection, Your Honor.  This is

23  -- I mean, the plan, that's a confirmation issue.  We're

24  here about whether we're entitled to credit bid at the

25  auction.

1           MR. CHOUDHURI:  I was talking about credit

2     bidding, Your Honor.  I was asking about credit bidding --

3           MR. FITZMAURICE:  In the plan.

4           THE COURT:  I'll sustain the objection.  Ask

5     another question.

6     BY MR. CHOUDHURI:

7     Q    Mr. Murray, do you believe there are various exposure

8     or liability for the Bank of Kuwait with the -- do you

9     believe the estate has any legitimate claims against the

10    National Bank of Kuwait?

11    A    Yes.

12          MR. TROOP:  Sit down and shut up.

13          MR. CHOUDHURI:  No further questions.

14          THE COURT: All right.  Thank you.

15          All right.  Let me go back to Mr. Fitzmaurice.

16          RECROSS-EXAMINATION OF CHRISTOPHER MURRAY

17    BY MR. FITZMAURICE:

18    Q    Just one question, Mr. Murray.  Have you made an

19    assessment of the value of those claims?

20    A    Yes.

21    Q    Sorry.  I lied.  It's two.  What is that assessment

22    worth?

23    A    The value of those claims is something, but it's much

24    less than what the estate is getting through this plan

25    process.

1    Q     Thank you, Mr. Murray.

2              THE COURT:  Mr. Burks?

3              MR. BURKS:  May I confer for less than 60 seconds

4    only?

5              THE COURT:  You may have 30 seconds, which is less

6    than 60 seconds.

7              MR. BURKS:  Your Honor, may I?

8              THE COURT:  Yeah, with time to spare.

9              REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

10   BY MR. BURKS:

11   Q     Mr. Murray, you submitted at Docket Number 452 a

12   Chapter 11 trustee status report on the marketing process.

13   Let me make sure you submitted it.  Yes, it has been

14   submitted.  We're pulling that up so that you don't have to

15   remember.  First of all, it's kind of late.  Secondly, I

16   wouldn't remember it.  I'm talking to fill the time for Mr.

17   Baker to find the document.

18   Q     I'm blushing.

19             MR. BURKS:  (indiscernible) pull it down so we can

20   see the left bullet point in Paragraph 4, Mr. Baker.  Thank

21   you, sir.

22   BY MR. BURKS:

23   Q     Review Paragraph 4 before I ask you any questions,

24   please, Mr. Murray.

25   A     Sure.  Okay.  I've read it.

1    Q    You've been a trustee before in other cases?

2    A    Yes.

3    Q    You've sold property before?

4    A    Yes.

5    Q    You've sold property with credit bids before?

6    A    As a trustee, I don't think so.

7    Q    All right.  What do you think would happen if these 50

8    parties who had initiated (indiscernible), the 24 who have

9    signed the disclosure agreements, and the eight parties who

10   have conducted onsite inspections, what do you think would

11   happen if they were sent notices by you saying come to the

12   auction, there is no credit bidding?

13           MR. FITZMAURICE:  Objection, Your Honor, calls for

14   speculation.

15           THE COURT:  I'll sustain the objection.  Thank

16   you.

17   BY MR. BURKS:

18   Q    Do you believe that you would have more than one

19   qualifying bid if there had been no credit bidding.

20           MR. FITZMAURICE:  Same objection, Your Honor.

21           THE COURT:  I'll sustain the objection.  Thank

22   you.

23   BY MR. BURKS:

24   Q    Do you believe you would have more bids if there was no

25   credit bidding?

1            MR. FITZMAURICE:  Same objection, Your Honor.

2            THE COURT:  I'll sustain the objection.  Thank

3     you.

4     BY MR. BURKS:

5     Q    Is the only way to find out what the effect is on the

6     bidding of these people who are interested, is the only way

7     to find out to have no credit bid?

8            MR. FITZMAURICE:  Objection, Your Honor, calls for

9     peculation.

10            THE COURT:  I'll sustain the objection.

11            MR. BURKS:  Nothing further, Your Honor.

12            THE COURT:  Thank you.

13            Mr. Choudhri, back to you.  Again, very, very

14     limited.  Do you have anything that you want to add?

15            REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

16     BY MR. CHOUDHURI:

17     Q    Mr. Murray, I just want to ask you, so Hilco marketed

18     the property for approximately three weeks; is that

19     accurate?

20            MR. FITZMAURICE:  I think that's beyond the scope,

21     Your Honor.

22            THE COURT:  I think it's beyond the scope.  Again,

23     you're limited in what you can ask, Mr. Choudhri.

24     BY MR. CHOUDHURI:

25     Q    Mr. Murray, do you believe it would be a more fair

1    auction if everybody just was treated equally at the auction

2    and they had to pay if they bid on the property

3    (indiscernible) --

4            MR. FITZMAURICE:  So objection, Your Honor, calls

5    for speculation.  Also calls for -- it suggests that the

6    auction is not fair, which I think is inconsistent with the

7    evidence and the witness' testimony.

8            THE COURT:  I'll sustain the objection.  Thank

9    you.  Go ahead and ask another question.

10   BY MR. CHOUDHURI:

11   Q    Mr. Murray, do you believe the bank wants this

12   building?  They want to own the building?

13   A    I don't know.

14   Q    They haven't told you one way or the other?

15   A    No.

16   Q    So if they wanted to buy the building, would you be

17   supportive if they bid like everybody else?

18           MR. FITZMAURICE:  So objection, Your Honor, calls

19   for speculation.  I also think we're beyond the scope.

20           THE COURT:  I'll sustain the objection.

21   BY MR. CHOUDHURI:

22   Q    Mr. Murray, pursuant to the sale motion, you have

23   discretion to move the auction date, correct?

24           MR. FITZMAURICE:  So objection, Your Honor, both

25   beyond the scope and not relevant to the bank's credit bid.

1          THE COURT:  I'll sustain the objection.  But I

2     will say that I know he's got some ability.  So I know that.

3     I'm always amazed when lawyers ask questions I already know

4     the answer to.  Go ahead.

5          MR. TROOP:  He's not a lawyer.

6     BY MR. CHOUDHURI:

7     Q    Mr. Murray, since you were appointed, one of your

8     suggestions was -- and my suggestion was that since

9     (indiscernible) control over the estate and the

10    counterparties being the National Bank of Kuwait and the

11    other creditors should have a sit-down, and mediation to

12    work out whatever challenges or issues.  Do you recall

13    having that conversation with me, which included how the

14    credit bid issues would be dealt with?

15         MR. FITZMAURICE:  So objection, Your Honor, both

16    beyond the scope and not relevant to the credit bid.

17         THE COURT:  It's way, way beyond the scope of what

18    was asked, Mr. Choudhri.  So you're going to get one more

19    question, and then I'm going to tell you to sit down,

20    please.

21    BY MR. CHOUDHURI:

22    Q    Mr. Murray, would you be openminded to considering what

23    is the best and pivot your position or decisions based on

24    what maximizes the value for the creditors in the estate?

25    A    For sure, yes.

1    Q    Thank you.

2    A    Always.

3    Q    Thank you.

4             THE COURT:  Thank you.

5             All right.  Mr. Fitzmaurice?

6             MR. FITZMAURICE:  Nothing further at this time,

7    although, Your Honor --

8             THE COURT:  We've killed a dead horse.  Thank you.

9             MR. FITZMAURICE:  Your Honor, just to the extent

10   that we end up putting on a case on this motion, then we

11   would reserve the right to call Mr. Murray during that case.

12            THE COURT:  That's fine.  Thank you.

13            All right.  Mr. Burks, any other questions based

14   on what limited questions Mr. Choudhri asked?

15            MR. BURKS:  If you ask it that way, and even if

16   you hadn't, no, Your Honor.

17            THE COURT:  Okay.  Thank you.  Do you have another

18   witness?

19            Thank you, sir.  You may step down.

20            MR. MURRAY:  Thank you.

21            MR. BURKS:  Your Honor, may I speak with Mr.

22   Choudhri before I answer that question?

23            THE COURT:  Sure.  Feel free.  Mr. Burks?

24            MR. BURKS:  I'm faced with a conundrum.  The

25   principal of my client wants me to call up to three more

1   words.  I have been watching Mr. Choudhri.  I want this -- I

2   want him home resting.  So I don't know what to do.  I mean,

3   he -- Mr. Choudhri should not be standing in this courtroom

4   right now.  I'm watching the signs of --

5        THE COURT:  Mr. Burks, you can either call a

6   witness or not call a witness.  I don't care.  I'm here

7   until we get done.  If your client wants you to call

8   witnesses, call witnesses.  I was going to comment that Mr.

9   Choudhri seems to be doing remarkably well.  So I'm not

10  worried about his health at this point in time.

11       MR. BURKS:  I defer to you.  Yes, Your Honor.  I

12  have (indiscernible) witness.  One moment.

13       THE COURT:  Go ahead.

14       MR. BURKS:  But, Your Honor, for clarification,

15  noting prevents Mr. Choudhri from calling any of these

16  witnesses?

17       THE COURT:  That's correct, other than to the

18  extent he's not represented by a lawyer.  He's not doing

19  himself any favors.

20       MR. BURKS:  Thank you for saying that.  I hear

21  you.

22       MAN 1:  May I see the witness list, please?  Make

23  sure that the person's on there.  Hilco.

24       THE COURT:  All right.  Mr. Burks, it's time to

25  call a witness.  My patience -- my patience is growing thin.

1    Who do you want to call?

2           MR. BURKS:  Your Honor, I'm looking for the name

3    of the Hilco witness that was identified by NBK, and I'm

4    looking for that name right now (indiscernible) --

5           MR. BAKER:  Kneifel, Kneifel.

6           MR. BURKS:  What?

7           MR. BAKER:  Kneifel or Kneifel.  He was on --

8           MR. BURKS:  Kneifel?

9           MR. BAKER:  Yeah.  K-N-E-I, something.  He was on

10   the Zoom before.

11          MR. BURKS:  Right.

12          MR. BAKER:  Let's see.

13          MR. BURKS:  I call Mr. Kneifel of Hilco, Your

14   Honor.  He was on Zoom before.

15          THE COURT:  If he's there, I'm happy to have him

16   testify.  He's not there currently, I don't think.

17          CLERK:  K-N-E-I (indiscernible) he's not.

18          THE COURT:  Is Steve Madeira online, Tracy?

19          CLERK:  Yes, sir.

20          THE COURT:  If they want to show up on my screen,

21   they can show up on my screen.

22          MR. BAKER:  Are they there?  The Hilco

23   representative?

24          THE COURT:  Mr. Burks, those are the people who

25   are connected on the line.  So if you want to call another

1    witness and try and have someone make arrangements to get

2    him on GoToMeeting, I'm happy to hear from him.  But let's

3    call someone else.  You're wasting my time and everyone

4    else's time.  And everyone's billing at very, very high

5    rates.  Who do you want to call?

6              MR. BURKS:  No, Your Honor.  Thank you very much.

7              THE COURT:  Call a witness.

8              MR. BURKS:  I don't -- I don't see the Hilco

9    witness.

10             THE COURT:  Then call another witness.  Let's get

11   it done.  Okay.  Let's move along.  You can get him on the

12   phone and get him going.

13             MR. TROOP:  Your Honor, just to be perfectly

14   clear, we identified Hilco as a witness with a notice to

15   produce.  I don't believe that Mr. Choudhri filed anything

16   with a notice to produce.

17             THE COURT:  If he's not here under a subpoena, I

18   can't make him testify.

19             MR. TROOP:  And I don't think there's a subpoena.

20             THE COURT:  Okay.

21             MR. TROOP:  I don't know.  If no one tells me when

22   they serve subpoenas, Your Honor (indiscernible) --

23             THE COURT:  Okay.

24             MR. BURKS:  Your Honor, I have no other witness

25   available that I can call.

```
 1              THE COURT:  All right.  That's fine.
 2              Okay.  So Mr. Choudhri, do you have a witness you
 3    want to call?
 4              MR. CHOUDHURI:  (indiscernible) try to get on
 5    (indiscernible) --
 6              THE COURT:  Okay.  So who are you calling first of
 7    all?
 8              MR. CHOUDHURI:  Thomas Phillips.
 9              THE COURT:  Thomas Phillips?
10              MR. CHOUDHURI:  Yes.
11              THE COURT:  I'll give you a few minutes to see if
12    you can get him to connect.
13              MR. BURKS:  Your Honor, while we wait, I want to
14    acknowledge the bench and thank you for the patience you
15    just showed me.
16              THE COURT:  Not needed.  Thank you.
17              Mr. Choudhri, I need you to call a witness.  We're
18    not going to sit here and wait.  Do you have someone else
19    you want to call?
20              MR. CHOUDHURI:  (indiscernible) Phillips is just
21    logging in.
22              THE COURT:  Do you have another witness past Mr.
23    Phillips?
24              MR. CHOUDHURI:  Yes, Your Honor.
25              THE COURT:  Then you need to get him on the -- get
```

 1   him on the horn so we won't have to wait.  Okay.

 2            MR. CHOUDHURI:  I call Mr. Charles Conrad.

 3            THE COURT:  Mr. Conrad, come on forward.  I'll

 4   swear you in.  Please raise your right hand to be sworn.  Do

 5   you swear or affirm to tell the truth, the whole truth and

 6   nothing but the truth, so help you God?

 7            MR. CONRAD:  I do.

 8            THE COURT:  All right.  Please be seated, sir.

 9            Mr. Choudhri, come on up.  Start.  Let's go.

10                 DIRECT EXAMINATION OF CHARLES CONRAD

11   BY MR. CHOUDHURI:

12   Q    Good evening, Mr. Conrad.

13   A    Good evening.

14   Q    Do you represent the National Bank of Kuwait?

15   A    Correct.

16   Q    And all actions you've taken in relation to this case

17   or the state court or the federal court cases in the

18   capacity as a representative and attorney for the National

19   Bank of Kuwait, right?

20            MR. FITZMAURICE:  Objection, Your Honor, relevance

21   to the whether the bank's entitled to credit bid at the

22   auction tomorrow.

23            THE COURT:  It's preliminary.  We'll get there.

24   That's fine.  I'll overrule the objection as to preliminary

25   matters.

```
 1              Go ahead, Mr. Conrad.

 2              THE WITNESS:  The answer is yes.

 3   BY MR. CHOUDHURI:

 4   Q    Mr. Conrad, are you aware who Paul Caldwell is?

 5   A    I don't know who he is.

 6   Q    Have you ever spoken to Paul Caldwell?

 7   A    I have not.

 8   Q    You've never had a conversation with Paul Caldwell?

 9   A    I've never had a conversation with Paul Caldwell.

10   Q    Any email communication?

11   A    I have had emails with I recall, like, his assistant.

12   Q    But he never emailed you?

13   A    Not that I'm aware of, but I don't recall exactly.  I

14   do remember emails trying to schedule a call.

15   Q    Were you aware of that Pillsbury represents Paul

16   Caldwell.

17   A    I'm not aware of that.

18   Q    Did you ever represent that in state court, that the

19   settlement agreement does not exist?

20   A    I don't understand the context of your question, but

21   the settlement agreement is a document that does exist.

22   Q    I believe it's been made as an exhibit to this case.

23   Mr. Conrad, are you familiar with the June 12th hearing that

24   took place.

25   A    Generally.
```

1    Q    Did you represent to the state court, Judge Weems --

2    let me back up.  Mr. Conrad, were you there in March at a

3    meeting with Judge Weems' court in March of 2022 when the

4    temporary injunction was entered in favor of the debtor.

5    A    Yes.

6    Q    And what was the outcome of that injunction hearing?

7    A    A temporary restraining order was granted, that the

8    case was put on an accelerated trial schedule where we were

9    preferentially set, I believe, at the beginning of September

10   of 2023, September 6th, I believe.  And then a bond was

11   required to be posted in conjunction with a temporary

12   injunction.

13   Q    You were here earlier from Mr. Wetwiska's testimony,

14   right?

15   A    Yes.

16   Q    In fact, I believe you cross-examined him.

17   A    Yes.

18   Q    Mr. Conrad, I would like you to look at Page 59.  I'll

19   represent to you, this is Page 59.  Now I'm going to go to

20   the bottom of Page 59, Line 22.

21   A    Okay.

22   Q    Can you read that into the record, your statement?

23   A    Well, it looks like it's partial, with Lines 22 to 25,

24   but it says:

25        "Mr. Conrad:  Your Honor, I'm sorry.  I completely

1    understand that.  I just want to make sure that, like again,

2    it can't be part of the 2023, you know, contract claim

3    because the settlement agreement doesn't exist anymore.  The

4    court didn't extend the," there's a redaction, the

5    settlement agreement.

6    Q    So you're telling the court -- do you know who DC

7    Partners is?

8    A    Generally.

9    Q    Are you aware that they're a tenant I was able to put

10   into the building to take the entire seventh floor?

11   A    I'm not aware of that.

12   Q    Have you seen the DC Partners' lease I presented to you

13   at any time?

14   A    I generally know who DC Partners is, but I don't know

15   that any lease has a DC Partners name on it.

16   Q    Would it be fair to say -- or I think you understand

17   that that is a name, another name of the entity is also

18   known as St. Christopher Holdings?

19   A    I don't know that.

20   Q    What is the reason that a loan sale agreement was never

21   provided or requested?

22        MR. FITZMAURICE:  Objection, Your Honor.

23   Objection, Your Honor, lacks foundation, mischaracterizes

24   the evidence.  We saw an exhibit that in fact sent one.

25        THE COURT:  I'll sustain the objection.

 1    BY MR. CHOUDHURI:

 2    Q    Did Mr. Wetwiska ask you for a loan sale agreement in

 3    2023?

 4    A    And we've looked at the documents.  There was a June

 5    28th correspondence where, for the very first time, Mr.

 6    Wetwiska asked for certain documents in advance of a July 3,

 7    2023 date deadline that was given by the court in extending

 8    the time for performance for you and/or any other purchaser

 9    to perform the settlement agreement, which we did.  We

10    produced those documents.

11    Q    Were those the final loan sale documents?

12    A    I don't know what you mean by final.

13    Q    We have a final set of closing documents.  This is what

14    the bank will agree to.  This is final.  Here it is.  Was

15    that ever provided?

16    A    Well, I still don't understand the question because, if

17    I may explain, when you say final, that would mean that you

18    --

19         MR. CHOUDHURI:  I object.  I object to

20    nonresponsive.

21         THE WITNESS:  Well that might mean that you have

22    to agree to all them too.  We held nothing back from any of

23    your attorneys, you, anyone in response to those documents

24    being sent other than to hear, ask for additional time if

25    the bank would agree to yet another request from your side

1    from an extension.

2              MR. CHOUDHURI:  Objection, nonresponsive.

3              THE COURT:  I'll overrule the objection.

4    BY MR. CHOUDHURI:

5    Q    So when you say the settlement agreement doesn't exist

6    as of June 12, 2023, what do you mean by that?

7    A    The time for performance of the settlement agreement,

8    as Mr. Wetwiska testified earlier, which shouldn't be in

9    dispute, is March 20, 2023.  There were 210 days that the

10   settlement agreement provided for performance.  It did not

11   perform.  It was on you and or whoever on behalf of your

12   team (indiscernible) did not perform within that date.  And

13   so when we say from the existence, there is no additional

14   time for performance.  We objected on behalf of the National

15   Bank of Kuwait in the state court's ruling extending the

16   time for performance.  We are -- but if you're asking me

17   what the existence of this non-existence is, there are no

18   rights on behalf of the debtor, Galleria 2425 Owner, LLC to

19   enforce the terms of the settlement agreement.  The only

20   rights are for the bank as a result of the default.

21             MR. CHOUDHURI:  Your Honor, nonresponsive.

22             THE COURT:  I think he's being responsive.  You

23   just don't like his response, unfortunately.  But he's

24   responsive.  I'll overrule the objection.

25   BY MR. CHOUDHURI:

1    Q    Mr. Conrad, wouldn't be care to say there is a dispute

2    over the settlement agreement?

3    A    No.

4    Q    There's no dispute over the settlement agreement?

5    A    The dispute maybe is that you don't maintain that

6    you're in default, which you clearly are.

7    Q    So there's no dispute that the bank committed the first

8    material breach or fraud in the inducement in entering into

9    the settlement agreement?

10    A    That I disagree with.  There's absolutely no evidence

11    to support any claim based on your claim for breach of

12    contract of the settlement agreement.  There's nothing.

13    Q    That's according to you, but there's two sides to it.

14    Are you aware that Paul Caldwell made an offer for $75

15    million for the building?

16    A    No.

17    Q    Are you aware that he made any offer?

18    A    I don't know.  No, I'm not aware.  Because of that

19    document was prepared by one of your lawyers, Seth

20    Nichamoff, who appeared at the state court proceeding, it

21    has an electronic signature on behalf of Mr. Caldwell.  I

22    don't know what that is.  It's a document that you did not

23    produce, you did not attach to any of your complaints or

24    original complaints in the state court litigation.  It

25    wasn't until much later that I first saw that document.  But

1    again, I don't know what that is, other than it's

2    purportedly something that you contend is an offer.

3    Q    So the Bank of Kuwait has a claim here, and this is the

4    -- this court or this bankruptcy case is where they're

5    attempting to pursue the amount that they contend their

6    owed, right?

7    A    Yes.

8    Q    Anywhere else?

9    A    That action, I think, I believe has been removed.  That

10   was then the adversary proceeding.  There was a counterclaim

11   asserted against the debtor in the state court litigation.

12   Q    So outside of this court, in Judge Norman's case, the

13   only other place that the Bank of Kuwait is pursuing money

14   related to the note is in the adversary that was removed or

15   the state court case that was removed?

16   A    I'm not sure about that, but I don't think so.  I'm not

17   certain about that.

18   Q    Is there any avenue or any source or pursuit of claims

19   that the Bank of Kuwait is pursuing outside of Judge

20   Norman's court or Harris County district court?

21        MR. FITZMAURICE:  Objection.  Mr. Conrad clearly

22   doesn't need my help, as Your Honor can see.  But this is

23   not relevant to the issue of whether the bank can credit bid

24   at the auction tomorrow.

25        THE COURT:  I'll sustaining the objection as to

1    relevance.  Thank you.

2         MR. CHOUDHURI:  I just want to understand there's

3    no other -- I'm almost there, Your Honor.  I really have to

4    know this --

5         THE COURT:  It's not relevant to credit bidding,

6    so he doesn't have to answer it.  Thank you.  Move on.

7    BY MR. CHOUDHURI:

8    Q    Has the Bank of Kuwait filed a lawsuit in New York for

9    $70 million to pursue its claims under the settlement or

10   under the note, the deed of trust?

11   A    There is a lawsuit that's pursuant to the guarantee

12   that was against Brad Parker in New York.  That has been

13   filed.

14   Q    Has that been disclosed to this court?

15   A    I'm not aware (indiscernible).

16   Q    Was it in any kind of disclosure?  So you're not aware.

17        MR. FITZMAURICE:  So Your Honor, relevance to

18   credit bidding.

19        THE COURT:  I'm struggling with relevance, Mr.

20   Choudhri.

21        MR. CHOUDHURI:  Your Honor, It's a lack of

22   disclosure.  They're pursuing -- they're talking both sides.

23   They're saying the settlement agreement, the releases are

24   good.  We can't talk beyond that.  But yet they're suing the

25   guarantors that they've released the guarantors.

```
 1              THE COURT:  I'll sustain the objection.  Thank
 2    you.  Move on.
 3    BY MR. CHOUDHURI:
 4    Q    Have you ever have any communication with Security
 5    State Bank of Texas.
 6    A    I don't recall having any direct communications with
 7    them.
 8    Q    Are you aware that they were a lender to take out the
 9    loan that NBK agreed to sign under the settlement agreement?
10    A    I'm aware that Mr. Wetwiska represented that as such,
11    but I don't have any personal knowledge of that.
12    Q    Do you recall asking Mr. Wetwiska and Gene Meyers at
13    Security State Bank that if they were big enough to make
14    this loan?
15              MR. FITZMAURICE:  Objection, Your Honor, relevance
16    to the credit bidding.
17              MR. CHOUDHURI:  It's, Your Honor -- it goes to the
18    prevention of the debtor, myself, taking out the financing
19    and interfering with this process.  It goes to good faith.
20              THE COURT:  I'll allow the question.  Go ahead.
21              THE WITNESS:  Will you ask the question again.
22    I'm sorry.
23    BY MR. CHOUDHURI:
24    Q    Do you recall having conversations with Gene Meyers
25    regarding 2425?
```

1    A    If you scroll back up to the screen at the top of the

2    email chain, I remember exactly what Mr. Meyers tells me

3    being the case.  I remember that you and/or met with Mr.

4    Wetwiska asked him to reach out to me, not the other way

5    around.  And so --

6    Q    (indiscernible)

7    A    -- he states here, he says, Mr. Conrad, good afternoon.

8    Ali had requested an update on this loan request and

9    (indiscernible) --

10            MR. CHOUDHURI:  Objection (indiscernible) --

11            THE WITNESS:  -- share with you, so it was given

12    to me.

13            MR. FITZMAURICE:  So Your Honor, I also object the

14    use of this document.  It's not clear that it's on any list.

15            THE COURT:  It's not in evidence at this point in

16    time.  So go ahead.

17    BY MR. CHOUDHURI:

18    Q    And I put it on here because you said there's no

19    communications that you've (indiscernible) --

20    A    That is not how I understood your question.

21    Q    Are you aware of offers received by the Bank of Kuwait

22    since the filing of this case?

23    A    What do you mean by offers?

24    Q    Offers to buy the note or buy the property.

25            MR. FITZMAURICE:  So objection, Your Honor, the

1    bank can't sell the property.  But also what's the relevance

2    to the credit bidding?

3              THE COURT:  Sustain the objection as to relevance.

4    BY MR. CHOUDHURI:

5    Q    Has the bank received any offers to sell its note?

6              MR. FITZMAURICE:  Same objection, Your Honor.

7              THE COURT:  I'll sustain the objection as to

8    relevance.

9    BY MR. CHOUDHURI:

10   Q    Under the settlement agreement, once the bank gets paid

11   $26 million, what happens to the tax liens that it holds?

12   A    Well again, this goes back to assuming that it was paid

13   within the 210 days originally and then extended by the

14   state court judge on or before July 3rd, which never

15   happened.  So I don't know that I need to answer that

16   question because all of that time has expired and so those

17   tax liens were assigned to the bank and there is a default

18   by you of the settlement agreement.

19   Q    Is the bank's position to settlement agreement is

20   rescinded or still valid?

21             MR. FITZMAURICE:  Objection, Your Honor,

22   relevance.

23             THE COURT:  I'll sustain the objection.  It's not

24   relevant to credit bidding.  Thank you.

25   BY MR. CHOUDHURI:

1   Q    Did anybody from the bank tell potential buyers of the

2   property that the property was going to be foreclosed in the

3   near future?

4           MR. FITZMAURICE:  Objection, Your Honor, vague as

5   to time.

6   BY MR. CHOUDHURI:

7   Q    2023.

8           THE COURT:  Overruled.

9           THE WITNESS:  So going back to March 20th of 2023,

10  there was no payment made.  There was a default letter

11  issued approximately seven --

12          MR. CHOUDHURI:  Objection (indiscernible) --

13          THE COURT:  You asked the question.  He can answer

14  it.  Go ahead.

15          THE WITNESS:  know what your question is asking,

16  so I'm going to answer it.  And so after a week of following

17  no performance of March 20th, we issued a notice of

18  foreclosure for the May 6th, whatever the first Tuesday was,

19  in May 6, 2023.  Subsequent to that, we filed a motion to

20  appoint a receiver to the property.  Shortly before the oral

21  hearing of a motion to appoint receiver, you filed yet

22  another lawsuit claiming breach of the settlement agreement

23  regarding the Paul Caldwell issue.  At that hearing on April

24  12th, the court then entered into that order extending the

25  time for performance of the settlement agreement until July

1   3rd.  At that point in time, you've now made the argument

2   that the time for performance of the settlement agreement

3   was in existence from March 20th to April 12th.  And you

4   claimed that our notice, which we placed publicly, which we

5   were entitled to do under the settlement agreement,

6   constituted telling people that we were going to foreclose

7   on the property, which I think is entirely what we're

8   entitled to do.

9   BY MR. CHOUDHURI:

10  Q    So I think we're conflating things.  I just want to

11  make sure the question -- your answer is accurate.  The

12  state court enjoined you from going forward and foreclosing

13  on the property in 2023, correct?

14  A    On May 6th.

15  Q    And you were volleying phone calls from the buyers,

16  potential buyers who were contacting your agent, the

17  trustee, correct?  I can pull the emails.  Maybe it's

18  easier.

19  A    I don't know what you mean by trustee, but at this

20  timeframe --

21  Q    There's a substitute trustee that is listed on your

22  foreclosure notice, right?

23  A    Yes.

24  Q    And that substitute trustee has to post the property 21

25  days before the first Tuesday of the month, right?

1    A    Correct.

2    Q    And when the court tells NBK they must pass their sale

3    and not go forward with it, or the court tells NBK to not go

4    forward with their sale, correct?

5    A    Still understand what you're talking about.  Which

6    sale?

7    Q    The property was posted for foreclosure in 2023.

8    A    Several times.

9    Q    In May or June?

10   A    Not June.

11   Q    So when it was posted, it was posted in May then?

12   A    As I was stating earlier, from the time period of March

13   20th, when the time for performance ended then after the

14   default notice was issued, a notice of foreclosure was

15   issued, I believe, and I'm going to estimate here, around

16   March 26th, 27th, something like that.  It's in that

17   timeframe, and that it wasn't until after April 12th that

18   there was a hearing where you were requesting a temporary

19   restraining order, and the court ultimately decided to

20   extend the time for performance, take down our notice of

21   foreclosure but recognizing that the bank had the right to

22   reissue the notice of foreclosure for a July 3rd, excuse me,

23   July 5th foreclosure bid, which we did, and the court

24   specifically authorized us to issue that notice for the July

25   5th setting.  And that --

1    Q    My question --

2    A    Go ahead.

3    Q    Yeah.  My question is, and I can pull it up just in a

4    second, this.  My question is this, Mr. Conrad.  When the

5    court enjoined you from foreclosing and the Bank of Kuwait

6    was getting phone calls after the sale had been passed, the

7    sale had been passed for May, correct?

8    A    Yes, that's directed by the court.

9    Q    And once that had happened and the Bank of Kuwait was

10   getting phone calls, there was communication that I've seen,

11   and I'll put it on here, where the Bank of Kuwait was

12   telling the potential bidders that we're going to foreclose

13   in the future, we're going to post in the future.  Do you

14   recall that?

15   A    Not exactly how you stated.

16   Q    How do you recall what was said in those

17   communications, and I'll pull them up in a second.

18        MR. FITZMAURICE:  Your Honor, maybe that's the

19   best thing for us to do rather than --

20        THE COURT:  Sure.

21   BY MR. CHOUDHURI:

22   Q    I want to go back to one thing.  You said you never

23   spoke to Mr. Caldwell, right?

24   A    I don't recall ever speaking to him.

25   Q    Mr. Conrad, is your email charles.conrad@pillsbury?

1   A    It is.

2   Q    Is this an email on February the 2, 2023, that you

3   received from Paul Caldwell?

4   A    If you'll scroll down?

5   Q    It says, Mr. Conrad, we spoke briefly last week

6   regarding my firm's interest in acquiring a note from the

7   Bank of Kuwait.  I believe the bank holds the senior secured

8   position.  I'd like to have a discussion with the bank

9   concerning acquisition.  Thanks for your consideration.

10  A    Sorry.  What was the question?

11  Q    Earlier you testified you never spoke to Mr. Caldwell,

12  right?

13        MR. FITZMAURICE:  Objection, Your Honor,

14  mischaracterizes the witness' testimony.

15        THE COURT:  I'll sustain the objection.

16  BY MR. CHOUDHURI:

17  Q    Does this refresh your recollection, Mr. Conrad?

18  A    No.

19  Q    So did you speak to Mr. Caldwell after looking at the

20  email?

21  A    I don't have any recollection of speaking with him, my

22  memory as of today.  I remember trying to schedule a call

23  with him.  I remember, I believe potentially, but I think

24  everything was with his assistant, Jennifer Garcia, or

25  whoever her name was or his name.

1    Q    Who is Hugh Ray?  Is he with your firm?

2    A    Which Hugh Ray?

3    Q    Pillsbury.

4    A    Yes, there is a Hugh Ray that works at Pillsbury.

5    Q    And you're not aware if Mr. Caldwell is a client of

6    Pillsbury or not?

7              MR. FITZMAURICE:  Objection, Your Honor, asked

8    unanswered.  Relevance.  Now we're going to cast aspersions

9    on some other person who's not here?

10             THE COURT:  What's the relevance?

11             MR. CHOUDHURI:  Your Honor, the relevance is it

12   goes to the information, the contracts with Mr. Caldwell and

13   the bank saying they didn't get things that they did get, or

14   communications.  And it circles back to offers and leases

15   that were sent to the bank that they claim they never got.

16   And it's just --

17             MR. FITZMAURICE:  Your Honor, there's no proof of

18   any of that that's been offered.

19             THE COURT:  I'll sustain the objection.  Thank

20   you.

21   BY MR. CHOUDHURI:

22   Q    Are you aware of Bruce Merwin?  Do you know who Bruce

23   Merwin is?

24   A    No.

25   Q    Do you know who Holland & Knight is?

1    A    Yes.

2    Q    Did anybody from your firm relating to this transaction

3    receive leases and proposals and sales contracts from

4    Holland & Knight?

5              MR. FITZMAURICE:  Objection, Your Honor, relevance

6    to the bank's ability to credit bid at the auction tomorrow.

7              THE COURT:  Again, what's your relevance?

8              MR. CHOUDHURI:  Your Honor, if they have been

9    acting in bad faith and thwarting the efforts of myself, the

10   debtor, and not frustrating performance, then I think that

11   goes to good faith.  It goes to their bad faith and

12   interfering so they can create a situation where they can

13   credit bid.  They should not be rewarded.  The reason the

14   debtor is in bankruptcy --

15             THE COURT:  I'm going to sustain the objection.

16   Thank you.  Go ahead.

17   BY MR. BURKS:

18   Q    Are you aware that -- this is Exhibit 18?

19             MR. FITZMAURICE:  I apologize.  Can we get an ECF

20   number for that?  Exhibit 18 to what?

21             MR. CHOUDHURI:  499-18.

22             THE WITNESS:  Sorry.  What was the question?

23             MR. CHOUDHURI:  I'd like to go back for a second,

24   Your Honor, if it's okay.  Could I move to admit this email

25   from Paul Caldwell to Charles Conrad?

 1              MR. FITZMAURICE:  So objection, Your Honor, on

 2      authenticity grounds.  We have no way to know if that's Mr.

 3      Paul Caldwell's email, if this was actually sent by him.

 4      There's no foundation for that.  We have no basis --

 5              THE COURT:  I'll let you try and lay a foundation.

 6      But I'm going to sustain the objection.

 7      BY MR. CHOUDHURI:

 8      Q    Mr. Conrad, do you recognize your email address on this

 9      document, Document 498-6, Page 3 of 3?

10      A    Yes.

11              MR. CHOUDHURI:  I move to admit this email.

12              MR. FITZMAURICE:  Same objection, Your Honor.

13              THE COURT:  I don't think that gets you there.  In

14      fact, I know it doesn't get you there.  You've got to do

15      something else.

16      BY MR. CHOUDHURI:

17      Q    Did you receive this email, Mr. Conrad?

18      A    Again, I don't remember.  I did have emails with Mr.

19      Caldwell's assistant about scheduling something, but I don't

20      recall this one, just by looking at it.

21      Q    Mr. Conrad, you're aware that there was a discovery

22      request made for communications between the Bank of Kuwait

23      and Mr. Caldwell?

24              MR. FITZMAURICE:  Objection, Your Honor.  In what

25      case?  In what context?  At what time?

1          MR. CHOUDHURI:  In this case, on the 30(b)(6).

2          MR. FITZMAURICE:  Well, if that's true, Your

3    Honor, then there's a document that would show that.

4          THE COURT:  Yes.  So if you've got something, show

5    it to me.  Thank you.

6          MR. CHOUDHURI:  I would like to bring the court to

7    judicially recognize there's a motion for contempt filed in

8    this case, Your Honor.  I'd like you to have that document.

9    That has an attachment of the notice of the 30(b)(6) with

10   the communications.  But I can come back to these questions

11   (indiscernible).

12   BY MR. CHOUDHURI:

13   Q    Mr. Conrad, are you aware that Paul Caldwell signed a

14   CA and an NDA with Ali Choudhri?

15   A    No.

16   Q    Mr. Conrad, have you seen this document before?

17   A    Yes.

18         MR. CHOUDHURI:  I'd like to move to admit this

19   document, Your Honor.

20         MR. FITZMAURICE:  Your Honor, objection as to lack

21   of foundation and authenticity.  There's what appears to be

22   a typed in and script name Paul Caldwell, but there's no

23   indication as to whether or not he actually signed it, how

24   that signature got there, where it came from, or anything

25   else that would be needed to show the authenticity of the

1    document.

2         THE COURT:  I'll sustain the objection as to lack

3    of foundation.

4    BY MR. CHOUDHURI:

5    Q    So you said you've seen this document.  Do you recall

6    when you've seen it?

7    A    Yes.  It's one of your exhibits that you're trying --

8    that you listed as an exhibit that you might use.  That's

9    how I saw it.

10   Q    And can you read what --

11        THE COURT:  It's not in evidence.  He can't read

12   from it.

13   BY MR. CHOUDHURI:

14   Q    Mr. Conrad, do you have the information relating to

15   leases or contracts or offers -- do you have any knowledge

16   of any offers or leases that the Bank of Kuwait received?

17        MR. FITZMAURICE:  So Your Honor, we'll ignore the

18   compound portion of that, but relevance to the issues.

19        THE COURT:  Mr. Choudhri, what's the relevance?

20        MR. CHOUDHURI:  Bad faith.  Suppression of value

21   to come and benefit from a credit bid.  That they should be

22   rewarded for their actions of --

23        THE COURT:  I'll sustain the objection.  Thank

24   you.

25   BY MR. CHOUDHURI:

1    Q    Do you know who Keith Maxwell is, Mr. Conrad?

2    A    No.

3    Q    Newdevco?

4    A    No.

5    Q    You know who Bobby Salah is?

6    A    I do not.

7    Q    Or Lawrence Perry?

8    A    I'm sorry.  What was the last name?

9    Q    Lawrence Perry.

10   A    I don't know.

11   Q    Do you recall participating in the mediation of Edina

12   Marshall?

13   A    Yes.

14   Q    And at that mediation, do you recall this was at the

15   end of June 2023.  Is that accurate?

16        MR. FITZMAURICE:  The timing of the mediation is

17   whatever it is, but relevance to the issues --

18        THE COURT:  Again, relevance.

19        MR. CHOUDHURI:  It's to consummate the transaction

20   that has been being attempted to consummate where the bank

21   has interfered with that consummation.

22        THE COURT:  I'm going to sustain the objection as

23   to relevance.  Thank you.

24   BY MR. CHOUDHURI:

25   Q    Mr. Jeffrey Gilman.

1    A    Jeffrey Gilman is an attorney in Houston.

2    Q    Is he the trustee and attorney for National Bank of

3    Kuwait?

4    A    He was a substitute trustee.

5    Q    Are you aware that he told third parties that there

6    would be a foreclosure in the future?

7              MR. FITZMAURICE:  So objection, Your Honor,

8    hearsay.  But also if there's a document that says that,

9    let's take a look at it.

10             THE COURT:  I'll sustain the objection as to

11   hearsay.

12   BY MR. CHOUDHURI:

13   Q    Did you receive an email from -- was there a dispute

14   between the Bank of Kuwait and the debtor as it related to

15   posting of the property?

16   A    I don't understand the question.

17   Q    Was there any dispute between NBK and the borrower in

18   relation to the posting of the property for foreclosure?

19   A    I still don't understand.  I mean, you're asking me to

20   tell you whether or not you thought that there was a dispute

21   because the bank moved to foreclose the property to enforce

22   its right under the loan agreement and the loan documents.

23   Did the borrower, now debtor, try to contest it at every

24   single which way, basically six ways from Sunday?  Yes.  To

25   delay that process?  Yes.  So does that answer your

1   question?  That's the best I understand it.

2   Q    Was there a dispute between you and Jim Wetwiska, as it

3   relates to the court's ruling for the posting of the

4   foreclosure?

5          MR. FITZMAURICE:  Your Honor, objection.  I think

6   this is a version of the same question.  So it's been asked

7   and answered.  It's also not relevant to whether the bank

8   can credit bid.

9          THE COURT:  I'll sustain the objection as to

10  relevance.

11  BY MR. CHOUDHURI:

12  Q    If the bank is successful as a credit bidder, what is

13  it acquiring at the sale?  The real estate and anything

14  else, or just the real estate?

15         MR. FITZMAURICE:  Objection, Your Honor.  The bid

16  procedure in the stalking horse agreement, they all speak

17  for themselves as to what is being sold in the auction.

18         THE COURT:  I'll sustain the objection.  Thank

19  you.

20  BY MR. CHOUDHURI:

21  Q    Do you have any knowledge of who or what entity owns

22  the FF&E in the building?

23  A    I'd have to go back and look at the loan agreement and

24  the loan documents.  I don't know the answer.

25  Q    Are you aware that Stage Stores had filed bankruptcy?

1   A    Yes.

2   Q    And are you aware that they have sold all of the FF&E

3   in the building?

4           MR. FITZMAURICE:  Objection, Your Honor, relevance

5   to the credit bidding.

6           THE COURT:  I'll sustain the objection.  It's not

7   relevant to credit bidding.

8   BY MR. CHOUDHURI:

9   Q    Is the bank's expectation on a credit bid that they're

10  obtaining the FF&E in the building?

11          MR. FITZMAURICE:  Your Honor, it's the same

12  question as before.

13          THE COURT:  It's not relevant.  Move on.  Thank

14  you.

15  BY MR. CHOUDHURI:

16  Q    Is this an email you received, Mr. Conrad, from Jim

17  Wetwiska on May the 4th, 2023?

18  A    I don't know.  It could be.

19  Q    Is this your email address on here?

20  A    Yes.

21          MR. CHOUDHURI:  I'd like to move to enter this

22  document, Your Honor.

23          THE COURT:  What's the ECF number?

24          MR. CHOUDHURI:  I don't have the ECF number on me.

25  It goes to his earlier statements that --

1          THE COURT:  It has to be an ECF in order to be

2     admitted.  If it's not on ECF, I can't admit it because

3     everything's electronic.

4     BY MR. CHOUDHURI:

5     Q    Mr. Conrad, can you confirm this is an email you

6     received?

7          MR. FITZMAURICE:  So that question's been asked

8     and answered, Your Honor.

9          THE COURT:  I'll sustain the objection.

10         MR. CHOUDHURI:  May I ask him questions about the

11    email?

12         THE COURT:  Sure.  I'm just saying I can't admit

13    it because it's not on ECF.

14    BY MR. CHOUDHURI:

15    Q    What is the date of this email?

16    A    It purports to be May 4, 2023.

17    Q    What time?

18    A    2:51 p.m.

19    Q    Would you read the first paragraph, please?

20         MR. FITZMAURICE:  Your Honor, the email is not in

21    evidence.  Having Mr. Conrad read it is a way to --

22         THE COURT:  The only reason it's not in evidence

23    is because I can't admit it.  I'll let him -- I don't have

24    any problem with him testifying.  I'm not sure what it's

25    relevant to at this point in time.  But go ahead, answer the

1   question.

2          THE WITNESS:  Can you scroll down to the email,

3   the rest of the chain?  Stop.  Go back to mine.  Skip that

4   over it again.

5          THE COURT:  Go one up.

6          THE WITNESS:  Yeah.  I need to read the whole

7   chain.

8          THE COURT:  Right there.  Stop there.

9          THE WITNESS:  All right.  If you could scroll down

10  a little bit.  Yeah.

11  BY MR. CHOUDHURI:

12  Q    So the state court, and I can pull up the transcript,

13  but do you recall Judge Weems in the state court telling

14  you, you should not be telling people calling you that

15  you're going to post in the future?

16  A    At the beginning, where this email chain starts from is

17  that there was a bond requirement by the state court judge

18  for you to pay $80,000 per month.  There was a question that

19  we asked for purposes of securing performance of that

20  $80,000 a month and whether or not we would post, could

21  post.  And there was a disagreement by Mr. Wetwiska of

22  saying that.  And that was later discussed in a status

23  conference with the court saying, look, if they make the

24  $80,000 payments up until July 3rd, you cannot post.  But up

25  until July -- excuse me, until June, you can post for the

1   July 5th setting, which is what she ordered.  So there was

2   clarity of saying, look, as long as they're making the

3   $80,000 payments, which you did from April and May, but not

4   June, you could post, you could not post.  So that's what I

5   recall.

6   Q   But so the issue was telling the bidders, the potential

7   bidders, once the judge said you could not post and you had

8   to pass the sale and allow the bidder to perform, NBK's

9   agents continued to tell the bidders that there will be a

10  posting in the future, true or false?

11          MR. FITZMAURICE:  Objection, Your Honor, assumes

12  facts not in evidence.

13          THE COURT:  I'll sustain the objection.  Thank

14  you.

15  BY MR. CHOUDHURI:

16  Q   Do you know who Osama Abdullatif is?

17  A   No.

18  Q   Do you know who Rodney Drinnon is?

19  A   I know who he is, yes.

20  Q   You've had conversations with him?

21  A   I don't recall any other than kind of he was at

22  hearings where I was present, but I don't recall any other

23  conversations that I've had with him, other than at court

24  hearings.

25  Q   Are you aware of how this loan came to be and how the

1    structure was organized?

2         MR. FITZMAURICE:  Objection, Your Honor, relevance

3    to the credit budding.

4         THE COURT:  I don't even know what loan we're

5    talking about.  So, but I'll sustain the objection.

6    BY MR. CHOUDHURI:

7    Q    Mr. Conrad, how will the bank be impaired in any way if

8    it's not allowed to credit bit?

9         MR. FITZMAURICE:  Objection, Your Honor.  That's

10   not a relevant issue for whether or not the bank

11   (indiscernible) --

12        THE COURT:  I'll sustain the objection.  Thank

13   you.

14   BY MR. CHOUDHURI:

15   Q    So Mr. Conrad, whatever representations were made by

16   both sides in varying courts, whether it's by NBK or by

17   debtor or myself, you would stand by those as far as if any

18   representations were made by two courts?  Again, we don't

19   have all the transcripts here today, but if the

20   representation is made by NBK to varying courts, you would

21   stand by those are we sit here today.

22        MR. FITZMAURICE:  So I'm going to object to the

23   question, Your Honor, as I understand that he's asking if

24   there is evidence that's not before the court, that's not

25   part of the record of this hearing.  I don't know what

1    relevance it has to the hearing.  There are exhibits that

2    are being offered here into evidence or not.  That's what

3    we're here focused on.  So objection on that.

4              THE COURT:  I'll sustain the objection.  Ask

5    another question, please.

6    BY MR. CHOUDHURI:

7    Q    Mr. Conrad, you participated in the drafting of the

8    settlement agreement, true?

9    A    Yes.

10   Q    So you made your edits and changes in redlines and back

11   and forth with Mr. Wetwiska, right?

12   A    Among others.  Yes.

13   Q    Who was the others?

14   A    Nick Houpt was an associate of Mr. Wetwiska

15   (indiscernible).

16   Q    So as we sit here today, are the releases effective in

17   the settlement agreement?

18             MR. FITZMAURICE:  Your Honor, objection.  I know

19   that Mr. Conrad has a view as to the legal answer to that

20   question, but it calls for a legal conclusion which is for

21   Your Honor.  And also it's not relevant for purposes --

22             THE COURT:  I'll sustain the objection as to

23   relevance.

24   BY MR. CHOUDHURI:

25   Q    Mr. Conrad, we're not here today to try this case as it

1   relates to the dispute with the debtor, Ali Choudhri and the

2   Bank of Kuwait, right?

3   A    I don't know how to answer that question.  I don't know

4   what you are thinking.

5   Q    You believe today is going to lead to an adjudication

6   of the dispute between the Bank of Kuwait and the debtor and

7   Ali Choudhri?

8        MR. FITZMAURICE:  Objection, Your Honor.  We're

9   here on the motion to preclude the bank from credit bidding.

10        THE COURT:  I'll sustain the objection.  I know

11   why we're here.  Why he thinks we're here, again, I don't

12   really care.  And again, I'm going to tell you to move along

13   because we now have reached a point where I have given you a

14   lot of leeway.  But we're not getting very far.

15   BY MR. CHOUDHURI:

16   Q    Within a couple of weeks of the trustee being appointed

17   -- let me back up.  When was the first meeting the Bank of

18   Kuwait had with the trustee or its representatives?

19   A    I don't remember.

20   Q    When did the Bank of Kuwait want JLL to take over

21   management?

22        MR. FITZMAURICE:  Objection, Your Honor, assumes

23   facts not in evidence.

24        THE COURT:  I'll sustain the objection.  Thank

25   you.

Page 338

```
 1   BY MR. CHOUDHURI:

 2   Q    Did you have conversations with counsel for Sonder?

 3            MR. FITZMAURICE:  Objection, Your Honor, relevance

 4   to credit bidding.

 5            THE COURT:  I'll sustain the objection as to

 6   relevance.

 7            Again, Mr. Choudhri, you've got a couple more

 8   questions.  Let's make them worth your time and Mr. Conrad's

 9   effort.

10   BY MR. CHOUDHURI:

11   Q    Does the bank have an agreement with the trustee to pay

12   the admin expenses, whatever they are?

13            MR. FITZMAURICE:  Your Honor, is Mr. Choudhri

14   asking other than the provisions of the plan which could be

15   read in that way?

16            THE COURT:  I'm not sure what he's asking.  I'll

17   let him rephrase the question.

18   BY MR. CHOUDHURI:

19   Q    As we sit here today, the plan is not confirmed, right?

20   A    Correct.

21   Q    And the plan has a lot of contingencies, correct?

22   A    I don't know.  You have to be more specific.

23   Q    Is there -- is the plan or any agreement with the

24   trustee conditioned on allowing the bank to credit bid?

25            MR. FITZMAURICE:  So objection, Your Honor, the
```

1   plan speaks for itself.  But we're also here on credit

2   bidding, not confirmation.

3              THE COURT:  I'll sustain the objection.

4   BY MR. CHOUDHURI:

5   Q    Did the trustee tell or communicate or the trustee's

6   representative communicate with you that not having a capped

7   credit bid worth bidders at an auction?

8   A    So your question is whether or not not having a cap

9   would effect?  I remember the request being made about

10  whether or not we would consider not having a -- or whether

11  or not the bank would consider having a cap on its credit

12  bid.  I remember that request being made, or inquiry.

13  Q    And the bank's position is that's non-negotiable?

14             MR. FITZMAURICE:  Objection, Your Honor, non-

15  negotiable.  Assumes facts not in evidence.

16             THE COURT:  I'll sustain the objection.

17  BY MR. CHOUDHURI:

18  Q    Is there any limit that the bank is putting on the

19  trustee or the estate for admin expenses?

20             MR. FITZMAURICE:  Objection, relevance.

21             THE COURT:  I'll sustain the objection.

22             Mr. Choudhri, I've been, I think, more than

23  lenient.  I've warned you over and over and over again.  You

24  are done with this witness.  Please sit down.  And I'm going

25  to encourage you to ask questions on any other witnesses

1  that you want to call that are relevant to what I'm about to

2  rule on because my patience is very much wearing thin.  All

3  right.  You're done.  Thank you.

4          Let me go ahead and go to Mr. Burks first because

5  he's basically on the same side.

6          MR. BURKS:  No questions from this witness.

7          MR. FITZMAURICE:  Sorry, Charles.  Very briefly.

8          THE COURT:  Okay.  You're opening the door.

9          MR. FITZMAURICE:  Your Honor, the agreement says

10 what it says.  No questions.

11         THE COURT:  All right.  Thank you.  You may step

12 down.  Thank you, sir.

13         Mr. Choudhri, Mr. Phillips is on the line.  Do you

14 want to call him?  Yes, I'm assuming?

15         MR. CHOUDHURI:  Yes, Your Honor.

16         THE COURT:  Okay.  Then hold on for one second.

17 Let me make sure he's unmuted.

18         MR. PHILLIPS:  My computer screen says I'm muted.

19 Muted?

20         THE COURT:  Well, that's been because you're on a

21 phone line.  So that's different, Mr. Phillips.  But if we

22 can hear you, and you can hear us, that's all that matters.

23 Please raise your right hand to be sworn.  Do you swear or

24 affirm to tell the truth, the whole truth and nothing but

25 the truth, so help you God?

```
 1              MR. PHILLIPS:  I do.

 2              THE COURT:  All right.  Go ahead, sir.

 3              DIRECT EXAMINATION OF THOMAS PHILLIPS

 4    BY MR. CHOUDHURI:

 5    Q    Hello, Mr. Phillips.  How are you?

 6    A    I'm good.

 7    Q    Will you describe your profession and your background a

 8    little bit for the court here?

 9    A    I suspect the court knows, but I'm an attorney of

10    almost 50 years' practice (indiscernible) a partner at Baker

11    Botts law firm and served in the judiciary several decades

12    ago.

13    Q    Mr. Phillips, were you on the Supreme Court of Texas?

14    A    Yes.

15    Q    Were you the chief justice of the Supreme Court?

16    A    Yes.

17    Q    And approximately how long have you been representing

18    me or affiliated entities?

19    A    In one fashion, in one manner or another, perhaps six

20    or seven years.

21    Q    Do you recall the case with Judge Kerrigan?

22    A    Yes.

23    Q    And you represented me in the divorce case?

24    A    Yes, a time in the trial court.

25    Q    Mr. Phillips, you have -- you are representing several
```

1    entities -- well, let me back up.  Baker Botts has approved

2    a contingency -- can you describe this?  Has Baker Botts

3    approved a contingency or what is the process to approve

4    contingency arrangements at Baker Botts?

5         MR. FITZMAURICE:  So objection, Your Honor, there

6    were several questions.

7         THE WITNESS:  Our --

8         MR. FITZMAURICE:  If --

9         THE COURT:  Mr. Phillips, hold on one second.  I

10   got an objection.  I need a rule on that objection.

11        MR. FITZMAURICE:  So if the question that's being

12   asked is the last question, which is the process at Baker

13   Botts for approving a contingency --

14        MR. CHOUDHURI:  Yes.

15        MR. FITZMAURICE:  -- then we object on relevance

16   grounds.  If it's any of the prior questions, we still

17   object on relevance grounds.  But also to the extent that

18   there is some agreement in place, then that is the best

19   evidence of its terms and we should look at that.

20        THE COURT:  All right.  Mr. Burks?

21        MR. BURKS:  So my response here is that what Mr.

22   Choudhri is trying to establish the scope and the validity

23   of causes of action.  And I think if we let the two speak, I

24   think we can get through this quickly and it is relevant in

25   terms of establishing the -- whether or not there's a

```
 1    material dispute to be resolved, Judge.  I mean, that's what

 2    the case law says.

 3              THE COURT:  I'll sustain the objection as to the

 4    Baker Botts process as not relevant.

 5              Mr. Choudhri, ask your question again.  Be

 6    specific so I know exactly what you're talking about and

 7    we'll go from there.

 8    BY MR. CHOUDHURI:

 9    Q    Mr. Phillips, did Baker Botts approve the contingency,

10    the arrangement with Galleria 2425 Owner, LLC?

11              MR. FITZMAURICE:  So objection, Your Honor,

12    leading and also vague as to time.

13              THE COURT:  Be more specific as to what

14    litigation, when, where, how, Mr. Choudhri.

15    BY MR. CHOUDHURI:

16    Q    Mr. Phillips, as it relates to Sonder, holdings of

17    Sonder USA, are you familiar with that entity?

18              MR. FITZMAURICE:  So Your Honor, objection, Sonder

19    has nothing to do with whether or not the bank can credit

20    bid at the auction.  And if the Baker Botts contingency fee

21    arrangement as relates to claims against Sonder, that has no

22    relevance to the bank's ability to credit bid.

23              THE COURT:  I'll let you go as to relevance.  I

24    mean, I understand you bought those claims.  I understand

25    you have a right to sue them.  But I'm not sure what it has
```

1   to do with credit bidding.

2        MR. CHOUDHURI:  Your Honor, it has to do with some

3   communications I can share as it relates to the Bank of

4   Kuwait controlling if those claims are deeming sold and

5   having and exercising control over the trustee throughout

6   the process to make an agreement to make sure they can

7   credit bid (indiscernible) supported doing so, rather than

8   monetizing the claims for the estate, that would actually

9   help (indiscernible) --

10        THE COURT:  Okay.  So let me get this right.  You

11   want to argue that the fact that you won and you bought the

12   claims now is unfair to some other parties.  That makes no

13   sense to me.  You got what you wanted, right?  You bought

14   the claims.  And you're going after Sonder, right?

15        MR. CHOUDHURI:  From what is best, in my opinion,

16   for all the creditor in the estate is where I was going

17   (indiscernible) --

18        THE COURT:  I'll sustain the objection as to

19   relevance.  Thank you.

20   BY MR. CHOUDHURI:

21   Q    Mr. Phillips, did you have communications or

22   conversations with the trustee or R.J. or its attorneys

23   relating to Baker Botts' representation of the debtor?

24        MR. FITZMAURICE:  Objection, as it relates to the

25   bank or as relates to Sonder?

1          THE COURT:  As it relates to whom?

2          MR. CHOUDHURI:  To Sonder.

3          THE COURT:  I don't think anything that has to do

4     with Sonder has any relevance to the motion that's before

5     me.  So if those are the questions that you're going to ask

6     Mr. Phillips, you bought the claims.  Mr. Phillips can

7     pursue them for you or for one of your entities, because I

8     think it was bought by one of your entities.  It has no

9     relevance to the motion that's before me.  So let's get this

10    done quickly.  Are you going to ask him anything other than

11    about Sonder claims?

12         MR. CHOUDHURI:  I'll move this along.

13         THE COURT:  Well, no, I'm asking a specific

14    question.

15         MR. CHOUDHURI:  I'm getting ready to pass the

16    witness, Your Honor.

17         THE COURT:  Well, I don't -- you don't need to

18    pass the witness.  He's not relevant to what we're here

19    today for.  Okay.  Is there something else you're going to

20    ask him about?  Anything else other than Sonder claims?

21         MR. CHOUDHURI:  Maybe communications with the

22    trustee as it relates to the trustee's exercise of how --

23    what judgments has the trustee made (indiscernible) --

24         THE COURT:  Okay.  It's not relevant.

25         Thank you, Mr. Phillips.  Thank you for appearing.

1      You're excused.

2            MR. PHILLIPS:  Thank you, Your Honor.

3            THE COURT:  Thank you.  Do you have another

4      witness, sir?

5            MR. CHOUDHURI:  Your Honor, I was going to call

6      Russell Ingrum again as it relate to some rebuttal aspects.

7      But I don't want to frustrate the court anymore because he

8      was in court --

9            THE COURT:  If Mr. Ingrum wants testify again and

10     you want to call him again, that's fine.  As long as it's

11     relevant, I want to hear it.  Okay.  But if it's not

12     relevant, I don't want to hear it.

13           MR. CHOUDHURI:  I can just proffer or I can

14     just --

15           THE COURT:  I don't want a proffer.  If you want

16     to call him as a witness, call him.

17           MR. FITZMAURICE:  Your Honor, rebutting what?

18     There's been no other --

19           THE COURT:  I don't know.  But he's got to get on

20     the stand for me to figure that out.  So you want to call

21     him?

22           MR. CHOUDHURI:  Yes.

23           THE COURT:  All right.  Mr. Ingrum, call on up.

24     Is he here?

25           MR. TROOP:  Your Honor --

1          MR. FITZMAURICE:  He was on the Zoom this morning.

2          MR. TROOP:  He was on the Zoom this morning.  Your

3   Honor, Andrew Troop, for Pillsbury, for National Bank of

4   Kuwait.  This is their case-in-chief.

5          THE COURT:  I understand.

6          MR. TROOP:  Who can they rebut?  Who can they call

7   as a rebuttal witness?  They called them as a witness.  It

8   sounds as though we put a witness up that they're going to

9   rebut.  I'm just trying to move this along.

10          THE COURT:  I know and I'll let you recall him.

11   Is he here?  Is he on the phone?  Can we hear him.  Is he on

12   the phone?

13          CLERK:  I do not see him, sir.  His name was on

14   the list earlier.  There's no -- I don't know what happened

15   to the call.  It suddenly stopped working.  It's seven

16   minutes behind.

17          THE COURT:  I know.  It's three to six.

18          Mr. Choudhri?

19          MR. CHOUDHURI:  I can't get --

20          THE COURT:  Okay.  That's fine.  Do you have

21   anyone else you want to call?

22          MR. CHOUDHURI:  I'd like to call R.J. Shannon.

23          THE COURT:  All right.  Mr. Shannon, come on

24   forward.  Please raise your right hand to be sworn.  Do you

25   swear or affirm to tell the truth, the whole truth and

1    nothing but the truth, so help you God?

2              MR. SHANNON:  I do.

3              THE COURT:  Please be seated, sir.

4              Go ahead.

5                   DIRECT EXAMINATION OF R.J. SHANNON

6    BY MR. CHOUDHURI:

7    Q    Mr. Shannon, you spoke to Paul Caldwell, right?

8    A    I did.

9    Q    And you've seen a letter of intent for a signed

10   contract that Paul Caldwell signed.

11             MR. FITZMAURICE:  Objection, Your Honor, as to

12   letter, lacks foundation as to signed contract and letter of

13   intent.

14             MR. CHOUDHURI:  I can pull it up, Your Honor.  I'm

15   sorry.

16             THE COURT:  Okay.  I'll sustain the objection as

17   to lack of foundation.  Go ahead.

18   BY MR. CHOUDHURI:

19   Q    Mr. Shannon, you and I have met before in 2021,

20   correct?

21   A    Yes, I believe it was 2021.

22   Q    You came to my house and you came to my office.  Do you

23   recall that?

24   A    I am confident I never came to your house.  I did

25   attend with Mr. Parkins your office at, I believe, 1001 West

1    Loop.

2    Q    Yeah.  Let's -- going to go back to --

3          MR. FITZMAURICE:  So, Your Honor, relevance to

4    credit bidding?

5          THE COURT:  I'm going to give a little leeway.

6    It's just preliminary.  We'll get to that point.

7    BY MR. CHOUDHURI:

8    Q    Mr. Shannon, you were with a firm called Parkins Lee &

9    Rubio, correct?

10   A    I was an associate there, yes.

11   Q    And how many lawyers were at this firm?

12   A    I believe at that time it was four.

13   Q    And would that be Leonard Parkins, Kyung Lee and R.J.

14   Shannon?

15   A    And Charles Rubio.

16   Q    And Charles Rubio.

17   A    Yes.

18   Q    And are you aware that the Bank of Kuwait had received

19   offers from the borrower, the debtor, to sell the building

20   and lease the building in around August of 2021?

21         MR. FITZMAURICE:  Objection, Your Honor, lacks

22   foundation.

23         THE COURT:  I'll sustain the objection.

24         MR. CHOUDHURI:  I'm going to take this off, Your

25   Honor.  Hold on.  I'm going to pull this on.

1          THE COURT:  Just pull the cord off.  It'll stop

2    projecting.

3    BY MR. CHOUDHURI:

4    Q    Mr. Murray, you -- Mr. Shannon, you have produced lots

5    of documents in this case known as Murray production; is

6    that fair?

7    A    I don't believe that is how it was designated.  But

8    there were lots of documents.

9    Q    And those documents are basically inclusive of your

10   investigation and interviews that you conducted for the

11   trustee, correct?

12   A    It was in response to requests that may have had some

13   of that in it.  I don't know if that's how I'd characterize

14   it.

15   Q    So when did you leave Parkins Lee & Rubio.

16   A    It was either June 1st or the end of May of 2022.  And

17   actually, I do remember.  I believe it was May 31st.

18   Q    And our communications were limited to only the debtor

19   in this case or did we have communications as it related to

20   other representations of me personally in 2425 WL?

21          MR. FITZMAURICE:  Objection, Your Honor, relevance

22   to the bank's ability to credit bid at the auction.

23          THE COURT:  Again, what's the relevance to the

24   credit bidding?

25          MR. FITZMAURICE:  Your Honor, this is going to

1    show collusion and bad faith and misrepresentations to the

2    court, which I can prove, and I'm getting there because

3    there's been -- you have a May 15th order, Your Honor, where

4    you said if there are any conflicts (indiscernible) the

5    parties, and I have come to find out --

6            THE COURT:  Again, Mr. Choudhri, here's the

7    problem, okay?  You filed a motion.  I gave you a copy of

8    that motion.  You now want to raise all these secondary

9    issues where there's been no pleadings, nobody's on notice,

10   okay?  The only thing that's before me at this point in time

11   is the motion to prohibit credit bidding at 353.  That's

12   what I want to hear evidence about.  Okay.  You're off in

13   the hinterlands somewhere, okay?  And I'm not going to allow

14   it.  All right.  So two questions, time up and we're done.

15   Okay.  Go ahead.

16   BY MR. CHOUDHURI:

17   Q    You don't recall being on a call with Kyung Lee,

18   myself, Reese Baker, Melissa Hayward and others where Kyung

19   Lee and yourself stated unequivocally that we will not allow

20   any sale to go forward if there is no cap -- where there's

21   no credit bidding.  Do you recall anything like that?

22   A    I do not recall a statement like that being made.  I do

23   recall calls, but not that statement.

24   Q    Mr. Shannon, you record conversations you have with

25   people, correct?

1    A    Not normally.  There were a couple in this case with

2    respect to interviews that the trustee was not able to

3    attend.

4    Q    So you have a recorded conversation with Paul Caldwell,

5    correct?

6    A    I do.

7    Q    And we asked you for that, and you've refused to

8    provide that?

9    A    You asked me for it yesterday afternoon.  I believe it

10   was Mr. Sather who asked me for it, and I explained the

11   reasons why I believe it was subject to attorney work

12   product protection.  I cited cases and I got no response

13   from Mr. Sather.

14   Q    And you also had -- have you recorded conversations

15   you've had with anybody at NBK or the attorneys at NBK?

16   A    No.

17   Q    Have you recorded conversations you've had with me?

18   A    No.

19   Q    On May 24th, we had a Zoom meeting, right?

20   A    I don't -- I don't know if on May 24th we did.

21   Q    There was an icon that popped up that said that this

22   call is being recorded by AI or something like that.  Do you

23   recall that?

24         MR. FITZMAURICE:  Objection, Your Honor, lacks

25   foundation and also relevance to the credit bidding.

1             THE COURT:  I'll sustain the objection as to lacks

2      foundation.  Thank you.

3      BY MR. CHOUDHURI:

4      Q     There are marketing materials that I've asked you for,

5      what the bidders have been provided in this case, correct?

6      A     There are marketing materials, and you have asked for

7      them.  Yes.

8      Q     And you've refused to provide that to me, right?

9      A     No.  Actually, I offered to provide them to you.  You

10     asked me for them on Saturday, and I said after the hearing

11     on Monday, we'll figure out a way to get those to you.

12     Q     Did Deirdre Brown ask you for those?

13     A     Deirdre Brown asked something about the marketing

14     materials, although it was a little ambiguous that's what

15     she was talking about.  And then the following day, I

16     believe the following day, after she asked, she withdrew

17     from the case.

18     Q     Mr. Shannon, have you made statements to others that

19     I've gone in the control room and I am a cause of whatever

20     leak that has taken place at the building?

21             MR. FITZMAURICE:  Objection, Your Honor, lack of

22     foundation as to a leak, but also relevance to the credit

23     bidding motion.

24             THE COURT:  Again, we're off in the hinterlands.

25     And so again, you're on a very, very short leash.  Again,

1    nothing pled.  You're making wild allegations that aren't

2    anywhere in the pleadings and you unfortunately are doing

3    damage to your case, I think, by making those allegations,

4    Mr. Choudhri.  So please ask questions that are relevant to

5    the motion to prohibit credit bidding.  I'm happy to hear

6    that.  But I don't want to hear anything else.

7    BY MR. CHOUDHURI:

8    Q    Have you fully investigated the claims against the Bank

9    of Kuwait?

10   A    I have helped the trustee in his investigation.  I

11   believe it's a full investigation.  I would say yes.

12   Q    So you believe your investigation is complete?

13   A    Yes.

14   Q    Do you have any value as to what those claims are

15   worth?

16   A    I don't have a dollar amount.

17              MR. MURRAY:  Your Honor, may I object?

18              THE COURT:  Yes.

19              MR. MURRAY:  I own this privilege and I don't let

20   him answer.

21              THE COURT:  Okay.  Thank you.  I'll sustain the

22   objection.  But I'll also say that Mr. Murray testified as

23   to what he thought the value of those claims were, and I

24   heard his evidence.

25   BY MR. CHOUDHURI:

1    Q    Have you had conversations with Hilco regarding credit

2    bidding?

3    A    I have not, no.

4    Q    Are you aware that the phone number -- let me back up.

5    There's a big sign on the building that says bankruptcy

6    sale, right?

7    A    I've seen a picture of it, but I have not seen it with

8    my own eyes.  I believe so, but I'm not entirely sure of

9    that.

10   Q    And that phone number went to a 99 cent store real

11   estate site, a dedicated line for the sale of a 99 cent real

12   estate portfolio by Hilco, correct?

13   A    It did at one -- well, I'm not entirely sure.  It did

14   reference a 99 cent store when you called that number, at

15   least for a period.

16   Q    Do you recall on our phone call that we had actually

17   called the number so you could hear it yourself?

18   A    I do recall that.

19   Q    And I can play it in a second.  But it was a dedicated

20   phone line to you --

21             MR. CHOUDHURI:  And I'll play the recording in a

22   second.  It's an exhibit (indiscernible).  So the phone

23   number -- Your Honor, may I request assistance to playing

24   the (indiscernible) --

25             THE COURT:  Certainly.

```
 1              WOMAN 1:  May I approach?

 2              THE COURT:  Yes.  Come on up.

 3              WOMAN 1:  Thank you, Your Honor.

 4              MR. CHOUDHURI:  Appreciate it (indiscernible).

 5    BY MR. CHOUDHURI:

 6    Q    Did you need Hilco -- the Bank of Kuwait's approval

 7    before you hired Hilco?

 8    A    I didn't hire Hilco.  The trustee did.

 9    Q    And so are there communications where the trustee is

10    waiting on the bank to approve before hiring Hilco?

11              MR. FITZMAURICE:  Objection, Your Honor, relevance

12    as to whether the bank gets to credit bid.

13              THE COURT:  I'll sustain the objection as to

14    relevance.

15    BY MR. CHOUDHURI:

16    Q    Mr. Shannon, do you believe that -- hang on.  Mr.

17    Shannon, I asked you what the admin claim amounts are.  Do

18    you recall that?

19              MR. SHANNON:  Objection.  Here today?  No, you

20    didn't.  So it misstates the --

21              THE COURT:  I don't think you asked that question.

22              MR. CHOUDHURI:  No.  No, no.  I didn't ask it

23    today.

24              THE COURT:  Well, ask the question to the witness,

25    please.
```

1          MR. CHOUDHURI:  Yeah.

2    BY MR. CHOUDHURI:

3    Q    I emailed you, Mr. Shannon, asking you what are the

4    admin claims, correct?

5    A    Yes.

6    Q    And others like Mark Smith with Barron & Newburger have

7    also asked you, last week, what are the admin claim amounts,

8    true?

9    A    I believe it was last week that Mark Smith asked, yes.

10   Q    And every one of those questions, did you respond with

11   a number or an approximate number?

12   A    No.

13   Q    And when asked by me, your response was it's

14   irrelevant, correct?

15   A    That's not my full response.  I think it was a five

16   point thing about it.  I'm not sure if I used the word

17   irrelevant.  I might have said it doesn't matter or it's not

18   material, but along those lines, yes.

19   Q    So if somebody wants to come along and provide the

20   estate a better deal, and they want to know what the admin

21   claim amounts are, how is that not relevant?

22          MR. FITZMAURICE:  Objection, Your Honor, relevance

23   to the bank's credit bidding at the auction tomorrow.

24          THE COURT:  Again, we're talking about plan

25   confirmation potentially.  We're not talking about credit

1    bidding, Mr. Choudhri.

2            MR. CHOUDHURI:  And I could go (indiscernible).

3    BY MR. CHOUDHURI:

4    Q    Mr. Shannon, you've received multiple offers to buy the

5    claims against the Bank of Kuwait, correct?

6    A    I have not received them.  I believe they were directed

7    towards the trustee.

8    Q    Were you emailed offers to buy the estate's claims

9    against the Bank of Kuwait?

10           MR. FITZMAURICE:  Your Honor, relevance to the

11   bank's credit bidding at the auction.

12           THE COURT:  I'll sustain the objection.  We've

13   gone through this before, Mr. Choudhri.  It's not relevant.

14   And again, you're on a very, very tight rope.  We've been at

15   this now for almost nine hours.  And so again, I'm going to

16   direct you and say if you want me to hear something, I

17   really want to hear it, as long as it's relevant.  But if

18   it's not relevant, I don't want to hear it.  Not only do I

19   not want to hear it, I'm going to make you sit down and be

20   quiet if you don't.  And I'm not going to let you call any

21   more witnesses and go through this over and over and over

22   and over again.  All right.  So please ask the question

23   that's relevant to credit bidding so I can hear it and we

24   can move on.

25   BY MR. CHOUDHURI:

1    Q    If the phone number on the building is wrong and the

2    bank is allowed to credit bid, is that a fair process in

3    your opinion?

4              MR. FITZMAURICE:  So objection, Your Honor,

5    assumes facts not in evidence as to the phone number on the

6    building is wrong.  It mischaracterizes the witness'

7    testimony.

8              MR. CHOUDHURI:  Sorry.  Let me withdraw that

9    question.

10   BY MR. CHOUDHURI:

11   Q    Mr. Shannon, what is the phone number listed on -- so

12   there's two signs on the building, right?  There's a sign on

13   top of the building, or kind of in the middle, third floor

14   up, a banner that says bankruptcy sale.

15   A    I don't know where in the building it was.  I saw like

16   a picture of it.

17   Q    Okay, and then there's also this sign that we're

18   looking at that says bankruptcy sale, right?

19             MR. FITZMAURICE:  Objection, Your Honor, assumes

20   facts not in evidence and lacks foundation as to there is

21   also this sign.  The witness just testified he didn't know

22   that that was the case.

23             THE COURT:  I'll sustain the objection.

24   BY MR. CHOUDHURI:

25   Q    Are you familiar with the sign that we're looking at?

1    A    I'm actually not.  I don't think I've seen that

2    particular sign before.  It does look like the building

3    behind it.  But --

4    Q    And what is the phone number on that sign?

5    A    855-755-2300.

6    Q    And when we had our conversation, I think end of May,

7    on a Zoom call, do you recall that?

8    A    I do recall that, and it probably was the end of May.

9    I'm not entirely sure on the exact date though.

10   Q    And so the end of May would be approximately a month

11   since Hilco was hired, right?

12       MR. FITZMAURICE:  Objection, Your Honor, lacks

13   foundation as to when Hilco was hired, also relevance to

14   credit bidding.

15       THE COURT:  I'll sustain the objection as to

16   relevance as to credit bidding -- bidding, excuse me.

17       MR. CHOUDHURI:  I'd like to play this.

18       MR. FITZMAURICE:  So Your Honor, we object to the

19   playing of this.  I don't know what it is, who -- or

20   anything else about it.

21       THE COURT:  You can't just play something like

22   that.  That's not the way this works.  Okay.  So I'll

23   sustain their objection.  Thank you.  If you want to ask him

24   about if he called the phone number, what it reached, those

25   sorts of questions, ask away.  Go ahead (indiscernible).

1    BY MR. CHOUDHURI:

2    Q    Did you call the phone number yourself?

3    A    I did.

4    Q    And do you recall hearing a message that said 99 cent

5    store real estate by Hilco, dedicated hotline?

6    A    I don't remember dedicated hotline.  I do remember in

7    reference to 99 cent store or something.  But 99 cent was

8    there, was in the message.

9         MR. CHOUDHURI:  Your Honor, may I move to play the

10   phone call so that at least it can be transparent on what --

11   how the phone rings?

12        MR. FITZMAURICE:  So Your Honor, objection.  The

13   witness testified earlier that there was a period of time

14   where that was the case, and it's no longer true.  So we'd

15   object on that basis.  We don't know -- we don't have any

16   idea as to when this recording was made, whose phone or

17   anything along -- anything along those lines.

18        THE COURT:  I'm going to sustain the objection as

19   foundation on this witness.  If you have another witness,

20   basically you can prove it up.  Thank you.

21   BY MR. CHOUDHURI:

22   Q    Mr. Shannon, on our phone call that we had, do you

23   recall that I called the phone number together with you?  At

24   the end of May, me and you had a Zoom call, correct?

25        MR. FITZMAURICE:  Objection, Your Honor, relevance

1     to credit bidding.

2               MR. CHOUDHURI:  We've covered that.

3               MR. FITZMAURICE:  And --

4               THE COURT:  Go ahead.  I've got to hear it one

5     more time.  Your objection is?

6               MR. FITZMAURICE:  Oh, I'm sorry.  Relevance as to

7     credit bidding, Your Honor.

8               THE COURT:  I'll sustain the objection.  Thank

9     you.

10    BY MR. CHOUDHURI:

11    Q    Have you authorized Hilco or your client or you -- or

12    are you aware Hilco is marketing the property with the

13    furniture in it, meaning assets?  It's being represented

14    that assets that are being sold are not assets of the

15    estate.  Are you aware of that?

16              MR. FITZMAURICE:  Objection, Your Honor, as to

17    relevance.

18              THE COURT:  Mr. Choudhri, I've already warned you

19    on the record that the furniture is not relevant to credit

20    bidding.  You've just gone there again.  One more time, I'm

21    going to sanction you.  I'm not only going to tell you to

22    sit down, but I'm going to sanction you.  So please ask

23    questions.  You're an intelligent man.  You've been through

24    this.  You've heard everything I've said.  Please ask

25    questions that are relevant.  Thank you.

1    BY MR. CHOUDHURI:

2    Q    Did you ever have conversations with the Bank of Kuwait

3    regarding credit bidding?

4    A    With their attorneys, maybe.  I think it was in an

5    email.  I don't know if we ever had a conversation about it.

6    Q    Who negotiated the sale motion and the credit bid and

7    the stalking horse agreements with the Bank of Kuwait?

8    Whose redlining -- let me withdraw that.

9        Mr. Shannon, were you the one who was actually in

10   control of redlining the back and forth drafts with the Bank

11   of Kuwait?

12           MR. FITZMAURICE:  Objection, Your Honor, relevance

13   to credit bidding.

14           THE COURT:  I'll sustain the objection.

15   BY MR. CHOUDHURI:

16   Q    Was there any reference in any of those documents to

17   credit bidding?

18   A    I actually don't remember a reference to credit bidding

19   in the bid procedures motion.  Now the APA, I believe, did.

20   It certainly -- I don't think it would have referenced it as

21   discussing credit bidding.  It might have referenced a

22   credit bid by the bank, but --

23   Q    Was there any draft where the tax lien was part of the

24   credit bid?

25   A    Maybe.  I don't remember that.  I believe this would

1  have happened back in April, maybe in late March when that

2  was being negotiated.

3  Q    Do you believe that a cap on (indiscernible) credit bid

4  would promote bidding?

5         MR. FITZMAURICE:  Same objection, Your Honor, as

6  to relevance to the (indiscernible) --

7         THE COURT:  I'll sustain the objection as to

8  relevance.

9  BY MR. CHOUDHURI:

10 Q    So did you have discussions with the Bank of Kuwait

11 about you wanted to cap the credit bidding?

12 A    It would have been with their attorneys.  I certainly

13 communicated the request that they cap the credit bid.

14 Q    So it was something that you or your client wanted to

15 do, is cap credit bidding?

16         MR. FITZMAURICE:  Objection, Your Honor.  We've

17 been over this ground before several times with other

18 witnesses.  Mr. Murray, who is in fact the client, testified

19 on this topic.  So I'd object on that basis.

20         MR. CHOUDHURI:  Your Honor, may I project --

21         THE COURT:  Sure, go ahead.

22 BY MR. CHOUDHURI:

23 Q    Mr. Shannon, is this an email that you sent to Andrew

24 Troop, Patrick Fitzmaurice and Charles Conrad?

25 A    It looks like it.  If you could zoom down?  Yeah, at

1    least -- at least that part of it.  Yes, that is -- I

2    believe that is an email that I sent.

3         MR. CHOUDHURI:  I would like to move to admit this

4    document, Your Honor.

5         THE COURT:  Again, do you have an ECF number?

6         MR. CHOUDHURI:  I do.

7    BY MR. CHOUDHURI:

8    Q    What is the date of this email, Mr. Shannon?

9    A    It looks like April 28, 2024.

10   Q    And the time?

11   A    I don't remember this, but it says there 5:56:57 p.m.

12   Q    Mr. Shannon, could you read what it says on maximum

13   credit bidding?

14        MR. FITZMAURICE:  Your Honor, the exhibit is not

15   in evidence.

16        THE COURT:  Again, do you have an ECF number?  I'm

17   happy to see if anyone has objections and rule on them.  But

18   it's got to be on ECF in order for me to admit it.  There's

19   no way to make a record otherwise.  Do you have an ECF

20   number?  If it's not on ECF, you can't admit it.  It's that

21   simple.  That's why I enter the orders that I enter.

22        MR. CHOUDHURI:  Your Honor, I can find it.  Just

23   one second.  Your Honor, there was a (indiscernible) trying

24   to find it.  There was a motion that might have been

25   duplicative that Mr. Baker had filed.

1        THE COURT:  I just need an ECF number.  I don't

2    need an explanation.  Just give me the ECF number.

3        MR. CHOUDHURI:  I'm trying to find it right now.

4        MR. BURKS:  Your Honor, it's 499-29.  ECF number.

5        MR. CHOUDHURI:  Yes, sir.  Thank you.  499-29,

6    Your Honor.  I'd like to pull it up.

7        THE COURT:  Are there any objections to 499-29?

8        MR. CHOUDHURI:  I'd like to ask about it.  I'm

9    sorry.  We were wrong --

10        THE COURT:  All right.

11        MR. TROOP:  Then we object, Your Honor.

12        THE COURT:  Well, I'm going to look and see.  It

13    is --

14        MR. FITZMAURICE:  499-29 is an email from May

15    12th.  I think the email we were looking at earlier was from

16    April.

17        THE COURT:  Yeah.  All right, so move along.  I

18    mean, I'm not going to sit here and let you basically do

19    what you should have done before trial.  Ask your next

20    question.  Mr. Choudhri, ask your next question.  I'll give

21    you one more time.  Ask your next question.

22        MR. CHOUDHURI:  So I'm just trying to find

23    something.  Sorry, Your Honor.

24        THE COURT:  Mr. Choudhri, ask your next question.

25        MR. CHOUDHURI:  I found it, Your Honor.  It's

1    document -- if I may project, Your Honor.

2              THE COURT:  Tell me what ECF number it is.

3              MR. CHOUDHURI:  463-2.

4              THE COURT:  Any objection to 463-2?

5              MR. FITZMAURICE:  Sorry, Your Honor.  I need to

6    see it.  This is the May 12th email again?  Is this not --

7              THE COURT:  This is not the same thing.  Okay.

8    That's the same thing.  Is that what you want to ask him

9    about?

10             MR. CHOUDHURI:  Yes, Your Honor.  This is what I

11   have up.

12             THE COURT:  Okay.  Any objection to 463-2?

13             MR. FITZMAURICE:  No, Your Honor.

14             THE COURT:  All right.  It's admitted.

15             (Trial Exhibit 463-2 entered into evidence)

16             THE COURT:  Thank you.

17             Go ahead, Mr. Choudhri, ask your question.

18   BY MR. CHOUDHURI:

19   Q    Mr. Shannon, can you explain what you mean by Paragraph

20   Number 1, or would you read Paragraph Number 1, please?

21   A    Sure.

22             MR. FITZMAURICE:  Relevance, Your Honor, to the

23   credit bidding.  We've been down this road a lot.  There's

24   been a lot of testimony, a lot of evidence already on the

25   fact that the trustee asked the bank to agree to a maximum

1    credit bid and that the bank said no.  This is cumulative,

2    unnecessarily so, given the many times this issue has been

3    discussed.  So we object.

4              THE COURT:  All right.  I'm going to overrule the

5    objection.

6              Go ahead and ask him your question.

7              MR. CHOUDHURI:  Thank you.

8    BY MR. CHOUDHURI:

9    Q    Would you read what Paragraph 1 says, Mr. Shannon?

10   A    Yes.  Maximum credit bid.  To the extent that the

11   debtor and 2425 WL have a non-frivolous point, it is that a

12   cap on NBK's credit bid would promote bidding.  If there's

13   some maximum amount that NBK would commit to, that would be

14   helpful.  Comparing that maximum to an attached bid would

15   also need to consider the tax claims.  But that is a

16   separate issue.

17   Q    But the bank did not agree to put a cap despite that's

18   something that you wanted to do?

19             MR. CHOUDHURI:  Objection, Your Honor, lacks

20   foundation.

21             THE COURT:  I'll sustain the objection.

22             Mr. Choudhri, next question.

23   BY MR. CHOUDHURI:

24   Q    Can you explain what you mean by timing of hearing of

25   2425 WL's objection to NBK's claim?  What does that mean,

1    Mr. Shannon?

2    A    Sure.  2425 WL set their -- self-calendared their

3    objection for a couple hours before the auction.  And I

4    think we even referenced it in the reply that's referenced

5    in the first paragraph here where we thought that was an

6    attempt to interfere with the auction.  And so I was, you

7    know, seeing if there was a -- there were two possible ways

8    to deal with that one, which is addressed after the dash

9    there.

10   Q    Mr. Shannon, is there a reason that there's been a lack

11   of -- or do you believe that there has been a lack of

12   transparency between -- or let me back up.  I want to say

13   this right, so I don't say it wrong.  Do you believe the

14   trustee and this representative have been transparent to

15   other creditors in this case?

16              MR. FITZMAURICE:  So --

17              MR. MURRAY:  Object.

18              MR. FITZMAURICE:  -- objection, Your Honor, as to

19   relevance to the credit bidding and I --

20              THE COURT:  It's not relevant to credit bidding at

21   all.

22              MR. FITZMAURICE:  -- I think Mr. Murray has other

23   objections as well.

24              THE COURT:  Move on, Mr. Choudhri.

25   BY MR. CHOUDHURI:

1    Q    Do you recall questions by me about credit bidding --

2    let me go back up (indiscernible) --

3             MR. CHOUDHURI:  I'm sorry, Your Honor.  Just one

4    second.

5             MR. MURRAY:  Your Honor, I want to object to

6    questions that are asked or about to be, about Mr. Shannon's

7    beliefs, opinions, thoughts.  Those are things that the

8    estate pays for.  He hasn't paid for it, and I'm not waiving

9    privilege.  If he's asking about facts and if the facts are

10   what Mr. Shannon heard Mr. Choudhri say, that's hearsay and

11   not a party opponent.

12            THE COURT:  All right.  Thank you.

13   BY MR. CHOUDHURI:

14   Q    The cash collateral motion filed by the trustee, I

15   believe it was May -- March the 21st.  It had a timeline of

16   selling the building and it had a credit bit component in

17   it.

18            MR. CHOUDHURI:  That's a bad question.  I'm sorry,

19   Your Honor.

20            MR. MURRAY:  Object to relevance.  It's a motion

21   the court's ruled on.  The order speaks for itself.

22            THE COURT:  I'll sustain the objection as to

23   relevance.

24            Mr. Choudhri, you're taking way too long between

25   questions and you need to speed your presentation up and you

1    need to ask relevant questions.  We can't take 35 to 45

2    seconds every time between every time that you pause to ask

3    a question, not at 6:15 in the afternoon or actually 20

4    to -- that clock's wrong.  It's 20 to 7:00.

5    BY MR. CHOUDHURI:

6    Q    Yeah.  Mr. Shannon, do you believe that a credit bid

7    promotes --

8              THE COURT:  They're going to object.  You can't

9    ask him what he believes.  Okay.  Mr. Murray's objected

10   already.  I've sustained the objection.  Ask something else.

11   BY MR. CHOUDHURI:

12   Q    Are there any buyers that you've spoken to that have

13   taken issue with the credit bid?

14   A    No.

15   Q    Have you spoken to any buyers?

16   A    Their counsel.

17   Q    How many buyers have you spoken to?

18   A    Either two or three.  Well, I mean, buyers, you know, I

19   don't know.  Potential bidders, I guess is --

20   Q    Potential bidders, prospects.

21   A    Then at least three.

22   Q    And has there been any discussion about credit bidding

23   in those calls or communications?

24             MR. FITZMAURICE:  Objection, Your Honor.  The

25   issue on the table is whether the bank should be able to

1   credit bid.

2          THE COURT:  I'll sustain the objection.  It's not

3   relevant.

4   BY MR. CHOUDHURI:

5   Q   Mr. Shannon, if the bank received -- if the bank acted

6   in bad faith and the bank received --

7          MR. MURRAY:  Objection, Your Honor.  We're gearing

8   up for an opinion question and I want to lay down a

9   marker --

10         THE COURT:  It assumes facts not in evidence that

11  the bank acted in bad faith.  I'm not going to allow it.

12         MR. MURRAY:  Judge, and I'd like to make an oral

13  motion for sanctions for at least the time that the estate

14  is spending for Mr. Shannon and his counsel.  Others might

15  have the same objection.  But for the amount of time spent

16  on every question that he asked that has been asked and

17  answered or irrelevant or asking for opinion or any of the

18  other bases that the court has sustained objections over and

19  over again.

20         THE COURT:  I'll take that up.  Thank you.

21  BY MR. CHOUDHURI:

22  Q   Mr. Shannon --

23         MR. CHOUDHURI:  Let me just pull the document

24  here.

25  BY MR. CHOUDHURI:

1    Q    Mr. Shannon, are you aware of offers that were sent by

2    Holland & Knight or were you recipient of offers that were

3    sent in 2021 by Holland & Knight to the National Bank of

4    Kuwait, which included the $85 million offer?

5              MR. FITZMAURICE:  So objection, Your Honor, lacks

6    foundation, assumes facts not in evidence.  It's also not

7    relevant.

8              THE COURT:  It's not relevant, and I'm going to

9    sustain the objection.

10             And Mr. Choudhri, you've worn out you're welcome

11   on this witness.  You may step down.  You're not going to

12   ask him any more questions.

13             All right.  Hold on, hold on.  I want to make sure

14   that no one else wants to ask you any questions.

15             Mr. Burks, do you want to ask any questions?

16             MR. BURKS:  No, Your Honor.

17             MR. FITZMAURICE:  Briefly, Your Honor?

18             THE COURT:  Go ahead.

19             CROSS-EXAMINATION OF R.J. SHANNON

20   BY MR. FITZMAURICE:

21   Q    Good evening, Mr. Shannon.  You testified earlier that

22   you spoke with Paul Caldwell?

23   A    I did.

24   Q    Why did you do that?

25   A    To investigate the claims against NBK.

```
1    Q    And as a result of that conversation, did you reach a

2    conclusion?

3    A    I didn't reach a -- I personally did not reach a

4    conclusion about claims against NBK, no.

5    Q    Did Mr. Caldwell tell you whether or not the bank had

6    told them the contents of the confidential settlement

7    agreement between the bank on the one hand and Mr.

8    Choudhri's entities on the other?

9              MR. BURKS:  Objection, calls for hearsay.

10             MR. FITZMAURICE:  Your Honor, whether or not

11   Mr. -- the results of that conversation informed the

12   trustee's investigation and it's relevant to whether -- it's

13   relevant to the view that the trustee has formed.  The fact

14   that the answer -- regardless of the truth, the answer has

15   independent relevance to the (indiscernible) --

16             THE COURT:  I'll overrule the objection.  Go ahead

17   and answer the question.

18             THE WITNESS:  I'm sorry.  Could you please restate

19   it?

20             MR. FITZMAURICE:  Sure.

21   BY MR. FITZMAURICE:

22   Q    Did Mr. Caldwell tell you whether or not the bank had

23   told him anything about the confidential settlement

24   agreement?

25   A    He told me that the bank did not tell him anything
```

1    about the settlement agreement.

2    Q    And did he tell you that the reason he didn't complete

3    the transaction with the debtor was as a result of conduct

4    by the debtor?

5              MR. BURKS:  Objection, leading and hearsay.

6              THE COURT:  I'll overrule the objection.  Go ahead

7    and answer the question.

8              THE WITNESS:  Yes.

9    BY MR. FITZMAURICE:

10   Q    And that was the reason the transaction didn't go

11   forward?

12   A    I don't know if that's the reason or not.

13   Q    That was what he told you?

14   A    Yes.

15             MR. FITZMAURICE:  Thank you.

16             THE COURT:  Thank you.

17             Mr. Choudhri, any questions based on those two

18   limited questions that were asked?

19                  REDIRECT EXAMINATION OF R.J. SHANNON

20   BY MR. CHOUDHRI:

21   Q    And Mr. Shannon, there's a recording of this

22   conversation.  So whatever you and Mr. Caldwell talked about

23   is recorded in an audio conversation that you made, correct?

24   A    Not every -- not all of it.  Only once we started

25   talking about relevant things, but yes.

1  Q    And that's not an audio recording that has been

2  produced.

3            MR. MURRAY:  Objection, asked and answered.

4            THE COURT:  I'll sustain the objection.

5            MR. MURRAY:  I renew my request for sanctions on

6  repetitive questions.

7            THE COURT:  All right.  Thank you.

8  BY MR. CHOUDHURI:

9  Q    As it relates to Mr. Caldwell, in response to

10  questions, Mr. Shannon, you wrote a memo that discussed your

11  impressions or conversation of Paul Caldwell, correct?  What

12  he told you, what you said, correct?

13            MR. FITZMAURICE:  So Your Honor, it's not my

14  privilege.  My understanding --

15            MR. MURRAY:  (indiscernible)

16            MR. FITZMAURICE:  My understanding is that there

17  was a document that was produced.  I don't know if this is

18  the document that Mr. Choudhri is referring to.  The trustee

19  has asked for it back, saying that -- saying that it was

20  inadvertently produced, and it's privileged.  So if that's

21  what they're talking about, I just want to make sure that

22  we're all on the same page, that there's a live request to

23  claw back that document based on an inadvertent production.

24            MR. MURRAY:  Yeah.  I don't object to asking about

25  the fact that a memo was prepared at my request for me.  I

1    don't want to answer anything about what's in it.

2          THE COURT:  All right.  So you can ask about the

3    memo, but if it's been asked -- it's been asked to claw back

4    and it was produced inadvertently, I would say that it's

5    still privileged.

6          MR. CHOUDHURI:  I'm not going to ask questions

7    about the memo, Your Honor.  I'm going to ask questions

8    about --

9          THE COURT:  Well, ask away.

10   BY MR. CHOUDHURI:

11   Q   I would like to bring to your attention ECF 499-45 and

12   let's pull it up.

13         MR. FITZMAURICE:  Your Honor, 499-45 appears to be

14   a, sorry, PowerPoint is that what I was looking for?  I

15   apologize.  Produced by CBRE.  So I don't think that's

16   relevant to this witness.

17         MR. CHOUDHURI:  It's Exhibit 45.

18   BY MR. CHOUDHURI:

19   Q   Mr. Shannon, you had a -- you were made aware from Mr.

20   Caldwell that he wanted to pay $75 million for the property,

21   correct?

22   A   I'm not sure if that's how I was made aware of that.  I

23   believe there was a document in some pleading that indicated

24   an amount.  I don't know if I became aware of it from him.

25         MR. TROOP:  Your Honor, just because people can't

1    see what's going on, including me, Mr. Choudhri is flipping

2    through a document and asking questions from it.  And the

3    question I would have, is he flipping through the document

4    that was just clawed back?

5             THE COURT:  I do not know.  I'm not looking what

6    he's looking at on the screens, for that very reason.  So I

7    don't know what he --

8             MR. TROOP:  I guess, Your Honor, then the question

9    is, given your ruling, it's clawed back and it's privileged.

10   I would ask -- leave it on your screen, Mr. Choudhri.

11            MR. CHOUDHURI:  Excuse me.  You don't need to

12   yell, Mr. Troop.

13            MR. TROOP:  Actually, Mr. Choudhri, I think I did

14   it.  I apologize, though.  I would think, Your Honor, it

15   might be appropriate for you (indiscernible) --

16            THE COURT:  All right.  So let me just see what

17   you're --

18            MR. TROOP:  It could actually be something totally

19   different.

20            MR. CHOUDHURI:  It is totally different.

21            THE COURT:  Let me just look at it.

22            MR. CHOUDHURI:  Can I have I put it up, Your

23   Honor?

24            THE COURT:  Yeah.

25            MR. CHOUDHURI:  So --

```
1              THE COURT:  Hit connect.

2              MR. TROOP:  He just changed it.  Yeah.  He just

3    changed it.

4    BY MR. CHOUDHURI:

5    Q    Mr. Shannon, this is not the document that you clawed

6    back in an email the other day, is it?

7    A    It's not.

8    Q    Okay.  Thank you.

9              MR. CHOUDHRI:  Thank you, Mr. Troop.

10             THE COURT:  All right.  Go ahead, ask your

11   question.

12             MR. CHOUDHRI:  I would move to admit this

13   document, Your Honor.

14             THE COURT:  Again, is it on ECF?  If it's not on

15   ECF, I can't admit it.

16             MR. FITZMAURICE:  It is, Your Honor.  We can find

17   the number, but it is on ECF.

18             MR. CHOUDHRI:  499-44.

19             THE COURT:  499-44.  Any objections to 499-44?

20             MR. FITZMAURICE:  Your Honor, I'd like to just

21   make sure that that's in fact correct.

22             THE COURT:  All right.  I'll look, too.

23             MR. SATHER:  It's 45.

24             MR. FITZMAURICE:  499-44.

25             THE COURT:  Any objections?
```

```
1                MR. FITZMAURICE:  Not from us, Your Honor.

2                THE COURT:  From the trustee?  It's admitted.

3                (Trial Exhibit 499-44 entered into evidence)

4                THE COURT:  Thank you.  Go ahead.

5      BY MR. CHOUDHURI:

6      Q    Mr. Shannon, is this document's tile R.J.'s notes from

7      5/3/2024, called Paul Caldwell.  Is this -- is this a

8      document you authored?

9      A    Yes.  Well, I think so, I mean, based on the first

10     page.

11     Q    You want to look through it and confirm?

12     A    Yes, if you wouldn't mind.

13     Q    Is this your production on the bottom where it says TE

14     0008629?

15     A    It's not my production.  It was the trustee's

16     production in response to 2425 WL's request, but yes.

17               MR. CHOUDHURI:  So we've admitted this document?

18     This is --

19               THE COURT:  It's admitted.

20               MR. CHOUDHURI:  Thank you, Your Honor.

21     BY MR. CHOUDHURI:

22     Q.   Mr. Shannon, what does this say?  R.J. Shannon

23     discusses previous bid amounts of Caldwell Soames mentioning

24     $35 million cash and a $40 million note?

25     A    So I can't remember where I obtained this information
```

1   or where I obtained the document from, but there's a

2   document that purports to be a letter of indication from

3   Paul Caldwell where it had those numbers on it, and I asked

4   Mr. Caldwell about it.  But that's what that reference is

5   there.

6   Q    And it says that you suggest that just a cash amount

7   could likely secure a deal and acknowledge the need to

8   review all documents and no guarantees.  What do you mean by

9   that?

10  A    That $35 million would be strong offer at the bid, or

11  at the auction, but that I didn't have any guarantees and

12  that Mr. Caldwell would need to review all the documents

13  before he made any kind of bid.  But I thought that $35

14  million cash would be a strong offer.  I was attempting to

15  get Mr. Caldwell to participate in the auction at this point

16  in the -- in the --

17  Q    And did you express to him or for him the bid

18  procedures following that meeting you had with him?

19  A    I sent him the bid procedures after the bid procedures

20  order was entered, because he was somebody who I had a

21  belief was someone who formerly was interested in the

22  property.  And I believe the order required me to send it to

23  all of those people, and he is one of them.

24  Q    So you were charged to investigate the claims against

25  the Bank of Kuwait, right?  You did this in that process,

1    correct?  This interview was because you were investigating

2    the veracity of the claims against the Bank of Kuwait; is

3    that fair?

4    A    Yes.  That was the purpose behind the --

5    Q    So if there's evidence that comes out that Mr. Caldwell

6    was provided confidential information by the Bank of Kuwait

7    that precluded him from going forward and paying $75 million

8    -- now let me back up.  You're aware that $75 million offer

9    was for 55 percent of the building, right?

10                MR. FITZMAURICE:  Objection, Your Honor, lacks

11    foundation, assumes facts not in -- assuming that we're

12    talking about just the $75 million piece and not the --

13                THE COURT:  I'll say the objection.  It assumes

14    facts not in evidence.  Go ahead.

15    BY MR. CHOUDHURI:

16    Q    Did you discuss the credit bid with Mr. Caldwell?

17    A    I don't remember if I did or not.  If I did, it would

18    probably be in the document.

19    Q    And you believe that conversation you had with Mr.

20    Caldwell is an attorney-client privileged communication?

21                MR. FITZMAURICE:  Objection, Your Honor.  I think

22    that mischaracterizes -- I think that mischaracterizes the

23    witness' testimony.

24                THE COURT:  I'll overrule the objection.  Go

25    ahead.

1           THE WITNESS:  I don't know if it's -- I don't know

2      -- I don't believe it's a privileged communication.  I think

3      it's subject to the actual recording and the particular

4      questions that I asked him and the way I asked it to him is

5      subject to attorney work product protection, which is

6      technically different.  But I do believe that is subject to

7      attorney work product protection.

8      BY MR. CHOUDHURI:

9      Q    Would you believe that if the court and everyone here

10     could actually hear the recording which was requested, it

11     would actually shed more light --

12          MR. MURRAY:  Objection.  He's asking for his

13     opinion.

14          THE COURT:  I'll sustain the objection.

15     BY MR. CHOUDHURI:

16     Q    If the court ordered you to provide and produce that

17     recording that you have with Paul Caldwell, will you?

18     A    I will comply with the court's orders.

19          MR. CHOUDHURI:  Your Honor, I'd like to make an

20     oral motion that those recordings that he mentioned are

21     produced so there can be transparency in this process.

22          MR. MURRAY:  I object.  That's out of order.  We

23     have discovery pending in both directions.

24          THE COURT:  I'll sustain the trustee's -- Mr.

25     Murray's objection to that oral motion and deny it.  Thank

1    you.

2    BY MR. CHOUDHURI:

3    Q    Did Mr. Caldwell tell you that Pillsbury represents

4    him?

5            MR. FITZMAURICE:  Objection, Your Honor, relevance

6    to the bank's ability to credit bid tomorrow.

7            THE COURT:  I'll sustain the objection as to

8    relevance.

9    BY MR. CHOUDHURI:

10   Q    Are you aware that Mr. Caldwell signed an NDA?

11           MR. MURRAY:  Objection, form, foundation.

12           THE COURT:  I'll sustain the objection.

13   BY MR. CHOUDHURI:

14   Q    Did you ask Mr. Caldwell if he have any signed

15   agreements or signed any agreements?

16           MR. FITZMAURICE:  Objection, as to scope, any

17   signed agreements, with who, related to what?

18   BY MR. CHOUDHURI:

19   Q    Related to 2425 West Loop.

20   A    I don't believe I asked that particular question.  If I

21   did, I don't remember it.

22   Q    So if -- so instead of investigating the claims against

23   the Bank of Kuwait -- let me back up.  If there's an auction

24   and there's a credit bid, whether the building sells for $20

25   million or $40 million, the amount of money the unsecureds

1    get is the same.

2            MR. MURRAY:  Objection, opinion.  I renew my

3    request for sanctions on repetitive questions on grounds --

4    on objectionable grounds that have already been ruled on.

5            THE COURT:  I'll sustain the objection.  You

6    already exceeded the scope of the redirect.

7            MR. CHOUDHURI:  It was Paul Caldwell.  It was

8    limited -- it was limited to Paul Caldwell (indiscernible)

9    go back to this document.

10           THE COURT:  So you're getting very, very close to

11   being sanctioned on Mr. Murray's motion.  So you need to

12   wrap it up because if you ask any more questions that I

13   overrule, I am going to sanction you.

14   BY MR. CHOUDHURI:

15   Q    So in this meeting, Mr. Caldwell tells you he recalls a

16   conversation with Choudhri in February 2023 about the bank's

17   status regarding declaring default, right?

18   A    What are you asking me?  If that happened in the

19   conversation or what the document says?

20   Q    If that happened in the conversation.

21   A    I don't -- I don't remember that that

22   (indiscernible) --

23           MR. CHOUDHURI:  No further questions.

24           THE COURT:  All right.  Thank you.

25           Mr. Burks, anything further?

1               MR. BURKS:  No evidentiary questions, Your Honor.

2     Thank you.

3               THE COURT:  Mr. Fitzmaurice?

4               MR. FITZMAURICE:  None, Your Honor.

5               THE COURT:  Sir, you may step down.

6               Mr. Choudhri, do we have another witness?

7               MR. CHOUDHURI:  I believe Mr. Ingrum is on.  I

8     just want to make sure.

9               THE COURT:  Mr. Ingrum is on the phone, it looks

10    like.  He's not on video.

11              MR. CHOUDHRI:  Mr. Ingrum, can you hear me?

12              THE COURT:  He can now.  There he is.  Hold on for

13    one second.

14              Mr. Ingrum, can you hear us now?  I can't hear

15    you.  You must be muted on your end.

16              MR. INGRUM:  All right.  There we go.  Now you can

17    hear me.

18              THE COURT:  Now I can't see you, unfortunately.

19    There you are.

20              MR. INGRUM:  There I am.

21              THE COURT:  All right.  I'll remind you Mr.

22    Ingrum, that your still under oath.

23              MR. INGRUM:  Yes, sir.

24              THE COURT:  Go ahead and ask your question.

25                   DIRECT EXAMINATION OF RUSSELL INGRUM

```
 1    BY MR. CHOUDHURI:

 2    Q    Mr. Ingrum, do you recall being in the state court

 3    sometime in 2023 on a matter related to the National Bank of

 4    Kuwait?

 5    A    Yes.

 6    Q    And do you recall that there were a couple of parties,

 7    buyers that were interested in -- let me back up.

 8              MR. TROOP:  Your Honor, can we move the screen --

 9              THE COURT:  Oh, sure.  Sorry.  I apologize.

10              MR. TROOP:  Thank you.

11    BY MR. CHOUDHURI:

12    Q    Mr. Ingrum, do you recall being at a hearing with the

13    National Bank of Kuwait in state court related to 2425?

14    A    I never got into the court.  I was kept outside and

15    never stepped inside.

16    Q    Right, but you came to court and I think there was like

17    they wanted to excuse or call, make the witnesses leave or

18    something, go outside.  Do you remember that?

19    A    Yes.

20    Q    And do you recall your purpose of coming to court or

21    what kind of -- what the purpose of coming to court was as

22    it relates to 2425 and the process to sell 2425?

23              MR. FITZMAURICE:  Objection, Your Honor, relevance

24    is to --

25              THE WITNESS:  I honestly do not recall what the
```

```
 1   purpose was.

 2               THE COURT:  Hold on, what's the objection?

 3               THE WITNESS:  Okay.

 4               MR. FITZMAURICE:  Whatever reason Mr. Ingrum was

 5   in state court a year ago has no relevance to the bank's

 6   ability to credit bid at the auction tomorrow.

 7               THE COURT:  Mr. Choudhri, I'll let you respond to

 8   that.

 9               MR. CHOUDHURI:  I'll withdraw my question, Your

10   Honor.

11               THE COURT:  All right.  Go ahead.

12   BY MR. CHOUDHURI:

13   Q    Mr. Ingrum, would you describe how a sales process is

14   affected by a credit bid?

15               MR. FITZMAURICE:  Objection, Your Honor, asking

16   for expert opinion evidence on an issue that Your Honor has

17   already ruled on several times today.

18               THE COURT:  I'll sustain the objection.  Thank

19   you.

20   BY MR. CHOUDHURI:

21   Q    Mr. Ingrum, would you consider yourself to be an expert

22   in the office building sales area?

23               MR. FITZMAURICE:  Your Honor, whatever the answer

24   to that question is, Mr. Ingrum has not been identified as

25   an expert in connection with this proceeding.  He's
```

1   incapable of --

2           THE COURT:  I'll sustain the objection.  If he

3   hasn't been designated as an expert, he can't testify as an

4   expert.

5           MR. CHOUDHURI:  I guess (indiscernible) --

6           THE COURT:  If you had designated him, I'd love to

7   see him.

8           THE WITNESS:  Do I answer?  Do I not answer?

9           THE COURT:  You wait until I tell you to answer

10  the question.  Thank you.

11          THE WITNESS:  Okay.  Thank you.

12          MR. CHOUDHURI:  Your Honor, I think that he may

13  have been designated as an expert at our earlier hearing.

14  And I'm not sure if he was (indiscernible) --

15          THE COURT:  Nothing in front of me indicates he's

16  been designated as an expert.  So unless you can show me

17  something, he can't testify as an expert, end of story.  So

18  do you have another question to ask him?

19  BY MR. CHOUDHURI:

20  Q   Mr. Ingrum, are you familiar with 2425 West Loop?

21  A   I am familiar with the office, yes.

22  Q   Have you been to the building?  Have you toured it?

23  A   I have.  I have.

24  Q   And what would a normal marketing --

25          MR. CHOUDHURI:  I see you rolling your eyes.  I'll

```
 1   just withdraw.  I'll pass the witness, Your Honor.  I don't
 2   want to frustrate you anymore.
 3           THE COURT:  Okay.  Thank you.
 4           Mr. Ingrum, I don't think there's going to be any
 5   more testimony for you, but I'll go around and ask anyone.
 6           Mr. Burks, do you have any questions for Mr.
 7   Ingrum?
 8           MR. BURKS:  None, Your Honor.
 9           MR. FITZMAURICE:  None, Your Honor.
10           THE COURT:  All right.  Then you're excused, sir.
11   Thank you for appearing.
12           Mr. Choudhri, next witness.  Mr. Choudhri, next
13   witness.
14           MR. CHOUDHRI:  Your Honor, I have some tenants
15   that wanted to.  But if the court is not inclined to listen
16   to that evidence --
17           THE COURT:  I'm not sure that your tenants can
18   give me any relevant information relative to credit bidding.
19           MR. CHOUDHRI:  The only relevance that I would
20   demonstrate for Your Honor is that these are ready and
21   willing tenants willing to come in and the values
22   (indiscernible) but the values are (indiscernible) depressed
23   so a credit bid can take place (indiscernible) motivation
24   and bad acts of the bank have not wanted to approve leases
25   and just the historical fact.  But if the court would not
```

1    listen to that, then (indiscernible) --

2            THE COURT:  I don't think they can provide me any

3    sort of information that I would need.  Thank you.  All

4    right, do you have anyone else you want to call?

5            MR. CHOUDHURI:  (indiscernible) just to talk to my

6    --

7            THE COURT:  You don't get to talk to anyone.

8    You're representing yourself.  Do you have any other

9    witnesses you want to call?

10           MR. CHOUDHRI:  I don't.

11           THE COURT:  All right.  Thank you.  Then we'll

12   take it you rest.

13           All right.  Let me go over to NBK.  Do you have

14   witnesses you want to call?  Tell me what you want to do.

15           MR. TROOP:  Your Honor, I think at this moment in

16   time, it's appropriate to make a motion.

17           THE COURT:  All right.

18           MR. TROOP:  The motion is under Bankruptcy Rule

19   7052, made applicable to this contested matter by Bankruptcy

20   Rule 1114.  Your Honor, I'm going to be as brief as I can

21   be.  We have been through a lot today.  You laid out for the

22   movants six things on which they needed to present evidence

23   to convince you that there was cause to prohibit credit

24   bidding, and not to be too cheeky about it, Your Honor, what

25   you heard today was a number of witnesses trying to tell you

1   that based on what they were told by Mr. Choudhri, there are

2   claims.  The movants here put on not one single percipient

3   witness, no one with personal knowledge, no one who could

4   say there was an act that resulted in Y.  What you heard was

5   a lot of speculation about potential claims, again from a

6   single source, who no one put on the stand.

7        Your Honor, there's a complete failure of proof

8   here with regard to a demonstration of cause to prohibit

9   credit bidding.  What there is, however, Your Honor, is

10  there is admissible evidence with regard to why, as a matter

11  of law, the claims can't be pursued.  And there's also

12  credible evidence as to the exercise of the trustee's

13  independent judgment as to why he, in making his own

14  credibility assessments, determined not to pursue a claim

15  against NBK.

16       And Your Honor, while I know you can read the

17  documents themselves and the final cash collateral order

18  itself, to be clear, Your Honor, there are five or more

19  stipulations in Section 3 of the cash collateral order.

20  There's one which is subject to the challenge period, which

21  has to do with amount, validity and equitable subordination.

22  There's one that has to do with perfection, which is not

23  subject to the challenge period.  And regardless, Your

24  Honor, it is clear that once the challenge period ends,

25  everyone's bound by those stipulations.

1            Your Honor, I may disagree with you on your

2     decision with regard to the motion to strike the objections.

3     But Your Honor, what you didn't rule then and what's

4     applicable now is that with the challenge period having

5     expired and no act of a trustee having been taken, all of

6     those stipulations are binding on the parties.  You ruled

7     they could object, and they did.  But that doesn't mean the

8     estate can't settle.  That doesn't take the trustee's

9     ability away, his control, his ability to resolve, settle,

10    use, sell property, resolve under 1919 (indiscernible) by

11    the final cash collateral order, and that's what happens

12    here on a legal side, on the legal barrier side.

13            But again, Your Honor, I go back to the

14    fundamental point on the factual side.  I don't need to talk

15    about the facts.  I don't need to talk about the details.

16    It's because there wasn't a single percipient witness.  The

17    parties didn't carry their burden.  And when you put this

18    all together, Your Honor, there should be not another hour

19    spent on this.

20            The credit bidding motion should be denied and you

21    should exercise your prerogative under Bankruptcy Rule 7052

22    and 9014 to do that now and not require the National Bank of

23    Kuwait to put up a case at this point in time.  Thank you,

24    Your Honor.

25            THE COURT:  All right.  Thank you.  I'll let Mr.

1    Burks respond to that and then I'll also let Mr. Choudhri

2    respond to that.

3         MR. BURKS:  That would be a home run if an order

4    authorizing cash collateral releases it from liability of

5    the claims that have been filed.  Don't take my word for it.

6    Don't take Mr. Choudhri's word for it.  Take Mr. Jerry

7    Alexander's word for it.

8         So here's the evidence.  You took in a long time

9    ago.  I thought this hearing was over, Judge, and I thought

10   the hearing was over because I thought that what the

11   judge -- what Your Honor would be ruling is that credit

12   bidding above 18.6 with the cap is prohibited and the reason

13   I thought that was I read Flowers v. Sherman District Court

14   out of the Northern District of Texas.  I read Morgan

15   Stanley Dean Whitter v. Almond out of the district court in

16   the Northern District of Texas.  I read CS Mining Company

17   bankruptcy decision out of Utah, all cited in the brief.

18        The facts in those cases which disallowed credit

19   bidding don't say that you determine -- you tried

20   litigation.  You determine if there's a bona fide dispute.

21   I didn't know how bona fide this dispute was until I just

22   heard a motion from NBK's counsel saying, Judge, they've

23   been released.  Don't consider them.  They were released in

24   a cash collateral order despite the fact that you've already

25   ruled that they weren't.  They're released in a settlement

1    agreement, which is the subject matter of one of the

2    lawsuits.  So Judge, don't determine the lawsuit, don't hear

3    the lawsuit, don't hear evidence.  Simply rule that a credit

4    bid can be allowed because there is no bona fide dispute.

5           But don't take my word for it.  The evidence that

6    he's ignoring is Jerry Alexander.  Jerry Alexander is an

7    attorney.  If you look at ECF 232-2, he's, in my opinion,

8    the best lender liability attorney in the state of Texas.

9    The best reputation, the best.  He was one of the state bar

10   nominees for president in 2023.  He is highly regarded by

11   his peers.  Everyone who knows this man knows that he got an

12   $18.1 million judgment three years ago in front of Judge

13   Jordan on lender liability.  He's the man that if you have a

14   lender liability question, you call him.

15          Jerry Alexander thinks as much.  He said it's a

16   great case.  That's why I'm going to take it on a pure

17   contingency.  Look at the allegations that are in the

18   lawsuit regarding the enforceability of the settlement

19   agreement.  Jeff Steidley got on the stand and he said he

20   likes the case.  He wants to bring the case.  He's taking it

21   on a strict contingency fee.

22          There are disputes.  They don't want you to hear

23   them.  They don't want you to consider them.  But the

24   evidence is Exhibits 2 through 9, 10, which you took into

25   evidence, and the testimony of Jerry Alexander and Jeff

1   Steidley.

2          But there's also something that we're all

3   forgetting about.  It happened way back a long time ago.

4   Maybe it was in another galaxy or universe, but certainly in

5   a different time zone.  And it was when the very first

6   witness of this case told you that NBK values the property

7   at somewhere around 18.6 and NBK has a claim of about $70

8   million.  In other words, by credit bidding up to $70

9   million, they can move well above any buyback in the plan.

10  They can move at a true auction.

11         This court has, in three orders issued in this

12  court, said the most important thing to this court is to

13  have a true auction bid to determine the value of this

14  property.  The reason why the three cases I've cited

15  prohibited auction credit bids is because credit bids don't

16  facilitate.  How do I know that?  Well, a lot of judges in

17  these opinions think that, that they do not facilitate a

18  fair market value determination.  But here's something that

19  interests me.  It was tortured.  It was long.  It was

20  difficult.  But at Document Number -- at ECF 463-2, that

21  April 2023 letter from R.J. Shannon to the NBK legal team

22  says, I really want, for the benefit of everybody, I really

23  want a cap on credit bidding.  And there isn't one.

24         Maybe the old adage of something about if you get

25  too greedy, you don't get anything.  I don't know if that

1    applies here.  But that cap should have been there and it's

2    not.  There is no way to know exactly what the damages

3    models are going to be without trying the cases.  You don't

4    shut down the case and you don't allow credit bid when there

5    are this many disputes because one thing we do know, I've

6    never seen an individual more impassioned than Mr. Choudhri.

7    And I have never seen a presentation by professional

8    attorneys as impassioned, begging this court to rule that

9    these causes of action have been released and do not

10   consider them.  Don't say they're bona fide disputes.

11           I'm new to this case so maybe I should have been

12   used to such passions.  I'm a passionate man myself.  But,

13   Judge, the question in the case law is are there disputes.

14   Do you even know that the NBK claim is going to be

15   disallowed at all?  They have the cash.  Let them cash bid

16   if they want.  Let them be the winning cash bidder.  Thank

17   you.  The evidence, I've outline what it is.  I'm not going

18   to repeat it.  Two witnesses, ten exhibits.  Thank you,

19   Judge.

20           THE COURT:  Thank you.

21           Mr. Choudhri?

22           MR. CHOUDHRI:  Your Honor, I'd like to point you

23   to ECF 464.  It's a motion for contempt and it's got

24   exhibits on there.  And it was a deposition for credit bid

25   motion, or for the credit bid hearing so we could ask

1   questions.  And when you read Mr. Carter's deposition, Your

2   Honor, in ECF 464 and the 30(b)(6) notice that happened, six

3   topics that were not objected to, Mr. Carter couldn't answer

4   any questions.  He refused to.

5        MR. FITZMAURICE:  Your Honor -- Your Honor knows

6   this, but that motion was denied.

7        THE COURT:  It was, and I'm going to let him

8   argue.  But --

9        MR. CHOUDHRI:  This is argument, I thought.

10       THE COURT:  Yeah.  It is.  Go ahead.

11       MR. CHOUDHRI:  So Your Honor, this should be a

12   fair fight.  One of the exhibits shows, if I can find it,

13   the Bank of Kuwait attaches a PowerPoint for a 30-, 60-page

14   document with all the key people at the Bank of Kuwait.  And

15   those are the people that were compelled to be deposed, that

16   they get deposed.  Mr. Carter has no knowledge of the credit

17   bid, the plan.  But the night before Monday, he signs a 120-

18   page declaration.  This hide and seek, this hide the ball,

19   it should be transparent, information should be free-flowing

20   so Your Honor can have a whole picture.

21        As we sit here today, Your Honor, this claim is

22   disallowed unless and until it's allowed.  They should not

23   get the benefit.  The burden is on them to do what they need

24   to do.  They haven't.  The market test -- to come in here

25   and say that cash collateral releases them without allowing

1    other creditors or an auction or a 9019 or a sale process to

2    liquidate a claim or allow it to be market tested is unfair.

3    It is basically a fox guarding the henhouse and the

4    motivations are misaligned.  There is no -- there is no good

5    reason to not lease up a building.  There is no good reason

6    to only have a few weeks of marketing.  There is no good

7    reason to have a phone number that doesn't go anywhere and

8    discovery tells -- attempting to get discovery, it's been

9    stymied or stopped.

10        The claims against the Bank of Kuwait are the

11    largest, is the largest asset in this bankruptcy and it

12    should be market tested.  If the Bank of Kuwait wants to pay

13    for those, do a 9019 and others can show up, like the Sonder

14    issue and bid more and want to buy more, then that's

15    something that should be done and can be done.  But to allow

16    the asset that is necessary to reorganize and maximize the

17    estate so one creditor can take advantage I think is

18    completely unfair.

19        There's an exhibit, if I can -- Mr. Troop's

20    supplemental exhibits I believe attaches images of the

21    individuals at the Bank of Kuwait and it talks about how

22    many hundreds of billions of dollars.  The Bank of Kuwait,

23    if they want to buy this property, they should be able to

24    bid on it like anybody else, and if they're disqualified

25    then they should be capped at their stalking horse bid.

1    Anything above that, they should have to pay for it.  Even

2    the stalking horse and even the credit bid up to the

3    stalking horse, I disagree with.  But it should be a fair

4    fight, and it should be a true market test.  And when you

5    have -- so to back up a little bit, Your Honor, there is a

6    lot here, there is a lot of evidence and that evidence is

7    not here to try the entire case against the Bank of Kuwait

8    today.  And there is a colorable dispute.  It's a bona fide

9    dispute.  Obviously there's two sides to every story.

10    But one of the things that bothered us in the

11    beginning was a release of the claims against NBK without a

12    market test.  That should happen first, and as we sit here

13    today, the claim is disallowed.  So they should not get the

14    benefit of it because what if it's found that they have no

15    claim?  In fact, it goes the other way, that the claims --

16    the last question that I asked Mr. Murray before I passed,

17    he said, yes, there are legitimate claims against the Bank

18    of Kuwait.  The trustee said that.  And the trustee also

19    said the claims have not been released against the Bank of

20    Kuwait.  But Mr. Troop says they are released.  And as we

21    sit here right now, the claim is objected to and it's

22    disallowed.

23    When, and if Your Honor would entertain a summary

24    judgment or a quick hearing on the adversary that's been

25    removed and the only reason the motion to remand was filed

1    because of the venue provision selected by Mr. Conrad in the

2    settlement agreement between Mr. Wetwiska and Mr. Conrad was

3    Harris County District Court.  That's a gateway issue.  One,

4    do they own the note?  What if it's later decided the claims

5    or ownership and then this court has allowed them to credit

6    bid on an asset and it's later found that they don't have

7    standing and it creates a conundrum.

8         So obviously we'll respect whatever Your Honor

9    does.  I would just ask Your Honor to disallow the credit

10   bid.  There's no dispute that there's a dispute and compel

11   or re-urge to compel.

12        Your Honor, if you read the deposition of Mr.

13   Carter, it is astounding that that's the corporate

14   representative and he has misrepresented and not been

15   truthful.  And if the court would allow, we can provide a

16   brief on the statements in this court and other courts and

17   testimony.

18        MR. FITZMAURICE:  Your Honor, I understand this is

19   argument.  He's calling our witness a liar without any

20   support or foundation or evidence.  I understand this is his

21   argument and he has his --

22        THE COURT:  I'm going to (indiscernible) that's

23   fine.  Please sit down.

24        Go ahead.  I want to hear what you have to say.

25   Go ahead.

1           MR. CHOUDHRI:  Your Honor, in this case, if you

2     heard all the evidence and all the facts as it goes to the

3     issue of the dispute, my understanding is we're not here to

4     resolve the dispute because that is lots of witnesses.  A

5     trial on the claims between the Bank of Kuwait and the

6     counterparties.

7           But one thing is undisputed between myself and the

8     trustee is that there are legitimate claims against the Bank

9     of Kuwait.  Trustee Murray said that in his last answer.  So

10    to allow the Bank of Kuwait to go forward and benefit from

11    their actions and credit bid would be an injustice.  The

12    Bank of Kuwait has plenty of funds to bid and pay for the

13    property if they want to buy the property.  And the claim

14    against the Bank of Kuwait should be auctioned or market

15    tested.

16          Your Honor, I also want to say that there's some

17    post-hearing briefing that I can demonstrate to you that

18    everything I have represented to you is not just

19    accusations.  It has facts behind it and evidence.  There

20    has been lots of misrepresentations to Your Honor in this

21    case, and it ricochets.  If somebody says something that's

22    not true, it ricochets in other places and it creates a

23    domino effect.  And unless you stop that, it keeps going.

24    People keep getting rewarded for their behavior and they're

25    going to keep benefiting from it.  That's all I have to say,

1    Your Honor.

2         THE COURT:  All right.  Thank you.  All right.  So

3    here's what I'm going to do.  What I have before me is a

4    motion to prohibit credit bidding, which is ECF 353, and the

5    objection of National Bank of Kuwait, which is at Docket

6    Number 455.  The National Bank of Kuwait has basically asked

7    me to make a directed verdict, and so based on their motion,

8    I am going to grant their motion and I'll enter a specific

9    order that everyone can take to their clients and read, and

10   I'll do that between now and hopefully midnight tonight.

11        But let me make the following comments for the

12   record so that the parties know why I'm going to come down

13   the way I'm going to come down.  363(k) gives a right to

14   credit bid.  The only way I can basically not allow credit

15   bidding is if I find cause.

16        Okay.  I'll turn to what the parties said when

17   they first opened their case some ten hours ago, ten and a

18   half hours ago.  Mr. Choudhri said I would be astonished at

19   the evidence and that I would find evidence that there's

20   been a fraud on the court.  I'm afraid Mr. Choudhri hasn't

21   really met that burden.  I'm not sure that's a burden he has

22   to meet.  But certainly I wasn't astonished, and I certainly

23   haven't found any sort of fraud on the court.

24        Mr. Troop said that there were -- the claims of

25   Mr. Choudhri were implausible.  I think he said that the

 1    claims are implausible.  I'm not sure that I agree with that

 2    fully.  However, I do agree with the trustee's credibility

 3    judgment as to the nature of those claims.  I don't have any

 4    questions or reasons to doubt it, and I think that given the

 5    trustee's credibility judgment, I can find that, based on

 6    the evidence that I've heard relative to the specific issues

 7    that I mentioned, I didn't really hear any credible evidence

 8    that NBK has no interest in the property.  I really didn't

 9    find or hear any credible evidence about the breach of NBK

10    by the settlement agreement or even the court's -- the state

11    court extension to July 3, 2023 of the payment obligations.

12            I realize there are claim objections.  I realize

13    that there are disputes between the parties.  But are they

14    sufficient for the court to find cause so that NBK can't

15    credit bid?  I think the answer to that question is no.  I

16    think they should be allowed to credit bid, and I'm going to

17    enter an order to that effect, and I'll do that as soon as I

18    step down from the bench.

19            You'll have that by 9:00 tomorrow because, even if

20    I write it tonight, I won't have staff until first thing

21    tomorrow morning.

22            All right.  We're adjourned until Wednesday at

23    9:00 a.m.  It is a federal holiday.  You have to enter the

24    courthouse by the far entrance where there is a button.  You

25    will need to push that button.  Tell them you're here to

1   come into this courtroom and they will let you in.

2   Otherwise, the courtroom is closed.  Thank you.  I'll see

3   you then.

4              What street is that on, judge?  Is it on Rust?

5              THE COURT:  It's on Rust.

6              MR. TROOP:  And, Your Honor, just for everyone in

7   the courtroom, I want to thank you, but not you so much.  I

8   want to thank your staff.

9              THE COURT:  That's not necessary.  They'll be paid

10  to do this, believe it or not.  Thank you.

11             MR. TROOP:  Thank you, Your Honor.

12         (Proceedings adjourned at 7:35 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                        <u>CERTIFICATION</u>

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7    *[signature: Sonya M. Ledanski Hyde]*

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 24, 2024