```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3   In re                      )  CASE NO: 23-34815 (JPN)
                                )
 4   GALLERIA 2425 Owner, LLC,  )  Houston, Texas
                                )
 5            Debtor.           )  Wednesday, June 19, 2024
                                )
 6                              )  9:00 a.m. to 4:54 p.m.
     -----------------------------)

 7

 8                              TRIAL

 9          BEFORE THE HONORABLE JEFFREY P. NORMAN
                 UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Debtor:           REESE W. BAKER, ESQ.
                           Baker & Associates
13                         950 Echo Lane, Suite 300
                           Houston, TX 77024
14
     For 2425 WL, LLC:     H. GRAY BURKS, IV, ESQ.
15                         BurksBaker, PLLC
                           950 Echo Lane, Suite 300
16                         Houston, TX 77024

17                         STEPHEN SATHER, ESQ.
                           Barron & Newburger, P.C.
18                         7320 North Mopac Expressway
                           Suite 400
19                         Austin, TX 78731

20   For Ali Choudhri,     ALI CHOUDHRI
     pro se:               2425 West Loop South, 11th Floor
21                         Houston, TX 77027

22   For the Trustee:      R.J. SHANNON, ESQ.
                           Shannon & Lee LLP
23                         2100 Travis Street, Suite 1525
                           Houston, TX 77002

24

25   For National Bank of  ANDREW M. TROOP, ESQ.
```

EXHIBIT
4

```
 1   Kuwait, S.A.K.P., New      PATRICK E. FITZMAURICE, ESQ.
     York Branch:               Pillsbury Winthrop Shaw Pittman
 2                              31 West 52nd Street
                                New York, NY 10019-6131
 3                              CHARLES C. CONRAD, ESQ.
                                Pillsbury Winthrop Shaw Pittman
 4                              Two Houston Center
                                909 Fannin, Suite 2000
 5                              Houston, TX 77010-1028

 6   Court Reporter:            TRACEY CONRAD

 7   Transcribed by:            Veritext Legal Solutions
                                330 Old Country Road, Suite 300
 8                              Mineola, NY 11501
                                Tel: 800-727-6396
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

```
 1                              INDEX

 2    TRIAL WITNESSES        DIRECT    CROSS    REDIRECT    RECROSS

 3    MICHAEL CARTER           34       67        104        108

 4    CHRISTOPHER MURRAY      111      145        179        182

 5    ALLEN HOLLIMAN         185      187

 6    ALI CHOUDHRI          195      231        233

 7

 8    TRIAL EXHIBITS                                      RECEIVED

 9    Exhibit 508-7                                          45

10    Exhibit 501-01                                         59

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          <u>HOUSTON, TEXAS; WEDNESDAY, JUNE 19, 2024; 9:00 a.m.</u>

2                           (Call to Order)

3          CLERK:  All rise.

4          THE COURT:  Please be seated.  So we are on the

5     record for Wednesday, June 19th, 2024.  It's 9:00 a.m.

6     There is one matter set on the docket.

7          I apologize for the air conditioning situation.

8     We are working diligently to correct it, but sometimes I

9     can't control what goes on at the courthouse, and this is

10    one of those situations.  All right.

11         23-34815, Galleria 2425 Owner, LLC.  Let me take

12    appearances first please and we'll just go around the room.

13    Go ahead.

14         MR. TROOP:  I'm standing up here, Your Honor.

15    Good morning, Your Honor.  Andrew Troop from Pillsbury

16    Winthrop Shaw Pittman on behalf of National Bank of Kuwait.

17    I am here today with my colleagues, Charles Conrad, Thomas

18    Morris, and Kwame Akuffo.  We have some people on the line

19    as well.

20         As a quick aside, Your Honor, thank you.  I meant

21    to thank you on Monday.  But we actually had summer

22    associates observing the hearing on Monday and taking up

23    your bandwidth.  And we appreciate that.

24         Our corporate representative and a witness,

25    Michael Carter, is also here today, Your Honor.

1          THE COURT:  All right.  Thank you.  All right.

2     The objecting parties.

3          MR. BAKER:  Reese Baker on behalf of the Debtor.

4          THE COURT:  Thank you, Mr. Baker.

5          MR. BURKS:  Good morning.  It's Gray Burks, B-U-R-

6     K-S, on behalf of 2425 WL.  Good morning.

7          THE COURT:  Thank you.  Good morning.

8          MR. SATHER:  Stephen Sather, also appearing on

9     behalf of 2425 WL, LLC, Your Honor.

10          THE COURT:  Thank you so much.

11          MR. SHANNON:  Your Honor, just for the record

12     since we're here, RJ Shannon on behalf of the Chapter 7

13     Trustee, Christopher Murray.

14          THE COURT:  Mr. Shannon, does the Trustee intend

15     to take a position relative to plan confirmation?

16          MR. SHANNON:  The trustee supports confirmation,

17     although we did not file anything in support.  But we do

18     support the confirmation, Your Honor.

19          THE COURT:  You want to be involved in the witness

20     process at all?

21          MR. SHANNON:  Not unless it's the trustee being

22     questioned, Your Honor.

23          THE COURT:  Okay, that's fine.  All right.  Thank

24     you.

25          All right, Mr. Troop, I think your client is the

1    plan proponent.  So you have the burden.  So I'll let you

2    make an opening statement if you want to make one.

3              MR. TROOP:  Sure, Your Honor.  First I would like

4    to -- I do have a short opening statement where I suggest to

5    you how I think the day should go, talk about where we are

6    on a few things.

7              First, Your Honor, let's just sort of lay the land

8    in terms of what's in play today.  Right?  There were

9    several objections filed, mostly taxing authorities --

10             THE COURT:  Which both were withdrawn.

11             MR. TROOP:  They've been withdrawn.

12             THE COURT:  There are two pending objections right

13   now I'm aware of though.

14             MR. TROOP:  Exactly.  That's it.  Just two

15   pending.  You speak much faster than I do, Your Honor.  So

16   maybe Mr. Burks (indiscernible).

17             Your Honor, yesterday we spent some time with Mr.

18   Burks about some things at the hearing.  So let me tell you

19   what we have been able to agree to and what we haven't been

20   able to agree to.

21             We have agreed that between us there should only

22   be three witnesses today.

23             THE COURT:  Okay.

24             MR. TROOP:  Michael Carter, the trustee, Chris

25   Murray, and Mr. Choudhri.

1          We also agreed to the admission of all the

2     exhibits on our respective exhibits lists save two.

3          THE COURT:  So let's go ahead and do that now so

4     that it's on the record and we can just basically deal with

5     it.

6          So there's an exhibit list from 531.  Is that the

7     one you were making reference to?

8          MR. FITZMAURICE:  Your Honor, the bank's exhibit

9     list at 501.

10         THE COURT:  501.  We're going way, way back, huh?

11    Okay, so 501.  Any of the exhibit at 501 are exhibits that

12    we are not admitting?

13         MR. FITZMAURICE:  Yes.  We understand that 2425

14    objects to Exhibit 23, which is Mr. Carter's declaration,

15    and Exhibit 18, which we call on the list evidence of the

16    bank's ability to make its required plan payments.  But

17    that's the annual report.

18         THE COURT:  All right.  And so let's do one thing

19    at a time.  So as to 501, Mr. Burks, do you have any

20    objection to any of the exhibits save and except 23 and 18

21    which we'll deal with in due course?

22         MR. BURKS:  Only half of 2425 WL —— and I'm

23    looking at 501 Exhibits 1 through...

24         THE COURT:  501 actually only goes to 22 is what

25    I'm seeing.

1          MR. BURKS:  I have through 26.

2          MR. FITZSIMMONS:  So I think,  Your Honor, on the

3    list there are some that are to be filed.  And they were

4    filed in the future.  So they may actually have different

5    ECF references when they actually hit the docket.

6          THE COURT:  Okay.  So let me just make sure the

7    record is clear.  So I'm looking at the docket right now.

8    And I'll just show it to you.  It makes it easier.  Okay?

9          501 starts at Exhibit 1 and then goes through 21.

10   But 21 references Exhibit 22.

11         MR. FITZSIMMONS:  So I think for these, Your

12   Honor, as I understand the agreement it's all of these save

13   for, except for number 18.

14         MR. BURKS:  So at this point then from the

15   exhibits that Your Honor has called, to make the record

16   straight, Exhibits 1 through 17 --

17         THE COURT:  And again the problem with that, Mr.

18   Burks, is Exhibit 1 through 17 doesn't work electronically.

19   It's got to be by ECF number.  So that's the reason I'm

20   going ECF 501-1, dash two, dash three.  They don't

21   apparently match, which is part of the problem.  Yeah.

22   Maybe whoever is on the record.

23         MR. BURKS:  And what am I stipulating to?  Do I

24   have to look at each on the docket?

25         THE COURT:  Well, I haven't looked at 501.  I

1    don't know.  I mean -- but so you get to Exhibit --

2              MR. BURKS:  May I have a moment?  I see what

3    you're doing.  May I have a moment?

4              THE COURT:  Yeah.  Uh-huh.

5              MR. BURKS:  Mr. Troop will help me.

6              THE COURT:  And if you want to look -- I can pull

7    them up and show you what they are if you want to know.

8              MR. BURKS:  The way I understand it works is for

9    501 for the ECF numbers, Exhibit 1 is 501.1.

10              THE COURT:  That's correct.

11              MR. BURKS:  Exhibit 2 is --

12              THE COURT:  So the docket is going to reflect that

13    I admit exhibits by ECF number.  ECF 501-1, 501-2, 501-3.

14    The exhibit numbers mean nothing to me.

15              MR. TROOP:  Right.  So for your --

16              MR. BURKS:  I'm with you.

17              MR. TROOP:  Okay.

18              MR. BURKS:  May I see, Your Honor, will you click

19    on 501-18?

20              THE COURT:  Sure.

21              MR. BURKS:  And maybe scroll down?

22              THE COURT:  It's going to come.  It just takes a

23    minute to download.

24              MR. BURKS:  All right.

25              THE COURT:  That is 501-18.

1            MR. BURKS:  Can you scroll up?

2            THE COURT:  That's the top of the document.  If

3    you want to look at the top, it says 501-18.

4            MR. BURKS:  So what I stipulated to was 501-19.

5    May I see 17?

6            THE COURT:  Sure.  Hold on for one second.  Did

7    you say 17?

8            MR. BURKS:  Yes, please.

9            THE COURT:  Seventeen looks like it's marked

10   Exhibit 18.

11           MR. TROOP:  Your Honor, I can help clear this up.

12   Okay?

13           MR. BURKS:  Because I don't know...

14           MR. TROOP:  There is a disconnect in terms of

15   between this exhibit list and what actually got filed.  The

16   document that Mr. Burks wants to object to is the document

17   that is entitled Evidence of Feasibility, Your Honor.  And

18   we'll look for that exact ECF number for you and bring it up

19   and make it clear on the record that Mr. Burks has not

20   agreed to the admission of that exhibit.

21           THE COURT:  So let's just do this.  I'll

22   conditionally admit everything in 501 except whatever comes

23   up that we're not going to stipulate to.  Okay?

24           And Mr. Burks is grimacing, and I understand his

25   grimace.

1          MR. BURKS:  I don't know what I've just stipulated

2    to.  So I'm looking at a list that's apparently on the right

3    list.

4          THE COURT:  Well, I think it's the right list.  I

5    think it's just the way it's been filed.  And the problem is

6    how we're going to refer to it on the record.  So why don't

7    we --

8          MR. BURKS:  All right.  Let's try this.

9          THE COURT:  Okay.

10          MR. BURKS:  We can stipulate to everything except

11    in the exhibit entitled Evidence of NBK's Ability to Make

12    its Required Plan Payments and an exhibit called Carter's

13    Declaration.

14          With that said --

15          THE COURT:  Hold on.

16          MR. BURKS:  I know.  With that said, may I reserve

17    the right when I see an exhibit that I --

18          THE COURT:  To object to it.

19          MR. BURKS:  I didn't know that I was stipulating

20    to that I object to, that I may object to it.  Because this

21    is a little awkward because I don't know what I'm -- I don't

22    know what I'm stipulating to.

23          THE COURT:  That's fine.

24          MR. TROOP:  We're fine with that, Your Honor.  I

25    think conceptually we all understand that (indiscernible)

1    been reserved.

2           THE COURT:  All right.  Mr. Sather, do you have

3    something you want to say?

4           MR. SATHER:  I was just going to say that those

5    two documents were filed as one document at 514-2 as an

6    attachment to the bank's brief.

7           THE COURT:  Okay.  All right.  So the record is

8    clear, I am going to admit Exhibits 501-1 to 501-22 with the

9    exception of anything that references the evidence of NBK's

10   ability to make plan payments and then the Carter

11   Declaration plus Mr. Burks reserves the right to object to

12   any other document that basically comes up during testimony.

13          MR. BURKS:  Because 1 through 22 may include --

14   I'm looking at --

15          THE COURT:  I understand.  And I reserve your

16   right to object to it.  Okay?  So those are now done.

17          Is there other exhibits that Mr. Burks has that

18   we're going to stipulate to admissibility?

19          MR. TROOP:  Your Honor, we will stipulate to the

20   admissibility of all of the documents.  With respect to some

21   of them, Your Honor, that were filed yesterday, we

22   understand that they were intended to be used to address

23   some question as to whether or not the sale was going to

24   include furniture (indiscernible) equipment that it is

25   alleged that the trustee doesn't own.  And I believe that we

1   agreed yesterday that the asset purchase agreement is

2   intended only to purchase that which the Trustee can

3   transfer to us.  If the Trustee can't transfer to us --

4           THE COURT:  Which is the rule of law anyway.

5           MR. TROOP:  Exactly.

6           THE COURT:  So --

7           MR. TROOP:  No skin off our nose, Your Honor.  I'm

8   not -- I'm just saying I think --

9           THE COURT:  Mr. Burks, do you have exhibits that

10  you want me to put into evidence right now given the

11  stipulation?

12          MR. BURKS:  Yes, Your Honor.  I don't know the ECF

13  numbers.

14          MR. SATHER:  We've been using 499, which was

15  Reese's set.  And it would be 1 through 93.  Before we get

16  into all the supplemental ones.

17          MR. BURKS:  Yes, Your Honor.  At this point I

18  offer into evidence 2425 WL's Exhibits 499-1, 499-2, 499-3,

19  499-5, 499-6, 499-7, 499-8, 499-9, 499-10, 499-12, 499-34,

20  546 -- may see the Docket 541 -- 546.  So I understand what

21  you're doing.  And I just want to make sure that I'm

22  referring to the correct ECF numbers, Your Honor.

23          THE COURT:  It's the exhibit list you filed

24  yesterday.

25          MR. BURKS:  So what I called Exhibit 96, is that

1    546-1?

2              THE COURT:  I don't know without looking.  Bear

3    with me for one second.

4              MR. BURKS:  And, Mr. Troop, you're following along

5    with me so I can make sure our stipulation is accurate?

6              MR. TROOP:  We are keeping up.

7              MR. BURKS:  Thank you.

8              THE COURT:  That's it right there?

9              MR. BURKS:  Yes.  That is -- and that's 546-1?

10             THE COURT:  Mm-hmm.

11             MR. BURKS:  All right.  So offer into evidence

12   546-1, 546-2, 546-3, 546-4, 546-5, and 546-6.  May I see 6

13   on the screen just so I know that I've got this right?

14   That's what I offer at this time, Judge.

15             THE COURT:  All right.  Then I will admit based on

16   the lack of objection by Mr. Troop 499-1 through 10, 499-12,

17   499-34, 546-1, 546-2, 546-3, 546-4, 546-5, and 546-6.

18             MR. BURKS:  Reserve the right to of course call --

19   offer any rebuttal exhibits, Judge.

20             THE COURT:  That's fine.

21             MR. BURKS:  Thank you.

22             THE COURT:  Mr. Troop, back to you.

23             MR. TROOP:  Mr. Baker.  I'm sorry.

24             MR. BAKER:  On behalf of the Debtor, we would like

25   to also have the same exhibits that 2425 WL is offering.

```
 1          THE COURT:  They are admitted on the record and

 2   you can use them for whatever purpose you would like, Mr.

 3   Baker.

 4          MR. BAKER:  Thank you.

 5          THE COURT:  Thank you.

 6          MAN 1:  Your Honor, there are a number of people

 7   on GoToMeeting who I don't believe had an opportunity to

 8   announce their appearance, including the U.S. Trustee.

 9          THE COURT:  The only person that I'm currently

10   seeing is Mr. Choudhri, and I am taking notice of his

11   position.  So we're good to go.  Thank you.  Ms. Whitworth,

12   do you want to make an appearance?

13          MR. CHOUDHRI:  Your Honor?

14          THE COURT:  Mr. Choudhri, hold on for one second.

15   Ms. Whitworth, do you want to make an appearance?

16          MS. WHITWORTH:  Yes.  Good morning, Judge.  Jana

17   Whitworth on behalf of the United States Trustee.  Thank

18   you.

19          THE COURT:  All right.  Thank you.

20          MR. TROOP:  Thank you.

21          THE COURT:  Mr. Choudhuri, I note your appearance

22   for the record.  Do you have something else you want to say?

23          MR. CHOUDHRI:  Yes, Your Honor.  I would like to

24   make (indiscernible) and I would like to --

25          THE COURT:  Excuse me, sir.  I didn't -- go ahead.
```

```
 1          MR. CHOUDHRI:  Yes, Your Honor.  I would like to
 2    make an appearance and I would like to announce my
 3    appearance and I would like to make an oral motion right
 4    now, Your Honor, for continuance.  I have felt very, very
 5    ill yesterday.  I'm not in good condition.  And I would
 6    refer to ECF number document 442-1, which I presented for a
 7    continuance that I believe was denied, Your Honor.  But
 8    since then I have felt very, very ill yesterday and I am not
 9    in good condition.  And so I don't want to be forced to go
10    forward.  So I would ask for a very short continuance, Your
11    Honor.  So I would like to make an oral motion of that due
12    to my stroke that I am -- that I suffered from.
13          And then second, the doctor on the 6th and 7th of
14    June and I was advised by the cardiologist that I should not
15    take on any stress or work until July 7th.  I've been in the
16    hospital fighting for my health, I'm fighting for my
17    finances.  So I would urge for -- an oral motion here for an
18    emergency continuance of this hearing.  That's my first oral
19    motion, Your Honor.
20          THE COURT:  All right.  Mr. Choudhri, let me rule
21    on your oral motion.  And let me be clear for the record.
22          The first problem you have, Mr. Choudhri, is the
23    fact that we have at this point in time one, two, three,
24    four, five, six, seven, eight, nine lawyers in the courtroom
25    who are all billing at very, very high rates.  And for you
```

1   to come in at the last minute and ask for a continuance I

2   think is unfortunately too little too late.

3           I also will state for the record, Mr. Choudhri,

4   that you are a little bit like the boy who cries wolf.

5   Okay?  I've seen an emergency motion to continue this

6   hearing based on a stroke.  Two days later you appeared at a

7   hearing.  You appeared at a nine-hour hearing the other day

8   where you appeared to do just fine where counsel got up and

9   said that you were suffering so badly that you couldn't even

10  participate and you participated a great deal.  Okay?

11          I hold all those things against you, Mr. Choudhri.

12  I am going to deny your motion.  Thank you.

13          Do you have another motion you want to make?

14          MR. CHOUDHRI:  I do, Your Honor.  I would like to

15  make a motion because when the motion for continuance was

16  made by 2425 WL, as I walked in the courtroom, I was asking

17  to make a motion for a continuance.  Your Honor would not

18  hear it --

19          THE COURT:  I am denying any sort of request for a

20  continuance at this point in time, Mr. Choudhri.  If that's

21  what you intend to argue or make a motion for, I'm not going

22  to hear it.  Do you have some other motion you want to make?

23          MR. CHOUDHRI:  I do, Your Honor.  I would make a

24  motion based on the fact that after that motion for

25  continuance was filed, Your Honor went outside the record to

```
 1    investigate the motion.  And I believe Your Honor is biased
 2    against me and investigating the case outside of the record
 3    that was before you.  You had made some comments, Your
 4    Honor, that you had spoken to maybe --
 5              THE COURT:  I did speak to Judge Isgur about your
 6    appearance in front of him.  That's correct.  I don't
 7    consider that to be improper our outside the record or
 8    create any sort of problem for me hearing your case.
 9              MR. CHOUDHRI:  Right, well --
10              THE COURT:  And so I will acknowledge on the
11    record, I did do that.
12              MR. CHOUDHRI:  So my mental abilities are limited
13    --
14              THE COURT:  Mr. Choudhri, I'm going to cut you
15    off.  I've ruled on your motion.  We're done.  All right?
16    You may participate in this hearing.  I'm willing to let you
17    participate.  I'm willing to let you make whatever arguments
18    you want to make.  I'm not continuing this hearing.  Mr.
19    Troop, back to you.
20              MR. CHOUDHRI:  Your Honor --
21              MR. TROOP:  Thank you.
22              MR. CHOUDHRI:  -- are you denying the motion --
23              THE COURT:  Mr. Choudhri, no.  I already denied it
24    on the record, Mr. Choudhri, for all the reasons I just
25    said.  Okay?  Thank you.  Thank you.
```

1          MR. CHOUDHRI:  The motion for -- excuse me, Your

2     Honor.

3          THE COURT:  It's denied.  Thank you.

4          Mr. Troop?

5          MR. TROOP:  Thank you, Your Honor.  Why don't we

6     stay on some procedural housekeeping matters.

7          THE COURT:  Sure.

8          MR. TROOP:  This morning,  Your Honor, there was a

9     witness list and exhibit list filed by Jetall, which is an

10    affiliate of Mr. Choudhri.  They have not objected.  They

11    don't have an objection on file.  And as far as I can tell -

12    - I mean, I don't know whether they have a lawyer on the

13    phone or not, but there are entities, Your Honor.  That

14    strikes me as late, inappropriate ambush and the like.  And

15    I would move that that witness list and exhibit list be

16    stricken.

17         THE COURT:  And is that -- I'm not seeing that on

18    the record.  Is it just -- I mean...

19         MR. TROOP:  Try 548, Your Honor.  ECF 548.

20         THE COURT:  Okay.  Bear with me for one second.

21    So let me just be clear.  I came in the courtroom at 8:00

22    and set up my computer system.  All right?  It loads the

23    docket at that point in time.  So the record is clear, this

24    is what the docket reflects.  It reflects only the 547,

25    which means it was filed after 8:00 this morning.  All

1    right?

2            MR. TROOP:  Yes, Your Honor.

3            THE COURT:  I'm going to refresh now and look at

4    it.

5            There is an exhibit witness list followed by

6    Jetall Companies on -- after 8:00 this morning at 548.  I'm

7    going to find that it's untimely, that it's late, that the

8    objection deadline for objections to confirmation have

9    passed and that Jetall Companies Inc. can't participate in

10   the confirmation hearing.  And so the record is clear, the

11   Court spent a great deal of time preparing for this hearing.

12   There were at the time of my review after the objection

13   deadline four objections to confirmation.  286, which is the

14   City of Houston objection that has been withdrawn; an

15   objection by CC2 which was filed late, which I was going to

16   disallow but was also withdrawn; an objection by the debtor

17   at ECF 409 and an objection by 2425 WL LLC at 401.  Those

18   are the two objections I plan to hear.  All right?  Thank

19   you.

20           MR. TROOP:  In that regard, Your Honor, just again

21   to make the record clear, 2425 WL filed a supplemental

22   objection on Friday, on 5/26.  We have filed a response to

23   that saying it's both untimely, the three new objections

24   that were raised, the reasons given, which were we

25   identified them after the deadline, we identified clearly

1    how there's nothing in there that wasn't known by the

2    original deadline --

3             THE COURT:  Hold on one second.  Let me mute

4    everybody on the line.  Just mute everybody.  Thank you so

5    much.

6             MR. TROOP:  I'm sorry, Your Honor.

7             THE COURT:  I'll come back to the parties online.

8    Go ahead.

9             MR. TROOP:  And, Your Honor, we identified that it

10   was all -- everything they needed to know they knew by the

11   time the original June 3rd objection.  They will argue on

12   one of them with regard to voting that the summary of votes

13   wasn't filed until June 7th -- on Friday the 10th as I

14   recall.  But it was perfectly clear that the NBK votes were

15   being voted in favor of the plan.  There was no reason to

16   wait ten days, to the Friday before the original hearing

17   that was scheduled to file at the end of the day

18   supplemental objections on things that were at least well

19   known for ten days.  That's just unfair, Your Honor.  It is

20   additional ambush.

21            But I can address the merits as well of that

22   particular one when you'd like.  But effectively I think --

23            THE COURT:  So let me just make this ruling on the

24   record.  The deadline for filing objections to the plan was

25   June 3rd, 2024.  All right?  If it truly is a supplemental

1    response that simply basically amplifies what's previously

2    been filed, I am more than happy to hear it.  To the extent

3    that it raises new objections, I'm not going to hear it.

4    It's not timely.  Thank you.

5         MR. TROOP:  And again, Your Honor, I misspoke.

6    That supplemental objection was filed on Sunday, the day

7    before the hearing and not the Friday before the hearing.

8    The record will show what it shows, Your Honor.

9         THE COURT:  It shows what it shows.  But again

10   what's important is the reason the Court sets deadlines is

11   because it then enforces those deadlines.  Thank you.

12        MR. TROOP:  Thank you, Your Honor.  So with that,

13   Your Honor, the way I think I would like -- I propose we

14   proceed today --

15        THE COURT:  Go ahead.

16        MR. TROOP:  -- is that I'm going to give a very

17   high-level overview of what we're here for today and what I

18   at least see as the significant issues for you to decide.  I

19   would yield to the objecting parties and ask them to do the

20   same at the high level.  (indiscernible) witnesses at the

21   end.  Mr. Akuffo, our colleague, will go through the

22   confirmation requirements and discuss how they've been

23   satisfied to sort of wrap it up.  Then I will probably

24   address any other issues that have been raised during the

25   course of the day.  Although I guess we have to go last as

1    the moving party.  So right before we talk, they get to talk

2    about what they think about confirmation.  Sorry about that,

3    Your Honor.

4            THE COURT:  All right.

5            MR. TROOP:  Sorry about that.

6            Your Honor, at a very high level we are here today

7    on the confirmation of the liquidating proposed by NBK

8    today.  There is -- there is no other alternative available

9    and all of the confirmation requirements have been

10   satisfied.

11           Your Honor, you have made perfectly clear that the

12   issue that appears to be foremost in the Court's mind and

13   the parties' minds based upon what's been filed so far today

14   is whether this plan has been proposed in good faith.

15           And in that regard, Your Honor, I think there's

16   really no dispute about the background here that led to this

17   case.  A loan that wasn't paid, an effort to foreclose.

18   Multiple, multiple pieces of litigation in state court, a

19   Chapter 11 filing on the eve of a foreclosure, a dismissal

20   by Judge Lopez, a refiling again on the eve of the

21   foreclosure, a motion by NBK to convert the case because it

22   was very clear that this case, this asset required an

23   independent fiduciary to manage its going-forward basis.

24           At that hearing, you decided not to appoint -- not

25   to convert the case, but rather to appoint a Chapter 11

1    Trustee.  Mr. Murray became the independent fiduciary.  We

2    were the secured creditor.  We are the secured creditor, the

3    largest secured creditor.  Exclusivity terminated and we

4    needed a plan -- and this is in the colloquial sense -- to

5    move this case forward to conclusion.  And the viable way to

6    do that was to propose a plan of reorganization since we

7    were in Chapter 11.  We have the right to do so, and we did.

8    And it is a fair plan, Your Honor.  It was proposed in good

9    faith.  You'll hear testimony that as the fiduciary for the

10   estate, we negotiated with Mr. Murray about the plan.  The

11   plan terms were changed to accommodate some, not all of its

12   requests, like you would expect in any negotiation.  And

13   then we move forward in a transparent and open manner.

14          We have proposed a plan in good faith that, yes,

15   provides NBK with releases of estate claims and we have

16   proposed a plan of reorganization which enforces that

17   release both through injunctions and a gatekeeping

18   provision.  But the gatekeeping provision, Your Honor, is

19   not at all implicated by Highland Capital in the decision by

20   the Fifth Circuit where the issue was whether or not

21   gatekeeping could be used in that case to protect someone

22   who was arguably not on the narrow list but nonetheless was

23   sort of a quasi-fiduciary in a third-party release kind of

24   way.  All claims, any claims related to the Debtor or the

25   estate were typically post-petition exculpation claims.

1    Emphasize that, Your Honor.  The issue in Highland was

2    exculpation.

3            The plan has been modified to make it clear that

4    the only party receiving exculpation is the Chapter 11

5    trustee.  I don't think there can be any dispute that the

6    Chapter 11 Trustee is a fiduciary covered by (indiscernible)

7    entitled to be exculpated and protected both by injunctions

8    and by gatekeeping.

9            So the only question is whether on the facts of

10   this case, which are not dissimilar in some ways to

11   Highland, having a non-debtor who is very litigious and

12   arguably trying to pursue estate claims cabined in some way

13   in terms of this conduct or the company's conduct.  Similar

14   there, but dissimilar because the gatekeeping function as it

15   relates to NBK is only with respect to released claims.

16   Released claims against NBK are only estate claims.

17           And the alternative, Your Honor, is that every

18   time NBK would get sued, they would remove the case to this

19   Court and seek to enforce the injunction.  And here the

20   process is that parties around the table, around the video,

21   around anywhere, have to come here and say to you I am

22   pursuing something that's not an estate claim, not

23   frivolous, and I get to pursue it.  And we can argue in

24   front of you, and you decide.  But at the end of the day

25   it's only estate claims.

1           And in that regard,  Your Honor, doesn't impact

2    the good faith nature of the plan, doesn't impact anything

3    else.

4           And back on good faith, Your Honor, the issue is

5    whether the plan was proposed in good faith.  The focus on

6    that is predominantly on conduct during the Chapter 11 and

7    in connection with preparing the plan and proposing the

8    plan.  It's not the things that you heard on Monday.  It's

9    not the things that you heard about prepetition conduct.

10          Embedded in here is a settlement of those claims.

11   And the Trustee testified on Monday and we expect he will

12   testify again today that in his independent reasonable

13   judgement, that's a good settlement for the estate.  But I

14   note, Your Honor, and I hope we are careful today, subject

15   to your rulings of course, that we don't retread a

16   tremendous amount of ground that was addressed on Monday.

17   They are two different motions.  I understand there were

18   objections sustained that pushed certain issues to here.

19   Those issues should absolutely be addressed here.

20          But the fundamental question, which you ruled on,

21   the Court holds that there must be some sufficient dispute

22   between the parties.  And all the parties are here, Your

23   Honor.  There's no one here who wasn't there who didn't have

24   a full opportunity that it can find cause for disallowing or

25   limiting credit bidding.  Here it does not find any such

1    cause and denies the motion in its entirety.

2          But you went on, Your Honor, and you also found

3    the movants, and especially (indiscernible) go to great

4    lengths to pass blame for their nonpayment to NBK.  The

5    settlement payment.  In effect, that he or others could not

6    pay due to the actions of NBK.  You found that on a review

7    of the documentary evidence, and you could take judicial

8    notice of all the documentary evidence in this case, does

9    not believe -- does not believe these allegations.  Does not

10   believe these allegations.  There's no credible claim there

11   to waste our time on today.

12          And so, Your Honor, you may hear us object.  A lot

13   of it moves into that.  And we hope now that you will --

14   just a preview in terms of what our thinking on that would

15   be.

16          Those seem to us to be the big issues.  There

17   can't be an issue about feasibility, there can't be an issue

18   about classification -- that is that there are classes.

19   There are so many things in that list that there cannot be

20   issues about, Your Honor.  So I hope that we focus today on

21   the ones that are important and legitimately

22   (indiscernible).

23          THE COURT:  All right.  Let me hear from the

24   debtor first.  Mr. Baker?

25          MR. BAKER:  Your Honor, we would request that you

1    allow 2425 and Mr. Burks to go forward first at this point

2    in time.  We are generally filing along with what he is

3    doing at this point in time.

4            THE COURT:  I'm happy to do that if you want to

5    waive your opening argument.  If not, I want to hear it.

6            MR. BAKER:  I'll waive my opening argument.

7            THE COURT:  Thank you.  Mr. Burks?

8            MR. BURKS:  That was interesting.  To borrow from

9    a line from a movie, almost everything that that man said I

10   disagree with.  And here's why.

11           We don't have the burden of proof of confirmation.

12   The proponent, NBK, does.  There are 16 elements that

13   they're going to have to prove up in 1129.  Maybe this plan

14   conceptually could have been confirmed.  Technically, it's

15   flawed.  So flawed that it can't possibly meet the 16

16   elements of 1129.  We talk about what the scope of the

17   objections are.  I think the objection of 2425 WL is pretty

18   clear.  The objection of the Debtor is pretty clear on some

19   of the technical faults.

20           The first thing that counsel for NBK said was this

21   is the only option before the Court as far as the Chapter 11

22   plan.  Well, first of all, that was NBK's choice as to what

23   was in the plan or not in the plan.  It's an aggressive plan

24   with respect to classification, it's an aggressive plan with

25   respect to releases, and it's an aggressive plan in that he

1    only ballot accepting the plan is by the plan proponent.

2    And we'll get to that in a minute when we talk about

3    1129(a)(10).

4            I don't have the burden to prove that there is one

5    accepting class; NBK does.  And the proponent is the only

6    one who accepted it.  And so we have the gatekeeping issue

7    of do you even have one accepting class within the

8    definition of 1129(a)(10).  The answer is a resounding no.

9            Surprisingly no.  Don't know why we don't, but we

10   don't.  Maybe if the balloting had been -- the solicitation

11   had been different, I'm not saying you can't get an

12   accepting class other than the proponent.  But as we stand

13   here today right now -- or more accurately as of 8:00 a.m.

14   today -- we don't have an accepting class for two reasons.

15   Here's why.

16           The proof of claim on file by NBK has been

17   objected to.  It has not been allowed.  It has not been

18   estimated.  No motion on notice and hearing has been filed.

19   Judge Rodriguez in In re Bressler said that's fatal to

20   confirmation as we stand here right now.  Can it be fixed

21   later?  I don't know.  I don't know why they didn't file the

22   motion to estimate the claim.  But we don't have a creditor

23   with an allowed for voting purposes claim on file.  That

24   wasn't my choice.  There's a lot of counsel in this room

25   that know how to practice bankruptcy law.  I can't

1    substitute for them.  And I can't relieve them of the burden

2    of proof of showing that there's one allowed correct.  But

3    there's something else that's happening here.  Of course we

4    research whether or not the proponent of the plan can be the

5    one -- could be if it has an allowed claim or an allowable

6    or an estimated claim -- of course we'll research whether

7    they could be.  And the answer in all the six cases we found

8    is they could be.  But here we have a problem.  We have NBK

9    who has a note, has a proof of claim.  And in that proof of

10   claim, they can do really whatever they want with the debt.

11   They can reduce it, they can eliminate some of it, they can

12   do anything they want with their lien.  And as the proponent

13   of the plan, they've chosen to do just that.  They've

14   changed their rights.  They've exercised their rights under

15   the note and said here's how we are going to be treated.

16   That's not an impaired claim.  They've exercised their note

17   rights and set forth in this plan how they will accept and

18   agree to be paid.  They've exercised their note rights.

19         Is it a novel argument?  Yes.  But is it a

20   gatekeeping argument that they have the burden of proof to

21   overcome?  Yes.  And here's why it's important.  They didn't

22   get any other votes for the plan.  That's why it's

23   important.  I don't know if they tried.  I don't know why

24   they didn't.  But you're sitting here right now with a plan

25   that can't satisfy 1129(a)(10).  We wish it could maybe.

1          Let's go back to the first thing he told you; it's

2     the only option you have.  Not true.  There's nothing that

3     prevents you from converting this case to Chapter 7.  And

4     that would take care of a lot of the issues here.  When we

5     get to the issues of what's the value of the claims being

6     released, when we get to the issues, the technical issues of

7     the plan, all will go away.  No one is ever going to be able

8     to prove that in between the time of today and the time this

9     case may be converted that the value of the property is

10    going to go down.  It's not going to be able to be put into

11    evidence.

12          Can another party file a plan?  Can NBK file an

13    amended plan?  My point today is if what you had as of 8:00

14    a.m. today is technically not (indiscernible).  There's more

15    to this.  You bet it's an aggressive release.  And it's not

16    just a release...

17          THE COURT:  Go ahead.

18          MR. BURKS:  It's not a release of just -- or an

19    exculpation of just the trustee.  On Page 8 of the plan,

20    Paragraph 78, it says released parties means, A, the Chapter

21    11 Trustee.  But it doesn't stop there.  B, NBK.  C, the

22    liquidation trustee.  D, each related party of each entity

23    in Clause A through D.  Former and current equity holders

24    and their affiliates and related parties are not released

25    parties.  In other words, Mr. Choudhri or anybody else.

1          So I didn't write the definition of released

2     parties.  And I'm not going to mince words on the Fifth

3     Circuit caselaw on exculpation versus gatekeeping versus

4     released parties because a creditor has never been -- a

5     creditor who is not participating in the reorganization of a

6     debtor has never been gatekept.  I don't know if that's a

7     word or a phrase.  Maybe it is now.  Can you be gatekeep or

8     gatekept if you have absolutely nothing to do with the

9     reorganization?  No.

10          Maybe the Purdue Pharma case might change that

11     under certain circumstances.  The facts of that case are so

12     different than the facts of this case that there's no way

13     that that's going to be precedent here.

14          What's happened is, Judge, the exculpation or

15     release or gatekeeping provision is a technical bar to

16     confirmation.  Can this plan go forward and be confirmed

17     without it?  Sure it can.  If the proponent chooses to.  But

18     what they want you to do is not only to confirm a plan, but

19     to adjudicate today, right now here, three sets of claims

20     where with all respect certainly we didn't put on evidence,

21     we weren't trying those cases two days ago.  Couldn't have

22     if we tried.  You wouldn't have let us because you ruled

23     properly on the evidence as to what the issue was before us

24     two days ago.

25          But today they want you to rule on the merits of

1    all pending litigation against NBK.  And if they disagree

2    with my point, then simply put in the confirmation order

3    that any limited liability claim against NBK and any pending

4    adversary proceedings removed or otherwise against NBK are

5    not included in any injunctions, releases, or exculpations.

6    If they're not, they're not.  We can just say it.  And we

7    may be over very quickly here.  If their intent is not to

8    have this broad, overreaching release, make it clear.  If

9    their intent is to get a plan confirmed by the

10   classification issues by including classifying claims the

11   way Mr. Sather says are technically flawed, one vote, one

12   party, then we've got a problem.  We have a technical

13   problem.  I didn't write 1129, but they have to follow 1129.

14   And they didn't do it here.  Thank you.

15          THE COURT:  Thank you.  All right, Mr. Troop, back

16   to you.  I'll hear your first witness.

17          MR. TROOP:  I was just going to say I don't think

18   you expect me to respond, Your Honor.

19          THE COURT:  No, I don't.  I just expect you to

20   call a witness.

21          MR. TROOP:  So we'll call the witness and I'll

22   turn this over to Mr. Fitzmaurice, Your Honor.

23          THE COURT:  Thank you.

24          Mr. Carter, do you want to come forward, please?

25   Again, if you'll stand at the microphone.  I know we just

1    did this the other day.  I'll swear you in and then you can

2    be seated.  And I apologize to you for the lack of air

3    conditioning.

4         Please raise your right hand to be sworn.  Do you

5    swear or affirm to tell the truth, the whole truth, and

6    nothing but the truth, so help you God?

7         MR. CARTER:  Yes, I do.

8         THE COURT:  All right.  Please be seated.  Sir,

9    you know, the drill.  Please speak into the microphone.

10        Mr. Fitzmaurice, I'll turn on the podium if you

11   want to present from there.

12        MR. BURKS:  Excuse me, Judge?

13        THE COURT:  Yes.

14        MR. BURKS:  Mr. Choudhri had his hand raise.  I

15   don't know if he's muted or not or --

16        THE COURT:  He is muted.  And I don't know why he

17   would be trying to speak at this point in time.

18        MR. BURKS:  Yes, Your Honor.  I just wanted to

19   make sure you saw it.

20        THE COURT:  I saw it, yeah.

21        MR. BURKS:  Yes, Your Honor.

22        THE COURT:  Thank you.

23             DIRECT EXAMINATION OF MICHAEL CARTER

24   BY MR. FITZMAURICE:

25   Q    Good morning, Mr. Carter.  Mr. Carter, are you

1   currently employed at National Bank of Kuwait?

2   A     Yes.

3   Q     When did you join the bank?

4   A     At the end of May of 2018.

5   Q     Was that after the bank's loan to the Debtor was made?

6   A     Yes.

7   Q     I'm not trying to be obnoxious with this question, but

8   is this your first job out of college?  Is your job at the

9   bank your first job since you graduated from college?

10  A     No.

11  Q     Have you worked in banking for most of your career?

12  A     Yes.

13  Q     About how long have you worked in banking?

14  A     Since 1988.

15  Q     During the course of your career in banking, have you

16  focused on any particular industry?

17  A     Real estate.

18  Q     And has that focus on real estate continued during your

19  time at the National Bank of Kuwait?

20  A     Yes.

21  Q     Are you generally familiar with the bank's loan to the

22  Debtor?

23  A     Yes.

24  Q     And how are you familiar with the bank's loan to the

25  Debtor?

1    A    I am the RM for the loan, Relationship Manager.

2    Q    Thank you.  When did you assume that role as

3    Relationship Manager?

4    A    Around the end of 2018.

5    Q    So from the time that you assumed that role as

6    relationship manager up until today, have you maintained

7    that role during that entire period?

8    A    Yes.

9    Q    And during that period of time is there anybody else at

10   the bank who serves as relationship manager?

11   A    Not as relationship manager, no.

12   Q    Can you generally describe for the Court what your

13   responsibilities are as relationship manager for the loan to

14   the debtor?

15   A    To do annual reviews on the status of the loan and

16   provide those to the credit committees, monitor the interest

17   payments and other conforming covenants that are in the loan

18   agreement.

19   Q    You mentioned credit committee.  Do you sit on the

20   credit committee?

21   A    No.

22   Q    In your capacity as a relationship manager, do you make

23   recommendations to the credit committee?

24   A    Yes.

25   Q    Do you prepare reports that are submitted to the credit

1    committee?

2    A    Yes.

3    Q    As far as you are aware, since the time that you became

4    the relationship manager for the loan to the Debtor, have

5    there been any reports concerning the loan submitted to the

6    correct committee that you weren't involved in preparing?

7         MR. BURKS:  Objection.  There is no way that he

8    can know what he hasn't done.  Calls for hearsay.  Calls for

9    speculation.  He doesn't know -- he is not a member of the

10   credit committee.  He doesn't know what the credit committee

11   has received, Your Honor.

12        THE COURT:  I'll sustain the objection and let you

13   rephrase it and see if you can get it in another way.  Thank

14   you.

15   BY MR. FITZMAURICE:

16   Q    In the course of your duties as relationship manager

17   for the bank, when a credit committee makes a decision

18   relating to the loan, are you generally informed of that

19   decision?

20   A    Yes.

21   Q    Has there ever been a decision that you've been

22   informed of where you were not involved previously in

23   preparing some kind of submission to the credit committee?

24   A    No.

25   Q    So has there ever been a decision by the credit

1   committee that you were informed of that you were surprised

2   about or you had no idea that was happening?

3   A    No.

4   Q    Have you issued any reports to the credit committee

5   concerning this bankruptcy case?

6   A    Yes.

7   Q    Have you made any recommendations to the credit

8   committee concerning this bankruptcy case?

9         MR. BURKS:  Objection.  Best evidence rule.  If

10  the recommendations or if the reports are oral, hearsay.  If

11  they are written, I would like to see them in evidence,

12  please.

13        THE COURT:  If they are oral, I don't think they

14  are hearsay.  If they are written, then I think there is

15  best evidence.  I'll sustain the objection on that

16  particular part.  But I'll let him flesh it out.  He hasn't

17  said whether they were written or not.

18        MR. BURKS:  Yes, Judge.

19        THE COURT:  Thank you.

20  BY MR. FITZMAURICE:

21  Q    Have you had any discussions with the credit committee

22  concerning this bankruptcy case?

23  A    It has been mentioned in credit reviews.  We do monthly

24  credit reviews for troubled loans.

25  Q    Is the loan to the Debtor classified as a troubled

1    loan?

2    A    Yes.

3              MR. BURKS:  Objection.  At this point he is

4    getting into an area of questioning where he needs a credit

5    committee member who has got personal knowledge of the

6    reports that he's talking about right now, Judge.

7              THE COURT:  I'll overrule that objection.  Go

8    ahead.

9    BY MR. FITZMAURICE:

10   Q    I think you answered the question, but there was a

11   pending objection so --

12             THE COURT:  It doesn't make a difference.  I heard

13   it.  I overruled the objection.  Go ahead.

14   BY MR. FITZMAURICE:

15   Q    Is the bank's loan to the Debtor in default?

16   A    Yes.

17   Q    Was the filing of the bankruptcy case an event of

18   default?

19   A    Yes.

20   Q    Are you aware of any other defaults under the loan

21   agreement?

22   A    Yes.

23   Q    Can you describe any of them for me?

24   A    Principally failure to pay interest.

25   Q    Let me ask you about that.  Did the loan documents call

1   for the payment of principal and interest during the term of

2   the loan?

3            MR. BURKS:  Objection.  I don't have enough

4   foundation to know what this gentleman had analyzed in terms

5   of the loan documents or this account history.  We are

6   assuming he has looked at the loan documents and the account

7   history, but he hasn't told us he has.  Objection,

8   foundation.

9            THE COURT:  I will sustain the objection as to

10  foundation.  Let's lay a better foundation for the record,

11  please.  Thank you.

12  BY MR. FITZMAURICE:

13  Q    Mr. Carter, are you familiar with the loan documents

14  for the loan -- are you familiar with the loan documents

15  relating to the bank's loan to the Debtor?

16  A    Yes.

17  Q    Have you reviewed those loan documents?

18  A    Yes.

19  Q    Have you reviewed them during the course of your

20  employment as the relationship manager for the bank's loan

21  to the Debtor?

22  A    Yes.

23  Q    Are you generally familiar with the terms of those loan

24  documents?

25  A    Yes.

1    Q    Do you know when the loan was made?

2    A    It was mid-May 2018.

3    Q    Do you know what the original term of the loan is?

4    A    So five years.

5    Q    So if my math is right, mid-May 2018 plus five years is

6    May of 2023.  Does that sound right to you?

7    A    Yes.

8    Q    Do you have an understanding of as to whether or not by

9    its terms the loan matured in May of 2023?

10   A    Yes.

11   Q    And did it in fact mature in May of 2023?

12   A    Yes.

13   Q    Do you know whether the loan documents call for the

14   payment of principal and interest during the term of the

15   loan?

16   A    It was an interest-only loan.

17   Q    And how was principal to be repaid under the loan

18   documents?

19   A    The loan amount was $51,675,000.

20   Q    And when was that due under the loan documents?

21   A    Mid-May 2023.

22   Q    So the full principal balance was due at maturity.  Is

23   that right?

24   A    Yes.

25   Q    And how frequently was the Debtor required to make the

1    interest-only payments?

2    A    Monthly.

3    Q    Did the Debtor make all those required payments?

4    A    No.  They stopped in mid-2020.  And then there was an

5    interest reserve that had been established at closing, for a

6    years' worth of interest.  So that was tapped for the

7    following year until mid-2021.

8    Q    And at some point was the interest reserve exhausted?

9    A    Yes, mid-2021.

10   Q    Do you know if the loan agreement generally required

11   the Debtor to pay real estate taxes when they were due?

12   A    Yes.

13   Q    And it in fact required those taxes to be paid?

14   A    Yes.

15   Q    And in an event of default during the loan agreement

16   were those taxes not to be paid?

17   A    Yes.

18   Q    Are you aware of whether the Debtor in fact paid real

19   estate taxes?

20   A    It did not make the 2019 tax payment and made no

21   further tax payments since then.  But it did borrow the

22   money from a lender to pay those taxes.

23   Q    Just to make sure that I understand, did the Debtor pay

24   real estate taxes due for the year 2019?

25   A    No.

1  Q   Do you know whether a lien was recorded against the pt

2  relating to those taxes that were not paid?

3  A   Yes.

4  Q   Is the filing of that lien an event of default under

5  the loan agreement?

6  A   Yes.

7  Q   Were real estate taxes paid for the year 2020?

8  A   Not by the borrower.

9  Q   Was ultimately a lien recorded against the property for

10  the tax year 2020 as a result of the failure to pay the tax

11  -- I mean -- let me start over again.

12      As a result of the debtor's failure to pay real estate

13  taxes in 2020, was a lien filed against the property?

14  A   Yes.

15  Q   Do you know if the Debtor paid real estate taxes for

16  the year 2021?

17  A   Similarly they borrowed the money from a tax lender and

18  assigned the county tax lien to that lender.

19  Q   And did the Debtor pay real estate taxes for the year

20  2022?

21  A   Same situation.

22  Q   2023?

23  A   Same.

24  Q   And each one of those failure to pay, are they separate

25  events of default under the loan agreement?

1    A    Yes.

2    Q    After the bank exhausted the funds in the interest

3    reserve, did it do anything to attempt to enforce its

4    rights?

5    A    Filed for foreclosure.

6    Q    Was it successful in completing that foreclosure?

7    A    No.

8    Q    Why not?

9    A    The borrower filed for a TRO, temporary restraining

10   order.

11   Q    Did the bank ultimately attempt to resolve these

12   disputes with the borrower?

13   A    We entered into a settlement agreement with the

14   borrower.

15   Q    And are you generally familiar with that settlement

16   agreement?

17   A    Yes.

18   Q    I'm going to show you what's -- what was filed at ECF

19   508-7.  I think this document is -- was entered into

20   evidence on Monday and we neglected to include it in our

21   discussions earlier this morning, so we'll look at it now.

22         MR. BURKS:  Well, excuse me.  For the record, it's

23   been entered into evidence today.  I don't -- we're not

24   going back -- the record on Monday I assume does not apply

25   to the record here, Judge.  It's been admitted into evidence

1    today.

2              MR. FITZMAURICE:  And I'm not disputing -- my only

3    point was if I had remembered, I would have asked you to

4    stipulate to this this morning when we talked about

5    stipulations for today.  And I didn't.  So that's why I'm

6    showing it to him now.

7              MR. BURKS:  I thought I stipulated to the

8    admission of this.  And if I haven't --

9              MR. FITZMAURICE:  I'm happy to take that

10   stipulation now.

11             MR. BURKS:  Stipulate into evidence admission for

12   the document what is at ECF 508-7?

13             MR. FITZMAURICE:  Yes, that's right.

14             MR. BURKS:  Stipulated that it's admissible,

15   Judge, for whatever it says.

16             THE COURT:  I'll admit 508-7 on stipulation.

17   Thank you.

18             (Exhibit 508-7 admitted into evidence)

19   BY MR. FITZMAURICE:

20   Q    Is this document, 508-7, is this the settlement

21   agreement that the bank entered into with the Debtor and Mr.

22   Choudhri and (indiscernible) Galleria LLC?

23   A    Yes, I believe so.

24   Q    Okay.  Who is (indiscernible) Galleria LLC?

25   A    That was the mezzanine lender.

```
 1          MR. FITZMAURICE:  Your Honor, my (indiscernible)
 2  have disappeared and I'm going to ask if my colleague could
 3  open up the document.  I am not sure why it's not
 4  projecting.
 5          THE COURT:  It's the way the PDF is trying to
 6  write.  But I can move it over here if you want to move it
 7  to that table.  (indiscernible) plug in.
 8  BY MR. FITZMAURICE:
 9  Q    While we're doing that, let me ask you an unrelated
10  question while we get those organized.  You know what?  Mr.
11  Akuffo is faster than I am.
12          MR. FITZMAURICE:  Kwame, you can go to Section
13  3.1A, please.
14          THE COURT:  Go ahead.
15  BY MR. FITZMAURICE:
16  Q    Mr. Carer, I'm showing you Section 3.1A of the
17  settlement agreement.  Do you see that in front of you?
18  A    Yes.
19  Q    And do you see that in the settlement agreement that as
20  of the effective date of the settlement agreement, the
21  borrower acknowledges the debt that was owed to NBK?
22  A    Yes.
23  Q    And it acknowledged that that was owed without the
24  setoff claim, counterclaim, or deduction of any nature
25  whatsoever?
```

1    A    Yes.

2    Q    And all of those things I just asked you about, all of

3    those were expressly weighed by the settlement agreement.

4    Is that right?

5    A    Yes.

6    Q    Okay.  Can you scroll down just a bit?  Thank you.

7         And in the settlement agreement you see that in Section

8    3.1B the Debtor and Mr. Choudhri and the mezzanine lender

9    acknowledged existing events of default under the loan

10   documents?

11   A    Yes.

12   Q    And that all of those events of default existed, again,

13   without defendant's setoff -- you can read the language for

14   yourself.

15   A    Mm-hmm.

16   Q    Is that right?

17   A    Yes.

18   Q    Okay.

19        MR. BURKS:  Your Honor, at this point I object to

20   the testimony of this witness.  To the extent that he's

21   reading from what the terms of the settlement terms are.

22   That's best evidence rule.  It says what it says.

23        To the extent that he's testifying as to the legal

24   effect or the current legal status of this settlement

25   agreement, he is not the qualified witness for that.  There

1   is a litigation on file.  He can certainly say what they

2   intend.  He can certainly say what it says.  But if he's

3   giving legal conclusions as to what the current status of

4   these settlement terms are and the effect of the settlement

5   agreement as we stand here today, this is a non-qualified

6   witness.  And I object --

7            THE COURT:  I think all of your objections, Mr.

8   Burks, go to weight, which I am very, very aware of.  And

9   we've covered this more than once.  So I'm going to overrule

10  your objection.  Thank you.

11  BY MR. FITZMAURICE:

12  Q    In the settlement agreement, did the bank agree to

13  compromise the amount of the debt that was owed?

14  A    Yes.

15  Q    And did it agree to accept a discounted amount in

16  exchange for release of the loan (indiscernible)?

17  A    Yes.

18  Q    What was that?

19  A    $27 million.

20  Q    And was the Debtor and Mr. Choudhri's other parties,

21  were they given a period of time within which to make that

22  payment?

23  A    210 days.

24  Q    Okay.  Did they?  Did they make that payment?

25  A    No, they did not.

1    Q    Do you know what the settlement provides happens if the

2    payment is not made?

3    A    It allows for the filing of foreclosure.

4    Q    After the Debtor and Mr. Choudhri's other entities

5    failed to make the payment, did the bank -- what did the

6    bank do?

7    A    We filed for foreclosure again.

8    Q    And was that foreclosure successful?

9    A    No.

10   Q    Why not?

11   A    The court allowed extension of the payment for 90 days

12   provided the borrower paid $80,000 each month toward the

13   payment.

14   Q    Did the borrower make those payments?

15   A    Only two of the three payments were made.

16   Q    Did the bank proceed with its foreclosure at the end of

17   that 90-day period?

18   A    It filed again, yes.

19   Q    And was that foreclosure successful?

20   A    No.

21   Q    Why not?

22   A    The borrower filed bankruptcy.

23   Q    Do you know what happened in that bankruptcy case?

24   A    It was eventually dismissed.

25   Q    And after the dismissal of that bankruptcy case, did

1   the bank seek to exercise its rights under the loan

2   documents?

3   A    Yes.

4   Q    Was it successful?

5   A    No.  There was a second bankruptcy filed.

6   Q    Was that this one?

7   A    Yes.

8   Q    Have you ever heard of an entity called 2425 WL, LLC?

9   A    Yes.

10  Q    How have you heard about it?

11  A    They filed a subordinate mortgage claim about -- it was

12  three years after the loan originally closed.

13         MR. BURKS:  Objection.  Subordinate mortgage claim

14  is a legal conclusion, Judge.  I would ask that you strike

15  that sentence.

16         THE COURT:  I'll overrule that objection.  Go

17  ahead.

18  BY MR. FITZMAURICE:

19  Q    Is 2425 WL's mortgage, the filing of that mortgage, is

20  that an event of default under the loan documents?

21  A    Yes.

22  Q    Has the bank proposed a plan in this case?

23  A    Yes.

24  Q    Can you tell me generally what the plan provides for?

25  A    It provides for payment of outstanding real estate

1   claims.  It also includes payment of administrative fees and

2   partial payment of trade creditors.

3   Q    Dop you know what the plan provides for with respect to

4   the Debtor's building?

5   A    Yes.  There's a credit bid allowed in the plan.  And a

6   deficiency is also one of the categories in the plan.

7   Q    Do you know if there's going to be a sale of the

8   Debtor's building?

9   A    Well, there's an auction.  That's the process by which

10  either credit bid or third party bids take place.

11  Q    Do you know when that auction is scheduled to take

12  place?

13  A    Friday.

14  Q    Has the bank made a bid in connection with that

15  auction?

16  A    Yes.

17  Q    And what's the amount of that bid?

18  A    $18,600,000.

19  Q    Do you know if there are any other bids?

20  A    My understanding is there was another bid.

21  Q    Do you know what the amount of that other bid is?

22  A    I believe it's --

23          MR. BURKS:  Objection.  This is hearsay, Judge.

24          THE WITNESS:  $20 million --

25          THE COURT:  Bear with me.

1          MR. BURKS:  There's no basis for him knowing what

2    the bids are.

3          THE COURT:  I'll sustain the objection.  The

4    trustee can testify as to what the bids are.  Go ahead.

5    BY MR. FITZMAURICE:

6    Q    Does the plan provide for the bank being paid

7    everything it is owed?

8    A    No.

9          MR. BURKS:  Objection, legal conclusion.  That is

10   a legal conclusion, what is it owed.

11         THE COURT:  I'll overrule that objection.  Thank

12   you.

13   BY MR. FITZMAURICE:

14   Q    If there was a third party who purchases the property

15   at auction, do you know what the plan provides as to who

16   gets paid for that money?

17   A    Payments go first to the real estate tax liens.  And

18   there is also portions that go to the administrative fees.

19   And there is a portion that goes to the liquidation trust

20   for the trustee.  The balance then goes to our note.

21   Q    You mentioned the real estate taxes.  Do you know

22   whether the plan pays those in full?

23   A    Yes.  Whatever is legally owed.

24   Q    And you said something about administrative expenses.

25   Do you know whether the plan pays those in full?

1    A    Yes.

2    Q    And does it?

3    A    Yes.

4    Q    Is it your understanding that the plan does not --

5    withdrawn.  Does the plan pay anything to general unsecured

6    creditors?

7    A    Well, the plan pays some to trade plans.  You know,

8    contractors who provided work on the building at the 70

9    percent.

10   Q    Does it pay those creditors cash?

11   A    Yes.

12   Q    Are there other unsecured creditors who --

13   A    There's another group of third-party creditors that are

14   in the class along with our deficiency -- 90 percent of our

15   deficiency claim (indiscernible).

16   Q    And so does that class of creditors receive anything

17   under the plan?

18   A    Well, they would get pro rata share of any recoveries

19   that the trustee gets that goes into the liquidation trust.

20   Q    You mentioned the word class in the context of the

21   plan.  Do you know what that is?  Do you know what that

22   means?

23   A    Well, yes.  There are eight classes of creditors to the

24   borrower.  And they are each identified and each have

25   different rights, different recoveries under the plan.

1    Q    Does the plan attempt to group creditors together in
2    those classes?
3    A    Yes.
4    Q    Do you know as the plan proponent how the bank chose
5    which creditors go in which class?
6    A    Based on their legal status and claim status.
7    Q    Are there some creditors who don't get a recovery under
8    the plan?
9    A    Yes.
10   Q    And who are those?
11   A    Those tend to be subordinate claims by related parties
12   to the borrower.
13   Q    Do you know if the borrower's equity holders receive
14   anything under the plan?
15   A    They don't.
16   Q    Why not?
17   A    There's insufficient value in the property to pay the
18   primary secured claim of our loan.
19   Q    We talked before about 2425 WL.  Do you recall that?
20   A    Yes.
21   Q    Do you know whether the plan treats 2425 WL as having a
22   secured claim or an unsecured claim?
23   A    Well, unsecured because there's insufficient funds to
24   cover the first mortgage, which is our mortgage.
25   Q    Do you know what the plan provides for if the bank is

1    the successful bidder at the auction?  And let me withdraw

2    that question and I'll ask a different one.

3         In terms of payments to creditors, do you know what the

4    plan provides for if the bank is the successful bidder at

5    the auction?

6    A    The bank will pay cash to the real estate tax claims,

7    the administrative costs, and that portion to the trade

8    creditors as well as a contribution to the liquidation

9    trust.

10   Q    And do you know approximately the amount of the cash

11   that's required to make all of those payments?

12   A    It's approximately $3.7 million.

13   Q    And has the bank committed to make those payments?

14   A    Yes.

15   Q    And if it turns out those required payments are a

16   little higher, has the bank committed to make those higher

17   payments?

18   A    Yes.

19   Q    Does the bank have the financial ability to make those

20   payments?

21   A    Yes.

22   Q    Well, let's assume that the bank is not the successful

23   bidder at the auction.  Do you know in that instance what

24   the plan provides by way of payments to creditors?

25   A    The payments are similar.  They get deducted from the

1   amount of the winning bid.

2   Q    And what happens to the bank's claim in that instance?

3   A    Well, after those other amounts are paid, the remainder

4   goes to cover the bank's claim.

5   Q    And similarly if those expenses are a little higher

6   than anticipated, the bank understands it's going to take --

7   it's going to receive a little bit less.  Is that right?

8   A    Yes.

9   Q    And the bank has accepted that?

10   A    Yes.

11   Q    That's what the plan provides?

12   A    Yes.

13   Q    Do you know whether the plan that's on file with the

14   court is the first draft of the plan that was prepared for

15   the bank?

16        MR. BURKS:  Objection, foundation.

17        THE COURT:  I'll overrule the objection.  Go

18   ahead.

19   BY MR. FITZMAURICE:

20   A    There was negotiations between the trustee and NBK's

21   lawyers on the features of the plan.

22        MR. BURKS:  Objection.  Question called for

23   hearsay.  Answer is hearsay.  This is the wrong witness for

24   this, Judge.

25        THE COURT:  I'll overrule the objection.  Thank

1   you.

2            MAN 1:  Your Honor, may I (indiscernible)?

3            THE COURT:  Sure.  I just need to change the

4    connection over here.  Hold on for one second.  There you

5    go.

6    BY MR. FITZMAURICE:

7    Q    It's difficult to see on the top of the page given

8    several layers of blue text, but I'm showing you the

9    document that's at ECF 501-01 titled Chapter 11 Plan of

10   Liquidation of the Debtor by National Bank of Kuwait

11   S.A.K.P. New York Branch.

12           MR. BURKS:  Judge, for clarification and as part

13   of what I didn't understand on the stipulations, is this the

14   plan that's being proposed?  Is this the final form of plan

15   that we are here on today?

16           MR. FITZMAURICE:  Yes, it is.

17           MR. BURKS:  Thank you, Judge.

18           THE COURT:  Thank you.

19           MR. FITZMAURICE:  So again, Your Honor, I'm having

20   --

21           THE COURT:  (indiscernible).  Do you want me to go

22   back over to the --

23           MR. FITZMAURICE:  I do, please.  So 501-1.

24           MR. BAKER:  And, Your Honor, it doesn't seem like

25   that's projecting on GoToMeeting.

```
 1              THE COURT:  It's not.  And I'm aware of that.
 2              MR. FITZMAURICE:  Your Honor, I see it here, but I
 3    don't -- just for...
 4              THE COURT:  I'm seeing it on my screen here, which
 5    means it should be projecting there.  But for some reason --
 6              MR. FITZMAURICE:  I see it on the tables, I just
 7    don't see it on these back here.
 8              THE COURT:  I'm not sure why it's doing that.
 9              MR. FITZMAURICE:  May I just ask the witness?  Do
10    you see the document?
11              THE WITNESS:  Yes.
12              THE COURT:  It's on.  For some reason it's not
13    working.  We'll see if we can fix it.  Go ahead.
14    BY MR. FITZMAURICE:
15    Q    Is that your signature?
16    A    Yes.
17    Q    And did you sign the plan of liquidation that the bank
18    is proposing?
19    A    Yes.
20    Q    And is this in fact a copy of that plan?
21    A    Yes.
22              MR. FITZMAURICE:  Your Honor, I think we've done
23    this.  But nevertheless, move to formally admit into
24    evidence ECF 501-01, a copy of the plan of liquidation for
25    the Debtor submitted by National Bank of Kuwait.
```

1              THE COURT:  All right.  Any objection to the

2     admission of 501-01, Mr. Burks?

3              MR. BURKS:  I'm sorry, Judge.  What?

4              THE COURT:  Do you have any objection to 501-01?

5              MR. BURKS:  Yes, no objection.

6              THE COURT:  It's admitted.  Thank you.

7              (Exhibit 501-01 admitted into evidence)

8              MR. TROOP:  Excuse me, Your Honor.  And I

9     apologize for interfering.  But on a procedural matter, our

10    witnesses is our corporate rep, gets to be in here as a

11    trustee.  He gets to be in here.  I didn't ask are there any

12    witnesses in the courtroom for 2425?

13             We invoke the rule, Your Honor.

14             THE COURT:  All right.  So at this point in time

15    the rule has been invoked.  So you just need to go outside,

16    sir.  Maybe Ms. Conrad will give you a place to sit.

17             There are a number of people on the line.  I think

18    the only person who you've told me -- I mean, you've told me

19    there are going to be three witnesses.  And I don't think

20    that person is on the list that we talked about.  All right.

21    So you may be excused, sir.  We'll give you a place to sit.

22             Mr. Choudhri is on the phone.  I'm assuming you

23    have no objection to him listening?

24             MR. TROOP:  Your Honor, I don't.

25             THE COURT:  Okay.

1              MR. TROOP:  I do not assert an objection.  I

2    believe he is a corporate rep.

3              THE COURT:  How are you?  Good to see you.  Yeah,

4    tell him to bring him up.  He can come up.

5              Mr. Choudhri is waiting to be in the courtroom so

6    I'm going to bring him up.  All right, that's fine.

7              MR. TROOP:  And I would suspect they would say he

8    is the corporate rep for both of them.

9              MR. BURKS:  He is the corporate representative of

10   my client.  He is the corporate representative of the

11   debtor.

12             THE COURT:  That's fine.

13             MR. TROOP:  And I don't think I can invoke the

14   rule with respect to him, Your Honor.

15             THE COURT:  All right.  Then, Ms. Conrad, do you

16   want to go open a room?  Or you want to get the testimony

17   going and then you can do it?

18             CLERK:  Give me one second.

19             MR. BURKS:  And, Judge, do we need -- do you want

20   for the record to name this witness as being excluded?

21             THE COURT:  We'll do it when you call him as a

22   rebuttal witness.  Thank you.

23             MR. BURKS:  Yes, Judge.

24             THE COURT:  Thank you.  All right.

25             MR. BURKS:  Excuse me, Judge.  Is now an okay time

1  for me to take a restroom break?  I am struggling with a

2  stomach issue.

3          THE COURT:  I typically break every two hours.  I

4  was planning a break at 11:00.  But, Mr. Burks, if you need

5  to go to the bathroom, I don't want to stop you from doing

6  that.

7          MR. BURKS:  That's not the way I would have put it

8  on the record, but thank you for putting it that way.

9          THE COURT:  That's basically what you said.  All

10  right, but we'll stand down.  We'll stand down for ten

11  minutes.  This will be our 11:00 break.  Thank you.

12          CLERK:  All rise.

13          (Recess)

14          CLERK:  All rise.

15          THE COURT:  Please be seated.

16          MR. FITZMAURICE:  Your Honor, can Mr. Burks take

17  one other thing to the witness stand?

18          THE COURT:  Mr. Carter?  Sure.  No problem.

19          MR. FITZMAURICE:  And Mr. Burks can do whatever he

20  wants.

21          MR. BURKS:  You're calling me?

22          MR. FITZMAURICE:  No, no.

23          THE COURT:  I did exactly the same thing, so my

24  water's here as well.

25          CLERK:  It's okay.

```
 1              THE COURT:  Again.  All right, Mr. Carter.  I'll
 2    remind you that you're still under oath.  Go ahead, sir.
 3              MR. FITZMAURICE:  Thank you, Your Honor.
 4              BY MR. FITZMAURICE:
 5    Q    Mr. Carter, what kind of building is the property owned
 6    by the debtor?
 7    A    It's an office building.
 8    Q    Thank you.  Are you aware of whether the building has
 9    tenants?
10    A    I'm not aware of the actual situation.
11    Q    Well, whether or not the building has any tenants, do
12    you know what the plan does with respect to any leases those
13    tenants have?
14    A    It vacates all the leases so we can then review after
15    and decide whether or not we want them, and any third-party
16    bidder can decide which ones they would like to retain.
17    Q    You testified earlier concerning litigation that was
18    brought by the debtor.  Do you know if the plan does
19    anything with respect to that litigation?
20    A    Litigation by the?
21    Q    By the debtor.
22    A    The debtor is released.
23    Q    Do you know whether the -- under the plan the bank
24    receives a release of claims by the estate?
25    A    Yes.  It does.
```

1  Q    And if the bank did not receive that release, would it

2  fund the amounts it's paying under the plan?

3  A    No.

4  Q    Can you remind me again what the banks -- what

5  approximate amount the bank is owed as of the filing of the

6  bankruptcy case?

7  A    I believe it's around 61 or 2 million.

8  Q    And in connection with the auction, the bank made a

9  bid.  The bank made a credit bid.  Is that correct?

10  A    Yes.

11  Q    And what was the amount of that credit bid?

12  A    18 million 6.

13  Q    And if the property sold to the bank at that credit bid

14  in a foreclosure, would there be any money that was left for

15  unsecured creditors?

16  A    No.

17  Q    But the bank is paying unsecured creditors something

18  under the plan, right?

19  A    Yes.

20  Q    In your view, is the bank making those payments

21  essentially in exchange for the release and getting of

22  estate claims?

23  A    No, we're making those payments because we think it's

24  fair to those parties.

25  Q    Is the bank asking for the estate to pay any legal fees

1    the bank has incurred in connection with the bankruptcy

2    case?

3    A    No.

4    Q    Is the bank asking the estate to pay any expenses the

5    bank has incurred in connection with the bankruptcy case?

6    A    No.

7    Q    I want to go back to the settlement agreement for a

8    moment, 508-7.

9              THE COURT:  Do you have a copy of the exhibit?

10             MR. FITZMAURICE:  It's on the screen.

11             THE COURT:  Let me try something.  I'm going to --

12   I'm just going to see if I can get the screens to come back

13   so it's on the big ones.  I'm sorry.  I'm not able to do

14   that.  Go ahead.

15             BY MR. FITZMAURICE:

16   Q    Under the settlement agreement, in general terms, the

17   bank agreed to accept less than it was owed.  Is that right?

18   A    Yes.

19   Q    And does the settlement agreement provide what happens

20   concerning the amount owed to the bank by the debtor if the

21   debtor fails to perform under the settlement agreement?

22   A    Could you ask that again?

23   Q    I'll try to ask it better.  Do you know if the

24   settlement agreement says what happens to the amount owed to

25   the bank if the Choudhri parties fail to make the payment

1   required under the settlement agreement?

2   A     They acknowledge the original full amount due.

3   Q     And in that instance, is -- do you know if the

4   settlement agreement allows the bank to exercise all of its

5   rights under the loan documents?

6   A     Yes.

7   Q     And to collect the full amount that's owed?

8   A     Yes.

9         MR. FITZMAURICE:  Excuse me one moment, Your

10   Honor.

11        THE COURT:  All right.  Go ahead.

12        MR. FITZMAURICE:  Your Honor, I think we've

13   addressed this issue, but just for clarity, I move for

14   admission of document at ECF 508-7, which is the settlement

15   agreement.  I think we've done it, but I just want to...

16        MR. BURKS:  So for clarification, I --

17        THE COURT:  It was admitted.  I admitted it back

18   originally.

19        MR. BURKS:  Is it that?  Is it 508-7 or do we have

20   now two copies of it?

21        MR. FITZMAURICE:  No, it's -- 508-7 is the -- is

22   what I had showed him earlier and that was the version that

23   we referenced earlier.  So it's the same one.

24        THE COURT:  It's on the record.  It's been

25   admitted.  I'm pulling it up to make sure it is 508-7.

1    Thank you.

2    BY MR. FITZMAURICE:

3    Q    Mr. Carter, do you know whether the bank voted in

4    connection with the plan?

5    A    Yes.

6    Q    Did the bank vote in favor or against?

7    A    In favor.

8    Q    Do you know how many claims the bank had?

9    A    I'm not sure I understand the question.

10   Q    Does the bank have one claim in this case or more than

11   one?

12   A    Oh, you mean in terms of the categories.  Yes, it has

13   three.

14   Q    However many claims it had that are entitled to vote,

15   did it vote all of those claims the same way?

16   A    No, I believe just two of the three are voting.

17   Q    So two of the three claims are voting claims?

18   A    Yes.

19   Q    And were those two claims voted in favor or against?

20   A    In favor.

21          MR. FITZMAURICE:  Your Honor, I know that we just

22   came back.  May I have a short time to confer?

23          THE COURT:  Yeah.  Take your time.

24          MR. FITZMAURICE:  Thank you.

25          MR. TROOP:  We're going to step away from the mic,

1   aren't we?

2            THE COURT:  That's probably a wise idea.

3            MR. FITZMAURICE:  Your Honor, I'm happy to report

4   this is one instance where a short break hopefully saves

5   some time.  Pass the witness.

6            THE COURT:  All right.  Mr. Baker, you made the

7   first appearance, but I realize you may not want to go

8   first.

9            MR. BAKER:  I'd like Mr. Burks to go first.

10            THE COURT:  Then I'll call on Mr. Burks for cross.

11            MR. BURKS:  Thank you, Judge.

12            THE COURT:  Mr. Burks, are you going to project?

13   Where are you going to project from?

14            MR. BURKS:  I'm going to project from Mr. Baker.

15            THE COURT:  All right.  Then I'll go to the right

16   table.  Mr. Burks -- Baker can connect at his leisure.

17            MR. BAKER:  Fixed it.

18            MR. BURKS:  He did it.

19            MR. BAKER:  I'm multi-talented, Mr. Burks.

20            MR. BURKS:  Who am I to disagree, Your Honor?

21               CROSS-EXAMINATION OF MICHAEL CARTER

22   BY MR. BURKS:

23   Q    Hi, Mr. Carter.  How are you, sir?

24   A    Good.  How are you?

25   Q    I'm doing all right, thanks.  Feeling a little better,

1   thanks.  All right.  So let's go over the provisions of the

2   plan, and let's start with what you gave your testimony on,

3   the note in the -- the note.  And you testified what exactly

4   your opinion was as to the terms of the note, correct?  Did

5   the settlement agreement modify the terms of that original

6   note?

7          MR. FITZMAURICE:  Objection, Your Honor.  Calls

8   for a legal conclusion.

9          MR. BURKS:  This door is really wide open at this

10  point.

11         THE COURT:  I'll give you a little bit of leeway.

12  I think the agreement speaks for itself, Mr. Burks.  What he

13  thinks may or may not have any relevance to me, but if you

14  want to ask the questions and put it on the record, I'm more

15  than happy to do that.

16         MR. BURKS:  Thank you, Judge.  I made the same

17  objections, frankly.

18  BY MR. BURKS:

19  Q   In your opinion, did the settlement agreement modify

20  the original terms of the note?

21         MR. FITZMAURICE:  So objection, Your Honor.

22  Question calls for speculation and the witness' opinion.  He

23  is not here as an opinion witness, as an expert.  He's here

24  to offer factual testimony.

25         MR. BURKS:  He gets to answer that.

```
 1            THE COURT:  I'll let him answer that question.
 2   Thank you.  Go ahead.
 3    BY MR. BURKS:
 4    A    Could you say that again?
 5            THE COURT:  Let me be clear.  Mr. Burks may be
 6   asking you questions that you do not know, and if you do not
 7   know --
 8            THE WITNESS:  Mm hm.
 9            THE COURT:  -- the correct responses, you don't
10   know, okay?  But if you do know or you have an opinion, I'd
11   like to hear it.  Go ahead.
12            MR. BURKS:  Thank you, Judge.
13   BY MR. BURKS:
14   Q    You testified as to the terms of the note and whether
15   or not the note was in default and whether or not the
16   borrower had performed.  Do you remember that testimony?
17   A    Yes.
18   Q    All right.  Was your -- and you testified that there
19   was a settlement agreement, correct?
20   A    Yes.
21   Q    You testified that you understood and you were familiar
22   with the terms of that settlement agreement, correct?
23   A    Yes.
24   Q    All right.  Did the settlement agreement modify or
25   change any terms of the original note?
```

1    A    Well, because it's a settlement, it made some changes

2    to the amount that was due.

3    Q    Did it cure all the defaults up to and effective as of

4    August 22, 2022?

5              MR. FITZMAURICE:  Objection, Your Honor.  Calls

6    for a legal conclusion.  And also, the document and its

7    terms speak for themselves.

8              MR. BURKS:  Let's see what he knows, Your Honor.

9    You gave him an awful lot of leeway on direct.  I'm

10   certainly within the scope of direct here.

11             THE COURT:  I'll let -- again, and I'll say it

12   again for the record, the document says that it says, Mr.

13   Burks, but I don't have any objection to you asking that

14   question.

15             MR. BURKS:  I'm eventually going to -- the only --

16             THE COURT:  The question.  You don't need to tell

17   me what you're going to do.  I'm happy to hear the

18   testimony.  Go ahead.

19             MR. BURKS:  You've ruled.  Thank you, Judge.

20   BY MR. BURKS:

21   Q    Do you need the question again, sir?

22   A    Could you ask it again?

23   Q    Sure.  By the terms of the confidential settlement

24   agreement, did all the defaults leading up to the settlement

25   agreement date of August 22, 2022, were those cured?  Were

```
 1   those brought current by the settlement agreement?

 2   A    Yes.  The borrower properly behaved under the

 3   settlement agreement and those claims were waived.

 4   Q    All right.  So let's go to what the settlement

 5   agreement required.  The first requirement was a payment of

 6   --

 7             MR. BURKS:  Scroll down, please.

 8   BY MR. BURKS:

 9   Q    -- $800,000.  And I -- I'm telling you that so we can

10   get to the agreement, sir.

11             MR. BAKER:  Where is it?

12             MR. BURKS:  Until you see (indiscernible).  Keep

13   going down.

14    BY MR. BURKS:

15   Q    So the settlement payment of $801 -- 509 --

16   $801,509.42, was that received by NBK?

17             MR. FITZMAURICE:  So objection, Your Honor, to the

18   extent that counsel described that as the settlement payment

19   and mischaracterizes the evidence.

20             MR. BURKS:  Actually, I said "was the payment of"

21   in terms of the settlement payment.  We all see what the

22   settlement payments are.  I'm asking was the 801,509.42

23   received.  That's a simple question.

24   BY MR. BURKS:

25   A    Yes.
```

1    Q    The Judge has to rule on the objection.  One moment.

2         THE COURT:  What?  Was there an objection?  I

3    didn't hear it.

4         MR. BURKS:  Okay.

5    BY MR. BURKS:

6    Q    So the 801,509.42 was received by the bank, correct?

7    A    Yes.

8    Q    All right.  The settlement payments also include...

9         MR. BURKS:  (indiscernible).  Wherever.  Go back

10   up.  Go ahead and put the three payments of $80,000.

11        THE COURT:  I think that's part of the state court

12   litigation.

13        MR. BURKS:  Okay.  Freeze there.

14   BY MR. BURKS:

15   Q    Were any other payments due to the bank under this

16   settlement agreement?

17   A    There was a total settlement of 27 million.

18   Q    And when was that due?

19   A    That was due within 210 days.

20   Q    Did the bank receive 27 million with the

21   (indiscernible) balance due within 210 days?

22   A    No.

23   Q    So what did the bank do?  Did the bank extend the time

24   or make any sort of agreement?

25   A    We proceeded to file for foreclosure.

1   Q    Did you make an agreement to extend the time to receive

2   the money?

3   A    The borrower made a request to the court to extend it.

4   And there was an agreement to extend it for 90 days with a

5   payment of $80,000 a month.

6   Q    Mm hm.

7   A    Of which only two of the three months were paid.

8   Q    So was the first month paid?

9   A    Yes.

10   Q    Was the second month paid?

11   A    Yes.

12   Q    Was the third month paid?

13   A    No.

14   Q    At what point did the bank take the position that the

15   borrower was in default on the settlement agreement?  On

16   what date or what time?

17   A    When they failed to make the third payment.

18   Q    And what date was that?

19   A    I don't remember specifically.

20   Q    All right.  Are you aware that there was a lawsuit

21   filed?  The lawsuit's been admitted into evidence, not for

22   voracity of the claims, but for the fact that the lawsuit

23   exists and the claims exist.  Are you aware of that lawsuit?

24   A    No.

25   Q    So you're not aware that NBK is a defendant in a

1  lawsuit regarding the enforceability and terms of this

2  settlement agreement.

3          MR. FITZMAURICE:  So objection, Your Honor.  Lacks

4  foundation.  And if there's a lawsuit, we can look at it.

5          THE COURT:  Yeah, I'll sustain the objection.

6          MR. BURKS:  Well, I'm asking him if he's aware.

7  An objection's sustained.  I'll reask it.

8  BY MR. BURKS:

9  Q    When you stated that the debtor or the borrower was in

10  default of the settlement agreement, were you under the --

11  were you making the assumption that the bank had not first

12  been in breach of the settlement agreement?

13  A    Yes.

14  Q    If I told you, and it's purely hypothetical, but if I

15  told you as a hypothetical in your experience as a banker,

16  in your experience as -- dealing with loans that if there

17  was an agreement that the bank breached first, would you

18  take the position that the borrower was still in default of

19  that agreement?

20          MR. FITZMAURICE:  Objection, Your Honor.  Calls

21  for speculation.

22          THE COURT:  I'll sustain the objection.

23  BY MR. BURKS:

24  Q    The tax liens that the bank claims are going to be paid

25  to the bank by -- in terms of the plan.  Is that correct?

1           MR. FITZMAURICE:  Objection, Your Honor.  The plan

2    speaks for itself.

3           THE COURT:  I'll sustain the objection as to what

4    the plan says.  And it's in evidence.  If you want to show

5    him and have him read it you can.

6           MR. BURKS:  Yes, Your Honor.

7    BY MR. BURKS:

8    Q    Does the settlement agreement affect the rights of the

9    borrower or NBK with respect to the tax liens?

10          MR. FITZMAURICE:  Objection, Your Honor.  Calls

11   for a legal conclusion.

12          MR. BURKS:  Your Honor -- response, Your Honor.

13   This door is so wide open regarding what he understands the

14   effects of the settlement agreement --

15          MR. FITZMAURICE:  If he doesn't know, he doesn't

16   know.

17          THE COURT:  Here's my problem.  I struggle for the

18   relevance of what he thinks because what he thinks really

19   isn't that important to me.  It's what I think and how I

20   rule.  It's in evidence.  If you want to make an argument

21   that it does some particular thing for the debtor, that's

22   fine.  But I don't really care what he thinks.  How's it

23   relevant?

24          MR. BURKS:  He's declaring the loan in default and

25   he's testifying as to the validity of the claim, Judge.

1          THE COURT:  And so your point is what?  You're

2     going to cross-examine him on that issue?

3          MR. BURKS:  And I want -- I think it goes to

4     weight in the documents.

5          THE COURT:  Okay.  Thank you.

6     BY MR. BURKS:

7     Q    I want to talk about classification, which is something

8     you talked about.  Do you remember talking to your attorney

9     about classification of claims?  Sort of the grouping.  You

10    described it, I believe, as the grouping of the claims.

11    A    Yes.

12    Q    You said that 2425 WL filed a second lien on the

13    property.  Is that correct?

14    A    Yes.

15    Q    You stated that WL is getting zero under the plan.  Is

16    that correct?

17    A    Yes.

18    Q    And why is WL getting zero under the plan?

19    A    They have a subordinated claim and mine is insufficient

20    to cover the first claim.

21    Q    Why is the plan -- if that is true if -- after the

22    auction if that is true, why does the plan not provide for a

23    general unsecured claim on WL's second -- 2425 WL's second

24    lien?  Why does it not provide for that as an unsecured

25    claim?

1    A    They are a Category 6.

2    Q    So it's because of the way they were classified.  Let

3    me ask it differently.

4    A    Okay.

5    Q    Is the unsecured portion of 2425 WL's claim in the same

6    class as the under-secured or unsecured portion of NBK's

7    lien?

8    A    No.

9    Q    But NBK's lien is mixed with some other unsecured

10   creditors, isn't it?

11   A    It's mixed with some third-party claimants.

12   Q    Okay.  Let's assume under your math, you told your

13   attorney that the value -- you believe the value is

14   somewhere around 60 -- or excuse me, you said today that the

15   amount due on the note was about 60, 61.  Correct me if I'm

16   mischaracterizing.  Is that what you said?

17   A    Say that again?  That the...

18   Q    What is the current amount due on the first lien note

19   of NBK?

20   A    It's a little over 60 million.

21   Q    All right.  Let's say -- and you said that the credit

22   bid was for 18 what?

23   A    Six.

24   Q    All right.  So let's say you have a 41,000 --

25   $41,400,000 unsecured claim, okay?

1    A    Yes.

2    Q    That's mixed in with -- in the plan, that's classified

3    and mixed in with unsecured -- of an unsecured claim in the

4    total amount of what?

5    A    I don't know the total amount of those other unsecured

6    claims.

7    Q    Small, deminimis compared to NBK's claim?

8    A    Yes, they are small.

9    Q    What would happen if you took the $26 million unsecured

10   claim that you believe that exists of WL on its second lien

11   and mixed it in with NBK's lien?  What would happen?

12            MR. FITZMAURICE:  Objection, Your Honor.  Vague as

13   to what would happen.  Also relevance if -- to the current

14   plan and whether it would be the confirmation standards,

15   whether there was some other set of facts that doesn't

16   exist.

17            THE COURT:  I think the question is vague.  Tell

18   me how it affects me confirming this plan or not.

19            MR. BURKS:  Classification -- unfair

20   discrimination classification, Judge.

21            THE COURT:  I think you can ask that question a

22   different way rather than the way you're asking it.  So

23   rephrase your question please.

24   BY MR. BURKS:

25   Q    Would a $26 million claim classified in the same group

```
 1    as NBK's probable approximately $43 million claim, would

 2    that dilute substantially the distribution on that unsecured

 3    claim?

 4               MR. FITZMAURICE:  Objection.  Vague as to

 5    "dilute".  Vague as to "that claim".

 6               THE COURT:  I'll overrule the objection.  You can

 7    answer the question.

 8    BY MR. BURKS:

 9    A    Well, all of the -- all of that junior subordinate

10    claim is subordinate to NBK's claim.

11    Q    So your position is, is that the unsecured claim

12    portion of the junior lien is subordinate to the unsecured

13    portion of the first lien.  Is that what you're saying?

14    A    Yes.

15    Q    All right.  Let's talk about leases for a minute.  What

16    happens to the current tenants' leases?  You said they were

17    being rejected, correct?

18    A    Yes.

19    Q    And where -- how much are the rejection lease claims

20    being paid?

21    A    They don't get a payment.

22               MR. FITZMAURICE:  Objection, Your Honor.  The plan

23    speaks for itself as to the treatment that the creditors

24    receive.

25               MR. BURKS:  I can't tell.
```

1          THE COURT:  If he knows he can testify to it.  If

2     he doesn't know, he'll tell you he doesn't know.

3     BY MR. BURKS:

4     A     The tenants don't get a payment.

5     Q     They don't get one dime, do they?

6     A     No.

7     Q     All right.  Trade creditors, are those trade creditors,

8     do they hold liens on the property?

9     A     They are various contractors who were doing work on the

10    property that haven't been paid by the borrower.

11    Q     My question is for purposes of this plan.  Do they hold

12    liens?

13    A     I don't know.

14    Q     And they're getting paid .70 cents on the dollar,

15    correct?

16    A     Yes.

17    Q     And how much are general unsecured creditors being

18    paid?

19    A     The general unsecured ones get the pro rata share of

20    all the claims in that category.

21    Q     And is the approximately $40 million claim of NBK in

22    that same class?

23    A     Yeah, it's 90 percent of it.

24    Q     So the general unsecured claims are mixed in with NBK's

25    claim, correct?

1          MR. FITZMAURICE:  Objection, Your Honor.

2    Mischaracterizes the plan.

3          MR. BURKS:  Oh, I doubt it.  It's a --

4          THE COURT:  Well, let's show him the plan then.

5          MR. BURKS:  All right.  Let's have the plan.

6    Paragraph 12.  Page 12, Paragraph G, please.

7    BY MR. BURKS:

8    Q    Sir, you recognize this as the plan you've testified

9    you're familiar with?  Or do you need the first page of it?

10   A    Yes.

11   Q    That is the plan that you're testifying about that

12   you're familiar with?

13   A    Yes.

14   Q    To you, what does -- on Page 12, what does Paragraph G

15   Classified B of the general unsecured claims -- what does it

16   mean when it says, "Pro rata distribution of general

17   unsecured claims, provided, however, NBK should be deemed to

18   have another general unsecured claim equal to 90 percent of

19   its deficiency"?  What does that mean to you?

20   A    Pro rata means that whatever is recovered through the

21   liquidation trust, it would then be divided up based on the

22   size of the claim.  But NBK's claim is reduced to 90 percent

23   of its unpaid claim at that point.

24   Q    So the other general unsecured claims are mixed in with

25   that 90 percent.

1   A     Yes.

2   Q     All right.

3   A     They're at 100 percent.

4          MR. TROOP:  Objection, Your Honor.  That

5   mischaracterizes the plan.  The plan doesn't say general

6   unsecured claims.  It says --

7          MR. CHOUDHRI:  Objection.  One --

8          MR. TROOP:  It says other.  Other general

9   unsecured claims.  And there's only so much misleading that

10  counsel ought to be able to do through his testimony because

11  the plan's pretty clear.  5(a) is trade creditors, trade

12  general unsecured creditors.

13         MR. CHOUDHRI:  Objection.

14         MR. TROOP:  There's a definition of other general

15  unsecured creditors, and then there's Class 6.

16         THE COURT:  Okay.  And so let's be clear to

17  everyone.  I can read the plan.  I could take what this

18  witness says in light of what the plan says, and it goes

19  greatly to weight, okay?  So Mr. Burks' questions, I don't

20  see any problems with them.  You may have some disagreement

21  with the form of the question, but I take that answer in

22  context of the plan that I'm going to review, and it doesn't

23  bother me in the least.  Mr. Choudhri, you may sit down.

24  You don't get to object.  Go ahead.

25  BY MR. BURKS:

1    Q    Paragraph B, treatment of classes of claims in

2    interest, Paragraph B(g), the second -- just to be clear,

3    the second lien claim of WL to the extent there's no value

4    to that lien, it is excluded from B(g), correct?

5                 MR. FITZMAURICE:  Objection, Your Honor.  Is

6    counsel asking about Classified B in Subsection G of this

7    section?

8                 MR. BURKS:  Yes.

9                 THE COURT:  You can answer the question, sir.

10                THE WITNESS:  Okay.

11   BY MR. BURKS:

12   A    Could you repeat that question?

13   Q    The (indiscernible) -- the second lien claim of WL is

14   excluded from Page 12, Paragraph B(g).

15                MR. FITZMAURICE:  Objection, Your Honor.  There is

16   no Paragraph B(g).  Misleading.

17                MR. BURKS:  Well, (indiscernible) claims is

18   Capital B and then little (g) is Class B5.  I'm looking at

19   it.  The witness is looking at it.  We're all looking at it.

20                THE COURT:  Go ahead.  Ask the question and answer

21   it.  I mean, I'm looking at the same thing and I'm taking it

22   in light of what the plan says.  And I -- Mr. Burks, I

23   wonder why -- the questions you're asking seem to be

24   undisputed facts, okay?  I mean, I'm aware of what the plan

25   says.  I'm aware of the claim classification.  I'm really

1   worried about disputed facts.  This appears not to be a

2   disputed fact as to what's in the claims and how they're

3   being paid.

4       MR. BURKS:  I'll answer the question, Judge.  This

5   witness said that this is a fair, equitable, and permittable

6   plan.

7       THE COURT:  Well, why don't you ask him questions

8   about whether it's fair and equitable rather than how claims

9   are classified?  Because I can tell how claims are

10  classified.  It's in the plan, okay?  If you have an

11  argument to make, you have evidence that relates to fair and

12  equitable, how the claims are classified perhaps, but I know

13  how they're classified.  Go ahead.

14      MR. BURKS:  All right.  I'm going to ask him one

15  more question about classification and then I'll move on.

16  May I, Judge?

17      THE COURT:  Yeah, you can.

18      MR. BURKS:  Thank you.  Turn to trade creditor.

19  (indiscernible).

20      MR. BAKER:  In the (indiscernible)?

21      MR. BURKS:  Mm hm.  Go backwards.

22      MR. BAKER:  Wait.  Do you want me to go back to

23  definitions?

24      MR. BURKS:  No, I want you to go -- I'd like you

25  to go, Mr. Baker, to trade creditors.

1           MR. BAKER:  Which section?

2           MR. BURKS:  It's what I'm looking for, treatment

3    of trade creditors.

4           MR. BAKER:  I'm almost there.

5           MR. BURKS:  (indiscernible).  I'm looking for it.

6    Scroll up and look for it (indiscernible).  It's on the same

7    page.

8    BY MR. BURKS:

9    Q    The plan provides, as the judge has said -- and we can

10   all read it, the plan provides for trade creditors to

11   receive 70 percent of their allowed claims, correct?

12   A    Yes.

13   Q    Under any test, do you believe that the creditors, the

14   other general unsecured claimants in Subclass G will receive

15   70 percent of their allowed claims?

16          MR. FITZMAURICE:  Objection, Your Honor.

17   Mischaracterizes the document.  There is no Subclass G.

18   It's the --

19          MR. BURKS:  Paragraphs -- Paragraph G, Class 5B of

20   the general unsecured claims.

21   BY MR. BURKS:

22   Q    Do you believe that there is any way that they will

23   receive .70 cents on the dollar?

24          MR. FITZMAURICE:  Objection, Your Honor.  Calls --

25   the question is misleading.  Counsel is making the legal

1   argument about whether that's required in order for the plan

2   to be fair and equitable.

3          THE COURT:  I think he's asking a question that I

4   already know the answer, but I'll ask you to answer the

5   question, sir.  And then I may ask the questions which I

6   think you should be asking because I don't think you're

7   getting there.  But go ahead.  Answer the question.

8   BY MR. BURKS:

9   A     It's unlikely.

10  Q     All right.

11         MR. BURKS:  Am I deferring to you now or --

12         THE COURT:  You are.

13         MR. BURKS:  -- am I proceeding?

14         THE COURT:  So if we look at the plan, Mr. Carter,

15  there are two general unsecured classifications, Class A and

16  Class 5B.  And what I'd like to know is the rationale of why

17  those claims are split into two separate classes of claims.

18  If you know, tell me what the rationale is.

19         THE WITNESS:  The general rationale is that the 5A

20  category was third-party contractors that were doing work on

21  the building and didn't get paid by the borrower at the time

22  of the bankruptcy filing.  While the 5B is entities that

23  were doing work for the borrower but not the building.

24         THE COURT:  Okay.  So you're basically --

25         THE WITNESS:  Essentially most of them were law

 1   firms that were doing claim work on behalf of the borrower.

 2              THE COURT:  All right.  So your rationale is --

 3              THE WITNESS:  It goes in a different category.

 4              THE COURT:  And in your mind, that separate

 5   classification is fair and equitable.

 6              THE WITNESS:  Yes.

 7              THE COURT:  Okay.  Let me ask about Class 7, which

 8   is the subordinated claims.  They're not getting paid

 9   anything.  What's the rationale for not paying the

10   subordinated claims anything?

11              THE WITNESS:  Well, Class 6, 7, and 8 are all

12   related entities to the borrower.

13              THE COURT:  So in effect, you're saying their

14   insider claims, they shouldn't be paid.

15              THE WITNESS:  Not that they shouldn't be paid, but

16   there are insufficient funds or value in the property to pay

17   them.

18              THE COURT:  Okay.  Go ahead, Mr. Burks.

19              MR. BURKS:  Thank you, Judge.  I forget sometimes

20   you were a debtors' attorney.

21              BY MR. BURKS:

22   Q    Sir, you stated that there would be -- you stated that

23   the bank anticipates paying $3.7 million cash into the plan,

24   correct?

25   A    Yes.

1    Q    And you stated that you were -- if you did not receive

2    the release, if NBK did not receive the release in the plan

3    -- that's provided in the plan, did I understand you

4    correctly to say that you would not pay the -- the bank

5    would not pay the $3.7 million?

6    A    Some of that 3.7 is administrative fees that would need

7    to be paid anyway.  But some parts of it are for trade

8    creditors, etcetera, that would be voluntary.

9    Q    Well, I don't think I asked the question clearly.  If

10   the --

11   A    Yeah.

12   Q    If the judge rules that he cannot grant a release in

13   this plan -- and I'm not saying he will or won't, but if the

14   judge rules he can't grant NBK the release that's in the

15   plan, will NBK pay the $3.7 million if the plan's otherwise

16   confirmed?

17            MR. FITZMAURICE:  Objection, Your Honor.  Calls

18   for speculation.

19            THE COURT:  I'll sustain that objection.

20   BY MR. BURKS:

21   Q    In the plan, is the $3.7 million payment tied to the

22   release?

23            MR. FITZMAURICE:  Objection, Your Honor.  The plan

24   speaks for itself.

25            MR. BURKS:  No, he --

```
 1                    THE COURT:  I'll sustain the objection.

 2                    MR. BURKS:  All right.

 3       BY MR. BURKS:

 4       Q    Have you or -- have you made a determination what is

 5       the value against NBK of all the litigation that's pending

 6       that you're aware of?  Have you made a valuation of that?

 7                    MR. FITZMAURICE:  Objection.  The witness

 8       personally?

 9                    MR. BURKS:  That's where I'm going as my initial

10       question, yes.

11                    MR. FITZMAURICE:  So then I'll object to the

12       extent the witness -- the question would ask the witness to

13       reveal the contents of the attorney-client communications.

14       I instruct the witness not to do so.

15                    THE COURT:  I'll sustain the objection.  I think

16       that question's better directed to the trustee anyway.

17       BY MR. BURKS:

18       Q    Has NBK's loan committee -- did they approve the

19       payment of 3.7?  Did they approve the payment of $3.7

20       million through the plan if it's confirmed?

21       A    Yes.

22       Q    Did they do so on the expectation of the full release

23       from litigation?

24       A    Yes.

25       Q    In doing so, did they assign a value to the litigation
```

1   that they're being released from?

2          MR. FITZMAURICE:  Objection, Your Honor.  Calls

3   for speculation and again (indiscernible).

4          THE COURT:  I'll sustain the objection.

5   BY MR. BURKS:

6   Q    Is this plan being confirmed or proposed with the bank

7   assigning no valuation to the litigation (indiscernible)?

8          MR. FITZMAURICE:  Objection, Your Honor.  It's the

9   version of the same question that we've been at here a

10  little while.

11         THE COURT:  And I sustained the objection for the

12  first time, and I'll sustain it again.  Thank you.

13         MR. BURKS:  Yes, Your Honor.  So your ruling is

14  that I don't get to know what the value -- the bank's value

15  of the litigation is?

16         THE COURT:  I just said I think that question is

17  better asked of the trustee.  He's probably in a much better

18  position to make an evaluation of what it's worth and not

19  worth.

20         MR. BURKS:  Yes, Your Honor.  I understand.  I'm

21  going to ask the Court to take judicial notice that in the

22  case the proponent in this plan and the trustee is not.

23         THE COURT:  That's fine.

24         MR. BURKS:  Thank you, Judge.

25         THE COURT:  Thank you.

1          MR. BURKS:  May I have a moment with my notes,

2    Judge?

3          THE COURT:  Certainly.

4          MR. BURKS:  Thank you.  Thank you, Your Honor.

5          MAN 1:  May I borrow a tissue from the court?

6          THE COURT:  Yeah, sure.

7          MAN 1:  And (indiscernible) I will not return it.

8          MR. BURKS:  Mr. Baker, will you turn to Page 11 of

9    the plan, please?  May I proceed?

10          MR. FITZMAURICE:  Oh, yes.  Thank you, yes.

11   BY MR. BURKS:

12   Q    Mr. Carter, will you look on Page 11 of the plan?

13   There's a summary of classification.  I want to know what

14   other secured claims in Class 1 are.  Who are they, please?

15   A    Class 1 is the outstanding tax claims.

16   Q    Are you aware of proof of claim at ECF Docket 496-1

17   filed by Arin-Air Inc.?

18   A    No.

19   Q    Never heard of it?

20   A    No.

21   Q    Okay.  Do you know whether or not the claim of Arin-Air

22   Inc. is being paid in the plan?

23   A    I don't know what that claim is.

24   Q    Okay.  Let's put it up on the screen and see.  Docket

25   ECF 496-1.

```
1                MR. BURKS:  Mr. Baker, will you slowly scroll

2    down?

3    BY MR. BURKS:

4    Q    And Mr. Carter, I'm doing this so -- I'm trying to see

5    if you can identify this claim.  It purports to be from

6    Arin-Air Inc. and it purports to have a mechanic

7    (indiscernible) on it.

8                MR. BURKS:  All the way down (indiscernible).

9    BY MR. BURKS:

10   Q    Have you seen this proof of claim, Mr. Carter, before?

11   A    I don't recall this one.

12   Q    It purports to be, certainly on its face --

13               MR. BURKS:  Go to Page 1, please.

14   BY MR. BURKS:

15   Q    -- a secured claim.  Isn't that the definition of Class

16   1, other secured claims?

17               MR. FITZMAURICE:  Objection, Your Honor.  The plan

18   speaks for itself in how it defines numbers of the classes.

19               THE COURT:  I'll sustain the objection.  Thank

20   you.

21   BY MR. BURKS:

22   Q    Do you know what class Arin-Air Inc. is included in?

23   A    Given that it appears to be a construction company,

24   it's like in the 5A group.  If it's there.  I don't know

25   that one particularly.
```

1   Q    And which group is that?

2   A    That's the one that gets 70 percent.

3   Q    The date of the lien purports to be 8/11/2023.  Do you

4   recall the date of the second lien filed by 2425 WL?

5              MR. FITZMAURICE:  So objection, Your Honor.  Calls

6   for a legal conclusion as to whether or not the -- if there

7   is a lien that is actually valid and perfected as of that

8   date.

9              THE COURT:  Ask the question again, Mr. Burks.

10   BY MR. BURKS:

11   Q    We see that Arin-Air Inc.'s lien affidavit by order or

12   not was filed on 8/11/2023.  Do you recall when the lien of

13   2425 WL, valid or not, do you recall when that was filed?

14              MR. FITZMAURICE:  So objection, Your Honor.  Lacks

15   foundation as to the date of the filing.  I don't know if

16   the witness knows what any of the markings on this document

17   mean.

18              MR. BURKS:  I asked him when it was filed.

19              THE COURT:  I'll overrule the objection.  You can

20   answer the question.  If you recall.

21              THE WITNESS:  I don't recall it --

22              THE COURT:  If you don't recall --

23              THE WITNESS:  -- when it was filed.

24   BY MR. BURKS:

25   Q    All right, sir.  Well, I have a question about that,

1   and I'm going to pull up the proof of claim, which has been

2   previously admitted into evidence so you can take a look at

3   it.  (indiscernible) one moment, sir.  I understand that you

4   don't remember all the claims.

5          MR. BURKS:  Is this you (indiscernible)?  Let's do

6   some work on it.

7          MR. BAKER:  FR claim?

8          MR. BURKS:  Of the (indiscernible).

9          MR. BAKER:  Yeah.  I would have to look there.

10          MR. BURKS:  (indiscernible).

11          MR. BAKER:  He's there.  Go up.  Keep going up.

12          MR. BURKS:  And on a slightly lighter note, I do

13   miss the days of paper a little bit.

14          MR. BAKER:  12.  No, I'm sorry.  (indiscernible).

15   Here it is.

16          MR. BURKS:  Yeah, there it is.  7.  Go down to the

17   middle of the page.

18   BY MR. BURKS:

19   Q    So the date of the lien affidavit of Arin-Air was

20   8/11/23 irrespective of this enforceability.  And the --

21          MR. TROOP:  Object -- I'm sorry, Your Honor.

22          MR. BURKS:  Can I ask the question?

23          MR. TROOP:  Well, no, because it's about what

24   you're talking about.  It's not admissible.

25          MR. SATHER:  Your Honor, this --

```
 1            THE COURT:  Whoa, whoa, whoa.  One at a time.  One
 2     at a time.  I'll let you go, Mr. Sather, but let him talk
 3     first.  Don't interrupt him.  Thank you.  Go ahead.
 4            MR. TROOP:  Your Honor, I do not believe that the
 5     Arin-Air proof of claim has been admitted into evidence.  If
 6     it's not been admitted into evidence, you're entitled to
 7     take judicial notice of the fact that it is on the claims
 8     register, but you can't take anything about it as being true
 9     for a fact that's been asserted.  There's no foundation for
10     that.  And therefore to the extent that this line of
11     questioning is trying to elicit something between the truth
12     of a document that is not admitted for the truth, it can't
13     be admitted for the truth of it and another document.  But
14     the line of questioning should be prohibited, Your Honor.
15            THE COURT:  Mr. Burks, I'll let you respond to
16     that.  Go ahead.  And I'll let Mr. Sather respond as well.
17            MR. BURKS:  So you can do -- I'm asking the Court
18     to take judicial notice of Docket Number 496-1, which is the
19     proof of -- excuse me.
20            THE COURT:  I'll take judicial notice of the
21     claims register in 2334815 Galleria 2425 (indiscernible).
22            MR. BURKS:  And all I'm asking is the Court to
23     take judicial notice that the claim includes (indiscernible)
24     with the date.  Whether it's valid or not is for you to
25     decide when you write your opinion on this (indiscernible).
```

1          THE COURT:  Okay.  So what's your question to this

2     witness then?

3          MR. BURKS:  My question is comparing the date of

4     lien on (indiscernible) for Arin-Air from 8/11/2023, whether

5     valid or not, is it before or after the trust date, whether

6     valid or not, in 2425 WL from Proof of Claim 7.

7          THE COURT:  Mr. Burks, that has so much

8     speculation in it, it's not even that funny.  So I'm not

9     going to allow that question.  But I can look at the claims

10    here to strike and compare dates.  Thank you.

11         MR. BURKS:  All right.  I ask -- hold on, please.

12    Your Honor, I ask the Court to take judicial notice of Claim

13    7-1 --

14         THE COURT:  I've already taken judicial notice of

15    the entire claims register, Mr. Burks.

16         MR. BURKS:  I ask the Court to take judicial

17    notice that the date of trust purports to be recorded on

18    8/11/2021.

19         THE COURT:  Scrolling down, that's an official

20    copy, right?

21         MR. BURKS:  Yes, Your Honor.

22         THE COURT:  It's unofficial.

23         MR. BURKS:  On the proof of claim it purports to

24    be recorded on 8/11/2021.

25         THE COURT:  What claim is that, Mr. Burks?

1          MR. BURKS:  This is Claim 7, the claim on 2425 WL.

2     Go to the first page where it says the date on it.

3          THE COURT:  Bear with me for one second.  I'm

4     looking at it.  I'm pulling it off ECF.

5          MR. BURKS:  Let me see it (indiscernible).  You're

6     going to put it on the screen, Judge?

7          THE COURT:  Yeah, I'm going to look at it.  But I

8     can put it on the screen.  It's already on the screen.

9          MR. BURKS:  Mm hm.  All right.  Keep going.  Stop.

10          THE COURT:  You want me to take judicial notice of

11     the fact that it was recorded on 5/11/2021?  Is that what

12     you're asking?

13          MR. BURKS:  That the proof of claim purports to

14     claim that it was recorded on 5/11/2021.

15          THE COURT:  The recording information seems to

16     indicate that it was filed on 5/11/2021.  That's at the top

17     of Page 5 of 18.  I'll take judicial notice that.

18          MR. BURKS:  Thank you, Your Honor.  May I ask the

19     Court to take judicial notice of Docket Number 496-1, the

20     proof of claim of Arin-Air Inc.?

21          THE COURT:  I've already taken judicial notice of

22     the entire claims register, Mr. Burks.  I don't need to.

23          MR. BURKS:  Will you take judicial notice that the

24     lien affidavit purports to be recorded on 8/11/2023?

25          THE COURT:  I'll take judicial notice of the

1    recording stamp dated 8/11/2023, Claim 17-1 on Page 4 of 9.

2            MR. BURKS:  Yes, Your Honor.  Thank you.

3    BY MR. BURKS:

4    Q    Mr. Carter, on that class of trade creditors, they are

5    getting paid 70 percent of their allowed claims.  Are you

6    aware of any of those claims that have recorded mechanic's

7    and (indiscernible) liens?

8    A    No.

9            MR. BURKS:  Your Honor, I may be complete with my

10   cross of this witness.  May I -- Mr. Ali Choudhri did ask

11   for me to speak to him.  May I take --

12           THE COURT:  That's fine.

13           MR. BURKS:  -- 60 seconds or more?  How much time

14   may I have?  90 seconds?

15           THE COURT:  I'll give you as much time as you

16   need, Mr. Burks.  I don't want to cut anyone off from asking

17   questions as long as they're relevant.  So go ahead.

18           MR. BURKS:  Thank you, Judge.  I'd rather handle

19   it this way.

20   BY MR. BURKS:

21   Q    Go back to the very beginning of the plan.  You talked

22   a little with your client -- with your attorney, sorry.  You

23   talked with your attorney about the negotiation and proposal

24   of the plan.  Did NBK negotiate the terms of this plan with

25   the Chapter 11 trustee?

1    A     No.

2    Q     Did NBK provide the terms of the plan to the Chapter 11

3    trustee?

4    A     Our lawyers did the initial draft.

5    Q     Okay.  Do you know -- for purposes of this hearing, do

6    you know if the Chapter 11 trustee asked for a cap on credit

7    bidding?

8    A     They did.

9    Q     Excuse me?

10   A     They did.

11   Q     And was a cap on credit bidding provided in the plan?

12   A     We declined that request.

13   Q     All right.  Did the Chapter 11 trustee request more

14   funds be paid in for the release of claims?

15   A     That was a suggestion they made.

16   Q     Is -- and did you?  Did you agree to provide more than

17   the estimated 3.7 note?

18          MR. FITZMAURICE:  Objection, Your Honor.  The

19   question is misleading.  The first question was what was

20   initially requested, and now it's what is ultimately

21   provided.  And counsel is asking whether what was initially

22   requested -- there's a logical connection between the two,

23   and he hasn't established that they're in fact --

24          THE COURT:  Let's ask a little more detail, Mr.

25   Burks.

1              MR. BURKS:  Fair enough.  I agree.  Sorry.

2    BY MR. BURKS:

3    Q    You're aware of the cash payments in the -- that are

4    provided for -- required of the bank if they get a release

5    and the plan's confirmed, correct?

6    A    Yes.

7    Q    And your estimation is that it was about -- it's going

8    to be more or less $3.7 million.

9    A    Yes.

10   Q    And the board's approved that.

11   A    Yes.

12   Q    Did the trustee ask for more than that amount of $3.7

13   million?

14   A    I'm not aware of any specific request of an amount.

15   Q    Did the trustee ask for more?  Not an amount, more than

16   $3.7 million.

17   A    Well, that's an estimate.  It could be more.

18   Q    Did the trustee ask for more than $3.7 million?

19              MR. FITZMAURICE:  Objection.  Asked and answered.

20              THE COURT:  And I'll sustain the objection.

21   BY MR. BURKS:

22   Q    Has NBK's board approved more than $3.7 million?

23              MR. FITZMAURICE:  Objection, Your Honor.

24   Mischaracterizes the witness' testimony.

25              THE COURT:  I'll sustain the objection.

1    BY MR. BURKS:

2    Q     Do you know --

3              MR. SATHER:  Your Honor, if I may, I believe the

4    two counsel from NBK are making objections.  I would request

5    that they be limited to a single counsel per witness.

6              THE COURT:  Mr. Fitzmaurice will make objections.

7    Go ahead.

8    BY MR. BURKS:

9    Q     Do you know how many negotiating sessions there were

10   between NBK's attorneys and the Chapter 11 trustee or the

11   Chapter 11 trustee's attorneys?  I'm not asking you for what

12   was said, but do you know how many negotiation sessions were

13   made?

14   A     No.

15             MR. FITZMAURICE:  Objection, Your Honor.  Lacks

16   foundation.

17             THE COURT:  He answered the question.  I don't

18   need to rule on the objection.  Go ahead.

19   BY MR. BURKS:

20   Q     You negotiate deals and workouts on loans, don't you?

21   A     Yes.

22   Q     Isn't it true that NBK in its negotiations constantly

23   told the Chapter 11 trustee if you want the cash, I got to

24   have credit bidding?

25             MR. FITZMAURICE:  Objection, Your Honor.  Lacks

1    foundation.

2         MR. BURKS:  He either knows or he doesn't.

3         THE COURT:  I'll overrule the objection.

4    BY MR. BURKS:

5    Q    If you want the cash, we've got to have credit bidding.

6    Was that a point that the bank made with the trustee?

7         MR. FITZMAURICE:  So objection, Your Honor, to the

8    extent that the question calls for the witness to reveal the

9    contents of attorney-client privileged communications for

10   which I instruct him not to do so.

11        MR. BURKS:  I asked him what the bank's position

12   was.  I was careful not to dance in between the bank and the

13   attorneys.

14        MR. FITZMAURICE:  Well, what he asked was what did

15   the bank's lawyers say to the trustee.

16        THE COURT:  I'll sustain the objection as to

17   privilege.  Thank you.

18   BY MR. BURKS:

19   Q    Did the bank -- not the bank's lawyers, did the bank

20   take the position that no credit bidding equals no $3.7

21   million in the plan?

22   A    We agree with that concept, yes.

23   Q    Isn't it true that the bank said no release of claims,

24   no release of liability, no $3.7 million?

25   A    We agreed with that concept, yes.

1  Q    Is there any other plan on file right now for the

2  Chapter 11 trustee to consider?

3  A    Not that I know of.

4  Q    So it's your plan or the highway, correct?

5  A    From my understanding.

6          MR. FITZMAURICE:  Objection, Your Honor.

7  Argumentative.

8          THE COURT:  That's argumentative, Mr. Burks.

9          MR. BURKS:  Yes, Your Honor.  Only 30 seconds to

10  confer with counsel to make sure that --

11          THE COURT:  Go ahead.

12          MR. BURKS:  Your Honor, I'm checking my notes to

13  make sure that I've asked what I need to ask and then I'll

14  pass the witness.  Thank you, Your Honor.  Pass the witness.

15          THE COURT:  All right.  Mr. Baker?

16          MR. BAKER:  No additional questions, Your Honor.

17          THE COURT:  All right.  Thank you.  Mr.

18  Fitzmaurice?

19          MAN 1:  Your Honor?  May I ask a few, Your Honor?

20          THE COURT:  No, you may not.  Thank you.

21          MAN 1:  I thought I misunderstood maybe in the

22  beginning of the hearing you said that I would be able to

23  ask --

24          THE COURT:  You may sit down, sir.  Thank you.  Go

25  ahead.

1          MR. FITZMAURICE:  Your Honor, briefly, before I

2     begin, have we invoked the rule?  I just want to make sure I

3     understand who the rest of the -- other than the marshals in

4     the back, the -- I understand who the rest of the folks are

5     in the courtroom who are sitting behind the bar.

6          THE COURT:  I --

7          MR. FITZMAURICE:  Mr. Steidley is counsel for

8     2425.  I want to make sure he's here in that capacity, not

9     as a witness given we've had lots of lawyers called as

10    witnesses.

11         THE COURT:  The rule's --

12         MR. FITZMAURICE:  And he was previously a witness.

13         THE COURT:  The rule's been invoked.  If they

14    violate the rule, it's on the people who are sitting at that

15    table right over there.  They know what the rule is.  And if

16    it's invoked and it's violated, then they don't get to

17    testify.  It's simple.  Thank you.

18         MR. FITZMAURICE:  Thank you, Your Honor.

19              REDIRECT EXAMINATION OF MICHAEL CARTER

20    BY MR. FITZMAURICE:

21    Q    Mr. Carter, do you know whether the Chapter 11 trustee

22    has filed an objection to 2425 WL's proof of claim?

23         MR. BURKS:  Excuse me, Your Honor.  I'm invoking

24    the rule on Mr. Steidley.  Somebody might call him.

25         THE COURT:  He's already been in the witness --

1    he's already been -- he's already heard testimony.  He can't

2    testify.

3              MR. BURKS:  All right.

4              THE COURT:    Thank you.

5    BY MR. FITZMAURICE:

6    Q    I'll repeat the question, Mr. Carter.  Do you know

7    whether the Chapter 11 trustee has filed an objection to the

8    2425 WL proof of claim?

9    A    Not that I know of.

10   Q    Okay.  Counsel was asking you questions about the

11   classification of claims in the plan.  Do you recall that?

12   A    Yes.

13   Q    And one of those questions was about Class 7

14   subordinated claims.  Do you recall that?

15   A    Yes.

16   Q    Just in general --

17   A    Oh.

18   Q    -- that he asked you questions about that topic.

19   That's all I'm asking for now.

20   A    Yes.

21   Q    Okay.  Do you know whether there are in fact any

22   creditors in Class 7?

23   A    Not that I know of.

24   Q    Okay.  Do you know whether the trustee has filed a

25   complaint seeking to equitably subordinate certain claims

1    that have been filed in this case by affiliates of Mr.

2    Choudhri?

3    A    Not that I know of.

4    Q    Okay.  There were some questions that were asked of you

5    about a proof of claim filed by Arin-Air.  Do you recall

6    those questions?

7    A    Yes.

8    Q    And do you recall that Mr. Burks was asking whether you

9    knew anything about whether that claim was in fact secured?

10   Do you recall those questions?

11   A    Yes.

12   Q    Okay.  Do you know whether that claim filed by Arin-

13   Air, if it's allowed, is senior in priority to the bank's

14   claim?

15   A    Not that I know of.

16   Q    Okay.  If it is senior in priority to the bank's claim,

17   do you know what happens to it under the plan?

18   A    I believe it goes into Category 2.

19   Q    And do you know what -- do you recall what the

20   treatment is to those claims?

21   A    It's 100 percent payment.

22   Q    Okay.  Do you know whether the period of time for the

23   estate to object to claims, whether that period of time has

24   passed?

25   A    I don't know that specific.

1    Q    Did you specifically, you, Mr. Carter, did you

2    negotiate any terms of the Chapter 11 plan of liquidation

3    with the Chapter 11 trustee?

4    A    No.

5    Q    Do you know whether any other bank employee negotiated

6    the terms of the plan on behalf of -- well, with the Chapter

7    11 trustee?

8    A    No.

9    Q    Do you know whether counsel for NBK negotiated the

10   terms of the Chapter 11 plan with the Chapter 11 trustee?

11   A    That's my understanding, yes.

12   Q    The bank has previously sought to foreclose its

13   mortgage against the property.  Is that correct?

14   A    Yes.

15   Q    And in the event of a foreclosure, do you have an

16   understanding as to what would happen to any lien that comes

17   after the banks?

18   A    They would be wiped out --

19   Q    Would they --

20   A    -- if the bank is not fully repaid.

21   Q    And if there are any parties who hold any unsecured

22   claims, would they receive any benefit in the event of a

23   foreclosure?

24   A    Not if the bank is not fully repaid.

25              MR. BURKS:  Objection.  Calls for speculation as

1    to what would be brought in at a foreclosure.

2            MR. FITZMAURICE:  The witness' answer I think

3    resolves the question.  He said unless -- not if the bank

4    wasn't fully repaid.

5            THE COURT:  I'll overrule the objection.  Thank

6    you.  Based on the response.

7    BY MR. FITZMAURICE:

8    Q    Thank you, Mr. Carter.

9            MR. FITZMAURICE:  No further questions, Your

10   Honor.

11           THE COURT:  Mr. Burks?

12           MR. BURKS:  Yes, Your Honor.

13           RECROSS-EXAMINATION OF MICHAEL CARTER

14   BY MR. BURKS:

15   Q    Mr. Carter --

16           MR. BURKS:  Put the plan up please.  It's 23.

17   It's 194.

18   BY MR. BURKS:

19   Q    Bear with me, Mr. Carter.  I want to ask you a question

20   about the plan without being -- I believe we're on page --

21   the first page.  You're the representative of the bank,

22   correct?

23   A    Yes.

24   Q    A deposition was taken of an officer of the bank who

25   had knowledge of this case.  Within the scope of that

1   deposition -- and was that taken of you?

2   A    Yes.

3   Q    Are you --

4        MR. FITZMAURICE:  Your Honor, objection as beyond

5   the scope.  I think he's limited to what the redirect was.

6        THE COURT:  It is.  He is limited, but he's asked

7   about a deposition.  That could be impeachment.  I'll let

8   him go.  But if it's beyond the scope you can raise your

9   objection again.  Go ahead.

10       MR. BURKS:  I would never do that, Judge.

11       THE COURT:  I don't believe that for a minute, Mr.

12  Burks.

13       MR. BURKS:  I tried to keep a straight face.

14  BY MR. BURKS:

15  Q    Mr. Carter, you recognize this document, correct?

16  A    Yes.

17  Q    All right.  Who signed this?

18  A    Well, if you scroll down I could tell you.

19  Q    Thank you.

20  A    Yes, it's me.

21  Q    And the National Bank of Kuwait signed it through its

22  representative Michael Carter, correct?

23  A    Yes.

24       MR. BURKS:  Mr. Baker, scroll down.

25  BY MR. BURKS:

1    Q    Did the law firm sign it?  I don't see their signature.

2    Did the law firm sign it?

3             MR. FITZMAURICE:  Your Honor, we'll stipulate that

4    the bank signed and the law firms didn't.

5             THE COURT:  All right.  Thank you.  It's -- I'll

6    take the stipulation.  Thank you.

7    BY MR. BURKS:

8    Q    Is your statement that you had no knowledge of the

9    negotiation of the terms of this plan?

10            MR. FITZMAURICE:  Objection, Your Honor.

11   Mischaracterizes the witness' testimony.

12            MR. BURKS:  I asked him if it was.

13            THE COURT:  I think it mischaracterizes his prior

14   testimony.  Ask a different question.

15            MR. BURKS:  Yes, Your Honor.

16   BY MR. BURKS:

17   Q    Do you know the terms back and forth of the

18   negotiations of this plan that you signed?

19   A    Generally.  Generally, yes.

20            MR. BURKS:  Nothing further, Judge.

21            THE COURT:  All right.  Thank you.  Mr. Baker?

22            MR. BAKER:  Nothing further, Your Honor.

23            THE COURT:  All right.  Thank you.  Mr.

24   Fitzmaurice?

25            MR. FITZMAURICE:  Nothing further for Mr. Carter,

1  Your Honor.

2          THE COURT:  Thank you.  Mr. Carter, you're

3  excused.  You may step down.  Thank you.  All right.  Mr.

4  Fitzmaurice, next witness.

5          MR. FITZMAURICE:  Your Honor, National Bank of

6  Kuwait calls the Chapter 11 trustee Christopher Murray.

7          THE COURT:  All right.  Mr. Murray, come on

8  forward.  I'll swear you in.  Please raise your right hand

9  and be sworn.  Do you swear or affirm to tell the truth, the

10  whole truth, and nothing but the truth so help you God?

11          THE WITNESS:  I do.

12          THE COURT:  Thank you.  Have a seat.

13          DIRECT EXAMINATION OF CHRISTOPHER MURRAY

14  BY MR. FITZMAURICE:

15  Q    Good morning, Mr. Murray.

16  A    Good morning.

17  Q    Were you in the courtroom earlier this morning when the

18  Court took appearances?

19  A    I was.

20  Q    Did you hear Mr. Shannon tell the Court that the

21  Chapter 11 trustee supports confirmation of the bank's plan?

22  A    Yes, I did.

23  Q    Do you support confirmation of the bank's plan?

24  A    I do.

25  Q    Why?

1   A    It is -- if confirmed, will lead to a superior outcome

2   for unsecured creditors and other parties in interest than

3   the alternative.

4   Q    Is there presently an alternative?

5   A    No.

6   Q    Was there previously an alternative?

7   A    There were other plans filed but ultimately withdrawn.

8   Q    In your role as Chapter 11 trustee, did you evaluate

9   the benefit to the estate from -- at the time when there

10  were in fact competing plans?

11  A    Yes.

12  Q    And did you make a determination as to which of the

13  competing plans was superior from the estate's purposes?

14  A    Yes.

15  Q    I should say from the estate's perspective.

16  A    Yes.

17  Q    Okay.  What was that determination?

18  A    I determined that the NBK plan was more likely to be

19  confirmed and therefore in the creditor's best interest.

20  And in that sense, superior to the competing plans.

21  Q    What factors did you consider in determining whether or

22  not you thought -- that you thought the bank's plan was more

23  likely to be confirmed than the plan proposed by the debtor?

24  A    I considered feasibility in terms of ability to fund.

25  That was critical.  I considered what -- whether there'd be

1    enough money for admins.  I considered permission to use

2    cash collateral, which was essential to keep the business in

3    an 11.  I considered what recovery to unsecured creditors

4    might be.  I considered how causes of action would be

5    preserved or not.  And I considered my assessment of

6    confirmability of the plan.  There might be other things,

7    but those are what come to mind right now.

8    Q    And after consideration of all of those factors, you

9    made the determination that the bank's plan was superior to

10   the debtor's plan.  Is that right?

11   A    Well, yeah.  I'd say that I think it was superior to

12   not having a plan.

13   Q    Did you make a determination as to whether you thought

14   the debtor's plan was confirmable?

15   A    I did.

16   Q    Did you make a determination as to whether you thought

17   the debtor's plan was feasible?

18   A    Yes.

19   Q    What was that determination?

20   A    I didn't believe it was feasible.

21   Q    Why did you believe the debtor's plan was not feasible?

22   A    Lack of funding primarily, but also the de facto veto

23   that the bank would have absent adequate assurance payments

24   and adequate protection, which I didn't see the feasibility

25   of.

1          MR. FITZMAURICE:  Your Honor, may I project?

2          THE COURT:  Sure.

3          MAN 1:  (indiscernible)?

4          MR. FITZMAURICE:  Please.  Thank you.

5          MAN 1:  Thank you.

6   BY MR. FITZMAURICE:

7   Q    Mr. Murray, I'm showing you Document ECF 302.  Do you

8   recognize this to be the third amended plan that was

9   proposed by the debtor jointly with 2425 WL?

10  A    Yeah, that's what it says.

11  Q    Do you recall whether the funding source was for the

12  payments that the debtor was required to make under this

13  plan?

14  A    I don't.  I don't remember.

15         MAN 1:  I think you're having your Adobe problem

16  again.

17         MR. FITZMAURICE:  Oh, I am.  That's unfortunate.

18  Here I was, Your Honor.  I thought I was organized.  I had

19  all my documents open.  All my -- for my witnesses ready to

20  go.  I apologize.

21         THE COURT:  There are reasons why we hate Adobe,

22  and this is one of them.

23         MR. FITZMAURICE:  So Your Honor, I'm going to ask

24  my colleague to open the document at ECF 302, which is the

25  debtor's third amended plan.  I will unplug.  And I'm going

1   to ask you, Mr. Akuffo, to scroll down to the end.  Yep.  Up

2   a little bit to the first page of the term sheet.

3   BY MR. FITZMAURICE:

4   A    Okay.  I see that.

5   Q    Do you recall reviewing this summary of key terms of

6   and conditions for debtor-in-possession term loan facility?

7   A    Yes.  Yes.

8   Q    Do you know whether this was, in fact, the source of

9   funding for the payments the debtor was required to make

10  under its third amended plan?

11  A    Yes, I think that's what they were proposing to fund

12  their plan with.  Yes.  Yeah.

13  Q    Did you make an assessment as to whether or not funding

14  would in fact be available?

15  A    Yes.

16  Q    And what was that assessment?

17  A    I doubted it would be.

18  Q    And what were the factors that led to that conclusion?

19  A    Well, the history of the debtor generally being unable

20  to secure funding even for its settlement agreement, the

21  inability to fund its first bankruptcy case, its inability

22  to show a commitment to funding at any point during the

23  case.  Those things generally, but also a proposed DIP

24  lender term sheet is not a loan.

25  Q    Do you know whether this term sheet contemplated a loan

```
1   that would prime the bank's lien?

2            MR. FITZMAURICE:  I'll ask you, Mr. Akuffo, to

3   scroll --

4   BY MR. FITZMAURICE:

5   A    I don't remember this one specifically.  I remember

6   thinking --

7            MR. FITZMAURICE:  Go up a little bit.

8   BY MR. FITZMAURICE:

9   A    Yeah.

10           MR. BURKS:  Your Honor, I object to any further

11  answer.  The document speaks for itself and he has answered

12  that he doesn't remember.

13           MR. FITZMAURICE:  Your Honor, I'm allowed to use

14  essentially anything to try to refresh the witness'

15  recollection, which is what I'm trying to do.

16           THE COURT:  That's fine.  I'll overrule the

17  objection.

18  BY MR. FITZMAURICE:

19  Q    Mr. Murray, I'd ask you to look at the sort of middle

20  portion of your screen.  Does that refresh your recollection

21  as to whether or not --

22  A    I see now it's a priming DIP.

23  Q    Okay.  Did you make an assessment as to whether you

24  thought a priming DIP would be available to the debtor in

25  this case?
```

1   A    I did.

2   Q    And what was that assessment?

3   A    That they would not be able to meet the requirements to

4   prime.

5   Q    Do you know whether the debtor sought to support its

6   payment obligations in connection with its fourth amended

7   plan with this same term sheet?

8   A    I don't remember.

9         MR. FITZMAURICE:  So I'm going to ask my colleague

10  to pull up Document Number ECF 366.  Sorry, 366.

11        MAN 1:  365.

12        MR. FITZMAURICE:  366 is what I'm looking for.  Go

13  to the first page, please.

14        MAN 1:  (indiscernible).

15        MR. FITZMAURICE:  I don't.  Thank you.

16  BY MR. FITZMAURICE:

17  Q    Mr. Murray, I'm showing you the document at ECF 366.

18  Do you recognize this to be the disclosure statement the

19  debtor filed in connection with its fourth amended joint

20  plan with 2425 WL?

21  A    Yes, I do.

22        MR. FITZMAURICE:  So I'll ask my colleague to move

23  to Page 47 of 129.

24        MR. BURKS:  Is this the fourth amended

25  (indiscernible)?  What's --

1  BY MR. FITZMAURICE:

2  Q    Do you see there, Mr. Murray, the same summary key

3  terms of the conditions for debtor-in-possession term loan

4  facility?

5  A    Yes, it looks like the one we just looked at.

6  Q    All right.  And does this refresh your recollection as

7  to whether the same contemplated financing from Legalist was

8  used by the debtor to support the payments for

9  (indiscernible) it made under its fourth amended plan?

10 A    I mean, not this specifically, but I recall that the

11 funding source in those plans was the same.  Or would've

12 been the same had they had the funding.

13 Q    Thank you.

14      MR. FITZMAURICE:  And Mr. Akuffo, if we could go

15 to ECF Number 377 please.

16 BY MR. FITZMAURICE:

17 Q    Mr. Murray, do you recognize this to be the debtor's

18 fifth amended plan?

19 A    Yes.

20 Q    And this was the last plan the debtor had on file?

21 A    Yes.

22 Q    And this is the plan that was ultimately withdrawn?

23 A    That's my understanding, yes.

24      MR. FITZMAURICE:  I don't have the page number.

25 Can you scroll down for me?

```
 1          MAN 1:  Yeah, he's looking for the term sheet.

 2          MR. FITZMAURICE:  Thank you.

 3  BY MR. FITZMAURICE:

 4  Q    Mr. Murray, do you see again in the same May 3, 2024

 5  summary of key terms under the conditions for debtor-in-

 6  possession term loan facility?

 7  A    Yeah.  It looks like the same term sheet, yes.

 8  Q    So is it your understanding that the debtor was again

 9  contemplating using the same facility in support of the

10  payments under the fifth amended plan?

11  A    Yeah, it was the Legalist funding.  Yes.

12  Q    Are you aware of whether Legalist ever approved its

13  funding?

14  A    No, I'm not.

15  Q    Do you know of -- has anyone told you that Legalist did

16  not in fact approve funding for the plan?

17          MR. BURKS:  Calls for hearsay.  Has anyone told

18  you?

19          THE COURT:  I'll sustain the objection.

20  BY MR. FITZMAURICE:

21  Q    Do you know whether or not Legalist ever in fact

22  approved funding contemplated by the debtor's plan?

23          MR. BURKS:  Objection.  Calls for hearsay.  He

24  already stated that he's not aware.

25          MR. FITZMAURICE:  But the last question was
```

1   whether somebody told him.  This is whether he's aware.

2              MR. BURKS:  Two questions ago was, was he aware.

3              THE COURT:  I'll overrule the objection.  He can

4   answer the question.  Thank you.  If you're aware.

5   BY MR. FITZMAURICE:

6   A   I know we had asked for information to confirm that --

7   whether there was funding.  I never saw any kind of

8   confirmation.  So...

9              MR. FITZMAURICE:  I'm going to ask my colleague to

10  pull up a document at ECF 527-3.

11  BY MR. FITZMAURICE:

12  Q   Mr. Murray, you've got in front of you a document

13  that's ECF 527-3, a June 13, 2024 email.  That purports to

14  be an email from someone named Brian Rice to me.  Do you see

15  that?

16  A   I see it.

17  Q   Reading this email, does that refresh your recollection

18  as to whether or not Legalist ever approved the finance --

19  the contemplated financing for the debtor?

20             MR. BURKS:  Objection.  The rules of evidence do

21  not allow that witness' recollection to be refreshed by a

22  hearsay document.

23             MR. FITZMAURICE:  In fact, they specifically do,

24  Your Honor.  I'm allowed to show him anything.

25             THE COURT:  I'll overrule the objection.

1   BY MR. FITZMAURICE:

2   A    I mean, it doesn't refresh my recollection.  I don't

3   think I've seen this email.

4   Q    Okay.  Thank you.

5        MR. FITZMAURICE:  You can take that one down.

6   Thank you.  Actually, sorry.  Just one more.  ECF Number

7   474.

8   BY MR. FITZMAURICE:

9   Q    Mr. Murray, showing you what's -- the document that's

10   been docketed at ECF Number 474.

11        MR. FITZMAURICE:  Just scroll up to the top so we

12   can see that please.  Thank you.

13   BY MR. FITZMAURICE:

14   A    I recognize this.

15   Q    And is this the debtor's withdrawal of its fifth

16   amended plan?

17   A    Yeah, right before a show-cause hearing on the plan,

18   yes.

19   Q    Do you know what that show-cause hearing was intended

20   to address?

21   A    I recall that the court ordered the disclosure of

22   documents evidencing availability of funding.  Something

23   like that.  And I remember waiting for that day.  Then it

24   came and went and there was no proof of funding that was

25   ever filed.

1          MR. FITZMAURICE:  Okay.  You can take this one

2     down.  Thank you.

3     BY MR. FITZMAURICE:

4     Q    Mr. Murray, are you aware of whether or not the debtor

5     has asserted claims against the National Bank of Kuwait?

6     A    Yes.

7     Q    In the course of your duties in this case as the

8     Chapter 11 trustee, have you investigated those claims?

9     A    Yes.

10          MR. FITZMAURICE:  I'm just going to grab a

11     document from the table if that's okay.

12          THE COURT:  That's fine.  Feel free.

13          MR. FITZMAURICE:  Always at the bottom of the

14     pile.

15     BY MR. FITZMAURICE:

16     Q    So Mr. Murray, I'd like to discuss with you the things

17     that you did to investigate the debtor's claims against the

18     bank.  Did you discuss the nature of those claims with the

19     debtor's counsel?

20     A    Yes.

21     Q    Now the debtor has more than one counsel.  Is there --

22     can you let us know who you spoke to?

23     A    At different points I spoke to Mr. Baker, I spoke to

24     Mr. Choudhri personally, spoke to Ms. Hayward, spoke with

25     Mr. Alexander.  At some point I think we spoke, but Mr.

1    Sather.  I don't think I discussed it ever with Mr. Burks.

2    Might have discussed it with Ms. Brown, but I don't remember

3    that.  But there were lots of discussions with the debtor

4    and its representatives about the claims.

5    Q    Do you have in your mind a rough estimate of the time

6    that was spent by you having conversations with the debtor

7    and/or its representatives relating to the claims asserted

8    against the bank?

9         MR. BURKS:  Objection, Your Honor.  Ambiguous.  I

10   need to know is he talking about his time personally or his

11   counsel's time combined with his or his counsel's time.

12        THE COURT:  I understood the question to be his

13   time, so I'll take it such.  Mr. Murray, go ahead.

14   BY MR. FITZMAURICE:

15   A    Personally probably a dozen hours.

16   Q    Are you aware of whether or not your counsel had any

17   separate conversations with any of those folks that you were

18   not involved in?

19   A    I believe they had lots of conversations, yes.

20   Q    And do you know approximately how much time your

21   counsel spent talking to those folks about the debtor's

22   claims against the bank?

23   A    I don't know.

24   Q    Rough order of approximation more or less than -- of

25   the time that you spent?  If you know.

```
 1                MR. BURKS:  Objection.  Asked and answered I don't

 2   know.

 3                THE COURT:  I'll sustain the objection.  Thank

 4   you, Mr. Burks.

 5   BY MR. FITZMAURICE:

 6   Q    Did you discuss the claims with Mr. Choudhri?

 7   A    Yes.

 8   Q    On one occasion, more than one occasion?

 9   A    At least three in person and there were other

10   communications too.  I don't know how many.

11   Q    Did you review any pleadings filed by the debtor

12   against the National Bank of Kuwait?

13   A    Yes.

14   Q    Did you review any pleadings relating to claims filed

15   by Mr. Choudhri against the National Bank of Kuwait?

16   A    Yes, I think so.

17   Q    Did you review any pleadings relating to any claims

18   filed by 2425 WL against the National Bank of Kuwait?

19   A    Yes.

20   Q    Mr. Murray, do you know who James Pope is?

21   A    I don't know him personally.  I think he entered an

22   appearance as debtor's counsel.

23   Q    Did you talk to him at all about the claims against the

24   bank?

25   A    He might've been on one of the early phone calls, but I
```

1    don't remember specifically.

2    Q    There was an attorney who testified here on Monday

3    named Jim Wetwiska.  Do you recall that?

4    A    Yes.  Yes.

5    Q    Did you speak with Mr. Wetwiska about the claim against

6    the bank?

7    A    I did, yes.

8    Q    There was another attorney who testified here on Monday

9    named Jerry Alexander.  Do you recall that?

10   A    Yes.

11   Q    And did you speak with Mr. Alexander about the claims

12   against the bank?

13   A    Yes.

14   Q    Did you speak with anyone -- so again, in the context

15   of your investigation into the claims against the bank, did

16   you speak with anyone that's not affiliated with the debtor?

17   A    Yes.

18   Q    Can you recall anyone that you spoke with who wasn't

19   affiliated with the debtor?

20   A    Well, I spoke with your team.  I know my counsel

21   interviewed Mr. Cauldwell.  I and my counsel spoke with a

22   woman named Azeemeh Zaheer and her counsel.  And that's who

23   I can recall right now.

24   Q    Without revealing anything that you discussed with the

25   contents of any communications, the specific contents of any

1  communications you had with your attorneys, did you in

2  general discuss counsel's meeting with Mr. Cauldwell with

3  counsel?

4  A    Yes.

5  Q    And I apologize.  I don't recall whether you said you

6  attended the meeting with Ms. Zaheer or not.

7  A    I was at most of the meeting with Ms. Zaheer.  Then I

8  had to leave.

9  Q    Okay.  Again, without revealing the contents of any

10  communications with counsel, did you discuss with them the

11  portions of the meeting that you missed?

12  A    Yes.

13  Q    Whether formally or informally, did you request

14  document production from the debtor?

15  A    Yes, we did.

16  Q    And were any documents provided?

17  A    I don't think they ever produced anything in the formal

18  discovery.

19  Q    But informally did the debtor provide you with any

20  information?  Withdrawn.  Informally, did the debtor provide

21  you with any documents?

22  A    Yes.

23  Q    Do you recall what those were?

24  A    I recall there was a letter and an email I think from

25  Mr. Alexander.  There might've been a letter or email from

1   Mr. Wetwiska.  At some point there was a PowerPoint

2   presentation I think.  I think that was about the claims

3   against the bank that we paged through at Mr. Choudhri's

4   desk early on.  There might've been some other papers, but

5   that's all I remember was informally produced.

6   Q    And that description of the discovery, is that the same

7   if I ask you about Mr. Choudhri and the debtor and 2425 WL?

8   A    Yes.  I don't the WL entity provided anything apart

9   from what Mr. Choudhri provided.

10  Q    In connection with assessing the estate's claims

11  against the bank, did you review the settlement agreement?

12  A    Yes.

13  Q    In connection with assessing the estate's claims

14  against the bank, did you form a view as to the

15  enforceability of the settlement agreement?

16  A    Yes.

17  Q    And what was that view?

18       MR. BURKS:  Objection.  This is a multi-layered

19  question based on his entire investigation.  The --

20  everything that is attorney-client privilege with respect to

21  NBK, unless the trustee has waived it, is privileged.  WL --

22  these are settlement negotiations regarding the description

23  of the settlement agreement, parties' views of them.  2425

24  WL does not waive the settlement privilege.

25       MR. FITZMAURICE:  So I'm not asking about any of

1   that.  I'm asking about the confidential settlement

2   agreement that was entered into between the debtor Mr.

3   Choudhri, and Naissance Galleria on the one hand and the

4   National Bank of Kuwait on the other hand.  The agreement

5   that is in evidence, that's the agreement that I'm talking

6   about.  And 2425 is not a party to that.  So I'm not sure

7   what the basis of the objection is.

8            THE COURT:  Go ahead.  Make your objection again.

9            MR. BAKER:  Your Honor, the debtor does not waive

10   -- agree to waive the privilege.  I'm going to object.

11            MR. FITZMAURICE:  Mr. Baker has no right to assert

12   the debtor's privilege.  There's a Chapter 11 trustee in

13   this case.

14            THE COURT:  Mr. Baker, you can't assert any

15   privilege to the debtor.  That's clear.  You can't.  Okay?

16   So Mr. Burks, tell me your objection one more time.

17            MR. BURKS:  Yes, Your Honor.  The -- NBK's

18   attorney has gotten the trustee to state a wide variety of

19   things in conversations and documents that he's looked at.

20   And then based on his analysis of everything, he's being

21   asked to form a legal conclusion as to the validity of the

22   settlement agreement based on all the conversations, almost

23   of which are privileged settlement communications, Judge.

24            THE COURT:  I disagree.  I really do.  You can

25   answer the question.  I'll overrule the objection.

1          MR. BURKS:  Based only his view of the settlement

2    agreement?

3          THE COURT:  I overruled the objection, Mr. Burks.

4    You don't get to reargue the objection.  Please sit down.

5    Thank you.  Go ahead.  You can answer the question.

6    BY MR. FITZMAURICE:

7    Q    Do you recall the question?

8    A    I think it was what my -- ask again.

9    Q    Yes.  After -- as a result of the investigation that

10   you performed in connection with reviewing the estate's

11   claims against the bank, did you form a view as to the

12   enforceability of the settlement agreement?

13   A    Yes.

14   Q    And what was that view?

15   A    That it was likely enforceable.

16   Q    In conducting your investigation, were you looking for

17   factual support for the concept that the settlement

18   agreement could be rescinded?

19   A    Yes.

20   Q    Did you find any?

21   A    No.

22   Q    Are you aware that Mr. Choudhri and the debtor assert

23   claims against the bank that relate to events that occurred

24   after August 22nd of 2022?

25   A    Yes.

1    Q    And I'll just represent to you that's the date of the

2    settlement agreement.  We can look at it, but the document's

3    in evidence.  Did they provide you any factual support for

4    those claims?

5    A    They told me what their allegations were, yes.

6    Q    Did they provide you with any documentary evidence in

7    support of those claims?

8    A    No.

9    Q    Did you form a view as to the factual support for those

10   claims?

11   A    Yes.

12   Q    What was that?

13   A    That it was weak to non-existent.

14   Q    In connection with your investigation into the estate's

15   claims against the National Bank of Kuwait, did you form a

16   view as to the voracity of Mr. Choudhri?

17   A    Yes.

18   Q    What was that?

19   A    I did not think I could rely on the voracity of things

20   Mr. Choudhri told me.

21   Q    Have you read the plan that NBK has filed in this case?

22   A    Yes.

23   Q    Do you understand that the plan reflects a compromise

24   or settlement of estate claims against the bank?

25   A    Yes.

1    Q    Do you think that settlement should be approved?

2    A    Yes.

3    Q    Do you think that settlement is in the best interest of

4    the estate?

5    A    Yes, absolutely.

6    Q    Do you think that the funding the bank is providing

7    under the plan provides more benefit to the estate than

8    pursuing those claims?

9    A    Yes.

10   Q    Have you -- during the course of your investigation,

11   did you form an opinion as to the value of the estate's

12   claims against the bank?

13   A    Yes.

14   Q    Did you form a view as to whether that value was more

15   or less than the value the bank is providing under the plan?

16   A    Yes.

17   Q    Is it more or less?

18   A    I'd say much less.

19   Q    Mr. Murray, does the plan incorporate an auction of the

20   property?

21   A    Yes.

22   Q    Is that auction going forward?

23   A    Yes.

24   Q    Does that mean that there's more than one qualified

25   bidder?

```
 1    A    Yes.

 2    Q    The bank is a qualified bidder?

 3    A    Yes, by definition.

 4    Q    Pursuant to the stalking horse agreement?

 5    A    Yes, and I think bid procedures motion to -- for order,

 6    yeah.

 7    Q    So I'm going to ask you questions about the auction.

 8    To the extent that there is confidential information that

 9    you feel you can't reveal, then please just tell me that.

10    But other than the bank, how many qualified bidders are

11    there?

12    A    There is one other bidder.

13    Q    And who is that?

14    A    It is -- I always say it wrong.  I think it's QB Loop

15    or QB Investments Loop.  It's an entity that's represented

16    by Simon Mayer.

17    Q    How much is their bid?

18    A    Their bid is $21 million.

19    Q    The property is -- was being marketed by Hilco.  Is

20    that correct?

21    A    I should say their qualifying bid is $21 million.  We

22    have not had the auction.

23    Q    And the property is being marketed by Hilco.  Is that

24    correct?

25    A    Yes.
```

1    Q    You were here the other day and there was a lot of

2    questions and testimony concerning the Hilco marketing

3    process.  Do you recall that?

4    A    Yes.

5    Q    And there were questions and testimony concerning the

6    Hilco brochure.  You recall that?

7    A    I do.

8    Q    And there was reference in the Hilco brochure to a

9    minimum overbid amount?

10   A    Yes.

11   Q    What is the minimum overbid amount?

12   A    It was 19,750,000 I think.  It starts with a 19.

13   Q    And I apologize for the stupidity of this question, but

14   21 million is more than 19,750,000, correct?

15   A    Yes, it is.

16   Q    Okay.  Do you know whether Mr. Choudhri has any

17   connection to QB Loop?

18   A    I do.

19   Q    And does he?

20   A    Yes.

21   Q    And what is that?

22   A    Mr. Mayer told me that Mr. Choudhri's mother is one of

23   the participants in the investor group that that group

24   represents.  Also, Mr. Anwar Qadeer, who I think organized

25   that group, had told me -- I sense an objection coming.

1            MR. BURKS:  Yeah, I'm --

2            MR. FITZMAURICE:  Hasn't come yet though.

3            MR. BURKS:  Objection.  No personal knowledge.

4    Complete hearsay.  He has no personal knowledge of what the

5    -- what, if any, connection there is between Mr. Choudhri

6    and Q whatever.  And it's your role, frankly.

7            MR. FITZMAURICE:  I'd like to respond to that

8    objection.

9            THE COURT:  Which one?

10           MR. FITZMAURICE:  The objection that it lacks

11   personal knowledge.

12           MR. BURKS:  Hearsay and relevance.

13           THE COURT:  I think it's relevant.  I certainly

14   think it's relevant.  I'll overrule that objection.  Whether

15   it's hearsay or not is a different issue.

16           MR. FITZMAURICE:  I'll ask a different question,

17   Your Honor.

18           THE COURT:  Thank you.

19   BY MR. FITZMAURICE:

20   Q    Did anyone tell you that Mr. Choudhri has a connection

21   to QB Loop?

22           MR. BURKS:  Hearsay.

23    BY MR. FITZMAURICE:

24   A    Yes, he did.

25   Q    Mr. Choudrhi did.

 1    A    Yes.

 2              MR. FITZMAURICE:  Statement by a party opponent,

 3    Your Honor.

 4              THE COURT:  All right.  I'll overrule the

 5    objection.

 6              MR. BURKS:  All right.

 7    BY MR. FITZMAURICE:

 8    Q    What did he tell you?

 9    A    During our lunch break on Monday --

10              MR. BURKS:  Objection, hearsay.

11              MR. FITZMAURICE:  It's --

12              THE COURT:  Again, it's -- I'll overrule the

13    objection.  Go ahead.

14    BY MR. FITZMAURICE:

15    A    During our lunch break on Monday, he -- I forgot

16    exactly what he said, but I said, "Why didn't you make a

17    bid."  And he said, "I did.  QB Loop is me."

18    Q    Mr. Murray, when the bank filed its proposed plan of

19    liquidation on the docket, was that the first time you had

20    seen it?

21    A    I'm sorry.  Repeat the question.

22    Q    Sure.  When the bank filed the proposed plan of

23    liquidation of the debtor on the docket, was that the first

24    time you had seen all that?

25    A    No.

1   Q     So you had seen it prior to that.

2   A     Yes.

3   Q     Do you know whether bank's counsel provided your

4   counsel with direct copies of the plan?

5   A     Yes.

6   Q     Do you know whether the respective counsel, yours on

7   the one hand, the bank's on the other, discussed proposed

8   revisions to the plan?

9   A     Yes.

10  Q     Do you know whether your counsel made suggested

11  revisions to the plan?

12  A     Yes.

13  Q     Do you know whether the plan that's on file reflects at

14  least some of the suggestions that you or your counsel made?

15  A     Not as many as I could like, but yes.  At least some.

16  Q     Do you know if the original draft plan that you or your

17  counsel received from the bank provided for a recovery from

18  Choudhri's or the debtor's former counsel?

19  A     I think initially --

20        MR. BURKS:  Go ahead.

21  BY MR. FITZMAURICE:

22  A     One of the drafts had debtor's former counsel not

23  considered a trade creditor and I think maybe classified as

24  an insider or otherwise subordinate to the trade class, but

25  I don't remember exactly.

1    Q    Did you or your counsel ask the bank to classify those

2    creditors in a manner that they would receive some value

3    under the plan?

4    A    Yes.

5    Q    Does the plan so classify those creditors?

6    A    Yeah.  I thought that exclusion of debtor's prior

7    counsel from trade -- I didn't see how that was fair to that

8    creditor group that they provided services for the debtor.

9    And their side ultimately acquiesced and included them in

10   the trade clause.

11   Q    Do you know whether the debtor's former counsel are in

12   the Class 5A trade class or if they are in another class?

13   A    I don't.  I don't remember.

14            MR. FITZMAURICE:  Let's -- can we open the --

15   let's look at the plan.

16            MAN 1:  It's the only number.  Sorry.

17            MR. FITZMAURICE:  You need to plug in I think.

18   That's what I got.  It's all right.  Yeah, and just a little

19   bit so we can see 5A.

20   BY MR. FITZMAURICE:

21   Q    So looking at the descriptions here, Mr. Murray, on

22   Page 12 of the bank's plan, does this refresh your

23   recollection as to where the debtor's former counsel are

24   classified?

25   A    No, I think I need the definition of trade general

1    unsecured.

2              MR. FITZMAURICE:  Can we scroll up, please, to

3    definition of trade general unsecured?

4              MR. BURKS:  Objection to the answer to that

5    question.  The witness has demonstrated that he does not

6    know, and then the document speaks for itself under the Best

7    Evidence Rule.

8              THE COURT:  I'll overrule that objection.

9    BY MR. FITZMAURICE:

10   Q    So Mr. Murray --

11   A    I think you need to --

12   Q    -- looking the definition of trade unsecured creditors

13   -- excuse me, looking at the definition of trade unsecured

14   claims --

15             MR. FITZMAURICE:  Keep going down so that the

16   chart shows.

17   BY MR. FITZMAURICE:

18   A    I don't see her firm on here.  Can I see the --

19   Q    Was it other general unsecured?

20             MR. FITZMAURICE:  Can we see the definition of

21   general unsecured claims?

22   BY MR. FITZMAURICE:

23   A    Yeah, it must be that unless her firm is still listed

24   on the insider claims that are subordinated.  Do you have

25   that definition?  The --

1    Q    What's that?

2    A    -- subordinated claims.  Yeah.  This -- yeah, I was

3    misremembering.  It was originally subordinated and then it

4    wasn't I think was how we resolved that.

5    Q    Okay.  So do you know whether debtor's former counsel

6    is -- receives value under the plan?

7    A    Yes.

8    Q    And that's as a result of a request that you made to

9    the bank?

10   A    Yes, that's right.

11   Q    In your work as the Chapter 11 trustee in this case,

12   have you made an assessment of any claims that have been

13   filed against the estate?

14   A    Yes.

15   Q    Did you make an assessment of the claim that was filed

16   by 2425 WL?

17   A    Yes.

18   Q    You objected to that claim.

19   A    I did.

20   Q    What's the basis of that objection?

21   A    I've got to look at the objection.  I don't remember.

22   I'm pretty sure it was subordination.

23            MAN 1:  Page 402?

24            MR. FITZMAURICE:  Yeah, I'm not sure I've looked

25   at that since we found it.

1   BY MR. FITZMAURICE:

2   A    If you could just scroll down --

3            MR. FITZMAURICE:  Mr. Akuffo, I'll just ask you to

4   scroll through --

5   BY MR. FITZMAURICE:

6   A    -- and I can try to read it.

7            MR. FITZMAURICE:  -- slowly please.

8   BY MR. FITZMAURICE:

9   A    Try to remember exactly what the basis (indiscernible).

10           MR. FITZMAURICE:  So let's stop there.

11   BY MR. FITZMAURICE:

12   A    Oh, right.  Okay.

13   Q    So Mr. Murray, does reading the document here at ECF

14   402 refresh your recollection as to the basis of the

15   objection that you filed to the 2425 WL claim?

16   A    Yeah.  I think we take the position that the asserted

17   debt and its perfection and its security interest are not

18   valid for enforcement.

19   Q    Does the trustee take the position that there is in

20   fact no debt owed by the estate to 2425 WL?

21   A    Yes.  Yeah.  I think it was a fake debt.

22   Q    I'm sorry.  It was a fake debt?

23   A    Fake debt.

24   Q    Thank you.  Have you objected to any other claims --

25   A    Yes.

1   Q    -- so far?  Do you recall any other claims that you

2   objected to?

3   A    I think we -- that are filed.

4   Q    That are -- and I'm only asking about the claim

5   objections that have been filed as of the day, the 19th of -

6   -

7   A    Yeah.  I think -- of what we filed, I think we objected

8   to Mr. Choudhri's personal claim by Jetall Capital, and then

9   we filed an adversary against Jetall Companies.  Which I

10  think also had filed a claim and the objection is in the

11  adversary.

12  Q    And do you recall what the basis of the adversary

13  proceeding against Jetall Companies is?

14  A    There's a few.  There's preferences, fraudulent

15  transfers, breach of fiduciary duty I'm pretty sure.

16  Q    Does the adversary seek equitable subordination?

17  A    Yes, I think so.  To the extent there was a secured

18  claim by Jetall Companies.

19  Q    Mr. Murray, do you know whether the plan of disclosure

20  statement filed -- withdrawn.  Do you know whether the

21  voting procedures in connection with the (indiscernible)

22  plan of liquidation of the debtor called for balance to be

23  delivered to you or your counsel?

24  A    I know I got a solicitation package.  I don't know

25  where I was on the procedures there though.

1    Q    Do you know whether ballots were in fact delivered to

2    you?  Whether completed ballots were delivered to you.

3    A    Oh, yes.  I thought you were talking about the

4    solicitation.  No, the completed ballots, yes.

5    Q    Yes, apologize for my -- for the bad question.

6    A    Well, not to me.  I think Mr. Shannon received those.

7    Or at least he collected them.  I might've been copied on

8    the email.

9         MR. FITZMAURICE:  So I'm going to ask Mr. Akuffo

10   to pull up a document at ECF 428.

11   BY MR. FITZMAURICE:

12   Q    Did your counsel file this ballot summary?

13   A    Yes.

14        MR. FITZMAURICE:  Can you scroll down please?  Go

15   back to the -- yep, right there.

16   BY MR. FITZMAURICE:

17   Q    Does this reflect -- accurately reflect the votes, the

18   ballots( that were received -- let me start again.  I

19   apologize.  Does this accurately reflect the ballots that

20   were received by your counsel?

21   A    Yes.

22        MR. FITZMAURICE:  Your Honor, I'd ask the Court to

23   accept into evidence the document at ECF Number 428.

24        THE COURT:  All right.  I'll take the ballot

25   summary into evidence at 428.  Thank you.

1          MR. FITZMAURICE:  Your Honor, might I take a

2    moment and see --

3          THE COURT:  Sure.  Feel free.

4          MR. FITZMAURICE:  Thank you.

5          MR. BURKS:  Your Honor, may I be excused?  Just --

6    I have --

7          THE COURT:  Sure.  I plan on breaking in just a

8    minute.

9          MR. FITZMAURICE:  Your Honor, if it helps speed up

10   the break, I have no further questions for Mr. Murray at

11   this time.

12         THE COURT:  All right.  Mr. Murray, why don't you

13   step down?  Now would be a good time to break.  Now here's

14   my only concern.  I have someone checking on it as it is.  I

15   don't know whether you want to break for lunch or not.  The

16   problem is I can't guarantee that we can everyone rescreened

17   to come back into the courthouse.  They're checking on that

18   now.  Assuming that they can, and if you can go back out and

19   then get rescreened coming back in, you guys want to break

20   for lunch?

21         MR. SHANNON:  I think it makes sense.

22         MR. FITZMAURICE:  If we can, Your Honor, then yes.

23   Otherwise I think we'll plow through.

24         CLERK:  He's going downstairs to check.

25         THE COURT:  Okay.  So we'll check.  In a just

1    minute we'll have Mr. Baker come back.  As long as you can

2    rescreened I'm willing to give you a break.  At least you

3    guys can go across the street and get in air conditioning.

4    That would be a huge benefit I'm sure.  I don't have that

5    ability unfortunately.  So let's see.  And what I'll do is

6    I'll switch when we come back.  I'll come back out and I'll

7    tell you what we're going to do relative to breaking.  I

8    want to give you a lunch break.  I may be limited in what I

9    can do based on screening, okay?  So I'll step down for a

10   few minutes.

11          MR. FITZMAURICE:  Thank you, Your Honor.

12          MR. BURKS:  Thank you, Your Honor.

13          CLERK:  All rise.

14          (Recess)

15          CLERK:  All rise.

16          THE COURT:  Mr. Burks, I think that you are up.

17          MR. BURKS:  I think I'm up and I'm feeling very

18   much better than I was before break.  Thank you, Judge.

19          THE COURT:  You're welcome.

20          MR. BURKS:  May I gather my notes and then take

21   the podium?

22          MR. BAKER:  Mr. Burks, I'm disappointed you don't

23   have a second Astros tie.

24          MR. BURKS:  I was thinking of you this morning and

25   I almost … I have a close family member who works for the

1    Astros and I have plenty of ties.  I'm looking for my work

2    copy of the plan and I'll be right at the podium, Judge.

3    Got it.

4              THE COURT:  Mr. Burks, you want to project, you

5    ever project from a particular placed podium?

6              MR. BURKS:  From the podium, Mr. Baker?

7              THE COURT:  Mr. Baker has to help.

8              MR. BURKS:  Should I wait for Mr. Troop, Your

9    Honor?

10             THE COURT:  I think that Mr. Fitzmaurice is more

11   than capable of handing the matter, so go ahead.

12             MR. BURKS:  All right, Judge.  Thank you, Your

13   Honor.

14             CROSS EXAMINATION OF CHRISTOPHER MURRAY

15   BY MR. BURKS:

16   Q    Hi, how are you?  Still all right?

17   A    Yes.  Glad you're feeling better too.

18   Q    Thank you very much.  Let's go back a little bit.

19   Starting with, I'm going to go last to first

20   (indiscernible).  There's an auction coming up.  It's on

21   Friday, correct?

22   A    Yes.

23   Q    How many qualified bids are there?

24   A    There are two.

25   Q    Who are they?

1    A    It's QB Loop Investments, I think that's their full

2    name, and the bank.

3    Q    All right.  QB Loop, there was a statement you said

4    that Mr. Saunders said that is him, that is he, whatever

5    your statement was.  Do you remember that?

6    A    Yes.

7    Q    Have you done any investigation as to who owns Q --

8    what is QB Loop?

9         MR. FITZMAURICE:  Objection, compound?

10        THE COURT:  One question at a time.

11   BY MR. BURKS:

12   Q    Who owns QB Loop?

13   A    I don't remember who all owns it.  It's a group of

14   investors.

15   Q    So, next question is, what is QB Loop?

16   A    I think it's a group that was put together for the

17   purpose of bidding on the building.

18   Q    So, but you don't know that.  That's your surmise?

19   A    No, that's what they told me, I mean in sum and

20   substance.  I did have conversations with, first with Anwar

21   Qadeer, who is an attorney who said he represented that

22   group.  I'd also spoken with Leonard Simon at one point, who

23   said he spoke on behalf of that group.  And most recently,

24   Simon Mayer has been representing that group and I've spoken

25   to him about it.

1   Q    But Mr. Ali is not an owner in this investment group?

2   A    I don't know.

3   Q    If you know whether or not Mr. (indiscernible) is an

4   investor in that group?

5   A    I don't think he is directly an investor.  I think Mr.

6   Mayer told me that he was not directly an investor, but that

7   his mom was.

8   Q    That his who was?

9   A    His mother.

10   Q    His mother.  Did (indiscernible) comply with all the

11   requirements so far with (indiscernible) instructions?

12   A    I think so, yeah.

13   Q    And can they put down earnest money?

14   A    They did.

15   Q    How much?

16   A    There's $2.1 million in escrow.

17   Q    All right.  So, irrespective of who they know or don't

18   know, or who's involved in the group, they're a qualified

19   bidder.  Cash?

20   A    Oh, absolutely.

21   Q    The auction was supposed to take place, I believe,

22   initially, subject to (indiscernible) yesterday at one

23   o'clock.  Is that correct?

24   A    I think that's the earliest it could have happened.

25   Q    And why did it not happen yesterday?

1    A    I wanted more time to evaluate this.

2    Q    And --

3    A    Well, I had -- that's not the full answer.  The other

4    answer is I lost the entire day Monday doing the hearing.

5    So, the time I would have spent on that was spent doing

6    that.

7    Q    (indiscernible)

8    A    Yes.

9    Q    So, are you taking anymore bids?

10    A    Not at the present time, no.

11    Q    Do you intend to take more bids at the (indiscernible)?

12    A    I don't know.

13    Q    When is the auction going to be held, where you sit

14    now, what time and day?

15    A    I've scheduled it for Friday at one o'clock, local

16    time, Central.

17    Q    And where is that taking place?

18    A    We're going to do it virtually.

19    Q    And who, who can sign in or link in to watch the

20    bidding process?

21    A    I don't think I've determined that yet, probably just

22    the parties who are qualified.

23    Q    All right.  So, for example, can Mr. Choudhri be muted

24    and watch?

25    A    I suppose anybody could watch the auction.  I don't

1   have a problem with that.  I, I don't want any interference

2   with the auction.

3   Q    Exactly.  So, you can, if you do it remotely, you can

4   have a situation where no one can see Mr. Choudhri, no one

5   can hear Mr. Choudhri, right?

6   A    I suspect we could do that.  I know Hilco is going to

7   handle the electronic logistics, so I don't know exactly

8   what system they use.  But I imagine that's possible, and if

9   so, I wouldn't mind anyone watching.

10  Q    Thank you.  I think Mr. Choudhri would like to watch

11  it.

12  A    Yeah, I would have no problem with that.

13  Q    I, personally, would rather watch the Astros game than

14  that but … (indiscernible) still going backwards.  You made

15  decisions regarding the validity of the Choudhri claims,

16  correct?

17  A    Are you talking about his proof of claims?

18  Q    No, I'm talking proof of claims right now, yes.

19  A    Okay, yes.

20  Q    And you objected to it.

21  A    Yes, I objected to -- yes.

22  Q    And you made decisions regarding three sets, or three

23  pieces of litigation also, correct?

24  A    I think so.

25  Q    Right.  And of those three pieces of litigation, is it

1   fair to say, or isn't it true, that you're basically

2   releasing them to MPK for 3.7 million or less?

3   A    Releasing the Choudhri claims or -- I misunderstand.

4   Q    So, there are three pieces of litigation.  It's the two

5   lawsuits that have been admitted into evidence, and it's the

6   (indiscernible) claim, that (indiscernible) --

7   A    Okay, you're saying the claims against the family?

8   Q    Yes.

9   A    Right, okay.

10  Q    And you're releasing those to the extent you can,

11  correct?

12  A    If the plan is confirmed, they're released as part of

13  the plan, yes.

14  Q    Right.  And what is the consideration that the estate

15  receives for those releases of those three actions?

16  A    I consider it to be everything the estate gets from the

17  plan.  So, that's the funding that comes in that will cover

18  the admin expenses, the carveout, essentially, that funds

19  the trade creditors and the money that's for the general

20  unsecureds.  And also, there's some seed funding for the

21  litigation trust.  That's the … most of it, yeah.

22  Q    And Mr. Carter has testified that he thought that was

23  about 3.7 million.  Is that your understanding?

24  A    I think he said that's his estimate of how much cash

25  the bank would have to put in if their credit bid of 18.6

1    prevailed.  That's what I understood him to stay.

2    Q    And is that your understanding?

3    A    Yeah.  I mean, I don't know exactly what the total

4    admins will be, so it's just an estimate, but that sounds

5    about right.

6    Q    So, it's fair to say the bank gets the right to credit

7    bid for 18.6, they've got a full release of everything

8    that's out there, and (indiscernible) 3.7.

9    A    Not everything.  They get a release of the claims the

10   estate has; other parties might have claims.

11   Q    Unless the release in the plan is written the way I

12   read it, right?  I'm reading it as a full release.  Are you?

13        MR. FITZMAURICE:  Objection, Your Honor.  The plan

14   speaks for itself.  Your Honor will interpret its breadth

15   and scope and terms.

16        THE COURT:  I'll sustain the objection.  Thank

17   you.

18   BY MR. BURKS:

19   Q    You said you spoke to Jerry Alexander, correct?

20   A    Yes.

21   Q    And what did you speak to him about?

22   A    We spoke to him about the lender liability claims.

23   Q    Did he tell you what his damages model was on that

24   lender liability claim?

25   A    I … numbers, I don't remember that, no.

1    Q    All right.  So, you don't know what he was assessing

2    the value of his action?

3    A    I mean, I know he thought it was potentially very

4    valuable, big number, but I don't remember a number.

5    Q    Thirty-five million?  Does that sound familiar?

6    A    It doesn't, but it could be.

7    Q    All right.  And have you ever tried a lender liability

8    claim yourself?

9    A    As an attorney?

10   Q    Yes.

11   A    No, no I …

12   Q    Are you --?

13   A    I've objected to bank claims before, but I've not …

14   lender liability, no.

15   Q    Fair enough.  Are you aware that … let's say it

16   differently.  Isn't it true that Jerry Alexander has a

17   reputation for being an accomplished lender liability claims

18   attorney?

19   A    Honestly, I had not heard of him before this case.

20   Q    So, you don't know what his reputation is?

21   A    That's right, I don't.

22   Q    You now know.

23   A    I've been told that people hold him in high regard and

24   that he's succeeded in one lender liability case.  That's

25   pretty much the extent of it.

```
1    Q    All right.  But that was after the plan was filed.

2    A    I don't know when I came to know that, but that was

3    certainly after I met him and tried to find out who he was.

4    I don't remember chronologically, whether that was before or

5    after the plan.

6    Q    Did you speak with Jeff Steidley, an attorney?

7    A    I don't think so.

8    Q    All right.  Are you aware that Jeff Steidley is the

9    attorney who has filed a State Court lawsuit that's been

10   removed and subject to remand, regarding the enforceability

11   and the settlement agreement?

12   A    That sounds right, but I don't really remember one way

13   or the other.

14   Q    Have you spoken to -- you haven't spoken to him?

15   A    I don't think so.

16   Q    All right.

17   A    Personally, I don't remember talking to him.

18   Q    Do you know what his theories are on the lawsuit

19   regarding enforceability and regarding damages on the

20   settlement?  Do you know what his theories are?

21   A    I'm not sure I understand them very well.

22   Q    You don't understand them?

23   A    No.

24   Q    Okay.  James Wetwiska, have you spoken to him?

25   A    Wetwiska?
```

1    Q    Is that how you pronounce his name?

2    A    That's how you pronounce his name, Wetwiska.

3    Q    Mr. Wetwiska, have you spoken to him?

4    A    Yes.

5    Q    And what did you speak to him about?

6    A    Same thing.  Oh, no, I didn't speak to him about the

7    theories of why the settlement agreement wouldn't be valid.

8    I talked to him about the bank's conduct that might underlie

9    claims.

10   Q    And is there another claim that's currently on file

11   against National Bank of Kuwait that the … is, in fact, on

12   file, that you considered?

13   A    I'm not sure what you're referring to.

14   Q    All right.  Let me be less vague on that, because that

15   was pretty vague.  Are you aware that Mr. (indiscernible)

16   filed an adversary proceeding, pending in this Court, for

17   the equitable subordination of MPK's lien to the purported

18   second lien of 2425 WL?

19   A    Yes, I remember.  Yes.

20   Q    All right.  Well, that was the other action I was

21   talking about.  Are you familiar with that action?

22   A    As I sit here today, not in detail, no.

23   Q    So, if I asked you what was the basis of that

24   complaint, for that … for the claim of subordination, could

25   you tell me?

1    A    Yeah, I can tell you my recollection generally.

2    Q    Yes.

3    A    It was that the bank behaved badly and their lien

4    deserves to be subordinated because of that.

5    Q    You stated that you concluded, and you objected to the

6    claim of 2425 WL, of which that cause of action is

7    predicated, obviously.  You objected to it, correct?

8    A    Yes.

9    Q    And you objected to it, as I understand, because, isn't

10   it true that you think the lien is fictitious?

11   A    I think (indiscernible) was fictitious?

12   Q    And therefore the liens are fictitious.

13   A    Yeah.

14   Q    Right now, is that lien on file?

15   A    I don't remember.

16   Q    Has it been voided?

17   A    I don't know.  I don't remember.

18   Q    Okay.  And what was your basis for determining that the

19   lien was voidable and/or the (indiscernible) debt was

20   fictitious?  What did you base that on?

21   A    It was based on some irregularities in the documents

22   that appeared that the debt instruments were created after

23   the debt would have existed, and it contradicted some other

24   documents in the case, is my recollection.

25   Q    And was the lien reported and is it still reported?

1    A    I don't know.  I don't remember that.

2    Q    All right.  You spoke with Mr. Ali Choudhri, correct?

3    A    Yes.

4    Q    And I think you testified that you find him to be, in

5    all ways, not credible.  Is that correct?

6    A    I didn't say that.

7    Q    How do you find him to be?  Do you find him to be

8    credible?

9    A    I was asked about the veracity of what he says, and I

10   says, I said I do not think I can rely on the veracity of

11   the things he says.  I don't know if he's lying all the

12   time, none of the time.  But I have doubts when he says

13   things, that they are true.

14   Q    I understand.  Did you receive an email, personally, or

15   from your counsel, where Mr. (indiscernible) or Mr. Choudhri

16   figured -- and I'll let you answer yes or no; I'm using the

17   word tendered on purpose -- when Mr. Choudhri tendered

18   $700,000 cashier's check to buy claims from you against MPK?

19        MR. FITZMAURICE:  Objection to the use of the term

20   tender.  It calls for a legal conclusion as to whether that

21   standard has been satisfied.

22        THE COURT:  I'll let it be used in the generic

23   sense of tender.  Go ahead, answer the question.

24   BY MR. BURKS:

25   A    I saw an email that had, as an image attached to it,

1   what looked like a cashier's check for $700,000.

2   Q    All right.  And what did you do with that tender --

3   that letter -- I'll re-ask.  What did you do with the email

4   that had -- well, tell me what the email was.  It was a copy

5   of, it was a copy of a cashier's check for how much?

6   A    It was $700,000 was the amount on that image of a

7   check.

8   Q    And what else came to you with the image of the check?

9   A    I think it was a proposal from Mr. Choudhri, or one of

10  the entities, I don't remember, but to buy the claims of the

11  estate against the bank.

12  Q    For how much?

13  A    It was an offer for $700,000.

14  Q    Right.  Did you respond?

15  A    I don't know if I responded definitely to it yet.  I

16  mean, I haven't accepted that.

17  Q    Have you rejected it?

18  A    I don't know if I have.  I don't, actually don't think

19  I have yet.

20  Q    Do you believe that it's a valid tender of money?

21  A    I don't know.

22  Q    If it was, would you be inclined to accept it?

23          MR. FITZMAURICE:  Objection, calls for

24  speculation.

25          THE COURT:  I'll sustain the objection,

1    speculation.

2            MR. BURKS:  All right.  May I approach, please?

3            THE COURT:  No.  I mean, you want to tell me why -

4    - typically, we don't approach the witness.

5            MR. BURKS:  I have the original check and I'm

6    asking if (indiscernible) the original cashier's check --

7            THE COURT:  There's the ELMO right there, you can

8    show it to me.  Thank you.  It's right there.

9    BY MR. BURKS:

10   Q    Sir, do you see on the screen what's in the projector,

11   ELMO projector?

12   A    Yes, and that's the image that was in the email.  I

13   think the email image was black and white, but that looks

14   like what I saw.

15   Q    All right.  So, the document that I put down here, can

16   we agree, that kind of looks like an official cashier's

17   check, payable to you.

18           MR. FITZMAURICE:  Objection.  Objection to the use

19   of the term cashier's check.  I think that lacks foundation.

20           THE COURT:  I'll sustain the objection.  It looks

21   like a check, obviously.  You can ask the next question.

22   BY MR. BURKS:

23   Q    Does this appear to be an original official check

24   written on, written by Metro City Bank?

25   A    Yeah.  It looks like a check and that's what it says.

1    Q    Who is the payee?

2    A    Me.

3    Q    Yeah.  For how much?

4    A    It's $700,000.

5    Q    Purpose, it reads -- can you read the purpose?

6    A    It says, "Purchase of estate claims against MPK."

7    Q    You now -- dated June 14th, 2024, correct?

8    A    I see that.

9    Q    Now, do you believe now that Mr. Choudhri seriously

10   intends to pay you, would like to pay you $700,000 for the

11   purchase of the claims against MPK?

12            MR. FITZMAURICE:  Objection, Your Honor, lacks

13   foundation as to Mr. Choudhri's intent.  His name appears

14   nowhere on this image.

15            MR. BURKS:  I actually asked him does he now

16   believe.

17            THE COURT:  Excuse me, Mr. Burks.  Ask the

18   question again.

19   BY MR. BURKS:

20   Q    You stated (indiscernible), apparently I need more

21   predicate, Judge.  You stated that this appears to be the

22   document from which, the image you received, with that email

23   offer.

24   A    Yes.

25   Q    All right.  Based on seeing this official check, right

 1   now in Court, are you, do you now believe that Mr. Choudhri

 2   is serious about paying you $700,000 cash to buy the claims

 3   of MPK?

 4          MR. FITZMAURICE:  Objection, Your Honor, lacks

 5   foundation as to official check and Mr. Choudhri.  I mean, I

 6   see the words on there, but I think counsel is using that

 7   for a different purpose.  And also, as to Mr. Choudhri,

 8   whose name does not appear anywhere on the image.

 9          MR. BURKS:  Response.

10          THE COURT:  Go ahead.

11          MR. BURKS:  So, Mr. Murray just testified that

12   this is the, appears to be the document from which the image

13   included in this settlement offer from Mr. Choudhri, and

14   he's testified to that; it was from Mr. Choudhri or one of

15   his entities.  And this is the image that was included with

16   it.

17          THE COURT:  I'll just note for the record, I'll

18   let him answer the question, and I'll just note for the

19   record that the remitter is not Mr. Choudhri but BPH

20   Acquisition, LLC, whoever that happens to be.  All right?

21   Go ahead.

22   BY MR. BURKS:

23   Q    Do you now believe that Mr. Choudhri is serious about

24   paying you $700,000 for the claims against MPK?

25   A    I believe he's serious about wanting the claims.  I

1    have no idea if this check is real or not.  I have no reason

2    to think it's not, but until I deposit it and it appears in

3    my account, I … I don't know how to answer the question

4    other than that.

5    Q    Sure, fair enough.  Is it your understanding that

6    confirmation of the plan today would preclude you from

7    accepting an offer of $700,000 to buy those claims?

8    A    Yes.

9    Q    Okay.

10         MR. BURKS:  Your Honor, may I take this off of the

11   ELMO?

12         THE COURT:  Yeah sure.  It's off.  I turned it

13   off.  Don't lose it.

14   BY MR. BURKS:

15   Q    Going back to your causative action, did Mr. Wetwiska

16   tell you, or give you a damages model for the action, which

17   is model for the action that he'd like to bring in terms of

18   enforcing the suit, which is about the settlement agreement?

19   A    I don't --

20         MR. FITZMAURICE:  Objection.  I think that lacks

21   foundation.

22         THE COURT:  I'll let you answer the question, go

23   ahead.

24   BY MR. BURKS:

25   A    I don't remember getting a damage model from Mr.

1   Wetwiska.

2   Q    All right.  Do you have a general idea what he thinks

3   of the claim after your conversation with him?

4   A    No, no different from my recollection of what Mr.

5   Alexander said.  Big damages, but I don't remember a number.

6   Q    There he speaks in terms of huge damages, correct?  All

7   right.  And let the record reflect that the witness nodded.

8   A    In the affirmative.

9   Q    Have you read the lawsuit, which is at ECF -- actually,

10  if you've read it.  I don't want to ask you to testify

11  (indiscernible) at this point.  Have you read the lawsuit

12  which is at ECF … or maybe I lost it (indiscernible) … ECF

13  502-6.  Is the second amended (indiscernible) petition, and

14  it's the one that (indiscernible) talked to you about.  It's

15  the one that Jeff Steidley talked to you about, correct?

16  A    I don't remember talking to Mr. Steidley.  I'm pretty

17  sure I reviewed that pleading though.

18  Q    All right.  Are you aware that that complaint has two

19  very distinct causes of action within it?

20  A    I really don't remember the pleading.

21  Q    All right, fair enough.

22  A    I remember it exists, I don't remember it.

23  Q    Are you aware, or do you know, that that pleading

24  involves two tax liens?

25  A    That sounds, I think that sounds right.

1    Q    All right.  Are you aware that the Plaintiffs' position

2    is, is that if the settlement agreement failed, that the tax

3    liens would be returned to Ali Choudhri?

4    A    Yeah, my … yes.

5    Q    All right.  Doesn't the claim, though, provide for the

6    tax liens to be satisfied through the plan, and paid off?

7    A    Yes.

8    Q    If the tax liens are owned by Mr. Ali Choudhri, why

9    isn't he entitled to the value of those tax liens?

10           MR. FITZMAURICE:  Objection, Your Honor, calls for

11   speculation.  Also, calls for a legal conclusion as to the

12   results of that lawsuit.

13           THE COURT:  I'll sustain the objection.

14   BY MR. BURKS:

15   Q    Does the lawsuit sue MPK for the value of those two tax

16   liens?

17   A    I don't remember the prayer in the lawsuit.

18   Q    All right.  But it's of record.  (indiscernible) can

19   just read it.  What's the amount owed on those two tax

20   liens?

21   A    Well, I'm a little confused because there's lots of tax

22   liens (indiscernible).

23   Q    There are two tax liens that are being paid through the

24   plan.

25           MR. FITZMAURICE:  Objection, Your Honor,

1    mischaracterizes the plan.

2              THE COURT:  I'll sustain the objection.

3    BY MR. BURKS:

4    Q    The two tax liens that are the subject of the

5    litigation, the complaint at ECF 502-6, what are the amounts

6    of those two loans?

7    A    I don't remember.

8    Q    Would it surprise you if their face value of $4 million

9    combined?

10   A    Sure.

11   Q    Okay.  Let me move along.  When you were negotiating

12   with the bank, in the manner that you testified, did you

13   have any other option than what the bank was offering and

14   agreeing to?

15   A    It depends on what point in time you're talking about.

16   Q    The point in time in which the plan that's filed today,

17   that we're considering, was filed.

18   A    At that time, I recall somebody on the Debtor's side

19   was also either talking about or had filed another plan.

20   So, there was that.  I understand there was an exclusivity,

21   so there might have been other plans.  I mean, early on I

22   didn't know.

23   Q    Were there?

24   A    Other than the five or six filed by the Debtor's side,

25   no.

1    Q    Right.  And you talked about -- and it's a big document

2    (indiscernible).  And you said, hey, I want a cap on credit

3    (indiscernible), correct?

4    A    I know, I know I wanted one, and I know we talked about

5    that with the bank and asked if they would do that.

6    Q    Did you have any bargaining power to get that

7    accomplished?

8    A    Yeah, some.

9    Q    So, why wasn't it accomplished?  Why wasn't there a

10   cap?  You wanted it.

11   A    I wanted all general unsecureds to get paid in full.  I

12   didn't get that either.

13   Q    Did you agree that … did you want more money for the

14   release?

15   A    I wanted as much money as I could get.  At different

16   times I asked for more.

17   Q    And what was your bargaining power, or leverage, to get

18   you (indiscernible)?

19   A    Well, a couple of things.  I mean, I have the claims

20   against MPK, that if, for nothing else, has some nuisance

21   value to the bank; no bank wanted a release, so they have to

22   give you something for that.

23   Q    Nuisance value?

24   A    Yeah.

25   Q    Nuisance value?

1   A   I said if nothing else.  I think they're worth more

2   than nuisance value.  I don't think they're worthless

3   claims.  I don't think they're worth as much as you think

4   they're worth, or (indiscernible).

5   Q   Did Mr. Alexander offer to try the case over on

6   (indiscernible)?  Did he tell you he'd do it?

7   A   He asked me to hire him, yes.

8   Q   And what were the terms of his proposed engagement?

9   A   He said he would do it on, I think, full contingency, I

10  think a third.  But I don't … I think it was a third.

11  Q   What about Mr. Steidley or Wetwiska?  Do you know what

12  their terms of employment or engagement are?

13  A   I don't remember anything about Steidley.  I'm pretty

14  sure Wetwiska said he was uninterested in representing the

15  estate.

16  Q   All right.  Did Steidley, so you don't recall Steidley

17  offering to represent the estate and do it for a full

18  continency, no money down?

19  A   I don't remember one way or the other.

20  Q   Okay.  Now, the (indiscernible) subordination agreement

21  case, there is a pending motion in front of Your Honor, Jeff

22  Norman, I guess His Honor, Judge Norman, and that's filed by

23  Mr. Steve Sather.

24  A   That's the claim you were talking about earlier?

25  Q   Right.

1    A    Okay.

2    Q    And that's filed by my co-counsel for 2425 WL, correct?

3    A    Yes.

4    Q    And there's a motion pending to allow the Creditor,

5    2425 WL, to bring this, correct?

6    A    I don't know the current status of the motions

7    (indiscernible).

8    Q    Did you file the suit?

9    A    Mr. Sather's suit?

10   Q    Yes.

11   A    No, I --

12   Q    Did you file the cause of action?

13   A    No.

14   Q    All right, so you didn't file equitable subordination

15   cause of action.

16   A    Wait --

17   Q    Did you file a complaint for equitable subordination?

18   A    Which lien, against who?  There's a lot of liens in

19   this case and there's a lot of claims that they should be

20   subordinated.

21   Q    Did you file a complaint for equitable subordination of

22   the MPK lien, subordinate to 2425 WL?

23   A    Did I file a claim to subordinate the bank's lien?  No,

24   I don't think so.

25   Q    But there's, my co-counsel for 2425 WL did, correct?

1  A    Right.

2  Q    And do you oppose him bringing that lawsuit?

3  A    No.

4  Q    Will he be able to bring it if this plan is confirmed?

5  A    I don't know.

6  Q    It's your claim you're releasing, correct?

7  A    If it's my claim and I'm releasing it, he can't bring

8  it.  I think he has a theory that he has some sort of

9  independent standing or independent claim, and I don't

10 really care about it in our creditor dispute that is, you

11 know, (indiscernible).

12 Q    Right.  Fair enough.  What's the value of that

13 subordination claim in your bid?

14         MR. FITZMAURICE:  Objection, foundation.

15         THE COURT:  I'll sustain it if it's foundation.

16 If you want to lay a foundation, please do.

17 BY MR. BURKS:

18 Q    In approving this claim, and say that you approve this

19 claim, that you formed a damages model or an effect, a model

20 of the effect of this suit, against MPK, what's the value of

21 that suit?

22 A    I didn't approve of them.  I said, as I sit here today

23 I supported it as the only plan that's available.  So, you

24 want to know if I … an advantage model of the subordination

25 claim?

1    Q    Or an effect model, yes, sir.

2    A    I considered the effect but …

3    Q    (indiscernible) wins MPK is subordinate to 2425 WL

4    (indiscernible), right?

5          MR. FITZMAURICE:  Objection, calls for

6    speculation.

7          THE COURT:  I'll sustain the objection.

8    BY MR. BURKS:

9    Q    Are you aware that the requested relief in the

10   complaint is to put the 2425 WL lien ahead of the MPK lien?

11   Are you aware of that?

12   A    Not specifically, no, but it sounds like the goal of

13   the subordination claim.

14   Q    And did you consider that in determining whether to

15   sell all your claims for $3.7 million?

16          MR. FITZMAURICE:  Objection, you know,

17   mischaracterizes the witness's testimony --

18          MR. BURKS:  I actually asked him what he

19   considered.

20          THE COURT:  I'll sustain their objection.  I think

21   it does misclassify the testimony.  Ask another question.

22   BY MR. BURKS:

23   Q    Is the … so, how does the subordination suit filed by

24   Mr. Sather, impact your decision to accept $3.7 million?

25          MR. FITZMAURICE:  Objection, lacks foundation.

```
 1            THE COURT:  I'll overrule the objection.

 2   BY MR. BURKS:

 3   A     I don't know.

 4   Q     Fair enough.  How many breach of contract cases have

 5   you personally tried?

 6            MR. FITZMAURICE:  Objection, relevance, Your

 7   Honor.  It's a confirmation of the bank's plan.

 8            MR. BURKS:  He's making a business decision and

 9   I'm trying to understand the foundation for the basis of

10   that decision.  His business decision is to support the plan

11   and his business decision was to agree --

12            THE COURT:  He's already testified as to why his

13   business decision supports the plan.  If you want to attack

14   that testimony, you can.  But I think that that's not a

15   proper question and I'll sustain the objection.

16   BY MR. BURKS:

17   Q     You've read the second amended (indiscernible)

18   petition; it's the one on the lawsuit involving the tax

19   liens, and also the validity of the settlement agreement.

20   You've read that, correct?

21   A     Yeah, I'm sure at some point I've read it, I just

22   wanted (indiscernible).

23   Q     Sure.  And you testified as to the investigation and

24   inquiry you made regarding that, right?

25   A     Yes.
```

1    Q    Have you ever tried a case like that?

2              MR. FITZMAURICE:  Same objection, Your Honor.

3              THE COURT:  I'll sustain the objection.  Thank

4    you.

5              MR. BURKS:  May I have a moment to make sure that

6    I've asked all the questions I intended to ask?

7              THE COURT:  Certainly, Mr. Burks.

8    BY MR. BURKS:

9    Q    On the plan, you've been very forthright as to what's

10   happening, I believe, on Friday, and I appreciate it,

11   especially if you can have it muted, where people can

12   actually, like Mr. Ali Choudhri, can watch the bidding

13   process.  You've talked about the bidding, the auction

14   that's going to occur on Friday, correct?

15   A    Yes.

16   Q    If the cash bid is higher than the highest credit bid,

17   are you going to take the cash bid or the credit bid?

18             MR. FITZMAURICE:  Objection, Your Honor, calls for

19   speculation about some event that theoretically might happen

20   in the future.

21             THE COURT:  I'll overrule the objection.  Go

22   ahead.

23   BY MR. BURKS:

24   A    Probably, but there's other things that might happen,

25   so I can't say for sure, but generally speaking, yes, I'll

1    take the higher bid.

2    Q    Any bid you accept, of course, is tradition

3    (indiscernible).  They've only paid you $2 million.  So, if

4    another bid is the highest bid, they'd still have to pay the

5    balance and lose it, right?

6    A    Oh, yeah.

7    Q    Sure.

8    A    They'd (indiscernible) close.

9    Q    If the credit bid is not successful, what is your

10   understanding regarding the bank's right to releases?  Do

11   they still get the release?

12   A    If the plan is confirmed, yes.  The releases come from

13   the plan, is my understanding.

14   Q    Right.  If their credit bid is unsuccessful, then they

15   still owe you $3.7 million.

16        MR. FITZMAURICE:  Objection, Your Honor.  The plan

17   speaks for itself, and "Owe you $3.7 million,"

18   mischaracterizes the nature of the plan.

19        THE COURT:  I think it does.  Ask the question a

20   different way, perhaps.

21        MR. BURKS:  Yeah, all right.

22   BY MR. BURKS:

23   Q    If the credit bid is not successful, does MPK still owe

24   you (indiscernible) liquidating trust $3.7 million?

25   A    Sort of.  And my --

1    Q    Go ahead, because I don't know the answer to this.

2    A    There is money from the sale of the bank's collateral

3    that some cash bidder will pay at closing.  And that money

4    will, under the plan, go first to the tax liens, then to the

5    admins.  And that's money that, in a sense, is the proceeds

6    of the bank's collateral, so they are kind of paying it.

7    That's why I say sort.  Do they have to come out of pocket?

8    There might be some strange scenario where that happens,

9    because I think they're backstopping the admins under the

10   plan, whether there's a credit bid or not.  But that seems

11   really unlikely, because their credit bid is high enough

12   that the cash bid would recover those expenses.  That's how

13   I understand the bid.

14   Q    (indiscernible) isn't it true that you made a decision

15   not to market test the value of those three lawsuits that

16   I've been talking about in (indiscernible)?  (indiscernible)

17   for sale (indiscernible).

18   A    I have not pursued an auction of the causes of action.

19   Q    Why not?

20   A    Because the value I get from trading those for a

21   release as part of the plan, in my view, is a much better

22   and more solid outcome for the estate and its creditors.

23   Q    But not (indiscernible) is right, correct?

24        MR. FITZMAURICE:  Objection, Your Honor, lacks

25   foundation.

1          THE COURT:  I'll sustain the objection.  Thank

2   you.

3   BY MR. BURKS:

4   Q    If the damage models that you've testified to that you

5   understand being huge -- and I did that so I can get back to

6   it -- it's a huge … if the damage models are right though,

7   wouldn't the amount you covered be considerably higher than

8   $3.7 million?

9          MR. FITZMAURICE:  So, Your Honor, lacks foundation

10   as to damage models, also mischaracterizes the witness's

11   testimony and is otherwise misleading.

12          THE COURT:  Let's say what he did say.  He said he

13   hadn't seen any damage models.  So, for you to ask him about

14   damage models he hasn't seen, he didn't testify the way your

15   question, basically, is formulated.  So, I'll sustain he

16   objection.  If you ask in a different way you can.  I know

17   what he testified to, but he testified that he hadn't seen

18   any damage models; they weren't shared with him.

19          MR. BURKS:  Thank you, Judge.

20   BY MR. BURKS:

21   Q    You investigated the causes of action, correct?

22   A    Yes.

23   Q    You got to release them -- on the one hand, here we go,

24   I'm holding my left hand out -- on the one hand, you're

25   going to release them for $3.7 million, right?

1   A    Right.  I continue to disagree with the way you're

2   describing this but --

3   Q    How would you describe it?

4   A    Under the plan, I'm releasing the claims.  What I get

5   under the plan, is what I get under the plan.  Somebody said

6   it, and likely to be 3.7 million; in a credit bid scenario

7   it could be a different number, that's why -- but when you

8   say 3.7, I understand you to mean what the estate gets out

9   of this plan.  And yes, I'm releasing the claims under the

10  plan.

11  Q    In a credit bid scenario, will you actually get $3.7

12  million cash, or will you get considerably less?

13           MR. FITZMAURICE:  Objection, Your Honor.  The plan

14  speaks for itself.

15           THE COURT:  I'll sustain the objection, it speaks

16  for itself.  We're don't have to argue what the plan says,

17  because the plan is -- it says what it says, Mr. Burks, and

18  I can read.

19  BY MR. BURKS:

20  Q    Whatever the plan says here, the alternative would be,

21  though, to either try and market those causes of action

22  independently, correct.  Would that be an alternative?

23  A    I suppose that's possible, sure.

24  Q    And what would you expect to get from that?

25  A    Less.

1    Q     Why?

2    A     Because I don't think the claims are worth much to

3    anyone other than the party, because they're worth a lot,

4    and that party made an offer.  That's why the claim was in

5    an amount that was less than what I believe the estate gets

6    out of the claim.

7    Q     But there's another alternative sir, is there not?

8    Don't release them and let these attorneys, who are offering

9    to do it on a full contingency, try the case.  Isn't that an

10   alternative?

11   A     It is something else that could happen, yes.

12   Q     What is the truest way to determine the validity of a

13   piece of litigation?  Is it to try it?

14   A     If the only thing you care about is rolling the dice

15   and seeing if you hit snake eyes, that's a thing you can do.

16   That's not what I'm doing here.  I'm trying to make

17   decisions that are in the best interests of the estate.

18   Q     If you don't sell it for $3.7 million, those three

19   actions, have you formed an opinion, if you went forward

20   with them, have you formed an opinion as to how much MPK

21   would offer to settle?

22          MR. FITZMAURICE:  Objection, Your Honor,

23   mischaracterizes the witness's testimony of the plan.

24          THE COURT:  I'll sustain he objection.

25   BY MR. BURKS:

1   Q    Can you form a valid business decision without

2   determining what you could get in settling if you brought

3   the claims yourself?

4        MR. FITZMAURICE:  Objection, Your Honor,

5   mischaracterizes the witness's testimony.  He's testified

6   that he did, in fact do that.

7        THE COURT:  I'll sustain he objection.

8   BY MR. BURKS:

9   Q    So, based on the objections of MPK's counsel, the only

10  thing that we have for your consideration, is that true, is

11  releasing the claims to MPK for $3.7 million?  I mean,

12  that's it.

13       MR. FITZMAURICE:  Objection, Your Honor, as to the

14  predicate of the question, that it somehow benefits the

15  estate and entirety gestalt of objections by MPK's

16  (indiscernible).

17       MR. BURKS:  I'm going to ask him what his opinion

18  is, because it's his judgment that he's testified about.

19       THE COURT:  I think he's testified as to what his

20  judgment was and how he got there.  I think the question

21  mischaracterizes his prior testimony.  So, if you want to

22  ask another question, Mr. Burks, you can, but I've listened

23  to all of his testimony.  I'm listening to your questions.

24  I think your questions are not a true indication of what he

25  previously testified to.  And I can read from my notes back

1    to you what I think he said, because they're right here, but

2    I don't think that's my job, okay.

3              MR. BURKS:  It's not your job and (indiscernible).

4              THE COURT:  So, ask a question within the law.

5    Thank you.

6              MR. BURKS:  I've asked all the questions in that

7    area, Judge.  Thank you.

8              THE COURT:  Thank you.

9    BY MR. BURKS:

10   Q    So, the final question is, just so I understand, your

11   business judgment is that there is no need to market test

12   the sale or the litigation of these claims, because $3.7 is

13   the most you think you can get.

14             MR. FITZMAURICE:  Objection, Your Honor,

15   mischaracterizes the witness's testimony.

16             THE COURT:  It does mischaracterize the testimony.

17   Ask another question.  He never testified to that.

18             MR. BURKS:  (indiscernible) no further questions,

19   Your Honor.

20             THE COURT:  Thank you.  Mr. Baker?

21             MR. BAKER:  No questions.

22             THE COURT:  Mr. Shannon, I'll come to you, just

23   because you said you might want to participate.

24             MR. SHANNON:  No questions, Your Honor.

25             THE COURT:  All right, thank you, Mr. Fitzmaurice.

1          MR. FITZMAURICE:  Thank you, Your Honor.

2          REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

3     BY MR. FITZMAURICE:

4     Q    Mr. Murray you were asked questions about the equitable

5     subordination claim filed by 2425 WL against the bank.  Do

6     you recall that?

7     A    Yes.

8     Q    Do you recall that the bank filed a motion to dismiss

9     the complaint in that case?

10    A    I don't.  But that sounds right, but I don't really

11    remember what the status of that litigation is.

12    Q    Similarly, do you not recall whether or not that motion

13    to dismiss was granted?

14    A    I just don't remember, no.

15    Q    Do you know whether 2425 WL has filed a motion, has

16    filed an application with the Court seeking to assert estate

17    claims?

18    A    Yes.

19    Q    And you oppose that application, correct?

20    A    Yes, I do oppose it.

21         MR. FITZMAURICE:  Your Honor, I'm going to give it

22    another shot.

23         THE COURT:  Sure, go ahead, you're connected.

24         MR. FITZMAURICE:  Thank you.

25    BY MR. FITZMAURICE:

1   Q    So, Mr. Murray is showing me the document at ECF 534.

2   A    Yes.

3   Q    That's the objection you filed to the 2425 WL

4 application to pursue estate claims?

5   A    Yeah, I recognize that.

6   Q    Mr. Burks was asking you questions about a $700,000 --

7 let's just call it a check for purposes of these questions -

8 - do you recall those questions?

9   A    Yes.

10   Q   Do you know the amount of the tax liens that have been

11 filed in this case?

12   A   The ones filed, the ones by the taxing authorities, not

13 the ones that were purchased or traded later, yes.

14   Q   Do you know about the approximate amount of those?

15   A   It's over two million.  I don't know exactly.

16   Q   So, that's more than 700,000.

17   A   Yes.

18   Q   And does the indicated plan call for those tax liens to

19 be paid in full?

20   A   Yes.

21   Q   Is there also a tax lien against the property that's

22 currently held by … and we'll call it Caz Creek or

23 (indiscernible)?

24   A   Yes.

25   Q   Do you know the approximate amount of that tax lien?

1   A    I don't.  It's more than 700,000, to be sure, but I

2   don't remember.

3   Q    And do you know if that tax lien is paid off in full

4   under the bank's plan?

5   A    Yes, it is.

6   Q    The bank's plan also pays off administrative expenses

7   in full, correct?

8   A    Yes.

9   Q    It makes a cash payment to a certain amount of secured

10  creditors.  Is that right?

11  A    Yes, to cash creditors.

12  Q    And it funds a liquidation trust?

13  A    Yeah, that was the second (indiscernible).

14  Q    As compared to $700,000, do you have a sense of the

15  magnitude, as a comparison, of the payments the bank is

16  making under the plan?

17  A    Yes.

18  Q    Is it about five times as much?

19  A    Well, it's 3.7 or more versus 700, so, yeah a little

20  more than five times, at least.

21  Q    Counsel was asking you whether you spoke to an attorney

22  named Jeff Steidley.  Do you recall those questions?

23  A    I do.

24  Q    Did Mr. Choudhri or anyone on any side ask you to talk

25  to Mr. Steidley?

1   A    I just don't remember.  I don't remember that name and

2   those discussions.

3   Q    In connection with the determinations that you've made

4   in this case, without telling me the contents of it, have

5   you sought legal advice?

6   A    Yes.

7   Q    And does the legal advice that you've received from

8   your counsel form part of the basis for the conclusions that

9   you've reached?

10  A    Yes, very much.

11           MR. FITZMAURICE:  Nothing further.  Thank you.

12           THE COURT:  Mr. Burks?

13           RE-CROSS EXAMINATION OF CHRISTOPHER MURRAY BY

14  BY MR. BURKS:

15  Q    Just to be clear, the tax liens that he was talking

16  about, the various liens he was talking about, if the

17  property is sold, whether it's sold to a cash bidder or to a

18  stalking horse, credit bearer, or another credit bearer,

19  they still don't get paid, or do they?

20           MR. FITZMAURICE:  Objection, Your Honor, calls for

21  speculation as to the results of, for example, negotiation

22  that the bidder might, a successful bidder might have with

23  the taxing authority.

24           THE COURT:  I'll overrule the objection.

25  BY MR. BURKS:

1   A    Yeah, I think the tax liens have to get paid at a

2   closing on the building regardless of whether it's sold a

3   cash buyer or be accredited.

4            MR. BURKS:  Nothing further, Your Honor.

5            THE COURT:  Thank you.  Mr. Baker?

6            MR. BAKER:  No questions.

7            THE COURT:  Mr. Shannon?

8            MR. SHANNON:  No questions, Your Honor.

9            THE COURT:  Mr. Fitzmaurice?

10            MR. FITZMAURICE:  Nothing further, Your Honor.

11   Thank you.

12            THE COURT:  Thank you, Mr. Murray.  Thank you for

13   your patience.  You may step down.

14            MR. MURRAY:  Thank you, sir.

15            THE COURT:  Thank you.  Mr. Fitzmaurice.

16            MR. FITZMAURICE:  Thank you, you know, the bank

17   rests.

18            THE COURT:  All right, thank you.  Mr. Baker, do

19   you have witnesses?

20            MR. BAKER:  I defer to Mr. Burks.

21            THE COURT:  Mr. Burks, do you have a witness?

22            MR. BURKS:  Your Honor, at this time … Judge, at

23   this time, 2425 WL calls Mr. Holliman.

24            THE COURT:  Is he the gentleman that's in the

25   waiting room?

1              MR. BURKS:  Yes.

2              THE COURT:  All right (indiscernible).  He's a

3    rebuttal witness, I assume?

4              MR. BURKS:  Excuse me?

5              THE COURT:  He's a rebuttal witness, I assume?

6              MR. BURKS:  I'm putting on my case in chief.

7              THE COURT:  How come I was told that I only had

8    three witnesses and now I've got someone else?

9              MR. BURKS:  He's a rebuttal witness for my case in

10   chief.  I'm sorry.

11             MR. FITZMAURICE:  Your Honor, may we inquire,

12   rebuttal as to what?

13             MR. BURKS:  So, it's been represented that the

14   plan was noticed out and this is a creditor who received no

15   notice and no (indiscernible) to vote on.

16             THE COURT:  Okay, fine.  Sir, if you'll come to

17   the podium.  (indiscernible) I will swear you in.  Please

18   raise your right hand to be sworn.  Do you swear or affirm

19   to tell the truth, the whole truth and nothing but the

20   truth, so help you God.

21             MR. HOLLIMAN 1:  Yes.

22             THE COURT:  All right.  Please be seated sir,

23   right here.  Make sure you speak into the microphone.  Mr.

24   Baker you may proceed at your leisure.

25             MR. BURKS:  Mr. Burks.

```
 1                THE COURT:  Mr. Burks, sorry.
 2                DIRECT EXAMINATION OF ALLEN HOLLIMON
 3    BY MR. BURKS:
 4    Q    Hi, thanks for waiting.  I bet that was a lot of fun.
 5    A    Yes, sir.
 6    Q    What is your name, sir?
 7    A    My name is Allen Holliman.
 8    Q    And what do you do, sir?
 9    A    I am the owner of the(indiscernible) company that 2425
10    (indiscernible).
11                THE COURT:  I didn't catch it, sir, so please say
12    that answer again.  You are what?
13                THE WITNESS:  I am the owner and CEO of Nationwide
14    Security, which is (indiscernible) 2425 (indiscernible),
15    suite 300.
16                THE COURT:  Thank you.
17    BY MR. BURKS:
18    Q    Do you have any knowledge of a company called Galleria
19    2425 Owner?
20    A    Yes, I do.
21    Q    And what knowledge do you have?  How do you know this
22    company?  How do you know the company Galleria 2425 Owner?
23    A    I provide security services for the building.
24    Q    And do you have a contract with someone to do that?
25    A    Yes, we do.
```

1    Q    With whom?

2    A    With the Galleria 24.

3    Q    With Galleria 2425 Owner?

4    A    Correct.

5    Q    Did you file a proof of claim in this case?

6    A    We have not, as of yet.

7    Q    All right.  Are you owned, in your mind, are you owed

8    money by the estate?  By the creditor?

9    A    Absolutely.

10   Q    Did you receive a plan ballot voting … let me look …

11   did you receive a notice regarding voting on the plan?

12   A    Yes, from Galleria.

13   Q    From Galleria.  And did you receive notice from anybody

14   else?

15   A    I have not.

16   Q    Did you submit a ballot?

17   A    No, I have not.

18   Q    When did you receive the ballot from Galleria?

19   A    Early May.

20   Q    Early May?

21   A    Early May, if I recall correct.

22   Q    Did you receive anything in the mail from MPK or the

23   chapter 11 trustee regarding this plan?

24   A    Not that I recall.

25        MR. BURKS:  Pass the witness, Your Honor.

```
1              THE COURT:  Bear with me for one second.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Give me the full name of your company

4    again, sir.

5              THE WITNESS:  Nationwide Investigations and

6    Security Inc.

7              THE COURT:  So, Nationwide Security 2425 West Loop

8    South 300, Houston, Texas 77027.

9              THE WITNESS:  That's correct.

10             THE COURT:  That's your mailing address.

11             THE WITNESS:  Correct.

12             THE COURT:  Go ahead.

13             MR. TROOP:  Thank you, Your Honor.

14                  CROSS EXAMINATION OF ALLEN HOLLIMAN

15   BY MR. TROOP:

16   Q    Mr. Holliman, good afternoon.

17   A    Good afternoon.

18   Q    Mr. Holliman, I'm not sure I understood what you said.

19   You said you received a package in early May, with regard to

20   (indiscernible).  Correct?

21   A    If I can recall, yes.

22   Q    Early May.  And you said that that package that you

23   received was from the Debtor, Galleria Owner 2425, not from

24   National Bank of Kuwait?

25   A    Yeah, I haven't heard from the Bank of Kuwait.
```

1        MR. TROOP:  Your Honor, I'm going to bring up on

2    the screen, through Mr. (indiscernible).

3        THE COURT:  Thank you (indiscernible).

4        MR. TROOP:  Your Honor, this is the -- go to the

5    top, please, of the document …

6        MAN 1:  Sir, this is ECF 501 (indiscernible).

7        MR. TROOP:  ECF 501-15, Your Honor.

8        THE COURT:  All right.

9    BY MR. TROOP:

10   Q    Mr. Holliman, you said the name of your company is

11   National Security?

12   A    No, Nationwide.

13   Q    Nationwide Security.

14   A    Investigation.

15   Q    Thank you.

16       MR. TROOP: Could you scroll down to the attachment

17   with the addresses?

18   BY MR. TROOP:

19   Q    Do you see this highlighted in blue, sir?

20   A    Yes, I do.

21   Q    Is that your address, 2425 West Loop, Suite 300?

22   A    That's my address.

23   Q    Houston, Texas 77007.

24   A    Correct.

25   Q    And you said you received a package at the beginning of

1    May.  Correct?

2    A    From my recollection.

3         MR. TROOP: Can you go to the top of the document,

4    please?  Could you scroll down just a little bit.

5    BY MR. TROOP:

6    Q    Do you see that it was National Bank of Kuwait,

7    paragraph three, that mailed the solicitation package in

8    early May?  There, right there, number three?

9    A    Three …

10   Q    On May 6th.

11   A    On May 6th, (indiscernible) National Bank, okay, yes, I

12   see that.

13        THE COURT:  (indiscernible) down a little bit.

14        MR. TROOP:  I'm sorry.  Could you please bring up

15   the plan, 2425 in the Debtor's certificate of services

16   (indiscernible)?

17        THE COURT:  Who's doing it?

18   BY MR. TROOP:

19   Q    You said you received it in early June, right?  That's

20   what you said?

21   A    I said early May, from my recollection.

22   Q    Actually, that's not what you said, sir.  Early May,

23   that's right, that's correct, that was our plan.  I

24   apologize.  Did you receive a second package in early June?

25   A    I don't recall.

1   Q    You don't recall.  Do you see that this would have been

2   service made by the Debtor, Galleria 2425 Owner LLC, and the

3   other plan proponent, 2425 WL LLC?  The plan you said you

4   got.  You said you go the Debtor's plan, right?

5   A    I got the Debtor's plan.  Okay.

6   Q    You see, this was mailed on May 30th, correct.

7   A    Correct.

8   Q    Like a month after you said you got the package, which

9   would have been consistent with when MPK sent you a package.

10  Correct?

11  A    (indiscernible) MPK, I recall the Debtor's package but

12  I don't recall (indiscernible).

13  Q    And can that be because you looked at the name of the

14  case and it said Galleria 2425 Owner at the top?

15  A    That's what it says.

16  Q    Do you have the package that you received with you?

17  A    I don't have it with me, no.

18  Q    But if you received a package in early May, did it have

19  a ballot in it?

20  A    I don't recall.

21  Q    Could you tell me who asked you to come here to be a

22  witness today?

23  A    The attorneys from Choudhri (indiscernible).

24  Q    And they asked you.  Did Mr. Choudhri talk to you about

25  whether you received a package before you talked to the

1   attorneys?

2   A    No.

3   Q    No.  How did they get your name?

4   A    They should have a name.  I operate the security in

5   that building.

6   Q    But how did they think to call you about whether you

7   got this or not?

8   A    I couldn't answer that question.

9        MR. TROOP:  Okay.  What else?  I don't think

10   anything else, Your Honor.  No further questions for this

11   witness.

12        THE COURT:  All right, (indiscernible).  Sir, when

13   did you become aware of this bankruptcy filing the first

14   time?

15        THE WITNESS:  I can't recall that.  It's been

16   going on for a while, so probably, I think maybe a year ago

17   (indiscernible) paperwork had come through.  But that's all

18   that my office (indiscernible), from my attorney.

19        THE COURT:  Thank you.  Mr. Burks?

20        MR. BURKS:  Nothing further, Judge.

21        THE COURT:  All right, thank you, sir.  You may

22   step down.  Mr. Burks, next witness.

23        MR. BURKS:  He's not here yet.  Let me see, my

24   witness list because I'm constantly losing the damn thing.

25   Put this up on the screen, please, 12.

1          Your Honor, rather than call Mr. Choudhri at this

2     time, what I think I would like to do, is put some

3     documents, court filed documents, that have been admitted

4     into evidence.

5          THE COURT:  I can let you do that in argument if

6     it's already in the record.  But what I'd like to do is I'd

7     like to conclude testimony.  So, if you want to rest that's

8     fine.  But this is the time to call witnesses, live

9     testimony.  That's what I would like for you to do.  I'm

10    surprised we're not hearing from Mr. Choudhri.  I really

11    wanted to hear from him.  But if you don't want to call him,

12    that's fine.

13         MR. BURKS:  Well, I want to call him, but he's

14    ill.  I don't know where he is.  He's on the screen, he's …

15    I know that he is ill.  Excuse me.  I know that he has told

16    me he is very ill.

17         THE COURT:  He is on the phone.

18         MR. BURKS:  All right.

19         THE COURT:  And if he'll show up on video, I'm

20    happy to have you examine him.  If he doesn't want to show

21    up or doesn't want to testify, that's fine too.  You can

22    rest.  And I'm happy to give you a few minutes, if you would

23    like, to try and contact him to get him by video.

24         MR. BURKS:  You've read my mind.  May I do so?

25         THE COURT:  Yes.  So, let's do this:  It is 2:42.

1    I'll come back at 2:50.  That gives you eight minutes to try

2    and get (indiscernible).

3              MR. BURKS:  Thank you.

4              THE COURT:  All right, thank you.

5              CLERK:  All rise.

6              (Recess)

7              THE COURT:  All right, Mr. Burks, what's the

8    status?

9              MR. BURKS:  Your Honor, 2425 WL calls Mr. Ali

10   Choudhri.

11             THE COURT:  He is not online or on the phone.  He

12   was when I left the bench.  He's left.  You should hear a

13   ding if he calls in.

14             MR. BURKS:  Is he on the headphones?

15             THE COURT:  No.

16             MR. BURKS:  I will wait for him to come on for as

17   long as --

18             THE COURT:  No, I'll wait a few more minutes, and

19   then he's not going to testify.

20             MR. BURKS:  Yes, Your Honor.  Was that something

21   (indiscernible), Judge?

22             THE COURT:  Excuse me?

23             MR. BURKS:  Was there --

24             THE COURT:  Oh, there's a phone call.  There he

25   is.  He's been unmuted.  He needs to show up now by video.

```
 1             MR. CHOUDHRI:  Hello?

 2             THE COURT:  Mr. Choudhri, I can hear you.  Can you

 3    hear me?

 4             MR. CHOUDHRI:  Judge Norman?

 5             THE COURT:  Yes.

 6             MR. CHOUDHRI:  Yes, I can hear you.

 7             THE COURT:  Okay, I need you to appear by video,

 8    and I'll swear you in, sir, and you can testify.

 9             MR. CHOUDHRI:  Okay, I'm having a problem with my

10    video.  Can you give me just a minute?

11             THE COURT:  I'll give you a few more minutes.

12    I've already given you a few minutes, but I'll give you a

13    few more.

14             MR. BURKS:  Let me see.  Do we have

15    (indiscernible) deposition?

16             MR. BAKER:  Yeah.

17             MR. BURKS:  Which one is it?

18             MR. BAKER:  It's 49922 or 23.

19             MR. BURKS:  Yeah, all right, okay.

20             MR. CHOUDHRI:  Thanks for your patience.

21             THE COURT:  Just so the parties are aware, if you

22    want to share documents with Mr. Choudhri, which I'm

23    assuming that you are going to do, that will have to occur

24    through GoTo Meeting.  So just be aware of that fact.

25             MR. BURKS:  Where's our exhibit list?
```

1          MR. BAKER:  (indiscernible).

2          MR. BURKS:  Yeah, it's all the same.

3          THE COURT:  All right, Mr. Choudhri, can you hear

4     me?  Mr. Choudhri, can you hear me?

5          MR. CHOUDHRI:  Yes.

6          THE COURT:  All right, I'm going to ask you to

7     raise your right hand, sir, and be sworn.  Do you swear or

8     affirm to tell the truth, the whole truth, and nothing but

9     the truth, so help you God?

10          MR. CHOUDHRI:  Yes.

11          THE COURT:  All right, go ahead, Mr. Burks.

12               DIRECT EXAMINATION OF ALI CHOUDHRI

13     BY MR. BURKS:

14     Q    Sir, will you please state your -- state and spell your

15     name for the record?

16     A    Ali Choudhri.

17     Q    And how do you spell your last name, sir?

18     A    C-H-O-U-D-H-R-I.

19     Q    Are you the -- what is your position in 2425 WL?

20     A    Equity.

21     Q    What is your position in Galleria 2425 Owner?

22     A    Equity.

23     Q    All right, I'm going to start with some housekeeping

24     matters, Mr. Choudhri.  I'm going to put up ECF Docket

25     Number 502-34.  And I'd like you to tell me when you can see

1    it, because I'm not sure what technological (indiscernible).

2    There's no 502-34, Hilco sale brochure.

3    A    I'm sorry?

4         MR. FITZMAURICE:  One moment, sir.

5         MR. BURKS:  One moment, sir.  We're putting up an

6    exhibit for you to look at.  So the Exhibit 30 -- 499-34 is

7    somewhere.

8         MR. FITZMAURICE:  Your Honor, I apologize.  Before

9    we begin the questioning of Mr. Choudhri, looking at it on

10   the screen, it's not clear to me that that's a real

11   background or --

12        THE COURT:  It's a virtual background.  Mr.

13   Choudhri, will you turn off your virtual background?  You

14   have to project your GoTo Meeting, Mr. Choudhri.  Anything

15   you do internally, we can see in the courtroom, he can't

16   see.  You've got to be connected to GoTo meeting.  You've

17   got to share through GoTo Meeting.  Because you can project

18   it all over the courtroom, but he's not going to see it.  So

19   Mr. Choudhri, in case you didn't understand my instructions,

20   any sort of virtual background blurring needs to be turned

21   off.  Thank you.

22        THE WITNESS:  Can you see this?

23        THE COURT:  I can see you, yeah.  That's fine, but

24   you can't --

25        THE WITNESS:  Okay, (indiscernible).

1            THE COURT:  -- no virtual backgrounds.

2            THE WITNESS:  Yes, sir.

3            MR. BURKS:  And Mr. Choudhri, we're waiting for

4    ECF 499-34, the Hilco sale brochure, to come up, and then

5    we're going to go to 499-12 in one moment, sir.

6            MR. BAKER:  Your Honor, I apologize.  I'm

7    connected and I'm clicking on it.  It says "Can't share your

8    screen.  We apologize, but we're experiencing difficulties

9    with the video contents and are unable to share your

10   screen."  I've never had that happen before.

11           THE COURT:  Yeah, it sometimes -- and that's the

12   reason why we -- okay, let's see if I could make it work.

13           MR. BAKER:  You want me to try --

14           THE WITNESS:  I can't see with these.

15           THE COURT:  Mr. Choudhri, we'll be with you in a

16   second.

17           THE WITNESS:  Okay, sorry.

18           THE COURT:  I get the same error message, Mr.

19   Burks.  We can't share documents.

20           MR. BURKS:  So we can see it, but he won't.  Is

21   that correct?

22           THE COURT:  That's correct.

23           MR. BURKS:  Oh.

24           THE COURT:  Yeah, there we go.  All right, so I'll

25   try and pull up documents for you.  What do you want to pull

1    up?

2            MR. BURKS:  Thank you, Your Honor.  I apologize.

3    I mean, I don't know what I can do about it, but I do

4    apologize.  Docket 499-34, Your Honor, ECF 499-34 and 36.

5            Mr. Choudhri, hang on there.  We're about to,

6    apparently, about to get this done.

7            Mr. Choudhri, the document, ECF 499-34, is on the

8    screen.  Is it big enough for you to see it?

9            And Judge, I don't know if you can click and open

10   it bigger.  I just don't know how it works.

11           THE COURT:  All I can do is this.

12           THE WITNESS:  Yeah, yeah, I see it.

13           THE COURT:  Mr. Choudhri, you can drag on your

14   screen and basically make us very small and your exhibits

15   very, very large.

16           THE WITNESS:  Okay, yes, sir.  I can.  Thank you,

17   Your Honor.

18           MR. BURKS:  Let me know when you've got it to

19   where you can read the document, Mr. Choudhri.

20           THE WITNESS:  I can't scroll down, but I can zoom

21   in and out.  I'm not able to scroll down.

22           THE COURT:  You can't scroll?  All you can do is

23   make it bigger or smaller?

24           THE WITNESS:  Yes, I see it.

25   BY MR. BURKS:

1    Q    Mr. Choudhri, obviously, you're aware --

2    A    (indiscernible).

3    Q    -- of the proceedings going on in the bankruptcy case

4    of Galleria 2425 Owner.  Is that correct?

5    A    Huh?  Say that again.

6    Q    Are you aware that there's an auction taking place this

7    Friday regarding the --

8    A    Yeah.  (indiscernible).

9    Q    -- building in this bankruptcy case?  And do you know

10   who marketed the property for auction?

11   A    Yes.

12   Q    Who?

13   A    Hilco.

14   Q    Look at what has been put on the screen as Docket

15   Number 499-34.  It purports to be the Hilco Real Estate

16   sales document.

17   A    Yes, I see this.

18   Q    All right, do you know whether or not Hilco is

19   marketing the building or the building with all the --

20   A    Can you speak up?

21   Q    Sure, can you hear me now?

22   A    Just if you can speak up a little, please.

23           THE COURT:  I don't think he can get any louder,

24   Mr. Choudhri.  You need to get off your speaker phone.  Hold

25   your phone up to your ear.  Go.

1            THE WITNESS:  Hello?

2            MR. BURKS:  Can you hear me now?

3            THE WITNESS:  Better.  Yeah, much better.

4            MR. BURKS:  All right, thank you.  And the judge

5    has let you put the phone up to your face, so you're in good

6    shape, sir.

7            THE WITNESS:  Thank you, Your Honor.  Thank you,

8    Judge.

9    BY MR. BURKS:

10   Q    Looking at the exhibit up on the screen, have you seen

11   that whole document before?

12           THE COURT:  Do you want me to scroll through it?

13           MR. BURKS:  Please, so we can see.

14           THE WITNESS:  Yep, please.  I have -- that's the

15   one with an extra zero.  I think it's got an extra zero on

16   the 18.6 million.  That's the one.  I've seen it.  Yeah,

17   I've seen this.

18   BY MR. BURKS:

19   Q    Do you know whether this brochure is auctioning or

20   offering for auction the building or the building and the

21   furniture?

22           MR. FITZMAURICE:  Your Honor, objection.  The

23   Trustee can only sell the things the estate owns.  That's

24   what's going to be sold pursuant to the auction and approved

25   or not by Your Honor at the sale hearing.

1            MR. BURKS:  That's not what I asked.

2            THE COURT:  Well, I'll let you respond to the

3    objection.  The objection basically is the Trustee can only

4    sell, and you and I know that he can only sell whatever

5    ownership interest he has.

6            MR. BURKS:  Right.

7            THE COURT:  So what's --

8            MR. BURKS:  Well, what I want to make sure is, I'm

9    going to establish what he has an ownership interest in or

10   not, through Mr. Choudhri.

11           THE COURT:  Well, I -- why is that important to

12   plan confirmation?

13           MR. BURKS:  Because the plan is offering the --

14   whatever Hilco is advertising, and Hilco is advertising the

15   building and the furniture.  I want to put on testimony that

16   the furniture is not the estate.  It's just Mr. Choudhri's

17   or one of his enemy's.

18           THE COURT:  I'll sustain the objection.  Thank

19   you.

20           THE WITNESS:  I (indiscernible) --

21           THE COURT:  Mr. Choudhri, there's no question for

22   you, so you don't get to talk.  Thank you.

23           MR. BURKS:  There's no question.  There's no

24   question.

25           Put on 499 as well.

1          THE COURT:  Are you asking me?  Because he can't

2    do it.

3          MR. BURKS:  I am asking you.  I apologize.  And he

4    just gave me that look like "Don't ask me.  Ask him."

5          THE COURT:  We're going to do it a different way.

6    It'll make things a little quicker.

7          MR. BURKS:  I'm used to the tap screen, so I'm not

8    going to embarrass myself like I did the other day.  Judge

9    said "Mr. Burks, you just tap that screen and expect a

10   result?"

11         THE WITNESS:  I see the thing about

12   (indiscernible).

13         THE COURT:  Hold on, Mr. Choudhri.  We'll be with

14   you in just a second.

15         THE WITNESS:  Sorry.

16         MR. BAKER:  Back, 2425.  Yes, 2425.

17         MR. BURKS:  Is that what we want?

18         MR. BAKER:  Yeah.

19         THE COURT:  All right, this should be easier.

20   What is it that you want to look up, pick up, Mr. Burks?

21         MR. BURKS:  I appreciate what you're doing.  499 –

22   – well, Your Honor...

23         MR. FITZMAURICE:  So Your Honor, it appears that

24   the witness has materials in front of him that he's flipping

25   through or otherwise looking at, so we would object to that.

1          THE COURT:  All right, Mr. Choudhri, you may not

2    look at anything other than what's presented on the screen.

3    Let me ask you two questions.  Do you have any paperwork in

4    front of you?

5          You're muted, Mr. Choudhri.

6          THE WITNESS:  Your Honor, I have a 499 --

7          THE COURT:  I need you to set that all aside,

8    please.

9          THE WITNESS:  Okay.

10          THE COURT:  Okay?  Is there anyone else in the

11    room with you?

12          THE WITNESS:  No, Your Honor.

13          THE COURT:  Okay, so I don't want to see any

14    paperwork in front of you, besides you.  Move it all away

15    from you. Thank you.

16          I apologize.  When all my bandwidth is taken with

17    GoTo Meeting, everything else becomes super slow for me,

18    which is a reason we don't typically present exhibits for

19    parties.

20          MR. BURKS:  Makes sense.

21          THE COURT:  All right, 499-12, is that correct?

22          MR. BURKS:  Yes, Your Honor.

23          THE COURT:  That's 499-12.  I'm not sure that's

24    what you want.

25          MR. BURKS:  Let me see.

1              THE COURT:  Is it two pages?

2              MR. BURKS:  I think it is.

3              THE COURT:  Okay.

4              MR. BURKS:  I can't read it, though.

5              MR. FITZMAURICE:  No, second page.

6              MR. BURKS:  Second page?

7              MR. FITZMAURICE:  On the second page.

8              MR. BURKS:  Mr. Choudhri, move onto the second

9    page, please, on Page 2.

10             THE COURT:  What number do you want to go to that

11   I can make it bigger for him?

12             MR. BAKER:  Very top.

13             MR. BURKS:  It's very top --

14             THE WITNESS:  Yeah, I don't see this.

15             MR. BURKS:  Very top of the second page.

16   (indiscernible).

17             THE WITNESS:  Is this document (indiscernible)?

18   Yeah.

19   BY MR. BURKS:

20   Q     Does the Debtor own any office equipment or

21   furnishings?

22   A     No.

23             MR. BURKS:  All right, Your Honor, you can take

24   all these ones off, please.

25   BY MR. BURKS:

1    Q    Mr. Choudhri, did you make an offer to buy the claims

2    of the Chapter 11 Trustee against NBK?

3    A    No.  Yes, on behalf of 2425 WL, LLC.

4    Q    And what was the last amount of the offer you made to

5    the Trustee?

6            MR. FITZMAURICE:  Objection, Your Honor.

7            THE WITNESS:  $700,000.

8            THE COURT:  Hold on, one second.  What's the

9    objection?

10            MR. FITZMAURICE:  There's lack of predicate, lack

11    of foundation as to the response of the -- of who the offer

12    was on behalf of.  We've seen an offer of fifty.  The first

13    offer on behalf of some other entity, not on -- nothing

14    related to any of the -- like Mr. Choudhri has testified to.

15            THE COURT:  I'll overrule the objection.  Go

16    ahead.  I mean, I've seen the check.  Everyone's seen the

17    check.  Go ahead.

18            THE WITNESS:  I'm (indiscernible) it was on behalf

19    of -- I made it on behalf of 2425 WL, LLC, Barron

20    Newburger's the law firm that Steve Sather's with.  And Mr.

21    Sather (indiscernible) while Mr. Sather (indiscernible) made

22    the last offer for $700,000.

23            MR. BURKS:  Thank you.

24            THE COURT:  Mr. Choudhri, I'm going to ask you to

25    do a couple of things.  I need to see your face when you're

1   testifying.  I don't have a problem with you doing it

2   remotely, but you need to be looking at the camera.  Get

3   your hand off your face.  Thank you so much.  Go ahead.

4   BY MR. BURKS:

5   Q    Have you received -- and is the phone -- have you

6   received a rejection or an acceptance in that offer?

7   A    Yes.

8   Q    And what was it?

9   A    Rejection.

10  Q    I have in my pocket a check.  It's a cashier's check, a

11  bank check.  It's called a bank check.  Those are good

12  funds.  Do you want me to return those to you now that

13  you've received the rejection?

14       MR. FITZMAURICE:  Objection, Your Honor.  Lacks

15  foundation.  Mischaracterizes the nature of the document we

16  looked at earlier.  There's no evidence as to whether the

17  purported check represents "good funds."

18       THE COURT:  I'll sustain the objection.

19       THE WITNESS:  So --

20       THE COURT:  You don't get to answer the question.

21  There's no question before you, Mr. Choudhri.  Thank you.

22       THE WITNESS:  All right.

23       MR. BURKS:  Is there a way for him to see...

24  BY MR. BURKS:

25  Q    So I'm holding what purports to be an original,

1    official check, written on the bank of Metro City Bank.

2    What can you tell me about that check?

3              MR. BURKS:  And is there a way that he can...

4              THE COURT:  No, unfortunately not.

5              THE WITNESS:  I'm familiar with this check.

6    BY MR. BURKS:

7    Q    Can you see it?

8    A    Yes, I'm familiar with this check.

9    Q    All right, what is it?

10   A    It's a cashier's check payable to Christopher Murray, a

11   trustee.  And in the memo, it's "purchase of claims

12   (indiscernible) against NBK," which is the latest -- or

13   offers made with proof of funds.  And then, Mr. Shannon

14   asked for proof of funds and provided them earlier, and then

15   he -- and then to eliminate any further issues to the bank

16   statement as holder that he had, which had $7 million in it.

17   And then he got a cashier's check payable to the trustee for

18   $700,000.  And Mr. Shannon said Mr. Murray rejects this

19   offer and he's going to (indiscernible) Chapter 7 trustee as

20   the Chapter 7 Trustee.  And the same reason that Mr. Shannon

21   said that Mr. Murray rejects this offer, we asked why.  He

22   said it was attorney/client privilege.

23             MR. FITZMAURICE:  Objection, Your Honor.  He went

24   very, very far beyond the question.  It also appears that

25   Mr. Choudhri's looking off camera and perhaps reading

1  something.  (indiscernible) --

2          THE COURT:  I don't think so, but I'm going to --

3  first of all, bear with me --

4          THE WITNESS:  I'm not reading anything, Your

5  Honor.

6          THE COURT:  -- Mr. Choudhri, bear with me.

7  There's a -- well, there's a question in front you.  You can

8  answer it.

9          So Mr. Burks, I want to make sure that I recall

10  that that check is dated June 14th, 2024.  Is that correct?

11          MR. BURKS:  June 14, 2024, written on Metro City

12  Bank.

13          THE COURT:  Okay, that's fine.  I'll strike the

14  part of his testimony that basically asked whatever you

15  asked him, because he went on for quite a while.

16          MR. BURKS:  Yes, Your Honor.

17          THE COURT:  Mr. Choudhri, I'm going to ask you to

18  listen to the question and answer it succinctly.  You don't

19  get to give narratives.  Thank you.

20          THE WITNESS:  Yes, Your Honor.

21  BY MR. BURKS:

22  Q    Mr. Choudhri, who is QB Loop?

23  A    QB Loop Property, LLC is a limited liability company

24  that a number of investors and its general partners

25  (indiscernible).

1   Q    Do you have any interest, ownership interest, in that

2   entity?

3   A    No.

4   Q    Do you have anything invested in the funds personally,

5   in that entity?

6   A    No, other than verify the (indiscernible) who used the

7   funds when I made the offer on behalf of myself to purchase

8   the note and lien, and they're the financier to advance the

9   funds to acquire the note and lien.  And (indiscernible) had

10  made offers to buy 2425.  They made offers (indiscernible) –

11  –

12          THE COURT:  Mr. Choudhri, let me cut you off.  I'm

13  going to strike anything after "no."  Okay?

14          Go ahead.  Ask the next question.

15          MR. BURKS:  Am I the only one who's having trouble

16  understanding enough?

17          THE COURT:  I don't think so.  Do want earphones?

18          MR. BURKS:  Do you understand him?

19          WOMAN 1:  He's muffled.

20          THE COURT:  He's muffled, but that's because he's

21  on a speaker phone.

22          MR. BURKS:  Mr. Choudhri, will you please get off

23  the speaker phone and hold the phone up?

24          THE WITNESS:  I'm sorry, I'm having a problem with

25  my phone.  I'm having a problem with my –– I'm having a

1   problem with my phone.  I could come back to court if that's

2   easier.

3            MR. BURKS:  No, sir.  Were you here on the phone -

4   - no.

5   BY MR. BURKS:

6   Q    Do you have an opinion as to whether -- are you aware

7   that the cash -- final cash collateral order entered by this

8   court is up on appeal?  Are you aware of that?

9            MR. FITZMAURICE:  Objection, Your Honor.  Calls

10  for speculation.

11           THE WITNESS:  Can you repeat your question?

12           MR. BURKS:  I'm sorry, Mr. Choudhri, why don't --

13           THE COURT:  Foundation?

14           MR. BURKS:  Foundation?

15           THE COURT:  Yeah, is he aware --

16           MR. FITZMAURICE:  And also relevance to

17  confirmation, Your Honor.

18           MR. BURKS:  Well, it's been (indiscernible).

19           THE COURT:  Is the appeal part of the exhibits

20  have been admitted?

21           MR. BURKS:  Right, 546-98 and 99.

22           THE COURT:  All right, so what's the relevance?

23           MR. BURKS:  The relevance is, is that is he aware

24  that the cash collateral order is not final with respect to

25  anything that may have an impact on the plan?

1          MR. FITZMAURICE:  So Your Honor --

2          THE COURT:  I'll sustain the objection as to

3    relevance.  There's no said pending appeal, so at this point

4    in time, I'm not bound by anything the appeals court does.

5          MR. BURKS:  Right, that's not why it was being

6    offered.  I'm going to move along.

7          THE COURT:  Okay.

8    BY MR. BURKS:

9    Q    Mr. Choudhri, you've been here on the phone most of the

10   day today, correct?

11   A    Yes, I've been listening in.

12   Q    All right, are there any concerns that you have right

13   now about the confirmation process?

14         MR. FITZMAURICE:  Objection, Your Honor.

15   Relevance to any concerns that Mr. Choudhri has.  What

16   relevance do they have to confirmation?

17         THE COURT:  I'm more than happy to hear from Mr.

18   Choudhri about his concerns.  Okay?  But to allow him to

19   give a narrative about what his concerns are, Mr. Burks,

20   doesn't work for me.

21         MR. BURKS:  All right.

22         THE COURT:  Okay.  If you want to address specific

23   concerns, I told Mr. Choudhri that I would listen to

24   whatever sort of complaints he might have about the plan,

25   about the plan proponents, about fairness, and I'm more than

1   happy to hear that.  I don't want to hear him give a

2   narrative.  Okay?  And part of it is what happened on

3   Monday.  Okay?

4           MR. BURKS:  That's what I'm balancing.

5           THE COURT:  So ask your questions.  Be specific.

6   Get an answer to the questions, and I'm happy to hear it,

7   and I'm happy to give you as much time as that takes.

8           MR. BURKS:  Thank you.  Subject to Your Honor

9   cutting off any non-responsive answers.

10          THE COURT:  Well, we'll get to a point where I'll

11  ask you to sit down, so just be warned.

12          MR. BURKS:  All right.

13          THE COURT:  Okay?

14  BY MR. BURKS:

15  Q    Mr. Choudhri, do you believe that $3.7 million for the

16  causes of action that you believe the Debtor or 2425 WL or

17  you -- do you believe that that is a fair purchase price for

18  those three causes of action?

19          MR. FITZMAURICE:  So Your Honor, I think that

20  mischaracterizes -- objection, I think that mischaracterizes

21  the plan of what it does in its provisions.  I also think

22  that Mr. Choudhri's view is that issue is not relevant to

23  whether or not the plan is confirmed --

24          THE COURT:  I'm going to give, in fairness to Mr.

25  Choudhri, because I know that he already believes it, I

1    don't like him, and then I'm prejudiced against him.  I'm

2    going to give him a little bit of leeway.

3              So go ahead, answer the question, Mr. Choudhri.

4              THE WITNESS:  I believe it's absolutely unfair.

5    There's no -- it's -- I'll stop.  I'm going to keep going,

6    Your Honor.  I don't want to upset you any more than I have

7    already.

8              THE COURT:  No, Mr. Choudhri.  I want to know why

9    you think it's unfair.

10             THE WITNESS:  I'm telling you, Your Honor.  It's

11   unfair, because everything has been (indiscernible) in the

12   whole process.  There's been no transparency.  Mr. Murray

13   has ignored me, not responded.  I've made multiple offers to

14   buy the claims.  I've even drawn the litigation finance

15   funds for $2 million.  (indiscernible) or there's more than

16   the debt, and you take claims.

17             NBK wants desperately out of -- they want to buy a

18   (indiscernible), but they don't want to market test it.  It

19   should -- just like the property should be market tested,

20   the claims should be market tested.  I know people that are

21   willing to buy the claims.  I know -- I have investors.  The

22   claims are very, very valuable.  There's a lot the bank has

23   done, and what the bank has done is they they've given the

24   Trustee an unlimited admin amount, unlimited.

25             (indiscernible) admin claims, so I could take hold

1    of the offer then, but the response in writing from Mr.

2    Murray -- Mr. RJ was, "It's irrelevant.  We're not going to

3    tell you that it's unlimited."  The -- these plans are

4    originally, defenseless, completely defenseless, and you're

5    trading the biggest asset of the estate for one creditor,

6    which is not appropriate.  It's not fair.

7            The reason we're in bankruptcy is because of NBK.

8    NBK (indiscernible).  They didn't approve offers.  They

9    didn't respond to it.  The loan agreement says you're

10   supposed to provide SNDA.  The settlement agreement says

11   you're supposed to provide SNDA.  I worked hard day and

12   night.  It is completely unfair.

13           Mr. Murray got on the stand today and told Your

14   Honor that he so considered the offer (indiscernible)

15   rejected.  (indiscernible) rejected it.  I have emails of

16   them responding.  I have emails from Kyung Lee, who is Mr.

17   Murray's lawyer, saying "I don't care if Mr. Choudhri lives

18   or dies."  I had a stroke because of the stress because of

19   the stress here, Your Honor.  And it's so unreal that the

20   Bank of Kuwait, that the Trustee --

21           THE COURT:  Okay, I'm going to -- Mr. Choudhri,

22   I'm going to cut you off now and go back to Mr. Burks --

23           THE WITNESS:  I'm sorry, I'm sorry, I'm --

24           THE COURT:  No, that's fine.  I'm going to go back

25   to Mr. Burks.

 1             THE WITNESS:  -- really sorry, Your Honor.

 2             THE COURT:  No, I need you to stop.  Okay?  Just

 3    listen and stop.

 4             THE WITNESS:  I'm sorry.

 5             THE COURT:  I'm going to go back to Mr. Burks and

 6    let Mr. Burks ask you a follow-up question or questions

 7    about what you just said.

 8             Mr. Burks?

 9             MR. BURKS:  Thank you, Your Honor, very much.  Mr.

10    Choudhri, please take a deep breath, sir.  Please, just take

11    a deep breath.  Sit up --

12             THE WITNESS:  I'm really sorry.  (indiscernible) -

13    -

14             MR. BURKS:  -- straight so we can see your face.

15    You don't have anything to apologize for.  You don't.  Now,

16    I'm going to ask the next question, all right?  All right.

17    BY MR. BURKS:

18    Q    Why do you think the causes of action should be market

19    tested instead of simply sold for the amount that the

20    Trustee thinks is a good price, whatever that price is?

21    A    Because --

22    Q    And limit your answer to why.  Why do you think that?

23    A    -- because it maximizes the value to everybody, not

24    just one Creditor, to all the Creditors, everybody.  Instead

25    of discriminating and just not a lot of due process to me or

1   my claim, if people got (indiscernible) not giving them due

2   process and discriminating against them in the plan,

3   allowing -- if a recovery can be made, let's say

4   (indiscernible) --

5   Q   Wait a minute, if a recovery can be made, if a recovery

6   can be made?

7   A   I'm sorry, my blood pressure is my low -- my systolic

8   is over 110.  And I'm sorry I'm not 100-percent myself.  So

9   please forgive me.  If a recovery can be made against the

10  Bank of Kuwait, whether it's a contingency (indiscernible)

11  like wasn't -- just like with Baker Botts and just like with

12  Jerry Alexander, the contingency was not a million at first,

13  and the cash could be used for the estate to stabilize or

14  maximize it.  In essence, sell the assets (indiscernible)

15  for more, but the biggest asset of the estate is the lawsuit

16  against the Bank of Kuwait.  It is the biggest asset.

17       I had many conversations with large law firms that had

18  evaluated these claims, and I believe the claims are very,

19  very valuable, not just for me, but they have -- they're an

20  asset of the estate, and they should be market tested and

21  auctioned, just like anything else.  It should be fair and

22  open, and people should be able to bid on those things and

23  value them.

24  Q   All right, I'm going to ask you the next question.

25  Thank you, sir.  That's very lucid.  I'm going to give you

 1   about 30 seconds just to -- please, breathe.  I've seen what

 2   happens when you get this excited right now.  Please, one

 3   moment, 15 seconds.  All right?  Just relax, please.

 4   A    Okay.

 5   Q    All right.  Did you hear the testimony of Mr. Carter

 6   this morning?

 7   A    Yes.

 8   Q    All right, when you -- did you sit in a deposition with

 9   Mr. Carter?

10   A    Yes.

11        MR. BURKS:  All right, Mr. Baker, what is the ECF

12   of that deposition, please?  Do we have it?

13        THE WITNESS:  I believe it is on 499-22 if I'm --

14   if memory serves me correctly.

15        MR. BURKS:  Maybe it's 499-22.

16        THE WITNESS:  I think so.  (indiscernible) a lot

17   of these memorized.  I know Mr. Fitzmaurice may think I'm

18   looking at something, but I actually know it by heart.

19        MR. FITZMAURICE:  And we're going to have this

20   (indiscernible).

21        MR. BURKS:  I don't know why (indiscernible) so

22   Mr. (indiscernible) and Mr. Choudhri can --

23        THE COURT:  The only way is for me to try and pull

24   it up for you.

25        MR. BURKS:  Okay.  One moment, Mr. Choudhri.

1                    THE WITNESS:  Yeah.

2                    THE COURT:  Mr. Burks, it's --

3                    MR. BURKS:  Mr. Choudhri, you just stated a moment

4       ago that you listened to the --

5                    THE WITNESS:  (indiscernible).

6                    MR. BURKS:  -- testimony of the gentleman this

7       morning.  You've also sat through the deposition.  I think

8       it was one document.

9       BY MR. BURKS:

10      Q    Did you ask a lot of questions at that deposition?

11      A    I did.

12      Q    All right.  Subject to, and let the other side object

13      before you start talking, do you believe that the testimony

14      today was inconsistent with what you heard?  And this is a

15      yes or no answer, inconsistent with what you heard at the

16      deposition about ten days ago?

17      A    Absolutely.  Absolutely.

18                   MR. FITZMAURICE:  Your Honor, objection.

19                   MR. BURKS:  All right, (indiscernible) objection.

20                   THE COURT:  I think that's so general, I can't let

21      that in.

22                   MR. BURKS:  Yes or no?

23                   THE COURT:  He can't testify to that, no.

24                   MR. BURKS:  All right.

25                   THE COURT:  I'm giving -- willing to give him some

1    leeway.  I'm not willing to give him that much leeway.

2           MR. BURKS:  Yes, Your Honor.

3    BY MR. BURKS:

4    Q    So in the deposition, did, in your opinion, did Mr.

5    Carter seem to know anything about the Chapter 11 plan?

6           MR. FITZMAURICE:  Objection, Your Honor.

7    Relevance?  Mr. Carter?

8           THE COURT:  I'll sustain the objection as to

9    relevance.  I don't want to hear that.  I want to hear what

10   Mr. Choudhri thinks about the plan.  And I'll give you some

11   leeway for that to happen.  He's expressed that it's unfair,

12   that it doesn't evaluate claims properly, that it hasn't

13   been fair and open.  That's what I want to hear, Mr. Burks,

14   over their objections.  Okay?

15          MR. BURKS:  Understood.

16          THE COURT:  All right, now, if you have other

17   evidence that will survive their objections, I want to hear

18   that, too.

19          MR. BURKS:  Yes, Your Honor.

20          THE COURT:  Okay.

21   BY MR. BURKS:

22   Q    Mr. Choudhri, I want to turn to Exhibit 499-98.

23   A    Eight, it's very small.

24          THE COURT:  We're not there yet, Mr. Choudhry.

25   Bear with me.

1          THE WITNESS:  (indiscernible).  Okay.

2          THE COURT:  You said 499-88?

3          MR. BURKS:  No, I did, but I meant 546-98, one of

4    the exhibits amended this morning, Judge, 546.

5          THE COURT:  It doesn't go to 98.  It's got 1

6    through 6.

7          MR. BURKS:  One, two, three, four, five, six,

8    okay.

9          MR. FITZMAURICE:  Is that an order?

10         THE COURT:  That is the order granted, Trustee's

11   motions for an order.

12         MR. BURKS:  Okay, just so -- all right, Mr.

13   Choudhri, when you have a -- when you can view that, if you

14   wouldn't tell me what it is, please.

15         THE WITNESS:  Right, this is the (indiscernible)'s

16   order.

17   BY MR. BURKS:

18   Q    And is that the order we're authorizing you to buy the

19   claims against Sonder?

20   A    Yeah, an entity, yes.  Not me personally.

21   Q    All right.

22   A    I know there's confusion about it, so I just want to be

23   clear when we say that.  That's correct.  I think this is --

24   yes, short answer, yes.  All right.

25   Q    All right, and is it your understanding that the plan

1    was proposed and filed before you bought those claims or

2    your entity bought those claims?

3    A    Correct.

4    Q    And is it your understanding that the plan currently

5    provides that only the Trustee can pursue that claim, and

6    that no other creditor or party in interest can pursue that

7    claim?  Is that your understanding?

8         MR. FITZMAURICE:  Objection, Your Honor.  Mr.

9    Choudhri's understanding is not relevant to what --

10        THE WITNESS:  (indiscernible).

11        MR. FITZMAURICE:  -- the order actually provides.

12   We dealt with this on Monday.

13        THE COURT:  I'll sustain the objection.  What he

14   believes really doesn't make any difference to me as it

15   relates to this order and the plan, Mr. Burks.

16        MR. BURKS:  All right, I have to find it in the

17   plan.  One moment.  I think we've -- we all know about it.

18   Counsel and I discussed it.  We need to exclude the Sonder

19   claim from the plan, but one moment, and I'll find it,

20   Judge.

21   BY MR. BURKS:

22   Q    What is the entity that purchased the --

23        MR. TROOP:  Yeah, Your Honor, we'll stipulate that

24   the Sonder claim has been sold pursuant to a court order at

25   this point.  It is not property of the estate that's going

1    to be purchased by the APA or administered under the plan.

2              THE COURT:  I'll take that stipulation, Mr. Burks.

3    It's not really an issue for me, based on what I've read.

4              MR. BURKS:  As long as we -- it's in the plan

5    paragraph, on Page 16, Paragraph J, causes of action and

6    avoidance actions.  As long as any confirmation order, if

7    you decide to confirm the plan, if the stipulation is that

8    the confirmation will specifically exclude or reserve that

9    Sonder claim pursuant to your order, then I can move on,

10   Judge.

11             MR. FITZMAURICE:  Okay, Your Honor, we understand

12   that the draft confirmation order we've submitted transfers

13   claims that are owned by the estate into the liquidation

14   trust by definition.

15             THE COURT:  It's not a state claim anymore.

16             MR. BURKS:  Okay, I sure would like that to be as

17   clear as possible, Judge.

18             THE COURT:  All right, go ahead.

19             MR. TROOP:  Okay, Your Honor.  We'll stipulate to

20   it for (indiscernible).

21             THE COURT:  That's fine.

22             Go ahead.

23   BY MR. BURKS:

24   Q   Mr. Choudhri, do you understand what the plan would do

25   -- first of all, did 2425 WL file a proof of claim?  Let's

1    focus in.  This may be one of my last areas, sir.  Let's

2    focus in on the 2425 WL claim, okay?

3    A     Yes.

4              MR. BURKS:  All right, Mr. Baker, will you put the

5    proof of claim up?

6              (indiscernible).

7              MR. BAKER:  Claim 14.  I actually think 13 and 14

8    -- 13 is tax claims, 14 is the big claim.

9              MR. BURKS:  499-4, Your Honor, please.  That's 3,

10   499-3.  Wait, these claims were not --

11             MR. BAKER:  That's the amended objection.  Is that

12   what you want?

13             MR. BURKS:  Yes, 3, Proof of Claim 14.

14             MR. BAKER:  You want the proof of claim?

15             MR. BURKS:  Yeah.

16             THE COURT:  What do you want to see, Mr. Burks?

17             MR. BAKER:  The tax claim or the big claim?  Okay,

18   13 --

19             MR. FITZMAURICE:  You're looking for the 2425

20   proof of claim?  Proof of claim --

21             MR. BAKER:  Thirteen --

22             MR. BURKS:  The one with the lien on it.

23             MR. FITZMAURICE:  Proof of Claim Number 7 by your

24   client?

25             THE COURT:  Either your claim's registered or both

1    claim's registered.  I can get that with you.  Is that

2    easier?

3              MR. BAKER:  Here, look.

4              MR. BURKS:  The WL claim with the lien attached to

5    it, the one (indiscernible).

6              MR. SATHER:  Seven.

7              MR. BURKS:  Seven, so Proof of Claim Number 7.  Do

8    you have it?

9              (indiscernible).

10             MR. BURKS:  I feel so compromised.

11             THE COURT:  Well, this is just a horrible way to

12   try a case.  Okay, and that's the reason I enter the orders

13   that I enter and say that technological problems are your

14   problems.  They're not my problems.  And I'm trying to be

15   really, really nice, but my patience is about to wear real

16   thin.  Okay?  So what do you want to to do --

17             MR. BURKS:  Understood.

18             THE COURT:  You would pull up what?

19             MR. BURKS:  Proof of Claim Number 7.

20             THE COURT:  Do you want me to pull up the claims

21   register and then look at the claim?

22             MR. BURKS:  Yes, please.

23             THE COURT:  Claim 7?

24             MR. BURKS:  Yes, please.  And thank you for

25   (indiscernible).

1              MR. FITZMAURICE:  What page do you want to go to?

2              MR. BURKS:  Mr. Choudhri, we're here, and then

3      we'll just go to the deed of trust.

4      BY MR. BURKS:

5      Q    Mr. Choudhri, do you see this claim, proof of claim?

6      Can you enlarge the screen so you can see it?

7      A    Yes.

8      Q    All right, the judge is scrolling down to the attached

9      deed of trust.

10     A    Yes.

11     Q    It has been posited by one witness or more that that is

12     a fictitious lien that has no underlying basis.  How do you

13     respond to that?

14     A    Mona Dajani with Pillsbury approved this transaction

15     and the closing statement.  This transaction was initially

16     supposed to be a refi, and then the Bank of Kuwait wanted it

17     to be a sale because of the lis pendens sales by Osama

18     Abdullatif during litigation.  And this is reflected on the

19     closing statement from May 2020 -- May 2018.

20     (indiscernible) --

21     Q    How much money --

22             MR. FITZMAURICE:  Your Honor, Your Honor,

23     objection.  The witness is testifying, first of all, far

24     beyond the scope of the question, but also, the contents of

25     documents that we haven't seen and testifying -- I don't

1    want to represent -- testifying to the contents of documents

2    that are not in evidence and that need to be, if that's what

3    he's -- that's -- if he wants to testify about.

4            THE COURT:  I'm not going to let him testify about

5    dockets that are not before the Court that I haven't seen.

6            MR. BURKS:  Mr. Choudhri --

7            THE COURT:  He can answer your basic question as

8    to why he disagrees with Mr. Murray's claims.

9            MR. BURKS:  -- Mr. Choudhri, this is the last

10   area, I believe, I'm going to ask you questions on, so I

11   want -- the judge is going to scroll to show you what is

12   attached to the proof of claim.

13           THE COURT:  I'm there, but do you want to go

14   further down?  That's the deed of trust.

15           MR. BURKS:  Right.

16           THE COURT:  You want me to go further?

17           MR. BURKS:  Yes, please.  I want to see what's on

18   this thing.  All right, what's that?

19           THE COURT:  Property description.  Your list that

20   they sent -- he's -- because he can't see it, but I can show

21   it to you in a better way that you can tell me what you --

22           MR. BURKS:  There, thank you.

23           THE COURT:  He's not seeing this, though --

24           MR. BURKS:  That's okay, that's okay.

25           THE COURT:  So that's the end.

 1          MR. BURKS:  That's the property description I'm

 2   saying, so we have a proof of claim and note and a deed of

 3   trust, right?

 4          THE COURT:  Yes, proof of claim and the deed of

 5   trust is basically it.  It's all that's attached to it.  You

 6   tell me where you want me to go.  I'll move it back over.

 7   Then he can see it.

 8          MR. BURKS:  And is there anything above that?

 9          THE COURT:  Just the proof of claim.

10          MR. BURKS:  Okay, that.

11   BY MR. BURKS:

12   Q    Mr. Choudhri, the judge is about to show you, and this

13   is our last area, Mr. Choudhri, what happened in the

14   transaction that's reflected in the document directly in

15   front of you with the numbers on it?  Was that real money?

16   What happened?

17   A    2425 WL was the seller, the grantor of this property

18   that went to Gallery 2425 Owner, LLC in May 2018.  The --

19   there was zero cash that came from the (indiscernible)

20   Galleria 2425.  The funds went towards a seller carry of

21   $14,780,000.  That's reflected on the settlement statement

22   in the closing of the underlying transaction, on the close.

23   Q    So are you saying that before this transaction, the

24   Debtor did not own 100 percent of the building?  Is that

25   what you're saying?

1    A    No, 2425 WL did.  2425 WL is the seller in -- as of May

2    2018, and then the buyer is Galleria 2425 Owner

3    (indiscernible).

4    Q    Understood, and this is the claim, this is the note and

5    deed of trust --

6         MR. FITZMAURICE:  Objection, Your Honor.  Lack of

7    foundation.  There is no note.

8         THE COURT:  There is no note, yeah.  And he can't

9    talk about the settlement statement, either.

10         MR. BURKS:  Okay.  Now I'm in the deed of trust,

11   please.

12   BY MR. BURKS:

13   Q    So don't refer -- the judge doesn't want you talking

14   about documents that aren't in evidence.  He's heard, the

15   judge has heard you, as to what the basis for that deed of

16   trust is.  Is there anything else you want to say about that

17   deed of trust, Mr. Choudhri?

18         MR. FITZMAURICE:  Yeah, objection, Your Honor.

19   Witness can't testify generically in the narrative just

20   about whatever it is he wants to talk about a given topic.

21         MR. BURKS:  On the deed of trust?

22         THE COURT:  Again, I'm going to give him a little

23   bit of leeway.  Go ahead.  Tell me, Mr. Choudhri.

24         THE WITNESS:  Yes, Your Honor.  It's what

25   (indiscernible) -- its own (indiscernible) file, and they're

1    underlining, and there's a one memo that they did

2    (indiscernible), and I believe it's one of the ECF numbers –

3    –

4            THE COURT:  And again, you can't testify as to

5    stuff that's not in front of me.

6            THE WITNESS:  (indiscernible).

7            THE COURT:  He asked a generic question, so ask --

8    answer it if you can, and if you can't, that's fine, too.

9            MR. BURKS:  And speak as distinctly as you can,

10   please, sir.

11           THE WITNESS:  I'm sorry, I apologize, Mr. Burks.

12   Can you repeat the question so I can get it right?

13           MR. BURKS:  Right, so there's a deed of trust.

14   I've heard what you said so far.  I'm satisfied, but I don't

15   count.

16   BY MR. BURKS:

17   Q    Is there anybody -- is there anything else you want to

18   say regarding a transaction, without referring to the

19   documents, that underlies the granting of this deed of trust

20   2425 WL?  I understand what you've already said.  Is there

21   anything else?

22   A    If I recall, it's like something like -- it's in one of

23   the ECF numbers that are filed like 4 or 2 or something.

24   (indiscernible) the objection.  It's a settlement statement

25   that the consideration (indiscernible) --

 1                MR. FITZMAURICE:  Objection, Your Honor.  He's

 2    doing exactly --

 3                THE COURT:  You're doing exactly what I asked you

 4    not to do.

 5                MR. BURKS:  I know, I know.

 6                THE COURT:  So I'm going to cut you off.  Ask the

 7    next question.  I gave you leeway.

 8                He blew it.

 9                MR. BURKS:  No further questions, Judge.

10                THE COURT:  Thank you.

11                Mr. Fitzmaurice.  Okay, and I'll offer you the

12    same thing I offered Mr. Burks.  If you need me to put

13    something on the screen for you, I'm happy to do that.

14                MR. FITZMAURICE:  Thank you, Your Honor.  Well,

15    I've been challenged all day, so I was going to give it a

16    shot.  If I lock into GoTo Meeting --

17                THE COURT:  You should be able to share your

18    screen.

19                MR. FITZMAURICE:  And I can -- Mr. Choudhri will

20    be able to hear me through this microphone or do I need to

21    be on a phone?

22                THE COURT:  No.  No, no.  That's everything.  So

23    if you look -- just follow me on the screen --

24                THE WITNESS:  I can hear you very well.

25                THE COURT:  All right, there -- here it says

1    "share."  You'll click on "share."  It'll show "share

2    screen," and then you'll just hit that button, and you'll be

3    able to share.

4            There you go.

5            MR. FITZMAURICE:  All right.

6            THE COURT:  You're the wizard today of technology.

7            MR. FITZMAURICE:  Well, all evidence to the

8    contrary this morning, Your Honor.

9            CROSS-EXAMINATION OF ALI CHOUDHRRI

10   BY MR. FITZMAURICE:

11   Q    Mr. Choudhri, I'm showing you a copy of the proof of

12   claim for Claim 7-1.  Do you see that on the screen?

13   A    Yes.

14   Q    And this is a proof of claim that was filed by 2425 WL.

15   Is that right?

16   A    Yes.

17   Q    So I'm going to scroll through the -- it looks like 18

18   pages of this PDF.  And my question at the end is, I'm going

19   to ask you if you've seen, in any of the documents that are

20   here attached to the proof of claim, a promissory note.

21   Okay?

22   A    No.

23   Q    I'll keep going.  We'll go all the way to the end.  And

24   I'll pause here for a second.  Is that your signature?

25   A    Yes.

1   Q    At the time that -- at the time this proof of claim was

2   signed by you, were you the manager of 2425 WL?

3   A    Yes.

4   Q    I'll keep scrolling.  We'll look for the note.

5   A    I don't believe the note is there.

6   Q    So you think there's no note attached to the deed of

7   trust.  Is that right?

8   A    There's no note here on this proof of claim.

9   Q    Okay.  So let me ask you another question about the

10  deed of trust that's attached to the proof of claim.  And I

11  apologize.  I'm just going to scroll to the point that I'm

12  allowed to show you.  Okay, is that your signature here, Mr.

13  Choudhri, under grant -- ultimately under "grantor?"

14  A    Yes.

15  Q    Do you see here it says, the text on the document says

16  "this instrument was acknowledged before me this," blank,

17  "day of," blank, "2021?"  Do you see that?

18  A    Yes.

19  Q    And then it's signed?

20  A    Yes.

21  Q    Is that because this group -- this deed of trust was

22  executed in 2021?

23  A    Yes, that's why.

24       MR. FITZMAURICE:  Thank you, sir.  No further

25  questions.

```
1                THE COURT:  All right, thank you.

2                Mr. Burks?

3                RE-DIRECT EXAMINATION OF ALI CHOUDHRI

4    BY MR. BURKS:

5    Q    Mr. Choudhri, on that proof of claim, does the note

6    exist?

7    A    Yes.

8    Q    Did you give a copy of it to Mr. Sather?

9    A    Yes.

10   Q    Did you give a copy of it to Mr. Sather in time to file

11   the amended proof of claim?

12               MR. FITZMAURICE:  Objection, Your Honor.  Lack of

13   foundation.  There is no amended proof of claim on file.

14               THE COURT:  I'll sustain the objection.

15               THE WITNESS:  (indiscernible) --

16   BY MR. BURKS:

17   Q    Have you provided Mr. Sather a copy of the note to put

18   forth as an exhibit in the proof of claim objection

19   proceeding?

20               MR. FITZMAURICE:  Objection, Your Honor.  Lack of

21   foundation.

22               THE COURT:  I'll overrule the objection.

23   BY MR. BURKS:

24   Q    Have you provided a copy of the note to Mr. Sather for

25   use in the objection of claim proceeding?
```

```
1    A    Yes.  Yes.

2              MR. BURKS:  Nothing further, Judge.

3              THE COURT:  All right, Mr. Fitzmaurice?

4              MR. FITZMAURICE:  Nothing, Your Honor.

5              THE COURT:  All right, thank you.

6              Mr. Burks, you have a witness.

7              MR. BURKS:  Who's on the screen other than Mr. --

8              THE COURT:  Mr. Choudhri.

9              MR. BURKS:  And that's it?

10             THE COURT:  That's it.

11             MR. BURKS:  May I look in the hallway, please?

12             THE COURT:  No, I mean, I've been really, really

13   patient.  Do you rest?

14             MR. BURKS:  I rest --

15             THE COURT:  Mr. Baker, do you rest?

16             MR. BURKS:  -- Your Honor.

17             MR. BAKER:  Nothing further, Your Honor.

18             THE COURT:  Thank you.  All right, I think that

19   concludes at least the evidence, which allows me to give you

20   some time to argue.  Mr. Troop and Mr. Fitzmaurice, he's

21   going to argue for --

22             MR. FITZMAURICE:  Your Honor, Mr. Troop will, I

23   think, begin and Mr. Akuffo as well will present with

24   respect to the confirmation standards.

25             THE COURT:  Okay, that's fine.  I'd like to limit
```

1    argument.  I think I've heard what I need to hear, but I

2    want to give you time.  I'm going to limit each side to 15

3    minutes.  All right?

4          MR. BURKS:  Thank you.

5          THE COURT:  I'll give you five minutes to close.

6    All right?  Thank you.  So if you want to start now, you

7    may, or do you want a few minutes?

8          MR. BURKS:  Wait, did you say 15 or five?

9          THE COURT:  Fifteen.

10         MR. BURKS:  Is there any way that we can take a

11   very quick break that I need?  I --

12         THE COURT:  I'm fine breaking if you guys want to

13   break.

14         MR. BURKS:  I just have to run to the restroom,

15   frankly.

16         MR. TROOP:  I don't mind, Your Honor, but I

17   thought when we spoke this morning we decided that as the

18   moving party I would go last.

19         THE COURT:  Mm hm, well, you can do that, or you

20   can open and close if you want.  It's your choice.

21         MR. TROOP:  Oh, that's what you meant by open and

22   close, by 15 and five?

23         THE COURT:  Yeah.

24         MR. TROOP:  And it won't further (indiscernible).

25         THE COURT:  Okay, that's fine.  And let's do this,

1    it's 3:53.  I'll come back and four o'clock.  I'll let Mr.

2    Troop start, and then we'll go from there.  Thank you.

3            CLERK:  All rise.

4            (Recess)

5            CLERK:  All rise.

6            THE COURT:  All right.  We're back on the record

7    in 23-34815.  Mr. Troop, you may proceed.

8            MR. TROOP:  Thank you, Your Honor.  Again, Andrew

9    Troop from Pillsbury on behalf of National Bank of Kuwait.

10           Your Honor, we're going to try to stick to three

11   minutes and get Mr. Akuffo the first opportunity he's ever

12   had to present a confirmation order.

13           THE COURT:  That's fine.  I'd be happy to have him

14   present.

15           MR. TROOP:  Thank you.

16           THE COURT:  That said, it's always an exciting

17   time when you do it for the first time.  Go ahead.

18           MR. TROOP:  He's getting an interesting case as

19   well.

20           Your Honor, when we started this morning, I talked

21   to you primarily about two things, the two things of focus.

22   The first thing that I talked about is that I thought that

23   there was an objection that was going -- that was being

24   raised with regard to good faith.  And I don't think there's

25   been any evidence presented with respect to a lack of good

1   faith, and -- to the contrary -- only evidence that supports

2   a finding of good faith.

3           A plan was proposed in good faith.  It was not

4   proposed in any means prohibited by law.  It was

5   transparent.  It was negotiated with the Chapter 11 trustee.

6   It was sent out to both -- it was sent out to both properly.

7   The only witness with regard to notice, I believe it was

8   clearly shown that he actually received our plan, not

9   theirs.  Your Honor, nothing against him.  It's just -- Your

10   Honor, it's a matter of circumstance.

11           Your Honor, the plan is in good faith because it

12   seeks to maximize what would otherwise be a truly insolvent

13   state.  And yes, are there things that NBK gets in exchange

14   for that?  It's a release of estate claims.  It gets

15   protection against anyone breaking estate claims.  The

16   argument that their releases are broader than that, I

17   disagree with, but if there's concern about that, Your

18   Honor, we'll make it as crystal clear as you want it in the

19   confirmation order.

20           Your Honor, there are also other objections

21   raised, and I talked this morning about three that were made

22   untimely.  One of the ones that was made untimely had to do

23   with, indirectly, 1129(a)(10) and whether there is

24   (indiscernible) impaired class.

25           Mr. Burks, I think, tried to make two points

1    today.  He tried to say that NBK's claim was not impaired

2    because it accepts its treatment under the plan, but he'd be

3    -- that's just nonsensical Your Honor.  You'd remember

4    having an impaired accepting class.  You would never have an

5    impaired accepting class.  And the fact that (indiscernible)

6    doesn't change the fact that our legal rights are being

7    altered under the plan.  Our payment rights are being

8    altered under the plan.  (indiscernible) not we're impaired.

9         The second thing is there's no doubt that the

10   votes were cast, and cast affirmatively and cast timely.  So

11   the argument is that there was an objection pending, which

12   shouldn't involve the case here, I if can call it that, is

13   that there is a valid claim held by National Bank of Kuwait

14   or you would not have allowed it to credit it on Monday.

15        To move forward, Your Honor, a proof of claim is

16   prima facie evidence of the validity of the claim.  And yes,

17   an objection raises that question, but it has to raise

18   sufficient issues to rebut the prima facie validity of the

19   claim.  And again on Monday, you effectively found it does

20   not.  It does not.

21        A technical issue -- which it may be a technical

22   issue at best -- to not stand in the way of confirmation of

23   this plan.  But if you have any concern at the end, Your

24   Honor, Bankruptcy Rule 3018 allows you to estimate for

25   voting purposes the claims.  It is on notice in hearing, but

1    we all know the code says that notice in hearing -- it's

2    notice in hearing justified by the circumstances.  Here

3    there's no question that these parties, who are now more

4    than two full days of trial, that tried to raise disputes

5    about those claims.  And Your Honor, I think they did so

6    unsuccessfully.

7            So if there's any concern, I believe you can just

8    allow the claims for voting purposes in the form in which

9    they were presented for the votes.  And then if you confirm

10   the plan, the impact of the plan will be what it is with

11   respect to those claims.

12           I went way over my three minutes, Your Honor.  I

13   apologize.

14           THE COURT:  That's fine.

15           MR. TROOP:  Mr. Akuffo.

16           MR. AKUFFO:  Good afternoon, Your Honor.  Kwame

17   Akuffo from Pillsbury on behalf of the National Bank of

18   Kuwait.  (indiscernible) and secured lender to the debtor.

19           Mr. Troop already, you know, went through a couple

20   of plan confirmation requirements, and so I'm going to be

21   brief with my presentation and just focus on a couple of

22   issues that were discussed today, one being clarification,

23   the other being cram down with respect to whether or not

24   there's unfair discrimination against the rejected classes,

25   which include Class 6 and 8; and lastly the permissive

1    provisions that -- excuse me -- the permissive provisions

2    related to Section 1123(b).

3           So first with respect to classification, our

4    requirements, Your Honor, we believe that Section 1122's

5    classification requirements are met because our Goal 3 of

6    the plan designates a class of claims and interest under the

7    plan.

8           Briefly, I'm just going to take us through these

9    classes.  Again, Class 1 is other secured claims.  Class 2

10   is other priority claims.  Class 3 is the NBK tax claim.

11   Class 4 is NBK secure claim.  Class 5(a) and 5 -- Class 5(a)

12   is general -- trade general unsecured claims.  Class 5(b) is

13   other general unsecured claims.  Class 6 is insider claims.

14   Class 7 is subordinated claims, and Class 8 is interest of

15   the debtor.

16          We believe that the classifications in the plan is

17   rational, and they're valid, legal, and factual reasons that

18   justify classification.

19          With respect to Class 1, again, these classes hold

20   secured claims against the estate, and particularly they

21   cover secured real estate tax claims held by certain taxing

22   authorities and (indiscernible).

23          Class 2 claims consist of non-administrative

24   expense claims that I'll classify separately because they

25   are priority claims under Section 507 of the bankruptcy

1    code.

2            And Class 3 advocates the sole holder of that

3    claim and onto the plan.  NBK will receive -- will receive

4    value for its claim under Class 3 if it's not the winning

5    bidder of the property.  But to the extent that it is the

6    winning bidder of the property at the auction on Friday,

7    then it has agreed to waive its claim.

8            NBK is also the sole holder of our claim in Class

9    4, which is based on unsecured claim under the loan

10   documents that were -- under the loan documents between NBK

11   and the debtor.

12           Class 5, as you've heard throughout today,

13   consists of trade, unsecured claims arising from maintenance

14   and related work.  We particularly classed 5 as claims

15   separately because the trustee recommended that we do so,

16   and these claims are, again, based on secure claims that

17   were payable to trade to allow them to continue to provide

18   services to the estate's main assets, which are other

19   property.

20           With respect to Class 5(b), these are non-trade

21   unsecured claims, and they consist of the debtor's former

22   attorneys as well as NBK's deficiency claim based on its

23   loan to the debtor.

24           With respect to Class 6, which has been a hot-

25   button issue, they were separately classified because they

1    applied to the debtor's affiliates who are insiders,

2    particularly 2425WL and general.

3           Your Honor, it makes no sense to place these

4    entities into classes under the subclasses -- under the

5    subclasses, meaning Classes 5(a) and 5(b), because these

6    classes -- again, meaning 5(a) and 5(b) -- are going -- part

7    of their recovery are pro rata share interests and

8    litigation trust assets, and to the extent -- and they're

9    litigation targets.  And to the extent that recovery -- to

10   the extent that there are recoveries against these potential

11   litigation targets -- again, meaning Jetall and 2425WL -- it

12   makes no sense to recover money against them and then, you

13   know, have them actually receive recovery from -- under

14   those classes.

15          And so that's the basis because we separately

16   classified them.  And as you've heard all throughout today,

17   Your Honor, there are pending objections to these claims,

18   which are highly suspect.  And those objections are found at

19   ECF Number 402 and 404.

20          Moving on to Section 1129(d)'s cram down

21   requirements, we believe that there's no inferred

22   discrimination here against the rejecting classes,

23   particularly Classes 6 and 8, again for the same reasons

24   that we separately classified Class 6, there's no inferred

25   discrimination against them.

1          Again, these are -- this class covers -- this

2     class includes Jetall and 2425WL's claims.  And again,

3     placing these insiders in classes 5(b), for example, does

4     not make sense because to the extent that there are

5     recoveries against them through a litigation, they shouldn't

6     be able to share those recoveries for that reason.

7          And in terms of distribution to creditors in Class

8     5(a), it's not unfair to do so because, again, these Class

9     5(a) trade creditors are receiving value because they

10    provided critical services to the estate by helping maintain

11    its -- by helping to maintain the value of the property.

12         And the bottom line here is that NBK can decide

13    who gets to get paid under its plan, especially after the

14    debtor failed to pay the loan back to NBK a couple of years

15    ago.  That was the issue out of the loan documents, Your

16    Honor.

17         I'm sorry if I'm moving too fast.

18         THE COURT:  That's fine.  You still have four

19    minutes.  You're good to go.

20         MR. AKUFFO:  Okay.  With respect to fair and

21    equitable, again, simply the plan is not for -- the plan is

22    fair and equitable to holders of claims in Classes 6 and 8

23    because there's no value available to make distributions to

24    these creditors, and the plan does not provide for

25    recoveries for claims or interests junior to Classes 6.

1        Lastly, the permissive requirements of Section

2    1123(b) are met, particularly with respect to Section

3    1123(b)(3)(a), it requires that a plan may settle an action

4    that belongs to the estate.

5        For the estate release, as you've heard today, the

6    debtor commenced a loss against NBK in state court based on

7    breach of a settlement agreement and has alleged tortious

8    interference and lender liability claims agent NBK.  That

9    state court lawsuit was removed -- excuse me.  That lawsuit

10    was removed from state court to this court, and after the

11    trustee was appointed in February, he was substituted as

12    Plaintiff in this lawsuit.

13        Today, Your Honor, you heard testimony from the

14    trustee that after you entered the cash collateral order

15    that allowed him to investigate claims and challenge the

16    amount in allowance of NBK's claims against the debtor under

17    their own documents, he conducted an exhaustive

18    investigation and assessment of claims against NBK.

19        For example, he spoke to Debtor's current and

20    former counsel.  He spoke to other parties, including Mr.

21    Caldwell, Ms. Azeemeh; and he requested documents from the

22    debtor.  And I believe he mentioned that they did not

23    produce certain documents.  And to the extent that they did

24    produce certain documents, they did not provide any factual

25    support to -- any factual support to support the lawsuit

1   that is pending against NBK.

2          And so after his exhaustive investigation of NBK

3   into its -- into the debtor's claims against the bank as

4   well as to determine whether or not NBK has a valid claim

5   under the loan documents, he determined that there was no

6   basis -- there was no -- excuse me -- he determined that

7   there was -- the claims asserted by the debtor lacked any

8   sufficient merit and that it was the best interest -- it was

9   not in the best interest of the estate to pursue claims

10  against the estate.

11         Now, even if the trustee had pursued litigation

12  against NBK, he would've had to rely on testimony from Mr.

13  Choudhri, and you've heard today that the trustee determined

14  that any testimony by Mr. Choudhri is not truthful.

15         And so in return for the estate release, NBK has

16  agreed to reduce its deficiency claim to 90 percent of -- 90

17  percent of that amount in Class 5(b).  It has also agreed to

18  pay administrative expenses -- expense claims in full, and

19  has also agreed to fund the liquidation trust for, I

20  believe, $150,000.

21         And lastly, based on the trustee's testimony

22  today, he determined it's reasonable business judgment that

23  the estate release is fair and equitable to the estate.  And

24  again, it's in the best interest of the estate.  And for

25  those reasons, Your Honor, we believe that the estate

1    release should be approved.

2         With respect to exculpation, we -- exculpation in

3    our goal 9.C of the plan should be approved.  Again, today

4    you heard that we received comments from the U.S. Trustee

5    regarding the breadth of the exculpatory party definition

6    under the plan that included NDK and related parties.  This

7    exculpation definition has been modified to apply to the

8    trustee and its related parties only, and that modification

9    is reflected in Paragraph 59 of the revised proposed order

10   filed at ECF Number 528.  So for that reason, Your Honor, we

11   believe that the exculpation under the plan should be

12   approved.

13        And lastly, the injunction and gatekeeper

14   provision, we believe that these injunction provisions

15   should be approved.

16        With respect to the gatekeeper provision, it

17   simply requires that any party with a colorable claim come

18   to this Court and confirm that that colorable claim --

19   excuse me.  Let me retract.

20        The gatekeeping provision basically is designed to

21   enforce the estate release that are being -- that is being -

22   - the estate release under the plan, and to the extent that

23   any party has a colorable claim, it requires that party to

24   come to this court to determine whether or not there's a

25   basis to go ahead and pursue that claim against a release

1    party.  And to the extent that those claims, again, are

2    released under the plan, there's no reason to do so.

3              I also want to point out that the gatekeeper

4    provision is not a third-party release.  The injunction and

5    the gatekeeper provision is consistent with Fifth Circuit

6    law.

7              And so for the brief reasons that I've explained

8    on the record, Your Honor, I believe that -- excuse me --

9    NKB believes that the plan should be confirmed.

10             THE COURT:  All right.  Thank you, sir.

11             All right.  Mr. Burks?

12             MR. TROOP:  Your Honor, we were asked to advise

13   you that Ms. Whitworth, the U.S. Trustee, might want to

14   speak.

15             THE COURT:  She's on the phone, and she's unmuted,

16   and I'm sure she'll want to say something at the end, and

17   I'm going to give her the opportunity.  Thank you.

18             MR. TROOP:  Thank you.

19             THE COURT:  Mr. Burks, they did run over by a few

20   minutes.  If you run over by a few minutes, I'll give you

21   the same courtesy.

22             MR. BURKS:  How much time do I have, Your Honor?

23             THE COURT:  15 minutes plus a couple of minutes

24   grace.

25             MR. BURKS:  It's been a while since I heard an

1    accomplished bankruptcy attorney tell the Court that any

2    requirement for confirmation is just technical.  It's not

3    technical.  It's a requirement, 1129(a)(1) through (16) have

4    to be met.  Period.

5            I don't know why.  I assume that Counsel had a

6    reason for not estimating the claim.  I assume that they

7    read In re Bressler, which is the only opinion in this

8    district regarding whether or not -- not whether or not you

9    credit bid, not whether or not you have standing, but

10   whether your vote can be the sole accepting vote for

11   purposes of 1129(a)(10).

12           It's more than a technicality here.  In re

13   Bressler, which is written by Judge Rodriguez at 2021 Bankr.

14   LEXIS 64, says, "Here's what you have to do if you have a

15   claim -- proof of claim that is objected to."  You don't

16   have to try the proof of claim.  You don't get to try the

17   proof of claim.  It's an objected-to claim.  It's not a

18   deemed-allowed claim.

19           Why they didn't come to you already and ask you to

20   estimate it -- it's a strategy, I guess.  But to somehow

21   deem the fact that they're entitled to credit bid to somehow

22   mean that they are -- you know, one allowed claim for

23   purposes of 1129(a)(10), that's going to be new law, and

24   they're asking you to make new law.  It's not a

25   technicality.  It's a requirement under 1129(a).

```
 1              THE COURT:  So let me understand your arguments

 2     first.  Your argument is that because the claim was objected

 3     to, they simply cannot go without me making some sort of

 4     claims estimation?

 5              MR. BURKS:  After notice in hearing, they need an

 6     allowed -- they need an estimated claim in some amount after

 7     notice in hearing.  They make the motion.  We get a fair

 8     opportunity to object to that motion.  Yes, Your Honor.

 9              THE COURT:  Okay.  Thank you.  Go ahead.

10              MR. BURKS:  Additionally, I was interested by

11     Counsel's opening argument where he said that somehow, the

12     fact that the proponent accepted the plan, somehow that

13     makes them unimpaired.  I never argued that.  That would be

14     an astonishing argument.

15              What I said was that if you only have one

16     "impaired claim," and it's not that the bank accepted it --

17     that's not what I'm talking about -- it's that they proposed

18     their own treatment under the note, which they're allowed to

19     do.  They can discount that note.  They can modify that

20     note.  They can propose anything they want, and it's under

21     the note that they're doing it.

22              So I'm not saying that there's a proponent who

23     accepted it.  I'm saying the only accepting class is the

24     proponent who's voluntarily pursued to the note, said,

25     "Here's how we're going to get paid to the note," and I'm
```

1    saying that is not impairment.  That's -- that is somebody

2    discounting the note just like anyone can -- the bank can

3    settle the note.  You know, the bank can waive foreclosure.

4    The bank can call off the auction.  They can do anything

5    they want under that note and deed of trust, and they've

6    done it.  That's not impairment.

7           Moving on to the next issues, I'm really

8    interested by Counsel's portrayal of the abandonment.  He

9    said, "Gee, they just haven't made any argument that it

10   wasn't proposed in good faith."

11          To the contrary.  The entire plan is based on bad

12   faith proposal, and here's why.  I don't know what the

13   counsel here in this room or the Court thought the purpose

14   of my questions to Mr. Carter and Chapter 11 trustee were

15   regarding the -- were regarding the negotiation of the plan

16   terms, but I'll tell you what it was.  We all read In re

17   Cajun Electric.  We know what the three prongs from 9019,

18   and we know what the Fifth Circuit said.  A balance to

19   leverage negotiation, a balanced negotiation is critical for

20   acceptance of any settlement.

21          This was a highly, highly leveraged negotiation

22   where the trustee, frankly, didn't have a chance.  He

23   bravely testified as to how he fought for things that he

24   wanted to, but the bottom line was he had once choice, and

25   one choice only for a plan.

1    You talk about an uneven playing field.  It

2    doesn't even come close.  He wanted different provisions for

3    the settlement and the payment amount.  He wanted different

4    provisions for the credit bid amount.  He even caved in, in

5    terms of not testing the true market value of these three

6    claims against the estate.  And we can all speculate whether

7    or not it was reasonable for him to do so.

8         In this highly leveraged and charged situation

9    that he was in, in negotiating the plan, reasonable or

10    unreasonable, no choice.  No choice.  And that is one of the

11    biggest arguments or problems that we have with this plan.

12         Look at the classifications.  Let's just

13    understand what the classification problems here are.  You

14    have a WL lien -- second lien.  Well, first -- here's the

15    first problem.  You have a lien from -- a second lien from

16    2425WL.  You have proof of claim with a deed of trust

17    attached.  It's filed.  Right now, you couldn't go to a

18    closing -- a title company right now and sell that first

19    lien if you tried because there's deed of trust on it.  What

20    would you do in state court?  You could only file a petition

21    for quiet title.  Then the party would -- Mr. Choudhri

22    would, on behalf of the entity, bring the note.  You'd have

23    a jury trial as to the validity of the claim and liquidity

24    of the lien, and whether or not you can quiet title.

25         In bankruptcy court, what do you do?  You file a

1   proof of claim.  It's deemed allowed until it's objected to.

2   Then you have a trial.  You get to try it.  You try whether

3   or not on all the evidence that's available, that's

4   admissible, relevant evidence.  You get to determine whether

5   or not that lien is valid, whether or not there's a debt

6   owed, and then ultimately whether or not there's cause to

7   subordinate it.  They want to pass all that.  They want to

8   cut through all that in this plan.  No way.

9        But it goes more.  It goes further than that,

10  Judge.  They don't want any unsecured claim allowed at all.

11  We not only void the lien.  Void the claim, and don't dare

12  put it in with a deficiency claim of the first lienholder

13  because that will then actually split the pool that's

14  available for the first lien deficiency.  That's unfair

15  discrimination at its quintessential basis.  At least,

16  that's my view of it.

17        Let's look at the trade creditors.  You have -- we

18  have the claim of (indiscernible) Inc.  It was at Document

19  Number 496-1.  We talked about the proof of claim.  It had a

20  lien attached to it.  We talked about that that lien was

21  filed after 2425WL's lien -- excuse me -- after the Bank of

22  Kuwait's lien but before -- excuse me -- after both the

23  first lien and WL's lien, yet the response of the trustee

24  was -- or Mr. Carter was, "Yeah.  That's going to be paid as

25  another security claim."

1           Now, wait a minute.  A claim filed after 2425L is

2      going to be paid before 2425L.  Hm.  All right.  And in

3      full.  What about those trade creditors?

4           See, the trade creditors are different than a

5      lienholder.  They're not being treated as a secure claim,

6      but they're getting 70 cents on the dollar.  Why's that

7      important to me representing 2425L?  Well, it's important to

8      me because my client's getting zero on their unsecured

9      claim, and trade creditors without liens are getting 70

10     percent.  Unfair classification.

11          Now, they can say, "Wait a minute.  We're giving

12     the insiders zero."  You can't go through due process of

13     claim allowance and claim trials and just say this lien is

14     invalid, and the claim underneath it is invalid.  There

15     isn't hope.  You'll hear it.  You'll hear the evidence and

16     decide.  But they're asking you to forgo all of that.  You

17     have a hearing on the subordination.  You have a hearing on

18     the removed case, whether or not to remand it.  There's

19     litigation to be done.

20          Is it doubtful in anybody's mind?  Not in my

21     client's and not in my client's attorney's.  Of course, the

22     bank will tell you it's frivolous.  Rule that way, but don't

23     cut off the litigation rights right here and now today.  But

24     they want you to, and they told you that that release is

25     pretty darn important for $3.7 million.

1        Now, do we think -- do we know what the value of

2   the causes of action are?  No.  Nobody does.  We have

3   thoughts.  Trustee has an opinion, but he never tested that

4   on the market, and the reason he didn't test it is because

5   he can't because otherwise, he doesn't get the NBK to play

6   ball.  That's bad faith.  Excuse me.  That's not proposing a

7   plan in good faith.  That's restricting the trustee's time

8   and the trustee's hands on what to do.

9        Classification is fatal here.  Could it be fixed?

10  Yeah, probably.  Could you estimate a claim procedurally,

11  just file a motion, give a few days' notice, have a hearing

12  on estimation, and you fix these technicalities?  Maybe.

13  Probably some.  The classification though would look very

14  different.  You'd have the NBK claim paired other claims.

15  You'd have the trade creditor claims in the pool of other

16  unsecured creditors.  You'd have a different looking plan on

17  distribution, Judge.

18        These aren't technicalities.  Unfair

19  discrimination, fair and equitable as far as the liquidation

20  test.  You have no idea what the value of those claims are,

21  and frankly, neither do I, and if you confirm this plan,

22  you'll never find out.

23        I hope -- now, what do you do?  What do you --

24  what would you do here?  I mean, we have technical problems.

25  I'm not going to reread Mr. -- Steve's objection or the

1    debtor's objection, but what I know you're going to do is

2    you're going to go down -- you're going to take -- go in

3    Chambers, and you're going to go down 1 through 16 and look

4    at 29(a).  And if you can't check the 16 boxes, the code

5    says you can't conform.  If you can check the 16 boxes, you

6    can confirm.  As a matter of fact, you shall confirm if you

7    can check the boxes.

8            It's not that a plan isn't confirmable.  The

9    auction can go forward.  The trustee said that it's going to

10   look the same one way or the other on the auction, but the

11   releases shouldn't go forward.  No way.  I mean, I'm sorry.

12   That just violates Fifth Circuit law.  You can say it

13   doesn't, but just read the releases.  Gatekeeper?

14   Gatekeeper for a non-debtor or somebody who's not essential

15   to reorganize the debtor, never been done.  You'll be

16   creating new law against this circuit precedent.

17           These are not technical problems.  These are real.

18   Follow the law of the Fifth Circuit.  Follow the law in

19   (indiscernible).

20           Lastly, I want to thank you personally for hearing

21   all the evidence, including Mr. Choudhri's opinions.  Unlike

22   anyone else, I think they were critical in terms of there's

23   more than one side.  There's more than one story on these

24   causes of action.  But if you confirm today, we'll never

25   know what their actual value is.  That release is the

1    problem of this plan.  That classification is the problem in

2    that plan.  1129(a)(8) -- (10) is a problem with this plan.

3                Thank you, Judge.  I'm out of time.

4                THE COURT:  All right.  Thank you, Mr. Burks.

5                I'm going to turn now to Ms. Whitworth who

6    indicated she may have something to say.  I'll let her say

7    whatever she needs to say before I go back to Mr. Troop.

8                Ms. Whitworth?

9                MS. WHITWORTH:  Thank you, Judge.  Yes.  Thank

10   you, Judge.  Jana Whitworth on behalf of the United States

11   Trustee.

12               Your Honor, I just wanted to make a short

13   announcement on behalf of my client.  We did not file a

14   formal objection.  We did however submit a series of

15   requested revisions.  Those are reflected as counsel

16   (indiscernible) out in Paragraph 59 of the proposed orders

17   uploaded at 528 that correctly in the trustee's opinion

18   limits the definition of exculpated party to Chapter 11

19   trustee (indiscernible) professionals and people who were

20   working on his behalf.

21               There were a couple of other revisions in

22   Paragraph 59, 29 -- or excuse me -- 29 and 73 that relate to

23   post-effective date reporting by the liquidation trustee and

24   his responsibility for paying quarterly fees.

25               Other than that, Your Honor, the U.S. trustee does

1    not oppose entry of the -- a proposed confirmation order at

2    528.  Thank you, Your Honor.  I appreciate your time.

3              THE COURT:  I'm just going to look at something

4    really quick to make sure that I have that real quick.

5              MS. WHITWORTH:  I believe it was attached at the

6    exhibit to the --

7              THE COURT:  Yeah.  That's what I want to make

8    sure.  I saw the --

9              MS. WHITWORTH:  -- document.

10             THE COURT:  I'm sorry.  The bandwidth is taking a

11   minute to come up.  It must be pretty large.

12             MS. WHITWORTH:  It's 100 pages.

13             THE COURT:  Yeah.  So it's going to take a minute.

14   Okay.

15             MR. BURKS:  Your proposed order is 100 pages?

16             MS. WHITWORTH:  No.  It's the notice that attaches

17   --

18             THE COURT:  It's the plan, and everything's

19   attached to it.

20             MS. WHITWORTH:  Correct.

21             THE COURT:  It's 95 pages long.  Can you tell me

22   where -- what page your language starts on?  Oh, there it

23   is.  I found it.  Don't worry.  Okay.  All right.  Thank you

24   for the announcement.  I appreciate it.

25             MS. WHITWORTH:  Thank you, Judge.

1              THE COURT:  All right.  Mr. Baker, is there

2     something you want to say?

3              MR. BAKER:  Just a very short close, Your Honor.

4              THE COURT:  Okay.  You've silently made it till

5     the very end, but go ahead.

6              MR. BAKER:  I apologize.  I was somewhat surprised

7     because Mr. Troop got up here and said, "Well, you can

8     estimate the claims," but they've never filed a motion to

9     estimate the claims.  They're just showing up here today

10    saying, "Please estimate the claims," without ever filing a

11    motion.  That's --

12             THE COURT:  I have to tell you that I have found

13    at least a couple of cases from the early '90s that say I

14    don't need to.  So I think that potentially, there's a 1991

15    case that says -- so I'm not sure I agree with that

16    proposition, but I have looked at case -- I looked at some

17    on the break.  I'll have to do a little bit more digging on

18    it, but there is some Southern District caselaw from the

19    early '90s that says I can basically confirm the plan

20    without estimating the claims.

21             MR. BAKER:  Okay.

22             THE COURT:  Okay.  Go ahead.

23             MR. BAKER:  The other thing that I would point

24    out, under the plan, tax claims that NBK is claiming they

25    own would get paid to NBK.  Now, under the confidential --

1   and this hasn't been pointed out.  Confidential settlement

2   agreement, which is part of the record, goes through and

3   says, "Okay.  There's a liquidated damages provision if it

4   is breached."  What is it?  NBK, it's $800,000.  They're not

5   supposed to keep the tax claims.  Those are supposed to go

6   back to Mr. Choudhri.  So the plan doesn't comply with

7   what's in the confidential settlement agreement.

8          There is no payment based on the testimony to any

9   of the creditors with rejected leases.  It was asked --

10  there's nothing.  So what happens to the rejected leases

11  that are deemed rejected if NBK is the bidder, and the plan

12  provides that they all are rejected?  They just get tossed

13  out in the window.

14         It's interesting.  There are only three classes

15  that can vote: NBK on its secured claim, the general

16  unsecured creditors of which -- the way NBK has drafted it -

17  - they have 90 percent of it because they've excluded

18  2425WL, and the trade creditors.  That's it.  That's -- two

19  of the three classes are controlled by NBK.  Again, you go

20  back to what Mr. Burks's argument.  That seems to be a real

21  problem.  Was this proposed in good faith?

22         And I'm going to go back and just tie in a little

23  bit into what Mr. Burks was talking about as far as the

24  claims against NBK.

25         The other thing I found interesting is that Mr.

1    Murray did not get any damage models from either Mr.

2    Alexander or Mr. Wetwiska, specifically Mr. Alexander.  So I

3    didn't get any.  I don't know.  He never asked him for any.

4    He never got far enough into his investigation to determine

5    that.

6          At some point, if Mr. Alexander really is the

7    expert that he appears to b, the question should've been

8    asked by Mr. Murray to him, "What do you think we could

9    recover on this?"  He didn't make any effort to ask that

10   question.  Never probed.  Never even went into talking about

11   it.

12         And that's not an issue of Mr. Choudhri.  That's

13   an issue of a gentleman who was one of the two people

14   nominated to be president of the State Bar of Texas last

15   year who has the largest lender liability judgment in the

16   last 10 years who said this is a good claim, but he never

17   bothered to ask, "How much do you think you could recover on

18   it?"  That's surprising to me.

19         And Your Honor, I'll just conclude again with the

20   idea whether you estimate their claims or not, there is a

21   huge issue about what are the value of the claims against

22   NBK?  Thank you.

23         THE COURT:  All right.  Thank you.  All right.

24   Mr. Shannon, since the trustees had their -- the people

25   appointed the figure of the trustee, do you want to say

1   anything in response?  Then I'll go back to Mr. Troop, and

2   then I think we're done.

3          MR. SHANNON:  Your Honor, I'm just going to

4   reiterate that the trustee does support confirmation.  I

5   believe that the evidence both yesterday and today confirmed

6   that the trustee engaged in an investigation that was

7   serious, that was focused, and that was determined to make

8   an evaluation.  That's what he's done here.

9          As far as the particular -- you know, the

10  particular requirements of confirmation, I'm going to leave

11  that to NBK.  It's their plan.  But I do just want to say

12  that for the record.

13         THE COURT:  Thank you.

14         All right.  Mr. Troop.

15         MR. TROOP:  Thank you, Your Honor.  Your Honor, I

16  think that this case feels as though it has had a life that

17  has extended beyond its many months before you, and that is

18  particularly true with regard to NBK in this matter.

19         This Chapter 11 case is the result of -- and the

20  evidence clearly shows this -- repeated efforts by the

21  debtor and its principals to get this property for less and

22  less and less than what they promised they would pay back on

23  the loan.

24         And we're here, Your Honor, because Chapter 11 --

25  or had you converted the case at that point, Chapter 7 --

1    would've provided a pathway to an end.  And that's what this

2    plan does, and it does it fairly for this all the reasons

3    that we've discussed.

4           Your Honor, when you evaluate the issues that have

5    been raised, for example, about the NBK claim -- and the

6    claims against NBK.  And Your Honor, I thought about raising

7    my hand and saying it's huge, but it seemed a little too

8    theatric.

9           But what we know from a factual matter is that the

10   person who thinks they are the most valuable offered

11   $700,000 for them, not even two full business days before

12   the confirmation hearing was about to begin.  And the

13   trustee told you he evaluated that amount against what's

14   here for the benefit of creditors and the estate, and

15   concluded that this was a better deal.

16          Talk about it in 9019 terms, right.  It was within

17   the range of appropriate settlements, although the real

18   question is ultimately was it in the best interests of the

19   estate, and the trustee concluded that was true.  And if I

20   heard his testimony correctly, it's because he looked at the

21   facts that were alleged, and he was told, and he said,

22   "Ultimately, I find them -- some of them may be okay, but

23   overall -- not credible.  Not really strong claims."  Those

24   are factual claims.  You could create a damage model that

25   could say the claims are worth $1 billion.

 1          But that's not the question.  The question is

 2    whether the claims are likely to return something to the

 3    estate.  This plan does, and those claims have to be based

 4    on facts.  The trustee did his job to confirm whether he

 5    thought there were facts to do that.

 6          And, Your Honor, this case needs to come to a

 7    close.  And I don't want to be -- you've got our

 8    confirmation brief.  You'll see every element of 1129 laid

 9    out clearly there to the extent not addressed here.  But

10    there was this impassioned plea that somehow proof of claim

11    number seven that only has a deed of trust attached to it

12    should be given some more weight, and the fact that they

13    didn't attach a note to it, well, it shouldn't mean all that

14    much.

15          But just look at the chronology here.  That deed

16    of trust was allegedly executed in 2018.  Didn't get

17    notarized until 2021 and recorded later at a time when, you

18    know from the evidence before you, the debtor was in

19    default, and NBK was pursuing its rights.

20          And what you also know simply from looking at the

21    document was Mr. Choudhri gave a lien to himself.  Your

22    Honor, it would be perfectly appropriate for you to discount

23    any validity to that claim in addition to everything else

24    raised by the trustee in his objections in his complaints.

25          Your Honor, there's also no dispute there's no

1   value here beyond the first lien.  So anything that anyone

2   gets under this plan is in effect -- you know, gifting is

3   out of vogue, right?  But it's effectively a gift from the

4   secured creditor.  And the secured creditor's determination

5   about how it was going to take its value, not the estate's

6   value, its value -- and spread it out amongst creditors was

7   to say that trade creditors -- like 260,000 of them --

8   dollars' worth of them, Your Honor -- who may do work for

9   the building in the future, they should get the least amount

10  of hurt.

11          The next group of people who should get the least

12  amount of hurt but a completely contingent recovery because

13  it's completely contingent on litigation results should be

14  those third parties who weren't trade creditors who extended

15  credit to the debtor.

16          And then finally, you've got the people who caused

17  this problem who acted inappropriately.  Again, I'll go back

18  to proof of claim number seven.  Look at its timing.  Look

19  at the party giving himself a benefit to put himself into

20  the capital structure on a secured basis for an obligation I

21  note -- although the document -- I meant are not relying on

22  the document itself, the settlement statement.  But he

23  described -- Mr. Choudhri described has a credit from the

24  seller -- not a loan from the seller.  A credit.  A credit

25  against the purchase price.  Comes back three years later

1    and decides, "I'm going to but a lien on the property," and

2    you look at the loan documents, Your Honor, and there's no

3    permitted lien.  There's no permitted note.  There's no

4    permitted encumbrance for 2425WL.

5           So when the trustee described it as fake, I think

6    there is a strong amount of evidence to support that

7    description.  And so the question at the end of the day

8    becomes because the plan satisfies all the requirements of

9    1129, should there nonetheless be additional delay to allow

10   parties to further allow this property to deteriorate -- you

11   heard evidence about that on Monday -- to further hamstring

12   a transfer of the property on the hope and the prayer of

13   claims that the trustee evaluated independently, that the

14   party is trying to prove up -- at the very least created a

15   bona fide dispute -- and that you found really basically

16   lacked no merit -- lack of merit.  I'm sorry, Your Honor.

17   Double negative there.  Lack of merit.

18          On those conditions, Your Honor, not like other

19   judges -- I'm sorry -- similar to how other judges have

20   ruled in this district from time to time, enough is enough.

21   It is time to permit this process to end, the plan to be

22   confirmed.

23          And the last thing I will just underscore, again,

24   Your Honor.  If in fact Mr. Choudhri -- two things, Your

25   Honor.  Go back and look at the confidential settlement

1    agreement.  It does not say what Mr. Baker says.  It says

2    (indiscernible) liquidated damages.  It is a misreading at

3    best of that agreement.

4              But here, Your Honor, it is time to bring this

5    case to an end.  It is time for it -- it doesn't violate

6    (indiscernible).  It doesn't extend exculpation provision

7    protections and non-fiduciaries or (indiscernible) doesn't

8    even really talk about the gatekeeping function other than

9    to say in that case, it was a fair implementation tool for

10   the issue that was before the Court, whether the directors

11   of the liquidating trust were to get some protection.  But

12   here, it's a fairer limitation of a release of estate claims

13   and (indiscernible) estate claims.

14             Your Honor, I will just end with two other things.

15   The first is that notwithstanding some of the

16   contentiousness that you have seen in the courtroom over the

17   last few days, I really want to thank in particular Mr.

18   Burks for his time and his efforts over the last few days to

19   try to address those things that we could do consensually.

20             And then as he said, and we echo, I can't believe

21   it's a federal holiday, but we thank you all for your time

22   and effort here.  And obviously I hope it comes to a

23   particular conclusion, but I also thank you regardless of

24   the conclusion.  Thank you.

25             THE COURT:  Thank you.

```
 1              All right.  So I'll just make a couple of comments
 2    on the record.  First of all, the air conditioning does seem
 3    to be working after all this time at this point in time,
 4    which I'm very happy for.
 5              I want to address not really the merits of the
 6    case, but I want to make some comments to Mr. Choudhri.  For
 7    whatever reason, he believes that this process has been
 8    unfair, and I would disagree very, very highly; that he may
 9    not like the results, he may not like my determination of
10    the facts, but I think that he's been given every
11    opportunity to present his evidence and present his case,
12    and if he claims due process has not been met in this case,
13    I disagree with him very, very highly.
14              I also disagree very highly with him that we
15    haven't done what we need to do to evaluate claims in this
16    case.  The trustee's testimony is compelling as to his
17    evaluation of the claims.  It also lines up with my limited
18    evaluation of the claims based on what's before me in the
19    evidence that's before me.
20              A lot of lawyers tell me that their clients have
21    great claims.  When I have lawyers tell me they have great
22    claims and I don't hear any sort of evidence that tells me
23    why they have great claims, I start to wonder.  All right.
24              I think the process has been fair and open.  I
25    wish Mr. Choudhri the best of luck depending upon what I do.
```

1   But quite clearly, this is a case that is now over 18 months

2   old, and I agree that it is a case that needs to come to a

3   conclusion one way or the other.

4          I am hopeful, Mr. Murray, that I will get some

5   findings of fact and conclusions of law and an order either

6   confirming the plan or not to you by the time that you have

7   your auction.  That's the goal.  All right.

8          It's just been a really, really bad week.  I mean,

9   I will say that I'm not typically as busy as I've been this

10  week.  I have a huge panel tomorrow that's 61 pages.  I

11  contested confirmation hearings in the afternoon.  And I

12  have a Galveston docket on Friday.  So I will work as I can

13  and as I'm allowed to given what limited time I have, but I

14  promise you that I'll get something to you that you can look

15  at, agree with, disagree, and appeal as you feel necessary.

16         All right.  Thank you.  We're adjourned today.

17         CLERK:  All rise.

18         (Whereupon these proceedings were concluded at

19  4:54 PM)

20

21

22

23

24

25

```
 1                C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4     transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8     Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date  June 25, 2024
```