George M. Lee

```
 1                CAUSE NO. 19-DCV-262281

 2   AZHAR M. CHAUDHARY,           ) IN THE DISTRICT COURT OF
              Plaintiff,           )
 3                                 )
     v.                            ) FORT BEND  COUNTY, TEXAS
 4                                 )
     GEORGE M. LEE, THOMAS HUNT,   )
 5   SERENA YU, ROBBY FRANK,       )
              Defendants.          ) 458TH  JUDICIAL DISTRICT
 6

 7


 8   *******************************************************

 9                    ORAL DEPOSITION OF

10                     GEORGE M. LEE

11                    August 12, 2022

12   *******************************************************

13

14        ORAL DEPOSITION OF GEORGE M. LEE, produced as a
     witness at the instance of the Plaintiff and duly sworn,
15   was taken in the above-styled and numbered cause on
     Friday, August 12, 2022, from 1:54 p.m. to 3:07 p.m.,
16   before JAMES M. PLAIR, Certified Shorthand Reporter in and
     for the State of Texas, reported by computerized stenotype
17   machine at the offices of THOMAS L. HUNT & ASSOCIATES,
     P.C., 4635 Southwest Freeway, Suite 900, Houston, Texas
18   77027, pursuant to the Texas Rules of Civil Procedure and
     the provisions stated on the record or attached hereto.
19
     Job No. 57593
20

21

22

23

24

25
```

**George M. Lee**

2

```
 1                          APPEARANCES

 2

 3   REPRESENTING PLAINTIFF:

 4   Mr. Sanjay R. Chadha
     ATTORNEY AT LAW
 5   6575 West Loop South, Suite 500
     Bellaire, Texas 77401
 6   866.818.2328 Telephone
     866.620.8194 Fax
 7   SRChadha@ReachaLaw.com Email

 8
     REPRESENTING DEFENDANTS PRO SE, GEORGE M. LEE AND ROBBY
 9   FRANK:

10   Mr. Thomas L. Hunt
     THOMAS L. HUNT & ASSOCIATES, P.C.
11   4635 Southwest Freeway, Suite 900
     Houston, Texas 77027
12   713.977.3447 Telephone
     832.201.9117 Fax
13   Tom@ThomasLHuntAssociates.com Email

14
     REPRESENTING DEFENDANT SERENA YU:
15
     Mr. J. Steven Stewart
16   LAW OFFICES OF J. STEVEN STEWART
     4635 Southwest Freeway, Suite 900
17   Houston, Texas 77027
     713.977.3447 Telephone
18   832.201.9117 Fax
     JSS@JStevenStewart.com Email
19

20   THE COURT REPORTER:

21   Mr. James Plair

22

23

24

25
```

George M. Lee

3

1                          INDEX

2                                              PAGE

3

4   TESTIMONY OF GEORGE M. LEE

5   Examination by Mr. Chadha                    4

6

7   Changes and Signature                       51

8   Reporter's Certificate                      53

9   Further Certification                       55

10

11

12

13                     EXHIBITS

14

15             (None offered)

16

17

18

19

20

21

22

23

24

25

George M. Lee

4

1          (Witness is sworn)

2          THE REPORTER:  Thank you.  You may lower

3  your hand and Mr. Sanjay can now begin with the

4  examination.

5          MR. CHADHA:  Thank you.

6                GEORGE M. LEE,

7  having first been duly sworn, was examined and testified

8  as follows:

9                EXAMINATION

10 BY MR. CHADHA:

11     Q.   Mr. Lee, would you please state your name again

12 for the record.

13     A.   George M. Lee, L-E-E.

14     Q.   And you have been sitting here through many of

15 these depositions.  So you know how it's going to go.

16     A.   Yes.

17     Q.   I would ask questions and you will respond.

18 Your counsel here will object to whatever he thinks is

19 appropriate, and unless he specifically instructs you to

20 not answer a question, you are to respond to that question

21 and the objection will go before the judge.

22     A.   Yes.

23     Q.   So let me start with some background on you,

24 Mr. Lee.

25                Tell me a little bit about your academic

George M. Lee

5

1   background.

2            What's your educational background?

3   A.   I have a master degree --

4   Q.   Okay.

5   A.   -- from Lehigh University in Civil Engineering.

6   Q.   In what engineering?

7   A.   Civil Engineering.

8   Q.   Civil Engineering.  Okay.

9            And anything else after that or that was --

10  A.   That's -- that's about it.

11  Q.   That's -- Okay.

12           And after your education, did you work as a

13  civil engineer somewhere?

14  A.   Yes.

15  Q.   Where was that?

16  A.   Bechtel --

17  Q.   Bechtel?

18  A.   -- Corporation.

19  Q.   How long ago was that?

20  A.   Let's see.  The year 1983.

21  Q.   And then after Bechtel, where did you go next?

22  A.   I worked for myself in the real estate business.

23  Q.   Okay.

24           Did you also work for a bank at any point

25  in time?

George M. Lee

6

1      A.   No.

2      Q.   So you went to work for Bechtel and then

3 basically started your own company?

4      A.   Yes.

5      Q.   And when you say "real estate business," what do

6 you mean by that?

7      A.   We develop shopping centers; we own convenience

8 store; lease to people.

9      Q.   Okay.

10          What else?

11     A.   That's basically it.

12     Q.   Okay.

13          And you have multiple companies or just one

14 company?

15     A.   We have a lot of joint venture, no multiple

16 companies.

17     Q.   So in these joint ventures, your -- your company

18 is a member or venturer in those companies or are you

19 individually a participant in those companies?

20     A.   It depends on all kind of things.

21     Q.   All right.

22          So then it's more than one company.

23          You have more than one company then.

24          Right?

25     A.   I don't.

George M. Lee

7

1    Q.   You don't.  Okay.

2              Or what is the name of the company that you

3    have?

4    A.   Japage Partnership.

5    Q.   So outside of Japage, or Japage Partnership, you

6    don't own any other companies?

7    A.   I don't remember.  I don't have any company.

8    Q.   Okay.

9              And when I say, you know, you "own any

10   other" company, are you a member or manager as George Lee

11   of other companies?

12   A.   I have a joint venture.

13             That's as far as I know.  Joint with other

14   people but not my -- by myself.

15   Q.   Okay.

16             So the joint venture is between Japage and

17   other companies or --

18   A.   It depends.

19   Q.   Okay.

20   A.   Sometimes Japage, sometimes myself.

21   Q.   So when it is you, individually, uh, you're

22   saying you don't see that as an ownership in that company?

23             Is that what you're saying?

24   A.   It's a joint venture.  It's not a company.

25   Q.   And those JVs, what is their -- Do they have a

George M. Lee

8

1  corporate form, independent corporate form at all?

2      A.   It's a joint venture.

3      Q.   Okay.

4           And outside of real estate development that

5  you talked about; building shopping centers, convenience

6  stores, uhm, are you also involved in money lending

7  business?

8      A.   Yes.  I loan people money.

9      Q.   And that's also as Japage -- Japage?

10     A.   No, they don't do it.

11     Q.   So tell me a little bit, a little bit about your

12 money lending.

13     A.   People that needs money, I put a first lien on

14 the property, they pay my interest and here they get a new

15 loan and pay me off.

16     Q.   And you compete with banks or you serve

17 different clientele?

18     A.   I don't compete with anybody.  Whomever needs

19 the money come over to me.

20     Q.   Okay.

21     A.   I evaluate it, if they are good enough for me to

22 loan the money.

23     Q.   All right.

24           And how do you do that?

25     A.   Just by myself.

George M. Lee

9

1    Q.   Okay.

2         Can you describe the process a little bit

3   on how you do that evaluation.

4    A.   Take a look at the property value, trying to

5   make sure the character is, we may say, decent.  I make

6   mistake, okay.  Like this loan, I made a mistake, sorry.

7   So if I think the borrower is a good one, they going to

8   pay me.  Personal judgment.

9    Q.   All right.

10        Are you familiar with the term "hard money

11  lender"?

12   A.   Whatever the name is, I don't -- I just loan

13  people money.

14   Q.   But does that term mean something to you, "hard

15  money lender"?

16   A.   Probably somebody say.  I don't know the

17  definition of "hard money loan".  There is no definition.

18   Q.   Okay.  Okay.

19        You have been characterized as a hard money

20  lender a few times in different documents and --

21   A.   Okay.

22   Q.   -- so, you know, I just wanted to see what --

23  what your understanding of that term is.

24        What does that mean to you?

25   A.   It doesn't mean anything.  They can call

**George M. Lee**

10

1  anything I want it.  I just charge interest rate.

2            I told the guy if he's willing to pay,

3  that's fine.  There is no definition of what means a "hard

4  money loan".

5      Q.  Okay.

6            And at any given time, how many properties

7  do you lend money on?

8      A.  It depends on the time.  Sometimes two, three,

9  sometimes five, eight and ten.  Then they pay me off.  You

10  never know.

11      Q.  So at present time, your portfolio of properties

12  on which you have lent money is how big?

13      A.  It's -- I don't -- Estimate it, I have probably

14  ten loans.

15      Q.  Okay.

16            So any rough idea on how many; 10s, 20s,

17  15, 50, 100?

18      A.  About what?

19      Q.  Properties.

20      A.  About ten properties.

21      Q.  Okay.

22      A.  Each of them one property.

23            THE REPORTER:  Each of them is what?

24            THE WITNESS:  Is one property, one loan.

25      Q.  (BY MR. CHADHA) Is it a certain dollar amount

**George M. Lee**

1  that you lend at or below?  You know, you don't lend

2  people $10,000 or would you lend $10,000?

3      A.   It's between 200,000 to 3, 4 million.

4      Q.   And how do people find you?

5      A.   Your question again?

6      Q.   How do people find you?

7           How do -- how do your clients find you?

8      A.   Word of the mouth.

9      Q.   And you maintain a website or some other

10 presence on the Internet?

11     A.   No.

12     Q.   And these people that find you from word of the

13 mouth, that's from referral from other clients or other

14 professionals?

15          MR. HUNT:  Object to form.

16          THE WITNESS:  From other clients.

17     Q.   (BY MR. CHADHA) All right.

18          You get repeat clients?

19     A.   Yes.

20     Q.   How often does that happen?

21     A.   Quite a few times.

22     Q.   And usually what is the term of the loan that

23 you lend?

24     A.   Usually it's 3 points plus 12 percent for one

25 year.

1    Q.   Okay.  I'm sorry.

2              Can you repeat the first part?

3    A.   Three points --

4    Q.   Three points.

5    A.   -- 12 percent for one year.

6    Q.   Okay.  All right.

7              What's the longest term of loan that you

8  do?

9    A.   It's always one year.

10   Q.   Always one year.

11             And when you do lend this money, is it done

12 in the traditional promissory note or do you use some

13 other format?

14   A.   Traditional promissory note.

15   Q.   And do you draw your own documents or you have

16 somebody do that for you?

17   A.   We do it in our -- in our office.

18   Q.   Do you use a law firm for that?

19   A.   No.

20   Q.   And when you -- In these documents, do you

21 generally assign yourself as the trustee?

22   A.   I don't remember.  Whatever the trustee, I don't

23 remember.  Usually, it's somebody else.  Sometimes I

24 think -- I don't know the details about this.

25   Q.   But you draw those documents or somebody in the

**George M. Lee**

1 office does that?

2     A.   I don't draw myself.  It's my office manager.

3     Q.   Okay.

4     A.   He just copy from somebody else.

5     Q.   And those trustees, are they your employees as

6 well?

7     A.   Usually, yeah, probably it's my trustee.

8     Q.   And how much of your business do you do in cash?

9     A.   No cash.

10     Q.   No cash.

11        You don't get any cash from convenience

12 stores?  You don't get any cash from your other real

13 estate holdings?

14     A.   No.

15        We don't accept the cash.  Only check.

16     Q.   So the convenience stores don't generate any

17 cash?

18     A.   Convenience store is the real estate we lease to

19 the people.  We have nothing to do with the convenience

20 store operations.

21     Q.   Okay.  Thank you for clarifying that.

22        So you don't operate those stores.

23        You lease them to other operators who run

24 the store?

25     A.   Yes.

George M. Lee

1          We are in the real estate business.

2     Q.   Okay.

3          So in your bank transactions, we will not

4 see any cash deposits or withdrawals in general?

5     A.   We do not accept the cash.

6     Q.   Okay.  Okay.

7          So in your bank deposits, we will not see

8 any cash?

9     A.   I already told you the answer.

10    Q.   Do you know Mr. Hussain Ali?

11    A.   I don't know who's --

12    Q.   You don't know?

13    A.   -- Hussain.

14    Q.   Hussain Ali?

15    A.   Hussain Ali.  He is -- That's a lot of name.  He

16 is the Mike Ali or the borrower?

17    Q.   Well, maybe also go by the name "Mike", "Mike

18 Ali".

19    A.   Oh.  Mike Ali, I know.  I know him.

20    Q.   How do you know him?

21    A.   Uhm, he is a loan broker.  He get a loan from --

22 arrange the loan for other people.

23    Q.   How long have you known him?

24    A.   I never done business with him recently.  About

25 six, seven years.  Mr. -- This is -- The borrower name is

1  also "Ali".

2         That's one of the deals he brought to us.

3      Q.   And how did you meet him, Mr. Hussain Ali, for

4  the first time?

5      A.   How do I know him?

6      Q.   How did you meet him?  How did you meet him, for

7  the first time?

8      A.   He called me.  He say he got some people that

9  wants the money.  He is the loan broker.  He can charge a

10  few dollars from the borrower.

11      Q.   All right.

12         But I guess the -- the question I am trying

13  to get to is:  How did you get introduced to him?  Did he

14  just show up to you, for the first time?

15      A.   He referred by somebody else.  We are doing the

16  loan.  He called in and he got a client who wants to

17  borrow money.

18      Q.   So who referred him to you?  Who referred

19  Hussain Ali to you?

20      A.   I do not know.

21         He just called me, to our office.  He heard

22  that we were doing that kind of business.

23      Q.   Well, what other loan brokers do you work with

24  other than Mr. Hussain Ali?

25      A.   I don't have anyone.  He's the only one.

**George M. Lee**

16

1  Usually, we don't like loan brokers, to be honest.

2      Q.   So Mr. Mike Ali, or Hussain Ali, he is the only

3  loan broker that you have done business with.

4           Is that --

5      A.   Yes, as far as I can recall.

6      Q.   Okay.

7           And all other loans that you have, they are

8  direct with the person borrowing the money.

9           There is no broker involved?

10     A.   Yes.

11     Q.   Okay.

12          And when was the last time you saw Mr. Ali?

13     A.   Mike Ali?

14     Q.   Yes.

15     A.   Three or four years ago.

16     Q.   And you have not seen him since?

17     A.   No.

18     Q.   All right.

19          And how many total loan transactions have

20  you done with Mr. Ali?

21     A.   Probably two or three.

22     Q.   And was that before the loan with Mr. Chaudhary

23  or after?

24     A.   Since before this loan.

25     Q.   All right.

1          And you have not done any transactions with

2  him since?

3      A.   No transaction with him.

4      Q.   Now, let's talk a little bit about this

5  transaction that is the subject of this litigation.

6          Uhm, how did that transaction start?

7      A.   Ali, Mike Ali, as far as I can remember, said

8  they got a good borrower, has a property, wants to borrow

9  some money.  I told I want a first lien, so he brought in

10  a loan and we did it.

11      Q.   Okay.

12          Do you remember how much was that amount of

13  that money?

14      A.   It's a few years ago.  Originally, I think it's

15  270,000, then increased to 400,000 because I think --

16  What's the borrower's name?  Ali?  Is that his name?  The

17  borrower's name?

18      Q.   Are you asking me?

19      A.   Yeah.  I don't -- I forgot his name.

20      Q.   Oh.  Okay.

21      A.   His name is --

22      Q.   Well, I think, at this point in the subject

23  transaction, your dispute is with Azhar Chaudhary.

24      A.   Chaudhary.  Okay.

25          From now Mr. Chaudhary needed more money,

George M. Lee

18

1   so we change from 270,000 to 400,000.

2       Q.   There was an original loan for

3   200-something-thousand dollars?

4       A.   That, I don't remember the details.

5       Q.   Okay.

6            And then there was a second note?

7       A.   I only remember we have a $400,000 first lien on

8   the property, in additional to 270.  We convert it into a

9   one note, a first Deed of Trust, and he is the owner.

10      Q.   Okay.

11           Now, do you remember at one point in time

12  this property was titled in your name?

13      A.   From the very beginning, it's my name.

14           He has option to buy, but he defaulted the

15  option to buy because he short of the money.

16           He came into my office two or three times,

17  asked me additional funding on top of the 270.  I

18  remember.

19           And he swore to me he's going to pay, have

20  no problem.  And I convert that one into 400,000 and also

21  I think I deed the property back to him.

22           I'm very nice with him because he's a very

23  good, sweet person.  Okay?  He's a -- He's an attorney.

24  He can abide by the law.  I shouldn't have any problem

25  with him and I -- I did him a favor.

George M. Lee

19

1    Q.   Okay.  So I want to make sure I understand what
2    you just said.
3                 You said there was an option contract.  He
4    had an option.  That property was in your name.
5                 He defaulted?
6    A.   Yes.
7    Q.   Okay.
8                 And so you transferred the property in his
9    name?
10   A.   Because he need additional fund.  He's -- he's a
11   little bit in financial trouble.
12   Q.   Okay.
13                So he defaulted on the original note so you
14   lent him more money and transferred the property in his
15   name?
16   A.   Yes, as a favor.
17   Q.   Okay.
18                And what did he give you in return?
19   A.   First lien on the property --
20   Q.   Which you already had?
21   A.   -- personal guarantee.
22   Q.   I'm going to park this transaction for a minute
23   and go back to your background.
24                Uhm, something -- I missed something in the
25   timeline.  I just want to make sure I get the timeline

ORIGINAL

George M. Lee

20

1    part of it.

2              I think you said you worked in Bechtel up

3    to 1986?

4         A.   1983.

5         Q.   '83.  Okay.  Thank you.  1983.

6              And then, thereafter, you got into the real

7    estate business?

8         A.   Yes.

9         Q.   And -- and you have been doing that since.

10             Have you been lending money since, the same

11   time?

12             When did you start the money lending part?

13        A.   I don't remember.  Ten years ago, probably.

14        Q.   Okay.  Ten years ago.

15             So that would make it somewhere around

16   2010?

17        A.   I don't recall exactly.  About '10, '15.  I

18   don't remember.

19        Q.   Okay.

20        A.   But, yeah, recently.

21        Q.   Okay.

22             And you have been quite successful in the

23   real estate business?

24        A.   Yep, pretty successful.

25             If you are honest, you pay your bill, you

George M. Lee

21

1  will be successful.

2      Q.    And you have been quite successful in your money

3  lending business also?

4      A.    Not all the time.

5            Like this case, I didn't get paid.  I got a

6  lawsuit.  It's not a good transaction.

7      Q.    Were there other cases where you didn't get

8  paid?

9      A.    It happened in one or two times.  I don't

10  remember, but it's not always good, but fairly good.

11     Q.    You still lend money?

12     A.    "You still" what?

13     Q.    Do you still lend money?

14     A.    Yes.

15     Q.    Okay.  So you continue to do it.

16            So it's done well enough for you to want to

17  continue to do it?

18     A.    Yes.

19     Q.    All right.

20            And how big portfolio any -- How many

21  properties at this point do you think you own?

22     A.    What's your question?

23     Q.    How many properties at this point do you own?

24     A.    I own?

25     Q.    Yeah.

George M. Lee

22

1          But through your companies or your joint

2   ventures.

3          MR. HUNT:  Object to the question based on

4   the form, relevance.

5          THE WITNESS:  I don't -- I don't remember.

6   Ten, fifteen.

7     Q.   (BY MR. CHADHA) So you don't have a good idea of

8   how many real estate properties you own?

9     A.   I do not own property.  I loan people money on

10   real estate.  I don't own, myself.

11     Q.   Okay.

12          So none of those properties are titled in

13   your name or your company's name.  They are owned by other

14   people.

15          You only have notes against them?

16     A.   Yes, that's exactly right.

17     Q.   And you said you gave -- I think we talked

18   earlier you said about maybe 10 to 15 loans currently that

19   you have outstanding?

20     A.   Outstanding, yes.  You are right.

21     Q.   And so, in that case, would it be a fair way of

22   characterizing that you are basically in the money lending

23   business only?  You don't own any properties from which

24   you --

25          MR. HUNT:  Object to the form.

George M. Lee

23

1    Q.   (BY MR. CHADHA) I misunderstood you earlier.   I

2  thought you owned real estate, but that wouldn't --

3                 MR. HUNT:  Object to the form.

4                 THE WITNESS:  Not right.

5    Q.   (BY MR. CHADHA) Not right.   Okay.

6                 Can you describe in your words what's your

7  main business.

8                 MR. HUNT:  Object to the form.

9                 THE WITNESS:  Main business is invest in

10  real estate with other people; real estate investment.

11    Q.   (BY MR. CHADHA) Okay.

12                 And when you say "invest", what do you mean

13  by that?

14    A.   Somebody has a project.  You put in the money.

15  They call it investment.

16    Q.   Okay.

17                 And other than lending them the money, what

18  other activity do you participate in?

19    A.   I invest into the project as equity planner.

20    Q.   Then you own the company when you have equity.

21    A.   You are --

22    Q.   What do you have equity in?

23    A.   You are part of the owner according to the joint

24  venture agreement.  You are the equity partner.

25    Q.   Okay.

1          And when you have equity in those joint
2  ventures, you don't see that as owning that venture?
3      A.   I don't see that.  What question are you --
4      Q.   Okay.
5          Holding that, a piece of that venture,
6  whatever you have equity in, you don't see that as
7  ownership of that joint venture?
8      A.   I think it's kind of an ownership.  It depends
9  on how you define it.
10     Q.   Okay.
11          How do you -- how do you see it?
12     A.   How I see it:  I'm one of the partners; I'm
13  putting in the equity; if they make a profit, I have a
14  share.
15     Q.   Okay.
16          And those ventures, they own the real
17  estate or they don't own the real estate either?
18     A.   They own the real estate.
19     Q.   Okay.
20          So then you are one of the equity owners on
21  various properties, pieces of real estates?
22     A.   You're right.
23     Q.   And so my question earlier was around how many
24  pieces of real estate are in your portfolio that you are a
25  equity owner of some kind.

**George M. Lee**

25

1     A.    If that's the case, I have got 30, 40 of them.

2     Q.    Thank you.

3           And in these equity ownership, you know,

4   usually how many participants are there?

5           Two to four?  You know, five to ten?

6     A.    Five to ten.  Five to ten.

7     Q.    Five to ten.  Okay.

8           And, generally, do you have a model or a

9   preference on that you want to own a certain percentage or

10  you own any -- any amount?

11          1 percent?  5 percent?

12    A.    Whatever amount.

13    Q.    Whatever amount.

14          There is no set mechanism that you use?

15    A.    No.

16    Q.    And that's essentially the business you have

17  been in since 1983?

18    A.    Yes.

19    Q.    Thank you.

20          THE REPORTER:  Since 19 --

21    Q.    (BY MR. CHADHA) About 40 years.

22    A.    1983.

23    Q.    Yeah, 1983.  Yeah, about 39 years.  That's a lot

24  of years.  Okay.

25          Now, outside of that business, is there any

ORIGINAL

George M. Lee

26

1  other business that you also own or operate?

2      A.   No.

3      Q.   Thank you.  All right.

4           So now, back to our transaction.  Thank you

5  for allowing me to do so and make sure I have it entirely

6  in my head on that.

7           On this transaction, it started with a loan

8  for 200-something, and then it went to a larger amount,

9  $400,000.  And in -- Along the way, first, you had the

10 title in your name and Mr. Chaudhary had an option on the

11 property.  And then you said you transferred the title to

12 his name.

13          That's a correct capture of what you said

14 earlier?

15     A.   Yes.

16     Q.   Okay.

17          And once you transferred the title to his

18 name, what happened after that?

19     A.   I have the first lien Deed of Trust.  He paid

20 one or two months; I don't remember.  And he said he has a

21 financial problem, he cannot pay anymore.

22          I remember, I talked to him many times.

23 He's an attorney himself.  I told him you need to arrange

24 your financing or do something.  He never paid a penny

25 until I post the foreclosure.

ORIGINAL

George M. Lee

27

1     Q.    Okay.

2     A.    Then he's starting the lawsuit and all kind of

3  games.

4     Q.    Now, when you own the property for the period

5  when you owned it, do you remember how long you owned it

6  for?

7     A.    I don't remember.  One or two -- One year or

8  something.  I don't remember.  I don't remember.

9     Q.    Is it more than a year or less than a year?

10             MR. HUNT:  Object to the form.

11             THE WITNESS:  I don't remember.

12    Q.    (BY MR. CHADHA) So you have no recollection of

13  how long you owned that property before you transferred

14  it, the title, back to his name?

15             MR. HUNT:  Object to the form.

16             THE WITNESS:  It's one year or something

17  like that, and here he cannot pay.  He came into my

18  office, telling me he's short of the money; he needs to

19  borrow a little more; the value of the real estate is

20  higher; he only has 270,000; he has no money.

21             Otherwise I told him, "Why not you just buy

22  the property?  Worse more, you just buy it.  It's 270,000.

23  Just do it yourself."  He has no money; he's got lawsuit;

24  he's got a problem.  I met him one or two -- I think two

25  or three times.

George M. Lee

28

1    Q.   (BY MR. CHADHA) Okay.  All right.

2            So after he had trouble with the payment,

3  you said, you foreclosed?

4    A.   As far as I remember, he only paid one or two

5  times because he's in financial trouble.  I thought the

6  $125,000 would help him to cure it.  He said he will, but

7  probably he has some other problem.  I don't know the

8  details.

9    Q.   Okay.

10           Have you done foreclosures before?

11   A.   Yes.

12   Q.   Roughly, how many?

13   A.   Three or four times.

14   Q.   And what did you do in those foreclosures?

15   A.   People don't pay; I close the book, foreclosure;

16  and open for bid.  Hopefully, somebody can buy it and get

17  my money back.

18   Q.   Okay.

19           So in those three to four foreclosures that

20  you have done, at these foreclosures you credit bid on the

21  property?

22   A.   Yes.

23   Q.   You did not do that on this property.

24   A.   Your question again?

25   Q.   You did not credit bid on this property in this

George M. Lee

29

1  foreclosure?

2      A.   I made a deal with my fiancée.  She was going to

3  try to make some money.  I didn't get involved.  I just

4  told her, "You can make some money.  Somebody defaulted."

5      Q.   Okay.

6           What exactly did you tell her at that time?

7      A.   I said, "There is a property.  The guy is not

8  paying.  I am going to foreclose.  The loan is 400,000."

9  She said it might be a little bit more, she can make a few

10 dollars.  I said, "Okay.  I'll loan you the money.  You do

11 it.  Anything more than 400,000, you get it."

12     Q.   Okay.  So anything more than $400,000, she gets.

13          And -- and we are talking about Ms. Yu

14 here; Serena.

15          Right?

16     A.   Yes.

17          That's our verbal agreement at that time.

18     Q.   And how did you formalize that loan agreement

19 with her?

20     A.   She's my fiancée.  I don't need a formal, just a

21 verbal agreement.  She wants to make money, period.  She

22 told me she only makes money.  If we lost money, that's my

23 deal.

24     Q.   Okay.

25     A.   That's called a sweetheart deal.

**George M. Lee**

30

1    Q.   So in this case, you choose not to credit bid
2  and ask your fiancée to bid on it and you loaned her the
3  money to bid on the property?
4    A.   Yes.
5            Because she wants to make money.  I don't.
6    Q.   Okay.
7            And how did you loan that money?  I know
8  you didn't formalize it, but how did that money --
9  transaction happen?
10   A.   I went up to Wells Fargo, get a cashier's check;
11 told her that's on her behalf; you bid on it; you return
12 the money back to me, $400,000.  Anything more than that,
13 it's yours.
14   Q.   And you give that check to Ms. Yu?
15   A.   Yes.
16   Q.   Okay.
17           Was that at your office or at your home?
18   A.   Probably home, because I see her every day.
19   Q.   All right.
20           And then what happened?
21   A.   Apparently, she bid it.  I think it's 400,000.
22 She got the property.  She's trying to sell, make some
23 money until Mr. Chaudhary starting a lawsuit.  She got
24 super upset.
25   Q.   Now, the lawsuit was already there before the

George M. Lee

31

1   auction happened.

2        A.   I don't think so.

3             What do you mean by that?

4        Q.   The lawsuit was filed before the auction took

5   place.

6        A.   Option?

7        Q.   Auction, the foreclosure.  I'm sorry.

8        A.   He never paid a payment.  Why he filed a

9   lawsuit?  I don't understand.  I don't think so.

10       Q.   Okay.

11            So you don't think the lawsuit was in place

12  when you foreclosed on the property?

13       A.   I post foreclosure.  Everything is legal.

14  Somebody bid it; that's Serena.  She wants to make money.

15  I don't know the details about it.  That depends on my

16  attorney.  But Mr. Chaudhary did not pay the payment.

17       Q.   My question was simple.  I mean, that wasn't my

18  question.

19            My question was:  The lawsuit was -- Did

20  you know that the lawsuit had already been filed when you

21  foreclosed on the property?

22       A.   No, I do not know at all.

23       Q.   Okay.

24            So you did not hire a lawyer to go defend

25  yourself before you foreclosed on the property?

George M. Lee

32

1       A.    There is no lawsuit, as far as I know.  That's
2  the reason we post the foreclosure.
3       Q.    So I can make sure that I understand your
4  answer:  You -- As best as you know, you did not hire
5  anyone to go defend yourself in a lawsuit before the
6  foreclosure occurred?
7       A.    I do not remember the details.
8       Q.    Okay.
9       A.    It is many years ago.
10            Only remember, Mr. Chaudhary did not pay
11  his payment, so he had foreclosed.
12      Q.    But you don't remember when this lawsuit was
13  filed.  Okay.
14            And so let's talk about that foreclosure
15  some more.
16            Uhm, who bid for the property?
17      A.    I do not know anything about it.
18            Ms. Yu bid on it and she wants the
19  property.  I'm not involved.
20      Q.    All right.
21            So you did not talk to Robby Frank about
22  bidding on that property?
23      A.    Ali's friends?
24      Q.    Robby Frank.
25      A.    She's representing her.  Whatever they want to

George M. Lee

33

1  do, they can do themselves.

2       Q.   Is Mr. Frank your employee?

3       A.   Yes.

4       Q.   How long has he been your employee?

5       A.   Fifteen years.

6       Q.   And Ms. Yu instructed Mr. Frank to go bid on the

7  property?

8       A.   I do not the details.

9       Q.   You don't know the details?

10      A.   That's none of my business.

11      Q.   But you did not give Mr. Frank any instruction?

12      A.   No.

13           Because money is not from me.

14      Q.   Okay.

15      A.   The bidder is Ms. Yu.

16      Q.   Okay.

17           And you did not give Mr. Frank the check,

18  the cashier's check?

19      A.   I gave -- As far as I remember, I gave Ms. Yu a

20  loan.  I loaned her the money.

21      Q.   So you loaned Ms. Yu the money and somebody bid

22  on the property at the foreclosure.

23           And did you get paid?

24      A.   Who get paid?

25      Q.   Did you get paid, after the foreclosure?

**George M. Lee**

34

1     A.   There is a lawsuit from Mr. Chaudhary.

2           We have major problem between two of us.

3 Finally, I get paid by her to deed the property back to

4 me.  She is very upset about what's happening.

5           MR. CHADHA:  I want to mark that as

6 nonresponsive.

7     Q.   (BY MR. CHADHA) My question to you, I'll repeat

8 it again, is:  After the foreclosure, did you get paid?

9     A.   Eventually, I get paid back.

10    Q.   But you did not get paid when the foreclosure

11 occurred?

12    A.   Not -- No, I didn't get.

13    Q.   So when Ms. Yu bought the property at the

14 foreclosure and gave a check, what happened to that check?

15          Where did it go?

16    A.   Well, the check goes to the trustee and they

17 deed it according to law.

18          I don't know the details, but it's,

19 according to my attorney, whomever bid on it get a cashier

20 check and counter trust the deed and that's typical deal.

21 I'm not an attorney.  I don't get involved, but that's

22 what happened.

23    Q.   Okay.

24          But you didn't get the money at that time?

25 That's what you --

**George M. Lee**

35

1    A.   I didn't get the money.  I'm not supposed to get

2    the money.  Eventually, I will.

3    Q.   Okay.

4    A.   I don't remember the details because you're

5    confusing the whole thing.  I'm sorry.  I don't remember

6    the details at that time.  That was many years ago.

7    Q.   And you bought that property back again from

8    Ms. Yu?

9    A.   Your question about "bought".  He deed it back

10   to me in exchange for the loan.  I loan him the money.  I

11   loan her the money.  She doesn't want it anymore.

12              She said, "I deed it back to your property,

13   and I don't owe you anything."

14              She's supposed to make money.  She didn't

15   make any money and got a lawsuit.  It's a major problem

16   between two of us.

17   Q.   Did you do a -- a release of the loan when she

18   deeded that property back to you?

19   A.   I don't remember the details.

20              I only remember she was furious.  We never

21   talked about this deal anymore.  I was good heart to have

22   her to make some money.  It turned out to be I got sued

23   and she got sued.  She's really upset.  We never talk

24   about this case anymore.

25   Q.   Okay.

George M. Lee

36

1    A.   She says, "I'm going to have an attorney.

2  Business is business.  I'm going to sue you."  I said,

3  "Oh, oh, oh."

4    Q.   And that was from January of this year you are

5  talking about?

6    A.   I do not remember the time.  Just that's what

7  happened.

8    Q.   So the -- the property was deeded back to you in

9  January of this year?

10   A.   I do not remember the time --

11   Q.   Okay.

12   A.   -- but Mr. Chaudhary did create a major problem

13  for us.  If I divorce her, there's going to be a problem.

14   Q.   Okay.

15        And did Ms. Yu sue you?

16   A.   She was really upset to say, "Business is

17  business.  If I cannot get out of the deal, I'm going to

18  sue you," because I don't want a lawsuit.  I told her it's

19  a nonsense lawsuit.  She doesn't believe me.  She said,

20  "You dragged me in."  That's not good between the two of

21  us.  That's the reason we do not talk too much about this

22  case.

23   Q.   Okay.

24        So she -- I want to make sure I'm getting

25  this correctly.

George M. Lee

37

1          She threatened to sue you and you took the
2     property back?
3          A.    I told her, "The property, deed it back to me.
4     Then I handle it.   Okay?   You are out of the picture."
5          Q.    Okay.
6                So was it an accurate statement of what you
7     said, that she threatened to sue you and you took the
8     property back and said, "You -- Then you are out of the
9     picture"?
10               MR. HUNT:   I'm going to object to the form.
11               THE WITNESS:   She deed it back to me.   She
12    doesn't need to return the 400,000 I loaned to her.   She
13    says she's out.   "I take care of my business from there
14    on."   We agreed.
15         Q.    (BY MR. CHADHA) Okay.
16               Are you familiar with the term
17    "lis pendens".
18         A.    I'm not an attorney but I know what that means.
19         Q.    What do you know what it means?
20               What's your understanding of it?
21         A.    Understanding is a cloud of the title trying to
22    preventing people by selling the property.
23         Q.    Have you ever filed a lis pendens yourself?
24         A.    Yes.
25         Q.    You have.

George M. Lee

38

1              And when was that?

2      A.   I don't remember.  One, two years ago.

3      Q.   And what were the circumstances in which you

4  filed it?

5      A.   Somebody cheat me on the loan.  I filed a

6  lis pendens, preventing them from selling the property.

7      Q.   Okay.

8              And did you file a lawsuit first?

9      A.   Usually lis pendens, you file a lawsuit, yes.

10     Q.   And, in this case, there was a lis pendens

11 before the foreclosure occurred?

12     A.   I do not know it.

13     Q.   Okay.

14              Is this transaction an average transaction

15 for you?

16              MR. HUNT:  Object to form.

17              THE WITNESS:  This is not a very big loan

18 amount but created a big problem for me because I loaned

19 to the wrong person.

20              I don't know why he sue me for the

21 lis pendens.  He didn't pay his payment.  As far as I

22 understand as a layman, you don't pay, you get foreclosed.

23              MR. CHADHA:  Okay.  I'll object to -- to --

24              THE WITNESS:  Okay.  I don't understand.

25 Okay.  I'm sorry.

George M. Lee

1          MR. CHADHA:  -- nonresponsive.

2     Q.   (BY MR. CHADHA) My question was simple.

3     A.   Okay.

4     Q.   Is this a average loan amount for you?  And I

5 think your response to that part of it was it's smaller

6 than your usual amount.

7          Is that correct?

8     A.   It's --

9          MR. HUNT:  Object to the form.

10          THE WITNESS:  It's in the range.

11     Q.   (BY MR. CHADHA) And, typically, how big of an

12 amount do you loan?

13          MR. HUNT:  Object to the form.

14          THE WITNESS:  About 200,000 to 3 or

15 4 million.  I already told you the number.

16     Q.   (BY MR. CHADHA) Okay.

17          Would most of them tend to be larger rather

18 than smaller?

19     A.   Most of them tend to be smaller than larger.

20     Q.   Okay.

21     A.   Not too many larger loans.

22     Q.   But most of them are smaller loans loan-wise?

23     A.   Yes.

24     Q.   So in your primary business of investing and

25 loaning people money, you do your own paperwork, is what

George M. Lee

40

1   you testified to earlier.  You do it in your own office.

2              Uhm, how important is that paperwork to

3   you?

4       A.   Pretty important.

5       Q.   Okay.

6              Does it always accurately reflect what you

7   deal with the person is?

8              MR. HUNT:  Object to the form.

9              THE WITNESS:  Yes.  They are -- they are my

10  employee.  Usually I trust them.

11      Q.   (BY MR. CHADHA) Do your employees negotiate the

12  deal or you negotiate the deal?

13      A.   I negotiate the deal.

14      Q.   You negotiate the deal.

15             And then you tell your employees what the

16  deal is that they need to capture in the documents?

17      A.   Yes.

18      Q.   Okay.

19             And then how do you make sure that they did

20  that?

21      A.   What's your question?

22      Q.   Do you read the document?  Do you simply believe

23  that they did it correctly?

24             I mean, you read the document before you

25  sign it?

George M. Lee

41

1          How does that work?  What's your process?

2     A.   Usually in the middle.  It depends on how busy I

3 am.

4          If I am not busy, I read the whole thing.

5 If I'm pretty busy, I trust them.  They have done it many

6 times.

7     Q.   And the loan document with Mr. Chaudhary, did

8 you read them or not?

9     A.   I don't think I read it very carefully for that

10 because it's not too big amount.

11    Q.   The loan document -- Well, whatever documents,

12 loan or otherwise, you signed with Ms. Yu, did you read

13 them or did you not?

14          MR. HUNT:  Object to the form.

15          MR. STEWART:  Object to form.

16          THE WITNESS:  Our office prepared it.  I

17 didn't read it very carefully because it's not too big a

18 loan for me.  I believe Mr. Chaudhary will pay is not

19 critical for the loan documents until we got a lawsuit.

20    Q.   (BY MR. CHADHA) That wasn't my question.

21    A.   Okay.

22          MR. CHADHA:  Nonresponsive.

23    Q.   (BY MR. CHADHA) My question was:  The document

24 between you and Ms. Yu, Ms. Serena Yu, did you read those

25 documents?

ORIGINAL

George M. Lee

1          MR. HUNT:  Object to the form.

2          MR. STEWART:  Object to the form.

3          THE WITNESS:  I don't have any documents

4   with Ms. Yu.  I don't understand what you're talking

5   about.

6      Q.  (BY MR. CHADHA) You -- When she deeded the

7   property back to you, did you not sign documents?

8      A.  Well, that one, I kind of read it.  We --

9   Verbally, we already agreed upon.  Then she's not going to

10  be upset about me --

11     Q.  Okay.

12     A.  -- if I do that.

13     Q.  So you read those documents and they were as per

14  your instructions?

15     A.  That -- The documents, I understand that's what

16  I'm agreeing with her.  I didn't read it word by word.

17     Q.  But the document will only have in it what you

18  instructed your office people to write in it?

19     A.  The documents will reflect, generally, what we

20  agreed upon.

21          But I have a lot of business to do.

22  Usually, I don't read every single sentence, the legal

23  department.  The idea is she deed it back to me, forgive

24  about the loan, and I have to take care of from there on.

25  She's out.  That's as far as I remember.

George M. Lee

43

1    Q.   All right.

2              And your office drafted those documents or

3    you had an attorney draw them?

4    A.   I don't remember.

5    Q.   These documents are from a few months back.

6    A.   Yeah, I don't remember who draft it, what is

7    inside, did you read it.  No, I'm sorry.

8    Q.   But the documents are important in your

9    business?

10   A.   Not very important.

11             Just my fiancée, she deed it back to me and

12   forgive me -- forgive me for what I did to her.  That's

13   good for me.  That's all.  It's not a business deal

14   transaction between me and her.  It's a little, like I

15   told you, a sweetheart deal.

16   Q.   I understand.  But my question --

17             MR. CHADHA:  Again.  This is nonresponsive.

18   Q.   (BY MR. CHADHA) My question was:  The documents

19   are important in your business.

20             Correct?

21             MR. HUNT:  Object to the form.

22             THE WITNESS:  Documents, yes.

23   Q.   (BY MR. CHADHA) And they reflect the underlying

24   transaction accurately in your business?

25             MR. STEWART:  Object to form.

George M. Lee

44

1          THE WITNESS:  Yes.

2     Q.   (BY MR. CHADHA) So whatever the documents say,

3 that's what should have happened?

4     A.   Yes.

5     Q.   Thank you.  That's what I was trying to clarify.

6 All right.

7          And you don't make oral or verbal

8 arrangements with people that your documents don't

9 reflect?

10          MR. HUNT:  Object to the form.

11          THE WITNESS:  It depends.  If my fiancée,

12 we do verbal agreement, okay, I can't have her to sign

13 documents.  It depends on the person.

14          Like Mr. Chaudhary, I put in writing, it's

15 not going to do me any good either.  Okay?  It depends.

16     Q.   (BY MR. CHADHA) Okay.

17          Now, you testified earlier that Ms. Yu was

18 unhappy and she was going to sue you, so you took the

19 property back to get it out of her.

20          Did you realize that she had sued?

21     A.   I do not real- -- We try to avoid this topic,

22 believe me.  We never want to talk about it.  Every time

23 we talk about it, we have a big argument.

24     Q.   All right.

25          When the property was in your name, is that

**George M. Lee**

45

1  something you do frequently, take the title of a property

2  on which you have a loan, or that's the only time you have

3  done it?

4      A.   I have done one or two times, called it deed,

5  option to buy.

6      Q.   Okay.

7      A.   I own the property; people have the option to

8  buy it.

9      Q.   And when that happens, the title of the property

10 in your name, you get the tax bills and all the property

11 tax bills for that property because the title is in your

12 name?

13              MR. HUNT:   Object to form.

14              THE WITNESS:   I receive those documents.

15     Q.   (BY MR. CHADHA) Okay.

16     A.   But the option-to-buy person depends on our

17 agreement.  Sometimes whomever have option to buy pay the

18 property tax, maintain the property.  It depends on our

19 agreement.

20     Q.   Okay.

21              But you get those documents and then you

22 send them to them or you -- You know, what I'm trying to

23 find out is how does your process work.

24              When you take the title of a property, do

25 you keep your name and address on that property or you put

George M. Lee

46

1  your name and their address on the property?

2              What do you do?

3      A.   When there is an option to buy, I keep my name.

4  The property tax, all those things come to me.

5      Q.   Okay.

6      A.   They have only an option to buy.  They are not

7  the owner.  I provide it to them --

8      Q.   Okay.

9      A.   -- if they need to pay.

10             MR. CHADHA:  Mr. Lee, I am going to take a

11  short break.  You are free to, you know, take a break, get

12  some water or whatever.  I'm going to look through my

13  notes and make sure that I --

14             THE WITNESS:  You have covered everything?

15             MR. CHADHA:  Yeah.

16             (Recess from 02:56:04 p.m. to 03:03:45

17             p.m.)

18             MR. CHADHA:  Thank you.  We're back on the

19  record.

20             THE WITNESS:  Okay.

21      Q.   (BY MR. CHADHA) We'll, I just have a few more

22  things to cover with you.

23      A.   Okay.

24      Q.   When you have a loan outstanding, do you service

25  that loan yourself or your staff does?

**George M. Lee**

47

1    A.   Usually my staff and me, both of us, service the

2  loan.

3    Q.   Okay.

4         Do you involve the broker in that process?

5    A.   I do not deal with broker.  Usually, we never

6  had a broker.  This is a unique situation because Mike Ali

7  told us the borrower is good, everything is fine, he wants

8  to make a little money.

9         From there on, we -- we don't use broker

10  anymore.

11    Q.   Okay.

12         But when you use them, the three or four

13  times that you have used brokers, the -- what role does

14  the broker play after the client has borrowed the money?

15    A.   The broker sometimes, because they brought the

16  deal, they say they are a good borrower, if we have a

17  money problem, a collection problem, we call the broker

18  and tell them, "Hey, you introduced it.  You need to go

19  collect the money from this guy.  Otherwise, we're going

20  to sue the gentleman you introduced to us."

21         So we usually ask them because he get paid.

22  But he get paid by the borrower, not us, usually is the

23  case.

24    Q.   Okay.

25         And when it is not the case -- You said

ORIGINAL

**George M. Lee**

1   usually that's the case.

2                    Sometimes you pay the broker and sometimes

3   the borrower?

4        A.   I think I --

5                    MR. HUNT:  Object to form.

6                    THE WITNESS:  -- I never paid a broker

7   because I don't need a broker.  I got a lot of loans.

8        Q.   (BY MR. CHADHA) All right.

9                    Uhm, what are your claims against

10  Mr. Chaudhary?

11       A.   He never pay me.  That's the problem.

12                   I talk to him many times.  I talked to him,

13  I try to be nice to him.  I told him, "Hey, he said he has

14  a financial problem."

15       Q.   Okay.

16       A.   I never thought that he was going to play this

17  kind of game, okay.  Be honest, okay.  I thought he was

18  pretty decent.  He came into my office at least five or

19  six times.

20                   That's the reason I changed the option to

21  buy to become a deed.  I deeded to him the property.  Not

22  too much people do that, okay.  I did it all for him.  I

23  said, "You own the property.  I have a first lien but

24  please pay your payment."

25                   Then he says, "Oh, you do this.  You do

George M. Lee

49

1  that."  I think he has a financial problem.

2       Q.   Okay.

3       A.   I understand what he's doing, but just don't sue

4  me.

5       Q.   And what are your claims against his wife?

6       A.   I don't know.

7                 Are they personal guaranteed by him and his

8  wife, the loan?

9       Q.   I'm asking you.  Not him; it's you.

10      A.   I don't -- I don't remember.  I'm sorry.

11                If it is a -- the promissory note has his

12 name -- her name on it, she needs to guarantee it.

13      Q.   Okay.

14      A.   If it's not, then I don't know.  Probably

15 community properties; she need to pay, too.

16      Q.   So you're not familiar with your claims against

17 his wife?

18      A.   I'm familiar with I want money back.  That's

19 all.  I do not know the detail of the lawyer.  Depends the

20 law; it depends on my lawyer.

21      Q.   Well, I mean, the lawyers don't make the claims.

22 It's your claim really.

23                I am simply asking:  What are your claims,

24 sir?

25      A.   I just -- I told my instructions for my lawyers,

ORIGINAL

**George M. Lee**

50

1  to get the money back.

2      Q.   Okay.

3      A.   That's all.

4      Q.   Okay.

5                MR. CHADHA:  All right.  Mr. Lee, I think

6  you have been quite helpful --

7                THE WITNESS:  Thank you.

8                MR. CHADHA:  -- and thank you for your

9  time.

10               MR. HUNT:  We reserve ours and he is going

11  to review and sign.

12               MR. STEWART:  I will reserve mine.

13               (Deposition concluded at 03:07:49 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

ORIGINAL

**George M. Lee**

51

1                    CHANGES AND SIGNATURE

2        ORAL DEPOSITION OF GEORGE M. LEE AUGUST 12, 2022

3   PAGE LINE   CHANGE                    REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

**George M. Lee**

52

1      I, GEORGE M. LEE, have read the foregoing deposition

2  and hereby affix my signature that same is true and

3  correct, except as noted herein.

4

5                    _____

6                    GEORGE M. LEE

7

8  THE STATE OF _____)

9  COUNTY OF _____)

10     Before me, _____, on this day

11  personally appeared GEORGE M. LEE, known to me or proved

12  to me under oath or through _____(description

13  of identity card or other document) to be the person whose

14  name is subscribed to the foregoing instrument and

15  acknowledged to me that he/she executed the same for the

16  purposes and consideration therein expressed.

17     Given under my hand and seal of office on this

18  _____ day of _____, 2022.

19

20                    _____

                     NOTARY PUBLIC IN AND FOR
21                    THE STATE OF _____

22

23  My Commission expires: _____

24

25

53

1                    CAUSE NO. 19-DCV-262281

2  AZHAR M. CHAUDHARY,           ) IN THE DISTRICT COURT OF
             Plaintiff,          )
3                                )
   v.                            ) FORT BEND  COUNTY, TEXAS
4                                )
   GEORGE M. LEE, THOMAS HUNT,   )
5  SERENA YU, ROBBY FRANK,       )
             Defendants.         ) 458TH  JUDICIAL DISTRICT
6

7                     REPORTER'S CERTIFICATION

8                 ORAL DEPOSITION OF GEORGE M. LEE

9                    Friday, August 12, 2022

10

11      I, JAMES M. PLAIR, Certified Shorthand Reporter in and

12  for the State of Texas, hereby certify to the following:

13      That the witness, GEORGE M. LEE, was duly sworn by the

14  officer and that the transcript of the oral deposition is

15  a true record of the testimony given by the witness;

16      That the deposition transcript was duly submitted on

17  _____, 2022, to the witness or to the

18  attorney for the witness for examination, signature, and

19  return to me by _____, 2022;

20      That pursuant to information given to the deposition

21  officer at the time said testimony was taken, the

22  following includes all parties of record and the amount of

23  time used by each party at the time of the deposition:

24

25

George M. Lee

54

```
 1      Mr. Sanjay R. Chadha  - (01:13:18)
            Attorney for PLAINTIFF
 2      Mr. Thomas L. Hunt    - (00:00:00)
            Attorney for DEFENDANTS PRO SE, GEORGE M. LEE AND
 3          ROBBY FRANK
        Mr. J. Steven Stewart - (00:00:00)
 4          Attorney for DEFENDANT SERENA YU

 5

 6      I further certify that I am neither counsel for,

 7  related to, nor employed by any of the parties or

 8  attorneys in the action in which this proceeding was taken

 9  and, further, that I am not financially or otherwise

10  interested in the outcome of this action.

11      Further certification requirements pursuant to

12  Rule 203 of the Texas Code of Civil Procedure will be

13  complied with after they have occurred.

14      Certified to by me on this the 24th day of August,

15  A.D., 2022.

16

17

18      _____

19      JAMES M. PLAIR
        Texas CSR 4409
20      Expiration:  12-31-2022

21

22

23

24

25
```

**George M. Lee**

55

```
1              FURTHER CERTIFICATION UNDER TRCP RULE 203

2

3        The original deposition was/was not returned to the

4   deposition officer on _____;

5        If returned, the attached Changes and Signature

6   page(s) contain(s) any changes and the reasons therefor;

7        If returned, the original deposition was delivered to

8   Mr. Sanjay R. Chadha, Custodial Attorney;

9        That $_____ is the deposition officer's

10  charges to the Plaintiff for preparing the original

11  deposition transcript and any copies of exhibits;

12       That the deposition was delivered in accordance with

13  Rule 203.3, and that a copy of this certificate was served

14  on all parties shown herein on _____ and filed

15  with the Clerk.

16       Certified to by me on this _____ day of

17  _____, 2022.

18

19

20

21

22  _____

23  JAMES M. PLAIR
    Texas CSR 4409
24  Expiration:  12-31-2022

25
```