IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | | |
|---|---|---|---|
| IN RE: | | § | CASE NO. 21-60082-11 |
| | | § | HOUSTON, TEXAS |
| GROVER ENTERPRISES, LLC, | | § | WEDNESDAY, |
| | | § | SEPTEMBER 22, 2021 |
| | DEBTOR. | § | 11:00 A.M. TO 11:47 A.M. |

MOTION HEARING (VIA ZOOM)

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: KIMBERLY PICOTA

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
1                    APPEARANCES (VIA ZOOM):

2

3  FOR THE DEBTOR:              TRAN SINGH, LLP
                               Brendon Singh, Esq.
4                              2502 La Branch Street
                               Houston, TX  77004
5                              832-975-7300

6
   FOR SETH KRETZER:           LAW OFFICE OF SETH KRETZER
7                              Seth Kretzer, Esq.
                               440 Louisiana St, Ste 1440
8                              Houston, TX  77002
                               713-775-3050
9
                               JAMES W. VOLBERDING
10                             James Volberding, Esq.
                               110 North College Avenue
11                             Suite 1850
                               Tyler, TX 75702
12                             903-597-6622

13 FOR US TRUSTEE:             OFFICE OF THE U.S. TRUSTEE
                               Jayson Ruff, Esq.
14                             515 Rusk St., Ste. 3516
                               Houston, TX 77002
15                             713-718-4650

16 FOR BRMK LENDING, LLC:      MUNCSH HARDT KOPF AND HARR
                               John Cornwell, Esq.
17                             Sameer Karim, Esq.
                               Aynsley Young, Esq.
18                             700 Milam Street, Suite 2700
                               Houston, TX  77002
19                             713-222-4066

20 ALSO APPEARING:             Michael Chang
                               David Tang
21                             Brad Shepherd

22

23

24 (Please also see Electronic Appearances.)

25
```

1    HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 22, 2021; 11:00 A.M.

2            THE COURT:  Okay.  Good morning, everyone.  This

3    is Judge Lopez.  Today is September 22nd.  I'm going to call

4    the 11:00 a.m. docket, and that is 21-60082 Grove

5    Enterprises, LLC.  Here, originally, on a status conference

6    that was requested, but since then there was an emergency

7    motion to dismiss this case by Mr. Seth Kretzer, I believe

8    is the receiver.

9            So let me go ahead and just take appearances and

10   let's see -- is someone here on behalf of the Debtor?

11           MR. SINGH:  Yes, Your Honor.  Brendon Singh on

12   behalf of Grove Enterprises --

13           THE COURT:  Okay.

14           MR. SINGH:  -- in the bankruptcy case.

15           THE COURT:  Good morning, sir.

16           I also ordered Mr. Michael Chang to be present for

17   today.  Is Mr. Chang here, Michael Chang?

18           MR. SINGH:  He is, Your Honor.  Mr. Chang is here

19   on and on the line and on the video.

20           THE COURT:  I see him.  I see him on video.  Good

21   morning, sir.  Thank you for the -- thank you.

22           MR. CHANG:  Thank you.

23           THE COURT:  Okay.

24           Mr. Kretzer, I'll go ahead and take your

25   appearance.

1          MR. KRETZER:  Good morning, Your Honor.  Seth

2   Kretzer state court-appointed Receiver.

3          THE COURT:  Okay.

4          And Mr. Ruff, good morning.

5          MR. VOLBERDING:  And Your Honor, my name is James

6   Volberding.  I am representing Mr. Kretzer.  I'm his law

7   partner.

8          THE COURT:  Ah, perfect.  Good morning, sir.

9          MR. VOLBERDING:  Thank you, sir.

10          THE COURT:  Okay.  Mr. Ruff, now I'll let you go.

11          MR. RUFF:  Yeah.  Good morning, Your Honor.  Jason

12   Ruff on behalf of the U.S. Trustee.

13          THE COURT:  Okay.  Mr. Cornwell, do you wish to

14   make an appearance?

15          MR. CORNWELL:  I do, Your Honor.  Thank you.  John

16   Cornwell on behalf of BRMK Lending, LLC.  -- the most --

17          THE COURT:  Mr. Cornwell, I know who you're

18   representing through the pleading, but I couldn't hear you

19   too clearly.  Do you mind just stating it again?  At least

20   to me it was breaking up on my end.

21          MR. CORNWELL:  Of course, Your Honor.  This is

22   John Cornwell, again, representing BRMK Lending, LLC.  And

23   Your Honor, also on phone Sameer Karim, one of my litigation

24   colleagues that has had the fortune of being involved

25   through the history of this case.  And on phone and by video

1 is another litigation colleague Aynsley Young all on behalf

2 of BRMK Lending.

3       THE COURT: Okay. Good morning.

4       Does anyone else wish to make an appearance this

5 morning in connection with this case?

6       MR. TANG: Your Honor, My name is David Tang. I

7 represent Harold Poke and Grove Enterprises in some state

8 district court actions. I'm their lawyer before this

9 purported and disputed assignment that they pulled out last

10 week to stop the foreclosure. So I'm trying to figure out

11 where I stand in all this, because we kind of joined in the

12 receiver's motion. I got a copy of the pleading -- the

13 complete pleading last night from everybody. I wasn't on

14 any emailing list. Not anybody's fault or anything it just

15 again just me didn't activate my bankruptcy account, again.

16       THE COURT: Yeah. No, no, no.

17       MR. TANG: -- my pace account.

18       THE COURT: Understood. And thank you. And to

19 the extent that there is somebody who wishes to make an

20 appearance today that would need to file a pro hoc, that is

21 waived today. You're free to appear today, this is an

22 emergency motion, and I just think what we're discussing is

23 really important. So there's no need to file anything or

24 have to worry about any of that today. Okay.

25       MR. TANG: Thank you -- I appreciate --

1         MR. SHEPHERD:  Good morning.

2         THE COURT:  Good morning, Mr. Shephard.

3         MR. SHEPHERD:  Good morning, I'm Branch Shephard

4 and I represent -- in the state court litigation.

5         THE COURT:  Did you say Daiyo (phonetic)?

6         MR. SHEPHERD:  Yes, sir.  Daiyo Holdings and --

7 Daiyo as a junior lien holder it's important to be around.

8         THE COURT:  Okay.  Good morning.  Does anyone else

9 wish to make an appearance?

10        And for those that are on the line, there's no

11 need to hit five-star your line is completely unmuted, and I

12 hope to keep it that way just to let the parties speak.  I

13 just ask everyone to please keep your phone on mute until

14 it's your turn to speak, so that way we can just minimize

15 background noise.  So anyone else wish to make an appearance

16 and there's no need to hit five-star?

17        Okay.  Mr. Singh, why don't you just talk to me

18 kind of about this case at the 10,000-foot level?

19        MR. SINGH:  Happily, Your Honor.

20        THE COURT:  Starting there and kind of where we

21 are and then I will turn to Mr. Volberding --

22        How do I pronounce your last name, sir?  I want to

23 make sure I got it right.  Is it Volberding?  You're on

24 mute, sir.  I muted you and I told you I -- sorry about

25 that.

1          MR. VOLBERDING:  I apologize.  Volberding, you did

2     it exactly right.  Mr. V. is perfectly fine --

3          THE COURT:  No, no, Volberding --

4          MR. VOLBERDING:  -- that works just as well.

5          THE COURT:  -- I just want to make sure I

6     pronounce it correctly.  I'm going to be very respectful.

7     So thank you very much.  So I'll turn to you next and then

8     I've got a couple of comments before we officially get

9     started, okay?

10         MR. VOLBERDING:  Thank you, sir.

11         MR. SINGH:  All right.

12         THE COURT:  Mr. Singh, good morning.

13         MR. SINGH:  Thank you, Your Honor.

14         So Your Honor, this is sort of -- I requested a

15    status conference and we took a little bit of time just so

16    we set the stage.  When this case was filed it sort of had a

17    lot of tentacles to it and so we -- I was able to reach out

18    to Mr. Cornwell for the first lien hold in this case.  I

19    actually got a chance to speak to Mr. Tang and Mr. Polk and

20    I reached out to their receiver a little bit later on but

21    wasn't able to get ahold of him at that time.

22         So here is sort of where this is.  The main -- and

23    this has gone on for some time and the litigation has gone

24    on pretty far.  The main issue, I think, we have before the

25    court and I had sort of extensive conversations with the USD

1  and I think everyone involved on whether authority to sort

2  of put the company into bankruptcy again.  So here's sort of

3  when it's --

4          So the main documents that we have that are at

5  issue here are a couple loan agreements and one from 2017,

6  pledge of assignment of equity interest and a pledge of

7  assignment of equity interest in 2019.  And before I go any

8  further, Mr. Tang and Mr. Polk -- just so I have -- the

9  Court understands where they are, they believe that all of

10 the documents including these documents and the documents

11 from the first lien holder, Mr. Cornwell's client, they --

12 allegations from their standpoint is that all of those

13 documents are fake and fraudulent, at least they weren't

14 supposed to be done to a certain extent.  So just so that

15 when we're talking about them, that's their stance so the

16 Court understands where they're coming from.

17         The steps forward in the state court, lots of

18 things went on in the state court, and the second lien

19 holder on this -- property in 2019, let me back up a little

20 bit just so everyone is clear.  2019 there was a deal to

21 purchase 411 North Main which is sort of the property that's

22 at issue here.  That property was originally supposed to be

23 bought -- the pleadings and the documents are somewhere

24 between I think the contract says $7.5 million.  That

25 contract was supposed to be funded by Mr. Cornwell's client

1 Broadmark or BMRK [sic] I just know them as Broadmark.  BMRK
2 [sic] put in sort of approximately about $408 million, Mr.
3 Polk was supposed to then put in $305 million.  Something
4 happened and a really large contention of what happened at
5 the title company in terms of documents being signed days
6 they were supposed to be signed.

7 But the best that I can sort of unravel is that
8 Mr. Polk signed some documents on January 11th, 2019.  It
9 was supposed to fund the other half of the loan, that didn't
10 happen, the documents went back and forth over the next
11 week, and the deal eventually closed I think somewhere
12 around the 18th or the 17th and the confusion in the
13 documents are sort of just bad.  Some of the documents --
14 the documents all had the 7th -- January 17th of 2019, and
15 some of them were marked out and then 18 was written in.  So
16 the documents are sort of bad and that's sort of I think
17 where a lot of this comes about.

18 Along with those documents, is a pledge agreement
19 in '19 and there was a deal with Mr. Polk, an entity back in
20 2017, when he pledged all of his interest in Grove
21 Enterprises to two different companies, at the time, all
22 basically controlled by -- for today's hearing let's say Mr.
23 Chang's sort of in control of those.  There's another
24 individual Ali Chandry (phonetic) who technically runs them,
25 but Mr. Chang is sort of the manager of those companies.

1       So what happened?  After trying to foreclose and I
2  think the state court -- the state court appointed a
3  receiver to collect rent on these properties and they were
4  sort of kicking back and forth.  And the state court didn't
5  really make a decision on whether the documents were
6  fraudulent or not, but the state court said it can go
7  foreclose.  So both of these of properties -- both lien
8  holders, first and second, posted the property for
9  foreclosure and my clients ended up looking at getting
10 advice from corporate counsel on whether the -- whether they
11 can accept the pledge and assignment and what that would do.

12      From sort of 10,000-foot level the position is
13 that they accepted those pledges, both the '17 and the '19
14 on the basis that just out of abundance of caution, we're
15 going to accept the interest in both.  They then became 100
16 percent interest holder in Grove Enterprises which then they
17 held a meeting and removed Mr. Polk and appointed Mr. Chang,
18 and then Mr. Chang put the company into bankruptcy.

19      THE COURT:  So, Mr. Singh -- Mr. Singh, let me ask
20 you.  Is there a governing security agreement that governs
21 when a pledge can be used or under what instances or do
22 these documents -- we're not talking evidence.  I just want
23 to understand your position.  So there was a default that
24 occurred and then, if I were then to look at the assignments
25 and the pledges, they would then indicate when someone could

1  use this as default?  Or is there another document out there

2  that governs that?  I just want to understand what it is

3  that -- it's you-all's position.

4        If I understand it correctly, that these documents

5  allowed the assignment to occur upon some event, that event

6  occurred, Mr. Change was then assigned all of the rights and

7  interest to Grove, Mr. Polk was then put out, and then Mr.

8  Chang authorized the filing of the bankruptcy case, is that

9  correct?

10       MR. SINGH:  That's basically correct.  There are

11 some names differences obviously, but not Mr. Chang

12 specifically but a different company.  But Yes, Your Honor.

13       THE COURT:  Correct.

14       MR. SINGH:  In general --

15       THE COURT:  Correct.  I agree.

16       MR. SINGH:  -- in general, yes.  The documents --

17 the pledge agreements are such that if there's a default and

18 in 2018 -- for the '17 default in 2018, Mr. Polk signed an

19 acknowledgement that the 2017 loan that was in default was

20 in default.  And again, just so that I'm clear, I'm not

21 trying to mislead the Court or anything, Mr. Polk believes

22 all of those documents or at least the -- all of those

23 documents that I'm talking about right now are fraudulent

24 documents just so that it doesn't seem like I'm not -- I'm

25 disregarding that argument.

1          THE COURT:  No, no, no.  I understand.  Okay.

2 Thank you.

3          MR. SINGH:  And so yeah, unfortunately we would

4 hope that -- have better documents in terms of something

5 that sort of lays that out, but the lead -- the pledge and

6 assignment agreement does have in the event of default then

7 they can in essence accept those pledges and assignments.

8 And so the basic argument is --

9          THE COURT:  Mr. Singh, are you sure about that?

10          MR. SINGH:  -- Your Honor --

11          THE COURT:  You sure about that?

12          MR. SINGH:  And that's sort of when we filed the

13 bankruptcy my belief is that it was.  I am just a bankruptcy

14 lawyer, but corporate counsel has sort of gone through the

15 process and said, yes that's sort of how that works and

16 that's the belief that Mr. Chang and I have and that's sort

17 of how we're operating.

18          THE COURT:  Okay.

19          MR. SINGH:  Why I set this status conference

20 initially was, I sort had gone through that process with Mr.

21 Cornwell.  We had talked about first let's figure it out,

22 what we do -- is there a global settlement, is there a way

23 to get this resolved?  And so what we had looked at was and

24 that's sort of how it was filed, the CRO motion was sort of

25 put in place.  That was more of a -- this is where we

1  thought this fight was going to come from when I talked to

2  Mr. Cornwell was this is -- I don't know that we -- we have

3  our positions they have their positions, it's different than

4  our position.  And so if they listen as we're going down

5  that road let's figure out because the company still needs

6  be up and running.  We were hoping to get a status

7  conference last week but when I spoke to Mr. Chang -- Mr.

8  Tang he was going to be out of town --

9           THE COURT:  Yeah.

10          MR. SINGH:  -- so that's the reason for the

11  later --

12          THE COURT:  Right.

13          MR. SINGH:  I want to make sure -- and what I was

14  hoping to do today, Your Honor, was set a hearing on a date

15  that everyone could come and say all the things they want to

16  say about authority to file, we can tee that up, the Court

17  could make a decision on that -- we could be right, we could

18  be wrong -- the Court makes a --

19          THE COURT:  Right.

20          MR. SINGH:  -- decision.  And then from there we

21  go where we go and everyone has the ability to kind of say

22  what they want to say and enough time to get all the things

23  on plate and get all the things on board.  And but I think

24  this has been --

25          THE COURT:  So Mr. Singh, let me ask you one

1  question.

2         MR. SINGH:  Uh-hu.

3         THE COURT:  I get that, and I think that makes

4  sense.  Talk to me about the September 3rd filing petition.

5  That's going to come up so you might as well give me the

6  10,000-foot level.  I don't see any signatures on that

7  petition and that's been raised -- so why don't you tell me

8  about that.

9         MR. SINGH:  So that was -- that was a purely a

10  mess up in my office.  That was a September 7th, we got all

11  the documents probably about an hour before the case was

12  filed, and I just uploaded the wrong document.  So I had

13  everything, but the document -- if the Court looks I think

14  it got filed somewhere on eight minutes before.  We had

15  filed -- I can file the signatures.  I have them.  It's just

16  I didn't actually realize we filed the wrong document just

17  because we were moving so quickly.

18         THE COURT:  Right.

19         MR. SINGH:  That is purely my fault on that

20  document being filed.

21         THE COURT:  So let me ask you as well, the

22  estimated assets that are checked on either this one or the

23  amended, says 0 to 50,000.  I think in the motion, I know

24  I'm jumping ahead -- there's a CRO motion where you're

25  seeking to sell something for about half a million.  So

1  what's -- I'm just trying to understand the size of the

2  case.

3  　　　　MR. SINGH:  So and this is --- and just the way we

4  came in, in terms of because -- again it's undisputed Mr.

5  Polk was running this company but for and until those liens

6  -- those assignments were accepted.  So the main

7  (indiscernible) that we know of and I have a motion to

8  extend the deadline but I didn't file -- when this motion

9  came down, I sort of said, okay, let me pause on all of

10  those.  And I don't want it to look as though I'm trying to

11  railroad over anyone in terms of their ability to come fight

12  and say no this -- should be dismissed and so I have all of

13  those.  One of them is how (indiscernible).  The second is a

14  motion to extend time.

15  　　　　The main asset that I believe is here is the

16  building at 411 North Main that the receiver is collecting

17  all the rent on.  At this moment in time, I believe from the

18  receiver's notices in the state court, there's approximately

19  $200,000 worth of rent that the receiver is collecting.  The

20  value of that building is sort of at this point in time

21  contested I guess -- it was sold in 2019, for 7.5 million.

22  The appraisal at the moment is 4.2 million, is my

23  understanding, and there's a huge leak and a roof problem

24  that's going to cause about $500,000.

25  　　　　So when I got onto the case one of the hopes was

1 that with Mr. Cornwell's client is that we would -- my

2 client would be willing to do a DIP loan, get the roof

3 fixed, get the place sort of pinned up sort of say and then

4 sell it for enough to pay off all the DIP.  And that's sort

5 of what we were rounding about before I spoke to Mr. Chang

6 and he sort of -- he told me that their stance of the

7 documents were not accurate or fraudulent documents.

8          THE COURT:  Got it.

9          MR. SINGH:  And so --

10          THE COURT:  Okay.

11          MR. SINGH:  -- that's sort of why I sort of paused

12 and backed up because I didn't want it to seem as though we

13 were just sort of plowing forward and didn't listen to all

14 the folks that we sort of circled up with and again I'll

15 just go over the --

16          THE COURT:  I understand.

17          MR. SINGH:  -- and sort of given that same

18 overview of here's where I think we are, here's where -- I

19 want everyone to be able to come tell the Court what it is

20 they want to tell them, they have their day in Court, and

21 they have the opportunity to make all of those statements.

22 We can then defend those statements.  We win or we lose, and

23 then we go on down the road.  But the CRO motion I wanted to

24 make sure I copied, because there are things -- there's rent

25 being collected and things being there.

1    There is a state court receiver, but the state

2  court receiver -- in the state court receiver appointment

3  only allows them to do a certain thing, mainly collect rent,

4  try to make a settlement, allow the foreclosure, pay

5  utilities.  And so when I spoke with Mr. Cornwell in terms

6  of someone who one had the ability to do it, and two sort

7  off had the cost structure that I think we're looking at the

8  same rate as the receiver $350 -- we pitched -- we talked

9  about folks that would be in that range, that had some

10  bankruptcy experience that would be able to do what needed

11  to be done.  And we sort of coalesced on Mr. Quinn

12  (phonetic) and that's how he came about.

13    And that's primarily just because we wanted --

14  that was more of a we wanted someone that -- both of the

15  parties --

16    THE COURT:  Okay

17    MR. SINGH:  -- in this litigation, like most

18  litigation, don't like each other, no one likes each other.

19  Fortunately Mr. Cornwell has a pretty good relationship and

20  so we sort of talked that through and we thought that would

21  have been a good way to go, and that's why that motion got

22  filed.  But I still think the lynch pin issue is the

23  authority and then we can push all those things.  Because if

24  the Court finds that we did have authority and we are wrong,

25  then I think that none of the other motions matter.  If

1  although the Court finds that we are right and we have the

2  authority, then we don't want to wait on some of those

3  things to get going and that's sort of how we have that teed

4  up in that manner, Your Honor.

5        THE COURT:  Yeah.  Yeah.  I get it.  Okay.

6        Mr. Volberding, let me give you an opportunity to

7  tell me anything you want, respond how you want, the floor

8  is yours.

9        MR. VOLBERDING:  Thank you, sir.  Can you hear me?

10        THE COURT:  Yeah.

11        MR. VOLBERDING:  -- Can you hear me okay, sir?

12        THE COURT:  Yeah.  And again, at this point I

13  don't want to -- you don't have to kind of introduce any

14  evidence, I don't want to get into that, I just want to kind

15  of keep it high level and give you an opportunity to address

16  the Court.  Thank you.

17        MR. VOLBERDING:  Yes, sir.  High level, very high

18  level.  I think what is before you, Judge Lopez, is this.

19  Is that a second tier creditor -- a second tier secured

20  creditor who lost in state court twice, in two different law

21  suits, who did not file a motion for a new trial, who did

22  not seek relief from either of the two Houston Court of

23  Appeals is seeking to make an end run around those state

24  court rulings.  And is seeking, as a creditor, to come in

25  and do an involuntary bankruptcy action against the debtor

1  in violation of all the strictures of section 303.  I based

2  that ascertain on really three concepts.  Three high level

3  concepts here.

4           Number one, is that I'm going to use Chawdry

5  (phonetic) as the party here, because I think that's what's

6  really driving all of these.  Mr. Chawdry, his claims, if

7  you want to use that term broadly, his claims to seize Grove

8  and therefore seize the six-story office building, are all

9  barred by state law procedure and substandard law.  I've

10 laid that out in the motion in my response.  And I note you

11 very well understand that state law controls.  There's state

12 law property, there is no federal property rules, and I so I

13 know you're familiar with those rules.  But all of that

14 litigation X where he had the opportunity to litigate this

15 so-called claim, based on these so-called equity release

16 agreements.  He waived them, he defaulted them, they were

17 mandatory counter claims, none of these documents are

18 recorded, we didn't see any of these documents until

19 yesterday when Mr. Singh filed them.  There has been two

20 years of litigation with discovery, all the standard request

21 for production, interrogatories, pleadings, factual

22 assertions, an affidavit is in the record from Mr. Chawdry,

23 none of this has been said.  So I can -- at a high-level

24 state law bars -- state law and procedure bars what he's

25 trying to do today.

1         Second, the 2009 purported equity pledge

2 agreement is invalid on its face.  You can tell that, it

3 doesn't have certain language that's missing, it's missing

4 an assignee of the pledge.  It doesn't have any procedures

5 for this so called activations that they've invented, this

6 term called activation that I've never heard of before.

7 None of these procedures exist in this purported 2009 equity

8 pledge agreement.  And that's the lynch pin of why they're

9 here, is this so-called agreement which I think you can and

10 should ignore.

11        And third, the 2017, purported equity pledge

12 agreement is invalid as well.  Putting aside whether it was

13 legitimate at the time, subsequent in this in the 2019

14 refinancing in which the parties signed new agreements,

15 signed new documents, provided new consideration, suddenly

16 it (indiscernible) into litigation in 2019 and whatever

17 existed in 2017 is by the boards, so neither of these equity

18 pledge agreements are valid.  One is invalid on its face,

19 the other invalid by (indiscernible) if it was invalid -- if

20 it was actually valid at the time.

21        I will stop there, subject to your questions, sir.

22        THE COURT:  Yeah.  Thank you very much.

23        Mr. Cornwell --

24        MR. SHEPHERD:  -- I know Your Honor --

25        THE COURT:  -- is there anything you wish to say?

1        MR. SHEPHERD:  -- I would like to say a couple of

2    things in response to Mr. Volberding.

3        THE COURT:  All right.  Just tell me --

4        I'll get to you.  I'll get to you.

5        MR. SHEPHERD:  -- things about the state court --

6        THE COURT:  I want to go to Mr. Cornwell next and

7    then I'll go to --

8        MR. SHEPHERD:  Yes, sir.

9        THE COURT:  -- you, Mr. Shepherd, I promise.

10        MR. CORNWELL:  Thank you very much, Your Honor.  I

11   appreciate an opportunity -- I'll keep it very brief.  I

12   certainly agree with -- Mr. Volberding said if not all and

13   even a whole lot of what Mr. Singh said.  I think the

14   representations about discussions we've had, about what this

15   case might look like at this stage in bankruptcy your

16   absolutely right.  I've got nothing but positive glowing

17   things to say about Mr. Quinn.  And frankly the need, if we

18   remain in bankruptcy for some intermediary to take the keys

19   to the car, and I think there will be a time, if we get past

20   today, and maybe the next hearing to discuss that.  But I'll

21   just leave that as all those statements have been said and

22   look forward to working with the parties if we get there.

23        I will say that the lender, Broadmark, as we're

24   affectionally referred to, is very concerned about this

25   last-minute foreclosure stoppage with documents that we had

1  never heard of before.  And we've seen them now, because the

2  debtor -- the purported debtor filed them last night, and

3  we've got some real questions about whether they're

4  effective, whether they're authentic, and frankly just the

5  timeline of how all this happened, in light of the fact that

6  through several different state court proceedings, as

7  recently as July and August -- I think there were five

8  different hearings where all or most of the parties before

9  Your Honor, right now -- were participant relating

10 specifically to foreclosure and the underlying loan

11 documents between us and Grove and the second lien holder in

12 Grove, and the pledge or authority to act was never once

13 raised.  And so we've got some concerns.

14          On top of that, Your Honor, we've got some real

15 concerns, now that a bankruptcy has been filed what's

16 happening at the property.  I understand and very much

17 appreciate that Mr. Kretzer has continued his role as

18 receiver and I talked to Mr. Singh about that and I don't

19 believe the purported debtor, I can't find the right

20 phraseology here Your Honor has allowed that to happen

21 without objection.  I think it's frankly best for all

22 parties involved that the properties actively managed.  But

23 anything we can do today to make sure that everybody knows

24 their role and that the property is safe and value is

25 protected, Broadmark would very much appreciate.

1       THE COURT:  Thank you.

2       Mr. Shepherd.

3       MR. SHEPHERD:  Yes.  Can you hear me okay, Judge?

4       THE COURT:  Yes.

5       MR. SHEPHERD:  Thank you.  I wanted to clear up a

6  couple of things Mr. Volberding represented.

7       One of the things he said is that there's been

8  some kind -- at least it sounded like there's been some kind

9  of adjudication of these lawsuits.  There are four lawsuits

10  that have been filed among the parties.  Two by Mr. Polk

11  himself, one by Broadmark, and one by Daiyo.  And none of

12  the lawsuits have been fully adjudicated.  There has been

13  absolutely no ruling on any of the substantive matters in

14  any of those cases.  They were in four different courts, and

15  the 2019 lawsuit had gotten delayed on account of COVID and

16  an arbitration that ultimately did not go forward, because

17  the arbitrator recused herself.

18       And it gets back before Judge Dollinger in the

19  189th Harris County District Court.  And all of the parties

20  are now, by virtue of a motion that Daiyo filed to try and

21  streamline the litigation, because it was in four different

22  courts -- over objection from all parties, Daiyo

23  consolidated, sought to consolidate all four cases into the

24  first filed lawsuit in Judge Dollinger's court in the 189.

25  All of those cases are now consolidated, those cases were

1 going forward, and Broadmark with full steam ahead was

2 attempting to foreclose, even though Mr. Polk had sued Daiyo

3 alleging forgery, sued in the separate lawsuit, which

4 actually we just recently found out about, because nobody

5 had even disclosed this to us.

6          Second lawsuit Grove filed was against the title

7 company, alleging that the title company forged documents.

8 So all the people that forged documents, but nevertheless he

9 admits he still owes three-and-a-half million dollars to

10 Daiyo. Even at one point was alleging that the Broadmark

11 loan documents were also forged. So there's a lot of things

12 being bounced around out there, but Mr. Volberding says

13 there's been some kind of ruling that were against Daiyo or

14 something has been adjudicated. There is absolutely not a

15 single thing that has been adjudicated in any of these cases

16 except for the denial of temporary injunction. Which while

17 we still disagree with that, all of the in fighting going on

18 with the parties, that's the only thing that's been ruled

19 on. But there's been absolutely no adjudication of any

20 different substance of fact in any of these cases.

21          THE COURT: Thank you.

22          Anyone else wish to address the Court?

23          MR. TANG: If I may real briefly, Your Honor.

24          THE COURT: Yes, sir. Just state your name for

25 the record, just we've got a clean a record.

1         MR. TANG:  Thank you, Your Honor.  David Tang for

2    the -- how do I word this -- for Harold Polk and Grove

3    Enterprises before the (indiscernible) assignment was -- the

4    (indiscernible) before the assignment.

5         Your Honor, I want to clarify just a little bit of

6    what Mr. Sheperd had said.  Mr. Branch Shepherd had said.

7    There's actually -- let me start with a 10,000 foot and go

8    down, maybe that's easier.  I think that's how this is

9    proceeding.

10         Your Honor, broadly speaking there's two equity

11    pledge assignments, 2017 and 2019.  I'm going to take the

12    2019, first because, in relation to time, it relates more

13    this transaction, because the transaction (indiscernible)

14    over the loss of most (indiscernible) is around that time.

15    The 2017 pledge, you know, had nothing to do with this

16    building -- the 2019 pledge was purported executed on

17    January 17th.  We're saying that's a forgery by itself.

18    That equity pledge agreement.  The equity -- the 2019,

19    equity pledge agreement is condition on a payment of a

20    promissory note, Your Honor --

21         THE COURT:  Hold on a second, I want to --

22         MR. TANG:  -- that was reported --

23         THE COURT:  -- I want to make sure I hear you

24    correctly.  You're saying that which document is a forgery?

25         MR. TANG:  The 2019 equity pledge agreement, Your

1    Honor.

2            THE COURT:  Okay.  Thank you.

3            MR. TANG:  The one that I think everybody's been

4    talking about.  The one that's more in relation to the

5    actual property that we manage right now.

6            THE COURT:  Okay.  Okay.

7            MR. TANG:  And then so the 2019 equity pledge

8    agreement, you know, is I guess was activated I guess, it

9    comes into effect if my client defaults on a promissory

10   note.  What it says in the equity pledge agreement if I

11   remember it right.  And the promissory note is worth an

12   amount roughly 3.5 million.  That promissory note, Your

13   Honor, which is Exhibit No. 5 I believe in Mr. Singh's

14   response to the receiver's motion to appear, that -- clearly

15   notarized by a man named Richard Milliman (phonetic), Your

16   Honor, is his name.

17           I took Mr. Milliman's deposition, one of these

18   companion lawsuits that Mr. Shepherd was talking about.  If

19   I remember correctly he says I don't know what this document

20   is, I don't remember notarizing it.  I said let me see a

21   notary book.  I did not keep a notary book, David, so I

22   can't help -- David, me, David Tang that's in question.  He

23   said I did not keep a notary book.  Well he says, I don't

24   recognize this document.  And that's my signature, that's my

25   stamp, but I don't remember seeing it.  And he goes on to

1 detail -- why don't you remember signing the -- he goes

2 promissory notes aren't typically notarized in the course of

3 business. You know, (indiscernible) my client before

4 (indiscernible) I did not sign that promissory note for $3.5

5 million. That's not a signature. But it's notarized like

6 it was. The notary has stated in his deposition -- I don't

7 remember notarizing that. I don't have a book to even show

8 you, David, that Mr. Polk was in front of me when I

9 notarized it -- purportedly notarized it, right.

10       So what's just a little bit more muddled than this

11 is as I sued the title company, Your Honor, right, they

12 produced another promissory note around the same day for

13 $1.5 million. Now I'm getting a little bit closer to the

14 ground level here, Your Honor, but I just feel it's

15 important to talk about that particular set of

16 circumstances. There's another promissory note made to

17 Daiyo's favor very much like the 3.5 million that's

18 purportedly signed by my client, but the notary -- in there,

19 right, is blank. But they purport it has a signed

20 signature, but it has a different amount on there right.

21 And I believe it's dated January the 11th.

22       So the equity pledge agreement that they're

23 putting in front of you, Your Honor, the 2019, is based on

24 $3.5 million note that the notary cannot verify that he

25 notarized, has suspicions about it, and (indiscernible)

1  didn't sign it and then we look at the same week of that

2  transaction, there's a second promissory note that is nearly

3  identical to the one that they produced for 1.5 million that

4  purportedly has my client's signature, but the notary stamp

5  there is a notary (indiscernible) is not filled in nor

6  signed.  But it's the same (indiscernible) that was

7  purportedly signed on the 18th.  That is -- and I'm not

8  being critical, Your Honor --

9          THE COURT:  Okay.

10          MR. TANG:  As I'll now in closing -- documents --

11          THE COURT:  Hold on.  Hold on.  I think there's

12  some background noise, if everyone can please put your

13  phones on mute.  Not you Mr. Tang, just everyone else, I

14  think I heard some papers rattling.  I couldn't hear you to

15  well.  Okay.  Go ahead, sir.  In closing.

16          MR. TANG:  No.  Like I said -- the person

17  (indiscernible) everything I just wish the title company and

18  everybody would use staples.  There seems to be a lot of

19  documents floating around these days, right.

20          THE COURT:  Okay.  Thank you, sir.

21          MR. TANG:  And so -- and so there seems to be two

22  conflicting notes that remain the basis of the pledge,

23  different numbers, the bottom line is my client didn't sign

24  either one of them.  The one that's notarized, the notary

25  has said I don't even remember notarizing that, I don't

1  remember Harold being in front of me on the 17th or the
2  18th.  Because Harold was in front of me on the 11th not the
3  17th or 18th.  And so up on a macro level and a little bit
4  down into the rows that's our contention on the 2019 pledge
5  agreement, Your Honor.
6          THE COURT:  Okay.  Thank you.
7          MR. TANG:  Do you have any questions for me, Your
8  Honor -- 2017 or --
9          THE COURT:  No.  No.  I want to hear from the U.S.
10 Trustee.  Mr. Ruff.
11         MR. RUFF:  Good morning, Your Honor.  So I think
12 our view, really I think the proposal by Mr. Singh to --
13 this authority to file is a gating issue, anything else
14 should probably be pushed off until that is resolved.  And
15 then, you know, we would be happy to take those other
16 matters in order.
17         THE COURT:  Here's what I'm going to do folks, and
18 here's the gating issue for me.  Is that there was a
19 petition filed on the 7th and it was unsigned by both the
20 client and the lawyer.  And that essentially the filing of
21 that petition initiated the automatic stay, right?  But
22 there was no authority -- no one signed a petition under
23 penalty of perjury, but the lawyers filed and so that's a
24 certification in and of itself.  And there's dating errors
25 on the petition itself.  Those errors then continue to the

1  filing on the 13th.  From there those documents are signed

2  under penalty of Perjury by both Mr. Chang and Ms. Tran --

3          But folks if someone could put their phones on

4  mute, I'm really asking.  The reality is folks is that --

5          UNIDENTIFIED FEMALE:  Okay.  Oh.  Okay.

6          THE COURT:  Just a second.

7          UNIDENTIFIED FEMALE:  -- we were going to be on

8  this though, I was on the right link, right?  Okay.  Good.

9  All right.  All right.

10          THE COURT:  I apologize.

11          UNIDENTIFIED FEMALE:  Well yeah -- hang on let's

12  see what -- let me see if there's anything on --

13          THE COURT:  Just a second folks.

14          UNIDENTIFIED FEMALE:  -- Patrick know.

15          UNIDENTIFIED MALE:  I didn't see them on there --

16  did you see them on there?

17          UNIDENTIFIED FEMALE:  No.

18          UNIDENTIFIED MALE: Let's see -- no they're not on

19  there anyways.

20          THE COURT:  That might have done it.  Can

21  everybody still hear me?  Okay.  Appreciate it.

22          So bankruptcy rule 1008 says that all petitions

23  shall be verified, and the initial one wasn't verified.  But

24  it might have saved everyone from me asking some really hard

25  questions about things that are to come.  Because all

1    petitions are signed under penalty of perjury by and under

2    rule 90(11) for the attorneys in which 90(11)(b) says that

3    by presenting to the Court whether by signing, filing a

4    petition, or another motion the attorney is certifying it

5    has not been presented for any improper purpose, but it's

6    signed to the best of the presenter's knowledge,

7    information, and belief formed after an inquiry reasonable

8    under the circumstances that it wasn't filed for

9    frivolousness, for an improper purpose, to harass, that the

10   claims in the legal contentions therein are supported by

11   law.  That the allegations and other factual contentions

12   have evidentiary support, or specifically so identified or

13   likely to have evidentiary support after a reasonable

14   opportunity for further investigation or discovery, and any

15   denials are warranted.  Right.

16          And filing a bankruptcy petition is a little

17   different than just filing a motion in which can be

18   corrected.  So, I'm just saying this for the non-bankruptcy

19   folks.  Typically bankruptcy rules require that one file a

20   heading to look in a certain way or to contain a proposed

21   order -- all those can be corrected without violating 90(11)

22   but the rules -- when one looks at the advisory committee

23   rules and I'm looking at the ones in 1997 say that the safe

24   harbor doesn't apply to a petition, because -- right the

25   automatic stay comes in has far reaching implications,

1   right?  Because now creditors can't exercise it, so it's a

2   little different than fixing a heading or adding a proposed

3   order later or you know, adding another signature.  So that

4   means a lot.

5          So to me there was a filing on the 7th that was

6   improper, and it was later attempted to be amended, but you

7   can't amend what should have never existed in the first

8   place.  So I'm dismissing this bankruptcy case for failure

9   to file a petition correctly on the 7th that had

10  implications through the automatic stay.

11         If folks decide to file this case again, I just

12  want everybody to really look at what they think they have,

13  on both sides, and really look at what the assignments say

14  and what folks are telling me that they say, and what those

15  pledges say on its face, and if there's a default what

16  people get under the 2019 and how the membership interests

17  are defined and if there's some other documents out there, I

18  don't --

19         You know, Mr. Tang you talked about you know,

20  really, really -- I call it some real serious territory.

21  And everybody should really take a hard look because folks

22  are going to start -- if this case gets filed again -- and

23  it may get filed this afternoon in Houston, I don't know --

24  but everybody better take a hard look, because I'll be

25  looking really hard at what folks are alleging on the

1   petition and who signed the petition, and what authority

2   they think they have and whether it's reasonable, and what

3   are the implications of filing a petition, and what

4   information they've done and how they did it.

5          I want folks to really look at the -- I want folks

6   to look at the Texas UCC law, I want folks to look exactly

7   at these -- what they're going to ask me to do.  And if

8   other folks are going to make allegations in this case about

9   fraud, right, I'm going to take those allegations really

10  serious as well.  And everybody -- and I don't know where

11  this goes, but I think everybody ought to take a really hard

12  look, because if there is fraud, that's going to have to get

13  addressed, right?  And it's going to get addressed in a

14  manner that I'm not sure folks are going to want -- you

15  know, I'll deal with it.

16         If there are allegations -- unfounded allegations

17  of fraud and they're just being thrown around, then that's

18  going to get addressed as well.  I think I'm giving everyone

19  a fair opportunity, but this case cannot continue because

20  the petition wasn't originally signed correctly and 1008 --

21  Bankruptcy Rule 1008 has to mean something.

22         You can't file an unsigned petition and then you

23  know, seven days later correct it, right?  Because you know,

24  it just throws -- what do the -- what do the schedules do,

25  when did the automatic stay really go into effect?  And

1 folks are really acting like it was the seventh, but that's

2 really not the case. But maybe creditors have the ability

3 to exercise remedies past the seventh and were unable to do

4 it because there was an unsigned petition, and that has

5 consequences.

6 And so I want everyone to really do the diligence

7 that is required and really look at these documents the way

8 I have. And I'm telling you, some of you-all are reading

9 these documents in a way that I just -- I don't -- when I

10 just look at the plain language of them, I don't see it. So

11 everybody has to get really comfortable about what you did

12 and the steps that you took. And whether they're permissive

13 or not.

14 Maybe's there a reasonable basis for it. Can it

15 get into evidence, no one cited a statute to me, so we never

16 got there? So I don't need to start asking really hard

17 questions on all sides, but maybe everybody can take it and

18 do the diligence now, because this case should have never --

19 never even get here, because there wasn't an original

20 petition that could not be amended. That's the way I read

21 bankruptcy rule 1008.

22 So Mr. Singh, you know, I take very seriously that

23 your firm -- you know, you say it was a mistake or an error

24 and I get it, I mean that happens. But here's the chance

25 and you said you got the docs in a timely manner, and you

1  were relying on corporate counsel and all that, I just
2  everybody ought to know that when they sign something -- and
3  I'm not just talking to Mr. Singh, I'm talking to everyone
4  here, because folks are filing some really strong words with
5  some really strong language in each one of these pleadings
6  and if you sign it, I'm going to hold you to it.  And maybe
7  there's a reasonable basis to do it, maybe there's not.
8  That's not for me today.

9         So I know everybody had a bunch of evidence
10  presented, but I think the bankruptcy rules mean something
11  and I've got to -- and to me a voluntary petition may have
12  helped some parties today as a matter of fact based upon
13  where this could have gone.  And I don't have to ask
14  questions of a bunch of different parties today.

15         So I'm just going to enter a very short order
16  saying for the reasons stated on the record this bankruptcy
17  case is dismissed.  And if it gets refiled, we'll take up
18  all these issues.  And we'll have the hearing that we talked
19  about, we just can't have it today.  I'm uncomfortable
20  allowing the automatic stay to have continued from January
21  -- excuse me, from September the 7th, because technically
22  that meant that the schedules were due today or yesterday,
23  and we never got that.  And I don't want folks filing more
24  things under penalty of perjury in responding to it, or
25  making stronger allegations or having hearings in which

1  folks are going to -- you know, start throwing around words.

2  Everybody you've got a chance to go do some diligence,

3  everybody on all sides.  And maybe we see each other, maybe

4  we don't.  I wish everyone a good day.

5          I'll just enter a very short order, thank you.

6  We're adjourned.

7      (Proceeding adjourned at 11:47 a.m.)

8                          *  *  *  *  *

9          *I certify that the foregoing is a correct*

10  *transcript to the best of my ability due to the condition of*

11  *the electronic sound recording of the ZOOM/telephonic*

12  *proceedings in the above-entitled matter.*

13  */S/ MARY D. HENRY*

14  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17  *JTT TRANSCRIPT #64583*

18  *DATE FILED:  SEPTEMBER 28, 2021*

19

20

21

22

23

24

25