1                     REPORTER'S RECORD
                  VOLUME 1 OF 1 VOLUMES
2              TRIAL COURT CAUSE NO. 981,824

3  ERPILE, L.L.C.              ) IN THE COUNTY CIVIL COURT

4  vs.                     ) AT LAW NUMBER THREE (3)
                          )
5  OSAMA ABDULLATIF          )
  AND STEPHEN HUNT          ) HARRIS COUNTY, T E X A S

6

7

8       _____

9                       **HEARING**

10      _____

11

12     On the 13th day of June, 2011, the following

13  proceedings came on to be held in the above-titled and

14  numbered cause before the Honorable Linda Storey, Judge

15  Presiding, held in Houston, Harris County, Texas.

16     Proceedings reported by computerized stenotype

17  machine.

18

19

20

21

22

23

24

25

1                              **APPEARANCES**

2    Mr. Michael Phillips
     SBOT NO. 15939000
3    The Michael M. Phillips Law Firm
     515 North Velasco
4    Angleton, Texas  77515
     Telephone:  (979) 849-4382
5    Attorney for Plaintiff

6    Mr. Michael P. Fleming
     SBOT NO. 00073060
7    Michael P. Fleming & Associates
     440 Louisiana, Suite 1920
8    Houston, Texas  77002
     Telephone:  (713) 221-6800
9    Attorney for Plaintiff

10   Mr. Phillip L. Sampson, Jr.
     SBOT NO. 00788344
11   Mr. David W. Morris
     SBOT NO. 24046481
12   Bracewell & Giuliani
     711 Louisiana, Suite 2300
13   Houston, Texas  77002
     Telephone:  (713) 223-2300
14   Attorney for Defendants

15

16

17

18

19

20

21

22

23

24

25

3

**CHRONOLOGICAL INDEX**

**HEARING**

**June 13, 2011**                                              **PAGE**

Appearances                                                 2

Plaintiff's Witnesses   Cross(Cont)  Redir

Osama Abdullatif               6              69

Reporter's Certificate                             84

**EXHIBIT INDEX**

| PLF'S NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 8 | Resignation | 81 | 82 |
| 9 | Settlement Agreement | 81 | 82 |
| 10 | Assignment of Membership Interest | 81 | 82 |

| DEFT'S NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 2 | Assignment of Note and Liens | 13 | 14 |
| 3 | Receipt for purchase acknowledgment | 33 | 40 |
| 4 | Full release of liens | 44 | 44 |
| 5 | Deed of Trust | 54 | 54 |
| 6 | Special Warranty Deed | 57 | 57 |
| 7 | Deed of Trust, Security Agreement, and Absolute Assignment of Rents | 59 | 59 |
| 8 | Full Release of Liens and Security Interests | 63 | 63 |
| 9 | Company Agreement | 8 | 8 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    THE COURT:  Mr. Abdullatif, you were on
 2      the stand.  Let me re-swear you in.
 3                         OSAMA ABDULLATIF,
 4      having been previously duly sworn, further testified as
 5      follows:
 6                    THE COURT:  Do you promise to speak much,
 7      much louder?
 8                    THE WITNESS:  Yes, ma'am.
 9                    THE COURT:  I don't remember where we were
10      back and forth.
11                    MR. SAMPSON:  Your Honor, I was
12      questioning the witness.  We were on Exhibit 1,
13      Defendant's Exhibit 1.
14                    THE COURT:  Exhibit 1, that's the
15      membership regulations?
16                    MR. SAMPSON:  Yes, Your Honor.
17                    THE COURT:  And I had admitted that.
18      Okay.
19                    MR. SAMPSON:  May I approach?
20                    THE COURT:  Sure.
21                    MR. PHILLIPS:  As housekeeping, Your
22      Honor, counsel has advised me that he has a series of
23      certified copies of deeds and I agreed that he could
24      mark a copy.  He will show me he has a certified and
25      that way we won't have to go to the trouble of switching
```

 1   copies for originals later; and counsel has agreed,

 2   correct me if I'm misstating, that on the original

 3   documents I have offered into evidence, he has agreed to

 4   let me substitute copies at the end of the hearing.

 5            THE COURT:  And my understanding is your

 6   co-counsel is going to do the argument?

 7            MR. MORRIS:  Sure.

 8            MR. SAMPSON:  He may.

 9            THE COURT:  Why not?  Go ahead.

10            **CROSS-EXAMINATION (CONTINUED)**

11   BY MR. SAMPSON:

12       Q.   Mr. Abdullatif, last Thursday I believe we left

13   off discussing Exhibit No. 1 which is titled Membership

14   Regulations.  Do you see that document in front of you?

15       A.   Yes, sir.

16       Q.   Who signed these ERPILE membership regulations?

17       A.   I did.

18       Q.   When did you sign them?

19       A.   October 23rd, 2009.

20            THE COURT:  Didn't we already have

21   cross-examination on this or you just took him on voir

22   dire; that's what it was.

23            MR. PHILLIPS:  I took him on voir dire.

24            THE COURT:  And then he said after that "I

25   don't object," right?

1          *MR. SAMPSON:*  I don't remember.

2          *MR. PHILLIPS:*  Yes, Your Honor, I did.

3          *THE COURT:*  I thought that's what he said.

4    Okay.

5     Q.  *(BY MR. SAMPSON)* Mr. Abdullatif, under the

6    membership regulations, that this document describes

7    what the purpose of ERPILE, the company, is regarding

8    acquiring an assignment of a 4.5 million-dollar note; is

9    that right?

10    A.   Yes, sir.

11    Q.   And what was that note secured by?

12    A.   Secured by a property located at 1415 North

13   Loop West in Houston, Texas.

14    Q.   Is that the Northpark Office Tower?

15    A.   Northpark Office Tower, yes.

16    Q.   And down under the Article 3, members, what

17   does the document state regarding the hundred percent

18   ownership or the hundred percent owner of ERPILE?

19    A.   Osama Abdullatif.

20    Q.   And that's you?

21    A.   Yes, sir.

22    Q.   And the sole manager of ERPILE, what does the

23   document look like?

24    A.   Osama Abdullatif, and that's me.

25    Q.   Mr. Abdullatif, have you ever given up any of

```
 1   your interest in ERPILE?
 2       A.   No, sir.
 3       Q.   Have you ever been paid anything in exchange
 4   for giving up an interest in ERPILE?
 5       A.   No, sir.
 6               MR. SAMPSON:  Your Honor, defendants offer
 7   Defendant's Exhibit No. 9.
 8               MR. PHILLIPS:  We have no objections to 9,
 9   Your Honor.  Nine is identical to what we've had marked
10   for information purposes as Plaintiff's 14.  We may or
11   may not use our offer because we have an original.
12               THE COURT:  Was that you do or don't
13   object?
14               MR. PHILLIPS:  We do not object.
15               THE COURT:  Okay.  Defendant's 9 is
16   admitted.
17       Q.   (BY MR. SAMPSON) Mr. Abdullatif, I'm handing
18   you Exhibit 9.
19               MR. SAMPSON:  Your Honor, I'm sorry, I
20   don't have an additional copy of this for you.
21               THE COURT:  Just don't expect I'm going to
22   know what it says then.
23               MR. PHILLIPS:  I'm sorry, let me make sure
24   every page is the same.  I'm sorry, Your Honor.
25       Q.   (BY MR. SAMPSON) Mr. Abdullatif, what is 9?
```

1      *A.*   It says company agreement of ERPILE, LLC.

2      *Q.*   And on the first actual page of the document,

3  what is stated in the first paragraph?

4      *A.*   What article are you under, please?

5      *Q.*   The very first paragraph.

6      *A.*   Says the company agreement dated the 23rd day

7  of October 2009 and this company agreement for ERPILE --

8  you want me to read the whole article?

9      *Q.*   Mr. Abdullatif, could you please read, because

10 the Judge doesn't have a copy of this, this first

11 paragraph?

12     *A.*   "This Company Agreement, dated effective the

13 23rd day of October 2009, is hereby duly adopted as the

14 company agreement for ERPILE, LLC, a Texas limited

15 liability company, by the Managers, and is hereby

16 ratified, confirmed, and approved as such by the sole

17 Member."

18     *Q.*   Thank you.  Could you please turn to page 6 of

19 this ERPILE company agreement for me.

20              *THE COURT:*  Is this another agreement that

21 he wrote that he signed himself?

22              *MR. SAMPSON:*  No.  This is an agreement

23 that he utilized in forming ERPILE.

24              *THE COURT:*  In the formation.  Okay.  I

25 was just wondering, because, I mean, I figure as the

1    sole owner, shareholder in his mind, at the very least,

2    he can do whatever he wants, create whatever he wants,

3    and say whatever he wants.  My concern is more what

4    happened between the parties rather than what he did

5    unilaterally, but okay.

6        Q.   (BY MR. SAMPSON) Under Article 4.4, Mr.

7    Abdullatif, could you please read what that sentence

8    says on page 6, Article 4.4?

9        A.   4.4.  "There shall be only one Member of the

10   Company, that being Osama Abdullatif."

11       Q.   Did you sign this company agreement on the

12   back, in the back?

13       A.   Yes, sir.

14       Q.   Where did you get that company agreement?

15       A.   This company agreement I got from Ali, from Ali

16   Choudhri.

17       Q.   Why did you get this company agreement from Ali

18   Choudhri?

19       A.   When the company was formed, I needed one to

20   show the company agreement, that he said he had one

21   available, that he could do for everybody.  He offered

22   me one.  So, I said fine.  I said, "Get it prepared and

23   I'll use it."

24       Q.   So, you used the company agreement that Ali

25   Choudhri gave you in order to create that document in

1    Exhibit No. 9?

2       *A.*   Yes.

3                *THE COURT:*  Would you do me a favor, go

4    ahead and talk out loud.

5                Are you writing down when they murmur or

6    not as part of the record?

7                *THE REPORTER:*  No, Judge.

8                *THE COURT:*  Because I just don't know if

9    it's part of the record or I'm supposed to be hearing it

10   because you are not whispering.  You are sort of

11   murmuring.  I want to make sure I hear what I'm supposed

12   to hear and what goes in the record.

13               *MR. PHILLIPS:*  I was trying to see if I

14   had already made a companion of this and I have not,

15   Your Honor.

16               *MR. SAMPSON:*  Do you have an objection?

17               *MR. PHILLIPS:*  May I look at it?

18               *THE COURT:*  What number is that?

19               *MR. SAMPSON:*  Exhibit No. 2.

20               *THE COURT:*  Bear in mind, counsel, the

21   only exhibit I've laid eyes on so far is No. 1.

22               *MR. SAMPSON:*  Sure.

23               *THE COURT:*  With all that copying you

24   didn't get me a copy?

25               *MR. SAMPSON:*  No, I have it.

1          THE COURT:  This is going to be number?

2          MR. SAMPSON:  Two.

3          THE COURT:  This is my courtesy copy.  I

4    don't want to mess it up.

5          (Off the record)

6          MR. PHILLIPS:  On Exhibit 2 I have no

7    objection to the exhibit except I do object to the

8    cashier's checks and I would require some type of

9    authentication for them.

10          THE COURT:  Okay.  Prove them up, counsel.

11     Q.   (BY MR. SAMPSON) Mr. Abdullatif, could you

12    please take a look at the last two pages of Exhibit

13    Number 2?

14     A.   Yes.

15     Q.   What's on those pages?

16     A.   The first one is a check in the amount of

17    $1,500,000 to Ameripoint Title Company and the remitter

18    on that check is Osama Abdullatif and it's dated

19    October 23rd, 2009.

20     Q.   Mr. Abdullatif, do you have personal knowledge

21    of that check the copy of which is in Exhibit No. 2?

22     A.   Yes, sir, I do.

23     Q.   And, in fact, how do you have personal

24    knowledge of that check?

25     A.   I tendered this check from Allegiance Bank and

 1   I delivered it to the title company and I have it

 2   stamped when she received it from me October 23rd

 3   signed.

 4            THE COURT:  You have it stamped when she

 5   received it.  What?

 6            THE WITNESS:  The title company officer at

 7   the time, she signed reception of that check from me and

 8   give me a copy of it.

 9        Q.   (BY MR. SAMPSON) The second copy of the check

10   that's in Exhibit No. 2, what is that?

11        A.   It's a cashier's check from, made from Sterling

12   Bank for the amount of $900,000.  It is dated

13   October 23rd, 2009, the same day.  It is also made to

14   Ameripoint Title and ERPILE, LLC, Osama Abdullatif.

15        Q.   Do you have personal knowledge of that check in

16   that copy of the exhibit?

17        A.   Yes, sir, I do.

18            MR. SAMPSON:  Your Honor, I move to admit,

19   and if you'd like --

20            THE COURT:  I think they proved it up, so

21   do you have an objection now?

22            MR. PHILLIPS:  None, Your Honor.

23            THE COURT:  What number is that?

24            MR. SAMPSON:  May I leave it as Exhibit

25   No. 2?

1          THE COURT:  You're saying it's part of

2     Exhibit No. 2.  So, you don't have any objection to any

3     part of No. 2 now?

4          MR. PHILLIPS:  At this point I do not have

5     an objection to Exhibit No. 2.

6          THE COURT:  Leave it as Exhibit No. 2 and

7     hold.  I didn't realize it was only a part of Exhibit

8     Number 2.

9     Q.   (BY MR. SAMPSON) Mr. Abdullatif, what is

10    Exhibit No. 2?

11    A.   An assignment of note and liens.

12    Q.   Can you tell the Court what was going on in

13    connection with this assignment/transaction as reflected

14    in Exhibit No. 2?

15    A.   This is an assignment of the note from the

16    holder of the note, of the note called Architecture

17    Services International.  It's known as ASI dated

18    October 27, 2009.  And assigned the note and the deed of

19    trust that they have in their possession to ERPILE, LLC.

20    You want me to continue?

21    Q.   No, that's fine.  The note that I think we saw

22    referred to in the ERPILE regulation, 4.5-million-dollar

23    notes regarding the Northpark Office Tower, is that what

24    is being assigned here?

25    A.   Yes.  It's a promissory note, original date of

1   it, March 16th, 2006, and made by Northpark Office

2   Tower, LP and then 4 and a half million dollars original

3   amount.

4             *THE COURT:*  Let me ask a question.  Is

5   this before or after the alleged resignation of Mr.

6   Abdullatif?

7             *MR. SAMPSON:*  Before.

8             *THE COURT:*  I was going to say this case

9   is getting weirder and weirder.  At this point everybody

10   agrees he was still in the company.

11             *MR. PHILLIPS:*  Yes, Your Honor.

12     *Q.*  *(BY MR. SAMPSON)* Who signed this assignment of

13   note and liens on behalf of ERPILE?

14     *A.*  Osama Abdullatif.

15     *Q.*  Did you sign it, sir?

16     *A.*  Yes, sir.

17     *Q.*  On the first page of Exhibit No. 2, this

18   document states $2.395 million was in consideration

19   exchanged for the note and the lien, right?

20     *A.*  Yes, sir.

21             *THE COURT:*  Counsel, you need to know,

22   it's been a long day.  This has already been a long

23   hearing.  I'm just not seeing why this is relevant since

24   it is not disputed.  He was in the country at the time

25   this happened.  How is it relevant to what the issues

```
 1   actually are?
 2                  MR. SAMPSON:  Because Mr. Abdullatif
 3   through ERPILE purchased this note and lien.
 4                  THE COURT:  Mr. Abdullatif didn't do it.
 5   ERPILE did.  He did it on behalf of ERPILE.
 6                  MR. SAMPSON:  Through ERPILE, yes.
 7                  THE COURT:  On behalf of ERPILE.
 8                  MR. SAMPSON:  On behalf of ERPILE.
 9                  THE COURT:  There's a difference.
10                  MR. SAMPSON:  Yes.  He buys it on behalf
11   of ERPILE, a release of this lien that he paid, that
12   ERPILE paid $2.4 million.
13                  THE COURT:  That's the question.  Did he
14   personally pay it or was it ERPILE funds?
15                  MR. SAMPSON:  I am going to ask him.
16                  THE COURT:  Nobody disputes he was in
17   ERPILE at this time.
18                  MR. SAMPSON:  What the other side says, in
19   fact, Mr. Wakeland who filed responses on behalf of or
20   as the agent for ERPILE, what they say is that at the
21   same time that Mr. Abdullatif paid this money and bought
22   the note as ERPILE, that he also signed the resignation
23   and the assignment of membership interest.
24                  THE COURT:  That's why I'm asking, was it
25   at the same time?
```

 1            MR. SAMPSON:  At the same time.

 2            THE COURT:  Everybody just said it was

 3    before.  That's why I asked the question.

 4            MR. SAMPSON:  They say it was before.  I

 5    take it that it was before, because we say that the

 6    resignation of membership assignment never occurred,

 7    Your Honor.

 8            THE COURT:  I get that.  Assuming that it

 9    did, is the date on the resignation before or after the

10    date on this?  I didn't memorize the date.

11            MR. SAMPSON:  It's dated November 15, 2010

12    after this.

13            THE COURT:  Okay.

14            MR. SAMPSON:  They say it was signed at

15    the same time.

16            THE COURT:  Do they?

17            MR. PHILLIPS:  There were five documents

18    signed at the same time; and at the time we get back on

19    our case in chief, he signed off.

20            THE COURT:  So your contention is that he

21    laid out a couple of million dollars and resigned from

22    the company on the same day?

23            MR. PHILLIPS:  My position is he took --

24    he invested in the company that which he was to invest.

25    My client, Ali Choudhri, invested what he was to invest,

1    six hundred and one eight, I think.  He also signed
2    these other two documents that would exit him from the
3    company to be held for certain circumstances, which
4    we'll get into on the same day.

5         THE COURT:  Mr. Fleming, I noticed you
6    stood up and Mr. Tang has disappeared.  I ran him off.

7         MR. FLEMING:  From the hearing we had in
8    January, there was a series of documents which Mr.
9    Abdullatif never admitted signing.  Sort of went in
10   circles with him.

11        Remember, it was our contention and it was
12   in the documents that we admitted that Mr. Abdullatif
13   and Mr. Choudhri set up this company where he was going
14   to be the manager at the site agreements so that
15   Mr. Choudhri or his designee could take control of it if
16   he deemed it necessary.  So, those are those two
17   resignation documents signed which are, basically, held
18   in trust so that they could be activated later.  That's
19   why they were signed by Mr. Abdullatif a year before Mr.
20   Wakeland actually signed it.

21        THE COURT:  Not because it needed to be
22   more confusing or anything.

23        MR. SAMPSON:  That's why I am laying the
24   chronology as to ownership and what happened.  Because
25   what ended up happening was that Mr. Abdullatif gets cut

1  out of not only the note and the lien but also his

2  company is left with nothing when he pays his 2.4 --

3       *THE COURT:*  They didn't get rid of his

4  interest completely, did they?

5       *MR. SAMPSON:*  That's what they say.

6  That's why we're here.  They say he had zero interest in

7  ERPILE.

8       My only quick response, Your Honor, to

9  what Mr. Fleming just said is that, and we can go over

10  this, the participation agreement that you heard a lot

11  about, you went through it in the January hearing,

12  there's a participation agreement that Mr. Abdullatif

13  says he never signed.  The other side uses that to say

14  he was giving up an interest in ERPILE.  The

15  participation agreement, even if it had been signed, all

16  it would do is give Ali Choudhri an interest in the

17  note, not in the company.

18       *THE COURT:*  I get that.  Let me ask one of

19  you two.  You are not contending that he is not entitled

20  to his lien that he has individually, right?  You are

21  saying you can't go and sell the property without

22  accommodating my lien.

23       *MR. PHILLIPS:*  I think I can answer the

24  question, Your Honor.  This is an inception title issue.

25  The factual representations that I believe he will

1    testify today is that he refused to file the assignment

2    and demanded a bunch of extra money.  As a result of it,

3    it triggered two other documents.

4                 THE COURT:  Hang on.  My understanding of

5    why this injunction was originally filed was that

6    you-all came to me and said, "Hey, our $600,000 wasn't

7    accommodated here.  Because we have this interest in the

8    property, you can't sell it out from under us."

9                 MR. FLEMING:  They are bound by the

10   participation agreement.  I guess that's the short

11   answer.  They had this agreement that he would do this

12   assignment and be held in trust.  His compensation is

13   laid out --

14                 THE COURT:  He is not uncompensated here.

15   It's laid out in the agreement.  It's not he owns

16   nothing.

17                 MR. FLEMING:  If you recall from the first

18   hearing, the motivation for that first hearing was, one,

19   the foreclosure; and, two, he started demanding more

20   money than he was entitled to in the participation.

21                 THE COURT:  I get that.  But I'm saying

22   your contention that he is entitled to absolutely

23   nothing is not what they are saying.  He is entitled to

24   all the rights he has under the participation agreement

25   which is not nothing.

1          *MR. FLEMING:*  Yes.

2          *MR. SAMPSON:*  What I was saying is that

3    they allege here that he has zero interest in ERPILE.

4          *THE COURT:*  I get that.  They are saying

5    he has zero interest in ERPILE, except for what is due

6    under the participation agreement --

7          *MR. FLEMING:*  Right.

8          *THE COURT:*  -- and he no longer has any

9    right to run it because he signed all the other

10   documents.

11         *MR. FLEMING:*  Right.

12         *THE COURT:*  I think that's different from

13   saying he has no anything because of the agreement.

14         *MR. SAMPSON:*  I don't know what they are

15   going to end up saying that he individually is entitled

16   to receive.

17         *THE COURT:*  Where is the participation

18   agreement?  What number is that?

19         *MR. SAMPSON:*  I know it was part of their

20   Exhibit No. 1.

21         *THE COURT:*  It's part of Exhibit 1.  Could

22   somebody hand me --

23         *MR. FLEMING:*  It's in the transcript, Your

24   Honor.

25         *THE COURT:*  Somebody hand me that, because

```
1    those are down there and not up here.  I want to go
2    ahead and take a look at that right this second.  I know
3    it's frustrating when I keep stopping you; but if I
4    don't follow along as the questions come up, I can't
5    follow along.  Is this one of the ones that's a piece of
6    the transcript from the original?
7                  MR. SAMPSON:  It is.  We objected to it
8    based on foundation.
9                  THE COURT:  I know you.  You don't like
10   it.  I get it.
11                 MR. FLEMING:  It's also, the other issue,
12   is the $750,000 that he took --
13                 THE COURT:  I get the issues are different
14   in this case than they were in that case.  Under the
15   participation agreement, exactly what is he entitled to?
16   He is the principal, right, under it?
17                 MR. FLEMING:  Yes.
18                 THE COURT:  And that means the principal's
19   commitment is 1.8.  The principal's return is 1.8 plus
20   3.
21                 MR. FLEMING:  Yes.
22                 THE COURT:  So, they are saying he is
23   entitled to 1.8 plus 3 eventually whenever everything
24   kicks in which is 2.1.
25                 MR. SAMPSON:  I don't know if they've
```

1  admitted that or not.

2         THE COURT:  I don't know that they are not

3  admitting that.  I mean, that's what it says.

4         MR. PHILLIPS:  In this Exhibit 7 which is

5  in evidence, Your Honor.

6         THE COURT:  I'm holding it.  I am holding

7  Exhibit 7, the original, it says, the actual original.

8  I just want to see what it said.

9         You can go ahead.  You have to tolerate me

10 interrupting when I don't understand something.  I am

11 trying to understand.

12 Q.   (BY MR. SAMPSON) Mr. Abdullatif, where did the

13 $2.4 million come from that was paid as shown in Exhibit

14 No. 2 for the assignment of this Northpark note and

15 lien?

16 A.   From my bank.

17        THE COURT:  I still don't get how this is

18 relevant.  How is this relevant?  What are you talking

19 about?  Is it just me that doesn't think it's relevant?

20        MR. SAMPSON:  It's relevant, Your Honor,

21 because, in part, to disprove the participation

22 agreement.  That participation agreement purports to say

23 that he is going to pay 1.8, somebody else is going to

24 pay six hundred.

25        THE COURT:  They actually did pay six

hundred.  I've seen the check.  That's the one that
cleared.

        *MR. SAMPSON:*  I am about to show you what
that check was paid for.

        *THE COURT:*  I remember looking at it and
seeing his signature on the back.  It wasn't signed over
to anybody else.

        *MR. SAMPSON:*  You're right.

        *THE COURT:*  At least the copy I had.

        *MR. SAMPSON:*  Sure.

        *THE COURT:*  Which looks like he put it in
this bank account.

        *MR. SAMPSON:*  It does until you see the
receipt from the trustee at a foreclosure sale who notes
those two specific checks in those amounts from those
banks.  The receipt is signed by Ali Choudhri for the
purchase of a property --

        *THE COURT:*  Hang on.  But what he did with
the money, what does that have to do with they paid him
the money?  He could have done anything he wanted with
the money.

        *MR. SAMPSON:*  The receipt shows that the
$600,000 was paid by Ali Choudhri for the purchase of a
property or foreclosure sale.  It has nothing to do with
it.

1          THE COURT:  The money was not paid by Mr.

2   Choudhri to somebody else.  It was paid to him, Mr.

3   Abdullatif.

4          MR. SAMPSON:  That's not what the receipt

5   shows.

6          THE COURT:  That's how the check is made

7   out.

8          MR. SAMPSON:  The check is made out, I

9   believe, to Ali Choudhri himself.  I'll get to that.

10          THE COURT:  If it was made out to Ali

11   Choudhri, it wouldn't have your client's endorsement on

12   the back.

13          MR. SAMPSON:  You're right, but Mr.

14   Abdullatif can talk about this foreclosure sale.

15          THE COURT:  Hand me the whole transcript,

16   please, so I can look at the exhibits.  I know you feel

17   like you are doing this more than once, but I'm just not

18   understanding how what you are trying to get at now is

19   relevant to the issue in hand.

20          MR. SAMPSON:  I haven't done this yet at

21   all, Your Honor.  Y'all have done it before, but I

22   haven't.

23          THE COURT:  I know you haven't done it at

24   all.  But I feel I've done it a lot.

25          MR. SAMPSON:  I know you do.  I can tell,

1   Your Honor.

2                THE COURT:  You would think I didn't have

3   questions still.  The problem is the gap in time, even

4   though I read the transcript.

5                Okay.  Endorsed and given to him and then

6   it is signed by him.  Yeah, that's weird.  I don't know

7   what to say about that.  The whole thing is weird.  I

8   mean, you're right.  It does say what it says.  They are

9   made out to their client and then it says -- and who

10  knows who wrote that, right?  Endorsed and given to, the

11  date and then allegedly signed by your client.

12               MR. SAMPSON:  If it is his signature,

13  he'll agree to it.  If not, he will say it's not.

14               MR. FLEMING:  It's not the way it was in

15  January.

16               MR. SAMPSON:  I object to the sidebar.

17               THE COURT:  Overruled.  He is not wrong.

18               MR. SAMPSON:  Mr. Abdullatif consistently

19  said when things were and weren't his signature.

20               THE COURT:  Counsel, look, I was there.

21  You weren't.

22               MR. FLEMING:  Consistently said it looks

23  like my signature.

24               THE COURT:  I made a judgment on that, I

25  think, pretty clearly on the record.

```
 1            MR. SAMPSON:  May we proceed, Your Honor?
 2            THE COURT:  Yes.
 3       Q.   (BY MR. SAMPSON) Mr. Abdullatif, was there any
 4  contribution toward the $2.4 million that was paid for
 5  the assignment of the Northpark note and lien from Ali
 6  Choudhri?
 7       A.   No, sir.
 8       Q.   Was there any contribution toward that
 9  $2.4 million by anyone else other than you?
10       A.   No, sir.
11       Q.   What was the security for that note?
12       A.   Promissory note secured by Northpark Office
13  Tower, LP, on a property located at 1415 North Loop West
14  in Houston, Texas.
15       Q.   Mr. Abdullatif, have you ever released the note
16  or the lien that was assigned to ERPILE through Exhibit
17  No. 2?
18       A.   No, sir.
19       Q.   Have you ever authorized anyone else to release
20  the lien or the note reflected in Exhibit No. 2?
21       A.   No, sir.
22       Q.   Were you or ERPILE ever paid the principal and
23  interest on that note?
24       A.   No.
25       Q.   Who owed money on that note that ERPILE
```

1    purchased?

2        *A.*    Northpark Office Tower, LP.

3        *Q.*    Let me back up.  Was ERPILE paying off that

4    note or buying that note?

5        *A.*    No, it was -- I purchased -- ERPILE was

6    purchasing the note and it was assigned.

7        *Q.*    Who owned the note at the time?  Who owed money

8    on the note at the time?

9        *A.*    Northpark Office Tower, LP.

10       *Q.*    Who was the individual that was in charge of

11   running, that you dealt with, in terms of running

12   Northpark in 2009 and 2010?

13       *A.*    Ali Choudhri.

14       *Q.*    Who represented Northpark, LP in a bankruptcy

15   matter in early 2010?

16       *A.*    Richard Wakeland at that time.

17       *Q.*    So, both Richard Wakeland and Ali Choudhri were

18   affiliated with the entity that owed ERPILE $2.5

19   million?

20               *MR. PHILLIPS:*  Objection, leading.

21               *THE COURT:*  I think he was just restating.

22   Overruled.

23       *A.*    Yes.

24       *Q.*    *(BY MR. SAMPSON)* Mr. Abdullatif, in

25   November 2009 did Ali Choudhri pay $600,000 to anybody

 1   in a transaction that you were involved with?

 2        A.   Yes, sir.

 3        Q.   Who did you pay the money to?

 4        A.   To our trustee named Jeff Leva.

 5                  THE COURT:  Named Jeff who?

 6                  THE WITNESS:  Leva, L-E-V-A, I believe.

 7                  THE COURT:  L-E-V-E-R?

 8                  THE WITNESS:  L-E-V-A, I think.

 9                  THE COURT:  L-E-V-A-R.

10                  THE WITNESS:  No, there's no "r," Your

11   Honor.

12                  THE COURT:  Leva?

13                  THE WITNESS:  Yes.

14        Q.   (BY MR. SAMPSON)  What was the transaction

15   involving?

16        A.   It involved purchasing a property located in

17   Bellaire, Texas.

18                  THE COURT:  Isn't this all hearsay unless

19   Mr. Leva is going to come testify?  Did he invite him?

20                  MR. SAMPSON:  No, it's not hearsay,

21   because we're going to have Mr. Abdullatif prove up this

22   receipt.

23                  THE COURT:  You just asked him whether or

24   not their client paid this other person money, even

25   though your client is the one who endorsed the check

1  over somebody, apparently.  I don't understand, but

2  okay.

3       *Q.*   *(BY MR. SAMPSON)* This is Defendant's Exhibit 3.

4             *MR. PHILLIPS:* I object that the answer is

5  nonresponsive, Your Honor.

6             *THE COURT:* Sustained.  Has this been

7  admitted yet counsel?

8             *MR. SAMPSON:* No, Your Honor.

9             *THE COURT:* I don't know what it is,

10  85501.

11             *MR. SAMPSON:* I'm about to ask him.  I do

12  have an original on this if the Court would like to hold

13  this while we're proving it up.

14             *THE COURT:* Are you going to object to

15  this, counsel?  Show him the original, please.  Have

16  y'all exchanged these and have they seen it before?

17             *MR. SAMPSON:* I don't know.  I don't think

18  so.  They should, I mean, if I should have it.

19             *THE COURT:* You need to exchange things

20  before you get them to me for the first time.

21             *MR. SAMPSON:* There are things that I

22  haven't seen as well, Your Honor.

23             *THE COURT:* Some of that is because you

24  are kind of late to the case.

25             *MR. PHILLIPS:* We object.  We will have an

1   objection.  He would be required to do predicate on

2   that.

3                    THE COURT:  To do what?

4                    MR. PHILLIPS:  He hasn't laid the

5   predicate.

6                    THE COURT:  He would like you to lay the

7   predicate, if you can, I think is what he's saying.

8       Q.   (BY MR. SAMPSON) Mr. Abdullatif, what is

9   Exhibit No. 3?

10      A.   Exhibit No. 3 is a receipt for purchase

11  acknowledgment, usually given by trustee at a trustee

12  sale.  Describes the properties being sold and money

13  collected by the trustee.

14      Q.   Do you have personal knowledge of this document

15  in Exhibit No. 3?

16      A.   Yes, sir, I do.

17      Q.   What's the name of the company, the vesting

18  name of the company, that was the purchaser under this

19  receipt?

20      A.   Latif and Company.

21      Q.   Is that your company?

22      A.   Yes, sir.

23                    THE COURT:  Counsel, let me look at the

24  other one.  Things are cut off like signatures here.

25  That is not a good copy.  I don't understand what it is,

 1  other than a receipt.  Let me see what else it is.
 2  Substitute trustee.
 3              MR. SAMPSON:  Your Honor, it's a receipt
 4  you get when you buy something at the courthouse at a
 5  foreclosure sale.
 6              THE COURT:  I've never done that, so I
 7  don't know.
 8              MR. SAMPSON:  I haven't either.
 9              THE COURT:  I thought you got a deed.
10  That's all I ever see is constable's deed.  This is
11  Osama Latif.  Is that supposed to be Abdullatif?  It's
12  not the same name.  Is that an alias?
13              THE WITNESS:  Can I answer that, Your
14  Honor?
15              THE COURT:  Sure.
16              THE WITNESS:  I signed as Osama Latif.
17  I'm known as Osama Latif.  My full name is Osama
18  Abdullatif.
19              THE COURT:  Okay.  That is an alias.
20              MR. SAMPSON:  May I go on with predicate?
21              THE COURT:  Yes.
22      Q.   (BY MR. SAMPSON) Mr. Abdullatif, who is the
23  custodian of records from Latif and Company?
24      A.   I am.
25      Q.   In this document in Exhibit No. 3, is it a true

1  and correct copy of the original?

2      A.   Yes, sir.

3      Q.   Was this document made at or near the time,

4  that being November 3rd, 2009, by a person with

5  knowledge of the contents?

6      A.   Yes, sir.

7      Q.   Has this document been kept by Latif and

8  Company in the course of its regularly conducted

9  business?

10      A.   Yes.

11          MR. SAMPSON:  Your Honor, we move Exhibit

12  No. 3 be admitted.

13          MR. PHILLIPS:  Our objection is that it's

14  hearsay.  The proper predicate hadn't been made because

15  the original would be the best evidence.

16          THE COURT:  It's in my hand.

17          MR. PHILLIPS:  It's a copy of an original.

18          MR. SAMPSON:  It's the original receipt.

19          THE COURT:  Let me tell you my problem

20  with it.  I still don't understand why his endorsement

21  is the last one on the check before it cleared the bank.

22  Mr. Leva isn't here to explain this and I get that it's

23  listed here but I don't know who wrote it.

24          MR. PHILLIPS:  That is the other part of

25  my objection.

1           *THE COURT:*  Insofar as those questions are
2      unanswered, I'm going to sustain his objection.
3           *MR. SAMPSON:*  Your Honor, I just got
4      through proving it up as a business records exception.
5           *THE COURT:*  Well, that doesn't mean it
6      just comes in.
7           *MR. SAMPSON:*  It means that it is not
8      hearsay which is their objection.  I'm going to have Mr.
9      Abdullatif explain the answers to those questions as I
10     go through the documents.
11          *THE COURT:*  Well, let's start with those
12     and then offer it.
13          *MR. PHILLIPS:*  May I finish the objection?
14          *THE COURT:*  Yes.
15          *MR. PHILLIPS:*  You can't use your own
16     business records to turn a document into probated
17     evidence that you are intending to use.  His
18     manufactured business record which is a copy of some
19     document, and it comes in for the truth of the matter
20     stated.
21          *THE COURT:*  I don't know that it's
22     manufactured.  I am not going that far.  I am saying
23     that he didn't write it.  There's still a problem with
24     the face of the check.  He's the last endorsement on the
25     check.  Mr. Trustee didn't endorse it.  So, how do you

 1   explain that it went through a bank?

 2                   *THE WITNESS:*  Can I answer?

 3                   *MR. SAMPSON:*  I'll ask him that question.

 4                   *THE COURT:*  Okay.  Do that.  Maybe I'll

 5   change my mind, but right now their objection is

 6   sustained.

 7                   *MR. SAMPSON:*  May I approach, Your Honor?

 8                   *THE COURT:*  Yes.

 9      Q.   *(BY MR. SAMPSON)* Mr. Abdullatif, did you sign

10   this document, Exhibit No. 3?

11      A.   Yes, I did.

12      Q.   Were you present when Mr. Ali Choudhri signed

13   it as well?

14      A.   Yes, sir, I was.

15                   *MR. SAMPSON:*  I want to use these checks

16   in Exhibit No. 1, Your Honor.

17                   *THE COURT:*  Okay.  The one with his

18   signature is the last one.  Mr. Leva, the substitute

19   trustee, did not endorse it.

20                   *MR. SAMPSON:*  Right.

21                   *THE COURT:*  How is that?  Ask him.  I know

22   it's frustrating, but it's an important question.

23      Q.   *(BY MR. SAMPSON)* Could you take a look at

24   Plaintiff's Exhibit 8 which is attached to Plaintiff's

25   Exhibit 1 in this hearing.  Do you see those checks?

```
1        A.   Yes, sir, I do.
2        Q.   As we compare those checks to the checks listed
3   on Exhibit No. 3, is one of those checks Check No.
4   9010383837?
5        A.   Yes, sir.
6        Q.   What's the amount of that check in Exhibit No.
7   8 to Plaintiff's 1?
8        A.   $300,000.
9        Q.   What bank is it drawn on?
10       A.   Capital One.
11       Q.   The second check that is copied in Plaintiff's
12  8 to Plaintiff's 1, is that Check No. 9010383836?
13       A.   Yes, sir.
14       Q.   Is the amount $300,000 on that check?
15       A.   Yes.
16       Q.   Is it drawn on Capital One Bank?
17       A.   Yes, sir.
18       Q.   Mr. Abdullatif, who tendered those two
19  300,000-dollar checks to the bank trustee?  Who actually
20  handed it to him?
21       A.   Ali Choudhri.
22       Q.   Were you standing there with Mr. Ali Choudhri?
23       A.   Yes, sir.
24       Q.   Why were the checks tendered to the bankruptcy
25  trustee?
```

1      A.   To be for the trustee deed we buying from him.

2      Q.   For this property up in the legal description?

3      A.   For the property in the legal description

4   located in Bellaire, Texas.

5      Q.   Did the property that these checks pertain to

6   have anything to do with Northpark Office Tower?

7      A.   No.

8      Q.   Did it have anything to do with ERPILE?

9      A.   No.

10      Q.   Why is it that the -- first of all, were you

11   present when those checks were endorsed?

12      A.   Yes.

13      Q.   Why were the checks endorsed the way they were

14   endorsed?

15      A.   In most cases --

16      Q.   I'm just asking why these checks were endorsed

17   the way they were endorsed.

18      A.   That's what the trustee asked us to endorse.

19   That's what the trustee requirement was.

20      Q.   Who actually made that endorsement?

21      A.   Endorse given to Osama Abdullatif.  I endorse

22   on the bottom, November 3rd, 2009.

23      Q.   And that's actually the date of the trustee

24   sale that is listed on Exhibit No. 3?

25      A.   Yes, sir.

1      *Q.*   The reason the checks were endorsed the way

2   they were, that's what the bankruptcy -- or the

3   foreclosure trustee told you to do?

4      *A.*   Yes.

5              *MR. SAMPSON:*  Your Honor, we would tender

6   Exhibit No. 3.

7              *THE COURT:*  Tell me again how it is that

8   they ran through a bank -- if endorsed them over to the

9   trustee, how did they get cash?  I don't know how he can

10  answer this.  If you gave the checks to the trustee,

11  where is the trustee's endorsement or signature into a

12  bank?

13             *MR. SAMPSON:*  Do y'all have the originals

14  of those checks?

15             *MR. PHILLIPS:*  We have what we have when

16  we offered them into evidence.

17             *THE COURT:*  That wasn't his question.

18             *MR. PHILLIPS:*  I don't have the originals.

19             *THE COURT:*  The bank has the originals.

20  Your guess is there's another endorsement under the

21  magic line?

22             *MR. SAMPSON:*  Not an endorsement but a

23  stamp or some kind of computer generated --

24             *THE COURT:*  An electronic deal.  Like they

25  run through an electronic machine.

1          MR. SAMPSON:  You can see some light

2    writing here on the back.  I don't have the original.

3    The only evidence is that they were given pursuant to

4    the --

5          THE COURT:  Even if that's true, let's say

6    they went through to the trustee, how does that still

7    not constitute a payment from Mr. Choudhri to Mr.

8    Abdullatif?

9          MR. SAMPSON:  It does.  It does not

10   constitute a payment from Mr. Choudhri to Mr. Abdullatif

11   under a participation agreement or for ERPILE or for

12   Northpark.

13         THE COURT:  Even though it's the exact

14   $600,000 that needs to be required under the agreement?

15         MR. SAMPSON:  The reason, Your Honor, is

16   because that participation agreement was manufactured

17   after the fact by Mr. Ali Choudhri.  He is using these

18   payments that he made for something totally unrelated in

19   order to be able to come back in --

20         THE COURT:  I get it.  Your case is going

21   to be that they manufactured a case; and their case is

22   that you manufactured the case.  All right.  I got it.

23         MR. PHILLIPS:  We object to the hearsay.

24         THE COURT:  He is testifying.  I asked him

25   specifically what is the theory behind this.  He just

answered me.  So, overruled.

          *MR. SAMPSON:*  Plaintiff's Exhibit 3 is in, Your Honor?

          *MR. PHILLIPS:*  It's still hearsay.  You can't use your business records for probated evidence. You can use someone else's business records, but not your own.

          *THE COURT:*  I have not admitted this into evidence.  I have admitted the testimony.  I am thinking about it.  I get your point.

          *MR. SAMPSON:*  The custodian for the company --

          *THE COURT:*  I don't necessarily doubt that it happened.  I'm going to go ahead and admit it.  It will be Defendant's what?

          *MR. SAMPSON:*  Three, Your Honor.

          *THE COURT:*  He still gave him $600,000.  I understand your theory behind it.  It's still two checks from their client in the amount of $600,000 to your client, whatever they were used for.  I get that you are saying they had this agreement and that's not what the money was for but it's still, you know, I get it.

          *MR. SAMPSON:*  The reason is simply to show that the money was not paid for any interest in Northpark --

```
 1              THE COURT:  I get that that's your
 2    contention, but that is one of the issues.
 3              MR. SAMPSON:  It is which is disputed by
 4    this --
 5              THE COURT:  I don't think that disputes it
 6    at all, but okay.
 7         Q.   (BY MR. SAMPSON) Mr. Abdullatif, has Ali
 8    Choudhri ever paid you money or given you anything of
 9    value to buy an interest in the Northpark
10    45-million-dollar note?
11         A.   No, sir.
12         Q.   Has anyone ever paid you any money or given you
13    anything of value to buy an interest in that
14    45-million-dollar Northpark note?
15         A.   No.
16         Q.   Has Ali Choudhri or anyone else ever given you
17    anything of value to buy an interest in ERPILE?
18         A.   No.
19         Q.   Have you ever resigned from ERPILE?
20         A.   No, sir.
21         Q.   Have you ever signed a resignation document
22    from ERPILE?
23         A.   No.
24         Q.   Have you ever received any money or any
25    payments in exchange for resigning from ERPILE?
```

1      *A.*   No.

2      *Q.*   Have you ever signed an assignment of

3  membership interest in ERPILE?

4      *A.*   No.

5      *Q.*   Have you ever received any payment or anything

6  of value in exchange for an assignment of membership

7  interest in ERPILE?

8      *A.*   No.

9              *MR. SAMPSON:*  Your Honor, may I approach?

10             *THE COURT:*  All right.  Show it to

11 opposing counsel before you bring it up.

12             *MR. SAMPSON:*  Sure.  This is Richard

13 Wakeland -- Your Honor, I'll identify this.  This was

14 Document Exhibit 2 to the abatement proceeding.  It is

15 Defendant Richard Wakeland Rule 12 motion challenging

16 authority in the district court matter and it is

17 verified --

18             *THE COURT:*  What does that have to do with

19 this case?

20             *MR. SAMPSON:*  Because in it Mr. Wakeland,

21 who is the agent who filed this lawsuit for ERPILE, says

22 that the resignation and the assignment of membership

23 interest document that you asked about earlier were

24 actually signed at the same time that my client paid the

25 money to buy the note.  You said because it's true why

```
 1   would anybody pay $2.4 million and then just give up and
 2   resign the company and assign their membership interest
 3   for it.  They wouldn't.
 4                THE COURT:  How is he going to prove -- is
 5   that already in evidence?
 6                MR. SAMPSON:  No, it is a statement by a
 7   party opponent.
 8                THE COURT:  Why are you introducing it
 9   through him?
10                MR. SAMPSON:  Because he is the witness.
11                THE COURT:  He didn't write it.
12                MR. SAMPSON:  You're right.
13                THE COURT:  So you can't prove that up
14   through him.
15                MR. SAMPSON:  He knows what it is.  He's
16   seen it.
17                THE COURT:  You can't prove that up
18   through him.  You can prove it up through Mr. Wakefield.
19   Is that his name?
20                MR. PHILLIPS:  Wakeland, Your Honor.
21                MR. SAMPSON:  To be honest, Your Honor,
22   we've already talked about this.  I think they've
23   already acknowledged that their position is that the
24   assignment of membership interest and the resignation
25   were allegedly signed back in October of 2009 at the
```

1    same time my client paid a bunch of money.

2                THE COURT:  I get that.  But you can't put

3    a sworn statement in through somebody else through this

4    witness, so do something else.

5                MR. SAMPSON:  I am not going to do that.

6    Q.   (BY MR. SAMPSON) Mr. Abdullatif, did you

7    discover anything interesting about ERPILE's

8    4.5-million-dollar note and lien in December of 2010?

9                MR. PHILLIPS:  Objection, that's --

10               THE COURT:  Clearly there's something they

11   want to tell you so just let them tell you.

12   A.   Yes.

13   Q.   (BY MR. SAMPSON) What did you see?

14   A.   I seen in public records, real estate public

15   records, assignments and new liens and new releases.

16               MR. SAMPSON:  Your Honor, defendants would

17   offer --

18               MR. PHILLIPS:  Could I get a copy of it?

19               MR. SAMPSON:  Yes.  Defendants would offer

20   as Exhibit 4 a September 9, 2009 lien release.  I don't

21   believe there's any objection.

22               THE COURT:  Is there an objection?

23               MR. PHILLIPS:  There's no objection, Your

24   Honor.

25               THE COURT:  Defendant's 4 is admitted

45

1    without objection.

2              *MR. SAMPSON:*  Your Honor, I don't have a

3    copy.

4              *THE COURT:*  Let me look at it and I'll

5    hand it back.  I don't need very long just give me a

6    second.  Tell me what is the legal effect of this.

7              *MR. SAMPSON:*  This is a release of lien.

8    It is a release, purported release, of the lien that

9    ERPILE bought on October 27, 2009.

10             *THE COURT:*  So the legal effect of that?

11   Just give it to me in plain English.  What does it mean?

12             *MR. SAMPSON:*  It means that Ali Choudhri

13   or somebody connected with Ali Choudhri had this

14   September 9, 2009 lien release in his pocket, allowed my

15   client to buy this note and lien and a year later, you

16   can see the date this was actually filed of record,

17   October 22, 2010, a year after this was signed, it was

18   filed of record to purportedly extinguish the lien that

19   my client had paid $2.4 million for.

20             *THE COURT:*  After this was signed?

21             *MR. SAMPSON:*  Yes.

22             *THE COURT:*  That's weird, counsel.  What

23   about that?

24             *MR. PHILLIPS:*  Well, it's very simple,

25   Your Honor.  That release was sent to a title company.

46

1   The title company had it.  Mr. Osama refused to file the

2   assignment and demanded he be paid 900,000 or a million

3   dollars.  It triggered the, removing him from the

4   company based upon the participation agreement and the

5   transaction was completed.

6          THE COURT:  So, you're saying the trigger

7   happened back in '09?

8          MR. PHILLIPS:  The date of this document

9   is ASI signed that document and tendered it to a title

10  company to be distributed once the loan was funded.  A

11  decision was made to assign the note rather than release

12  the lien.  That release was sitting at the title

13  company.  Mr. Osama refused to file the assignment.  As

14  you will see the exhibit that is in evidence has not

15  been filed of record, yet, he's sued a bank for taking

16  action --

17         THE COURT:  You've lost me.  Which

18  assignment?  You are talking about Defendant's 2?

19         MR. PHILLIPS:  Yes, ma'am.  He refused to

20  comply with his agreement by filing the assignment and

21  holding the transaction up for more money than his

22  $300,000.

23         THE COURT:  His 1.7 plus three.

24         MR. PHILLIPS:  His agreement in the

25  participation agreement was I'll furnish a million

1   eight.  I'll get 300 -- a million eight plus six is 2.4.
2   I'll receive $300,000 as a fixed profit; and I'll get a
3   new loan.  In exchange for that I'll make this $300,000
4   off my million eight investment.  He received, after
5   this 2.4 was paid, he was given that assignment.  He was
6   supposed to follow the assignment.  He refused to file
7   the assignment.  So, it killed the transaction and they
8   couldn't go forward.
9              After a number of demands it became clear,
10  he was holding the transaction up for an additional
11  900,000 or a million.  The other two documents were
12  filled in and the transaction was completed with a
13  release because by that point in time there had to be a
14  new note made.  We had the witness here yesterday or at
15  the preceding hearing.  I asked for him to make sure his
16  office said he'd come back.  I didn't realize it would
17  be necessary today.  But prepared all the documents and
18  will give direct testimony on the preparation of the
19  documents and how they are used.  That's the Haynes and
20  Boone lawyer whose named Bruce Merwin.
21             *THE COURT:*  All right.
22             *MR. SAMPSON:*  That lien release that is in
23  Exhibit No. 4, this lien release was signed in September
24  of '09 in connection with an attempted bank refinancing
25  by Northpark, this building.  Because refinancing was

1   going to be done, because the bank was going to make a

2   new loan, the old note had to be released.  That's why

3   this document was signed by ASI as a lien release in

4   connection with this attempted bank financing.

5            The bank financing fell through which is

6   where Mr. Abdullatif comes in to actually buy the note

7   rather than the note being canceled through refinancing.

8   The problem is that while the old note holder signed

9   this lien release in connection with a potential bank

10  financing, the bank financing never occurred.  This

11  document has zero force and effect.  However,

12  somebody --

13            THE COURT:  Just for grins, which one are

14  you holding up?

15            MR. SAMPSON:  Excuse me.

16            THE COURT:  You said "this document."

17  What is that?

18            MR. SAMPSON:  This is the ASI,

19  Architectural Services, Inc., lien release that was

20  signed in September but not filed for over a year.  We

21  will prove one way or another, once we go through

22  discovery, somebody on the other side of us, in that

23  case and in this case had this invalid lien release from

24  a transaction that never occurred and they had it and

25  held it for a year and they filed it when they were just

1  about to refinance the property again.  And what I'm

2  about to show you through other real estate records, is,

3  Your Honor, what happened was this invalid lien release

4  was filed so that a bank would make a loan to

5  Mr. Wakeland/Mr. Choudhri's company and satisfy as it

6  was paid off, not ERPILE's lien that it bought, but,

7  rather, the lien of a Choudhri-family-related-alleged

8  loan that somehow creeps in.  After Mr. Abdullatif buys

9  this note, out of whole cloth appears a $4.3 million

10  promissory note for a loan made by one of Mr. Choudhri's

11  family member's company to Northpark.  That's the loan

12  that gets paid off with some refinancing in October of

13  last year, not ERPILE.  Because these guys made sure

14  that ERPILE's lien was gone.  Cleared the way for their

15  own company to get paid.

16          And I'll finally add that what is really

17  remarkable about the Choudhri-related-family's-alleged

18  loan, it gets $4.3 million paid off with some financing

19  in October of last year, is that that loan was allegedly

20  made October 30, 2009, three days after ERPILE buys its

21  notes, 4.3-million-dollar loan from a Choudhri related

22  company, AIGWT.  However, Northpark in bankruptcy, we

23  talked about a Northpark bankruptcy which was in place

24  in early 2010, Northpark never discloses a thing about

25  any AIGWT note.  The reason we will prove at trial is

1    because it never existed.  Once the Choudhri family had

2    gotten rid of ERPILE's lien, it filed its own deed of

3    trust in the real property records and gets it paid off

4    by the refinancing rather than my client.  That's what

5    is clear from the documents that are in the real

6    property records.  That's what the document in the real

7    property records show.  That's where this lien release

8    in Exhibit No. 4 signed in September for a deal that

9    never went through.  Somebody held onto it and filed it

10   a year later so that a different note would get paid

11   off.  That's what we have here.

12            MR. PHILLIPS:  There's a couple of weeks

13   of testimony for him to be able to establish it but when

14   you trash in, trash out.  I'll represent to Your Honor

15   is whatever kind of story his client has told him is not

16   consistent with the truth of the evidence that's before

17   Your Honor thus far in this trial which is this man was

18   to get $300,000 and he was to obtain a loan.  They have

19   never, and one question I would sure welcome you asking

20   him, where is the recording information on this transfer

21   of lien because all he had to do was file the transfer

22   of lien in the deed records and no one could have

23   released anything.  He protects himself by filing the

24   transfer of lien.  He refused to file the transfer of

25   lien.  He had limited participation in this field.  He

1  was to come into the deal, bring one million eight, earn
2  300,000.  Now, there was another circumstance where you
3  could add 4500 a month for 18 months but that was
4  handled different.  That was if there was a foreclosure.
5  That's probably not relevant for this hearing.  But he
6  is limited to a handsome profit, 300,000.  His million,
7  eight goes in and he had a lender that was supposed to
8  make a loan immediately, but he didn't do that because
9  he demanded to be paid a million rather than the --
10  either 900 or a million, rather than the 300,000 he had
11  agreed to earn.  And he refused to file the release of
12  lien which he will not be able to explain to you why he
13  didn't put the release of lien of record because none of
14  these bad things that they are talking about could have
15  happened.  But for his filing --
16          *THE COURT:*  Let's get away from the
17  argument.  Are you going to pass him soon?
18          *MR. SAMPSON:*  After I go through three or
19  four real property records to show you.
20          *THE COURT:*  All right.
21     *Q.   (BY MR. SAMPSON)* With respect to Exhibit No. 4,
22  Mr. Abdullatif, this document, when was it signed?
23     *A.*   It was signed on the third page.  Shows it was
24  signed September 9, 2009.
25     *Q.*   Does this document concern the promissory note

```
 1    that ERPILE had bought?
 2                   MR. PHILLIPS:  Which exhibit?
 3                   MR. SAMPSON:  Exhibit 4.
 4        Q.   (BY MR. SAMPSON) Does this document pertain to
 5    the promissory note, 4.5-million-dollar note that ERPILE
 6    had purchased?
 7        A.   Yes.
 8        Q.   When was it filed in the real property records?
 9        A.   It was filed October 22nd, 2010.
10        Q.   Over a year after it was signed?
11        A.   Almost about thirteen plus month.
12        Q.   Who filed it?
13        A.   I don't know.
14        Q.   Did you authorize anybody to file this for
15    ERPILE?
16        A.   No, sir.
17        Q.   Was this release part of a potential bank
18    refinancing in September '09 that never went through?
19                   MR. PHILLIPS:  Objection, may I take the
20    witness on voir dire?  Objection, hearsay.
21                   THE COURT:  Which one do you want?
22                   MR. PHILLIPS:  Hearsay.
23                   THE COURT:  Sustained.
24        Q.   (BY MR. SAMPSON) Mr. Abdullatif, have you
25    reviewed bank financing records for a transaction
```

1   between Northpark and a potential bank financier back in

2   September of 2009?

3      *A.*   In October.

4      *Q.*   September, October '09?

5      *A.*   2010.

6      *Q.*   Have you seen any potential bank financing

7   documents relative to potential financing between

8   Northpark and the bank back in September, October

9   of 2009 that never went through?

10      *A.*   No.

11      *Q.*   Were you involved in any potential bank

12   financing between Northpark and a bank in September,

13   October '09?

14      *A.*   No, sir.

15      *Q.*   Did Ali Choudhri or anybody else make you aware

16   of a bank financing in September or October '09 that

17   fell through?

18      *A.*   They mentioned during the bankruptcy hearing

19   there was financing but their partner never --

20           *MR. PHILLIPS:*  Objection, hearsay.

21           *THE COURT:*  Sustained.

22      *A.*   Never, never --

23           *THE COURT:*  When I sustain the objection,

24   stop talking, please.

25           *THE WITNESS:*  Yes, ma'am.  Thank you.

1    *Q.   (BY MR. SAMPSON)* When did you find out about
2    the existence of this release of lien in Exhibit No. 4?

3        *A.*   October 22nd.  When I found out about it, it
4    was September 13th, 2010 from the real property record
5    in Harris County.

6        *Q.*   Is that the date you got the certified copy of
7    this document?

8        *A.*   Yes.

9        *Q.*   Did you learn in December 2010 that in addition
10   to this release of the lien that ERPILE had purchased
11   being filed, anything else was happening with respect to
12   Northpark Office Tower?

13       *A.*   There was other documents regarding new loan
14   and new transfer of assets to secure my loan.

15               *MR. PHILLIPS:*  Counsel has shown me D5.
16   We don't have any objection to D5.

17               *MR. SAMPSON:*  Defendants would offer
18   Exhibit No. 5 which is a deed of trust regarding lender
19   First Community Credit Union.

20               *THE COURT:*  Let me see it.  Did you say no
21   objection, counsel?

22               *MR. PHILLIPS:*  Correct.

23               *THE COURT:*  Defendant's 5 is admitted.
24   The release of lien was 4, right?

25               *MR. SAMPSON:*  Yes, Your Honor.

1      Q.   (BY MR. SAMPSON) Mr. Abdullatif, what is

2   Exhibit 5?

3      A.   Exhibit 5 is a deed of trust.

4      Q.   Do you know what property this deed of trust

5   refers to?

6      A.   Refers to a property located in Harris County

7   at 1415 North Loop West owned by Northpark Office Tower,

8   LP.

9      Q.   Is that the Northpark Office Tower building

10  that was the security for ERPILE's lien?

11     A.   Yes.

12     Q.   Who signed this deed of trust on behalf of 1415

13  North Loop West?

14     A.   Would be signed by Ali Choudhri as the manager.

15     Q.   And the date it was signed?

16     A.   October 28, 2010.

17     Q.   The security for this deed of trust is the same

18  security ERPILE had for the note it had purchased?

19     A.   Yes.

20     Q.   Who was the lender under this deed of trust?

21     A.   First Community Credit Union.

22     Q.   If you look on page two of this document, can

23  you tell the Court what the amount of the loan is that

24  was being made by First Community Credit Union with

25  respect to this property?

1      A.   Well, it shows other specific debts,

2  $6,500,000.

3      Q.   So, a 6.5-million-dollar loan was being made

4  with respect to Northpark Office Tower building?

5      A.   Yes.

6      Q.   Did anyone make you aware that in October 2010

7  the property that ERPILE had a lien against was being

8  refinanced?

9      A.   No.

10      Q.   Did anyone make you aware that ERPILE's lien

11  that it had purchased was going to be released as part

12  of this refinancing?

13      A.   No.

14      Q.   Who owned the office building at Northpark

15  Office Towers at the time when ERPILE purchased the

16  note?

17      A.   Northpark Office Tower, LP.

18      Q.   Who was the individual in charge of running

19  Northpark?

20      A.   Ali Choudhri.

21      Q.   Who is the grantor of this deed of trust now in

22  October 2010?

23      A.   1415 NLW, LLC.

24      Q.   Mr. Choudhri signed as manager of 1415 --

25      A.   Yes.

1      *Q.*   Do you have any idea why this deed of trust
2  references 1415 as the grantor as opposed to Northpark?
3      *A.*   They did a transfer of assets from Northpark to
4  this entity.
5                  *MR. SAMPSON:*  Offer Defendant's 6, a
6  Special Warranty Deed between Northpark Office Tower and
7  1415 NLW.
8                  *THE COURT:*  Any objection?
9                  *MR. PHILLIPS:*  No objection to the
10 document.
11                 *THE COURT:*  Defendant's 6 is admitted
12 without objection.
13     *Q.*   *(BY MR. SAMPSON)* Mr. Abdullatif, what is
14 Exhibit 6?
15     *A.*   Six is a special warranty deed.
16     *Q.*   Who is deeding property -- who is the entity
17 that is actually deeding the property over?
18     *A.*   Northpark Office Tower, LP.
19     *Q.*   Who is the entity that's receiving the property
20 transfer?
21     *A.*   1415 NLW, LLC.
22     *Q.*   Who signed the special warranty deed on behalf
23 of Northpark Office Tower?
24     *A.*   Ali Choudhri, as the manager.
25     *Q.*   Is the property that's being transferred under

1    the special warranty deed the office tower that serves

2    as a basis of the note and lien that ERPILE purchased?

3         A.   Yes, sir, same property.

4         Q.   What's the date of this transfer?  When was it

5    recorded?

6         A.   It was recorded October 29, 2010.

7         Q.   The property was transferred from an entity

8    that was run by Mr. Ali Choudhri to an entity that was

9    controlled by Mr. Ali Choudhri?

10        A.   It was signed October 27, 2010.

11        Q.   By Mr. Choudhri?

12        A.   By Mr. Choudhri, yes.  October 27.

13        Q.   On or around October 27, 2010, Mr. Ali Choudhri

14   transfers the property that serves as the security

15   interest of ERPILE's lien from one entity that he

16   controls to a different one?

17        A.   Yes.

18        Q.   At the same time, again, I believe that the

19   ERPILE lien release, excuse me, the ASI lien release in

20   Exhibit No. 4 was filed in late October 2010?

21        A.   It was filed October 22nd, 2010.

22        Q.   And that's the release that purported to

23   release the lien that ERPILE had purchased?

24        A.   Yes.

25        Q.   So, at around the same time that ERPILE's lien

1    was being released and a 6.5-million-dollar loan was

2    being made on the property, the property was also

3    transferred from one Choudhri entity to another?

4        A.   Yes.

5              MR. SAMPSON:  Your Honor, defendants offer

6    as Exhibit 7 a deed of trust, security agreement and

7    absolute assignment of rents dated October 30, 2009 with

8    Northpark Office Tower as the grantor.

9              THE COURT:  Again, this is relevant how?

10             MR. SAMPSON:  Because it shows the fraud.

11   This is the lien that was -- the loan that was

12   apparently made in October 2009 but it was not filed of

13   record until October of 2010 in order to get paid off by

14   the 6.5-million-dollar loan rather than ERPILE's lien

15   being paid off.

16             THE COURT:  Okay.  Are y'all going to

17   object to Defendant's Exhibit 7?

18             MR. PHILLIPS:  We don't think it's

19   relevant, but we're not objecting to the authentication.

20             THE COURT:  Defendant's 7 is admitted.  I

21   had questions about the relevancy, too; but I assume he

22   will clear this up.  Let me ask you all this:  Have

23   you-all seen any of these deeds prior to today?

24             MR. PHILLIPS:  I'm sure my client has.  I

25   am sure these are legitimate deeds.

1           THE COURT:  That wasn't my question.

2           MR. PHILLIPS:  I haven't seen them, no,

3     ma'am.

4           THE COURT:  I was wondering if they get

5     how they are relevant, too, that's all.

6           MR. SAMPSON:  Your Honor, all of these

7     documents are attached to the big petition we filed in

8     district court --

9           THE COURT:  So, they have seen them.

10          MR. SAMPSON:  Absolutely.

11          MR. PHILLIPS:  Depending on whether or not

12    they've been served.  I mean, I am not arguing with him.

13    I am saying I don't know how they are relevant, but I am

14    not objecting to them being authentic, because he showed

15    me the certified copies.

16          THE COURT:  All right.

17    Q.    (BY MR. SAMPSON) Mr. Abdullatif, we've seen the

18    6.5-million-dollar loan in October of 2010.  It seems

19    that somebody filed a purported lien release of lien

20    that ERPILE had purchased.  Do you know from reviewing

21    the real estate document what lien or note was being

22    paid off in connection with the 6.5 million-dollar

23    financing?

24    A.    A promissory note from a deed of trust to a

25    company called AIGWT, Inc.

1      *Q.*   Is that what is reflected in Exhibit No. 7?

2      *A.*   Yes.

3      *Q.*   What is the date of this deed of trust in

4  Exhibit No. 7?  It's on the front page.

5      *A.*   October 30, 2009, date of effective.

6      *Q.*   Who signed this deed of trust back on page 13

7  on behalf of Northpark?

8      *A.*   On behalf of Northpark, it will be Ali Choudhri

9  as the manager.

10      *Q.*   What is Ali Choudhri's mother's name?

11      *A.*   Shahnaz Akhter Choudhri.

12      *Q.*   Who is the trustee under this deed of trust?

13      *A.*   Shahnaz Akhter.

14      *Q.*   So, Mr. Ali Choudhri, who executed this deed of

15  trust, his mother is actually the trustee on behalf of

16  AIGWT?

17      *A.*   Using her maiden name, yes.

18      *Q.*   This effective date of October 30, 2009, first

19  of all, down under the obligation, you see the

20  obligation references an October 30, 2009 promissory

21  note in the amount of $4.3 million executed by Northpark

22  and payable to AIGWT?

23      *A.*   Yes.

24      *Q.*   This effective date of this deed of trust and

25  of the note, this alleged note, is October 30, 2009,

1    right?

2         A.    Yes, sir, October 30, 2009.

3         Q.    How long after the date that you had paid

4    money, 2.4 million, to purchase the note and lien was

5    this promissory note in Exhibit 7 made?

6         A.    Three days.

7         Q.    Did anybody ever tell you about the note or

8    deed of trust that is reflected in Exhibit No. 7?

9         A.    No, sir.

10        Q.    Allegedly and according to this document, the

11   4.3 million-dollar loan was made in October of 2009; is

12   that right?

13        A.    Yes, October 30, 2009.

14        Q.    When was this deed of trust actually filed of

15   record?

16        A.    October 22, 2010, almost a year after.

17        Q.    Approximately a year later?

18        A.    A year and 22 days, yes.

19        Q.    That's at virtually the identical time when

20   Northpark was obtaining this 6.5-million-dollar loan on

21   its property?

22        A.    Same week, same time.

23        Q.    It's roughly the same time that the lien

24   release for the lien that ERPILE had purchased which was

25   a year old --

1      *A.*   Yes.

2      *Q.*   Rather than 6.5-million-dollar loan going to

3   pay off the note that ERPILE purchased, that money

4   actually went to pay off this alleged note reflected in

5   Exhibit No. 7; is that right?

6      *A.*   Yes, presumably.

7            *MR. PHILLIPS:*  I am not going to have an

8   objection.

9            *MR. SAMPSON:*  Defendants would offer

10  Exhibit No. 8 which is a full release of liens and

11  security interests executed by AIGWT regarding this

12  4.3-million-dollar note that we just went through.

13           *THE COURT:*  Any objection to Defendant's

14  8?

15           *MR. PHILLIPS:*  I have no objection with

16  regard to the authentication of the document.  I don't

17  know how it's relevant.

18           *THE COURT:*  Are you saying objection,

19  relevancy or are you saying objection --

20           *MR. PHILLIPS:*  I have no object --

21           *THE COURT:*  Pick one, counsel.  You either

22  object or you don't.

23           *MR. PHILLIPS:*  Objection, not relevant.

24           *THE COURT:*  Tell me again why it's

25  relevant.

1           *MR. SAMPSON:*  This is the lien release

2     that Ali Choudhri's mother filed.

3           *THE COURT:*  Secured.

4           *MR. SAMPSON:*  After her alleged

5     4.3-million-dollar promissory note got paid off with

6     this 6.5-million-dollar loan, she filed this lien

7     release on behalf of her company.  What all of this

8     reflects is how this group of defendants in the district

9     court case and Mr. Wakeland, the plaintiff behind ERPILE

10    in this case, was part of it, how they absolutely cut my

11    client and his company out of repayment of their note

12    and instead inserted this Choudhri-related-family note

13    to be paid off to the tune of $4.4 million.

14          *THE COURT:*  Since I let all the other

15    stuff in, I'll let this in, too, otherwise, there will

16    be a hole in it.

17     *Q.*   *(BY MR. SAMPSON)* Mr. Abdullatif, what is this

18    document, Exhibit No. 8?

19     *A.*   Full release of liens and security interests.

20     *Q.*   Who signed this document?

21     *A.*   The document is signed by a name of Shahnaz

22    Akhter.

23     *Q.*   Is that Ms. Choudhri?

24     *A.*   That's Ms. Choudhri.

25     *Q.*   Did she sign as president of AIGWT?

1      *A.*   Signed as president of AIGWT, Inc.

2      *Q.*   You can see down at the bottom of this release

3  of lien, the document says for good and valuable

4  consideration, including the payment in full of the

5  note, that's this 4.3-million-dollar note, AIGWT

6  releases and forever discharges its liens, et cetera; is

7  that right?

8      *A.*   Yes.

9      *Q.*   Did ERPILE ever get paid in full on the note it

10  had purchased?

11      *A.*   No, sir.

12      *Q.*   But the AIGWT loan made subsequent --

13          *MR. PHILLIPS:*  I'm sorry.  I object,

14  hearsay.  When he said did ERPILE ever get paid in full,

15  I object, hearsay.  There's no predicate that's been

16  laid.  I request to take him on --

17          *THE COURT:*  You are going to have to give

18  me a date to know whether he was officially, according

19  to them, with ERPILE.  And if he was, according to you,

20  give me some facts to back that up.  I don't know how to

21  answer that.

22          *MR. SAMPSON:*  I can ask it a different

23  way.

24          *THE COURT:*  Do that.

25          *MR. PHILLIPS:*  Sustained?

1              THE COURT:  Yes, because he is going to

2   ask it a different way and perhaps it will be clearer.

3        Q.   (BY MR. SAMPSON)  Mr. Abdullatif, to your

4   knowledge, has the note that ERPILE purchased ever been

5   paid in full?

6        A.   No, sir.

7              MR. PHILLIPS:  Objection, hearsay.

8              THE COURT:  Overruled.  He either has

9   knowledge or he doesn't.

10             MR. PHILLIPS:  May I take the witness on

11  voir dire to determine --

12             THE COURT:  No.  You can cross-examine him

13  on this issue in a minute.

14             MR. PHILLIPS:  Thank you, Your Honor.

15             THE COURT:  We will take a break when he

16  gets done introducing his documents, if he gets done

17  introducing his documents.  Are you getting closer,

18  counsel?

19             MR. SAMPSON:  I am very close, Your Honor.

20        Q.   (BY MR. SAMPSON)  To your knowledge, ERPILE

21  never had its note paid in full?

22        A.   No, sir.

23        Q.   Is that correct?

24        A.   Yes, that's correct.

25        Q.   But from the documents does it appear that

1    AIGWT which had a subsequent note had its note paid in

2    full?

3        A.    According to this release, yes.

4        Q.    A 4.3-million-dollar note?

5        A.    Almost 4.3-million-dollar note.

6        Q.    AIGWT, the president of that company, was the

7    mother of Ali Choudhri?

8        A.    Yes.

9        Q.    Who is the current president of AIGWT?

10       A.    Richard Wakeland.

11       Q.    Richard Wakeland, who filed this lawsuit on

12   behalf of ERPILE, is currently the president of AIGWT?

13       A.    Yes.

14       Q.    Mr. Abdullatif, do you have any intention of

15   taking any actions on behalf of ERPILE other than

16   pursuing a claim on its behalf in the 269th District

17   Court that's been pending now for awhile?

18       A.    No, sir.

19       Q.    For how long has that claim on behalf of ERPILE

20   been pending?

21       A.    Almost seven weeks already, almost two months.

22       Q.    How much money are you seeking on behalf of

23   ERPILE in that district court case?

24       A.    Approximately $3 million, close to 3 million.

25              MR. SAMPSON:  Pass the witness.

 1                    THE COURT:  Thank goodness.  I mean that

 2   nicely, counsel, but good grief.  You can step down.  We

 3   will take a ten-minute break.  You need to address some

 4   of the deeds that came in.

 5                    MR. PHILLIPS:  The deeds?

 6                    THE COURT:  Well, deeds and documents.

 7   All of these exhibits he brought in that are raising

 8   questions about the nature of the whole deal at least on

 9   your client's side.  You need to address some of that.

10                    MR. PHILLIPS:  I shall, but I have the

11   cart in front of the horse.

12                    THE COURT:  Fair enough.

13                    MR. PHILLIPS:  I'll get there near the

14   end.

15                    THE COURT:  You can put your horses in

16   front of the cart.  That's fine.  Be sure at some point

17   you address this.

18                    MR. PHILLIPS:  I shall.

19                    (Recess taken)

20                    MR. PHILLIPS:  Mr. Fleming is going to

21   address a little bit your question.

22                    THE COURT:  Which one?  Which question?

23                    MR. FLEMING:  You wanted us to talk about

24   some of the documents.  These documents, these deeds,

25   these liens, these transactions, they are all consistent

1    with what our position is in this case.  And that is

2    that Mr. Abdullatif was not going to end up with any

3    security interest.  He was not going to end up with any

4    control of this ERPILE company.  He knew at the time he

5    signed the participation agreement that the membership

6    could be transferred at any time by Mr. Choudhri to his

7    designee which is why these are completely consistent

8    with that.  If you look at every one of these

9    transactions when they were done, they are consistent

10   with actions taken by somebody who controls ERPILE.

11   It's our position and the position of our clients that

12   they control ERPILE and they can activate the assignment

13   of membership interest anytime, which they did do, and

14   which had been done when they ended up filing that

15   release.  Any other questions?

16                THE COURT:  A whole bunch, but not for

17   right this second.

18                MR. PHILLIPS:  May I go forward with

19   questioning the witness?

20                THE COURT:  Yes.

21                    **REDIRECT EXAMINATION**

22   BY MR. PHILLIPS:

23       Q.  Are you comfortable if I call you Mr. Latif?

24   Will that be how --

25                THE COURT:  Come on, let's use the same

1  name.  If everybody else can say Abdullatif, so can you.

2      Q.   (BY MR. PHILLIPS) Mr. Abdullatif, what do you

3  call or how do you identify the real estate investment

4  that is reflected in Defendant's Exhibit No. 3?  Three

5  is this copy of a trustee's memo.  What do you call that

6  real estate investment?  It's 855,000 checks total.

7      A.   What's your question?

8      Q.   What do you call it?

9      A.   This one?

10     Q.   Yes, sir.  What do you call that real estate

11 investment?

12             THE REPORTER:  I'm sorry?

13             THE COURT:  Not one of us heard you.

14     A.   What are you asking me?  This is a receipt.  Is

15 that what you asked?

16             MR. SAMPSON:  I'll object to the question

17 as vague.

18     Q.   (BY MR. PHILLIPS) How do you identify this in

19 your dealings?  What do you call this investment?

20     A.   Purchase of real estate property at the

21 auction, at the trustee auction.

22     Q.   Where is the property located?  If you have a

23 financial statement, what do you put on your financial

24 statement that reflects this investment?

25     A.   If it reflects an investment, it will be a

1    property in Bellaire.

2         Q.   Is it a property in Bellaire?

3         A.   I don't know the physical address of it.  I'll

4    get you the physical address of it.

5                   THE COURT:  Relax.  This is not a trick

6    question.  This is, for example, the Northpark Office

7    Building.  You call it the Northpark Office Building.

8    Do you have a name that you call this particular

9    property?

10                   THE WITNESS:  Yes.  We go by legal

11   description.  Lot 23 and Lot 26 of Teas Garden, Section

12   3 in Harris County, Texas.

13                   THE COURT:  There's your answer, counsel.

14        Q.   (BY MR. PHILLIPS) Have you ever described this

15   property on a financial statement, your ownership in

16   this property on a financial statement?

17        A.   Most likely I did, yes.

18        Q.   What did you call it on the financial

19   statement?

20        A.   Either Bellaire property or can be called Teas

21   Garden or the physical address of the property, which I

22   don't have in here.

23        Q.   Did you have a written investment agreement

24   with Ali Choudhri for Lot 23, 26 or the Bellaire

25   property, whatever the actual name is?

1      A.    The receipt and the copy of the checks we have.
2   I don't have it right there.
3      Q.    What percentage of it was Ali to own?
4      A.    We were supposed to, if we keep the property
5   the way we bought it, we would have to split the
6   profits.
7      Q.    50/50?
8      A.    We usually split the profit -- the money split
9   the profit 50/50 and the work that's being done gets
10  50 percent.
11     Q.    Did you have any -- did you take -- when did
12  you place this property into Ali's name to reflect his
13  50 percent ownership?
14     A.    I did not.  I would not change the deed.  The
15  deed of trust was the deed of trust that was given by
16  the trustee.  It was under Latif and Company.
17     Q.    So, you're saying that this property -- is it
18  titled today as Latif and Company or have you sold it?
19     A.    The property was sold during 2010, at some time
20  during 2010.
21     Q.    How much money did you pay Ali Choudhri in 2010
22  from his one-half interest in this property?
23     A.    I did not.
24     Q.    Why not?
25     A.    Because Ali Choudhri during the month of

1    December when he looked at the property, he decided he

2    doesn't want to be part of the deal.  So, we put the

3    money in another deal.

4        Q.   What was the other deal that you put the

5    $600,000 in?  What was it called?

6        A.   Ali was in conflict with Sterling Bank over a

7    loan that he had with the Houston real estate property.

8    So we purchased that and then I added some more

9    money because he wasn't -- the Bellaire dealer, he said,

10   was too slow and it would take too long to finish.

11       Q.   This Sterling Bank loan, Ali transferred nine

12   lots, nine houses or nine pieces of real estate to you

13   on that transaction and you borrowed money from Sterling

14   Bank, right?

15       A.   I think it was -- to correct you, I think it

16   was seven.

17       Q.   Your testimony is -- and you still hold those

18   lots, right?

19       A.   I hold those lots in an agreement that I had

20   with Ali Choudhri, yes.

21       Q.   And have you filled out financial statements

22   saying you own 100 percent of those lots?

23       A.   The money was used to purchase the note, if you

24   want us to clarify that issue.  We purchased the note, a

25   promissory note and a Houston real estate property

1    during the month of December.

2         *Q.*   Are there any written documents that establish

3    that you moved this $600,000 into this Sterling Bank

4    transaction?

5         *A.*   We did --

6              *THE REPORTER:*  Say that again, please.

7         *A.*   We did a participation agreement to participate

8    in the Houston real estate property between me and Ali

9    Choudhri.

10        *Q.*   *(BY MR. PHILLIPS)* Do you have a copy of that

11   participation agreement?

12        *A.*   Ali has a copy of that participation agreement.

13             *THE COURT:*  No, no.  He is asking you if

14   you have a copy.

15        *A.*   No.

16        *Q.*   *(BY MR. PHILLIPS)* Do you have a copy of that

17   agreement?

18        *A.*   No, sir, I don't.

19        *Q.*   Who drafted the agreement?

20        *A.*   Was drafted by Ali's associate or by him or

21   somebody that work for him.

22        *Q.*   You've sold the property that you claim the

23   600,000 was invested in and it's no question, Ali didn't

24   get his 600,000 back, right?

25        *A.*   The property was sold way after this money was

1   used in the Houston real estate property.

2       Q.    Do you have any document that ties this 600,000

3   into a transaction other than the document reflected in

4   the participation agreement?

5               MR. SAMPSON:  I'll object to the

6   foundation of that question.

7               THE COURT:  Sustain.  Now there's two.

8   Which participation --

9               MR. PHILLIPS:  The participation agreement

10   that's in evidence --

11               THE COURT:  Counsel, don't talk over me.

12   Which participation agreement are you referring to?

13               MR. PHILLIPS:  The participation

14   agreement, Plaintiff's Exhibit No. 7, in evidence.

15               MR. SAMPSON:  I'll still object to

16   foundation to the extent there's been no evidence that

17   the $600,000 is tied to that participation agreement at

18   all.

19               THE COURT:  Except that it recites

20   $600,000.

21               MR. SAMPSON:  Right.

22               THE COURT:  And what he's saying is, do

23   you have another agreement that recites $600,000 that

24   could purportedly represent this money that was rolled

25   from property to property?

1          MR. SAMPSON:  Right.

2          THE COURT:  That's a question.  You can

3  answer that one.

4          MR. SAMPSON:  Is a question on the table?

5          THE COURT:  I said he can answer that

6  question.

7          THE WITNESS:  I'd like to hear that

8  question again.

9          THE COURT:  Is there another document that

10  purportedly represents the $600,000 that has rolled from

11  property to property other than the original

12  participation agreement that references the $600,000 in

13  Exhibit 7?

14          THE WITNESS:  There was another

15  participation agreement, Your Honor, that has nothing to

16  do with the ERPILE that they're claiming.  It has

17  something to do with the Houston real estate

18  properties and Ali Choudhri --

19          THE COURT:  Stop.  I didn't ask you if

20  there was another participation agreement.  I said, is

21  there another document that references the $600,000?

22          THE WITNESS:  Not specifically, to my

23  knowledge.

24          THE COURT:  I think that was his question.

25  Right, counsel?

1          *MR. PHILLIPS:*  That is.

2          *THE COURT:*  He said no.

3     Q.   *(BY MR. PHILLIPS)* I show you what's been marked

4  Plaintiff's Exhibit No. 8.  This has been previously

5  marked and shown to counsel.

6          *MR. SAMPSON:*  What is this?

7          *MR. PHILLIPS:*  Eight.

8          *MR. SAMPSON:*  I don't have 8.

9     Q.   *(BY MR. PHILLIPS)* Is this your signature on

10 Plaintiff's Exhibit 8?

11    A.   It looks like my signature, but I didn't sign

12 this document.  This looks like my signature, yes.

13    Q.   So, you don't dispute this is your original

14 signature?

15         *MR. SAMPSON:*  Objection.

16    A.   It looks like my signature.

17         *THE COURT:*  I think he is disputing it.

18 He says, "It looks like my signature, but I didn't sign

19 it."  To me that's a dispute.

20    Q.   *(BY MR. PHILLIPS)* So that I can make sure that

21 I -- okay.  You see this is an original signature.  You

22 see that?

23         *THE COURT:*  He is saying it's not a xerox.

24 It's not a photocopy.  It's an original signature.

25    A.   Yes, I see that.

1      *Q.   (BY MR. PHILLIPS)* Are you the individual who
2  placed pen in hand and wrote that original signature on
3  that page?

4      *A.*   No, I did not sign this page.  That looks like
5  my signature.

6      *Q.*   You deny this is your original signature?

7      *A.*   I deny I signed this document, and this is
8  signature that I deny.

9              *THE COURT:*  Yes, he denies it.

10     *Q.   (BY MR. PHILLIPS)* I want to show you
11  Plaintiff's Exhibit No. 10 that was previously marked, I
12  believe.  Do you see these are original ink signatures
13  on Plaintiff's Exhibit No. 10.  Do you observe that?

14     *A.*   I observe that in a black pen.

15     *Q.*   Is that your signature?  Are either -- okay.
16  Is the first of the two signatures your signature?

17     *A.*   I told you it looks like my signature.

18              *THE COURT:*  You didn't tell us, because he
19  hadn't asked you about that document.  This is the first
20  question on the document.  You haven't already told us.
21  Answer the question.  Is it your signature?

22     *A.*   It looks like my signature, Your Honor.  But I
23  did not sign any assignment membership to anybody.

24     *Q.   (BY MR. PHILLIPS)* Did you take pen in hand and
25  draw this original signature on this piece of paper?

1      *A.*   It looks like my signature; but, no, I did not

2  take a pen to paper on this page.

3      *Q.*   How about the second signature on that page, is

4  that your signature?

5      *A.*   Pen in hand, what do you mean?

6          *THE COURT:*  Did you put a pen in your hand

7  and sign the paper?

8      *A.*   No, I did not.  This looks like my signature,

9  but I did not sign the documents.

10     *Q.*   *(BY MR. PHILLIPS)* You deny that you are the

11 human being that wrote those two signatures on

12 Plaintiff's Exhibit 10?

13     *A.*   As I told you, sir, it looks like my signature.

14 I did not sign this document, and I did not sign it.

15     *Q.*   Are you denying that these original signatures

16 were placed there by you?

17     *A.*   It looks like my signature.  I did not sign

18 this document.

19     *Q.*   Are you denying that you placed these

20 signatures, that's all I'm asking, yes or no?

21     *A.*   I did not sign these documents.

22     *Q.*   I believe it calls for a yes or no answer as to

23 whether or not he placed his signature.

24          *THE COURT:*  He needs to answer the

25 questions actually asked so he doesn't have to ask it 15

1    times.

2              *MR. SAMPSON:*  I thought he answered it 15

3    times.

4              *THE COURT:*  No, he hasn't answered it yet.

5    Answer the question he is actually asking.

6         Q.   *(BY MR. PHILLIPS)* Do you deny that you wrote

7    those original signatures, the two original signatures

8    on Plaintiff's Exhibit 10?

9         A.   Yes.

10        Q.   I'm going to show you Plaintiff's Exhibit No.

11   11.  Did you sign your name on that document?

12        A.   What is this document?  I haven't seen it.

13        Q.   Just look at it.

14        A.   Okay.

15        Q.   It is what it is.

16        A.   Yes.

17        Q.   You signed Plaintiff's Exhibit 11?

18        A.   Yes.

19        Q.   Is this your handwriting on Plaintiff's Exhibit

20   11?

21        A.   Yes.

22        Q.   Did you write the ASOF on Plaintiff's Exhibit

23   No. 11?

24        A.   I cannot say if I did or not, because this is

25   something that doesn't stand for anything that I would

1  think of.  This is a document, another transaction that

2  they had.

3           MR. PHILLIPS:  At this time, Your Honor, I

4  offer what's been marked Plaintiff's Exhibit 8, 10 and

5  11.

6           THE COURT:  Are some of them already in

7  evidence in some way, shape or fashion as in any

8  original transcript or are these all new?

9           MR. PHILLIPS:  No.  Eight and ten, Your

10 Honor, are original documents that were previously

11 marked but not used.

12          THE COURT:  Any objection?

13          MR. SAMPSON:  Yes, Your Honor.  Lack of

14 foundation.  This witness said he didn't sign them.  He

15 has never seen these documents until he was served with

16 the lawsuit back in January.  So, there's no foundation.

17          THE COURT:  He didn't say about the last

18 one.

19          MR. SAMPSON:  The last one I don't have a

20 problem with.  8 and 10, I object.

21          THE COURT:  Counsel, my only concern, I

22 have no idea what they are, where they came from.  What

23 are they?

24          MR. SAMPSON:  He doesn't know either.

25          MR. PHILLIPS:  Plaintiff's Exhibit No. 8

1    is the resignation from ERPILE.

2              THE COURT:  Isn't it already in evidence,

3    though?

4              MR. PHILLIPS:  I think so.

5              THE COURT:  This is my question:  Is this

6    something I've already ruled on that was part of the

7    transcript from the beginning from the first round of

8    this trial?  I understand that's the original, but I

9    want to know if it's already in evidence.

10             MR. PHILLIPS:  It's already in evidence.

11             THE COURT:  What about the other one?

12             MR. PHILLIPS:  10 is already in evidence.

13             THE COURT:  Since they are already in

14   evidence, I'm going to let them in because they are

15   already in.

16             MR. SAMPSON:  For the same reason that I

17   objected to the entry of Exhibit No. 1 which contains

18   these, I allege inadmissible documents, I'll again

19   object.

20             MR. PHILLIPS:  And 11?

21             MR. SAMPSON:  Eleven I'm fine with.

22             THE COURT:  Eleven he didn't object to.

23   It's in, too.  Is that also including the original

24   transcript?

25             MR. PHILLIPS:  No, Your Honor.

1          *THE COURT:*  It's time to stop.

2          *MR. PHILLIPS:*  I believe I have an

3   agreement that I can substitute copies for the

4   originals.

5          *THE COURT:*  We did that ages.  Don't worry

6   about that.

7          *MR. PHILLIPS:*  Okay.

8          *(Proceedings adjourned)*

9                              *

10                             *

11                             *

12                             *

13                             *

14                             *

15                             *

16                             *

17                             *

18                             *

19                             *

20                             *

21                             *

22                             *

23                             *

24

25

1 STATE OF TEXAS

2 COUNTY OF HARRIS

3

4     I, Laura M. Cutherell, Official Court Reporter in

5 and for County Civil Court at Law No. 3 of Harris, State

6 of Texas, do hereby certify that the above and foregoing

7 contains a true and correct transcription of all

8 portions of evidence and other proceedings requested in

9 writing by counsel for the parties to be included in

10 this volume of the Reporter's Record in the above-styled

11 and numbered cause, all of which occurred in open court

12 or in chambers and were reported by me.

13     I further certify that this Reporter's Record of the

14 proceedings truly and correctly reflects the exhibits,

15 if any, offered by the respective parties.

16     I further certify that the total cost for the

17 preparation of this Reporter's Record is $_____ and

18 was paid/will be paid by _____.

19

20                     _____

                              Laura M. Cutherell, CSR

21                               Texas CSR 3049

                              Official Court Reporter

22                               County Civil Court at Law No. 3

                              Harris County, Texas

23                               201 Caroline, 5th Floor

                              Houston, Texas 77002

24                               Telephone:  (713) 368-6658

                              Expiration:  12/31/2012

25