1          IN THE UNITED STATES BANKRUPTCY COURT

2         FOR THE SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4  KHAWAJA PARTNERS, LTD., ET AL §   CASE NO. 13-03252-H5-ADV
                         §   HOUSTON, TEXAS
5  VS.                 §   THURSDAY,
                         §   AUGUST 28, 2014
6  JETALL COMPANIES, INC., ET AL §   11:06 A.M. TO 3:46 P.M.

7

                  MOTIONS HEARING
8
       BEFORE THE HONORABLE KAREN K. BROWN
9         UNITED STATES BANKRUPTCY JUDGE

10

11               APPEARANCES:

12      FOR DEBTOR:       SEE NEXT PAGE

13      COURT RECORDER:   ALISHA MALY-WATSON

14      COURTROOM DEPUTY:  ANNAROSE HARDING

15

16

17

18

19

20           TRANSCRIPTION SERVICE BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, LLC
            935 ELDRIDGE ROAD, #144
22          SUGAR LAND, TEXAS 77478
       Tel: 281-277-5325 ▼ Fax: 281-277-0946
23         www.judicialtranscribers.com

24

   Proceedings recorded by electronic sound recording;
25    transcript produced by transcription service.

```
 1                      APPEARANCES:

 2

 3  FOR JETALL COMPANIES, INC.:   HUGH MASSEY RAY, III, ESQ.
                                  McKool Smith
 4                                600 Travis
                                  Suite 7000
 5                                Houston, TX  77002

 6                                BRUCE J. RUZINSKY, ESQ.
                                  MATTHEW D. CAVENAUGH, ESQ.
 7                                Jackson Walker LLP
                                  1401 McKinney Street
 8                                Suite 1900
                                  Houston, TX  77010
 9

10  FOR KHAWAJA PARTNERS, LTD:    LEWIS WILLIAMS JOST, ESQ.
                                  MARK MYERS, ESQ.
11                                Adair & Myers PLLC
                                  3120 S.W. Freeway
12                                Suite 320
                                  Houston, TX  77098
13
    FOR GEORGE LEE:               DAVID A. CHAUMETTE, ESQ.
14                                Chaumette PLLC
                                  50 Briar Hollow Lane
15                                Suite 235W
                                  Houston, TX  77027
16
    FOR AVONDALE DEVELOPMENT:     RACHEL SHERMAN, ESQ.
17                                Dunn Neal and Gerger
                                  3006 Brazos Street
18                                Houston, TX  77006

19

20

21

22

23

24

25
```

1                              INDEX

2    OPENING STATEMENTS                    Page
       By Mr. Jost                         7
3      By Mr. Ruzinsky                     9

4    WITNESS:          Direct      Cross      Redirect      Recross

5    ALI CHOUDHRI
       By Mr. Ruzinsky   12          .          .            .
6      By Mr. Jost       .          13          .            .

7    RUBEN BISK
       By Mr. Jost       19          .          .            .
8      By Mr. Ray        .          25          .            .

9    OMAR KHAWAJA
       By Mr. Jost       32          .         69            .
10     By Mr. Ruzinsky   .          50          .            .

11   GLENN LANDRUM
       By Mr. Ruzinsky   75          .          .            .
12     By Mr. Jost       .          80          .            .

13   ALI CHOUDHRI
       By Mr. Jost       85          .          .            .
14

15   ALI CHOUDHRI
       By Mr. Ruzinsky  111          .          .            .

16

17   EXHIBITS:                      Marked      Offered      Received

     Plaintiff's:
18
     1-11                            20          20            20
19
     Respondent's:
20
     1-11 and 13                     20          20            20
21

22   CLOSING STATEMENTS                    Page
       By Mr. Jost                       119
23     By Mr. Ruzinsky                   119
       By Mr. Chaumette                  121
24

25

1    <u>HOUSTON, TEXAS; THURSDAY, AUGUST 28, 2014; 11:06 A.M.</u>

2        THE CLERK:  All rise.

3        THE COURT:  Be seated, please.

4        All right.  The next case on the Docket for August

5  the 28th is 13-3252 Khawaja Partners.

6        Counsel, tell me your appearances, please.

7        MR. JOST:  Your Honor, Lewis Jost, J-O-S-T, and

8  Mark Myers for Plaintiff, Khawaja Partners.

9        THE COURT:  Okay.  Fine.

10       MR. RUZINSKY:  Good morning, Your Honor, Bruce

11  Ruzinsky and Matt Cavenaugh with Jackson Walker for Jetall.

12       MR. RAY:  And, Your Honor, Hugh Ray, McKool Smith,

13  also for Jetall.

14       THE COURT:  All right, fine.

15       MS. SHERMAN:  Your Honor, Rachel Sherman of Dunn,

16  Neal and Gerger on behalf of Avondale Development.

17       THE COURT:  All right.

18       MS. SHERMAN:  Merely an interested observer today,

19  Your Honor.

20       THE COURT:  All right.  Fine.  Spell your last

21  name.

22       MS. SHERMAN:  Sherman, S-H-E-R-M-A-N.

23       THE COURT:  Fine, all right.

24       MR. CHAUMETTE:  And David Chaumette, also an

25  interested observer today for George Lee and Serena Yu.

1          THE COURT:  All right, Mr. Chaumette.

2          MR. CHAUMETTE:  C-H-A-U-M-E-T-T-E.

3          THE COURT:  I know.  All right.  We have the

4   Fourth Motion for Leave to File the Amended Complaint and

5   the Motion for the Preliminary Injunction.  I don't know

6   that I heard or that I saw a response to the complaint

7   issue.

8          Mr. Ruzinsky, did you have one for your client,

9   the fourth -- the Motion to File the Fourth Amended?

10          MR. RUZINSKY:  No.  No response to that, Your

11   Honor, just maybe a preliminary point of clarification.

12          THE COURT:  All right.

13          MR. RUZINSKY:  If I'm remembering correctly, I

14   think procedurally the Court had prepared a recommendation

15   to Withdraw the Reference of the case, had begun the process

16   of actually doing that, and the parties said time out,

17   please, we'd like to go to mediation let's see if we can

18   settle it.

19          We did go to mediation.  Despite the great efforts

20   of our mediator, we were not able to reach an agreement, and

21   unfortunately, have not made progress since then.

22          We're happy to be here, we're happy to be

23   upstairs, we just think whoever is going to hear the case

24   ought to hear it --

25          THE COURT:  Needs to go forward.

1          MR. RUZINSKY:  -- from beginning to end.

2          THE COURT:  All right, fine.  Mr. Jost, you've

3   given notice of that and there's no objection.  Tell me

4   exactly what the change is from the third to the fourth?

5          MR. JOST:  I have to reach back.

6          THE COURT:  All right.

7          MR. JOST:  There was a -- I believe there's an

8   additional statutory cause of action for fraud in a real

9   estate transaction.  And I might point out at this point,

10  that the third was never live; the second is the last --

11         THE COURT:  All right.

12         MR. JOST:  -- live pleading.

13         THE COURT:  All right.  Well, I will grant the

14  Motion for Relief filed the -- well, it's the fourth Motion

15  for Leave to file the Third Amended Complaint, is that what

16  you're telling me?

17         MR. JOST:  No.  Well, I guess it truly is.

18         THE COURT:  I guess it is, all right, fine, that's

19  granted.  And that's instrument Docket No. 49, so we will

20  have that.

21         How do you wish to go forward on your Motion for

22  Preliminary Injunction for Appointment of a Receiver?

23         MR. JOST:  Well, Your Honor, if I could just make

24  a brief statement?

25              THE COURT:  Sure.

```
 1                    OPENING STATEMENT
 2          MR. JOST:  What we're trying to do by this motion
 3   is to protect this property while we fight over it.
 4          THE COURT:  Uh-huh.
 5          MR. JOST:  It was the only asset of Khawaja
 6   Partners Limited.  From what we can tell, it appears to be
 7   essentially whatever interest they have, the only asset of
 8   Jetall Companies, Inc., at least in terms of real property.
 9          We are concerned that with the property in the
10   name of Jetall Companies, that something could be done
11   either intentionally by Jetall Companies, or by a creditor
12   of Jetall Companies in regard to that property, which would
13   be damaging to the estate, and make this process moot.
14          THE COURT:  Uh-huh.
15          MR. JOST:  We have asked essentially for two types
16   of relief.  One is to prevent Jetall from encumbering or
17   transferring the property or taking actions which would
18   diminish the rental income or otherwise damage the property.
19          Now, we've also requested that the rents received
20   flow through the Registry, so there will be some
21   transparency on that point.  We've also asked in the
22   alternative that if the Court deems it more appropriate,
23   that a receiver be appointed to operate the apartment
24   complex.  In some ways that may be the more appropriate
25   relief because again, we are concerned about other creditors
```

1   acting to seize the property and if it was in *custodial*

2   *legis*, that would put up another roadblock to that.

3          We have argued that we're entitled to injunctive

4   relief, both under the standard principles for granting

5   injunctive relief and we've always raised the *Mortgage*

6   *America* argument that Section 362 is actually in effect as

7   to this property due to the pending fraudulent transfer

8   claims.

9          And again, what we are trying to do is just

10  preserve the property so we can determine what's going to

11  happen with it, and make sure there's something worth

12  fighting for.

13          THE COURT:  All right.  Mr. Ruzinsky.

14                     OPENING STATEMENT

15          MR. RUZINSKY:  Thank you, Your Honor.

16          We obviously have a very different view of the

17  current situation with respect to the property and what

18  ought to be done with respect to the property.  I think it's

19  undisputed that the parties entered into an agreement, this

20  letter agreement which the Court has seen before, and the

21  Court will see again as part of the exhibits today, and the

22  agreement provided for the development of the property.

23          It provided that the Debtor gets $750,000, less

24  the $100,000 it already got advanced, once the property is

25  developed and sold.  And there's really two scenarios here,

1  Judge.  The property gets developed and sold or the property

2  doesn't get developed and it gets returned.

3          The letter agreement provides, we're going to

4  develop it and sell it; once it's developed and sold, the

5  Debtor gets $750,000 less the 100 it got, plus the

6  25 percent profits participation.  So at least the 750 minus

7  the 100 that it got.

8          If the property is not developed and -- then it

9  gets returned, and the Debtor pays back the 100 it got, and

10 pays 50 more, but it has the property back.

11         So the clear intent and contemplation of the

12 parties from day one in this transaction is to develop the

13 property.  We believe strongly that the only rational

14 economic result with respect to this property is to develop

15 and sell it.  It's basically treading water right now.  It's

16 got a little bit of income, and it's got expenses that go

17 along with it, and it's not positive, it's a real negative

18 barely break even.

19         THE COURT:  Okay.

20         MR. RUZINSKY:  You know, if the Debtor is

21 concerned that we're going to go demolish the property and

22 then give it back to them, okay, we're happy to stipulate

23 right here that once we start -- once the ball hits the

24 building, okay, we're locked in.  We're locked in.  It's not

25 going back to them, it's getting developed, it's getting

1  sold.  Nobody's at risk here.

2          THE COURT:  Uh-huh.

3          MR. RUZINSKY:  Nobody's at risk.  There is no

4  evidence or no evidence that I've seen, and no evidence that

5  I know of that the property is being mismanaged, that the

6  property is not being properly maintained, our client is

7  paying the taxes; our client is paying the insurance; our

8  client is doing what you'd expect a reasonable party to do

9  with respect to a piece of property like this.

10          But all we want to do is to implement what the

11  parties agreed to at the very beginning, which is to develop

12  it and sell it and we're scratching our heads as to why the

13  Debtor wants to interfere and slow down that process, when

14  the ultimate result inures to their benefit, as well as our

15  benefit, to get $750,000 less the 100,000 advance at least,

16  or to get the property back and just pay $50,000.

17          So we're looking for the economic rational result

18  here, which is to develop and to sell.  There's no monkey

19  business going on, there's no shenanigans going on, and

20  we're concerned that the property, what they want to do is

21  just freeze it, hold it, not let it realize it's economic

22  potential, and then we just litigate till the cows come

23  home, which is not -- in nobody's best interest.

24          So we think that they don't meet the legal

25  standard.  We think they don't have a good business

1   justification for what they're doing, and there ought to be

2   a rational economic monetization of this property.

3          THE COURT:  Let me ask you, Mr. Jost is suggesting

4   that this is the only asset of Jetall Companies, Inc.; is

5   that correct?

6          MR. RUZINSKY:  I believe that's incorrect, Your

7   Honor, if I may --

8          THE COURT:  Please.

9          MR. RUZINSKY:  -- get confirmation from my client.

10          THE COURT:  All right.

11      (Pause in the proceedings.)

12          MR. RUZINSKY:  Jetall, Inc. is a management

13   company, Your Honor.

14          THE COURT:  All right.

15          MR. RUZINSKY:  And this is the only hard asset of

16   the management company.

17          THE COURT:  I see, all right.  Is there other

18   income to the managing company because it does manage other

19   properties?

20          MR. RUZINSKY:  May I have my client come up here

21   and --

22          THE COURT:  Yes, please.  Let me have your client

23   to come up and let's swear him in, and get just that facet

24   taken into account right now.

25          Raise your right hand to be sworn, please.

1     (Witness sworn.)

2            THE COURT:  Okay, Mr. Ruzinsky.

3            Step up here, please.

4            MR. RUZINSKY:  Your Honor, would you like me to --

5            THE COURT:  No, you go ahead.

6            MR. RUZINSKY:  Thank you.

7                 DIRECT EXAMINATION OF ALI CHOUDHRI

8   BY MR. RUZINSKY:

9   Q    Mr. Choudhri, would you please explain to the Court --

10  I indicated to the Court after talking to you that Jetall,

11  Inc. was a management company.  Would you explain how that's

12  set up and how -- and how and what income it gets from its

13  various operations?

14  A    Jetall Companies manages different properties.  It's a

15  property management company.  And in this instance, based on

16  the timing, we put title in Jetall Companies, Inc.

17  Q    For this property?

18  A    For this property.

19  Q    Okay.

20  A    But typically, we would have a special purpose entity

21  for every asset.

22  Q    So how many properties are being managed right now by

23  Jetall, Inc.?

24  A    Several.

25  Q    When you say several, could you give us a ballpark

1  number?

2  A    Dozens.

3  Q    Dozens, okay.  Are these all commercial, all

4  residential, or a combination of both?

5  A    Combination of commercial office buildings, retail

6  centers, other single family residential --

7  Q    Okay.

8  A    -- mix match.

9  Q    What sort of management income does Jetall, Inc. get

10  from managing these dozens of properties, ballpark?

11  A    I wouldn't know exactly.

12  Q    Are we talking five figures, six figures, on a monthly

13  basis?

14  A    Probably six figures or I'm sorry, on a monthly --

15  Q    On a monthly basis.

16  A    Yeah, probably five figures.

17  Q    Five figures, okay.  Would that be ballpark, below or

18  above $50,000, and I apologize for hitting you cold on this?

19  A    I'm just guessing.  I couldn't tell you exactly, I'd

20  have to check with my --

21  Q    Could you make a call and confirm it?

22  A    Yeah, I can make a call and find out --

23          THE COURT:  Okay.  Well, I think we have the gist

24  of this.  Mr. Jost, do you have questions of this witness?

25                CROSS-EXAMINATION OF ALI CHOUDHRI

1  BY MR. JOST:

2  Q    Mr. Choudhri, Lewis Jost.  We haven't been able to

3  conduct discovery yet in this case, so all of us are

4  shooting a little bit blind, but by monitoring other

5  litigation against Jetall Companies, it has come to my

6  attention that Jetall Companies, Inc. has never filed a tax

7  return; is that correct?

8  A    No, that's not correct.

9  Q    And have you ever received any income yourself from

10 Jetall Companies, Inc.?

11 A    I'm sure I have, yes.

12 Q    And that would be reflected by your tax returns?

13 A    Sure.

14        THE COURT:  All right.  Anything else?  All right.

15 BY MR. JOST:

16 Q    Oh, a couple of weeks ago, an Interlocutory Judgment

17 was entered against you and -- you personally and Jetall

18 Companies, Inc. in the amount of slightly less than

19 2 million, I believe it's 1.975; is that correct?

20 A    I think you're talking about the Osama Latif litigation

21 that you were at --

22 Q    Yes.  Yes, sir.

23 A    -- where you were at the trial?

24 Q    Yes, sir.

25 A    And your client, yes, sir.  There's a judgment we

1  received against Osama Latif, the gentleman who acquired the

2  Atlantic debt I believe here in this case.  We received a

3  judgment against Osama Abdullatif in the amount of

4  $2 million, and he appealed that, and he filed a parallel, a

5  mirrored Summary Judgment that he received and that's being,

6  I believe, combined in the appeal.

7       We received the judgment of $2 million against him on a

8  settlement agreement, and he went and -- take a Summary

9  Judgment for about this -- for exactly the same, it's a

10 reverse of that judgment, yes.

11 Q    So a couple of weeks ago, Judge Nancy Kerrigan issued

12 an interlocutory judgment against you and Jetall Companies,

13 Inc. for 1.975 million?

14 A    No, that's not against Jetall Companies, Inc.

15 Q    Who is that against, please?

16 A    I believe the judgment I received was for 1.975 against

17 Osama Abdullatif, and it's my understanding that he received

18 a Summary Judgment for 1.975 against me.

19           THE COURT:  You personally?

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  Okay.

22           THE WITNESS:  And that's the litigation where

23 Mr. Khawaja was at, the trial with Mr. Latif.

24 BY MR. JOST:

25 Q    And there's a Summary Judgment against Jetall

1  Companies, Inc. in the StarTex matter; is that correct, and

2  I believe that's also an interlocutory judgment.

3  A    I'm not aware of that.  I do know Mr. Drennan

4  (phonetic) represents Osama Latif and he represents StarTex

5  and Osama is involved in that, as he is involved in this

6  litigation.  So I would defer to my attorney.  I'm not

7  100 percent aware.

8        I do know that there is a trial that's scheduled in the

9  StarTex, it's an electricity -- it's a dispute over an

10 electricity bill.  The seller signed a contract, we bought a

11 building, and the seller -- we switched providers and the

12 electricity company said, hey, you know, you owe something

13 like $200,000 because of an early termination, but it wasn't

14 a contract resign, it was a contract with the seller of a

15 building we acquired something.  And that's something --

16 that's the StarTex case.  And that's, I believe, set for

17 trial at the end of this year, if not early next year.

18 Q    It's my understanding that liability has already been

19 established, and it's just a question of establishing the

20 amount of StarTex's damages in that case; isn't that

21 correct?

22 A    That's possible, I'm not 100 percent sure --

23              THE COURT:  Okay.

24              THE WITNESS:  -- but I can get that answer for

25 you.

1           THE COURT:  All right.  This is tangential to what

2    we're here about, but if -- let's defer any other

3    questioning of Mr. Choudhri, because that was essentially

4    what I wanted to get to, and let's go on to the basis.  You

5    may step down, Mr. Choudhri.

6        (Witness steps down.)

7           THE COURT:  Go ahead.

8           MR. JOST:  Your Honor, you've heard a point raised

9    about the highest and best use of the property, I'd like to

10   call Mr. Ruben Bisk to address that issue.

11          THE COURT:  Mr. Bisk, come up, please raise your

12   right hand and be sworn.

13          MR. RUZINSKY:  Your Honor?

14          THE COURT:  Yes, Mr. Ruzinsky?

15          MR. RUZINSKY:  I'm only standing up, because I

16   don't see him on the witness list.

17          THE COURT:  Mr. Jost?

18          MR. JOST:  He is on the witness list that was

19   filed yesterday.  He's not on the one in the book if that is

20   the case, I apologize --

21          THE COURT:  What's the basis of his testimony?

22          MR. JOST:  -- it should be on the Record.

23          Excuse me?

24          THE COURT:  What is the issue of his testimony?

25          MR. JOST:  The highest and best use of this

1    property.

2              THE COURT:  All right.  He is an expert --

3              MR. JOST:  Yes.

4              THE COURT:  -- that has been hired.  All right.

5    Mr. Ruzinsky, who did you have?  No, just a minute?

6              MR. RUZINSKY:  If it's on what was filed with the

7    Court, that's fine --

8              THE COURT:  Okay.

9              MR. RUZINSKY:  -- I just -- that was in the book.

10              MR. RAY:  I have what was filed with the Court and

11   here's --

12              THE COURT:  Okay.  All right.  Let's take it up

13   and let him testify and move to strike if there's a real

14   prejudice to this.  All right.  Raise your right hand,

15   please.

16        (Witness sworn.)

17              THE COURT:  Be seated up here, please.

18              All right.  Have many witnesses do you anticipate,

19   Mr. Jost?

20              MR. JOST:  I have three including Mr. Choudhri

21   adverse.

22              THE COURT:  All right.  And, Mr. Ruzinsky, just

23   responsive witnesses, or do you have some?

24              MR. RUZINSKY:  I'll try and cover what I need to

25   with Mr. Choudhri on cross-examination, and I have two other

1  witnesses.

2         THE COURT:  Okay.  Then we are going to go until

3  noon, and we will take this -- start back up at 1:30.  Okay.

4  By 1:45 and then we'll go as long as witnesses take.  All

5  right?

6         MR. RUZINSKY:  Thank you, Your Honor.

7         THE COURT:  Go ahead, please, Mr. Jost.

8         MR. JOST:  Thank you, Your Honor.

9              DIRECT EXAMINATION OF RUBEN BISK

10 BY MR. JOST:

11 Q    Mr. Bisk, would you state your name, please?

12 A    My name is Ruben Mark Bisk.

13        THE COURT:  Spell your last name, please.

14        THE WITNESS:  B as in boy, I-S-K.

15 BY MR. JOST:

16 Q    And where are you employed?

17 A    I'm the chairman and manager of Eagle Heights

18 Development, and I'm employed in our Houston, 101 Common

19 Road.

20 Q    And what does Eagle Heights Development do?

21 A    We develop properties primarily in the energy sector a

22 mile south of San Antonio, going up north toward I-10.

23 Q    What kind of experience, if any, do you have in

24 development or redevelopment of residential property?

25 A    Well, that's a longer story.  Generally, I worked with

1  a luxury housing development company for about 15 years, the

2  luxury housing around the United States.  More recently, I

3  was involved with a Dutch family office where I was

4  monitoring their financing and construction activities, also

5  through the United States, some of which is in Texas.

6  Specifically, with regard to similar to this, I developed

7  and refurbished the 24 units condo project in the Heights

8  and I also participated in another project on the Heights,

9  one was in Hyattsville on 17th Street, where basically we

10  took apartments that were a little rundown and we

11  rehabilitated them.

12           MR. JOST:  Your Honor, I'm about to refer to

13  exhibits.  We conferred prior to your taking the bench, and

14  I don't think that there are any objections to the

15  admissions of Plaintiff's Exhibits in bulk.

16           THE COURT:  All right.  1 through 11.  Let's see,

17  Mr. Ruzinsky?

18           MR. RUZINSKY:  That's correct, Your Honor.

19           THE COURT:  All right.  Then fine, I will admit 1

20  through 11.  What about the Respondent's exhibits, Mr. Jost?

21      (Plaintiff's Exhibit Nos. 1-11 received in evidence)

22           MR. JOST:  There's no objection.

23           THE COURT:  Fine.

24           MR. RUZINSKY:  And on those exhibits, Your Honor,

25  the only one we're not offering because we realize we left

1   out some of the expenses is Exhibit 12 --

2           THE COURT:  All right.

3           MR. RUZINSKY:  -- which was the profit and loss

4   statement.

5           THE COURT:  All right.  Now --

6           MR. RUZINSKY:  You've got 1 through 11 and 13.

7           THE COURT:  All right.  1 through 11 and 13 then

8   are admitted for Respondent.

9       (Respondent's Exhibit Nos. 1-11 and 13 received in

10   evidence.)

11   BY MR. JOST:

12   Q    Mr. Bisk, up there on the podium with you there should

13   be a white book with a Tab 9 in it.  Could you turn to that

14   Tab 9?

15   A    Yes.

16   Q    And I'll represent to you that that is a subdivision

17   plat, a replat of the property that we are discussing here.

18   Have you had occasion to look at that plat?

19   A    I received this yesterday, and I did look at it.

20   Q    That plat contemplates scrapping the existing apartment

21   complex, and subdivising -- or subdividing it into five

22   townhomes.  Do you have an opinion as to whether or not that

23   is the highest and best use for this property?

24   A    I have an opinion.

25   Q    Okay.  And what is that opinion?

1  A    I must caveat and can I explain my comments?

2  Q    Sure.

3  A    Obviously other than seeing this plat, I'm not familiar

4  with the details of the development plan proposed by the

5  party.  I was requested six months to look at the property

6  and say what I thought would be the highest and best use.

7  Therefore, to a certain extent, I'm basing it on my review,

8  plus my development and operating partners, making

9  assessment clear of this plat or any other assessment based

10 on experience.

11     Generally my theory would be that normally you would

12 take in the highest and best use, you would take the

13 existing structure, which the bones are decent, and do a

14 rehabilitation of the existing structure, as opposed to

15 incurring the cost of new construction.

16     Therefore, when I was asked six months ago what I

17 thought the highest and best was, use of this property was,

18 I said, instead of demolishing it on a small piece of

19 property and starting building something at a high

20 construction cost plus site work, plus demolition cost, my

21 preference would be, and based what I've done in the past

22 and other -- and my partners have done in the past, to

23 rehabilitate the existing property and then utilize it as a

24 rental property.  And at that point either refinance or sell

25 it.

1        So that was my highest and best use, was to use it to

2   rehabilitate the property, and to use it and to use it as an

3   apartment complex.

4   Q    And I don't know if it was clear, have you had occasion

5   to personally look at this property?

6   A    I've been there twice.  I've also met with the owners.

7   I reviewed the data I was presented.  I was not given a

8   walk-through, I was only given pictures of the interior

9   units, so my calculations were based basically of just

10  walking the property, but not actually me doing a unit

11  review.

12  Q    And what is your opinion regarding, and again, this

13  undoubtedly calls for some degree of speculation, but

14  informed by your experience in the industry, between the

15  plan that is shown on 9, Exhibit 9, and your plan, which do

16  you think is potentially more profitable?

17  A    Well, my reasoning would be that generally you spend

18  less money on a rehabilitation.  Now, obviously there are

19  facts.  I was told perhaps that there's a new roof and you

20  would save money, major expenses typically involved in

21  rehabilitating a property like this would be roof,

22  electrical, air conditioning, you know, certainly

23  mechanical, you would probably need all new appliances.  You

24  would, probably in my case, you would pull out the drywall

25  and you'd re-sheetrock the entire place.

1       But based on my costs of that, generally I've been able

2  to do that for somewhere between 35 and $40,000 a unit,

3  which in this context, as I would believe is 16 units,

4  although one was held or was occupied by a manager, I'll

5  avoid that, you're talking somewhere in the range of 560 and

6  $640,000 plus incidental costs.

7       The cost of new construction, and I do not know once

8  again what their site plan is, other than basically just the

9  breaking it into very small lots, typical house lot, which

10 is about .2 acres, although obviously they could be much

11 larger, a quarter acre, a half-acre, you know, five acres,

12 so it's hard for me to think that they would put on there

13 more square footage than already exists.

14      The basis of it is basically a 12,000 net rental per

15 square feet, even though the base of the building around

16 10,000 square feet, and the land itself is only about 12,000

17 square feet.  So normally new construction, and especially

18 in this area, would be, I assume, between 120 and $150 a

19 square if not more.

20      Now, the upside of it is, you can sell things there for

21 a high square foot price as well.  But at the end of the

22 day, and giving a long answer, probably being a terrible

23 witness, is the -- I'd rather make a million, a million and

24 a half dollars putting out 6 or $700,000 than gambling a

25 million, two million -- a million and a half, $2 million to

1  get the same profit.

2           MR. JOST:  Pass the witness, Your Honor.

3           THE COURT:  Okay.  Mr. Ray.

4               CROSS-EXAMINATION OF RUBEN BISK

5  BY MR. RAY:

6  Q    Sir, just to be clear here, you've never developed

7  property in the Montrose area.

8  A    Yes, I have.  I did a 24-unit condo project.

9  Q    In the Heights?

10 A    No, excuse me, I did it in the Heights, not in the

11 Montrose.

12 Q    Not in the Montrose.

13 A    Not in the Montrose area, no.

14 Q    Okay.  What was the name of that luxury housing company

15 that you were with?

16 A    Knutson Luxury Homes.

17 Q    Knutson Luxury Homes.  You were sued in Montgomery

18 County for breaching fiduciary duties, weren't you, sir?

19 A    No, I was not.  What are you referring to?

20 Q    A suit involving Crane --

21          THE COURT:  What does this have to do with the

22 expert witness' testimony?

23          MR. RAY:  Your Honor, in the breach of fiduciary

24 duty suit, according to the news report I just read, typing

25 his name in Google, it looked like he was accused of

1  hijacking property, but I'll --

2          THE COURT:  You have to have a basis for this,

3  Counsel.  A Google report is not a basis.

4          MR. RAY:  Raw 360 is actually what I read.  But,

5  Your Honor, I'll pass, I'll move on from this.

6          THE COURT:  Yes, please.

7  BY MR. RAY:

8  Q    You don't know -- if you look at the citation report,

9  do you have our exhibit book in front of you, sir, it's a

10 black book?

11 A    Sure, I have that, yes.

12 Q    If you'd turn to Exhibit No. 11.  Now, I want you to

13 assume, okay, I want you to assume when the property was

14 bought by Jetall, there were -- the citation report says

15 that there's no smoke detectors, the smoke detectors need to

16 be activated.

17          Is that something that needs to be done in your

18 experience as an expert, smoke detectors in bedrooms?

19 A    Typically you do need to -- when you do the electrical,

20 you also do the testing basically for fire safety purposes.

21 Q    So if Jetall added smoke detectors to the property, did

22 that increase its value in your opinion?

23 A    Yeah, I think anything like that would improve the

24 property.

25 Q    Is having no smoke detectors in a bedroom a bad thing?

1  A     That depends on the Code, but generally you need smoke

2  detectors where there are fire hazards within a property.

3  Q     Assume for me that when Jetall bought the property,

4  there was no Certificate of Occupancy and had not been

5  issued on the premises.  Is that a good thing or a bad

6  thing?

7  A     Obviously it's a bad thing if they don't have a

8  Certificate of Occupancy.

9  Q     So now, if Jetall got a Certificate of Occupancy, would

10  that increase the value and make it a better property?

11  A     Yes.  I think that would mean that they had a pass go

12  and go to the different inspectors, and get them to review,

13  and get approval.

14        THE COURT:  Is this within the scope of direct,

15  Counsel?

16        MR. RAY:  Yes, Your Honor.  Well, Your Honor, to

17  the extent it is an issue, he's alleged that the property

18  would be more valuable doing a rehab, and money needs to be

19  spent on rehabbing.  And he said he's visited the property,

20  and I want to understand if in the context of visiting the

21  property, he was aware of issues that --

22        THE COURT:  No.

23        MR. RAY:  -- were improved on.

24        THE COURT:  No.  This is outside the scope.

25  Direct your questions to the scope.

1  BY MR. RAY:

2  Q    When did you visit the property?

3  A    I visited the property twice.  I don't recall exactly.

4  It was six months, eight months ago I believe.

5  Q    When you visited the property, you said you looked at

6  photographs?

7  A    I also looked at photographs of the individual units

8  and what I could see.  I was given somewhere on the web, and

9  some of them were given to me by the owners.

10 Q    Do you know whether or not those photographs were taken

11 before or after improvements were made?

12 A    I do not know.

13 Q    Okay.  In your opinion, what the best development of

14 this property is, you're making an assumption that the

15 photographs were after or before improvements, or you just

16 don't know?

17 A    Well, it was apparent from those, I assumed the worth

18 that basically I would keep the bones of the building, and

19 just rip out everything that I could, including as I said,

20 the drywall.  So it would be a total rehab.

21 Q    And have you ever heard of Jetall being a developer?

22 A    I'm familiar with Jetall only from the point of view of

23 this suit, and I -- just looking at the records, not from

24 anything I've done.

25 Q    Did -- you did not conduct a rent survey of the

1  Montrose area rental values before you came here and

2  testified here today, did you?

3  A    No, I did not.  I just found out I was testifying last

4  day or two, and basically I just called a few -- well, I

5  talked to a broker and Montrose brokers.

6  Q    Okay.  When you talked about the value of property that

7  would be operated as an apartment complex, you are assuming

8  a hypothetical rental.

9  A    That's correct.  I'm assuming --

10  Q    And your value is based on a discounted cash flow,

11  correct?

12  A    That's correct.

13  Q    And you don't know what the rents actually would be in

14  that area, do you?

15  A    I have not made a market study.  I know they're getting

16  about 93 cents a foot now, and I've been told that the rents

17  would be between a buck and a half, and $1.93 per square

18  foot for a month.

19          MR. RAY:  Objection.  Hear -- well, I guess a

20  witness can't testify to hearsay if it's from a reliable

21  source.

22  BY MR. RAY:

23  Q    Do you have any idea where your sources got this

24  information?

25  A    Well, people who -- one is a mortgage company that

1  finances these projects --

2  Q    And what's the name --

3  A    -- and the other is basically, yes, I'm relying --

4  Q    -- of that mortgage company?

5  A    -- on --

6          THE COURT:  Please don't interrupt the witness,

7  Counsel.

8          THE WITNESS:  I'm relying on what I've been told

9  and what I saw and the financials I have from similar

10  projects, but mainly in the Heights.

11  BY MR. RAY:

12  Q    Do you know the current existing square footage of each

13  and every unit in the apartment?

14  A    No, I just know that roughly they're averaging about

15  750 per unit, just calculating it out.

16  Q    Do you know when the building was built?

17  A    I don't recall that I had that information, but I don't

18  recall, if it's an older building, maybe 50, 40, 50 years

19  old I guess.

20  Q    1955 sound about right?

21  A    Yeah, '50s, '55, that could be, yes.

22  Q    And do you have any idea of what issues might be

23  involved in rehabilitating?

24  A    I have not done a complete analysis of the building.  I

25  was not given that opportunity, that's correct.

1  Q    Okay.  Do you agree that businessmen might disagree as

2  to the best way to achieve value for a property?

3  A    I agree and as I stated, my first comment was, I have

4  not had the benefit of seeing their development plan or what

5  they think they can put on the pro.  Your client thinks they

6  can put on the property more -- a rehab on the sale of the

7  individual units.

8  Q    And do you agree that businessmen should be allowed to

9  contract a contract between themselves as to what they --

10            THE COURT:  Mr. Ray, do you have any more relevant

11  questions?

12            MR. RAY:  I pass the witness, Your Honor.

13            THE COURT:  Thank you.  Anything else, Mr. Jost?

14            MR. JOST:  No, Your Honor.

15            THE COURT:  All right.  You may step down.  Thank

16  you.

17        (Witness steps down.)

18            THE COURT:  Yes?

19            MR. JOST:  Thank you, Your Honor, we call Omar

20  Khawaja.

21            THE COURT:  Mr. Khawaja, come up please, raise

22  your right hand and be sworn.

23        (Witness sworn.)

24            THE COURT:  Be seated up there, please.

25            THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  All right.  Let's go.

2              DIRECT EXAMINATION OF OMAR KHAWAJA

3   BY MR. JOST:

4   Q    Mr. Khawaja, would you state your full name first.

5   A    My name is Omar Khawaja, K-H-A-W-A-J-A.

6   Q    And very briefly, if you'd tell us who you are and what

7   you do.

8   A    Yeah.  I am a practicing attorney, I was licensed in

9   May of 2010.  Prior to that, I worked -- prior to law

10  school, I worked as a congressional staffer on Capitol Hill.

11  During law school, I worked at the Securities and Exchange

12  Division, Division of Enforcement.  I moved to Houston, I

13  was a prosecutor in Midland, Texas for about a year, then I

14  was a prosecutor in Fort Bend County for about three years.

15  And since that time, I've been in private practice.

16  Q    Do you have any connection to the Plaintiff, Khawaja

17  Partners, Limited?

18  A    Yes.  That is an entity that is owned by my family, my

19  parents.

20  Q    Okay.  Do you have a personal role with the Plaintiff?

21  A    I do.  I help manage my family's business interests.

22  Q    Prior to March 8th of 2013, did you have any

23  involvement with the Avondale Apartments?

24  A    I did.  I was -- you know, my family had acquired the

25  property in 1997 or so, 1998, you know, of course I have my

1  own career and my own life, but since that time, I helped

2  manage the property to the extent that my father asked for

3  my help.

4       I also, and more recently, when I did have more time

5  here in Houston, after I moved back from Washington, D.C.

6  helped manage the property.

7  Q    Was there any reason within your family that required

8  you to step up a bit in terms of a new role?

9  A    Yeah, absolutely.  You know, in about early or late two

10  thousand -- early 2013 and late 2012, my father's health was

11  declining.  My father is 74 years old now, and you know,

12  he's sort of the patriarch of our large family here in

13  Houston, and I and my brothers were called upon to help him.

14  He has a business in manufacturing, as well as this

15  apartment complex, Avondale Apartments, which was supposed

16  to be his retirement income for him and my mother who

17  doesn't work.

18       And we had to play a larger role because of financial

19  difficulties that were occurring as a result of the

20  declining real estate market in Houston.  And so as a result

21  of my father's health declining and the real estate market

22  remaining stagnant for many years, my family's business

23  which is a manufacturing plant tied into the real estate

24  industry declined.

25       And so my father needed our help.  He was having severe

1  problems with his health, his back, his neck, and in fact,

2  he ended up having surgery in April -- late March 2013 when

3  all of this occurred.

4  Q    In your role for Khawaja Partners, Limited, did you

5  have occasion to come into contact with Mr. Ali Choudhri?

6  A    Well, I actually knew Mr. Choudhri before then.  I've

7  known him since high school.  I wasn't particularly close to

8  him.  I saw him around.  But my family and his family knew

9  each other very well.  His father knew me very well.  I do a

10 lot of community activities, I'm very well known in the

11 Pakistani Community for community service.  So I'd see his

12 father at various events, always exchanged courtesies with

13 him.

14     I knew his mother, because his mother and my mother

15 were good friends.  They would go to each other's homes,

16 they would attend events together.  My family attended his

17 wedding in 2009, I believe.  He was married here in Houston,

18 and my family attended that wedding.  I wasn't able to

19 attend.  So we knew each other.

20 Q    Personal contacts aside, in your role for Khawaja

21 Partners, Limited, did you ever have occasion to come into

22 contact with Mr. Choudhri?

23 A    Yes.  We came into contact really right around 2012,

24 and at that time, I was playing a role in my family's

25 business.  At that time, there was no -- there was still

 1  sort of a personal contact, but we had discussed back and

 2  forth -- you know, he had represented to me that he was, you

 3  know, an expert in sort of real estate development, and

 4  managing properties.  And we knew he always drove flashy

 5  cars, and he told me that hey, I can help you with your

 6  business interests.  So that was my initial sort of contact

 7  with him.

 8  Q    Did you ever make inquiry about his ability to help

 9  Khawaja Partners, Limited?

10  A    I did.  In early January 2013, I had started discussing

11  that in more detail with him, and you know, we had discussed

12  helping -- actually, it was more of a conversation about,

13  you know, what he could do generally for Khawaja Partners.

14  And I had explained to him that we were having some

15  financial difficulties, but they were not insurmountable

16  difficulties.

17       And he, you know, what I thought at that time, in the

18  interest of brotherhood and friendship said, hey, look

19  whatever you need I can help you.

20  Q    Did you take him up on that offer?

21  A    I did.  And that was after Mr. Choudhri sort of, you

22  know, showed me all of the properties that he allegedly

23  developed throughout the city.  He took me on different

24  tours of homes that he had built, you know, he was -- he

25  took me on tours in his $500,000 Lamborghini Aventador --

1          THE COURT:  All right.  Let's focus on what we

2   have here and the issues in the case.

3          THE WITNESS:  I apologize, Your Honor.

4          THE COURT:  Thank you.

5          THE WITNESS:  And so after sort of, you know,

6   building up my confidence and the fact that he was a

7   successful real estate developer, I did take him up on that

8   offer.  And I said, I need a short -- I need a small loan, a

9   short loan in order to overcome an issue that I was having

10  with a lender.

11  BY MR. JOST:

12  Q    What was that issue?

13  A    That issue was that Wells Fargo had called a note that

14  was encumbered that -- excuse me, that they had a lien on

15  our apartment complex, Avondale Apartments, as well as

16  another piece of land that we owned in the Heights.  And

17  basically what happened was, the -- on a sort of unrelated

18  matter, someone had placed a lien against our property, the

19  Avondale Apartment property.  And at the time of closing,

20  and we didn't learn this until very late in the process, but

21  at the time of closing in early March 2013, I needed around

22  96, $97,000 to overcome this lien.  In order -- I needed

23  that money at closing, which wasn't in the Heights property.

24  So I asked Ali Choudhri to lend me that money.

25  Q    What was the nature of that lien?

1  A    It was a -- it turned out to be a lien that was removed

2  in litigation, it was a fraudulent lien that a real estate

3  broker had placed on Avondale Apartments, as well as my

4  Heights -- the Heights property, which was sold.

5  Q    Did you discuss specific terms for this transaction

6  with Mr. Choudhri?

7  A    I did.  He -- we specifically discussed doing a Deed of

8  Trust on Avondale Apartments, and that, you know, we would

9  have a -- we didn't talk about an interest rate because that

10  was something that he didn't even mention to me.  He just

11  said, hey, we'll help you out, but we'll do a Deed of Trust

12  and a Promissory Note.

13  Q    And when approximately was this conversation?

14  A    This conversation was probably on the day before

15  closing, because I called him as a last minute -- sort of in

16  a last minute transaction, March 7th I want to say, 2013.

17  Q    Was there any reason why the closing couldn't simply be

18  delayed?

19  A    Yeah.  The lender basically wouldn't delay it any

20  further.  They were -- and we were ready to close as well,

21  but for this loan, but they wouldn't allow us to -- you

22  know, they wouldn't allow us to sort of have this lien

23  removed, and at that point, I thought Ali was there to help

24  me, so I went to him.

25  Q    What date was this approximately?

1    A     This was approximately -- I want to say it Wednesday,

2    Thursday, March 7th, March 6th, March 7th, around that time

3    period.

4    Q     And when was the closing?

5    A     The closing was the Friday, and I could be mistaken,

6    but I want to say it was March 8th, 2013.

7    Q     Was an attempt made to close the transaction that you

8    discussed with Mr. Choudhri?

9    A     Yes.  On the date of closing, I had been, you know,

10   sort of frantically trying to call him all morning because I

11   needed -- you know, I assumed he was going to wire that

12   money to me very quickly, and I believe he texted me in the

13   afternoon, you know, closing was in the morning, but he

14   texted me in the afternoon and said I can't do it.  And I

15   believe we had a phone conversation, and you know, I had no

16   idea why he said -- he said that there's something wrong

17   with Avondale Apartments, you know, something's wrong with

18   some document, and I can't do the Deed of Trust and the

19   Promissory Note.

20         So trusting him, I said, look, do whatever you need to

21   do, and we'll lend the money -- let you get the money and

22   then we'll decide afterward, but I need to close this

23   property, and I waited on him.

24   Q     That was during a telephone conversation?

25   A     That was during a telephone conversation.

1  Q    And did you have occasion to meet with Mr. Choudhri in

2  person after that?

3  A    I didn't meet with him in person until later that

4  afternoon.  We had another phone conversation, in which he

5  told me that he was preparing a letter contract and a -- he

6  told me he was preparing a development, and you know, he

7  knew the urgency.  My sick father was waiting, and my

8  parents were waiting at the closing title company, and we

9  were waiting for him to show up with -- to wire that money

10 so we could close.  And, you know, I said, look, send over

11 the letter agreement and I'll look at it and we'll sign it.

12 Q    And did he, in fact, send over the letter agreement?

13 A    He did.  He e-mailed it to me, and I opened it, you

14 know, I think it was on my phone.  I read -- I skimmed

15 through it very briefly, you know, focused in on numbers.

16 I'm not a real estate expert, I don't read a lot of

17 contracts, and you know, I saw that there was a profit -- I

18 think there was a profit -- the deal was $750,000 plus 25

19 percent profits or 15 percent profits I think originally.

20      And I said, Ali, look, you know, I don't know about

21 this entire contract, but put the profits up a little bit.

22 And he said, okay, I'll do it to 25.  I think he e-mailed me

23 back.  And then I said, well, okay, meet us at the title

24 company so we can get this thing done.

25 Q    Now, at this point, did you think you were negotiating

1  a loan or something else?

2  A    No, I still thought I was negotiating a loan.  More

3  importantly I, you know, trusted my friend who I thought was

4  going to look out for my interests.  And so I showed up

5  there with the intention of, you know, between brothers

6  signing this agreement and moving on with our lives.

7  Q    In the white folder or white binder in front of you,

8  please turn to Tab 2.

9  A    Okay.

10 Q    Now, that's the letter agreement that was presented.

11 A    That's correct.

12 Q    And did you or did you not recommend that your parents

13 sign that letter agreement?

14 A    I did.  Regrettably I asked them to sign this letter

15 agreement, and it was at the point at which my parents and I

16 were all in the offices of Jetall Companies, and you know,

17 despite my parents' misgivings at some of the language, I

18 said that, you know, we can trust Ali, and you need to sign

19 this contract so we can close on the property.

20 Q    All right.  The letter agreement contemplates that your

21 parents would execute a deed to Jetall.  Is that -- was that

22 deed also present at this meeting that you're describing?

23 A    Yes, that's correct.

24 Q    If you'd turn to Tab 1.  That is that deed?

25 A    Yes.  This is the deed that Gerald drafted -- that Ali

1  drafted, and that contract is also the contract that Ali

2  drafted.

3  Q    What was your personal understanding of what would

4  happen next after these documents were signed?

5  A    Well, you know, we -- it happened pretty quickly, but

6  you know, prefacing that a little bit, you know, we had

7  talked about working together, again you know, him taking me

8  on this grand tour, told me how much help he needed, his

9  father has passed away, I was -- in fact, I visited his

10  father when he was in the hospital.

11       And so he told me he needed help, and that, you know,

12  he considers me his close friend and his best friend, and

13  you know, that maybe you could work for me.  I've all these,

14  you know, real estate interests in managing, maybe you could

15  work for me.

16       So my understanding to him -- my understanding with him

17  was that we could -- you know, if we didn't want to do any

18  kind of development, we could walk away from the

19  development, of course, paying him his money that he owed,

20  and some reasonable amount of, you know, interest and my

21  other understanding was that if we did want to do the

22  development, that he would -- I would do it with him as a

23  partner, or in some type of joint venture.

24  Q    Now, the letter agreement does have an integration

25  clause that says, this is the deal, and there is no deal but

1  what is on the paper, correct?

2  A    That's correct.

3  Q    And you are an attorney, you went to law school, so

4  you're aware that that can be a significant provision?

5  A    I am aware of that.  Again, I wasn't a real estate

6  attorney, I did go to law school, and you know, I trusted my

7  friend.

8  Q    Were there further conversations after the closing on

9  March 8th in which you discussed these other possible

10 transactions with Mr. Choudhri, the employment, for

11 instance?

12 A    Well, there was -- there were a number of items I had

13 discussed with Mr. Choudhri, because as I mentioned earlier,

14 there was -- you know, we had a bit of financial turmoil

15 going on at the time that I was helping manage with my

16 family.  And, you know, Ali knew very well that immediately

17 after closing on this property, that Avondale Apartments

18 would be unencumbered, basically would be free and clear

19 most of any liabilities.  And, in fact, my family needed

20 money in order to move our operations from the land in the

21 Heights which we sold to another location.

22     And so Ali knew that, that we had a very urgent and

23 pressing need for money at the time.  And my understanding

24 with him was that we would be able to access that money in

25 Avondale, or we'd be able to sell Avondale and collect that

1  money, and I'd pay him his money back.

2  Q    When you say operations, you're talking about what type

3  of operations?

4  A    We have a manufacturing plant called Air Duct Metal

5  Products, and he -- you know, at that time, we needed to

6  move that operation from its location at a warehouse in the

7  Heights to another location.

8  Q    And when you say we, who owns --

9  A    Oh, my -- well, I own it and my sister owns it.

10 Q    And how is that organized?  Is that an entity or do you

11 own it directly?

12 A    It's a limited liability company.

13 Q    And what is the name of that limited liability company?

14 A    AEMP, LLC.

15            THE COURT:  All right.  Let's break right now and

16 instead of the 1:45, let's start up at 1:00.  All right?

17            Thank you.

18            THE CLERK:  All rise.

19      (Recess taken from 11:58 a.m. to 1:21 p.m.)

20            THE CLERK:  All rise.

21            THE COURT:  Be seated, please.  Call your next

22 witness, please, or step back up, please.

23            THE WITNESS:  Thank you.

24            THE COURT:  Go ahead, please.

25            DIRECT EXAMINATION OF OMAR KHAWAJA (RESUMED)

1  BY MR. JOST:

2  Q    Mr. Khawaja, we were talking about the financial

3  transactions with Jetall and Mr. Choudhri.  At any time did

4  Mr. Choudhri discuss another way of assisting Khawaja

5  regarding its outstanding indebtedness?

6  A    He did.  I believe it was the day prior to the closing

7  date.  He had talked about buying the note that Wells Fargo

8  held, and he told me to talk to the lender, basically the

9  lender's representative, and to put him in touch with him

10 and I did that.

11      And he sent an e-mail to them indicating that he was

12 willing to buy the entire note immediately for the price of

13 $1.02 million.

14 Q    And could you look at, I believe it's Exhibit 3, is

15 that the e-mail you're referring?

16 A    That's correct.  That's the e-mail from Ali to Derick

17 Hopkins who works for Wells Fargo.

18 Q    And you were copied on that e-mail?

19 A    That's correct.

20 Q    Okay.  Did you believe that to be a representation of

21 anything regarding liquidity as to Jetall?

22 A    Yes, that he had the money to buy the note or lend me

23 the $96,000 I needed.

24 Q    And we talked about this briefly, but did you ever

25 receive a job offer or proposed contract from Jetall or

 1  Mr. Choudhri after March 8th?

 2  A    No.

 3  Q    Was there ever any discussion between you and

 4  Mr. Choudhri as to why not or what happened?

 5  A    Yeah.  I sent him my résumé, I followed up with him,

 6  but him -- as soon as the transaction happened, basically

 7  him becoming unavailable was very common.  He was very easy

 8  to get ahold of before March 8th.  After that, he was almost

 9  impossible to get ahold of.

10  Q    And did you contact him by other means?

11  A    I sent him text messages, I e-mailed him, I called him.

12  Q    Would you take a look at Exhibit 4, please?

13  A    Yes.  This is an e-mail I sent him April 1st, trying to

14  follow-up after the initial transaction March 8th.

15  Q    And the first section of that e-mail refers to

16  employment with salary you said 70 to 85K.  Did you ever

17  receive any kind of response to that?

18  A    No.  And I believe we may have even met once prior to

19  this, maybe a short meeting.

20  Q    Further down in the e-mail, there was a discussion of

21  additional loans to ADMP.  Did that happen?

22  A    No, nothing like that happened at all.

23  Q    And did you discuss with Mr. Choudhri whether he was

24  willing to do that?

25  A    I did, and he indicated he was, he never followed up.

1   You know, that was my almost immediate concern at the time,

2   because as I mentioned, we were -- we had sold the property

3   that the plant had been basically housed, and so we had an

4   immediate need to move that plant.  So I was trying to get

5   in touch with him about that as well.

6   Q    What has been received as of right now, either by you

7   personally or by Khawaja Partners, Limited in return for

8   deeding the Avondale property?

9   A    The $100,000 in the letter agreement and that's all.

10  Q    No employment?

11  A    No.

12  Q    No other loans or other financial incentive?

13  A    No.  And he also is now, as of June, I believe or July

14  of 2013, he also started managing the apartments as well,

15  which was never part of our agreement.

16  Q    So what happened between March and June regarding the

17  management of the properties?

18  A    Well, you know, Ali knew that that was our basically

19  primary source of income, my family's primary source of

20  income, and you know, he never made any attempts at all to

21  assert any control over it per our agreement.

22       I found out later, like many other things, that he had

23  contacted my tenants in June, and he sent them a letter that

24  was dated March 8th, and it was sent in June, indicating

25  they should now pay rents to Jetall Companies.  And that's

1  the point at which I knew that he was trying to play games.

2  Q    And what specifically did you do in response to that?

3  A    Well, I sent him a text message, and I put a copy of

4  the letter and said what is this.

5  Q    And did you receive a response?

6  A    Some vague response as, you know, this is just telling

7  the tenants about the agreement, you know, we can discuss.

8  I don't have the exact text in front of me, but again my

9  mindset was that I'm still trying to figure out what he's --

10 is he being honest, is he being dishonest, I didn't know at

11 the time.  And that letter sort of helped me realize what

12 was going on.

13 Q    Now, eventually you took -- did you or did you not

14 eventually take legal action regarding this situation?

15 A    I did.  I hired counsel and I filed a lawsuit in state

16 District Court.

17 Q    And were there any hearings held in that District Court

18 suit?

19 A    There was an injunction hearing.  He also tried to

20 contact me after I filed suit.

21 Q    And did you successfully speak to one another?

22 A    We did.  He and his mom came to my house.  His mother

23 was there during the negotiation of the contract at Jetall

24 Companies.  I don't know what her role is there.  But she

25 tried to say, look, you're like my son, we're family members

1  here, and you know, we should work this out, and then we

2  did.

3  Q    So what was the next step at that point?

4  A    I think we had a temporary -- I believe it was a TRO

5  hearing or TIM.

6  Q    And what was the result of that hearing?

7  A    The result of that hearing was that we turned over

8  control to Jetall Companies for management of the property.

9  Q    And what about rental proceeds?

10  A    The rental proceeds were also turned over to Jetall

11  Companies.

12  Q    And has Khawaja received any income from the property

13  since --

14  A    None whatsoever.

15  Q    -- that hearing?

16  A    No.

17  Q    Do you currently have any reason to believe that the

18  property is in danger of a loss of value?

19  A    Yes.

20  Q    And what is the basis of that concern?

21  A    My -- the basis of that is the fact that almost

22  immediately after filing suit, he placed a lien against the

23  property of a million dollars to George Lee and Serena Yu,

24  and the Deed of Trust on that note speaks for itself, but

25  that's more -- that's worth more from my estimation than the

1  value of the property itself.  And there's no indication

2  whatsoever that that -- you know, he didn't take any

3  agreement from Khawaja Partners or myself or anyone before

4  doing that.

5  Q    Did he ever discuss the fact that he was going to put

6  that lien or Deed of Trust lien on the property with you?

7  A    Absolutely not.

8  Q    How did you find out about it?

9  A    Looking through the county clerk's website.

10 Q    Did you have any concerns about Jetall's ability to

11 successfully manage or Jetall Companies, Inc.'s abilities to

12 successfully manage the project that's contemplated by the

13 letter agreement?

14 A    I do.  You know, based on my personal knowledge and

15 research and attending hearings, and lawsuits that are filed

16 in other courts, I don't think he's capable.  I don't think

17 Jetall Companies or Ali Choudhri has the financial means to

18 develop the property.

19 Q    Is Jetall Companies, Inc. a party in those lawsuits?

20 A    In a number of them.  I don't have the total number,

21 but in a number of them, yes.

22 Q    In Jetall's response to this motion, there's a

23 statement that Jetall has invited the Debtor's input into

24 the nature, timing, and extent of the development, and that

25 this invitation was ignored.  Do you believe that's a true

1  statement?

2  A    It's not true.  That never happened, not from the day

3  -- the moment the agreement was signed, that never happened.

4  Q    How did you find out about Exhibit 9, the subdivision

5  plat that was discussed by Mr. Bisk?

6  A    Again, it was just a -- you know, standard review of

7  the county clerk's website that I do periodically.

8            MR. JOST:  I pass the witness, Your Honor.

9            THE COURT:  All right, Counsel.

10            MR. RUZINSKY:  May I have just a moment, Your

11  Honor?

12            THE COURT:  Yes.

13            MR. RUZINSKY:  Thank you.

14                 CROSS-EXAMINATION OF OMAR KHAWAJA

15  BY MR. RUZINSKY:

16  Q    Mr. Khawaja, good afternoon.

17  A    Good afternoon.

18  Q    You're an attorney, right?

19  A    Yes, sir.

20  Q    How long have you been an attorney?

21  A    May 2010.

22  Q    You know what a Promissory Note is, don't you?

23  A    I do.

24  Q    And you know what a Deed of Trust is, right?

25  A    I do.

1  Q    Would you turn please in the black binder, sir, and we

2  have some common exhibits that are in the black binder, at

3  least to start.  And this is Exhibit No. 3, please.

4  A    Okay.

5  Q    This is the letter agreement that Mr. Choudhri signed

6  on behalf of Jetall and the partners of the Debtor signed as

7  well; is that correct?

8  A    That's correct.

9  Q    And this is the document that you urged the partners to

10  sign on behalf of the Debtor, right?

11  A    Yes, my parents.

12  Q    Your parents, right.  And as a lawyer, you understand

13  that it's important to review documents before they're

14  signed, right?

15  A    I do, but I'm not a real estate attorney.

16  Q    But you are a lawyer?

17  A    Yes, a criminal prosecutor at the time.

18  Q    And you reviewed this document before it was signed,

19  correct?

20  A    Very briefly, but I did, yes.

21  Q    And it's a little over one page long, right?

22  A    That's correct.

23  Q    There's no language in this document that speaks in

24  terms of a loan being made, is there?

25  A    I'd have to look over it a moment, if you'd give me an

1  opportunity to review it.

2  Q    Yes, sir, please do.

3  A    No, that's what Mr. Choudhri and I discussed, there is

4  no language specifically for payment to a loan in this

5  agreement.

6  Q    And there's no interest rate that's specified in this

7  document, right?

8  A    Well, if you look at bullet point 5, it doesn't say

9  interest rate, but that looks like an interest rate.  To me,

10  the $50,000 fee as it's characterized.

11  Q    You -- in your mind, the $50,000 fee is an interest

12  rate?

13  A    Well, when Mr. Choudhri and I had discussed the loan,

14  the loan amount was $100,000, so if he's seeking $50,000

15  back from me, then gee, that was, okay, initially we hadn't

16  discussed an interest rate, but now you want $50,000 back

17  for the $100,000 you're lending me.

18  Q    And interest rates associated with a loan, right?

19  A    That's correct.

20  Q    And you agree with me there's no loan language in this

21  letter agreement that was signed, right?

22  A    There's no specific loan language, I agree with you,

23  yes.  In the contract, we had discussed it orally.

24  Q    Loans don't involve profit participations, do they?

25  A    I wouldn't know, Counsel.

1  Q    You had testified earlier that in the course of your

2  discussions with Mr. Choudhri that you asked for and

3  obtained an increase in the profit participation from

4  15 percent to 25 percent, right?

5  A    That's correct.

6  Q    You didn't ask Mr. Choudhri to put language in this

7  document reflecting a loan, did you?

8  A    No.  Again, I trusted him to look after my interests as

9  well.  I didn't -- I assumed, wrongly so, that he would

10 treat it as a loan.

11 Q    You assumed wrongly so, yes?

12 A    Yes, sir.

13 Q    I think you testified earlier that in your mind, you

14 believed that all the benefit that the Debtor got from the

15 transfer of the property was $100,000; was that right?

16 A    That's correct.

17 Q    When this transaction was made, you also testified it

18 was at a time when the Debtor was in default of its loan

19 indebtedness to Wells Fargo Bank; is that right?

20 A    That's correct.

21 Q    And the Debtor was at risk of losing the property,

22 right?

23 A    Correct, to foreclosure.

24 Q    So this transaction with Jetall saved the property,

25 right, from being foreclosed on; is that right?

1  A     That's correct.

2  Q     Now, it also benefitted the Debtor by giving the Debtor

3  the benefit of not having to pay a large deficiency, right?

4  A     Well, we had negotiated that, so Jetall didn't

5  negotiate that for us.

6  Q     No.  But if you didn't get the money through this

7  transaction to pay that extra $100,000 and get your

8  transaction closed, you wouldn't have had the benefit of

9  avoiding that deficiency claim, right?

10 A     Again, I trusted my friend to make a loan to me.  I

11 could've gotten that loan from elsewhere.

12            MR. RUZINSKY:  Your Honor --

13            THE COURT:  Yes, Mr. Khawaja, you need to respond

14 to the question, please.

15            THE WITNESS:  Yes, Your Honor.

16            MR. RUZINSKY:  Thank you, Your Honor.

17            THE WITNESS:  Would you repeat the question?

18 BY MR. RUZINSKY:

19 Q     Certainly.  This transaction which Jetall did with the

20 Debtor enabled the Debtor to avoid -- I got $400,000, a

21 deficiency to Wells Fargo that otherwise would've been on

22 the hook for, had this transaction not occurred, right?

23 A     Correct.

24 Q     So in terms of benefits so far, we've got property

25 wasn't foreclosed, we've got $400,000 savings off the

1  deficiency, right?

2  A    Correct.

3  Q    And in terms of the property not being foreclosed, the

4  property was worth at this time in March of 2013, about how

5  much, in your mind?

6  A    I would estimate maybe 750,000, 800,000.

7  Q    Okay.  Well, you're generally familiar with the real

8  estate market, aren't you?

9  A    Generally, very generally.

10 Q    You know that the market's been getting better, it's

11 not getting worse, right?

12 A    (No audible response.)

13 Q    Okay.  So you also -- let's see, this bankruptcy case

14 was filed in September of 2013, right?

15 A    Correct.

16 Q    And there were schedules filed by the Debtor in this

17 case, right?

18 A    Correct.

19 Q    And, in fact, you signed them, didn't you?

20 A    I may have.

21 Q    Okay.

22         MR. RUZINSKY:  Your Honor, may I approach the

23 witness?

24         THE COURT:  Yes.

25 BY MR. RUZINSKY:

1  Q    Sir, I'm going to hand you a copy of the Bankruptcy

2  Schedules off the Docket, and ask you if the last page of

3  that was signed by you.

4  A    Yes, sir, that's my signature.

5  Q    Okay.  And take a look at the document, the many pages,

6  and please tell me if you recall signing the Bankruptcy

7  Schedule.

8  A    Yes, sir, I do recall signing this.

9  Q    And on the first page of the Bankruptcy Schedules, you

10  indicate a value of the property of $750,000 current market

11  value, right?

12  A    Yes.

13  Q    Okay.  Sir, would you agree with me that back in March

14  of 2013, a half a year beforehand, in the market that's

15  rising and not declining, that the value of the property was

16  not greater than $750,000 in March of 2013?

17  A    It's possible, but I have no personal knowledge of

18  that.

19  Q    So in terms of benefits to the Debtor, the Debtor

20  didn't have foreclosed on a $750,000 piece of property, the

21  Debtor avoided $400,000 of a deficiency claim, and under

22  this agreement, Exhibit No. 3 in the black notebook, the

23  Debtor got certain rights under a couple of scenarios,

24  didn't he?

25  A    Yes.

1  Q    And let's go through those scenarios themselves.

2  Scenario number one, Jetall develops the property and sells

3  the property, and would you agree with me that in that

4  scenario, the Debtor gets at least $750,000 minus the

5  $100,000 that it was already advanced?

6  A    Yes.

7  Q    And in addition, the Debtor would get a 25 percent --

8  25 percent of the profits from the sale of the property,

9  right?

10  A    That's correct.

11  Q    Okay.  Now, let's look at the scenario of no

12  development and sale.  If the property was not developed and

13  sold, the agreement provides for Jetall to transfer the

14  property back to the Debtor, right?

15  A    That's correct.

16  Q    And then what the Debtor is obligated to do is to pay

17  back the $100,000 it already was advanced, right?

18  A    That's correct.

19  Q    And to also pay back 50 -- or to pay $50,000 to Jetall.

20  A    Correct.

21  Q    So in the scenario of development and sale, the Debtor

22  would be getting $650,000 cash, $100,000 that it already got

23  back in March of last year, a $400,000 savings off the

24  deficiency, and that's not even counting any profits

25  participation at that point, right?

1  A    Correct.

2  Q    And when we add up those numbers, we've got 750 -- the

3  650 plus 100 is 750 plus 400 is $1,150,000; is that right?

4  A    Sure.

5  Q    Right.  And that's the benefit that the Debtor got from

6  -- or gets from a scenario of development and sale, right?

7  A    If it actually happened, yes.

8  Q    Let's go to the other scenario.  The property gets

9  returned to the Debtor.  You've indicated in the Bankruptcy

10 Schedules that the current market value, $750,000 as of the

11 time you filed this in September of last year, right?  The

12 market's gotten better, it hasn't gotten worse, right?

13 A    Not from my understanding.

14 Q    So the Debtor is getting back something worth at least

15 $750,000, the Debtor has to pay back the $100,000 it got,

16 correct, such as paying that back, and then it has to pay

17 $50,000 more.

18 A    Correct.

19 Q    Okay.  And so really what the Debtor got under either

20 one of these two scenarios, okay, either one of these two

21 scenarios is reasonably equivalent value, right?

22 A    I won't say that.

23 Q    You wouldn't say that.

24        THE COURT:  Yes, Mr. Jost?

25        MR. JOST:  I think that calls for an expert

1  opinion on a bankruptcy type matter, and I don't think that

2  Mr. Khawaja is qualified to give such an opinion.

3           THE COURT:  He may answer if he knows, overruled.

4           THE WITNESS:  I don't know the answer to that.

5  BY MR. RUZINSKY:

6  Q    Staying on Exhibit No. 3 in the black book, is there

7  any place in this exhibit that says that -- this letter

8  agreement, Exhibit No. 3 that says that Jetall would not

9  manage the property?

10 A    No, that was told to me verbally.

11 Q    You had testified, sir, about this letter that Jetall

12 had sent to the tenants after it was deeded the property.

13 This is Exhibit No. 11, the white book.  And I think you

14 said that it was a March 2013 dated letter, and I just want

15 to correct the record.  It really took place in June, didn't

16 it?

17 A    That's correct.

18 Q    Okay.  Just so that record's clear.

19 A    Oh, I'm -- sorry.

20 Q    Yeah.  And was that letter sent in June 2013 or June

21 2014?

22 A    Let me clarify.  You referred to Exhibit 11, that's the

23 white --

24 Q    In the white book.

25 A    In the white book, I'm on Exhibit 11, that's a separate

1 letter than the one that was sent to my tenants, the tenants

2 at Avondale Apartments in June of 2013 --

3 Q    Okay.

4 A    -- in which Ali, for the first time, tried to assert

5 control of the property.

6 Q    Okay.  Sir, when the Debtor owned this Avondale

7 property before it was deeded to Jetall, the Debtor didn't

8 have a Certificate of Occupancy, did it?

9 A    I believe we were in the process of obtaining one.

10 Q    But you hadn't obtained one at that time, right?

11 A    I'm not sure.  I'd have to check with the property

12 manager at the time, but I'm pretty sure we didn't have one.

13 Q    So you were operating the property without a

14 Certificate of Occupancy?

15 A    Well, the city had just passed new regulations, and

16 they had given time to apartment complex owners in the area

17 to meet the requirements of that.  And we -- you know, we

18 had not been sent any, at the time at least that I managed

19 it, any specific notices that we were not in -- that said we

20 needed to obtain one, I believe.

21 Q    So you would agree with me that you were operating the

22 property without a Certificate of Occupancy, right?

23 A    I don't know if I can agree with you on that.

24 Q    So were you operating the property with a Certificate

25 of Occupancy?  It's a yes or no.

1  A    I would -- if you give me a moment to think about it.

2  Q    Sure, go ahead.

3  A    You know I'd have to see the records that we did not

4  have one, if we did or didn't have one.  I don't know to be

5  honest with you.

6  Q    Now, after the property was deeded to Jetall, the

7  Debtor hasn't been paying insurance on the property, right?

8  A    We paid insurance up until I think it was after the --

9  right after the TI hearing, that's when we stopped paying

10 insurance on it.

11 Q    So you haven't paid insurance this year, and you

12 haven't paid insurance for -- the TI hearing was -- I can

13 get that time frame later.  And the same would be said for

14 repairing the property, correct, and maintaining the

15 property?

16 A    Correct.

17 Q    The oral representations that you've testified to that

18 you say Mr. Choudhri made to you in connection with the

19 letter agreement --

20 A    Yes.

21 Q    -- those occurred before the letter agreement was

22 signed, right?

23 A    Yes.

24 Q    Now, the letter agreement provides for the property to

25 be developed, right?

1  A    Well, I think it has a number of different scenarios,

2  but it does provide as one of those scenarios to be

3  developed, yes.

4  Q    All right.  And you know that my client, Jetall, wants

5  to develop the property, right?

6  A    Yes.

7  Q    And am I correct that the Debtor now doesn't want to

8  develop the property?

9  A    No, that's not correct.

10 Q    Okay.  So are you saying then that the Debtor wants to

11 develop the property differently?

12 A    No, I'm saying that I -- the Debtor has no confidence

13 in Mr. Choudhri's ability to develop the property, to obtain

14 financing to develop the property, or in fact, we're at risk

15 of losing the property if he continues to have anything to

16 do with the property.

17 Q    So if Mr. Choudhri were to prove his financial

18 wherewithal, you'd be fine having him develop the property?

19 A    I wouldn't go that far, but that's a good starting

20 point.

21 Q    Well, the Debtor agreed and you encouraged the Debtor's

22 principals to sign an agreement where they agreed, that he

23 could develop it, or that Jetall could develop the property,

24 right?

25 A    On the basis of him having the financial wherewithal to

1  be able to do that.

2  Q    You agreed to the terms that are set forth in the

3  letter agreement, right?

4  A    But he also had specifically represented to me that we

5  would be a -- you know, a partner in developing that

6  property, and the fact that he would've hired me to help

7  manage the development of that property.

8           THE COURT:  You need to directly answer the

9  question, please, Mr. Khawaja.

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  Repeat your question.

12          MR. RUZINSKY:  Thank you, Your Honor.

13  BY MR. RUZINSKY:

14  Q    You had known Mr. Choudhri for -- I think you said for

15  a long time before you -- before this transaction took

16  place, right?

17  A    Not intimately, but we've known each other for a long

18  time, yes, sir.

19  Q    You had plenty of time to check out his financial

20  wherewithal, didn't you?

21  A    Well, he represented to me that he had millions of

22  dollars, as I mentioned earlier, even the day prior to this

23  transaction, he showed me a letter to my lender saying that

24  we'll buy this entire note off for 1.02 million.

25          MR. RUZINSKY:  I'm going to object, Your Honor.

1          THE COURT:  Sustained.

2    BY MR. RUZINSKY:

3    Q    Please listen to my question, sir.  Did you or did you

4    not have plenty of time before this transaction to check out

5    Mr. Choudhri's and his company's financial wherewithal?

6    A    No.

7    Q    You testified that he or that you started talking with

8    him generally about your company, this Debtor in January of

9    2013; is that right?  Or was it December of 2012?

10   A    I believe it was that time frame.

11   Q    Okay.  So whether it was starting in December of 2012

12   or January of 2013, you had months to check out his

13   financial wherewithal, right?

14   A    Well, these weren't, you know, specific conversations.

15   These were just sort of casual conversations, so.

16   Q    So did you or did you not have at least two months to

17   check out his financial wherewithal if you had chosen to do

18   so?

19   A    I mean, if you're asking me, you know, I guess that

20   depends on what you mean by financial wherewithal.  I didn't

21   know that there was a number of lawsuits filed against him.

22   Are you saying -- how do you define financial wherewith?

23          THE COURT:  No, just a moment, you need to answer

24   the questions to the best of your ability and then let's go

25   on.

1          THE WITNESS:  Yes, Your Honor.  I'm sorry, could

2    you please repeat the question?

3          MR. RUZINSKY:  Certainly.

4    BY MR. RUZINSKY:

5    Q    Will you agree with me that you had at least two months

6    to do due diligence in connection with Mr. Choudhri's or his

7    companies, Jetall's financial wherewithal?

8    A    I disagree with that statement.

9    Q    You indicated or the Debtor indicated in its motion

10   that the -- somehow the Debtor was being damaged by the fact

11   that the property was being replatted, and you used a term

12   there called, quote, use non-conforming, close quote.  Do

13   you see that?

14   A    I did see -- I'm not looking at it right now, but I did

15   see that term.

16   Q    And I interpreted that to mean that once the property

17   is replatted that it couldn't be used as an apartment

18   complex.  Is that your understanding?

19   A    Honestly, I don't -- I'm not sure.

20   Q    You had no information one way or the other as to

21   whether or not the replatting of the property has any effect

22   on what you could use the property for; isn't that right?

23   A    I think that's correct.

24   Q    Sir, would you turn to Exhibit 10 in the black

25   notebook, please?

1  A    Yes, sir.

2  Q    This is a City of Houston Public Works and Engineering

3  building inspection situs comments.  Do you see the dates

4  listed on the left-hand side, May 10, 2012?

5  A    Yes, sir.

6  Q    That was a period of time before the property was

7  deeded to Jetall, right?

8  A    Yes, sir, it was.

9  Q    And do you see there in the third line under the

10  comments where it says:

11      "Avondale with 16 units, there is no c/o posted."

12          Do you see that?

13  A    Yes, sir.

14  Q    Did you understand the c/o would be a Certificate of

15  Occupancy?

16  A    Yes, that makes sense what it would be.

17  Q    Would you turn, please, to Exhibit 4 in the black book?

18  A    Yes, sir.

19  Q    This is the deed involving the conveyance of the

20  property from the Debtor to Jetall, right?

21  A    Yes, sir.

22  Q    And this was the companion document to the letter

23  agreement Exhibit No. 3, right?

24  A    Yes, sir.

25  Q    And you reviewed this document as well, right?

1  A    Yeah, it was -- at a time of great pressure, very

2  briefly I did.

3  Q    And like the letter agreement, Exhibit No. 3, you

4  recommended to the signatories on this document that they

5  sign it, right?

6  A    I did.

7  Q    Mr. Khawaja, does the -- I looked in the Bankruptcy

8  Schedules and I didn't see much money there, and would you

9  agree with me that the Debtor doesn't have the money to do

10  the rehabilitation work on the apartment project that the

11  first gentleman who testified talked about?

12  A    You mean as we do now?

13  Q    As you do now?

14  A    With the property under the control of Jetall

15  Companies?

16  Q    That the Debtor doesn't have the money right now today

17  this moment in time to perform that rehab amount, which I

18  think he said was about $650,000.

19  A    Yeah.  If we had the property, we would be able to do

20  that.  Without the property, we would not be able to do

21  that.

22  Q    Going back to Debtor Exhibit No. 3 that's in the white

23  book, I just want to make sure the record is clear.  When

24  you said that Mr. Choudhri talked about purchasing, I think

25  you said the note for a million 20,000 dollars, I'd like you

1  to -- I think you will agree with me that the e-mail talks

2  about notes plural, and so it was the note on this property,

3  as well as -- I can't tell if it was one other note, or two

4  other notes.

5  A    No, I had said another note, that's correct, yes, two

6  notes.

7  Q    Around the time, or shortly before you did this

8  transaction with Jetall in March, March 8th of 2013, had you

9  received any purchase offers for the property?

10 A    We had.

11 Q    And was it one offer or was it -- how many offers was

12 it?

13 A    I think we had at least three or four offers.

14 Q    And what were the amounts of those offers?

15 A    Ranging from anywhere from cash offers of 600 to

16 financed offers of 750.  I think it was that range.

17 Q    And wasn't one of those offers for $500,000?

18 A    One of them may have been for 500,000.  I can't recall

19 specifically.

20 Q    And was the property listed for sale prior to this

21 bankruptcy filing?

22 A    Yes, it was.

23 Q    How much did you list it for?

24 A    I don't -- I think we were at -- my recollection is

25 that we were just entertaining offers that there wasn't a

1  list price, but I could be wrong.

2          MR. RUZINSKY:  Your Honor, I'll pass the witness

3  at this time, thank you, sir.

4          THE COURT:  All right.  Follow-up.

5          MR. JOST:  Thank you, Your Honor.

6                  REDIRECT EXAMINATION OF OMAR KHAWAJA

7  BY MR. JOST:

8  Q    At the time of the transaction on March 8th or prior to

9  that day, were you looking at other sources for this money

10 that you needed the 96,000?

11 A    No.

12 Q    Why not?

13 A    Again, because I talked about it with Ali, I trusted

14 him, we'd discussed it, and I thought he was going to be

15 able to give it to me.

16 Q    You thought he was going to give it to you as a gift?

17 A    No, excuse me, that he was going to be able to do the

18 loan.

19 Q    When is the first time that you heard of a transaction,

20 other than a loan transaction?

21 A    That was -- our closing was scheduled for the morning

22 of the following day, March 8th, 2013, and I think it was

23 around noon or 1:00 p.m. when he said he's not going to be

24 able to do the loan, that we had discussed previously.

25 Q    So it was the day before the closing?

1   A    No, it was the day of closing.

2   Q    The day of closing?

3   A    Yes.

4   Q    During that day, between noon and the closing, did you

5   have the opportunity to conduct any financial due diligence

6   on Mr. Choudhri as to whether or not he could fund a

7   property redevelopment?

8   A    None whatsoever.

9   Q    Regarding the letter agreement, I believe that you it

10  open in the black binder at 3, if you look at paragraph 4,

11  when does Khawaja get paid?

12  A    It says:

13       "Within 120 days after completion of development and

14       sale."

15  Q    Okay.  What does it say next?

16  A    "Jetall will pay you 750,000 plus 25 percent of any

17       profits realized after development" -- excuse me, "by

18       Jetall.  After development, Jetall will pay this money

19       to Khawaja Partners, Limited or its designee.  Jetall

20       will determine when 'completion of development' occurs

21       and the amount of 'profits' under this paragraph in its

22       sole, absolute, and unreviewable discretion."

23  Q    So, in your opinion, is that 180-day deadline -- 188 --

24  excuse me, 180-day deadline a real deadline?

25  A    No.

1  Q     And why not?

2  A     There's no date upon which he has to do completion, and

3  he gets to determine when completion is.

4  Q     What about the profit sharing under this agreement who

5  decides whether or not there's a profit?

6  A     It says, you will have -- it says that:

7        "An amount of any profits under this paragraph in its

8        sole, absolute and unreviewable discretion, you will

9        have no right to examine Jetall's books and records to

10       audit these calculations, or otherwise to challenge

11       them in the future."

12 Q     So is that a real undertaking to pay Khawaja a portion

13 of the profits in your opinion?

14 A     No.

15 Q     From Khawaja's perspective, how are Jetall's

16 undertakings in this letter agreement secured?  What

17 protection does Khawaja have to acquire them to live up to

18 this?

19 A     We have zero protection under this letter agreement.

20 Q     Now, did you think that after the letter agreement and

21 the transaction on March 8th that you would be in a position

22 where you could have at least transparency as to how the

23 property was being handled?

24 A     Yes.  I thought I would get that.

25 Q     And what was the basis of that thinking on your part?

1  A    Again, it was based on my friendship and interactions

2  with Ali leading up to the transaction.

3  Q    Now, there's been discussion earlier about a potential

4  job offer to you.  What was that job to be?

5  A    Some type of operations, counsel or general counsel by

6  Jetall Companies.

7  Q    Would part of your responsibilities, based upon your

8  understanding of your conversations with Mr. Choudhri, have

9  been overseeing that endeavor?

10  A    He specifically said to me that we will oversee -- you

11  will oversee development of Avondale, and even up to the

12  point where he said I will teach you how to develop a

13  property.

14  Q    Now, we discussed that the letter agreement has an

15  integration clause, and it says, it's the deal, and there

16  are no other representations.  But were there

17  representations made to you about whether Khawaja would have

18  a say and to whether it was option A, or pay $100,000 plus

19  50 or option B, proceed with development?

20  A    Yes, absolutely.

21  Q    Okay.  What were those representations?

22  A    That we had the option to do either one.

23  Q    And you talked about listing the property prior to the

24  Khawaja bankruptcy, which bankruptcy were you talking about?

25  A    The bankruptcy, I believe that -- I'm sorry, which one,

1 would you repeat the question?

2 Q    Yes.  There's -- when was the bankruptcy -- I'm trying

3 to establish the date of the listing agreement,

4 approximately when was the property listed?

5 A    It had to have been I think summer of 2012 maybe,

6 around that time.

7            MR. JOST:  Pass the witness, Your Honor.

8            THE COURT:  That's all.  You may step down.

9            MR. RUZINSKY:  Your Honor, may I ask any follow-

10 up?

11           THE COURT:  No.  More witnesses?

12           MS. SHERMAN:  Excuse me, Your Honor, may I note my

13 appearance for the Record?

14           THE COURT:  I thought you did.

15           MS. SHERMAN:  I did, but there's one thing I

16 neglected to add.

17           THE COURT:  Yes, Ms. Sherman.

18           MS. SHERMAN:  Rachel Sherman on behalf of Dunn

19 Neal & Gerger --

20           THE COURT:  Yes.

21           MS. SHERMAN:  -- I want to indicate our support to

22 the Debtor's --

23           THE COURT:  Motion.

24           MS. SHERMAN:  -- motion today.

25           THE COURT:  Fine.

OMAR KHAWAJA - REDIRECT BY MR. JOST                    74

1            MS. SHERMAN:  Thank you.

2            MR. RUZINSKY:  Your Honor, may I ask for an

3    accommodation on witness sequencing?

4            THE COURT:  Yes.

5            MR. RUZINSKY:  And I'll ask opposing counsel, too.

6    There's a gentleman here, Mr. Landrum, who apparently has

7    some time constraints.  He ran off to do something that we

8    asked him to do and then come back here.

9            THE COURT:  Okay.  So you want to take him out of

10   order?

11           MR. RUZINSKY:  I would if I can, Your Honor.

12           THE COURT:  Any problem?

13           MR. JOST:  That's fine.

14           THE COURT:  That's fine, let's just go ahead and

15   do that.

16           MR. RAY:  If we can get him in the hallway

17   before --

18           MR. RUZINSKY:  Let's go get him before --

19           MR. RAY:  If you can find him.

20           MR. RUZINSKY:  Thank you.  Thank you both.

21           THE COURT:  That's fine, go ahead.  Okay.  Let's

22   break for five minutes when he comes back.

23           THE CLERK:  All rise.

24       (Recess taken at 2:09 p.m. to 2:20 p.m.)

25           THE COURT:  All right.  Have you been sworn, sir?

1  Have you been sworn in?

2          MR. LANDRUM:  No, ma'am.

3          THE COURT:  Okay.  Go ahead, please.

4      (Witness sworn.)

5          THE COURT:  Okay.  Mr. Ruzinsky.

6              DIRECT EXAMINATION OF GLENN LANDRUM

7  BY MR. RUZINSKY:

8  Q    Mr. Landrum, would you please state your full name and

9  spell it for the Record?

10 A    My name is Glenn Landrum, G-L-E-N-N, L-A-N-D-R-U-M.

11 Q    And how are you employed?

12 A    I am the owner of Landrum Consulting.

13 Q    Briefly describe -- very briefly describe your

14 educational background for the Court please.

15 A    Two years at the University of Houston, 30 years in the

16 construction business, 15 years in municipal service, that

17 includes today, because I'm a subcontractor for some

18 municipalities now; a master co professional in the ICC.

19 Q    What is the ICC?

20 A    International Code Council.

21 Q    Okay.

22 A    That means I'm a certified building official.  I'm a

23 building code official, a fire code official, a plumbing

24 code official, a mechanical code official, an existing

25 building code official and commercial electrical inspector.

1  Q     How many municipalities have you worked for?

2  A     Four.

3  Q     Which ones?

4  A     City of Houston, City of Missouri City, City of

5  Prairieland, and City of Stafford.

6  Q     And how many buildings have you inspected over the

7  years?

8  A     Thousands.

9  Q     You visited this property, this Avondale property?

10 A     Yes, sir, I have.

11 Q     During the -- from your experience in visiting and

12 evaluating thousands of properties, have you gained

13 experience and formed opinions in terms of what the highest

14 and best use of properties are?

15 A     That's actually a real estate term, but I understand

16 the principles, yes, sir, and I understand the qualities of

17 buildings, yes, sir.

18 Q     And do you -- you were here in court when the first

19 gentleman testified about wanting to spend $650,000 to rehab

20 the Avondale Apartments, right?

21 A     Yes, sir, I was.

22 Q     If $650,000 was done -- if the Avondale Apartments were

23 to have been -- were to be rehabbed, okay, and I think he

24 said that you would bring rents up to $1.50 a square foot,

25 okay, what would the parking availability be at the

1   property?

2   A    They are only six available parking spots on that lot.

3   Q    Right now, six spots?

4   A    Yes, sir, I was there three weeks ago.

5   Q    Where does everybody else park?

6   A    Everybody else parks on the street and the surrounding

7   neighborhood.

8   Q    Okay.

9   A    The problem with that, is that immediately to the

10  south, you have a commercial district that is subject to --

11  and has some assembly being used where it constricts the

12  parking availability to a greater degree.

13  Q    Okay.  Do you know how old the building is?

14  A    About 59 years old, 60 years old, in there.

15  Q    What is the average economic lifespan for a building in

16  that area?

17  A    A Type 5 construction --

18            MR. JOST:  Your Honor --

19            THE COURT:  Yes, I'm sorry, Mr. Jost.

20            MR. JOST:  I object to opinions being solicited on

21  economic issues as opposed to building and code issues.  I

22  don't believe the witness is qualified to render those

23  opinions.

24            THE COURT:  Okay.  Well, thus far what I've been

25  hearing have been factual statements about this property.  I

1  do have problems with him testifying as to an economic model

2  of various matters, but if they're a factual issue about

3  which he is knowledgeable or code issues, on which he could

4  give an opinion, that's the scope of the expert.

5          MR. RUZINSKY:  Okay.  Thank you, Your Honor.

6  BY MR. RUZINSKY:

7  Q    Mr. Landrum, is this a wood frame building?

8  A    Type 5, that means wood frame non-sprinkler.

9  Q    Okay.  And what is the economic life span for a Type 5

10 wood frame non-sprinkler building?

11 A    Generally, in this area, that means Houston area --

12 Q    Uh-huh.

13 A    -- 30 years.

14 Q    And so we've got a building here which is about twice

15 that?

16 A    Yes, sir.

17 Q    And in a building like that, what type of conditions do

18 you typically confront?

19 A    Without looking -- making a detailed study, I would say

20 that there were three main issues that you would find.  You

21 would find insect damage in the structural frame, you would

22 find some rot because of water intrusion from various

23 locations through the years, and through adverse weather

24 conditions, and you would find problems with the foundation

25 and/or the structure because of expansion soil

1  characteristics that we have in this -- in Harris County.

2  Q    And in conditions like -- do conditions like that lend

3  themselves to rehabilitation of structures?

4  A    It's possible, but it's not generally.  It's -- after a

5  double life span, it's just not worth it.

6  Q    And when you say it's not worth it, why?

7  A    Well, because it's more work and expense to rehab it

8  than it is to tear it down and build a new one.

9  Q    How long generally is the permitting process to build

10 something new on that property?

11 A    To build something new, number one, you can't build --

12 you can't tear down that particular building more than 50

13 percent on that property without going through an entire new

14 building permit process.  That means that you'd be refused

15 out of hand because of traffic issues, you don't have

16 parking space for the number of units that are there.

17     Number two, if you're going to go change the use, which

18 you go from what you have there as an R-2, to an R-3, which

19 is single family, one or two family building or possibly

20 townhomes, that requires a replat process in the City of

21 Houston.

22     The replat process is a minimum of seven months.

23 Permit process, I'm doing right now that's very similar to

24 that, it's three units.  I've been involved in it since the

25 beginning on Stamford Street, which is not too very far

1  away.  We've been on that one since -- I've been in the

2  active process since last August, so I'm 12 months into it

3  right now.  And it looks like we may get building permits

4  next week.

5          MR. RUZINSKY:  I'll pass the witness, Your Honor.

6          THE COURT:  Go ahead, Mr. Jost.

7          MR. JOST:  Thank you, Your Honor.

8              CROSS-EXAMINATION OF GLENN LANDRUM

9  BY MR. JOST:

10 Q   Mr. Landrum, my name is Lewis Jost.  Have you performed

11 a full inspection of this building?

12 A   Sir?

13 Q   Have you performed a full --

14 A   No, sir, I have not.

15 Q   Have you been through the building to look for code

16 violations and what not?

17 A   No, sir, I have not.

18 Q   So is it fair to say you've just seen it from the

19 street?

20 A   Yes, sir.

21 Q   So if there was --

22 A   Well, actually from outside the gate.

23 Q   Outside the gate.  So if there was insect damage, water

24 intrusion, any other problems that existed, you wouldn't be

25 in a position to know --

1   A     No, sir.

2   Q     -- whether they're there or not?

3   A     No, sir.

4   Q     Do you -- I heard you when you came in, say that you

5   were busy, but you wanted to do this to help Mr. Choudhri.

6   Do you work with Mr. Choudhri frequently?

7   A     Yes.

8   Q     Can you just give the high points briefly, what do you

9   do for him?

10  A     I handle his occupancy compliance issues all the time.

11  Q     And --

12  A     I work for him intermittently, probably four jobs a

13  year.

14  Q     Different buildings or all the same place?

15  A     Oh, all over the city.

16  Q     And were you in the courtroom when Mr. Ruben Bisk

17  testified this morning, the guy who took the stand at the

18  very first?

19  A     Yes, sir.

20  Q     He talked about stripping out the drywall and rehabbing

21  as rental units, right?

22  A     Yes, sir.

23  Q     And you said that if you don't tear down more than 50

24  percent of the structure, you don't have to jump through all

25  those regulatory hoops, correct?

1  A    50 percent of the value of the structure.

2  Q    50 percent of the value.

3  A    And that's kind of a sliding scale, and that's up to

4  whoever has the authority or jurisdiction.

5  Q    So maybe, maybe not in this case?

6  A    When you do one down on a tear-out like that, down to

7  the structure, you're impinging 50 percent at that point.

8  Q    But that -- again, that's something that varies from

9  case-to-case, and that can --

10  A    Yes, sir.

11  Q    -- slide --

12  A    Yes, sir.

13  Q    -- as you put it?

14       Did you notice when you were out at the apartments that

15  there's a garage in back with an additional four or five

16  spots?

17  A    No, sir.

18  Q    Did you go to the back?

19  A    Yes, sir, I just didn't notice it.

20            MR. JOST:  I pass the witness, Your Honor.

21            THE COURT:  All right.  So that I'm clear,

22  Mr. Landrum, if you diminish -- if you change your

23  development to rehab, it's going to diminish 50 percent of

24  the value of the structure, you have to go through a new

25  permitting process, correct?

1            THE WITNESS:  Yes, ma'am.

2            THE COURT:  And that's -- but that's different

3    than replatting for a different purpose?

4            THE WITNESS:  Yes, ma'am.

5            THE COURT:  All right.  So how long does a new

6    permitting process ordinarily take?

7            THE WITNESS:  The permitting process right now in

8    the City of Houston is running four to six months.

9            THE COURT:  Okay.  And that's from the time at

10   which the contractor submits the proposal to them, or what

11   triggers that?

12           THE WITNESS:  No, ma'am, the time we have usable

13   construction drawings.

14           THE COURT:  I see, all right.  And what do you

15   mean by that?  What makes them usable?

16           THE WITNESS:  Well, they have to be relatively

17   complete.

18           THE COURT:  Okay.  All right.  Does that mean

19   you've got to have an architect sign off on them, or you

20   have --

21           THE WITNESS:  Yes, ma'am.

22           THE COURT:  Okay.

23           THE WITNESS:  On a building of that size and that

24   use, yes, ma'am.

25           THE COURT:  Okay.

1            THE WITNESS:  If the building is greater than

2    5,000 square feet, it has to have an engineer; if it's

3    greater than 20,000 square feet or have certain use, it's an

4    architect.

5            THE COURT:  Okay.  How standard are these proposed

6    designs on a process like this of a tear-out?  I mean, is

7    there some place to get them on software, is there some

8    place that these can be standardized in apartment buildings

9    like this or you have to --

10            THE WITNESS:  Not on rehab, ma'am.

11            THE COURT:  Okay.

12            THE WITNESS:  Simply there's just too much

13    variety.

14            THE COURT:  Uh-huh.  Okay.  Could you tell what

15    kind of upkeep these places had, what was deferred

16    maintenance on them?

17            THE WITNESS:  Ma'am?

18            THE COURT:  Could you tell what kind of upkeep

19    these places had?  Was there visible deferred maintenance on

20    them?  Had they been taken care of?

21            THE WITNESS:  When I first went by --

22            THE COURT:  Uh-huh.

23            THE WITNESS:  -- a year and a half ago, they

24    looked pretty rundown.  They look much better, but they went

25    through the occupancy process, they looked much better three

1  weeks ago.

2              THE COURT:  Okay.

3              THE WITNESS:  But they're still an older Montrose

4  apartment building.

5              THE COURT:  Okay.  The replat process, we've got a

6  proposed plat right here, has this been submitted to the

7  city as far as you know for the change of occupancy?

8              THE WITNESS:  I asked that question this morning,

9  and the one that you have does not -- is not recorded.

10             THE COURT:  Okay.

11             THE WITNESS:  It does look complete.

12             THE COURT:  Uh-huh.

13             THE WITNESS:  So I don't know if it's recorded.

14             THE COURT:  Okay.

15             THE WITNESS:  But it's certainly looks complete.

16             THE COURT:  So it could have started the replat

17  process, the permitting, this 12 months you described

18  already maybe?

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  Okay.  All right.  Any other questions

21  of counsel based on my questions?

22             MR. RUZINSKY:  No, Your Honor.

23             MR. JOST:  Nothing further, Your Honor.

24             THE COURT:  Okay.  Thank you.  You may step down

25  and you're excused.

1        (Witness steps down.)

2            THE COURT:  All right.  Mr. Jost, pick back up.

3            MR. JOST:  Your Honor, we call Ali Choudhri.

4            THE COURT:  All right.  Mr. Choudhri, step up, you

5   remain under oath.

6                DIRECT EXAMINATION OF ALI CHOUDHRI

7   BY MR. JOST:

8   Q    Mr. Choudhri, Lewis Jost.  When you took the stand

9   briefly this morning, you said you were going to call your

10  accountant and get some information.  Have you been able to

11  get that information, specifically income per month for

12  Jetall Companies, Inc. in management fees?

13  A    No, I didn't, but I did inquire that Jetall has no

14  judgments against it.  I think you mentioned earlier that

15  there was a judgment, that's another entity --

16            MR. JOST:  Objection, nonresponsive.

17            THE WITNESS:  But I did get the --

18            THE COURT:  Yes, yes, sustained.  Just answer the

19  question, please.

20            THE WITNESS:  No, I did not, sorry.

21  BY MR. JOST:

22  Q    No, you did not call, or no, you did not get the

23  information?

24  A    I called but they were out for lunch, and so I didn't

25  get the information.

1  Q    Did you call from your cell phone?

2  A    Yes, I did.

3  Q    I don't want to cover ground already covered this

4  morning when you were up very briefly, but I don't think we

5  kind of got your basic who you are.  Can you tell us who you

6  are and what you do for a living?

7  A    My name is Ali Choudhri, I'm in the real estate

8  business, real estate development business, investments in

9  real estate.

10 Q    And when you say you're in the investment business, are

11 you personally an investor?  You use personal funds to make

12 real estate investments?

13 A    Yes.

14 Q    Do you use any other funds to make real estate

15 investments?

16 A    Sure.

17 Q    And what are the sources of the funds?

18 A    Financing is a source.  Financing is a source, family

19 funds.

20 Q    So bank loans, people you know.

21 A    Family funds.

22 Q    Do you ever solicit an investment from people you don't

23 know?

24 A    No.

25 Q    What specifically does Jetall Companies, Inc. do?

1  A    Jetall Companies, Inc. is a property management

2  company.  I own different entities that own different

3  properties, but we have one company that handles service

4  calls, maintenance calls, day-to-day management, things of

5  that sort.

6       So Jetall Companies manages and, you know, there's

7  thousands of tenants and millions of square feet that it

8  manages for other entities that I own and I'm involved with,

9  but typically every building, every property we have,

10 typically is a single purpose entity.  And Jetall is usually

11 the property management company that does the day-to-day

12 management for that building or entity.

13 Q    Does Jetall do management for only buildings that are

14 owned by affiliated entities, or are they out there, anybody

15 can hire them to manage a building?

16 A    No, we only manage our own properties.  We don't do

17 third party management.

18 Q    Now, you said this morning, and it's been amplified by

19 your previous response here that Avondale is the only

20 property owned by Jetall Companies, Inc.

21 A    To the best of my recollection I'm pretty sure that's

22 accurate.

23 Q    The plan was to put it into a single purpose entity,

24 but at the time when we did the deal, we -- most of the

25 times we'll have a lot more time to do a deal and set the

1  SPD and close, and go through a title company in that

2  process.  This was a fast deal that had to be done or, you

3  know, as Mr. Khawaja told you, everything was going to be

4  lost and so I did the best I could to actually help them,

5  and we're here now, so.

6  Q    What's the purpose of using the special purpose

7  entities for each building?

8  A    That's what my attorneys always -- Bruce -- it's just

9  something we -- that's how we structure our different

10 assets, and that's just typically how we've done that.

11 Q    It's done as a liability limiting measure, correct?

12 A    Sure.  I guess if, you know, if you have an entity that

13 -- yeah, that's a good reason, yes.  Yes, sir.

14 Q    Any other reasons that you are personally aware of as

15 to why you would use single purpose entities?

16 A    You know that's -- I just -- it's my understanding

17 that's how we've always done it.  It's how my father had

18 done it, and that's what I've been continuing to do as well.

19 So if we -- if there's a commercial residential property,

20 we'll typically own it as a single purpose entity.

21      Now, occasionally, if it's something we're going to put

22 in -- if we're signing a contract to buy a piece of

23 property, we'll typically sign a contract as Jetall

24 Companies, Inc., as the buyer, and/or signs, and then we'll

25 usually have 30 days or 60 days to go through the process

1  and set up a special purpose entity, and then transfer or

2  assign the contract to the entity that'll end up owning it.

3       We've also done it where Jetall then transfers it to a

4  single purpose entity.

5  Q    Could you look at in the white binder in front of you,

6  could you look at Exhibit 3, paragraph 4?

7  A    Yes, sir.

8  Q    Who determines when --

9            MR. RAY:  Excuse me, is that exhibit in the white

10 notebook as --

11           MR. JOST:  Oh, excuse me, Exhibit 2, paragraph 4,

12 the letter agreement.

13           MR. RAY:  Sorry.

14           MR. JOST:  That's all right.

15           THE WITNESS:  Yes.

16 BY MR. JOST:

17 Q    Who signs when completion of development has occurred?

18 A    We would decide when completion of development -- I'm

19 sorry, where are you looking, paragraph --

20 Q    Paragraph 4.

21 A    I mean, completion typically would be once we've gotten

22 a CO with -- we've passed all the city inspections, and

23 we've delivered -- we've passed all the inspections and

24 we're basically transacting the delivery --

25           MR. JOST:  Objection, non-responsive.

1          THE COURT:  Repeat your question.

2   BY MR. JOST:

3   Q    Who?

4   A    Oh, who.

5   Q    Who decides when completion is -- completion of a

6   development has occurred?

7   A    It says after completion of if Jetall develops the

8   property.

9   Q    All right.

10  A    Then 180 days after completion and development and sale

11  -- if you'll give me a second, I've got the e-mail, it

12  doesn't say right off the bat, I can read it if you give me

13  a second.

14  Q    All right.  If you go to four lines down, two-thirds of

15  the way across to the right --

16  A    Yes, Jetall.

17  Q    -- where it begins with Jetall.

18  A    Correct.

19  Q    And will you read that sentence, please?

20  A    Correct, Jetall, oh, and there is -- that's what we

21  usually put in.

22       "Jetall Companies, Inc. or its designee."

23          You were asking me earlier -- and that's how we

24  normally write every contract, as Jetall and then we would

25  assign it.  And it says it on paragraph 1.

1  Q    Okay.  Will you go to paragraph 4, line 4, two-thirds

2  across the way from the right, and read the sentence that

3  begins, "Jetall will determine"?

4  A    Yes, sir.

5       "Jetall will determine when completion of the

6       development occurs."

7  Q    Please continue.

8  A    "And the amount of any profits under this paragraph in

9       its sole, absolute and unreviewable discretion, you'll

10      have no right to examine Jetall's books and records to

11      audit these calculations or otherwise to challenge them

12      in the future.  Jetall will owe you no fiduciary duties

13      under this paragraph.  No agents or joint venture or

14      partnership relation is created by this paragraph."

15 Q    Now, sir, you wouldn't sign an agreement like that,

16 would you, one that requires you to accept on faith what

17 you're told regarding profits on a venture?

18 A    Sir, I would, depending on the transaction, and I look

19 at a transaction of what's a good deal or a bad deal.  And

20 we did everything we could to help, and at a mutual benefit,

21 not at a one-sided benefit.  This was a mutual benefit.

22           MR. JOST:  Objection, Your Honor.

23           THE COURT:  You asked him an open-ended question,

24 overruled.

25           THE WITNESS:  And so -- can I -- I'm sorry.

1          THE COURT:  Go ahead.

2   BY MR. JOST:

3   Q    Please continue.

4   A    Okay.  Mr. Khawaja --

5          THE COURT:  All right.  I think you have now

6   answered the question, let's go on.

7          THE WITNESS:  I think the profits were more.

8          THE COURT:  Just a moment.  What's your next

9   question?

10  BY MR. JOST:

11  Q    You were in the courtroom when Judge Isgur was speaking

12  about this agreement to Mr. Sidley, correct?

13  A    No, sir, I was not.

14  Q    Okay.  What security is granted to Khawaja for Jetall's

15  obligations under the letter agreement?

16  A    Our performance, we did what we said we were going to

17  do, and we delivered.

18  Q    Is the obligation secured by a Deed of Trust?

19  A    No, sir.

20  Q    Is it secured by any document?  Is this the only

21  document on this deal, this letter agreement?

22  A    Yes, sir.

23  Q    And what are Jetall's repayment obligations under this

24  agreement, as you understand them?

25  A    My understanding is Omar came to me --

1          THE COURT:  All right.  You need to answer the

2    question, please, what is Jetall's obligations?

3          THE WITNESS:  It's my understanding our

4    obligations are to develop the property, which is what we

5    intend to do, but because we had to move so quickly, there

6    was no time for due diligence, environmental, if there's an

7    environmental issue, if the property is in a historic area,

8    we can't even develop it, what the setbacks are, so we would

9    have to take time and figure that out and we did.  But this

10   deal, I was asked to do this deal instantly, and I did to

11   help the Khawaja Partners.  It's my understanding the

12   obligations are --

13         THE COURT:  Just a moment.  What's your next

14   question?

15   BY MR. JOST:

16   Q    Absolute minimum that Khawaja Partners gets if the

17   property is developed is how much?

18   A    Here it's stated, $750,000.

19   Q    So that's the absolute minimum that Jetall will owe to

20   Khawaja Partners on completion?

21   A    That's the total plus 25 percent of the profits from

22   the development.

23   Q    Well, assuming there are no profits, $750,000 is the

24   absolute minimum that Khawaja Partners would be owed,

25   correct?

1  A     That would be the total they would get, not including

2  the profits, yes, sir.

3  Q     So that $750,000 is the absolute minimum which Khawaja

4  Partners will receive?

5  A     Yes, sir.

6  Q     You have come up with a plan for development of this

7  property?

8  A     Yes, sir.

9  Q     And that is the Avalon Avenue -- I'm sorry, what is

10 your subdivision named?  If you'd look at Exhibit 9 in the

11 white binder, assuming I got it correctly so.

12 A     Avondale Avenue, I believe, right?  There's another

13 street, Avalon, but this is Avondale.

14 Q     Okay.  Who came up with this plan?

15 A     I came up with this plan.

16 Q     What kind of consulting did you avail yourself of in

17 coming up with this plan?

18 A     Consulting?  This is something that I do and something

19 I've been doing and me and Omar went to another one of my

20 projects, we've been building inside the Loop for -- we've

21 built dozens and dozens and dozens of homes and projects.

22 And there's another project I did that I took Omar to, which

23 is a nine single family townhome project in Rice Military,

24 and that's on a 15,000 square foot lot and this is on a --

25              THE COURT:  Repeat your question, Mr. Jost.

1           THE WITNESS:  -- 11,000 square foot lot.

2           THE COURT:  Just a moment.

3           THE WITNESS:  Sorry.

4   BY MR. JOST:

5   Q    What kind of consultants did you use to come up with

6   this plan?  Did you use engineers, did you use architects?

7   A    Sure, yes.  Yeah.  This is by Total Surveyors, and

8   we'll hire a surveyor and they'll replat the property based

9   on what the city will typically allow.  And this is a five

10  single family home development on the 11,000 square foot

11  lot.

12  Q    And how did you determine -- you didn't use an

13  economist as a consultant, correct?

14  A    No, sir.

15  Q    You relied on your own judgment regarding the economics

16  of this project, correct?

17  A    Sure, yes.

18  Q    And the opinion that the subdivision plat is the best

19  way to go is your opinion, rather than the opinion of anyone

20  else, correct?

21  A    This was something that Mr. Khawaja was part of and

22  consulted with the plan, but --

23          THE COURT:  You --

24          THE WITNESS:  -- the opinion is mine as this would

25  be the -- a good development based on my history and my

1   performance in the past.

2   BY MR. JOST:

3   Q    So this was your decision that this was the best way to

4   redevelop this property?

5   A    Yes, I made this decision, yes, sir.

6   Q    And you went -- then you went to the architects and

7   engineers and say, this is my idea, help me make it happen,

8   do this, correct?

9   A    Well, it's the highest -- I'll design the homes, it's

10  the -- that's my passion, that's what I do.  That's correct.

11  But I don't engineer, no, sir.

12  Q    But you do design the homes?

13  A    Yes, sir.

14  Q    And you laid out these lots.

15  A    Yes.  Yes, sir.  And we -- in fact --

16          THE COURT:  What's your next question, please,

17  Mr. Jost?

18  BY MR. JOST:

19  Q    Shortly after Jetall Properties, Inc. acquired the

20  property, a lien for a million dollars in favor of George

21  Lee and Serena Yu was placed on the property, correct?

22  A    Correct.

23  Q    Where did that money go?

24  A    With different projects.  It's -- the property was

25  unencumbered with encumbered properties, some we have

1  unencumbered properties, it goes into different development,

2  different things I'm involved in.

3  Q    Well, again, I'm having trouble with the "we".  This is

4  the only property that Jetall Companies, Inc. owns, correct?

5  A    Correct, yes.

6  Q    So this $1 million, did that reflect a loan that was

7  received in the amount of $1 million?  Does the Deed of

8  Trust reflect an actual loan in the amount of $1 million?

9  A    Yes.

10 Q    From whom?

11 A    George and -- George Lee and Serena Yu.

12 Q    The Deed of Trust is dated -- excuse me while I scroll

13 -- well, it's filed of record on July 17, 2013.  When was

14 this $1 million loan made?

15 A    About that same time.

16 Q    Who are the obligees on the Promissory Note, who has to

17 pay the note?

18 A    Me personally.

19 Q    You personally, is it guaranteed by Jetall Companies,

20 Inc.?

21 A    No, it's guaranteed by me it's my understanding.  Yes,

22 it's guaranteed by me personally.

23 Q    Where did the $1 million go?

24 A    Different projects into --

25 Q    Where did it go first, which bank?

1  A    I cannot recall off hand, but I can get that

2  information.

3  Q    Where do you personally bank?

4         MR. RUZINSKY:  Your Honor?

5         THE COURT:  Yes, Mr. Ruzinsky?

6         MR. RUZINSKY:  May I just ask for the relevance

7  where he personally banks.

8         THE COURT:  Sustained.

9  BY MR. JOST:

10 Q    Where does Jetall Companies, Inc. bank?

11 A    With different banks that we bank with, maybe Capital

12 One would be one of them, I believe is probably where we

13 collect most of our rents.

14 Q    Is this million dollars spent at this point, or is it

15 still in one of the various banks?

16 A    No, sir, it's spent.

17 Q    What was spent it on?

18 A    I couldn't tell you offhand, but it's been spent on

19 different things, there's different projects I have, and

20 different things I do.

21 Q    Any project in particular consume the majority of this

22 $1 million?

23 A    No, not that I can recall or think of, I don't believe

24 so.

25 Q    If you ball parked it for me, how many projects would

1  it have been split up between?

2  A    I couldn't tell you.  I'd have to check.

3  Q    Was any of it spent on the Avondale property?

4  A    Yes, some repairs that were needed and things that were

5  necessary, yes.

6  Q    How much was spent on the Avondale property?

7  A    I'm not sure if the million, but I do know money was

8  spent on Avondale.  I don't know if the million was spent,

9  because the million was secured by another property and this

10 property, so it's not just all on this property by the way.

11 Q    Was the money that was spent on Avondale more than

12 $1,000?

13 A    Yes, sir.

14 Q    Was it more than $10,000?

15 A    Yes, sir.

16 Q    Was it more than $100,000?

17 A    I'm not sure exactly if it's more than a hundred,

18 but --

19 Q    So somewhere between 10 and $100,000?

20 A    I would really have to check, but I would say within --

21 more than likely less than 100,000 was spent on repairs and

22 what not that needed to be done.  And the plan was to

23 demolish the property, but we didn't do that because of this

24 circumstance we're in now.

25          THE COURT:  What's your next question, please?

1      THE WITNESS:  So we improved the property.

2      THE COURT:  Just a moment.

3  BY MR. JOST:

4  Q    Are there receipts for the money that was spent on

5  Avondale?

6  A    Sure.

7  Q    Who would have those receipts?

8  A    My accountant would have those receipts.

9  Q    And who's your accountant?

10 A    We have different people in my accounting department.

11 Q    So they're directly employed by you, you don't use an

12 outside service?

13 A    That's correct.  Well, we do use an outside service as

14 well that periodically will come in and review our

15 accounting.

16 Q    If you could look at Exhibit 10 in the white binder,

17 please.

18 A    Yes, sir.

19 Q    That is a tax statement on property that shows Jetall

20 Companies, Inc. as the owner, and it references a hearing

21 that was to be held last week I believe.  Did Jetall protest

22 the value that was assigned by the Harris County Appraisal

23 District on this property?

24 A    I believe it did, yes.

25 Q    Who testified at the hearing?

1  A     I'm not sure.  We use a company that handles that.

2  Q     So it was a service and it wasn't anybody -- it wasn't

3  you or anyone directly employed by you?

4  A     Correct, yeah.

5  Q     What was the basis of the protest?

6  A     Just as a -- kind of a carte blanc we protest -- we do

7  our best to protest all of the properties and try to get the

8  tax valuations down as much as we can.

9  Q     And what information did you provide to the company to

10 handle the protest?

11 A     I'm not sure.

12 Q     Would you know if it was based on inequitable appraisal

13 or any specific defect?

14 A     I don't understand.

15 Q     Are you aware of any structural defect with the

16 apartment complex?

17 A     Sure, yes.

18 Q     Any serious structural defect that would render it

19 unsafe?

20 A     Unsafe?  We fixed the sidewalk.  I know the foundation

21 has significant settlement and cracks, but we're doing the

22 best we can to get the property in good order.

23 Q     It's a solid building, right?

24 A     I disagree.  It's a teardown and it's always been a

25 teardown.

1  Q    Why is it a teardown?

2  A    As I entered into the transaction.

3  Q    Why do you consider it a teardown?

4  A    It's not a concrete structure, it's a wood structure,

5  there's termites, significant termites.  The building is

6  maybe 50, 60 years old, and for a number of reasons, it's

7  not something that -- it requires a lot to keep it the way

8  it is.

9  Q    So you had an inspection done on the building that

10 shows if it has termite damage?

11 A    Yes.  We had -- I need to say an informal inspection,

12 but we have people we've used at, you know, are

13 superintendents and managed different projects.  And this

14 particular property like many properties of this era are

15 teardowns.

16 Q    Have you personally see termite damage at this place?

17 A    I have.

18 Q    What -- and how many units are in the apartment

19 complex?

20 A    There are 16 units in the apartment complex.

21 Q    And it's -- what percentage are leased at this point?

22 A    I would guess -- I believe 12 and 13 units are leased.

23 Q    Does Jetall Companies, Inc. have money in the bank

24 right now sufficient to build the subdivision that's

25 depicted in 9, Exhibit 9?

1   A     Money in the bank to build?

2   Q     Avondale, I'm sorry, I keep forgetting the name of the

3   subdivision, your five-home subdivision that is your project

4   for this piece of property, is the money there to develop it

5   right now?

6   A     In Jetall Companies, Inc.?  Cash?  Money in Jetall

7   Companies, Inc.?

8   Q     Yes.

9   A     I -- I mean, we have funds in different accounts.  I

10  mean, I have maybe $3 million in my account, but I don't

11  know if that's Jetall or me personally, but we do have the

12  ability and the wherewithal, and all the other homes we've

13  built now, even the ones under construction, every one of

14  them has sold.  And these were also sold before completion,

15  but we lost the buyers.

16  Q     How much would it cost to build this subdivision?

17  A     The approximate cost I can get you the specific cost,

18  but it's about 3,000 square feet per single family home,

19  these are five single family detached homes, in fact, you

20  could build six, but we decided to build five being

21  freestanding, and having a little bit of yard for each one.

22  And the cost with elevators and high end homes in that area,

23  the cost would be -- if I had a calculator, I could tell you

24  a little easier if you --

25             THE COURT:  Would you hand this, please, to

 1  Mr. Choudhri.

 2          THE WITNESS:  Thank you.

 3          THE COURT:  Assuming it's working.

 4          MR. RUZINSKY:  May I hand him a pen and paper,

 5  Your Honor?

 6          THE COURT:  Yes, go ahead.

 7       (Pause in the proceedings.)

 8          THE WITNESS:  Thank you.

 9          Okay.  The cost, the approximate cost would be

10  525,000 per home, there'd be five homes.  In fact, we've

11  already had buyers for all five of them.  And the lot cost,

12  allocated lot cost would be 150,000, so the total cost per

13  unit would be 675,000.  These would be high end homes with

14  elevators, newly appliances, with bell bottom piers, an

15  engineered slab with 2x6 and 22-and-a-half foot ceilings.

16  Total cost would be 675,000.  We would sell the units for

17  799 or more, and the market is -- everything we're building

18  right now is all sold.

19  BY MR. JOST:

20  Q    Do you have -- does Jetall Companies, Inc. have five

21  times $675,000?

22  A    I don't know, I've have to check in our different

23  accounts.

24  Q    Now, you've already said that you used personal money

25  for these projects, correct?

1  A    Yes, sir.

2  Q    So it's your personal money as opposed to entirely

3  Jetall Company, Inc.'s money that would build this project?

4  A    Well, sure, yes.  It -- Jetall Companies, like I was

5  mentioning earlier, whenever we do a contract, and that's

6  how we did it here, and I just noticed that by the way on

7  paragraph 1 of our contract, we'll do Jetall Companies or

8  its designee, and usually they set up a special purpose

9  entity, and that's what supposed to happen in this project,

10  but we've kind of put things on hold.

11  Q    So that's how it's structured, but a substantial

12  portion of the money comes from you personally, correct, to

13  do the development?

14  A    Sure or on my signature, yes, sir.

15  Q    So this project depends to a large degree on you

16  personally having the money to fund it, correct?

17  A    Sure.  And my home building experience and the number

18  of homes we're building today and the number of homes we

19  built in the past, and our track record, yes, sir.

20  Q    You personally are involved in quite a few lawsuits

21  right now, correct?

22  A    With Mr. Osama Latif and we can talk about those

23  lawsuits, I'd like to.  Well --

24        THE COURT:  Just a moment, what's your next

25  question?

1  BY MR. JOST:

2  Q    How many lawsuits are you personally defending right

3  now?

4  A    We have thousands of tenants and millions of square

5  feet --

6           THE COURT:  Answer the question, please?

7           THE WITNESS:  How many lawsuits?  If you allow me,

8  there's the electricity with StarTex which we talked about

9  earlier, which is a building we acquired, and the seller

10  signed an electricity agreement that we weren't aware of.

11  That's a couple of hundred thousand dollar dispute.  To name

12  how many, I'm involved in different lawsuits with Mr. Osama

13  Abdullatif maybe five with him alone.

14           So I would say maybe several, at least five with

15  him.

16  BY MR. JOST:

17  Q    Okay.  Is it a fair estimate to say it's at least ten

18  lawsuits right now that you're defending?

19  A    Probably not ten.

20  Q    More than five, less than ten?

21  A    Yes, sir.

22  Q    Now, the numbers that you gave were costs and expected

23  price on the units, the profit totals less than 750,000 for

24  the entire project, doesn't it?

25  A    Yes, sir.  Yes.

1  Q    So how does Khawaja get their guarantee not to be less

2  $750,000 out of this project?

3  A    Well, when we went through the equation and math on the

4  buildings, we allocated $150,000 per lot and there's five

5  lots, so that's $750,000.

6  Q    So that's your lot cost number?

7  A    750,000.

8  Q    And that --

9  A    Divided by five is 150, which is how we got to the --

10 so 525 is my -- and this is off -- you know, lumber prices

11 are changing -- I mean, our contractors are changing with

12 their pricing and demand and the economy right now, but I

13 think these are pretty accurate.  525 would be the cost of

14 the construction for the home, plus -- now, that number

15 could be vary by $15-20,000, give or take.

16     Then we have 150,000 for the lot, so I took 750,000

17 divided by five, so it's 150,000, and the cost is 675.

18 Q    Okay.  So you're not changing or backing off of the

19 testimony that 750,000 is the absolute minimum that Khawaja

20 will receive assuming development occurs?

21 A    Correct.  Yes, sir, that is correct.  And --

22          THE COURT:  All right.  Next question, please.

23          THE WITNESS:  -- one of the --

24          THE COURT:  Just a moment.

25 BY MR. JOST:

1   Q    Now, in examination earlier today, it was suggested

2   that had Mr. Khawaja, Omar Khawaja requested financial

3   information regarding your or Jetall's ability to perform

4   this deal, to fund this project, it would've been freely

5   handed over.  Did you --

6   A    Sure.

7   Q    And have you freely handed over any information

8   requested by Khawaja regarding your personal finances and

9   regarding Jetall Company, Inc.'s finances?

10  A    Well, let me say this, I'm involved in litigation with

11  Osama Abdullatif, and Mr. Khawaja is involved with him, in

12  fact -- can I finish, please?

13              THE COURT:  No.  Let's just --

14              THE WITNESS:  So to answer --

15              THE COURT:  Just a moment.  Repeat your question

16  and let's keep it to this, and I'll give you only a couple

17  of more questions, Mr. Jost, let's finish up.

18  BY MR. JOST:

19  Q    Had Omar Khawaja requested complete financial

20  information from you since some of the money comes from you,

21  and on Jetall Companies prior to the deal on March 8th,

22  2013, you would've handed it over on the spot, is that what

23  you're saying?

24  A    I'm sure I would've, I don't have a reason, but today I

25  don't know if I --

1        THE COURT:  Just a moment.  All right.  That was

2   the scope of the question.  Anything else, Mr. Jost?

3        MR. JOST:  Your Honor, if I could have just a

4   moment?

5        THE COURT:  Go ahead.

6   BY MR. JOST:

7   Q    Okay.  I asked you about personal litigation.  How many

8   lawsuits does Jetall Companies, Inc., that entity involved

9   in defending?

10  A    I don't know how many, but I would say the lawsuits

11  with Osama, Jetall I believe is involved with.  I would have

12  to look at it, we have thousands of tenants --

13       THE COURT:  All right.

14       THE WITNESS:  -- so I wouldn't --

15       THE COURT:  All right.  Just a moment.  Is that

16  your last question?

17       MR. JOST:  If I could very briefly just run

18  through.

19       THE COURT:  All right.

20  BY MR. JOST:

21  Q    Makhren Latif and the 334 versus Ali and Jetall, that's

22  one of them, correct?

23  A    Yes.

24  Q    Galleria Lodging Associates versus Jetall and you

25  personally in the 55th, that's another?

1  A    Yes.

2  Q    Star Electricity versus Ali Choudhri and Jetall

3  Companies in the 129th is another, correct?

4  A    Yes.

5  Q    McCall Investments versus Jetall in the 164th; that's

6  another?

7  A    Yes.

8  Q    Stacy Smith versus Ali Choudhri --

9  A    Right.

10  Q    -- and others in the 133rd.

11      Osama Abdullatif versus Ali Choudhri, does that have

12  -- that one doesn't have Jetall as a defendant, does it?

13  A    I don't know.  That's my mom and my sister, so I don't

14  know who the defendants even are.  Everybody --

15          THE COURT:  All right.

16  BY MR. JOST:

17  Q    That's the one in Brent Gamble's Court, the 270th, if

18  that helps.  And Makhren Latif versus Jetall and Ali

19  Choudhri in the 190th.

20  A    That's the same one you mentioned earlier.

21  Q    So one of them is -- twice I thought I only had one in

22  the 190th.

23  A    Well, what Osama --

24          THE COURT:  All right.  All right.  Just a moment.

25  Is that the total number of cases that you believe are, and

1   you want to ask Mr. Choudhri about involving Jetall?

2            MR. JOST:  That is all the ones I have to ask

3   about.  I know that there are others.

4            THE COURT:  All right.  All right.  That's enough.

5   Follow-up, let's see, he was called on Cross.

6            Mr. Ruzinsky, do you want to go ahead and proceed

7   with your Direct at this point or do you want to reserve it?

8            MR. RUZINSKY:  No, I would, Your Honor, I'll

9   proceed with my Direct.

10           THE COURT:  Okay.  Go ahead.  Do you want to break

11  for five minutes?  All right.  That's fine.

12           THE CLERK:  All rise.

13       (Recess taken at 3:14 p.m. to 3:33 p.m.)

14           THE COURT:  Be seated, Mr. Choudhri.

15           MR. RUZINSKY:  Thank you, Your Honor.

16           THE COURT:  Uh-huh.

17               DIRECT EXAMINATION OF ALI CHOUDHRI

18  BY MR. RUZINSKY:

19  Q   Mr. Choudhri, I'd like to begin by looking at Exhibit

20  No. 2 in the white book, the white notebook, which is the

21  letter agreement.

22  A   Yes, sir.

23  Q   You were asked questions earlier about some language in

24  numbered paragraph 4, and I think it had to do with the

25  phrase, completion of development.

ALI CHOUDHRI - DIRECT BY MR. JOST                    113

1           Do you see that?

2  A    Yes.

3  Q    And earlier in that numbered paragraph where it talks

4  about you paying -- Jetall paying, let's see, find the

5  language here, yeah, even before the 750, it says

6  "completion of" -- in the second line, "completion of

7  development and sale," right?

8  A    Yes.

9  Q    See that?  And those are two things, one is completion

10 of development and one is sale, right?

11 A    Correct.

12 Q    And you got asked some questions about the imprecise

13 nature or the discretion about when the completion of

14 development occurs.  Do you remember that?

15 A    Yes.

16 Q    Okay.  There was never any doubt when the sale takes

17 place, is there?

18 A    After the completion, yes.

19 Q    Right.  After the completion, right?

20 A    Yes.

21 Q    You had testified earlier about the usual way you do

22 business when property is acquired that you put it into a

23 special purpose entity or an SPE; is that right?

24 A    Yes.

25 Q    Are you opposed to putting this property into an SPE if

1  you were requested to do so?

2  A    No.  I'm not opposed to doing that.

3  Q    Now, you testified a little while ago back on Exhibit

4  No. 2 in the white book, numbered paragraph 4, the $750,000,

5  and I want to make sure that I understood that testimony

6  perfectly clear -- clearly and what you meant.

7       I heard you say -- first of all, I want to focus on two

8  numbers.  In numbered paragraph 1, there's a reference to

9  $100,000 advance.  Do you see that?

10 A    Yes.

11 Q    And numbered paragraph 4, there's a reference to

12 $750,000.

13 A    Yes.

14 Q    Okay.  So it's clear, I want to understand, and like

15 the record to be clear that if you develop and sell the

16 property where it says, Jetall will pay you $750,000 plus

17 the profits participation there, is that $750,000 inclusive

18 or exclusive of the $100,000 advance in numbered paragraph

19 1?

20 A    It's total, 750,000 plus the profits, so the 100 is

21 inclusive of the 750,000.  The 100 is an advance.

22 Q    So the 100 was an advance of the 750?

23 A    Correct.

24 Q    So that when it comes time to pay after development in

25 sale, the actual amount of the check that would go out from

1  Jetall to the Debtor, would be 750 minus the 100 advance?

2  A     Correct, plus the profits.

3  Q     Plus the calculation profits, okay.

4        Why did you include in the letter agreement this

5  Exhibit No. 2 in the white notebook an option to return the

6  property to the Debtor?

7  A     Mainly because I was being asked to do this deal within

8  12 hours, and I had no due diligence on the property.  If

9  there's an environment -- there's a retail center behind the

10 property, and if there's an environmental issue, if the

11 property is in a historic area, if there are issues that the

12 property can't be developed or there's some issue that I am

13 not aware of, and can't be aware of within a matter of

14 hours, then if I choose not to develop the property, then I

15 would provide the property back to the Khawaja Partners and

16 be reimbursed for our out of pocket costs.

17       So if I went down the route of engineering and soil

18 testing, and figure out, wait, there's no way we can build

19 on it, or if it's a historic, because the next block over is

20 historic, and there's just -- there wasn't enough time to

21 make those determinations, so that was an exit for us if

22 there was some issue where we couldn't develop the property.

23 Q     And you decided to develop the property?

24 A     Yes, sir.

25 Q     Now, you were here in the courtroom when Mr. Omar

1  Khawaja testified, correct?

2  A    Yes.

3  Q    Okay.  And you heard him make a number of statements in

4  his testimony about representations that he said that you

5  made to him.  Do you remember that?

6  A    Yes.

7  Q    And I'm going to go through these as best as I can

8  here.  Did you represent to Mr. Omar Khawaja that this

9  transaction and the letter agreement was a loan?

10  A    Never.

11  Q    Did you make a representation to Mr. Omar Khawaja about

12  -- in connection with this letter agreement and transaction

13  that you -- that he could manage the property or the Debtor

14  could manage the property after it was transferred to

15  Jetall?

16  A    No.

17  Q    Did you make a representation to Mr. Khawaja that the

18  Debtor could have the property back any time that they

19  wanted it?

20  A    No.

21  Q    Did you make a representation to Mr. Khawaja that you

22  would hire him at your company?

23  A    No.

24  Q    Are there any outstanding judgments against Jetall

25  Companies, Inc.?

1  A    No.

2           MR. RUZINSKY:  I'll pass the witness, Your Honor.

3           THE COURT:  Response, Mr. Jost?

4           MR. JOST:  Nothing further, Your Honor.

5           THE COURT:  All right.  Mr. Choudhri, from your

6  description, the proposed or the cost of development on say

7  an average out of one of these homes was 525,000 for the

8  home and 150,000 for the property --

9           THE WITNESS:  Yes, ma'am.

10          THE COURT:  -- correct?

11          All right.  So 675 is the cost of the property and

12 you're proposing to sell those for 799,000 or more?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  All right.  So the difference is

15 approximately 125 on that 799 number, 125,000.  If you were

16 to calculate 25 percent of the profits, would the

17 calculation be on 25 percent of $124,000?

18          THE WITNESS:  Yes, ma'am, there would be

19 commissions that would need to be deducted.

20          THE COURT:  A commission?

21          THE WITNESS:  From the sales price.

22          THE COURT:  Okay.  And what were the commissions?

23          THE WITNESS:  Six percent plus 1 percent of

24 closing costs.

25          THE COURT:  And --

ALI CHOUDHRI - DIRECT BY MR. JOST                    118

1              THE WITNESS:  The sales price agreement.

2              THE COURT:  All right.  And that's in addition to

3       the $50,000 fee?  That's stated in number 5?

4              THE WITNESS:  No, ma'am.  No, ma'am.  The $50,000

5       number 5 is that because we did the deal in hours, if later

6       I'd found out a week or a month later, a few weeks later --

7              THE COURT:  Oh, I see.

8              THE WITNESS:  -- that I couldn't develop it, then

9       I would be reimbursed for my out of pocket costs and give

10      them the property which would be a win/win because they

11      would save the property at the end of the day either way.

12             THE COURT:  All right.  So the 6 percent and the 1

13      percent would be the percentage shared by both Jetall and

14      the Khawaja interest --

15             THE WITNESS:  25/75.

16             THE COURT:  All right.  Okay.  Any questions on

17      that, Mr. Jost, anyone?

18             MR. JOST:  No, Your Honor.

19             THE COURT:  Thank you.  You may step down.

20         (Witness steps down.)

21             THE COURT:  Anything further, Mr. Jost?

22             MR. JOST:  No, Your Honor, we rest.

23             THE COURT:  All right.  You rest.

24             Anything further?

25             MR. RUZINSKY:  No, Your Honor.

1        THE COURT:  All right, fine.  Let me have you wrap

2   up then, Mr. Jost?

3                    CLOSING STATEMENT

4        MR. JOST:  Your Honor, again what we're hoping to

5   accomplish here is to protect the property because we seem

6   destined to fight about it, and destined to fight about what

7   should be done with it, and who's going to do it.  We are

8   concerned about the -- for whatever reason, the potential

9   liabilities that are out there against Mr. Choudhri, whether

10  rightly or wrongfully, they put a significant risk on this

11  transaction because his funding is integral to it, and the

12  fact that Jetall Companies, Inc. is in a number of lawsuits

13  again without regard to the merits is a substantial risk.

14  And we are worried about having this property out there in

15  the name of Jetall, and what could happen to it under these

16  circumstances.

17        We are seeking to preserve what we've got, to hold

18  what we have, and we've requested injunctive relief for that

19  purpose.  And in the alternative, for a receiver to take

20  custody of it on behalf of the Court, and thank you, Your

21  Honor, for your time.

22        THE COURT:  All right.  Mr. Ruzinsky?

23                    CLOSING STATEMENT

24        MR. RUZINSKY:  Your Honor, if the concern is the

25  property being held in the name of Jetall Companies, Inc., I

1   could put it into a special purpose entity and get rid of

2   that concern.  Jetall has -- there's been too much fighting

3   in here, there's been too little economic effort to put into

4   the property and get it done.  He's got a plan that makes

5   sense to me.  The sooner he can do it, the sooner this

6   property can be monetized for everybody's benefit.

7          There's been no showing here today about

8   mismanagement about the property not being kept up.  I think

9   the testimony has been just the opposite.  There's just been

10  no showing of any basis for injunctive relief, no showing on

11  the -- for the remedy of the receiver, and in fact, 105 has

12  been cited as the basis for the receiver, and I think

13  there's a provision in 105 which specifically says, don't

14  appoint a receiver.  So I think they fail to meet the

15  burden, and we ask the Court to let us proceed to monetize

16  this property for everybody's benefit.  Thank you.

17          THE COURT:  All right.  Thank you.  I have

18  reviewed the evidence, admitted evidence and heard the

19  testimony of the witnesses, and I'm going to deny the

20  preliminary injunction.  I do direct the parties to reach

21  some agreement on the special purpose entity, which would be

22  the holder of this collateral pursuant to the letter

23  agreement and obligated on the letter agreement, along with

24  Mr. Choudhri.  And the case should go forward.

25          I am issuing the recommendation again that the

1  case be removed in view of the issues with regards to the

2  jury trial and the other parties and the state law causes of

3  action involved in the case.

4          So that will go out as soon as I've signed the

5  denial of preliminary injunction, and can you get me an

6  order, please?

7          MR. RUZINSKY:  I will, Your Honor.  Thank you.

8          THE COURT:  Mr. Jost?

9          MR. JOST:  A question.

10         THE COURT:  Right.

11         MR. JOST:  With the Deed of Trust lien on there,

12 I'm sure it's got a do on transfer clause and $1 million

13 lien, is this property going into the special --

14         THE COURT:  Mr. Chaumette?

15         MR. CHAUMETTE:  I get to say something?

16         THE COURT:  Yes, you do.  You do.

17                        CLOSING STATEMENT

18         MR. CHAUMETTE:  On behalf of Mr. Lee and Ms. Yu,

19 we will work with the parties to make sure that whatever

20 impediments exist in the Deed of Trust will be ameliorated

21 when we -- within the special purposes.

22         THE COURT:  Fine.  All right.

23         MR. RUZINSKY:  Thank you.

24         THE COURT:  All right.  Thank you, that's all,

25 you're excused.

1          THE CLERK:  All rise.

2       (Proceedings concluded at 3:47 p.m.)

3                    * * * * *

4          *I certify that the foregoing is a correct*

5   *transcript to the best of my ability from the electronic*

6   *sound recording of the proceedings in the above-entitled*

7   *matter.*

8   */S/ MARY D. HENRY*

9   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

10  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337*

11  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

12  *JTT INVOICE #53276*

13  *DATE:  NOVEMBER 18, 2014*

14

15

16

17

18

19

20

21

22

23

24

25